# EXHIBIT 'A'

## SETTLEMENT AND REDEMPTION AGREEMENT

THIS SETTLEMENT AND REDEMPTION AGREEMENT (this "**Agreement**") is entered into as of December 21, 2015 by and among FOODONICS INTERNATIONAL, INC., a Florida corporation (the "**Company**"); K. JACQUES KLEMPF, an individual ("**Jacques**"); LAURA JEAN KLEMPF ("**Jean**"), individually; LAURA JEAN KLEMPF, in her capacity as Trustee of, and on behalf of, the LAURA JEAN KLEMPF REVOCABLE TRUST dated April 1, 1992, as Amended (the "**Seller**"); JACQUES and JEAN as Trustees of the Family Trust under the Edward Klempf Revocable Trust Agreement dated April 1, 1992 (the "**Family Trust**"); DINA KLEMPF SROCHI, an individual ("**Dina**"); and MARC E. KLEMPF, an individual ("**Marc**"). Jean, Dina and Marc shall sometimes be collectively referred to herein as the "**5K Sellers**." The Company and Jacques shall sometimes collectively be referred to herein as the "**Foodonics Parties**." Jean and Jacques in their capacities as Co-Trustees of the Family Trust are sometimes referred to herein as the "**Family Trust Trustees**." Jacques, Marc and Dina are sometimes collectively referred to as the "**Policy Owners**." The Foodonics Parties, the 5K Sellers, the Family Trust Trustees and the Seller shall sometimes be referred to herein as the "**Parties**," and each, a "**Party**".

### Background Recitals

A. Jean is the mother of Jacques, Marc and Dina. The Company was begun by Jean's husband, and the children's father, Edward Klempf. Following his death on October 18, 2002, Jean and Jacques became the primary shareholders of the Company. In 2006, various of the Parties and some third parties to this Agreement entered into a number of transactions, including the execution of a shareholder agreement among the Company's shareholders (the "**2006 S/H Agreement**"). The 2006 S/H Agreement restricts Jean's ability to sell her shares of Company stock, and requires that at her death, her estate must sell her shares of Company stock to Jacques for consideration computed by a formula, with the purchase price to be paid over an eight year period. That formula price is based in part on an appraisal of the Company's shares of stock conducted by Sheldrick, McGehee & Kohler of Jacksonville, Florida ("**SMK**").

Disputes have arisen concerning the corporate governance of the Company, the lack of distributions to shareholders, over and above income tax distributions, and related matters (collectively, "Disputed Matters"). As a result Jean has threatened to file a lawsuit concerning those Disputed Matters and has incurred significant legal and accounting expenses in investigating and asserting those claims. Recognizing the legal and accounting fees the Parties have already incurred and that litigation would be very costly and disruptive, and desiring to avoid further family conflict, and expensive legal fees, the Parties desire to resolve the Disputed Matters. This Agreement affords the Parties the opportunity to accomplish these aims as well as allowing them to separate completely their joint business interests.

After extensive, protracted and costly adversarial negotiations that have occurred for more than two (2) years among the Parties and their legal, accounting and tax

1

advisors, the Parties are now motivated, in part, to enter into this Agreement to secure for Jean and her eventual beneficiaries, the adequate and full consideration for her shares of Company stock based upon an appraisal fairly conducted according to usual and customary valuation practices.

B. The Seller owns 1,591,177 of the Company's issued and outstanding Class A Voting Shares (collectively referred to as the "**Class A Shares**").

C. The Seller owns 1,387,431 of the Company's issued and outstanding Class B Non-Voting Shares (collectively referred to as the "**Class B Shares**"). (The Seller's Class A Shares and the Seller's Class B Shares are sometimes referred to herein collectively as the "**Seller's Shares**").

D. The Seller and Jacques each own a one-half undivided interest in that certain real property located at 5139 Edgewood Court, Jacksonville, Florida 32254 (the "**Edgewood Court Property**").

E. Jean owns an undivided forty percent (40%) interest ("**Jean's 5K Interest**") as a partner in 5K's General Partnership ("**5K Partnership**").

F. Marc owns an undivided twenty percent (20%) interest ("**Marc's 5K Interest**") as a partner in 5K Partnership.

G. Dina owns an undivided twenty percent (20%) interest ("**Dina's 5K Interest**") as a partner in 5K Partnership.

H. The sole material asset of 5K Partnership is a parcel of real property owned by the 5K Sellers and Jacques. That real property is more particularly described as set forth on Exhibit A attached hereto (the "**5K Property**").

