# EXHIBIT 1

DENNIS L. BLACKBURN, as Special     )
Trustee of the Laura Jean Klempf Trust,

                                 )

         Plaintiff,                 )

v.                                   )

K. JACQUES KLEMPF and
FOODONICS INTERNATIONAL, INC.,   )

         Defendants.              )

_____ )

## COMPLAINT

Plaintiff, Dennis L. Blackburn, as Special Trustee of the Laura Jean Klempf Trust

dated April 1, 1992, sues defendants K. Jacques Klempf and Foodonics International,

Inc., and alleges:

### The Parties

1.     Dennis L. Blackburn is the Special Trustee of the Laura Jean Klempf

Trust dated April 1, 1992 (the "Jean Klempf Trust" or the "Trust"). The Trust has its

principal place of administration in Duval County, Florida.

2.     Defendant K. Jacques Klempf ("Jacques Klempf"), a resident of St. Johns

County, Florida, was at all times relevant to this complaint the President of Foodonics

International, Inc. and the Chairman of its Board of Directors.

3.     Defendant Foodonics International, Inc. ("Foodonics" or the "Company")

is a Florida corporation with its principal place of business in Duval County, Florida.

4.     Cal-Maine Foods, Inc. ("Cal-Maine") is a Delaware corporation doing business across the United States, including the State of Florida. Cal-Maine is the largest producer and marketer of shelled eggs in the United States. Cal-Maine is not, at this time, a named defendant.

5.     Adolphus B. Baker ("Dolph Baker") is the President, Chief Executive Officer and Chairman of the Board of Cal-Maine. Dolph Baker is not, at this time, a named defendant.

### General Allegations

6.     In 1948, Jean Klempf and her husband, Edward Klempf, started the Dixie Egg Company in Jacksonville, Florida. The operation grew over the years, from a small buyer and seller of eggs, to a large scale operation with facilities spreading over three states utilizing the latest technologies to maximize production. Through a corporate restructure, Dixie Egg ultimately became the marketing arm for its holding company, Foodonics.

7.     Edward Klempf, with the continuous support and assistance of Jean Klempf, provided the leadership and direction for the Company until his death in October, 2002. By this time, the Company had become one of the preeminent egg producers in the United States, possessing several operating companies, feed mills and high-tech processing plants.

8.     Edward Klempf was married 48 years and is survived by his wife Jean Klempf, sons Marc Edward Klempf, Jacques Klempf and their daughter Dina Klempf Srochi.

9.    Following Edward's death, all of the Class A Voting Shares and the Class

B Non-Voting Shares of Foodonics were owned directly by or for the benefit of Edward

Klempf's widow, Jean Klempf, and their children and grandchildren as follows:

| Shareholder | Class A Voting Shares | Class B Non-Voting Shares |
|---|---|---|
| K. Jacques Klempf | 738,930 | 756,112 |
| Marc Klempf | 738,930 | 756,112 |
| Dina Klempf Srochi | 738,930 | 756,112 |
| Laura Jeanne Klempf, as Trustee of the Laura Klempf Rev. Trust | 900,000 | 728,180 |
| Laura Jeanne Klempf and K. Jacques Klempf, as Trustees of the Marital Trust | 691,177 | 659,251 |
| Laura Jeanne Klempf and K. Jacques Klempf, as Trustees of the Family Trust | 422,033 | 402,539 |
| Kevin Jacques Klempf, as Trustee of the Julianne M. Klempf Irrevocable Trust | 0 | 17,182 |
| Kevin Jacques Klempf, as Trustee of the Alexandria R. Klempf Irrevocable Trust | 0 | 17,182 |
| Kevin Jacques Klempf, as Trustee of the Heather J. Klempf Irrevocable Trust | 0 | 17,182 |
| Marc Klempf, as Trustee of the Nicholas B. Klempf Irrevocable Trust | 0 | 17,182 |
| Marc Klempf, as Trustee of the Zachary E. Klempf Irrevocable Trust | 0 | 17,182 |
| Dina Srochi, as Trustee of the Sara L. Srochi Irrevocable Trust | 0 | 17,182 |
| Dina Srochi, as Trustee of the Alan J. Srochi Irrevocable Trust | 0 | 17,182 |
| **Total** | **4,230,000** | **4,178,580** |

10.    At all times material to this complaint, Jean Klempf was a member of the

Board of Directors of Foodonics. After Edward passed away, and due to Jean Klempf's

health and advancing years, Jacques Klempf exercised wide latitude in operating the

Company as President.

3

11.     Between 2002 and 2015, Jacques Klempf was the President of Foodonics, chairman of the Foodonics Board of Directors and a shareholder of the family-owned company.

