IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

FOODONICS INTERNATIONAL, INC.,
a Florida corporation,

        Plaintiff,                                Case No.: 3:17-cv-1054-J-32JRK

v.

DINA KLEMPF SROCHI, as Trustee
of the LAURA JEAN KLEMPF
REVOCABLE TRUST, a Georgia Trust,

        Defendant.
_____/
DINA KLEMPF SROCHI, as Trustee
of the LAURA JEAN KLEMPF
REVOCABLE TRUST, a Florida Trust,
and DENNIS L. BLACKBURN, as
Assistant Trustee of the JEAN KLEMPF
REVOCABLE TRUST, a Florida Trust,

        Counterclaim Plaintiffs,

v.

FOODONICS INTERNATIONAL, INC.,
a Florida corporation, and KEVIN
JACQUES KLEMPF,

        Counterclaim Defendants.
_____/

## ANSWER AND AFFIRMATIVE DEFENSES TO COUNTERCLAIM BY FOODONICS AND KEVIN JACQUES KLEMPF

The Plaintiff/Counterclaim Defendants, FOODONICS INTERNATIONAL, INC. ("Foodonics") and KEVIN JACQUES KLEMPF ("Jacques"), submit this answer and affirmative defenses in response to the counterclaim filed by the Defendant/Counterclaim Plaintiffs, DINA KLEMPF SROCHI ("Dina"), as Trustee of the LAURA JEAN KLEMPF REVOCABLE

1

TRUST, a Florida Trust ("Trust"), and DENNIS L. BLACKBURN ("Blackburn"), as Assistant Trustee of the Trust.

## The Parties

1.      Admitted.

2.      It is admitted that Blackburn is a resident of Florida.  Counterclaim Defendants are without knowledge of the remaining allegations of paragraph 2 and said allegations are therefore denied.

3.      Admitted.

4.      It is admitted that Jacques, is a resident of St. Johns County, Florida, served as president of Foodonics and became its majority shareholder in 2006.  All other allegations of paragraph 4 not specifically admitted are denied.

5.      The allegations of paragraph 5 are, upon information and belief, admitted. However, Cal-Maine is not a party to this action.

6.      The allegations of paragraph 6 are, upon information and belief, admitted. However, Adolphus B. Baker is not a party to this action.

## General Allegations

7.      It is denied that Edward Klempf was 21 years old at the time he started Dixie Egg Company.  All other allegations of paragraph 7 are admitted.

8.      It is admitted that Edward Klempf, with the moral support of Laura Jean Klempf ("Jean"), provided leadership and direction for Dixie Egg Company until 1999 resulting in growth and the acquisition of franchise rights.  The remaining allegations and characterizations in paragraph 8 are denied.

9.      Admitted.

10.     Admitted.

11.     It is admitted that Jean was a member of the Board of Directors of Foodonics until approximately 2008.  The remaining allegations of paragraph 11 are admitted.

12.     It is admitted that Jacques was president of Foodonics between 2002 and 2015. All other allegations of paragraph 12 are denied.

13.     It is admitted that Jacques became well known and prominent within the egg industry, including serving on various boards of industry related organizations and developing relationships, both professional and social, with many others active in the industry, including Dolph Baker.  All other allegations of paragraph 13 are denied.

14.     Denied.

15.     Denied.

16.     It is admitted that Jacques purchased the Foodonics stock of Marc Klempf ("Marc") and Dina in 2006 through the 2006 Shareholder Agreement.  All other allegations of paragraph 16 are denied.

17.     The provisions of the 2006 Shareholders Agreement speak for themselves.  All other allegations of paragraph 17 are denied.

18.     It is admitted that Jacques became the majority owner of Foodonics stock as a result of the 2006 Shareholders Agreement, and that the stock ownership as a result of the 2006 Shareholder Agreement is as set forth in paragraph 18.  All other allegations of paragraph 18 are denied.

19.     Denied.

20.     It is admitted that Jacques was the President and majority shareholder of Foodonics following the 2006 Shareholders Agreement.  All other allegations of paragraph 20 are denied.

21.     Denied.

22.     Denied.

23.     The email referenced in paragraph 23 speaks for itself.  All other allegations of paragraph 23 are denied.

24.     The Settlement and Redemption Agreement referenced in paragraph 24 was entered into by the Trust, Jacques and Foodonics and speaks for itself.  All other allegations of paragraph 24 are denied.

25.     Admitted.

26.     It is admitted that Foodonics and Cal-Maine executed a non-disclosure agreement on or about April 20, 2016, and that Foodonics sold substantially all of its assets to Cal-Maine in about October, 2016.  All other allegations of paragraph 26 are denied.

27.     It is admitted that Cal-Maine purchased substantially all of Foodonics' operating assets on or about October 16, 2016 for the sum of $71,643,000.00.  All other allegations of paragraph 27 are denied.

28.     Denied.

29.     Denied.

**Jacques Klempf's Alleged Fraud by Omission**

30.     Denied.

31.     The allegations of paragraph 31 constitute legal conclusions to which no response is required.  The allegations are otherwise denied.

