IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

FOODONICS INTERNATIONAL,              Jacksonville, Florida
INC., a Florida corporation,
                                      Case No. 3:17-cv-1054-J-32JRK
      Plaintiff,
                                      June 5, 2018
vs.
                                      2:10 p.m.
DINA KLEMPF SROCHI, as
Trustee of the Laura Jean            Courtroom No. 5D
Klempf Revocable Trust, a
Florida Trust,

      Defendant.
_____


DIGITALLY RECORDED DISCOVERY STATUS HEARING
BEFORE THE HONORABLE JAMES R. KLINDT
UNITED STATES MAGISTRATE JUDGE


COURT REPORTER:

            Shannon M. Bishop, RDR, CRR, CRC
            221 North Hogan Street, #150
            Jacksonville, Florida  32202
            Telephone:  (904)549-1307
            dsmabishop@yahoo.com

      (Proceedings reported by mechanical stenography;
transcript produced by computer.)

## A P P E A R A N C E S

PLAINTIFF'S COUNSEL:

      **SAMUEL GRIER WELLS, ESQ.**
      GrayRobinson, PA
      50 North Laura Street, Suite 1100
      Jacksonville, FL  32202

DEFENSE COUNSEL:

      **JAMES H. POST, ESQ.**
      **R. CHRISTOPHER DIX, ESQ.**
      Smith, Hulsey & Busey
      One Independent Drive
      Suite 3300
      Jacksonville, FL  32202-3315

COUNSEL FOR MOVANT:

      **MARK A. CUNNINGHAM, ESQ.** (via telephone)
      Jones Walker, LLP
      201 St. Charles Avenue, 47th Floor
      New Orleans, LA  70170-5100

ALSO PRESENT:

      David Hancock (via telephone)

                    P R O C E E D I N G S

June 5, 2018                                    2:10 p.m.

                         - - -

          COURT SECURITY OFFICER:  All rise.  The United States

District Court in for the Middle District of Florida is now in

session.  The Honorable James R. Klindt presiding.

          You may be seated.

          THE COURT:  Hi.  Good afternoon, everyone.

          MR. WELLS:  Good afternoon, Your Honor.

          MR. POST:  Good afternoon.

          MR. DIX:  Good afternoon.

          THE COURT:  This is *Foodonics International, Inc.,*

*against Dina Klempf Srochi, as Trustee of the Laura Jean Klempf*

*Revocable Trust, a Georgia trust,* Case No. 3:17-cv-1054-J-32JRK.

          We're set for a -- basically, a status hearing

regarding electronic discovery that involves a third party,

Cal-Maine.

          And this is a -- a hearing that was requested by

Mr. Post.  And it's pursuant to -- he's making the request

pursuant to an order governing ESI issues that the Court

entered on March 15th, 2018, document 27, that, in paragraph 4m

states, in accordance with Rule 16(b)(3)(B)(v), that no

discovery-related motion may be filed unless the moving party

attempted in good faith, but without success, to resolve the

dispute and has requested a pre-motion conference with the

1  Court to discuss the dispute and to attempt to resolve it.

2          So this is a pre-motion conference.  So let's -- let

3  me go ahead and start with -- if -- with -- well, I'll start

4  with you, Mr. Post.

5          If you could announce your appearance, please.

6          MR. POST:  May it please the Court?  Jim Post and

7  Chris Dix from the law firm of Smith Hulsey & Busey on behalf

8  of the Jean Klempf trust.

9          THE COURT:  All right.  Thank you.

10         And as I understand it, Mark Cunningham is on the

11 telephone representing Cal-Maine.

12         Is that right, Mr. Cunningham?

13         MR. CUNNINGHAM:  Yes, sir, Your Honor.

14         THE COURT:  All right.  Thank you.

15         And then, Mr. Wells?

16         MR. WELLS:  Thank you, Your Honor.

17         Grier Wells with GrayRobinson here in Jacksonville.

18 And we also have Dave Hancock, who is our IT guru with the

19 firm.  He's on the phone as well.

20         THE COURT:  All right.  And, Mr. Hancock, you are,

21 indeed, on the telephone?

22         MR. HANCOCK:  Yes, sir.

23         THE COURT:  All right.  Well, you know, the first

24 question I have is why in the style -- at one point the Trust

25 is referred to as a Georgia trust and in another point a

Florida trust.

Can someone just answer that for me, and then we can get on to the business that we have?

MR. POST: Your Honor, of course, this complaint was filed by Foodonics. And they labeled -- mislabeled our trust as a Georgia trust.

The Jean Klempf trust is, in fact, a Florida trust. It happens that the primary trustee, Dina Klempf, is a Florida resident.

THE COURT: All right. Do you agree with that, Mr. Wells?

MR. WELLS: I agree that the trust is a Florida trust, Your Honor, and that Dina Srochi is a Georgia resident. I'm, frankly, not sure how it was labeled as a Georgia trust, but we certainly agree that it is a Florida trust.

THE COURT: All right. Well, at some point -- and my law clerk will help me figure this out -- we may want to just correct that, because I've had a couple of questions just as we've gone through it about why that might be. And I probably spent too much time thinking about it when I should have been thinking about other things.

But -- well, Mr. Post, you did request this hearing. So it seems to me it would be best to hear from you first.

You can use either podium. If that one is easier for you, you can do that. Whatever works for you.

1          MR. POST:  Thank you, Your Honor.  And thank you for

2     this opportunity for the discovery conference.  We appreciate

3     it.

4          Last January the Trust served its request for

5     production on Foodonics and a subpoena for documents on Jacques

6     Klempf, Cal-Maine, and Dolph Baker.

7          As of today, we have not received a single document

8     from Foodonics or Jacques Klempf, except for tax returns

9     produced only two weeks ago.  And we have not had a single

10    document from Cal-Maine or Dolph Baker.

11          Although the communications between the firms have

12    been cordial and professional, and some recent progress has

13    been made with the Foodonics and Jacques Klempf group, the

14    delay in the document production has precluded us from taking

15    depositions in this case and is jeopardizing our ability -- or

16    possibly jeopardizing our ability to meet the discovery cutoff

17    in this case, which is October 31st.

18          We're hoping this status conference would help us put

19    some of the document production in this case on a faster track

20    and help dislodge some of the roadblocks we presently face,

21    without the need of discovery motion practice, and -- which

22    would only add more delay and expense to this litigation.

23          Your Honor, as I said, the status of this case is

24    that the -- that the discovery cutoff is December -- is October

25    31st.  Trial is May 6th of 2019.

1    We've already had to move one deadline back, the

2    motion to add or amend parties pursuant to consent order.  It

3    was moved from June 29th to July 31st.

4    And in January the Trust served a request for

5    production on Foodonics and a subpoena for documents on Jacques

6    Klempf and the law firm that represented Jacques Klempf in

7    connection with these transactions at issue, GrayRobinson.

8    And in -- we also served subpoenas on both Dolph

9    Baker and Cal-Maine, Dolph Baker being the president of

10   Cal-Maine.

11   And in March of '18 we served subpoenas on potential

12   fact witnesses, falling into basically two groups, a group

13   we've referred to as the interested non-parties, former

14   business associates and relatives of Jacques Klempf -- there

15   were about seven of them -- and a group of what we've called

16   the classic disinterested non-parties, approximately ten

17   others.