I. The Company owes the Family Trust $489,207.29 as of December 31, 2015, pursuant to that certain Promissory Note dated June 30, 2006 (the "**2006 Promissory Note**"), which indebtedness is secured, pursuant to that certain Stock Pledge Agreement of even date therewith (the "**2006 Stock Pledge**"), by a pledge of 422,033 shares of Class A Voting Common Stock, par value $0.003, and a pledge of 402,539 shares of Class B Non-Voting Common Stock, par value $0.003. Collectively, the 2006 Promissory Note and the 2006 Stock Pledge are referred to as the "**2006 Documents**".

J. The Seller, as a shareholder of the Company, on behalf of Jean individually, have threatened litigation against the Foodonics Parties concerning the Disputed Matters. This Agreement is intended, among other things, to settle absolutely and forever all known and unknown bases for such threatened litigation.

K. The Policy Owners own that certain life insurance policy issued by Massachusetts Mutual Life Insurance Company or its affiliate (the "**Insurance Company**"), policy number 15,587,790, with a specified face amount of Two Million

Dollars ($2,000,000), together with internal fund value and cash surrender value (the "**Insurance Policy**").

L.    SMK has performed an appraisal of the Seller's Shares, as set forth in a valuation report dated December, 2015 (the "**2015 SMK Valuation Report**"). Moody Appraisal Group has performed an appraisal of (i) the 5Ks Seller's interests in the 5K Property, and (ii) Jean's interest in the Edgewood Court Property dated October, 2015 (the "**Moody Appraisals**"). These appraisals have been used to determine adequate and full consideration and to allocate the purchase price in Section 8 below.

M.    The Parties desire to accomplish the following transactions, on terms as more specifically described within this Agreement:

1.    In full and complete settlement of all threatened litigation, the Company desires to redeem from the Seller, and Seller desires to have redeemed, all of the Seller's Shares (the "**Stock Redemption**");

2.    The 5K Sellers desire to sell to Jacques, and Jacques desires to acquire from the 5K Sellers, all of the 5K Sellers' respective interests in 5K Partnership and the 5K Property;

3.    Jean desires to sell to Jacques, and Jacques desires to acquire from Jean, all of her interest in the Edgewood Court Property;

4.    Jean, Jacques, Marc and Dina as beneficiaries of the Family Trust, and the Family Trust Trustees, desire to terminate and distribute the corpus of the Family Trust for the benefit of Jean (as to the value of her income interest), and the remainder to Jacques, Marc and Dina equally.

5.    Jacques, Marc and Dina desire to create a new partnership whereby the Insurance Policy will be held by the partnership, the terms of which will allow one or more of the Policy Owners to contribute funds to the partnership from time to time, and to provide for the repayment of those contributions upon the event of Jean's death, the liquidation of the partnership at that time, and the disbursement of the partnership's remaining assets to the partners;

6.    The Company and Jean wish to provide for the payment of income taxes attributable to the taxable income of the Company for any period of time in which the Seller was an owner of the Company; and

7.    On the various terms and conditions set forth below, the Parties desire to settle any legal claims or disputes, including without limitation the Disputed Matters, that they may have against each other concerning the Company, its shares of stock, outstanding promissory notes, the Edgewood Court Property, the 5Ks Property, and the threatened litigation.

NOW THEREFORE, in consideration of the mutual agreements contained herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties do hereby agree as follows:

1. **Incorporation of Background Recitals.** The foregoing background recitals are true and correct and are hereby incorporated as part of this Agreement.

2. **Redemption of Seller's Shares.** At Closing (as defined in Section 9 below), the Seller shall sell, assign, transfer, convey, and deliver to the Company all of the Seller's rights, title and interest in and to the Seller's Shares and all of Seller's rights as a stockholder of the Company in exchange for the payment to Seller of the Redemption Purchase Price, as defined in Section 7 below. Following the Closing, the Seller will no longer have any ownership or equity interest in the Company, and will not participate in or receive any subsequent distributions of the Company.

3. **Sale of 5K Interests.** At Closing, Jean, Dina and Marc shall sell, assign and convey to Jacques, their 5K Partnerhip interests and their interests in the 5K Property by Special Warranty Deed (in the form attached as Exhibit B) in exchange for the 5K Purchase Price as set forth in Section 8 below.

4. **Edgewood Court Property.** At Closing, Seller shall sell, assign and convey to the Company by Special Warranty Deed (in the form attached as Exhibit C), Seller's interest in the Edgewood Court Property in exchange for the Edgewood Court Purchase Price as set forth in Section 8 below.