12.     Jacques Klempf took advantage of his position at the Company to leverage himself into an active role in the Egg Industry Association and to obtain positions on several egg industry boards. He also took advantage of his position at Foodonics to make business connections and friendships in the egg industry – which was a small fraternity – including a strong business and personal friendship with the President of Cal-Maine, Dolph Baker. The Jacques Klempf and Dolph Baker families often socialized at industry meetings and took family vacations together to Europe and elsewhere.

13.     While President of Foodonics, Jacques Klempf began a systematic acquisition of Foodonics stock from his siblings and family trusts. By June 5, 2014, Jacques Klempf had completed the maneuvers necessary to make himself the majority owner of Foodonics' stock (53.6%) leaving the Jean Klempf Trust as a minority shareholder (45.6%):

| Ownership | | | | |
|---|---|---|---|---|
| Shareholder | Class A Voting | Class B Non-Voting | Total Shares | % of Total |
| Laura Jean Klempf Rev. Trust | 1,591,177 | 1,387,431 | 2,978,608 | 45.6266% |
| K. Jacques Klempf | 2,216,790 | 1,281,278 | 3,498,068 | 53.5838% |
| Alexandria R. Klempf Irrev. Trust | - | 17,182 | 17,182 | 0.2632% |
| Julianne M. Klempf Irrev. Trust | - | 17,182 | 17,182 | 0.2632% |
| Heather J. Klempf Irrev. Trust | - | 17,182 | 17,182 | 0.2632% |
| **Total Shares** | **3,807,967** | **2,720,255** | **6,528,222** | **100.00%** |

4

14.    In 2008, after Jacques Klempf had completed the purchase of the Foodonics shares of stock owned by his siblings and other family trusts, he began his efforts to buy out the shares of stock owned by his mother through the Jean Klempf Trust. Jacques Klempf was informed, however, that his mother was not interested in selling her shares at that time and, instead, intended to remain a shareholder and an active member of the Foodonics' Board of Directors.

15.    From 2006 to December 2015, Jacques Klempf was in dominant control of Foodonics as President and a 53.5838% owner of the Company. As a result, the Jean Klempf Trust, as a minority shareholder, could not receive distributions (other than each year's allocable tax liability) without Jacques Klempf's approval. Jean Klempf was therefore at Jacques Klempf's mercy in order for her Trust to realize any return on its investment. The control and actions taken by Jacques Klempf as President of Foodonics during this period, including the lack of distributions to shareholders, caused Jean Klempf continued concern and discomfort as a director and shareholder of the Company.

16.    Beginning in 2014, Jacques Klempf renewed his efforts to persuade his mother to sell the stock owned by her Trust through a proposed redemption transaction with Foodonics. Jacques Klempf knew that his redemption proposal, if successful, would make him the sole owner of more than 98% of the Foodonics stock.

17.    In response to Jacques Klempf's efforts to persuade his mother to agree to a redemption transaction, Jean Klempf made it clear to her son that she was not willing to proceed with the redemption transaction if he was contemplating a sale of the Company or its assets after the redemption. Jacques Klempf knew his mother did not want to sell

5

her stock back to the Company if he intended to sell the Company or its assets -- or was even considering the possibility of such a sale to a third-party after the redemption -- because she knew Jacques Klempf would unfairly personally benefit at the expense of Jean Klempf and her Trust.

18.     Between December 31, 2014 and December 31, 2015, to induce his mother and her Trust to proceed with the redemption transaction, Jacques Klempf represented to his mother and her representatives that he would not be seeking to sell the company for "a good amount of years":

> I have not had any offers to purchase the company, nor are there any offers presently in play, nor am I seeking to sell the company at this time.
>
> I actually enjoy the day to day and farm life that this business allows me and hopeful I have a good amount of years left to create value so that I can take care of my family in the future.
>
> Email from Jacques Klempf dated December 31, 2014.

19.     On December 21, 2015, in reliance on (i) Jacques Klempf's representations that he would not be seeking to sell the Company for "a good amount of years" and (ii) his duty to provide full and current disclosures of all matters concerning Foodonics (including in particular, the redemption transaction), the Jean Klempf Trust entered into a Settlement and Redemption Agreement (the "Settlement and Redemption Agreement"), by which all of the Foodonics stock owned by the Jean Klempf Trust was to be "redeemed" by Foodonics for the purchase price of $9,418,500, or approximately $3.07 per share.

20.     On December 31, 2015, a closing was held on the Settlement and Redemption Agreement by which all of the Foodonics stock owned by the Jean Klempf Trust was "redeemed" by Foodonics (the "Redemption Sale"). As a result of the Redemption Sale, Jacques Klempf became the owner of 98.55% of all issued Foodonics' stock.