32.     Denied.

33.     Denied.

34.     Denied.

35.     Denied.

36.     Denied.

37.     The email referenced in paragraph 37 speaks for itself.  Jean, the Trust, Dina, Marc and their team of legal, including Blackburn, tax, accounting and business counsel were all well aware at all material times, that Jacques possessed the legal and corporate authority to sell substantially all of the assets of Foodonics at any time.   The remaining allegations and characterizations of paragraph 37 are denied.

38.     The redacted excerpt from the Daily Business Record set forth in paragraph 38 speaks for itself.  It is admitted that Jacques had known members of the Cal-Maine team for a long time and of Cal-Maine's possible interest in Foodonics.   All other allegations and characterizations in paragraph 38 are denied.

39.     The provision in the Settlement and Redemption Agreement set forth in paragraph 49 speaks for itself.  The referenced provision and all other provisions of the Settlement and Redemption Agreement were negotiated and accepted by Jean, the Trust, and their legal, including Blackburn, tax, accounting, business advisors and counselors.   The remaining allegations and characterizations of paragraph 39 are denied.

40.     Denied.  The reference to April 2015 in the email dated January 6, 2017 was clearly a typographical error.

41.     Denied.

42.     Denied.

43.     The email dated October 13, 2009 is admitted. It is admitted that the Trust, Marc, Dina and their team of legal, including Blackburn, tax, accounting and business counsel were all well aware, at all material times, that Cal-Maine was a prospective purchaser of the assets of Foodonics.  The remaining allegations and characterizations set forth in paragraph 43 are denied.

44.     The Cal-Maine quarterly report referenced in paragraph 44 is a matter of public record and speaks for itself.  All other allegations in paragraph 44 are denied.

45.     It is admitted that Jacques sent an email in January 2017 which referenced the impact of "industry dynamics" on his decision with regard to the sale of the assets of Foodonics. It is furthermore admitted that "industry dynamics" was a factor in the decision to sell the assets of Foodonics.   All other allegations and characterizations in paragraph 45 not specifically admitted herein are denied.

46.     Denied.

47.     Denied.

48.     Denied.

49.     Denied.

50.     Denied.

51.     Counterclaim Defendants are not presently aware of any conditions precedent to be addressed in this action.  The allegations of paragraph 51 are therefore denied.

**Count One**
*(Breach of Fiduciary Duty of Disclosure)*

52.     The allegations of paragraph 52 are admitted as a prefatory statement only.  It is specifically denied that any breach of any fiduciary duty of disclosure was committed by Counterclaim Defendants.

53. Counterclaim Defendants responses to paragraphs 1 through 51 are realleged as if fully set forth herein.

54. Denied.

55. Denied.

56. Denied.

57. Denied.

58. Denied.

59. Denied.

60. Denied.

61. Denied.

62. Denied.

63. Denied.

## Count Two
### *(Breach of Fiduciary Duty of Loyalty)*

64. The allegations of paragraph 64 are admitted as prefatory only. It is denied that Counterclaim Defendants committed any breach of any fiduciary duty of loyalty.

65. Counterclaim Defendants responses to paragraphs 1 through 51 are realleged as if fully set forth herein.

66. Denied.

67. Denied.

68. Denied.

69. Denied.

70. Denied.

71. Denied.

72.     Denied.

73.     Denied.

74.     Denied.

75.     Denied.

## Count Three
### *(Violation of Florida Securities Act)*

76.     The allegations of paragraph 76 are admitted as prefatory only. It is denied that Counterclaim Defendants committed any violation of the Florida Securities Act.

77.     Counterclaim Defendants responses to paragraphs 1 through 51 are realleged as if fully set forth herein.

78.     Denied.

79.     Denied.

80.     Denied.

81.     Denied.

82.     Denied.

83.     Denied.

84.     Denied.

85.     Denied.

86.     Denied.

87.     Denied.

88.     Denied.

89.     Denied.

90.     Denied.

91.     Denied.

## Count Four
### (Violation of § 10(b) of the Securities Exchange Act and Rule 10b-5)

92.    The allegations of paragraph 92 are admitted as prefatory only. It is denied that Counterclaim Defendants committed any Violation of Rule 10b-5 of the securities Exchange Act.

93.    Counterclaim Defendants responses to paragraphs 1 through 51 are realleged as if fully set forth herein.

94.    Denied.

95.    Denied.

96.    Denied.

97.    Denied.

98.    Denied.

99.    Denied.

100.    Denied.

101.    Denied.

102.    Denied.

103.    Denied.

## Count Five
### (Control Person Liability - § 20(a) of Securities Exchange Act)

104.    The allegations of paragraph 104 are admitted as prefatory only. It is denied that Counterclaim Defendants committed any violation of § 20(a) of the Securities Exchange Act exists.