18   With respect to the ten disinterested non-parties, we

19   have received documents.  And we haven't had any problems or

20   issues to speak of, certainly none that would be necessary to

21   bother the Court.

22   But as I said, we have not received any documents

23   from the interested non-parties or the Foodonics group or the

24   Cal-Maine group, other than the four tax returns I mentioned.

25   There is a motion to quash filed by the

1  non-interested parties filed by the GrayRobinson firm.  That

2  was document 30.  We filed a -- the Trust filed a response to

3  that document 34 in April of this year.

4          And one of the primary objections asserted in that

5  omnibus objection is -- by Foodonics group, is that any

6  document or ESI items dated prior to December 1st, 2014,

7  12 months prior to the redemption transaction at issue in this

8  case, is not relevant and should not be produced.  And this

9  argument is being mimicked by the Cal-Maine group as well.

10         And, of course, the Trust's position is that the --

11  the -- the efforts of Jacques Klempf to buy his mother's stock

12  began in 2008 and a one year cutoff is not reasonable.

13         And as we explained in our response, some of the

14  documents we received from the non- -- from the disinterested

15  non-parties outside that one-year period are very material to

16  our case.

17         THE COURT:  How far back?  Do -- do you know?

18         MR. POST:  We're asking that we go back to December

19  of -- September of 2008.

20         THE COURT:  But I -- no.  I meant -- you said you

21  have -- you have gotten some relevant documents from the

22  non-interested parties that go back prior to, obviously, the

23  December 1st, 2014.

24         Do those go all the way back to 2008?

25         MR. POST:  No, Your Honor.  The particular document I

1 referred to in my response was, we believe, generated

2 approximately 8 to 12 months before what they would deem the

3 cutoff date to be.

4 It was a valuation of Jacques Klempf and his company

5 based on 2003 numbers. And that document was prepared sometime

6 after -- between 2003 and before the redemption, the one-year

7 cutoff.

8 So, again, we -- the communications have been

9 cordial, but -- and professional, but we're -- we're being

10 slow-walked in this case.

11 And we would bring to the Court's attention, of

12 course, you know, the -- the objection -- that those -- the

13 federal rules -- the Florida rules, excuse me -- the Florida

14 Rules of Civil Procedure in the Middle District Handbook of

15 Discovery makes it clear that objections to portions of

16 requests or a subpoena do not excuse a responding party from

17 producing those documents which has no objection.

18 So we would hope as a result of this status

19 conference that -- one thing that we could achieve is that we

20 could obtain an agreement from the Foodonics group and the

21 Cal-Maine group to promptly produce, at a minimum, all the

22 responsive documents to ESI to which there's no objection.

23 And this would include, for example, the

24 non-disclosure agreement between Cal-Maine and Foodonics, as

25 well as all the closing sale documentation. And -- and that

1 certainly falls -- it's within the time period even they would

2 argue is relevant in this case.

3       That -- that's the big -- that's a big request,

4 but -- big picture request.  But, more specifically, with

5 respect to the Foodonics and -- group, a successful status

6 conference, we believe, would include a commitment from the

7 Foodonics group to produce all the responsive documents, ESI no

8 later than June 15th.

9       And if a phase production is required, to complete

10 their production by June 29th, which would, of course, include

11 the non-disclosure agreement and the Cal-Maine -- Cal-Maine

12 sale documentation.

13       And, also, a disclosure to the Trust during that --

14 as soon as possible of the current status of all the corporate

15 Foodonics e-mail accounts, as well as personal accounts used by

16 the employees of Foodonics for business purposes.

17       The problem there, Your Honor, is that we understand

18 that the Foodonics group has not yet even identified all of the

19 sources of the custodians and the mailboxes likely to contain

20 relevant ESI.  And, of course, you can't do a thorough

21 production unless you know where you're going to look.

22       So those are -- those are the two big things that we

23 would like to achieve, if possible, in connection with this

24 status conference.

25       And with respect to the Cal-Maine group, we would

1  envision a successful status conference would include a

2  commitment by Cal-Maine to produce all responsive,

3  non-duplicative, non-privileged ESI and documents on or before

4  June 20th of this month without waiting for production by

5  Foodonics, and a disclosure by -- by the Cal-Maine group by

6  June 20th of all the sources and locations the ESI they

7  allege to be -- might be duplicative or -- and how that

8  information is stored, and the difficulty, if any, retrieving

9  or reviewing or producing that information, because the -- what

10  we -- what we learned at the beginning of May from the

11  Cal-Maine group is they don't intend to even look for what

12  might be responsive until the Foodonics production is done

13  and -- and -- and then they would maybe produce stuff if it

14  wasn't duplicative of what was produced by the Foodonics group.

15        And, of course, the problem with that is, Your Honor,

16  there was obviously things in the domain of the Cal-Maine

17  group, which is certainly not duplicative and should be

18  produced at this time without any delay, at a minimum.

19        And, of course, if -- if we wait, we might be waiting

20  a long time before we get stuff from the Foodonics group to --

21  for them -- for there to be a duplicative effort or reduction

22  effort.

23        And the other thing with respect to Cal-Maine group

24  is that they've refused -- or have not agreed to conduct a

25  reasonable inquiry into what the text messages might be on the

1  mobile phone of Dolph Baker.  And so we -- they basically have

2  not done anything in connection with that.

3          We'd like a disclosure by June 20th of whether or not

4  there are cell phone text messages that Dolph Baker has for the

5  period in question related to -- responsive to our document

6  request.

7          So that -- those are the big-picture items, Your

8  Honor.  I'll confess up front that my partner, Chris Dix, is

9  more informed about ESI stuff.

10          So I might have him respond to any other questions

11  that -- or some other questions that might come up, if I can't

12  handle it.

13          THE COURT:  All right.  Thank you.

14          Well, Mr. Wells, why don't I hear from you, because

15  it seems like everyone's -- this is all intertwined or

16  connected somehow.

17          MR. WELLS:  Thank you very much, Your Honor.

18          May it please the Court?

19          THE COURT:  Yes, sir.

20          MR. WELLS:  I don't want to be presumptuous, but I

21  think it may be helpful if I give the Court a very brief

22  overview of the facts of the case that may put some of the

23  positions of Mr. Post on behalf of the Trust and Ms. Srochi in

24  context.

25          Mr. Klempf, who is the president -- or was the

1   president and CEO of Foodonics, purchased his mother's stock,

2   which was essentially held by the Trust, effective in December

3   2015.

4           The purchase agreement involved in that transaction

5   provided that there were no ongoing discussions about the sale

6   of the company within the preceding 12 months, nor have there

7   been any written offers.  And it may be just that there's no

8   written offer within 12 months and no ongoing discussions.

9           That was memorialized in the settlement agreement

10  and -- settlement and redemption agreement with the Trust.  And

11  it also -- that document also included a complete release by

12  the Trust of any claims that existed as of that time.

13          So we began with looking back 12 months from the date

14  of that agreement to -- and the agreement was December 31st,

15  2015.

16          We have contended consistently that the scope of

17  discovery should not be prior to December of 2014.