5. **Life Insurance Policy.** The Policy Owners will form the Klempf Family, LLC (the "**Insurance Partnership**") and enter into an operating agreement substantially in the form of Exhibit D, and execute such assignments, change of ownership forms, and change of beneficiary documents at Closing and thereafter, as are required or requested by the insurer to transfer ownership of the Insurance Policy to the Insurance Partnership, and to cause the beneficiary of the Insurance Policy to be the Insurance Partnership.

6. **Family Trust.** The Family Trust Trustees, together with Jacques, Jean, Marc and Dina, will take all steps reasonably necessary to terminate and distribute the corpus of the Family Trust to Jean to the extent of her income interest, and the remainder to Jacques, Dina and Marc immediately following the Closing.

7. **Mutual Releases.**

    (a) As partial consideration for payment of the aggregate Purchase Price by the Foodonics Parties to the Seller and the 5K Sellers as described in Section 8 below, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, each of the Seller, each 5K Seller, the Family Trust Trustees, as well as Jean both individually and in her capacity as trustee of any trust under the Edward Klempf Revocable Trust dated April 1, 1982 (collectively, the "**Releasing Parties**"), effective as of the Closing Date hereby release and waive any and all claims, causes of action, suits, rights or

4

damages each has or may have, and represents, warrants and agrees that it has no colorable claims against, any of the Foodonics Parties or any of their affiliates, including any arising under the 2006 Documents, except:

    (i)    with respect to any rights and obligations under that certain Agreement Regarding Condominium Use between the Company, Jacques, Dina and Mark dated in September 2006 (the "**Condo Agreement**") pertaining to condominium Unit 615, located at Surf Villas Condominiums, 615 Summer Place, Ponte Vedra Beach, Florida 32082, including without limitation the purchase option set forth in the Condo Agreement; and

    (ii)    the rights and obligations of the parties set forth in this Agreement and related documents.

    (iii)    the rights and obligations under the 2006 Documents as modified in accordance with this Agreement.

Without limiting the foregoing, each of the Releasing Parties hereby forever waives, releases and terminates, and shall treat as fully performed, all agreements, obligations and understandings each may have with Jacques or the Company not specifically set forth in this Agreement or in the Condo Agreement.

    (b)    For good and valuable consideration, the Seller, Jean and the Family Trust Trustees (i) hereby waive and release the Company and all other Parties from any default or breach which may otherwise occur under the 2006 Documents as a result of the transactions contemplated by this Agreement as a "Change in Control Transaction," as such term is referred to in the 2006 Documents, and (ii) hereby represent, warrant and agree that no such breach or default exists, and no set of facts exist that would, with the passage of time or otherwise, constitute a default, under the 2006 Documents, and (iii) agree that the 2006 Documents are hereby deemed terminated to permit the transactions contemplated hereby.

    (c)    For good and valuable consideration, the Foodonics Parties hereby release Jean in her individual capacity or any other capacity, from any and all claims, causes of action, suits, rights or damages that the Foodonics Parties have or may have against her, and each of the Foodonics Parties represents, warrants and agrees that it has no coloarable claims against Jean, except the rights and obligations of the parties set forth in this Agreement and related transactions. Without limiting the foregoing, each of the Foodonics Parties waives, releases and terminates, and shall treat as fully performed, all agreements and understandings each may have with Jean not specifically set forth in this Agreement.

8. **Purchase Price and Financial Transactions.** The various amounts to be paid by the Company and Jacques in connection with this Agreement are referred to as the "**Purchase Price**" and are set forth below:

(a) The consideration to be paid by the Company to Seller in connection with the Stock Redemption (the "**Redemption Purchase Price**") shall be the sum of Nine Million Four Hundred Eighteen Thousand Five Hundred Dollars ($9,418,500), which shall to be paid by the Company by wire transfer at the Closing.

(b) The Company shall transfer to Jean, ownership of the two (2) Lexis vehicles that are and have long been in Jean's possession or control (the "**Vehicles**") (or such other person that Jean directs in writing prior to the Closing) which Vehicles are described as:

| Year: | VIN: |
|---|---|
| 2002 Lexus | JTHBF30G820052757 |
| 2004 Lexus | JTHBN36F240138974 |

The Company shall be responsible for sales tax and transfer costs associated with the transfer of the Vehicles. The agreed value for the Vehicles stated above shall be reflected in any bill of sale or other transfer documents regarding the Vehicles.

(c) The Company shall pay the balance of the 2006 Promissory Note to the Family Trust by delivery of the sum of Four-hundred eighty-nine thousand two hundred seven dollars and twenty-nine cents ($489,207.29) at Closing by wire transfer.