21.     On April 20, 2016, less than four months after Jacques Klempf completed the redemption transaction with his mother, Foodonics and Cal-Maine executed a non-disclosure agreement which ultimately resulted in the sale of substantially all of Foodonics' operating assets to Cal-Maine. Upon information and belief, there were additional prior and non-disclosed related understandings or agreements between Cal-Maine and Foodonics.

22.     On October 16, 2016, only 10 months after the Redemption Sale, Cal-Maine purchased substantially all of Foodonics' operating assets for the sum of $68,900,000 or $10.66 per share (the "Cal-Maine Sale").[1]

23.     As a result of the Redemption Sale and the Cal-Maine Sale, Jacques Klempf and Foodonics realized the objective of their scheme -- Foodonics had purchased the stock of the Jean Klempf Trust at the price of $3.07 and sold the company's assets less than a year later for an equivalent price of $10.97 per share of Foodonics' stock. Had Jacques Klempf and Foodonics paid the Jean Klempf Trust for its stock at the same price per share as Jacques Klempf realized from the sale of assets to Cal-Maine, the Trust

---

[1] Because the Cal-Maine transaction was an asset sale, Foodonics remained responsible for the payment of certain Company debts. At the time of the Cal-Maine Sale, however, the value of the assets owned by Foodonics that were not part of the Cal-Maine Sale exceeded the amount which would have been necessary to have paid off all such debts and to redeem the stock owned by the Jean Klempf Trust on December 31, 2015.

would have been paid $32,675,329 -- $23,200,000 more than the Jean Klempf Trust was paid at the Redemption Sale.

## Jacques Klempf's Fraudulent Representations and Omissions

24.     Foodonics and Jacques Klempf, as the President and Chairman of the Board of Directors of Foodonics, had a fiduciary duty to disclose all information that Jean Klempf and the Trust might have found material in making the decision whether to allow the redemption of the Trust's stock at the time of redemption including, in particular, all information which could affect the value of stock in the Redemption Sale. Jacques Klempf and Foodonics also had the fiduciary duties of loyalty and fair dealing with Jean Klempf and the Trust in all matters concerning Foodonics and the Trust's ownership interest in Foodonics. Jean Klempf and the Trust relied on the faithful performance of these duties by Jacques Klempf and Foodonics which, as set forth below, were breached.

25.     Jean Klempf and the Trust executed the Settlement and Redemption Agreement and closed on the Redemption Sale (i) believing that Jacques Klempf had no intention, strategy or plan to sell Foodonics for a "good amount of years," and (ii) relying on Jacques Klempf's faithful performance of his fiduciary duties to Jean Klempf and the Trust.

26.     Unknown to Jean Klempf and the Trust, however, Jacques Klempf had considered and decided well in advance of the Redemption Sale to unfairly enrich himself by acting upon the business opportunity to sell the Foodonics' assets to Cal-Maine -- a known ready, willing and able buyer -- after Jacques Klempf induced his mother to surrender her shares for a reduced price through the redemption transaction.

As a result, Foodonics and Jacques Klempf enriched themselves, at the expense of the Jean Klempf Trust, by collecting additional sale proceeds of approximately $23,200,000 that would have been payable to the Jean Klempf Trust had the Redemption Sale not occurred.

27.     On numerous business and social occasions between 2009 and 2015, Dolph Baker informed Jacques Klempf that Cal-Maine wanted to buy Foodonics whenever Jacques Klempf was ready to sell.  As a result of these communications, Foodonics and Jacques Klempf knew prior to the Redemption Sale date -- but intentionally failed to disclose -- that Cal-Maine was a ready, willing and able buyer of Foodonics.  Therefore, during the time that Jacques Klempf and Foodonics owed the highest duties of loyalty and disclosure to Jacques' mother and the Trust (i.e. during the negotiations and ultimate consummation of the Settlement and Redemption Agreement), he and Foodonics intentionally failed to disclose that Cal-Maine was a ready, willing and able buyer of Foodonics and that his long intended sale of the Company to Cal-Maine could go forward -- without further ado -- as soon as Foodonics effected the Redemption Sale -- all for a much higher per share value than he had represented as fair to his mother and the Trust in the Settlement and Redemption Agreement.

28.     Contrary to Jacques Klempf's prior representations that "he was not seeking to sell the company" and further evidencing his hidden strategy to squeeze Jean Klempf and the Trust out of the Company before the Cal-Maine Sale, Jacques Klempf admitted in a newspaper interview after the Cal-Maine Sale that he had known "the Cal-Maine team" for "a long time" and that Cal-Maine "had made it known it wanted to be

9

involved if Klempf ever wanted to sell" the Company and that Jacques Klempf had "reached out" to his friend, Dolph Baker, to initiate a sales transaction:

> With the egg industry a small fraternity, Klempf said he had known the Cal-Maine Foods team a long time. The company had made it known it wanted to be involved if Klempf ever wanted to sell Dixie Egg.
>
> . . .
>
> That time had come, Klempf said, because he did not have a succession plan . . .
>
> . . .
>
> So he reached out to Cal-Maine Foods, led by friend Dolph Baker, the CEO.
>
> > Daily Record, November 8, 2016; Jacques Klempf on the Sale of Dixie Egg: *"I just think the time is right."*

This is an example of the type of information which Jacques Klempf should have disclosed pursuant to his fiduciary duty to Jean Klempf and the Trust prior to the Redemption Sale so that Jean Klempf could have made an informed decision as to whether to allow the redemption of the Trust's stock upon the terms being proposed by Jacques Klempf and Foodonics. Jacques Klempf failed to honor that duty to his mother and her Trust.