105.    Counterclaim Defendants responses to paragraphs 1 through 51 are realleged as if fully set forth herein.

106. Denied.

107. Denied.

108. Denied.

109. Denied.

110. Denied.

## Count Six
### *(Fraud by Omission)*

111. The allegations of paragraph 111 are admitted as prefatory only. It is denied that Counterclaim Defendants committed any fraud by omission.

112. Counterclaim Defendants responses to paragraphs 1 through 51 are realleged as if fully set forth herein.

113. Denied.

114. Denied.

115. Denied.

116. Denied.

117. Denied.

118. Denied.

## Count Seven
### *(Negligent Misrepresentation)*

119. The allegations of paragraph 119 are admitted as prefatory only. It is denied that Counterclaim Defendants committed any negligent misrepresentation.

120. Counterclaim Defendants responses to paragraphs 1 through 51 are realleged as if fully set forth herein.

121. Denied.

122.    Denied.

123.    Denied.

124.    Denied.

## Count Eight
### *(Breach of Representations and Warranties)*

125.    The allegations of paragraph 125 are admitted as prefatory only.  It is denied that Counterclaim Defendants committed any breach of representations and warranties.

126.    Counterclaim Defendants responses to paragraphs 1 through 51 are realleged as if fully set forth herein.

127.    Denied.

128.    Denied.

129.    Denied.

130.    Denied.

131.    Denied.

132.    Denied.

133.    Denied.

134.    Denied.

135.    Denied.

136.    Denied.

137.    Denied.

## AFFIRMATIVE DEFENSES BY FOODONICS AND JACQUES

Foodonics and Jacques submit the following affirmative defenses to the counterclaim by the Trust.

## Common Allegations to Affirmative Defenses by Foodonics and Jacques

1.    The following common allegations apply to each of the affirmative defenses set forth below.

2.    As of December 21, 2015, Foodonics, Jacques, Jean, individually and as Trustee of and on behalf of the Trust dated April 1, 1992, as Amended, Jacques and Jean, as Trustees of the Family Trust under the Edward Klempf Revocable Trust Agreement dated April 1, 1992, Dina and Marc entered into the Settlement and Redemption Agreement (the "Settlement Agreement"), a copy of which is attached hereto as Exhibit "A." The transactions contemplated by the Settlement Agreement were closed on or about December 31, 2015.

3.    The Background Recitals to the parties' Settlement Agreement explain why the parties entered into the agreement. Prior to Edward Klempf's death, on October 18, 2002, Jacques had been elected President of Foodonics and served as a member of the Board of Directors. The 2006 Shareholders Agreement removed Dina and Marc as shareholders of Foodonics and the restricted the right of the Trust and Jacques to sell their shares in Foodonics to third parties. Upon Jean's death, her estate was also required to sell her Foodonics stock to Jacques pursuant to an appraisal-based formula, adjusted for changes in Foodonics' annual revenue.

4.    The Background Recitals to the parties' Settlement Agreement, which refers to Foodonics as "the Company", provide as follows:

### Background Recitals

A.    Jean is the mother of Jacques, Marc and Dina. The Company was begun by Jean's husband, and the children's father, Edward Klempf. Following his death on October 18, 2002, Jean and Jacques became the primary shareholders of the Company. In 2006, various of the Parties and some third parties to this Agreement entered into a number of transactions, including the execution of a shareholder agreement among the Company's shareholders (**the "2006 S/H Agreement"**). The 2006 S/H Agreement restricts Jean's ability to sell her shares of Company

stock, and requires that at her death, her estate must sell her shares of Company stock to Jacques for consideration computed by a formula, with the purchase price to be paid over an eight year period. That formula price is based in part on an appraisal of the Company's shares of stock conducted by Sheldrick, McGehee & Kohler of Jacksonville, Florida (**"SMK"**).

**Disputes have arisen concerning the corporate governance of the Company, the lack of distributions to shareholders, over and above income tax distributions, and related matters (collectively, "Disputed Matters"). As a result Jean has threatened to file a lawsuit concerning those Disputed Matters and has incurred significant legal and accounting expenses in investigating and asserting those claims. Recognizing the legal and accounting fees the Parties have already incurred and that litigation would be very costly and disruptive, and desiring to avoid further family conflict, and expensive legal fees, the Parties desire to resolve the Disputed Matters. This Agreement affords the Parties the opportunity to accomplish these aims as well as allowing them to separate completely their joint business interests. (Emphasis added).**[1]

**After extensive, protracted and costly adversarial negotiations that have occurred for more than two (2) years among the Parties and their legal, accounting and tax advisors, the Parties are now motivated, in part, to enter into this Agreement to secure for Jean and her eventual beneficiaries, the adequate and full consideration for her shares of Company stock based upon an appraisal fairly conducted according to usual and customary valuation practices. (Emphasis added).**[1]

B.     The Seller owns 1,591,177 of the Company's issued and outstanding Class A Voting Shares (collectively referred to as the **"Class A Shares"**).