18  Nevertheless, we have produced some documents prior to that and

19  are agreeable to producing some documents prior to that.

20          The material documents that Mr. Post referred to, if

21  I understand what has occurred thus far, are some documents

22  that were produced by the former employee of Foodonics that

23  were produced -- that were dated in 2014.

24          They may have been somewhat prior to the one-year

25  cutoff from the settlement agreement and the stop purchase

1   transaction, but they were, nevertheless, documents that were

2   produced as of December 2014.  We certainly can take the

3   position at some appropriate time as to the materiality of

4   those documents.

5           We maintain, Your Honor, that documents prior to at

6   least 2013 are not relevant.  They're certainly not

7   proportional and not relevant to any claim or defense in the

8   case.

9           Nevertheless, we are being asked to go back to 2008.

10  A recent subpoena even goes back further than that.  And I

11  note, too, for the record that the Trust has issued 29

12  subpoenas in this case.  One party has been subpoenaed twice.

13          In the midst of all that, we have completed a

14  glossary of search terms as of May 22nd.  And the process has

15  begun to use those search terms to -- to pull electronically

16  stored information from various sources.

17          We are in the process on behalf of Foodonics of

18  pulling all of that from a variety of cell phones, laptops,

19  PCs, owned by Mr. Klempf.

20          The only sources that we are aware of that -- are at

21  issue as far as Foodonics is concerned -- there is one e-mail

22  account that was available to a number of employees, not all

23  employees.

24          When the sale to Cal-Maine occurred in October of

25  2015, Cal-Maine came in.  A lot of those e-mails in that one

1    e-mail account were transported to a Cal-Maine system.

2          We are trying to access that account.  We no longer

3    have it.  They're no longer our employees.  We're trying to

4    find out how to access that particular e-mail account.

5          We are in a process of providing documents in

6    response to the discovery requests.  But as I noted a moment,

7    we've only had search terms for the last two weeks.

8          There are probably hard documents that could be

9    produced, but it was our thought that producing the documents

10    generally at the same time would be more efficient than doing

11    so in a piecemeal fashion.

12          I would note, Your Honor, that we also submitted a

13    request to produce to the Defendant/Counter Plaintiffs in the

14    case.  In response to that, we have received trust documents

15    which are pretty basic, pretty axiomatic in the case, but have

16    received no other documents.

17          It has been suggested in their Rule 26 disclosure

18    that they don't really have any documents, even though they

19    have filed a fairly comprehensive counterclaim.

20          We're in the process of working.  We are getting the

21    ESI documents as we speak.  We got information this morning on

22    additional material that we may be able to access, but we are

23    in the process of doing that.

24          We would note, as we have noted in the omnibus motion

25    that we filed, that not only are we looking at a -- what we

1  believe is an unreasonable time range for production, but if

2  the Court were to examine some of the subpoenas, they are not

3  subject-matter related, they are simply produce everything

4  you've got between these people and those people since 2008.

5       So that is also a factor that we are having to deal

6  with.

7       THE COURT:  Anything else?

8       MR. WELLS:  No, sir.  Not at this point.

9       THE COURT:  Well, let me just -- I want to hear from

10 everybody before we get into motions for discussions.  So thank

11 you.

12       Mr. Cunningham?

13       MR. CUNNINGHAM:  Thank you, Judge.

14       As you can see, Judge, Cal-Maine is caught in between

15 these two warring parties.  We don't have a dog in this fight.

16 We're not aware of any dealings or communications between our

17 client and Foodonics in a substantive way prior to the 2015 or

18 '14 time period.

19       We've also cooperated, you know, in this process.

20 Any documents that we would have would be completely

21 duplicative of the documents that Foodonics would have, because

22 this was a transaction between Foodonics and Cal-Maine.

23       So anything of relevance that we might have to this

24 dispute could only be documents related to the transaction that

25 we would have received from Foodonics.

1    And what we've suggested, invited -- and invited the

2    Klempf Trust Plaintiffs or Counter Plaintiffs to do is to just

3    pursue the discovery with Foodonics, and then, if they have a

4    reasonable concern that there's something missing or that we

5    might have something that's not duplicative, then come back to

6    us and talk to us about what that information is, and we'd be

7    happy to work with them.

8    In the meantime, we've cooperated with both parties

9    by coordinating the transfer of a server that we have

10   possession of, but that which goes along to Foodonics.  We've

11   preserved our documents.

12   The Trust had asked us questions about these e-mail

13   accounts from the Jacques Klempf group.  And we were able to

14   confirm that we did not have control or possession over those

15   accounts.

16   We talked to them about the types of documents,

17   sources of documents, that we would have, and the reasons why

18   we think that they are cumulative or duplicative of anything

19   Foodonics has had.

20   And we've ultimately concluded by saying, "Look, you

21   know, what you're asking us to undertake here is a

22   substantial -- substantial efforts and investigation over a

23   very, very long time period."

24   One of the sets of data -- one of the data sets that

25   they're looking for is for us to turn over the cell phone of

1   our CEO.  This is a CEO of a publicly traded company.  He's

2   dealing with sensitive, confidential information every day all

3   the time.

4          The prospect of turning over that kind of data is,

5   you know, obviously of real concern to our company.  And then

6   there's the whole cost piece of it.

7          You know, we would need to go restore data, review

8   data, quantify data, and -- and ultimately produce it in order

9   to satisfy the Plaintiff's or the Trust's request.

10          The Trust, you know, as an inter-measure, has asked

11   us to provide them with details about kind of the volume of

12   information that we have in each data set, to confirm whether

13   we do, in fact, have text messages between our CEO and the

14   Foodonics CEO.

15          But undertaking just that, Judge, requires us to hire

16   an outside consultant, to start processing data, to look at the

17   data, quantify it.

18          And so, really, they're not -- they're asking us to

19   go through the process before even demonstrating any kind of

20   need whatsoever.  And we really are a non-party with no dog in

21   this hunt or interest in this dispute.

22          And until the Trust can come back with a reasonable

23   basis for saying, "Look, we really do need to impose on this

24   non-party in order to get a complete picture of the facts that

25   are in dispute," we'd just assume stay out of the middle of all

1  of this.

2        And you can tell by, you know, how this hearing has

3  gone that we really are caught in the middle.  Most of what is

4  being discussed here is a discovery dispute -- a routine

5  discovery dispute between the parties.

6        And we are a non-party.  We don't want a seat at the

7  table.  And until there's a demonstrated need for us to

8  undertake any efforts in order to satisfy the Court, we'd just

9  assume, you know, we not be required to do that, Judge.

10        That's all that I have, unless you have any

11  questions, Judge.

12        THE COURT:  Mr. Post, do you want to -- you or

13  Mr. Dix want to say anything in response to this?  I haven't

14  really heard anybody address specifically what you've proposed;

15  that is, that you get the closing agreement promptly and the

16  non-disclosure agreement promptly and -- or the sale

17  documentation by June 15th.

18        So I'm just assuming that I'm going to order those

19  things be provided, because there hasn't been any reason not

20  to.

21        So what else do you --

22        MR. CUNNINGHAM:  Judge -- I'm sorry to interrupt,

23  Judge.  I may be able to just kind of cut to the chase then.

24  We -- sir, we don't have an objection.

25        We had asked as an inter-measure to protect the

1   confidentiality of some formulas that are in the transactional

2   documents that the -- the details -- information that is

3   related to how we price transactions be redacted, because we

4   don't think that they need that information.