(d) The consideration to be paid by Jacques to Jean for her interest in the Edgewood Court Property shall be the sum of Two Hundred Twenty-One Thousand Five Hundred Dollars ($221,500) ("**Edgewood Court Purchase Price**"), payable at Closing by wire transfer.

(e) The consideration to be paid by Jacques to the 5K Sellers for their interests in 5K Partnership and the 5K Property shall be the sum of Three Hundred Sixty Thousand Dollars ($360,000) ("**5K Purchase Price**"), payable at Closing in cash or immediately available funds to be paid against delivery of the assignment of the interests of the 5K Seller's in 5K Partnership and the conveyance of their interests in the 5K Property. The 5K Purchase Price shall be allocated $180,000.00 to Jean, $90,000 to Marc, and $90,000 to Dina.

(f) From the proceeds of the 5K Purchase Price allocated to Dina, the sum of $12,500 shall be withheld and delivered to the Insurance Company for premium payments she has failed to make.

6

9. **Transactions to be Effected at Closing.**

(a) Subject to the terms and conditions of this Agreement, the consummation of the transactions contemplated by this Agreement (the "**Closing**") shall take place at the offices of GrayRobinson, P.A., 50 North Laura Street, Suite 1100, Jacksonville, Florida 32202, at 10:00 a.m. on December 15, 2015, or at such other time, date or place as the Parties may mutually agree upon in writing. The date on which the Closing is to occur is herein referred to as the "**Closing Date.**"

(b) At the Closing, Seller shall deliver the following to Company:

(i) Stock powers duly endorsed by Seller transferring Seller's Shares to the Company;

(ii) Duly executed resignations of Jean and all designees of the Seller on the Board of Directors of the Company and as an officer of the Company;

(iii) One or more duly executed written amendments to the Foodonics International, Inc. Shareholders Agreement dated September 15, 2006, in form and substance acceptable to the Company excepting the Stock Redemption and related transactions described herein from the restrictions of the Shareholders Agreement (the "**Shareholders Agreement Amendment**");

(iv) Instructions to the escrow agent holding the original stock certificates in connection with the 2006 Documents to the Company; and

(v) Such other documents as the Foodonics Parties or their counsel may reasonably request to effect the transactions described in this Agreement.

(c) At the Closing, the Foodonics Parties shall do the following:

(i) Pay the Redemption Purchase Price to Seller;

(ii) Pay the Edgewood Court Property Purchase Price to Jean;

(iii) Pay the 5K Purchase Price to Jean, Dina and Marc in the amounts set forth on paragraph 8(f) above, withholding $12,500 from Dina's portion, which amounts will instead be forwarded to the Insurance Company as set forth in Sections 8(f) above;

(iv) Deliver the duly executed certificates of title and general bill of sale to transfer ownership of the Vehicles to Jean;

7

(v)     Deliver the $489,207.29 balance of the 2006 Promissory Note to the Family Trust Trustees; and

(vi)    Deliver such other documents as the Seller or Seller's counsel may reasonably request to effect the transactions described in this Agreement.

(d)    At the Closing, Jean and the 5K Sellers shall deliver or cause to be delivered to Jacques the following:

(i)     Duly executed Assignment Separate From Certificate in form and substance acceptable to Jacques, assigning each of the 5K Sellers' interests in the 5K Partnership to Jacques;

(ii)    Duly executed special warranty deeds in form and substance acceptable to Jacques, conveying each of the 5K Sellers' ownership interest in the 5K Property to Jacques; and

(iii)   Duly executed special warranty deed in form and substance acceptable to Jacques, conveying Jean's ownership interest in the Edgewood Court Property to Jacques.

(e)    At the Closing, the Family Trust Trustees shall deliver or cause to be delivered to the Company, the following:

(i)     Original 2006 Promissory Note.

(ii)    Such other documents reasonably requested by the Foodonics Parties to evidence the full and complete payment of the 2006 Promissory Note and the release of any collateral associated with the 2006 Stock Pledge, and the satisfaction and performance by the Company of all conditions and requirements contained in the 2006 Documents.