29.    In the Settlement and Redemption Agreement, Foodonics and Jacques Klempf made the following so-called "representations and warranties" to Jean Klempf and the Trust regarding the prospective sale of the Company after the Redemption Closing:

> 10.    **Representations and Warranties.**
>
> . . .
>
>  (b)    **From the Foodonics Parties. . . .**
>
> . . .

10

(iii) The Foodonics Parties hereby jointly and severally represent and warrant to the Seller that as of the Closing Date: (i) **there are no current offers pending nor ongoing discussions: (A) for the sale of all or substantially all of the assets of the Company;** (B) for the sale by Jacques of his stock in the Company or (C) to effect a merger, stock exchange **or other transaction which would have the effect of either Jacques no longer holding a majority of the outstanding shares of stock of the Company or the Company no longer owning substantially all of the assets that it currently owns** (collectively referred to as a "Realization Event"); (ii) the Foodonics Parties have not received any written offers to effect a Realization Event within the twelve (12) months prior to the date of this Agreement.

The representation that there were no "ongoing discussions" regarding the sale of the Company was false -- Jacques Klempf and the President and CEO of Cal-Maine, Dolph Baker were, in fact, having "ongoing discussions" with each other regarding the possible sale of Foodonics to Cal-Maine. It was from these discussions that Jacques Klempf knew that Cal-Maine was a ready, willing and able buyer of Foodonics as soon as Jacques Klempf "wanted to sell."

30.     Moreover, Jacques Klempf admitted in an email dated January 6, 2017, that "[i]n April 2015, I contacted Cal-Maine to see if they had an interest [in purchasing Foodonics]" . . . 9 months before the Redemption Sale.

31.     In addition, these "representations and warranties" were fraudulently misleading because they were, at best, only deceptive "half-truths" -- a full disclosure of the facts regarding the prospective sale of Foodonics' assets would have disclosed all material information which included: (i) Jacques Klempf had considered and decided to sell the Company before the Redemption Sale; (ii) Jacques Klempf had a ready, willing and able buyer of the Foodonics' assets waiting on standby; (iii) Jacques Klempf had continuous discussions with Dolph Baker between 2009 and 2015 regarding a

prospective sale of Foodonics to Cal-Maine which were not disclosed to Jean Klempf; and (iv) Jacques Klempf had "reached out" to Cal-Maine before the Redemption Closing to discuss the Cal-Maine Sale which was ultimately consummated on October 16, 2016.

32.     Moreover, and in any event, these "representations and warranties" cannot cure Jacques Klempf and Foodonics' failure to disclose the foregoing material information which was omitted in connection with the Redemption Sale. Instead, the defendants had a duty to disclose these facts not only because they were necessary to render other disclosures not misleading, but also because of the fiduciary duties of loyalty and disclosure which they owed to the Trust particularly when, as here, a "closed corporation" is redeeming its own stock. Had the defendants disclosed this omitted material information, Jean Klempf and the Trust would not have agreed to the redemption of the stock owned by the Jean Klempf Trust upon the terms proposed by Jacques Klempf and Foodonics.

33.     In addition to the foregoing, Jacques Klempf and Foodonics failed to disclose material information in connection with the Redemption Sale relating to the Company's valuation that was subsequently disclosed by them to Cal-Maine in connection with the Cal-Maine Sale. As reflected in Cal-Maine's Form 10-Q filed with the United States Securities and Exchange Commission, Cal-Maine determined the value of Foodonics' assets to be $71,643,000 "based on significant input that are not observable in the markets":

> [T]he following table presents the preliminary fair value of the assets acquired and liabilities assumed (in thousands):

| | |
|---|---:|
| Inventory | $ 7,669 |
| Property, plant and equipment | 38,683 |
| Intangible assets | 24,000 |

| | |
|---|---:|
| Liabilities assumed | (2,005) |
| Total identifiable net assets | 68,347 |
| Goodwill | 3,296 |
| Purchase price | 71,643 |
| Deferred purchase price | (3,000) |
| Cash consideration paid | $ 68,643 |

These fair value measurements were primarily based on significant input that are not observable in the markets.