C.     The Seller owns 1,387,431 of the Company's issued and outstanding Class B Non-Voting Shares (collectively referred to as the **"Class B Shares"**). (The Seller's Class A Shares and the Seller's Class B Shares are sometimes referred to herein collectively as the **"Seller's Shares"**).

D.     The Seller and Jacques each own a one-half undivided interest in that certain real property located at 5139 Edgewood Court, Jacksonville, Florida 32254 (the **"Edgewood Court Property"**).

E.     Jean owns an undivided forty percent (40%) interest (**"Jean's 5K Interest"**) as a partner in 5K's General Partnership (**"5K Partnership"**).

F.     Marc owns an undivided twenty percent (20%) interest (**"Marc's 5K Interest"**) as a partner in 5K Partnership.

G.     Dina owns an undivided twenty percent (20%) interest (**"Dina's 5K Interest"**) as a partner in 5K Partnership.

---

[1] The Trust's claim that Jean accepted the terms of the Settlement Agreement based upon what she "thought were bonds of devotion and love between her and her son" (page 29, footnote 6 of counterclaim) is contrary to these express recitals in the parties' Settlement Agreement.

H.      The sole material asset of 5K Partnership is a parcel of real property owned by the 5K Sellers and Jacques. That real property is more particularly described as set forth on Exhibit A attached hereto (the **"5K Property"**).

I.      The Company owes the Family Trust $489,207.29 as of December 31, 2015, pursuant to that certain Promissory Note dated June 30, 2006 (the **"2006 Promissory Note"**), which indebtedness is secured, pursuant to that certain Stock Pledge Agreement of even date therewith (the **"2006 Stock Pledge"**), by a pledge of 422,033 shares of Class A Voting Common Stock, par value $0.003, and a pledge of 402,539 shares of Class B Non-Voting Common Stock, par value $0.003. Collectively, the 2006 Promissory Note and the 2006 Stock Pledge are referred to as the **"2006 Documents"**.

**J.      The Seller, as a shareholder of the Company, on behalf of Jean individually, have threatened litigation against the Foodonics Parties concerning the Disputed Matters. This Agreement is intended, among other things, to settle absolutely and forever all known and unknown bases for such threatened litigation. (Emphasis added).**

K.      The Policy Owners own that certain life insurance policy issued by Massachusetts Mutual Life Insurance Company or its affiliate (the **"Insurance Company"**), policy number 15,587,790, with a specified face amount of Two Million Dollars ($2,000,000), together with internal fund value and cash surrender value (the **"Insurance Policy"**).

L.      SMK has performed an appraisal of the Seller's Shares, as set forth in a valuation report dated December, 2015 (the **"2015 SMK Valuation Report"**). Moody Appraisal Group has performed an appraisal of (i) the 5Ks Seller's interests in the 5K Property, and (ii) Jean's interest in the Edgewood Court Property dated October, 2015 (the **"Moody Appraisals"**). These appraisals have been used to determine adequate and full consideration and to allocate the purchase price in Section 8 below.

M.      The Parties desire to accomplish the following transactions, on terms as more specifically described within this Agreement:

1.      **In full and complete settlement of all threatened litigation (emphasis added)**, the Company desires to redeem from the Seller, and Seller desires to have redeemed, all of the Seller's Shares (the **"Stock Redemption"**);

2.      The 5K Sellers desire to sell to Jacques, and Jacques desires to acquire from the 5K Sellers, all of the 5K Sellers' respective interests in 5K Partnership and the 5K Property;

3.      Jean desires to sell to Jacques, and Jacques desires to acquire from Jean, all of her interest in the Edgewood Court Property;

4.      Jean, Jacques, Marc and Dina as beneficiaries of the Family Trust, and the Family Trust Trustees, desire to terminate and distribute the corpus of the Family Trust

for the benefit of Jean (as to the value of her income interest), and the remainder to Jacques, Marc and Dina equally.

    5.    Jacques, Marc and Dina desire to create a new partnership whereby the Insurance Policy will be held by partnership, the terms of which will allow one or more of the Policy Owners to contribute funds to the partnership from time to time, and to provide for the repayment of those contributions upon the event of Jean's death, the liquidation of the partnership at that time, and the disbursement of the partnership's remaining assets to the partners;

    6.    The Company and Jean wish to provide for the payment of income taxes attributable to the taxable income of the Company for any period of time in which the Seller was an owner of the Company; and

    **7.    On the various terms and conditions set forth below, the Parties desire to settle any legal claims or disputes, including without limitation the Disputed Matters, that they may have against each other concerning the Company, its shares of stock, outstanding promissory notes, the Edgewood Court Property, the 5Ks Property, and the threatened litigation. (Emphasis added).**

    5.    The parties acknowledged that the above-referenced "Background Recitals" to the Settlement Agreement were true and correct, and they incorporated these recitals into the body of the Settlement Agreement.  The parties expressly agreed to include the above-referenced recitals as terms of their agreement.   The parties further acknowledged their various agreements, obligations, terms, conditions, waivers and releases described in the Settlement Agreement, as well as the receipt and sufficiency of valuable consideration for the same.