5         We provided that request for redaction and what

6   specifically we would like to see redacted to Foodonics.  And

7   we certainly don't have any objection to them going forward on

8   that basis.

9         MR. POST:  Your Honor, it's hard for me to comment on

10  what would be an appropriate redaction to a document I've never

11  seen.  It strikes me as something that I -- I'm not inclined to

12  agree to, because it's critical in this case for us to know

13  what information Jacques Klempf gave to Cal-Maine when -- and

14  what information Cal-Maine thought was relevant in coming up

15  with a $70 million purchase price, when 11 months earlier it

16  was represented to Ms. Klempf the company was only worth

17  35 million, so -- and we're not asking for internal documents

18  from Cal-Maine.  We're asking for the closing binder which has

19  the agreements between the two parties, so -- and there was a

20  confidentiality order already in this case entered by this

21  Court.

22        So for all those reasons, we would like the -- those

23  documents prepared -- or produced without redactions at this

24  time.

25        MR. CUNNINGHAM:  And if I might, Judge, just to take

1   another stab at that, the information that we want redacted is

2   highly detailed information.  It's, you know, like number of

3   coops and chickens and, you know, pieces of equipment.

4         Cal-Maine has a strategy and approach to acquisitions

5   that it believes gives it a strategic advantage in the

6   marketplace with respect to acquisitions.

7         Obviously there's a protective order in place.  But

8   ultimately this case may very well go to trial.  Information

9   like that, if it were to reach the public domain, would really

10   destroy the competitive advantage that Cal-Maine has built up

11   over time.

12         And I -- and, you know, I've spoken and -- with

13   Foodonics and the Trust counsel about an approach where we

14   would request certain limited redactions.  They would then see

15   what those redactions were.

16         And if they felt, again, like they needed that kind

17   of detailed line-item information, we could certainly work from

18   there.

19         But I think in the first instance they really need

20   the bottom-line numbers of -- of the purchase, rather than the

21   detailed line items and formulas that are set forth in those

22   transaction documents.

23         THE COURT:  And why doesn't the confidentiality order

24   give you the protection that you need?

25         MR. CUNNINGHAM:  We would be concerned for two

1  reasons, Judge.  One, the protective order is a two-level

2  protective order, in the sense that, you know, there's either

3  confidential or non-confidential information, there's no

4  attorneys' eyes only designation.

5      That kind of designation would certainly give us a

6  lot more comfort, in terms of being able to know and feel

7  assured that the information would not be disclosed

8  inadvertently or -- or otherwise.

9      Two, we're also concerned, Judge, with just mechanics

10 at trial.  You know, this case, you know, may very well go to

11 trial at some point.  And, you know, the handling of documents

12 at trial and the public's right to participate in that trial or

13 to observe the trial may mean that those transaction documents,

14 which are going to be a central part of the case, would then be

15 introduced into evidence into the public record.

16     And so if they're not redacted at this time, there

17 may never be an opportunity to obtain those redactions later

18 before trial, when they're introduced in evidence.

19     THE COURT:  Well, that -- the problem with what you

20 just said to me -- and just in a simple way, if they are

21 essential to the case and that would be a problem at trial,

22 then that's a problem now for the party that wants the

23 documents.

24     So if the confidentiality order needs to be amended,

25 or if there needs to be a second one drafted attorneys' eyes

 1  only, I'd be amenable to that.  But -- but I'm not going to

 2  look forward all the way to trial and say, gosh, if they really

 3  are relevant and they really are necessary, then -- then we

 4  have a problem at trial.

 5          If they really are relevant and really are necessary,

 6  then they need to be produced.  And we won't know that until --

 7  until -- until they -- they are produced, with as much

 8  protection as we can give you -- or as the Court can give you

 9  in that regard.

10          So I -- I don't -- I don't disagree with you that

11  maybe another level -- an attorneys' eyes only level may be

12  appropriate.  But I don't think looking ahead all the way to

13  the trial and what might happen then is a basis to not require

14  that they be produced.

15          Mr. Post, what do you say to an amended

16  confidentiality order that would -- would include an attorneys'

17  eyes only provision?

18          MR. POST:  Your Honor, that would be acceptable.

19          THE COURT:  All right.

20          All right.  So --

21          MR. CUNNINGHAM:  Thank you, Judge.  That certainly

22  would give us a lot of -- greater confidence of assurance.

23          THE COURT:  All right.  Mr. Post, what else?

24          MR. POST:  Just -- so we did -- I want to make sure

25  it didn't get lost in the shuffle here.  You -- I think you

1    heard it.

2         We -- we want to know where the -- where the

3    corporate Foodonics e-mail accounts are and no one can tell us.

4    We were first told by Foodonics that it -- that should be the

5    transfer to Cal-Maine.  Cal-Maine -- Mr. Cunningham told us

6    that they don't have them.  And now Mr. Wells has said again

7    that maybe they're in Cal-Main's possession.

8         We need -- we need to get to the bottom of that,

9    because we can't get a -- a full production of relevant

10   documents unless we have those Foodonics e-mail accounts.

11        And I'd also mention that the principals of

12   Foodonics, the officers, like Dick Still, had a Comcast account

13   where he did business -- he did transact business on that

14   Comcast account.

15        So we need -- we need the Foodonics group to also

16   make sure they get the personal e-mail accounts of employees

17   who used their accounts for business purposes.

18        MR. CUNNINGHAM:  And, Judge, this is Mark Cunningham

19   on behalf of Cal-Maine.  And I can confirm that I've been

20   informed by my -- my general counsel for Cal-Maine -- he's

21   worked with the IT director to confirm that we do not have

22   possession of these accounts and have never had possession of

23   the accounts.

24        THE COURT:  When you say "those accounts," are you

25   talking about the personal accounts this were used for business

1   purposes?

2         MR. CUNNINGHAM: Well, those accounts, but also these

3   e-mail accounts. I think that Mr. Post is looking for certain

4   Foodonics e-mail accounts that -- that may have existed, that

5   Foodonics may -- originally thought may have been transferred

6   to Cal-Maine, but they were, in fact, never transferred or

7   required as part of the transaction.

8         MR. POST: For clarification, Your Honor, there are

9   mailboxes from the @DixieEgg.com domain.

10         THE COURT: Say that again.

11         MR. POST: Mailboxes from the @DixieEgg.com domain.

12   We just don't --

13         MR. CUNNINGHAM: That's my understanding, as well,

14   Your Honor. And that's the accounts that we do not have

15   possession of.

16         THE COURT: And then, Mr. Wells, did you -- so you're

17   in the process of figuring this out, what you have and don't

18   have?

19         MR. WELLS: Yes, sir. The only thing that we had

20   some question about is this particular Dixie -- @DixieEgg -- I

21   have to confess, I'm not an ESI guy, and today is the first

22   time I've heard about @DixieEgg.