10.    **Representations and Warranties.**

(a)    **From Jean and the Seller.** Jean and the Seller, jointly and severally, represent and warrant to the Foodonics Parties that the statements in this Section 10(a) are correct and complete as of the date of this Agreement and will be correct and complete as of the Closing Date (as though made then and as though the Closing Date were substituted for the date of this Agreement throughout this Section 10(a)):

(i)     Seller is the record and beneficial owner of, and has good and marketable title to, the Seller's Shares, free and clear of any liens, encumbrances, restrictions on transfer or claims (with the exception of any restrictions on transfer set forth in the Foodonics International, Inc. Shareholders Agreement dated September 15, 2006, which shareholders agreement is being amended pursuant to the Shareholders Agreement

8

Amendment to remove all such restrictions), and shall convey such good and marketable title to the Seller's Shares at the Closing. The Seller's Shares constitute all of the Seller's ownership interest in the Company. Prior to the date of this Agreement, all shares of stock in the Company formerly owned by the Edward Klempf Marital Trust have been assigned to Seller, and those shares are being completely redeemed as a portion of Seller's Shares hereunder.

(ii) The execution, delivery and performance of this Agreement and the other documents and agreements contemplated hereby, and the consummation of the transactions contemplated hereby and thereby, will not result in any violation on the part of the Seller or be in conflict with, or constitute (with or without the passage of time and giving of notice) a default on the part of the Seller under: (i) any material contract, agreement, mortgage, note, bond, indenture or lease to which Seller is a party; or (ii) any law, rule, regulation, instrument, contract, judgment, order, writ, or decree to which the Seller is a party or by which the Seller's Shares are bound; or (iii) result in the acceleration of any indebtedness or in the creation of any encumbrance upon Seller's assets.

(iii) The Seller has the right, power, and authority to enter into and perform Seller's obligations under this Agreement and the other documents and agreements contemplated hereby. The Seller has duly executed and delivered this Agreement, and this Agreement is, and each of such other documents and agreements contemplated hereby when executed will be, a valid and binding agreement of the Seller, enforceable against the Seller in accordance with its terms, except as such enforcement may be subject to bankruptcy, insolvency, reorganization, moratorium, or other similar laws now or hereafter in effect relating to creditor's rights and general principles of equity.

(iv) Jean will take over responsibility for paying her Medicare supplement health insurance following the Closing Date.

(b) **From the Foodonics Parties.** The Foodonics Parties hereby jointly and severally represent and warrant to the Seller and the 5K Sellers that the statements in this Section 10(b) are correct and complete as of the date of this Agreement (except as expressly noted herein) and will be correct and complete as of the Closing Date (as though made then and as though the Closing Date were substituted for the date of this Agreement throughout this Section 10(b)):

(i) The execution, delivery and performance of this Agreement and the other documents and agreements contemplated hereby, and the consummation of the transactions contemplated hereby and thereby, will not result in any violation on the part of any of the Foodonics Parties or be in conflict with, or constitute (with or without the passage of time and

9

giving of notice) a default on the part of any of the Foodonics Parties under: (i) the organizational documents of such Foodonics Party; (ii) any material contract, agreement, mortgage, note, bond, indenture or lease to which such Foodonics Party is a party; or (iii) any law, rule, regulation, instrument, contract, judgment, order, writ, or decree to which any of the Foodonics Parties is a party, or (iv) result in the acceleration of any indebtedness or in the creation of any encumbrance upon such Foodonics Party's assets.

(ii)    Each of the Foodonics Parties has the right, power, and authority to enter into and perform its obligations under this Agreement and the other documents and agreements contemplated hereby. Each of the Foodonics Parties has duly authorized, executed and delivered this Agreement, and this Agreement is, and each of such other documents and agreements contemplated hereby when executed will be, a valid and binding agreement of each of the Foodonics Parties, enforceable against each of the Foodonics Parties in accordance with its terms, except as such enforcement may be subject to bankruptcy, insolvency, reorganization, moratorium, or other similar laws now or hereafter in effect relating to creditor's rights and general principles of equity.

(iii)    The Foodonics Parties hereby jointly and severally represent and warrant to the Seller that as of the Closing Date: (i) there are no current offers pending nor ongoing discussions: (A) for the sale of all or substantially all of the assets of the Company; (B) for the sale by Jacques of his stock in the Company or (C) to effect a merger, stock exchange or other transaction which would have the effect of either Jacques no longer holding a majority of the outstanding shares of stock of the Company or the Company no longer owning substantially all of the assets that it currently owns (collectively referred to as a "Realization Event"); (ii) the Foodonics Parties have not received any written offers to effect a Realization Event within the twelve (12) months prior to the date of this Agreement.