> Cal-Maine Foods, Inc., Quarterly Report (Form 10-Q), at 9-10 (Dec. 22, 2016).

The "significant input" Cal-Maine received regarding the "fair value measurement" of Foodonics' assets was provided, in large part, from Jacques Klempf and Foodonics which constituted material information which should have also been provided, but was not, to Jean Klempf or her Trust in connection with the Redemption Sale. As a result of the fraud and misconduct of Jacques Klempf and Foodonics, the Jean Klempf Trust agreed to the redemption of its stock at an inopportune time and for far less than it was worth.

## Count One
### (Violation of Florida Securities Act)

34.     This is an action against Jacques Klempf and Foodonics for damages based upon Sections 517.301 and 517.241, Florida Statutes, Florida's Securities and Investor Protection Act (the "Florida Securities Act").

35.     The Jean Klempf Trust realleges and incorporates by reference the allegations set forth in paragraphs 1 through 33 of this complaint.

36.     Section 517.301 of the Florida Securities Act provides that any person (person is defined to include individuals or companies) who offers to buy or buys a

security by means of an untrue statement of a material fact or an omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they are made, not misleading, is liable to the person selling the security to him.

37.     The Foodonics' stock held by the Jean Klempf Trust were securities within the meaning of the Florida Securities Act.

38.     Foodonics' redemption of the stock owned by the Jean Klempf Trust was an offer to purchase and a purchase of that stock covered by the Florida Securities Act.

39.     As alleged above, Jacques Klempf and Foodonics violated Section 517.301 of the Florida Statutes in that, in connection with the offer, sale, or purchase of any investment or security, they: (a) employed devices, schemes, or artifices to defraud; (b) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or (c) engaged in practices or courses of business which operated or would operate as a fraud or deceit upon any person, in connection with the sale or redemption of securities by the Trust.

40.     As alleged above, the statements or omissions of Jacques Klempf and Foodonics were untrue or misleading or omitted to state material facts necessary to make previously statements made, in light of the circumstances under which they were made, not misleading. But for those misrepresentations and omissions, the Jean Klempf Trust would not have allowed its stock to be redeemed on the terms and conditions offered by Jacques Klempf and Foodonics.

41. As alleged above, Jacques Klempf and Foodonics acted at all times with scienter based on an intent to deceive, manipulate or defraud or, at a minimum, negligence. This scienter was evidenced by, among other things, Foodonics and Jacques Klempf's breaches of fiduciary duty in withholding material information to which the Trust was entitled.

42. The omitted or misrepresented facts, statements, presentations and communications as alleged herein were material in that there was a substantial likelihood that a reasonable shareholder would consider these facts, statements or documents important in making decisions regarding the redemption or sale of the stock owned by the Jean Klempf Trust.

43. The Jean Klempf Trust, in ignorance of the false and misleading statements set forth herein and the deceptive and manipulative devices and contrivances employed by Jacques Klempf and Foodonics, relied to its detriment on such misleading statements and omissions.

44. As a result of Defendants' untrue statements and omissions to state material facts, the Jean Klempf Trust has been damaged in an amount exceeding $23,200,000, exclusive of interests, fees, and other costs.

45. The Jean Klempf Trust was required to hire the undersigned attorneys to prosecute this action. The Florida Securities Act provides that the Jean Klempf Trust may recover its reasonable attorneys' fees from the defendants.

46. Jacques Klempf was President of Foodonics, Chairman of its Board of Directors and owned over 53% of the outstanding stock during the period relevant to this action and is or was a control person under the Florida Securities Act who had

15

fiduciary duties to the Trust and is jointly and severally liable with Foodonics for the acts and omissions described above.

47. Jacques Klempf also materially aided Foodonics, as the buyer of the Trust's securities, in acquiring the Trust's securities with an intent to deceive or defraud or with reckless disregard for the truth or law, and is jointly and severally liable as if he was the buyer of the Trust's securities.

48. Pursuant to Section 517.211 of the Florida Statutes, every member, officer, partner, or agent of Foodonics which personally participated or aided in making the sale or purchase, is jointly and severally liable to Jean Klempf and the Trust in an action for rescission or for damages.

49. Accordingly, Jacques Klempf is jointly and severally liable to the Jean Klempf Trust for his participation or aiding in the purchase or sale of securities in violation of Section 517.301, Florida Statutes.

WHEREFORE, the Jean Klempf Trust demands judgment against Jacques Klempf and Foodonics, jointly and severally, in an amount exceeding $23,200,000, together with interest, costs and attorneys' fees.

## Count Two
### (Violation of § 10(b) of the Securities Exchange Act and Rule 10b-5)

50. This is an action against Jacques Klempf and Foodonics for damages pursuant to 15 U.S.C. §78j and 17 C.F.R. § 240, 10b-5 (the "Federal Securities Act").