    6.    Jean, individually, and as Trustee, was represented throughout the negotiation, execution and closing of the Settlement Agreement by Blackburn, a highly experienced business, estate, trust and tax attorney and by Daniel Edelman ("Edelman"), a sophisticated certified public accountant, business valuation expert and business consultant with substantial skills and experience in the resolution of complex business problems and the valuation and transfer of business assets.  With his valuation and forensic certification, Edelman has been involved in over 200 business valuation and litigation matters.

7.     Pursuant to the Settlement Agreement, and conditioned upon the release of various claims, the waiver of various rights, and the settlement of various disputes, all as more particularly described in the agreement, Foodonics and Jacques paid the sum of $9,418,500 for the redemption of all Foodonics stock held by the Trust.  In addition, the ownership of two (2) Lexus vehicles was transferred from Foodonics to Jean.  Foodonics also paid $489,207.29, representing the remaining, as-yet undue balance of the 2006 Promissory Note as defined in Background Recital 'I', to the Family Trust (one of the parties to the Settlement Agreement, the then beneficiary of which was Jean).  Further, Jacques paid Jean the sum of $221,500 for her interest in real property located in Jacksonville, Florida pursuant to an appraisal.  Jacques also paid Jean, Marc, and Dina the sum of $360,000 for their interest in real property located in Georgia pursuant to an appraisal.

8.     The beneficiaries of the Trust and Estate were Dina and Marc.

9.     Moreover, as part of the consideration for the Settlement Agreement, the parties agreed to very detailed, specific mutual releases as follows:

7.     **Mutual Releases.**

(a)     As partial consideration for payment of the aggregate Purchase Price by the Foodonics Parties to the Seller and the 5K Sellers as described in Section 8 below, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, each of the Seller, each 5K Seller, the Family Trust Trustees, as well as Jean both individually and in her capacity as trustee of any trust under the Edward Klempf Revocable Trust dated April 1, 1982, (collectively, the **"Releasing Parties"**), effective as of the Closing Date **hereby release and waive any and all claims, causes of action, suits, rights or damages each has or may have, and represents, warrants and agrees that it has no colorable claims against, any of the Foodonics Parties or any of their affiliates, including any arising under the 2006 Documents (emphasis added)** except:

(i)     with respect to any rights and obligations under that certain Agreement Regarding Condominium Use between the Company, Jacques, Dina and Mark dated September 2006 (the **"Condo Agreement"**) pertaining to

16

condominium Unit 615, located at Surf Villas Condominiums, 615 Summer Place, Ponte Vedra Beach, Florida 32082, including without limitation the purchase option set forth in the Condo Agreement; and

(ii)     the rights and obligations of the parties set forth in this Agreement and related documents.

(iii)     the rights and obligations under the 2006 Documents as modified in accordance with this Agreement.

**Without limiting the foregoing, each of the Releasing Parties hereby forever waives, releases and terminates, and shall treat as fully performed, all agreements, obligations and understandings each may have with Jacques or the Company not specifically set forth in this Agreement or in the Condo Agreement. (Emphasis added).**

(b)     For good and valuable consideration, the Seller, Jean and the Family Trust Trustees (i) hereby waive and release the Company and all other Parties from any default or breach which may otherwise occur under the 2006 Documents as a result of the transactions contemplated by this Agreement as a "Change in Control Transaction," as such term is referred to in the 2006 Documents, and (ii) hereby represent, warrant and agree that no such breach or default exists, and no set of facts exist that would, with the passage of time or otherwise, constitute a default, under the 2006 Documents, and (iii) agree that the 2006 Documents are hereby deemed terminated to permit the transactions contemplated hereby.

(c)     For good and valuable consideration, the Foodonics Parties hereby release Jean in her individual capacity or any other capacity, from any and all claims, causes of action, suits, rights or damages that the Foodonics Parties have or may have against her, and each of the Foodonics Parties represents, warrants and agrees that it has no colorable claims against Jean, except the rights and obligations of the Parties set forth in this agreement and related transactions. Without limiting the foregoing, each of the Foodonics Parties waives, releases and terminates, and shall treat as fully performed, all agreements and understandings each may have with Jean not specifically set forth in this Agreement.

10.     The Foodonics Parties made the following representations and warranties as part

of the Settlement and Redemption Agreement:

10.     **Representations and Warranties.**

(b)     **From the Foodonics Parties.**     The Foodonics Parties hereby jointly and severally represent and warrant to the Seller and the 5K Sellers that the

17

statements in this Section 10(b) are correct and complete as of the date of this Agreement (except as expressly noted herein) and will be correct and complete as of the Closing Date (as though made then and as though the Closing Date were substituted for the date of this Agreement throughout this Section 10(b)):

(i)     The execution, delivery and performance of this Agreement and the other documents and agreements contemplated hereby, and the consummation of the transactions contemplated hereby and thereby, will not result in any violation on the part of any of the Foodonics Parties or be in conflict with, or constitute (with or without the passage of time and giving of notice) a default on the part of any of the Foodonics Parties under: (i) the organizational documents of such Foodonics Party; (ii) any material contract, agreement, mortgage, note, bond, indenture or lease to which such Foodonics Party is a Party; or (iii) any law, rule, regulation, instrument, contract, judgment, order, writ, or decree to which any of the Foodonics Parties is a Party, or (iv) result in the acceleration of any indebtedness or in the creation of any encumbrance upon such Foodonics Party's assets.