23         I've been operating on DixieEgg.com. If there's

24   something different, we can sort that out. But we may be

25   talking semantics, Your Honor, when -- again, it's my

1  understanding when Cal-Maine purchased the assets of Foodonics

2  there were ongoing communications -- e-mail communications, and

3  those communications were somehow transported to Cal-Maine, not

4  under the Dixie Egg domain, but just certain communications.

5        We are trying to identify that.  We know that there

6  were several employees at Dixie Egg, Foodonics, who had access

7  to that particular e-mail domain and were trying to locate

8  that.

9        Keep in mind that we -- we don't employ anyone

10  anymore.  They're not our employees.  They were not our

11  employees when the litigation commenced.  But we're trying to

12  identify where that information is.

13        Mr. Post just mentioned a former employee by the name

14  of Dick Still and a personal e-mail account.  I'm not sure what

15  jurisdiction Foodonics has over a former employee's personal

16  e-mail account.

17        Certainly if it was a company account, we're making

18  the effort to find that.  I don't want to be repetitive, but

19  we're in the process of applying the search terms to over

20  50,000 e-mail transmissions from the 2014 -- excuse me, 20- --

21  all of them, 2008 to 2017 e-mail accounts, and narrowing those

22  down to the 2014 time -- time frame.

23        I can't comment on the date that Mr. Post has

24  requested.  We just got the search terms two weeks ago.  We're

25  in the process of doing that.  I don't know how long it would

1    take to cull the documents out between now and the time frame

2    that Mr. Post has suggested.

3              THE COURT:  Tell me this, what -- what e-mail

4    accounts are you searching?  In other words, you're searching

5    all these e-mail accounts.  What accounts are those?

6              MR. WELLS:  There are -- and Mr. Hancock, who is on

7    the phone, can probably give more information.  But I believe

8    there are three or four e-mail accounts that were used by

9    Mr. Klempf and certain employees of Foodonics/Dixie Egg.

10             Those are an AOL account, a DixieEgg.com account, and

11   I think one other account that we used on Mr. Klempf's cell

12   phone, laptop, PC, as well as the Dixie Egg account on several

13   other employees.

14             And may I invite Mr. Hancock to address that, Your

15   Honor?

16             THE COURT:  Yes.

17             Mr. Hancock?

18             MR. HANCOCK:  Yeah.  So Mr. Wells is right.  So we

19   have collected from Mr. Klempf's Dixie Egg account, because he

20   maintains that separately.

21             We have collected from his gmail account from his BAM

22   Jax account.  And then we have done forensic collections of his

23   three laptops and PC.

24             MR. POST:  Your Honor --

25             MR. HANCOCK:  And his AOL account, if I didn't

1  mention that.  I'm sorry.

2          THE COURT:  Mr. Post?

3          MR. POST:  May I have my -- my liaison discuss that?

4          THE COURT:  Yes.

5          Mr. Dix?

6          MR. DIX:  Your Honor, I didn't hear -- in what

7  Mr. Hancock mentioned, I didn't hear anything about the

8  @DixieEgg.com e-mail accounts at all.  I heard gmail, BAM Jax,

9  the computers and laptops.  But there should be a --

10          MR. HANCOCK:  That's the first thing I said, is we

11  collected from his DixieEgg.com account because he maintains

12  that separately.

13          MR. DIX:  So it's just Jacques Klempf's @DixieEgg.com

14  e-mail.  But there were other people at Foodonics, all of whom

15  had different e-mail accounts.  Those are the ones that we

16  don't have any idea where they are.

17          So if all -- everybody in this room all have an AOL

18  account, we'd each have a different e-mail address.  They're

19  only searching one of all of them.  The rest are saying, "We

20  don't even know where they are."

21          THE COURT:  Mr. Hancock?

22          MR. HANCOCK:  That's correct.  We've not located them

23  yet.  It was our understanding that those -- the contents of

24  those e-mail accounts went with the employees when they

25  transitioned from Foodonics to Cal-Maine.

1      I'm not saying that Cal-Maine had control over those

2  e-mail accounts.  I'm saying that the contents were copied from

3  the @DixieEgg.com domain for each of those employees and

4  brought with them when they started their -- when they

5  transitioned to their employment at Cal-Maine.  That may or may

6  not be the case.  We're still trying to determine that.

7      THE COURT:  And --

8      MR. CUNNINGHAM:  And, Judge, this is Mark Cunningham.

9  We've previously informed the group, both sides, that -- to the

10  extent that Cal-Maine has any documents for any employees that

11  were transitioned to Cal-Maine as part of the transaction that

12  predate the transaction, we certainly have no interest in

13  those, and they can have -- they can have the whole universe of

14  them.  We've just never been able to locate anything like that.

15      THE COURT:  So you've inquired of each of those

16  persons whether they have any of those documents?

17      MR. CUNNINGHAM:  This is the first that we've heard

18  about any transfer of e-mails from one account to another

19  account, so we've not done that inquiry.

20      We were asked to inquire about the DixieEgg.com

21  accounts.  And that's the inquiry that we made, and were able

22  to confirm that we've never had possession or control.

23      If, in fact, somehow e-mails were transferred from

24  that account to a Cal-Maine account, we certainly would be

25  willing to turn those back over.

1      MR. DIX:  Your Honor, the problem is they're saying

2  they're not going to go and look yet, they want to wait until

3  Foodonics finishes.

4      MR. CUNNINGHAM:  Oh, no.  We would go look for that.

5  You know, this, again, is new information that's never been

6  provided to me before, but -- because this, again, is a set of

7  documents or a set of data that is really Foodonics's data.

8      And to the extent that we've dealt with Foodonics

9  data in other contexts, our position has always consistently

10  been, "We have no interest in it, you guys are happy -- you

11  know, we're happy to turn it over to you for you-all's review

12  and analysis of it."

13      But ultimately, if Foodonics informs us, look, there

14  were mails that were, in fact, transferred from the Dixie Egg

15  account to a Cal-Maine account, that would cause us to go

16  collect that data for you.

17      THE COURT:  Mr. Dix, how many people's accounts

18  are -- or how many persons are we talking about?

19      MR. DIX:  That's the thing, Your Honor.  We don't

20  know.  We know of five or six of the top -- vice presidents

21  and, you know, officers of Foodonics.

22      Beyond that, we don't know -- we don't have a list of

23  who their employees were.  That was what we were hoping they

24  would do when we had the requirement in the ESI order that they

25  go and tell us the locations of the potentially discoverable

1   ESI.

2          So we got a list from them, but it didn't have that

3   level of detail.  And we didn't know that they didn't have what

4   they are now saying they don't have.

5          MR. WELLS:  May I respond, Your Honor?

6          THE COURT:  Yes, of course.

7          MR. WELLS:  I think that -- with all respect to

8   Mr. Dix and Mr. Post, I think we're -- we're talking --

9   something that is confusing to us.  Because we know there's a

10  Dixie Egg account.  And we know that Mr. Klempf was essentially

11  the primary user of that account.

12         We've just learned that other employees who have used

13  that account -- that, for whatever reason, did not transfer

14  over to Mr. Klempf's account when -- well, when Cal-Maine

15  purchased the assets.

16         At that point in time, Mr. Klempf continued to pay

17  for his own use of that account.  But the old account had --

18  other employees had access to it, as I understand it.

19         I don't think the -- it's not vice presidents and

20  officers.  They're employees.  And there are probably a handful

21  of employees who had access to that particular account.