(c)    **From the 5K Sellers.** Each of the 5K Sellers, severally and solely as to themselves, represent and warrant to the Foodonics Parties that the statements in this Section 10(c) are correct and complete as of the date of this Agreement and will be correct and complete as of the Closing Date (as though made then and as though the Closing Date were substituted for the date of this Agreement throughout this Section 10(c)):

(i)    Each 5K Seller is the record and beneficial owner of their respective interest in 5K Partnership, free and clear of any liens, encumbrances, restrictions on transfer or claims, and shall convey all ownership rights and entitlements associated with that interest to Jacques at Closing. Jean's 5K Interest, Dina's 5K Interest and Marc's 5K Interest collectively constitute all of the 5K Sellers' ownership interests in 5K

10

Partnership. Following Closing, Jacques will own 100% of the interests in the 5K Partnership and in the 5K Property. The 5K Sellers are not owed any amounts, and have received all amounts due with respect to the 5K Partnership and 5K Property.

(ii)   The execution, delivery and performance of this Agreement and the other documents and agreements contemplated hereby, and the consummation of the transactions contemplated hereby and thereby, will not result in any violation on the part of the 5K Sellers or be in conflict with, or constitute (with or without the passage of time and giving of notice) a default on the part of any 5K Seller under: (i) any material contract, agreement, mortgage, note, bond, indenture or lease to which such 5K Seller is a party; or (ii) any law, rule, regulation, instrument, contract, judgment, order, writ, or decree to which any of the 5K Sellers are a party or by which the 5K Sellers' membership interests are bound; or (iii) result in the acceleration of any indebtedness or in the creation of any encumbrance upon the 5K Sellers' assets. By execution of the documents described in this Agreement, the Parties are deemed to have waived any restrictions on transfer or other provisions related to such transfer that might otherwise exist or apply under the agreement of general partnership or any other organizational document applicable to 5K Partnership.

(iii)   The 5K Sellers have the absolute and unrestricted right, power, and authority to enter into and perform the 5K Sellers' obligations under this Agreement and the other documents and agreements contemplated hereby. The 5K Sellers have duly executed and delivered this Agreement, and this Agreement is, and each of such other documents and agreements contemplated hereby when executed will be, a valid and binding agreement of the 5K Sellers, enforceable against the 5K Sellers in accordance with its terms, except as such enforcement may be subject to bankruptcy, insolvency, reorganization, moratorium, or other similar laws now or hereafter in effect relating to creditor's rights and general principles of equity.

(d)   **From the Policy Owners.** Each of the Policy Owners represents and warrants to the other Policy Owners that the following statements are true and correct as of the Closing Date:

(i)   Jacques and Marc have paid one-third of all premium payments due under the Insurance Policy. After payment of the amounts described in Section 8(f) above, Dina will have paid one-third of all premium payments under the Insurance Policy as well. Upon transfer of the Insurance Policy to the Partnership, each of the Policy Owners will have an equal basis in the Insurance Policy.

11

(ii)    The Policy Owners will take all steps necessary to vest ownership of the Insurance Policy in, and to provide that the beneficiary of the Insurance Policy is, the Insurance Partnership.

11.  **Indemnification.**

(a)  **Survival of Representations, Warranties and Covenants.**  The respective representations, warranties and covenants of the Parties contained in this Agreement shall survive the consummation of the transactions contemplated hereby.

(b)  **Indemnification by Seller.**  Seller shall indemnify the Foodonics Parties against and hold them harmless from all damages, losses, expenses, claims, demands, suits, causes of action, proceedings, judgments and liabilities, including reasonable attorneys' fees and court costs (collectively, "**Indemnified Damages**"), assessed, incurred, threatened, alleged or sustained by or against the Foodonics Parties with respect to or arising out of (i) the failure of any representation or warranty made by Seller in this Agreement to be true and correct in all material respects as of the date of this Agreement and as of the Closing Date, (ii) the failure of Seller to fulfill any of Seller's covenants or agreements hereunder.

(c)  **Indemnification by Foodonics Parties.**  Each of the Foodonics Parties, jointly and severally, shall indemnify Seller against and hold Seller harmless from all Indemnified Damages, assessed, incurred, threatened, alleged or sustained by or against Seller with respect to or arising out of (i) the failure of any representation or warranty made by a Foodonics Party in this Agreement to be true and correct in all material respects as of the date of this Agreement and as of the Closing Date and (ii) the failure of a Foodonics Party to fulfill any of its covenants or agreements set forth in this Agreement or the documents contemplated hereunder.  In the event the Internal Revenue Service audits the Company for any period that results in an increase in the amount of taxable income of the Company for any taxable year ending on or prior to the Closing, the Company shall indemnify Seller for all additional income taxes (including interest and penalties thereon) owed by Seller and resulting from such increase. Furthermore, the Foodonics Parties will satisfy, and indemnify the 5K Sellers for any obligations arising in connection with the BB&T Loan secured by the 5K Property.