51. The Jean Klempf Trust realleges and incorporates by reference the allegations set forth in paragraphs 1 through 33 of this complaint.

52.     The Foodonics' stock held by the Jean Klempf Trust were securities within the meaning of the Federal Securities Act.

53.     Foodonics' redemption of the stock owned by the Jean Klempf Trust was an offer to purchase and a purchase of that stock covered by the Federal Securities Act.

54.     As alleged above, Jacques Klempf and Foodonics violated the Federal Securities Act in that, in connection with the offer, sale, or purchase of any investment or security, they: (a) employed devices, schemes, or artifices to defraud; (b) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or (c) engaged in practices or courses of business which operated or would operate as a fraud or deceit upon any person, in connection with the sale or redemption of securities by the Trust.

55.     As alleged above, the statements and omissions of Jacques Klempf and Foodonics were untrue or misleading or omitted to state material facts necessary to make previously statements made, in light of the circumstances under which they were made, not misleading. But for those misrepresentations and omissions, the Jean Klempf Trust would not have allowed its stock to be redeemed on the terms and conditions offered by Jacques Klempf and Foodonics.

56.     As alleged above, Jacques Klempf and Foodonics acted at all times with scienter based on an intent to deceive, manipulate or defraud. This scienter was evidenced by, among other things, Foodonics and Jacques Klempf's breaches of fiduciary duty in withholding material information to which the Trust was entitled.

17

57. The omitted or misrepresented facts, statements, presentations and communications as alleged herein were material in that there was a substantial likelihood that a reasonable shareholder would consider these facts, statements or documents important in making decisions regarding the redemption or sale of the stock owned by the Jean Klempf Trust.

58. The Jean Klempf Trust, in ignorance of the false and misleading statements set forth herein and the deceptive and manipulative devices and contrivances employed by Jacques Klempf and Foodonics, relied to its detriment on such misleading statements and omissions.

59. The Jean Klempf Trust was required to hire the undersigned attorneys to prosecute this action. The Federal Securities Act provides that the Jean Klempf Trust may recover its reasonable attorneys' fees from defendants.

60. As a direct and proximate result of Jacques Klempf's wrongful conduct, including violations of Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5, plaintiff suffered economic losses and damages in connection with the investment of their funds in an amount exceeding $23,200,000, exclusive of interest, attorneys' fees, and other costs.

WHEREFORE, the Jean Klempf Trust demands judgment against Jacques Klempf and Foodonics, jointly and severally, in an amount exceeding $23,200,000, together with interest, costs and attorneys' fees.

18

## Count Three
### (Control Person Liability - § 20(a) of Securities Exchange Act)

61.     This is an action against Jacques Klempf for damages pursuant to Section 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78t(a).

62.     The Jean Klempf Trust realleges and incorporates by reference the allegations set forth in paragraphs 1 through 33 and 52 through 59 of this complaint.

63.     Jacques Klempf acted as a control person within the meaning of Section 20(a) of the Securities Exchange Act of 1934, of Foodonics by virtue of his position as President of Foodonics and Chairman of its Board of Directors.

64.     Jacques Klempf influenced, directed and controlled the actions, misrepresentations, and omissions set forth herein.

65.     By virtue of his position of authority, responsibility and control, Jacques Klempf had the ability to direct the Redemption Sale and to prevent the actions, misrepresentations and omissions set forth in this complaint.

66.     Moreover, Jacques Klempf profited directly or indirectly from the unwarranted and deceptive methods by which the Redemption Sale was conducted.

67.     As a direct and proximate result of Jacques Klempf's wrongful conduct, including violations of Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5, the Jean Klempf Trust suffered economic losses and damages in connection with the investment of their funds in an amount exceeding $23,200,000, exclusive of interest, attorneys' fees, and other costs.

WHEREFORE, plaintiff demands judgment against Jacques Klempf in an amount exceeding $23,200,000, together with interest, costs and attorneys' fees.

## Count Four
### (Fraud)

68.     This is an action for damages against Jacques Klempf and Foodonics for fraud.

69.     The Jean Klempf Trust realleges and incorporates by reference the allegations set forth in paragraphs 1 through 33 of this complaint.

70.     As alleged herein, Jacques Klempf and Foodonics engaged in a common plan, scheme, and unlawful course of conduct, pursuant to which they knowingly or recklessly engaged in acts, practices, and courses of business which operated as a fraud and deceit upon the Jean Klempf Trust by misrepresentations and failing to disclose all information and material facts necessary to make a fully informed decision in regard to the value of the Foodonics' stock in connection with the negotiation and consummation of the Settlement and Redemption Agreement.