(ii)    Each of the Foodonics Parties has the right, power, and authority to enter into and perform its obligations under this agreement and the other documents and agreements contemplated hereby. Each of the Foodonics Parties has duly authorized, executed and delivered this Agreement, and this Agreement is, and each of such other documents and agreements contemplated hereby when executed will be, a valid and binding agreement of each of the Foodonics Parties, enforceable against each of the Foodonics Parties in accordance with its terms, except as such enforcement may be subject to bankruptcy, insolvency, reorganization, moratorium, or other similar laws now or hereafter in effect relating to creditor's rights and general principles of equity.

**(iii)    The Foodonics Parties hereby jointly and severally represent and warrant to the Seller that as of the Closing Date: (i) there are no current offers pending nor ongoing discussions: (A) for the sale of all or substantially all of the assets of the Company; (B) for the sale by Jacques of his stock in the Company or (C) to effect a merger, stock exchange or other transaction which would have the effect of either Jacques no longer holding a majority of the outstanding shares of stock of the Company or the Company no longer owning substantially all of the assets that it currently owns (collectively referred to as a "Realization Event"); (ii) the Foodonics Parties have not received any written offers to effect a Realization Event within the twelve (12) months prior to the date of this Agreement. (Emphasis added).**

11.     The representations and warranties made by the Foodonics Parties in Paragraph 10(b)(iii) of the Settlement Agreement were true and correct.  There were "no current offers pending nor ongoing discussions" for the sale of all or substantially all of the assets of Foodonics, for the sale by Jacques of his stock in Foodonics, or to effect a merger, stock exchange or other "Realization Event" as of the Closing Date of December 31, 2015.  Moreover, the Foodonics Parties had not received any written offers to effect a Realization Event within twelve (12) months prior to the date of the parties' Settlement Agreement.  In fact, the Trust, in paragraph 40 of the Counterclaim, has erroneously relied on a typographical date error of one-year in a January 6, 2017 email by Jacques.  The email erroneously references April, 2015 which is in fact a reference to April 2016 when the email is considered in context and in its entirety.

12.     The Trust, represented by sophisticated legal, including Blackburn, tax, accounting and business counsel, could have negotiated for broader representations and warranties from the Foodonics Parties, or could have negotiated for participation rights in a future sale of the assets of Foodonics. Instead, the Trust, knowingly, voluntarily and with professional advisors, entered into the Settlement Agreement, containing the referenced contractual provisions, for valuable consideration.

13.     In fact, the Trust admits, at page 29, footnote 6 of the counterclaim, that during the parties' negotiations of the Settlement Agreement, it requested a "sale recapture" provision by which it would be "paid an additional amount for its stock if Jacques sold Foodonics within two years of closing the Redemption Agreement."  This "sale recapture" provision was not agreed to by the parties and was not included in the final Settlement Agreement.  Instead, the Trust, for valuable consideration and with the advice of highly sophisticated legal, including

Blackburn, tax, accounting and business counsel, agreed to the above referenced terms and representations set forth in the Settlement Agreement.

14. The Trust, its beneficiaries Jean, Dina and Marc and its team of legal, including Blackburn, tax, accounting and business counsel were all well aware, at all material times, that Jacques Klempf possessed the legal and corporate authority to sell substantially all of the assets of Foodonics at any time following the closing of the Settlement Agreement, with no compensation owed to the Trust, so long as the sale, at the time of closing, was not made to a buyer which had made a written offer to purchase within the twelve (12) month period prior to closing, nor to a buyer with whom the Foodonics Parties had received a pending current offer or were engaged in ongoing discussions concerning such sale.

15. The Trust, Jean, Dina, Marc and their team of legal, including Blackburn, tax, accounting and business advisors were all well aware of Cal-Maine and its prominence in the egg industry at all material times to this case. In fact, the Trust has admitted, at paragraph 43 of its counterclaim, the October 13, 2009 email from Jacques stating that "I have been approached on more than one occasion from Cal-Maine Foods… regarding my interest to sell the company," that Cal-Maine had acquired several other companies, and that Dixie Egg Company might be a very strategic acquisition target for Cal-Maine to block entry into the Florida/Georgia market by one if its competitors.

16. In paragraph 14 of the Settlement Agreement, each of the parties agreed that they will take no action that is inconsistent with any of the provisions or requirements of that agreement. The Trust has materially breached its release and this provision by asserting its counterclaims.

17.     Moreover, the Settlement Agreement expressly provides in paragraph 16(b) that the Settlement Agreement shall be governed by and construed in accordance with the laws of the State of Florida.