22         We're now trying to identify who they were and how we

23  get access to that particular Dixie Egg account from -- again,

24  I think that account has been terminated as to everybody but

25  Mr. Klempf.

1        And so those employees who are now Cal-Maine

2  employees don't have access to that Dixie Egg account, so

3  somewhat suspended in time at the time it was terminated after

4  the acquisition by Cal-Maine.

5        We're trying to find that out.

6        MR. DIX:  Your Honor, it would be helpful if they

7  would just figure out what -- which version of what they've

8  been telling us is the case and tell us so that we can move

9  forward.  That's what we want them to do.

10       THE COURT:  What I'm going to do is, I'm going to

11  order certain things be provided within a -- a reasonable

12  period of time here.

13       And then I'm just going to set another status

14  conference in two weeks and have a list of items that I'll need

15  reported to me, that I'll want -- I'll want to hear about.  It

16  will include some things from Cal-Maine, and also from

17  Foodonics, in terms of the status of a number of these items.

18       I can't -- I can't tell -- I can't tell Foodonics to

19  produce things that they don't have and they haven't been able

20  to determine whether they have them yet.

21       And I appreciate Cal-Main's position that they don't

22  want to -- to -- to provide material that would be duplicative

23  of what Foodonics produces, but we're never -- the dog's never

24  going to catch its tail on that one, so -- so that's -- that's

25  just not going to be workable.

1           But to the extent that this needs to move along, I
2    think that the best -- the best -- the best way to go about
3    this is to order that certain items be provided now that there
4    shouldn't be disagreement about and -- and those things be
5    provided within -- within 15 days.
6           And then -- and then we'll have another status
7    conference either in 15 days or 20 days, whatever -- whatever
8    it is, and give -- give Cal-Maine the opportunity to -- to
9    identify whether there are persons who have the accounts that
10   we've talked about today who were working for them -- Foodonics
11   can -- can continue what it now is telling me that are their
12   efforts in regard to the e-mail accounts, and -- and then I can
13   get some sort of a report.
14          And if we don't make any progress after another
15   status conference, then -- then somebody's going to have to
16   start filing motions and we're going to have to start having
17   evidentiary hearings on these things.
18          I've -- I've run in -- I've had a run of these things
19   lately, the ESI issues, and whether it's spoliation or it's --
20   it's sluggish production, whatever you want to put on it -- I
21   must have two, three, four cases like that right now that are
22   ongoing.  And they're not all exactly the same, but there's a
23   certain pattern to them.
24          And -- and I think part of it is -- and, Mr. Wells,
25   I'm not being critical of you, because I probably am in the

1   same boat you are.  But some of this is just a little bit over

2   my head until somebody explains it to me.

3         And that's why oftentimes I have to have an expert

4   come in here from the parties and explain to me exactly what is

5   going on.  And so we're just going to have to get to the bottom

6   of it one way or the other.

7         MR. WELLS:  May I request, Your Honor, to refer to it

8   as a new field, rather than over our heads?

9         THE COURT:  Yeah.  Well, I -- I can't use that excuse

10   now.  I've had too many of these things.  But they all -- they

11   all -- I'll try to -- try to remember that.

12         MR. WELLS:  One other thing, Your Honor.  I

13   apologize.  You indicated a status conference in 15 or 20 days.

14   15 days is the end of -- week after next, which is the annual

15   Bar convention.  And I will be involved in that.  If we could

16   do it 20 days, it would be better.

17         THE COURT:  Mr. Post, did you -- did you want to get

18   Mr. Dix out of there and --

19         MR. DIX:  Yes.

20         THE COURT:  Giving him the hook, or what?

21         MR. POST:  Yes.  Although maybe I shouldn't.

22         Your Honor, we'll accommodate the Bar convention.

23   That's fine.

24         The -- the one thing I wanted to make sure didn't get

25   lost in the mix here is that -- in the e-mail exchange we had

1   with Cal-Maine, which we shared with you today --

2          THE COURT:  Yes.  I have it right here.

3          MR. POST:  Yes, sir.

4          They identified a number of areas of documents that

5   may -- or data sources that they had which would not be

6   duplicative of the Foodonics stuff.

7          So with respect to Cal-Maine, I would request that at

8   a minimum they be -- that we leave this conference with the

9   understanding that it's going to actually do an investigation

10  and -- and identify the sources of information that it has so

11  we don't come back here in four weeks from now and -- and

12  they're talking about what -- whether -- what sources they've

13  identified, and actually start producing, if -- if they were

14  producing the stuff that's non-duplicative, at least, that they

15  identified in their e-mails.

16         MR. CUNNINGHAM:  Judge, we've not identified anything

17  in our e-mails that we think is non-duplicative.  The whole

18  point of our position is that it is duplicative.

19         Anything we have other than our own internal

20  communications would be our own analysis of the transaction.

21  It would have nothing to do at all with this dispute, that

22  every -- anything else we have would be purely duplicative of

23  what Foodonics has.

24         If we're going to start, you know, requiring us to

25  produce, you know, what they would describe as non-duplicative

1   documents now and then not produce duplicative documents later,

2   we might as well do the whole thing all at once.  I mean,

3   trying to do ESI piecemeal just increases the cost for

4   everybody.

5           THE COURT:  I'm just looking at the e-mail just a

6   minute.

7           MR. POST:  I was referring to page 5 of the e-mail,

8   Your Honor.

9           THE COURT:  Well, the way these printed out, I'm not

10  sure that -- that your 5 is my 5.

11          MR. POST:  It was -- it says here -- Mr. Cunningham

12  said that -- at our meet-and-confer, we agreed the responsive

13  document categories would generally include 1, 2, 3, and 4.

14  And in order to go forward, we would produce the non-privileged

15  documents calling on 1, 2 -- 1, 2, and 4.

16          THE COURT:  But this is where -- once he found out

17  that you were reserving your right to request other documents,

18  he didn't want to agree to these?

19          MR. POST:  Right, right.  Exactly.

20          THE COURT:  All right.  Let me do this.  I'm going to

21  take a recess.  I've got to look at my calendar and -- and I

22  want to look back over my notes.

23          And then we'll get -- we'll get some timetables here

24  for -- for the production of certain things now.  We'll set a

25  status conference later.  And we'll try to make sure that we

1    have some meaningful goals for the next status conference, in

2    terms of what we want to identify.

3           But some -- whether -- whether -- Mr. Wells, whether

4    you think it's -- it's the best way to do it or not, we're

5    going to have -- Foodonics is going to have to start producing

6    what it has that it can produce at this point, and not wait

7    until it has everything.

8           And I think a couple of things that have been

9    identified are things that should be produced as -- as

10   you're -- as you're searching for the other matters.

11          But let me just take a brief recess.  And I'll --

12   I'll have a list of those things that should be produced

13   within -- within -- I'll probably say 15 or 20 days, and then

14   set a status conference shortly after that, so we can follow up

15   on those things, and then follow up on -- on the searches that

16   are going to be conducted by Cal-Maine, in terms of the former

17   Foodonics employees and this DixieEgg.com domain, and -- and

18   then the searches that -- that Foodonics are doing.