(d)  **Indemnification by the 5K Sellers.**  Each of the 5K Sellers, severally, shall indemnify Jacques against and hold Jacques harmless from all Indemnified Damages, assessed, incurred, threatened, alleged or sustained by or against any of the Foodonics Parties with respect to or arising out of (i) the failure of any representation or warranty made by a 5K Seller in this Agreement to be true and correct in all material respects as of the date of this Agreement and as of the Closing Date; (ii) the failure of a 5K Seller to fulfill any of its covenants or agreements set forth in this Agreement or the documents

contemplated hereunder; and (iii) any Indemnified Damages to the extent the same relates to a period of time or action or inaction prior to the Closing Date.

(e)  **Notice.** Each Party hereto shall give the indemnifying party prompt written notice of any claim, assertion, event or proceeding by or in respect of a third Party of which it has knowledge concerning any liability or damage as to which it may request indemnification hereunder. The Party providing indemnification shall have the obligation, if requested by the indemnified Party, at all times to defend any such claim or proceeding, including advancement of any costs of defense.

(f)  **Time for Payment.** All indemnification payments required to be made pursuant to this Article shall be made promptly after demand for payment has been made by the indemnified Party upon the indemnifying Party.

12.  **Taxes.**

(a)  **S Corporation.** Upon the Closing, the Foodonics Parties and the Seller agree to elect to allocate the taxable income of the Company for the taxable year ending December 31, 2015, as if the taxable year consisted of two (2) taxable years, as provided in Section 1377(a)(2) of the Code.

(b)  **Income Taxes.** The Company shall distribute to Seller or pay to the Internal Revenue Service on behalf of Seller an amount (the "**Distribution Amount**") equal to the income tax liability of Seller for the year ending on the Closing Date, in the same manner as made for prior periods. The Distribution Amount payable to or on behalf of Seller under this Section 12(b) are in addition to the amounts payable to Seller pursuant to Section 8(a) of this Agreement. The Company shall pay the Distribution Amount in a timely manner consistent with prior years to avoid assessment of penalties or interest against the Seller for underpayment of estimated income taxes for her 2015 tax year. Other than as expressly set forth in this Section 12(b), the Parties shall each be responsible for reporting and paying his, her or its income taxes.

13.  **Assignment.** Each of the Parties hereby agrees that it will not assign any of its rights or interests under this Agreement or any related documents referred to herein to any other person or entity without the prior written consent of all of the other Parties.

14.  **No Actions Inconsistent.** Each of the Parties hereby agrees that it will take no action that is inconsistent with any of the provisions or requirements of this Agreement.

15.  **Expenses.** Each party shall bear and pay its own costs and expenses (including without limitation legal fees and expenses incurred by Seller) incurred in connection with the preparation and negotiation of this Agreement and in connection with the transactions and other documents contemplated hereby. In the event of any litigation to construe or enforce this Agreement (or the agreements contemplated

13

*LJK*

herein), the prevailing Party shall be entitled to recover the prevailing Party's reasonable attorney's fees and costs from the non-prevailing Party, whether at trial or on appeal.

16. **Miscellaneous.**

(a) Each of the Parties hereby agrees to execute such other documents and perform such other acts as may be necessary or desirable to effectuate the intent of this Agreement. Without limiting the foregoing, Jean and Seller shall sign any cancellation of the 2006 Note and any stock certificate representing any of the Seller's Shares or any shares serving as collateral for the 2006 Documents.

(b) This Agreement shall be governed by and construed in accordance with the laws of the State of Florida (without giving effect to the choice of law rules thereof), and shall be binding upon and inure to the benefit of the Parties.

(c) Any legal action, suit or proceeding in equity or law arising out of or relating to this Agreement, shall be instituted in any state or federal court in Duval County, Florida, and each Party agrees not to assert, by way of motion, as a defense, or otherwise, in any such action, suit or proceeding, any claim that such Party is not subject to the jurisdiction of such court, that its property is exempt or immune from attachment or execution, that the action, suit or proceeding is brought in an inconvenient forum, that the venue of the action, suit or proceeding is improper, or that its Agreement or the subject matter hereof may not be enforced in or by such court. Each Party further irrevocably submits to the jurisdiction of any such court in any such action, suit or proceeding.

(d) This Agreement and the other writings referred to herein contain the entire understanding of the Parties with respect to its subject matter. This Agreement supersedes all prior agreements and understandings among the Parties with respect to its subject matter.

(e) This Agreement may be amended only by a written instrument duly executed by the Parties hereto. This Agreement (including without limitation this Section 16(e)) may not be amended by oral agreement, waiver or course of dealing among the Parties.