71.     The purpose and effect of this scheme, plan, and unlawful course of conduct was, among other things, to misrepresent facts and conceal important information affecting the value of the Company's stock in order to induce the Jean Klempf Trust to enter into the Settlement and Redemption Agreement with Jacques Klempf and Foodonics.

72.     Jacques Klempf and Foodonics, pursuant to this scheme, plan, and unlawful course of conduct, knowingly and recklessly issued, caused to be issued, or

participated in the preparation, issuance and distribution of deceptive and materially false and misleading written and oral statements to the Jean Klempf Trust.

73.     In addition, Jacques Klempf and Foodonics, pursuant to this scheme, plan, and unlawful course of conduct, knowingly and recklessly withheld and failed to disclose information material to the Redemption Sale.

74.     The omitted or misrepresented facts, statements, presentations and communications alleged in this complaint were material in that there is a substantial likelihood that a reasonable investor would consider these omitted facts and statements, and all related documents, important in the decision by the Jean Klempf Trust to sell its shares to the defendants pursuant to the Settlement and Redemption Agreement.

75.     The Jean Klempf Trust, in ignorance of the false and misleading statements set forth herein and the deceptive and manipulative devices and contrivances employed by Jacques Klempf and Foodonics counter, relied to its detriment on such misleading statements and omissions.

76.     The Jean Klempf Trust has been damaged as a result of the wrongful actions of the defendants in an amount exceeding $23,200,000, exclusive of interest, fees and other costs.

WHEREFORE, the Jean Klempf Trust demands judgment against Jacques Klempf and Foodonics, jointly and severally, in an amount exceeding $23,200,000, together with interest, costs and attorneys' fees.

## Count Five
## (Negligent Misrepresentation)

77. This is an action for damages against Jacques Klempf and Foodonics for negligent misrepresentation.

78. The Jean Klempf Trust realleges and incorporates by reference the allegations set forth in paragraphs 1 through 33 and 70 through 75 of this complaint.

79. Jacques Klempf and Foodonics made false and material misrepresentations and omissions or caused false and material misrepresentations or omissions to be made to the Jean Klempf Trust in connection with the Redemption Sale.

80. Jacques Klempf and Foodonics knew or had reason to know that (i) the representations were false at the time they were made, or (ii) failed to make reasonable inquiry into the truth or accuracy of the representations to the Jean Klempf Trust or the omissions were material.

81. The misrepresentations and omissions were material and were made for the purpose of inducing the Jean Klempf Trust to allow the redemption of its stock by Foodonics.

82. The misrepresentations and omissions induced the Trust to allow the redemption of its securities and the Trust reasonably relied on the misrepresentations and omissions to its detriment and would not have agreed to the redemption but for these misrepresentations and omissions.

83. As a result of these actions and omissions of Jacques Klempf and Foodonics, the Jean Klempf Trust has been damaged.

WHEREFORE, the Jean Klempf Trust demands judgment against Jacques Klempf and Foodonics, jointly and severally, in an amount exceeding $23,200,000, together with interest, costs and attorneys' fees.

**Count Six**
**(Breach of Fiduciary Duty of Disclosure)**

84.　　This is an action against Jacques Klempf and Foodonics for damages based on the breach of fiduciary duty of disclosure.

85.　　The Jean Klempf Trust realleges and incorporates by reference the allegations set forth in paragraphs 1 through 33, 70 through 75 and 79 through 83 of this complaint.

86.　　Jacques Klempf acted as a control person of Foodonics by virtue of his position as President and Chairman of the Board of Foodonics.

87.　　Jacques Klempf influenced, directed and controlled the actions, misrepresentations, and omissions set forth herein.

88.　　By virtue of his position of authority, responsibility and control, Jacques Klempf had the ability to direct the purchase or redemption of securities by Foodonics and to prevent the actions, misrepresentations and omissions set forth in this complaint.

89.　　Moreover, Jacques Klempf profited directly or indirectly from the unwarranted and deceptive methods by which Foodonics purchased securities from the Jean Klempf Trust, including withholding of important information affecting the value of the Company's stock.

90.    Jacques Klempf and Foodonics had actual knowledge of the omissions of material fact set forth herein, or acted with disregard for the truth in that they failed to disclose true facts, even though such facts were known to them.

91.    Jacques Klempf and Foodonics' misrepresentations and omissions were made for the purpose of enriching themselves at the expense of the Jean Klempf Trust.

92.    The Jean Klempf Trust justifiably relied upon the representations and omissions of Jacques Klempf and Foodonics in its decision to sell its shares of Foodonics' stock pursuant to the Settlement and Redemption Agreement.

93.    The Jean Klempf Trust would not have sold its shares of Foodonics' stock pursuant to the Settlement and Redemption Agreement but for the misrepresentations and omissions of Jacques Klempf and Foodonics, which proximately caused the Jean Klempf Trust's damages.