18.     The Trust entered into the parties' Settlement Agreement freely, voluntarily, knowingly, for valuable consideration and with the advice of highly sophisticated legal, including Blackburn, tax, accounting and business counsel.

19.     The Settlement Agreement is a complex business transaction involving substantial consideration moving between the various parties to the agreement.  All parties were *sui juris* and represented by expert legal, including Blackburn, accounting, tax and business counsel.  The Settlement Agreement is clear and unambiguous.  Therefore, the parties' Settlement Agreement should be enforced as written under Florida law.

20.     Furthermore, settlement agreements are highly favored under Florida law as a means of resolving disputes and conserving judicial resources.  Accordingly, Florida public policy strongly supports the enforcement of settlement agreements whenever possible. Similarly, Florida courts enforce general releases within settlement agreements to further the public policy of encouraging settlements.

21.     The Trust is wrongfully asking the Court to disregard and rewrite the parties' Settlement Agreement and thereby interfere with the parties' freedom of contract.  The Trust asks this Court to grant the Trust the benefit of terms and conditions to which the parties to the agreement did not agree.   Although the parties have agreed to very specific terms, representations, warranties and contractual provisions, in complex, multi-faceted, multi-party commercial transaction, the Trust now asks this court to find liability against one party for

breach of a provision of the Trust asked for and wished had been included in the Settlement Agreement, but which was not agreed to by the parties.

22.     In addition, the parties expressly agreed, at paragraphs 16 (d), (e) and (f) of their Settlement Agreement, as follows:

> (d)     This Agreement and the other writings referred to herein contain the entire understanding of the Parties with respect to its subject matter.   This Agreement supersedes all prior agreements and understanding among the Parties with respect to its subject matter.

> (e)     This Agreement may be amended only by a written instrument duly executed by the Parties hereto.   This Agreement (including without limitation this Section 16(e)) may not be amended by oral agreement, waiver or course of dealing among the Parties.

> (f)     The Parties have participated jointly in the negotiation and drafting of this Agreement. In addition, all Parties have been represented by their own legal counsel in the negotiation and preparation of this Agreement. Each Party has had the opportunity to consult counsel prior to executing this Agreement.

23.     Paragraph 16(d) of the Settlement Agreement eliminates any extraneous terms of the parties' agreement not included in the document.   Moreover, paragraph 16(e) precludes changes to the agreement absent consent by all parties; and that no party was without the benefit of counsel.

24.     In approximately March or April, 2016, due to changing industry and market conditions prevailing at that time, Jacques decided to explore a possible sale of substantially all of the assets of Foodonics. A nondisclosure agreement between Foodonics and Cal-Maine was executed in April or May, 2016. A Letter of Intent was executed between Foodonics and Cal-Maine for the purchase and sale of substantially all of the assets of Foodonics on about August 3, 2016.

25.     In about November of 2016, Cal-Maine purchased substantially all of the assets of Foodonics for $71,643,000.  Since the transaction was structured as an asset purchase and sale rather than a stock purchase and sale, Foodonics was obligated to pay all of its liabilities and debts which were not assumed by Cal-Maine.  The Trust claims that, had it remained a shareholder of Foodonics at the time of the Cal-Maine transaction, it would have received $32,675,330 of the $71,643,000, or about $23,200,000 more than the Trust was paid for its stock through the Settlement Agreement.  This assertion is wrong for many reasons, among which is that the assertion obviously overlooks the payment of liabilities and debts of Foodonics from the $71,643,000 sale proceeds.  The Trust's assertion grossly mischaracterizes the subject transactions.

26.     Jacques devoted his full and extraordinary efforts to the business of Foodonics and made the major decisions for the Company for many years prior to the sale to Cal-Maine. As a consequence of the considerable efforts, sweat and toil of Jacques over a period of many years, substantial value was created which provided significant economic benefit in the millions of dollars to the Trust, to Jean personally, and to Dina and Marc.

27.     The 2006 purchase of the Foodonics stock owned by Dina and Marc, the limitation of shareholder distributions to allocable tax liability, the compensation of Jacques for his services, and the restrictions and terms for the sale of the Foodonics stock owned by the Trust are irrelevant to this action but were all established lawfully, for valuable consideration and with all parties represented by competent legal, including Blackburn, accounting, tax and business counsel.

28.     Foodonics and Jacques complied with all of their obligations under the 2006 Agreement, as well as under the Settlement Agreement.  Foodonics and Jacques fulfilled all of

their legal, contractual and disclosure obligations to the Trust at the time of the Settlement Agreement. Foodonics and Jacques are not guilty of any non-disclosure of material facts in their dealings with the Trust. Moreover, Foodonics and Jacques had no intent to deceive, manipulate or defraud the Trust in connection with the parties' Settlement Agreement. Furthermore, the Trust did not reasonably rely on any alleged non-disclosure by Foodonics and Jacques. The Settlement Agreement provided the Trust with an opportunity for liquidity that was not otherwise available. There is no legal or equitable basis for the Trust to obtain a windfall by taking unfair advantage of events subsequent to the parties' Settlement Agreement for which it waived and released any claim, in direct contravention of the Settlement Agreement.