19          But let me just take a brief recess and -- and see.

20   And then if you-all can look at your calendars, too.  I'm

21   thinking -- we're probably shooting for about three weeks from

22   now.  So we're probably looking at about the last week in June,

23   is what I'm thinking.

24          So let's -- we'll take a brief recess.

25          COURT SECURITY OFFICER:  All rise.  Court is in

1    recess.

2        (Recess from 3:05 p.m. until 3:21 p.m.; all parties are

3    present.)

4        COURT SECURITY OFFICER:  All rise.  This Honorable

5    Court is back in session.

6        Be seated.

7        THE COURT:  Mr. Post, let me ask you a couple of

8    questions, if I may.  You had -- you had said that -- that one

9    of the things that you were hoping for was the -- that the

10   closing agreement sale documentation and non-disclosure

11   agreement -- that those things be produced, basically

12   immediately -- or with -- by June 15th, or whatever you said.

13       MR. POST:  Yes, sir.

14       THE COURT:  Now, are those -- when I'm looking at the

15   e-mail exchange that you referred to earlier, No. 4 is

16   transaction documents.  This is the e-mail communication with

17   Cal-Maine.

18       Are those the same things?

19       MR. POST:  Yes, sir.  I think -- I believe -- that

20   was Mr. Cunningham's term, but I think that -- they mean the

21   same thing, yes.

22       THE COURT:  All right.  So what you're -- in that

23   regard, you're -- you're requesting that -- that Cal-Maine be

24   directed to provide those materials -- or those things to you

25   by June 15th?

1      MR. POST:  Yes, Your Honor.  I -- what I envision --

2  like most corporate transactions, there's a big thick book.

3  It's a binder.  It's got a nice cover page and a tabbed index.

4  Those are the closing documents.

5      And there is also going to be related documents, like

6  the non-disclosure agreement.  So that would be a set of

7  operative documents.  If they were going to sue each other, for

8  example, that's what they'd -- they would look at those

9  documents.

10      THE COURT:  All right.

11      All right.  Well, I wanted to clarify that.  And

12  then -- let's see if I had one other question for you.

13      So I guess my point on that is you're expecting

14  that's going to come from Cal-Maine and not Foodonics?

15      MR. POST:  I don't care which group gives it to me.

16  I asked it from the Foodonics group first and they said, "We

17  can't do it without Cal-Main's consent," because there's some

18  sort of agreement.

19      THE COURT:  Right.  Okay.  I understand.  All right.

20  Well, let's do this -- thank you.

21      Let's do this.  Let's start by setting the -- the

22  next status conference in this matter, and then -- then we can

23  work backwards from there.

24      I was -- I was looking at the week of June 25th.  And

25  you-all tell me what works best for you.  And then I'll tell

1  you if it works for me, because I -- I think I only have one

2  day that doesn't work for me.  And that may only be in the

3  morning.

4          So I think -- I think I'm good every one of those

5  days except -- is it Thursday afternoon?

6          So I'm good every day except Thursday afternoon, in

7  terms of scheduling something that works for, I guess -- how

8  many people do we have here?  We have three here and two on the

9  phone -- the five of us -- or the five of you, and me being

10  six.

11          MR. POST:  Your Honor, I'm good Wednesday through

12  Friday.  But even if you have to have it on Monday or Tuesday,

13  I'll have Mr. Dix cover for me.

14          THE COURT:  Mr. Wells?

15          MR. WELLS:  I presently have depositions set in

16  St. Petersburg on June 29th.  I'm assuming that's -- roughly

17  Thursday of that week.

18          THE COURT:  That's Friday.

19          MR. WELLS:  Friday?  But, otherwise, I think right

20  now I --

21          THE COURT:  All right.  So it looks like we've tried

22  to narrow this to the 27th or 28th.

23          Mr. Cunningham, how do you look, sir?

24          MR. CUNNINGHAM:  Judge, as long as I can participate

25  by telephone, either one of those dates in the afternoon would

1  be fine.  My mornings are tied up with clients and meetings.

2          THE COURT:  All right.  And, Mr. Hancock, how about

3  you?

4          MR. HANCOCK:  Yes.  Either of those dates are fine

5  with me, as well.

6          THE COURT:  All right.  Well, let's do this, then.

7  Why don't we -- why don't we just set it for -- did you say

8  Wednesday, the 27th works, Mr. Post?

9          MR. POST:  Yes, sir.

10          THE COURT:  All right.  So let's set it for

11  Wednesday, the 27th, at 2 o'clock.

12          All right.  So in order to make some progress in the

13  case, let's -- let's do this.  The -- the first thing that I

14  think needs to happen, Mr. Post, is for you to work on an

15  attorneys' eyes only protective order, or -- or amend the one

16  that you have, to add that and submit it to the Court, if

17  that's -- did you -- I can't remember.

18          You submitted the last one to the Court, correct?

19          MR. POST:  That's correct.  That was a joint effort

20  between us and GrayRobinson.  But, yes, I -- we submitted it.

21          THE COURT:  All right.  Well, if you could -- if you

22  could -- you know, if you could get together with

23  Mr. Cunningham and -- and with Mr. Wells, and to the extent

24  Mr. Hancock's involved in this -- I know he's the computer

25  expert.

1    But if you-all could get together and come up with

2 a -- a joint proposal on that, then -- then I can -- I can deal

3 with that.

4    So -- so Cal-Maine will be producing -- I'm going to

5 assume Cal-Maine is going to be producing those documents that

6 are referred to as the transaction documents and the e-mails

7 that were provided to me.

8    And those should be provided no later than June 20th.

9 That's assuming that you have the protective order in place.

10 And that way that will be about a week out.  And we can discuss

11 any -- any issues related to the production of those documents

12 on June 27th, if it's necessary.

13    MR. POST:  Yes, sir.  May I ask -- perhaps

14 Mr. Cunningham might send us the -- some form that he was --

15 that he's interested in that is acceptable to him?

16    THE COURT:  In terms of the protective order?

17    MR. POST:  Some insert, right, for attorneys' eyes

18 only.  If he's willing to do that, we can expedite it.

19    THE COURT:  Mr. Cunningham --

20    MR. CUNNINGHAM:  Yes.

21    THE COURT:  -- can you do that?

22    MR. CUNNINGHAM:  Yeah.  Of course, Judge.  We're

23 happy to do that.

24    I would ask, however, that the transaction documents

25 actually be physically produced by Foodonics, just, again,

1   don't want to set a precedent of Cal-Maine producing documents

2   in this case when we -- when this is a great example of why

3   there would be a duplication of efforts for Cal-Maine to

4   produce documents that Foodonics already has and can produce.

5           THE COURT:  All right.  Well, once the -- well,

6   that's fine.  And that's -- that's probably the best way to

7   proceed.  I was just thinking -- because you were -- you

8   were -- had the concern about the -- the confidentiality

9   situation.

10          But once that order is in place, then Foodonics shall

11  produce those materials and those items that are referred to as

12  transaction documents, but what I see it, as the closing

13  documentation, non-disclosure agreement.  And I think there was

14  also -- sale documentation was another term that was --

15  Mr. Post referred to in his -- in his presentation.

16          All right.  Then -- then the -- and then Cal-Maine

17  should be ready to report on what the former Foodonics

18  employees, who now -- who work for Cal-Maine -- what they have,

19  in terms of -- of ESI from what was the DixieEgg.com domain

20  and, if that domain isn't active, which it sounds like it's

21  not, any content from that domain that was taken by or

22  transferred to any other e-mail account by those former

23  employees.