(f) This Agreement may be executed in multiple counterparts, all of which shall be but one and the same instrument, binding on all parties when all separately executed copies have been fully delivered.

(g) No failure by either Party to take action on account of any default by the other shall constitute a waiver of such Party's right to take action on such default or any future similar default, or of the performance required of the other of all of the provisions hereunder.

14

(h)   The descriptive headings of this Agreement are intended for reference only and shall not affect the construction or interpretation of this Agreement.

(i)   The Parties have participated jointly in the negotiation and drafting of this Agreement. In addition, all Parties have been represented by their own legal counsel in the negotiation and preparation of this Agreement. Each Party has had the opportunity to consult counsel prior to executing this Agreement. In the event an ambiguity or question of intent or interpretation arises, no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any of the provisions of this Agreement.

(j)   The Parties agree that time is of the essence to each of the provisions of this Agreement.

(k)   All notices, requests, demands and other communications required or permitted to be given or made under this Agreement shall be in writing and will be deemed to have been duly given if personally delivered or if sent by United States mail, certified, return receipt requested, postage pre-paid or upon delivery to any nationally recognized over-night courier service, in each case, addressed as follows or to such other person or entity as the Parties may designate by notice to the Parties in accordance herewith:

**To the Foodonics Parties:**
5139 Edgewood Court
Jacksonville, FL 32254
Attention: K. Jacques Klempf

With copy to:
Grier Wells, Esq.
GrayRobinson, P.A.
50 North Laura Street, Suite 1100
Jacksonville, FL 32202

**To Jean, Seller and 5K Sellers:**
6730 Epping Forest Way N., #108
Jacksonville, FL 32217
Attention:  Laura Jean Klempf

With copy to:
Dennis L. Blackburn, Esq.
Blackburn and Co.
5150 Belfort Road, Building 500
Jacksonville, FL 32256-6030

*LJK*

15

IN WITNESS WHEREOF, the Parties hereto have duly executed this Agreement as of the first date written above.

**FOODONICS INTERNATIONAL, INC.**

By:_____
Name: K. Jacques Klempf
Title: President


_____
K. Jacques Klempf, individually


**LAURA JEAN KLEMPF REVOCABLE TRUST** dated April 1, 1992, as Amended

By: *Laura Jean Klempf*
Laura Jean Klempf, Trustee


*Laura Jean Klempf*
LAURA JEAN KLEMPF


_____
DINA KLEMPF SROCHI

*Marc E. Klempf  12/28/15*
MARC E. KLEMPF


*Laura Jean Klempf*
LAURA JEAN KLEMPF, as Trustee of the Family Trust under the Edward Klempf Revocable Trust dated April 1, 1992


_____
K. JACQUES KLEMPF, as Trustee of the Family Trust under the Edward Klempf Revocable Trust dated April 1, 1992

16

IN WITNESS WHEREOF, the Parties hereto have duly executed this Agreement as of the first date written above.

**FOODONICS INTERNATIONAL, INC.**

By:_____
Name: K. Jacques Klempf
Title: President


_____
K. Jacques Klempf, individually


**LAURA JEAN KLEMPF REVOCABLE TRUST** dated April 1, 1992, as Amended

By:_____
Laura Jean Klempf, Trustee


_____
LAURA JEAN KLEMPF

*/s/ Dina Klempf Srochi*
DINA KLEMPF SROCHI


_____
MARC E. KLEMPF


_____
LAURA JEAN KLEMPF, as Trustee of the Family Trust under the Edward Klempf Revocable Trust dated April 1, 1992


_____
K. JACQUES KLEMPF, as Trustee of the Family Trust under the Edward Klempf Revocable Trust dated April 1, 1992

IN WITNESS WHEREOF, the Parties hereto have duly executed this Agreement as of the first date written above.

**FOODONICS INTERNATIONAL, INC.**

By: *(signature)*
Name: K. Jacques Klempf
Title: President

*(signature)*
K. Jacques Klempf, individually

**LAURA JEAN KLEMPF REVOCABLE TRUST** dated April 1, 1992, as Amended

By:_____
Laura Jean Klempf, Trustee

_____
LAURA JEAN KLEMPF

_____
DINA KLEMPF SROCHI

_____
MARC E. KLEMPF

_____
LAURA JEAN KLEMPF, as Trustee of the Family Trust under the Edward Klempf Revocable Trust dated April 1, 1992

*(signature)*
K. JACQUES KLEMPF, as Trustee of the Family Trust under the Edward Klempf Revocable Trust dated April 1, 1992