94.    Because Jacques Klempf and Foodonics owed the Jean Klempf Trust fiduciary duties, a presumption of unfairness attaches to the redemption -- a presumption which cannot be overcome unless the defendants show that (i) the transaction in question was fair and equitable to the Trust; (ii) the defendants made reasonable use of the confidence placed in them by the Trust; (iii) the defendants acted in the utmost good faith and exercised the most scrupulous honesty toward the Trust; (iv) the defendants placed the Trust's interest before theirs and did not use the advantage of their position to gain any benefit for themselves at the Trust's expense; (v) the defendants did not place themselves in any position in which their self-interest might conflict with their

obligations to the Trust as fiduciaries; and (vi) the defendants fully and fairly disclosed all important information to the Trust concerning the redemption.

95.  As a direct and proximate result of the wrongful conduct of Jacques Klempf and Foodonics, the Jean Klempf Trust suffered economic losses and damages in connection with the investment of their funds in an amount exceeding $23,200,000, exclusive of interest, attorneys' fees, and other costs.

WHEREFORE, the Jean Klempf Trust demands judgment against Jacques Klempf and Foodonics, jointly and severally, in an amount exceeding $23,200,000, together with interest, costs and attorneys' fees.

<u>Count Seven</u>
**(Breach of Fiduciary Duty of Loyalty)**

96.  This is an action against Jacques Klempf and Foodonics for damages based upon breach of the fiduciary duty of loyalty.

97.  The Jean Klempf Trust realleges and incorporates by reference the allegations set forth in paragraph 1 through 33, 70 through 75, and 79 through 83 of this complaint.

98.  Jacques Klempf acted as a control person of Foodonics by virtue of his position as President and Chairman of the Board of Foodonics.

99.  Jacques Klempf influenced, directed and controlled the actions, misrepresentations, and omissions set forth herein.

100.  By virtue of his position of authority, responsibility and control, Jacques Klempf had the ability to direct the purchase or redemption of securities by

Foodonics and to prevent the actions, misrepresentations and omissions set forth in this complaint.

101. Moreover, Jacques Klempf profited directly or indirectly from the unwarranted and deceptive methods by which Foodonics purchased securities from the Jean Klempf Trust, including withholding of important information affecting the value of the Company's stock.

102. Jacques Klempf and Foodonics had actual knowledge of the omissions of material fact set forth herein, or acted with disregard for the truth in that they failed to disclose true facts, even though such facts were known to them.

103. Jacques Klempf and Foodonics' misrepresentations and omissions were made for the purpose of enriching themselves at the expense of the Jean Klempf Trust.

104. The Jean Klempf Trust justifiably relied upon the representations and omissions of Jacques Klempf and Foodonics in its decision to sell its shares of Foodonics' stock pursuant to the Settlement and Redemption Agreement.

105. The Jean Klempf Trust would not have sold its shares of Foodonics' stock pursuant to the Settlement and Redemption Agreement but for the misrepresentations and omissions of Jacques Klempf and Foodonics, which proximately caused the Jean Klempf Trust's damages.

106. Because Jacques Klempf and Foodonics owed the Jean Klempf Trust fiduciary duties, a presumption of unfairness attaches to the redemption -- a presumption which cannot be overcome unless the defendants show that (i) the transaction in question was fair and equitable to the Trust; (ii) the defendants made

reasonable use of the confidence placed in them by the Trust; (iii) the defendants acted in the utmost good faith and exercised the most scrupulous honesty toward the Trust; (iv) the defendants placed the Trust's interest before theirs and did not use the advantage of their position to gain any benefit for themselves at the Trust's expense; (v) the defendants did not place themselves in any position in which their self-interest might conflict with their obligations to the Trust as fiduciaries; and (vi) the defendants fully and fairly disclosed all important information to the Trust concerning the redemption.

107. As a direct and proximate result of the wrongful conduct of Jacques Klempf and Foodonics, the Jean Klempf Trust suffered economic losses and damages in connection with the investment of their funds in an amount exceeding $23,200,000, exclusive of interest, attorneys' fees, and other costs.

WHEREFORE, the Jean Klempf Trust demands judgment against Jacques Klempf and Foodonics, jointly and severally, in an amount exceeding $23,200,000, together with interest, costs and attorneys' fees.

## Demand for Jury Trial

Plaintiff demands a trial by jury as to all facts and issues so triable.

SMITH HULSEY & BUSEY

By: _/s/ James H. Post_
James H. Post

Florida Bar Number 175460
225 Water Street, Suite 1800
Jacksonville, Florida 32202
(904) 359-7700
(904) 359-7708 (facsimile)
jpost@smithhulsey.com
khettinger@smithhulsey.com

Attorneys for Dennis L. Blackburn, as
Special Trustee of the Klempf Trust

964547.3

28