30. At paragraph 15 of the Settlement Agreement, the parties agreed "In the event of any litigation to construe or enforce this Agreement (or the agreements contemplated herein), the prevailing Party shall be entitled to recover the prevailing Party's reasonable attorney's fees and costs from the non-prevailing Party, whether at trial or on appeal."

**First Affirmative Defense**
*(Settlement)*

The Trust's counterclaim is without merit and should be dismissed with prejudice because of the settlement between the parties set forth in the Settlement Agreement attached hereto as Exhibit "A."

**Second Affirmative Defense**
*(Accord and Satisfaction)*

The Trust's counterclaim is without merit and should be dismissed with prejudice based on the principle of accord and satisfaction as a consequence of the parties' Settlement Agreement attached hereto as Exhibit "A."

### Third Affirmative Defense
*(Release)*

The Trust's counterclaim is without merit and should be dismissed with prejudice because of the release set forth in the Settlement Agreement attached hereto as Exhibit "A."

### Fourth Affirmative Defense
*(Waiver)*

The Trust's counterclaim is without merit and should be dismissed with prejudice based on the principle of waiver as a consequence of the settlement, release, merger and other terms of the Settlement and Redemption Agreement attached hereto as Exhibit "A."

### Fifth Affirmative Defense
*(Estoppel)*

The Trust's counterclaim is without merit and should be dismissed with prejudice based on the principle of estoppel as a consequence of the settlement, release, merger and other terms of the Settlement Agreement attached hereto as Exhibit "A."

### Sixth Affirmative Defense
*(Assumption of Risk)*

The Trust entered into the Settlement Agreement knowingly, voluntarily and with the advice of experienced legal, including Blackburn, accounting, tax and business counsel. The Trust, acting knowingly, voluntarily and with the advice of experienced legal, including Blackburn, accounting, tax and business counsel, gave up its request for a "sale recapture" provision in the Settlement Agreement and therefore assumed the risk of a later sale of the stock or assets of Foodonics.

## Seventh Affirmative Defense
### *(Jean Klempf Trust's Material Breach)*

The Trust's counterclaim is without merit and should be dismissed with prejudice because of its material and substantial breaches of the provisions of the Settlement Agreement attached hereto as Exhibit "A."

## Eighth Affirmative Defense
### *(Performance by Foodonics and Jacques)*

The Trust's counterclaim is without merit and should be dismissed with prejudice because Foodonics and Jacques have duly performed all of their obligations under the Settlement Agreement attached hereto as Exhibit "A."

## Ninth Affirmative Defense
### *(Failure to State Any Claim Upon Which Relief Can Be Granted)*

For all of the foregoing reasons, the Trust fails to state any claim upon which relief can be granted.

WHEREFORE, Foodonics and Jacques request that the Trust's counterclaim be dismissed with prejudice and that Foodonics and Jacques be granted the relief set forth in its Complaint, including an award of all attorneys' fees and costs incurred in this case.

Dated this 9th day of March, 2018.

/s/ S. Grier Wells_____
S. GRIER WELLS, ESQ.
Florida Bar No.: 203238
Primary E-Mail Address:
grier.wells@gray-robinson.com
Secondary E-Mail Address:
elizabeth.irvine@gray-robinson.com
GrayRobinson, P.A.
50 North Laura Street, Suite 1100
Jacksonville, Florida 32202
Phone: (904)-598-9929
Fax: (904)-598-9109
JOHN M. BRENNAN
Florida Bar No.: 297951
Primary E-Mail Address:
jay.brennan@gray-robinson.com
Secondary E-Mail Address:
jessica.rolon@gray-robinson.com
MICHAEL R. SANTANA
Florida Bar No.: 42124
Primary E-Mail Address:
michael.santana@gray-robinson.com
Secondary E-Mail Address:
lisandra.acosta@gray-robinson.com
GrayRobinson, P.A.
301 East Pine Street, Suite 1400
Orlando, Florida  32802
Phone:  (407) 843-8880
Fax:      (407) 244-5690
Attorneys for Plaintiff/ Counterclaim
Defendants, FOODONICS
INTERNATIONAL, INC., a Florida
Corporation and KEVIN JACQUES
KLEMPF

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that the foregoing was served electronically filed with the Clerk of the Court through the Court's CM/ECF electronic notification system and furnished by email delivery to JAMES H. POST, ESQ., MICHAEL E. DEMONT and R. CHRISTOPHER DIX (*jpost@smithhulsey.com, mdemont@smithhulsey.com, cdix@smithhulsey.com*), Smith Hulsey & Busey, 225 Water Street, Suite 1800, Jacksonville, Florida 32202 *(Attorneys for Defendant/Counterclaim Plaintiffs)*, this 9th day of March, 2018.

/s/ S. Grier Wells, Esq.
Attorney