24          And then we -- it may end up being nothing, but --

25  but Cal-Maine should take steps to investigate that so that we

1   have that information on June 27th.

2           MR. CUNNINGHAM:  We'll be happy to do that, Judge.

3           THE COURT:  All right.  Thank you.

4           And then Foodonics should produce ESI to which there

5   is no objection.  And -- and that should be done again by June

6   20th.  And then they should continue to -- to search the ESI as

7   outlined by Mr. Wells.

8           Now, one of the things that is going -- going to be

9   a -- an issue -- it's already been raised -- is the relevant

10  time period.  And, you know, I do note on page 26 -- let me

11  see.

12          Is it page 26?  Just one minute.

13          Hold on one second.  I lost my place.

14          Page -- page 23, paragraph 19, in the document 20,

15  which is the counterclaim, paragraph 19, in 2008, after Jacques

16  Klempf had completed the purchase of the Foodonics shares of

17  stock owned by his siblings and other family trusts, he began

18  his efforts to buy out the shares of stock owned by his mother

19  through Jean Klempf.  And it goes on from there.

20          And just the gist of what I've read, the

21  Defendant/Counter Plaintiff certainly has framed this that

22  the -- that the claims that are being made, and any -- any

23  alleged fraud was -- and scheme to defraud was hatched back --

24  at least around 2008, if not earlier.

25          At the same time, though, it -- it's unclear to me

1  what the burden would be of -- of the production of documents

2  going back to 2008.

3        So it seems that one of the things that -- that

4  Foodonics should be working on is -- is trying to quantify the

5  number of documents that we're talking about going back to

6  2008.

7        I don't know.  I think I've heard -- I've heard

8  references to a hit report, something that can be done to see

9  how many times certain terms come up, to at least have an idea.

10        Because when we get into -- the -- the whole -- the

11  whole game here in the ESI now is -- is -- is the burden, and

12  what the burden is and the -- the relative value of the

13  discovery versus the burden, which includes the cost of

14  producing it.

15        That's not very artfully said, but I think you-all

16  get the point.  But -- so if Foodonics is going to make some

17  sort of a burden argument, it's going to have to have something

18  to support it other than saying, you know, those are a lot of

19  years.

20        Because it may be a lot of years, but I'll have to

21  have an idea of how many documents we're talking about and what

22  the cost of production of those would be.

23        So that should go into the calculus of -- of what's

24  happening, just -- just looking ahead that -- that the -- that

25  the time period is going to be -- going to be an issue.

1    And it could -- it could be relevancy.  It could be

2  burden.  But in the end, it will probably come to weighing

3  those -- those matters and deciding how far back any of this

4  would have to -- have to go.

5    And so then we'll get together on the -- the 27th and

6  just see where we are with -- with all of this.  And to the

7  extent that you-all can work any of this out, I'll appreciate

8  it.

9    In the meantime, I have looked at the -- at the --

10  and read the -- the omnibus motion regarding the subpoenas and

11  the -- and, also, the -- the response.  And it may very well be

12  that I'll want to hear argument on that, too, at the June 27th

13  hearing.

14    So it won't -- it won't just be a status conference,

15  but it will be argument on that motion, if I don't do something

16  with that motion beforehand.  But it just seems to me that

17  these are intertwined to a degree.

18    But I'll let you-all know that.  I'll have -- I'll

19  have Ms. Wood, my law clerk, call you and alert you to that, or

20  I'll put it in a notice of some sort, so you'll know if we're

21  going to -- to argue all of that at that hearing.  It may be a

22  good idea to do it, but I -- if I put it in the -- I'll send it

23  out in the notice.

24    And I'll do a little order capturing this, so that

25  you-all can have the -- have this in a written -- written form.

1    And I should be able to get that out in the next day or two.

2         And, Mr. Wells, are you -- are you representing the

3    non-parties for the purposes of that motion?

4         MR. WELLS:  For purposes of the non- -- the

5    particular parties identified in the motion?

6         THE COURT:  Yes.

7         MR. WELLS:  Yes, sir.

8         THE COURT:  Okay.

9         MR. WELLS:  And there have been some other subpoenas

10   that have been issued since then that we've not yet determined

11   how we're going to address that.  But for the purpose of that

12   motion, yes, sir.

13        THE COURT:  All right.  Okay.  All right.

14        MR. WELLS:  May I make one further comment, Your

15   Honor?

16        THE COURT:  Yes, of course.

17        MR. WELLS:  Since the Court raised it on the date

18   range -- our concern going back to 2008, at this point in time,

19   is not predicated on the burden of producing documents going

20   back that far.

21        It's totally related to the relevance of that date

22   range, because -- even though the Court read from the

23   counterclaim, it's our position that the counterclaim

24   allegations are not supported by any evidentiary basis that is

25   set forth in the counterclaim itself.  They're conclusions.

1  It's not for today.

2  THE COURT:  No.  I understand.

3  MR. WELLS:  I understand -- I want to make the Court

4  aware, we're not predicating it at this point in time with the

5  burden of producing those documents.

6  THE COURT:  All right.  Well, I appreciate that.

7  MR. CUNNINGHAM:  And, Judge, I hate to prolong

8  things.  But just to confirm, I will be able to participate by

9  telephone on the 27th?

10  THE COURT:  Yes.  Yes.  Of course, you're welcome --

11  you're welcome to come.  But if you want to participate by

12  telephone, that's -- that's fine.

13  MR. CUNNINGHAM:  Thank you very much, Your Honor.

14  THE COURT:  All right.  Well, I think -- I think that

15  covers what we can.

16  And as I said, if you -- if you resolve some of these

17  things, that's great.  If not, we'll move forward on the -- on

18  the 27th.  And I'll get a little order out that -- that tries

19  to capture briefly what we've done today.

20  So, Mr. Post, Mr. Dix, anything else?

21  MR. POST:  No, sir.  Thank you very much for this

22  opportunity.

23  THE COURT:  Yes.  Well -- Mr. Wells, anything?

24  MR. WELLS:  Nothing, Your Honor.

25  Thank you.

1          THE COURT:  Mr. Cunningham, anything else, sir?

2          MR. CUNNINGHAM:  No, sir.  Thank you for your time.

3          THE COURT:  Mr. Hancock, anything?

4          MR. HANCOCK:  No, Your Honor.

5          THE COURT:  All right.  Then we're in recess.

6          COURT SECURITY OFFICER:  All rise.

7      (The digitally recorded proceedings concluded at

8   3:37 p.m.)

9                              - - -

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

# CERTIFICATE

UNITED STATES DISTRICT COURT     )
                                 )
MIDDLE DISTRICT OF FLORIDA       )


      I hereby certify that the foregoing transcript is a true and correct computer-aided transcription from the official electronic sound recording of the proceedings in the above-entitled matter.


      DATED this 21st day of November, 2018.



      s/Shannon M. Bishop

      Shannon M. Bishop, RDR, CRR, CRC