IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

FOODONICS INTERNATIONAL,          Jacksonville, Florida
INC., a Florida corporation,
                                  Case No. 3:17-cv-1054-J-32JRK
      Plaintiff,
                                  June 27, 2018
vs.
                                  2:07 p.m.
DINA KLEMPF SROCHI, as
Trustee of the Laura Jean         Courtroom No. 5D
Klempf Revocable Trust, a
Florida Trust,

      Defendant.
_____


DIGITALLY RECORDED DISCOVERY STATUS HEARING
BEFORE THE HONORABLE JAMES R. KLINDT
UNITED STATES MAGISTRATE JUDGE

COURT REPORTER:

        Shannon M. Bishop, RDR, CRR, CRC
        221 North Hogan Street, #150
        Jacksonville, Florida  32202
        Telephone:  (904)549-1307
        dsmabishop@yahoo.com

      (Proceedings reported by mechanical stenography;
transcript produced by computer.)

A P P E A R A N C E S

PLAINTIFF'S COUNSEL:

**SAMUEL GRIER WELLS, ESQ.**
GrayRobinson, PA
50 North Laura Street, Suite 1100
Jacksonville, FL  32202

DEFENSE COUNSEL:

**JAMES H. POST, ESQ.**
**R. CHRISTOPHER DIX, ESQ.**
Smith, Hulsey & Busey
One Independent Drive
Suite 3300
Jacksonville, FL  32202-3315

COUNSEL FOR MOVANT:

**MARK A. CUNNINGHAM, ESQ.**  (via telephone)
Jones Walker, LLP
201 St. Charles Avenue, 47th Floor
New Orleans, LA  70170-5100

ALSO PRESENT:

David Hancock (via telephone)

1                    P R O C E E D I N G S

2    June 27, 2018                              2:07 p.m.

3                          - - -

4              COURT SECURITY OFFICER:  The United States District

5    Court in and for the Middle District of Florida is now in

6    session.  The Honorable James R. Klindt presiding.

7              Please be seated.

8              THE COURT:  Good afternoon.

9              MR. POST:  Good afternoon.

10             MR. WELLS:  Good afternoon, Your Honor.

11             THE COURT:  Let me go ahead and call the case and

12   make sure we have everyone's appearance.

13             This is *Foodonics International, Inc., against Dina*

14   *Klempf Srochi, as Trustee of the Laura Jean Klempf Revocable*

15   *Trust.*

16             Did we decide it was a Georgia trust?  Is that --

17   or --

18             MR. POST:  It is a Florida trust, but the --

19   Ms. Srochi is a Georgia resident.

20             THE COURT:  Yes.  All right.  So Florida trust.

21             MR. POST:  Right.

22             MR. WELLS:  It's a Florida trust.  But I think the --

23   the Court entered --

24             THE COURT:  Yes.

25             MR. WELLS:  -- that last time, corrected the style of

1  the case.

2          THE COURT:  Yes.  Yes.  Thank you.

3          All right.  And it's Case No. 3:17-cv-1054-J-32JRK.

4  We're set for a status hearing regarding discovery.

5          Mr. Post and Mr. Dix are here on behalf of -- of Jean

6  Klempf.

7          And I'm saying that backwards because I really should

8  be saying that Mr. Wells is here on behalf of Foodonics, the

9  Plaintiff/Counter Defendant in the case, and then Mr. Post and

10  Mr. Dix are here on behalf of the -- the Defendant and the

11  Counter Plaintiff -- or Plaintiffs.

12          Then on the phone is Mr. Hancock and Mr. Cunningham,

13  who represent a third party, Cal-Maine.

14          Is that right?  Are you two gentlemen on the phone?

15          MR. HANCOCK:  I'm on the -- this is David Hancock.

16  I'm on the phone, but I'm with GrayRobinson.

17          THE COURT:  Oh, okay.  Yes.  I'm sorry, Mr. Hancock.

18  I -- yes, you're with GrayRobinson.

19          And then, Mr. Cunningham, you're on the phone?

20          MR. CUNNINGHAM:  Yes.  Good afternoon.

21          THE COURT:  Good afternoon.  Well, I had three

22  matters listed that I wanted to make sure we take up.  That is,

23  of course, the status of the discovery that's really driven by

24  the last hearing that we had and the June 6th, 2018, order that

25  was entered after that.

1    And then -- then I wanted to address the motion --

2    the omnibus motion to squash subpoena and/or for protective

3    order and other relief.  That's document 30.  It was filed on

4    March 22nd, 2018.  And that was filed by Foodonics, along

5    with -- and Counterclaim Defendant Jacques -- is it Jacques?

6         MR. WELLS:  Jacques Klempf.

7         THE COURT:  Jacques Klempf.  And then -- and then the

8    non-parties.  And that was, of course, responded to.  And so I

9    want to make sure we take that up.

10        And then there's the motion to extend deadlines that

11   we'll discuss.  Judge Corrigan has referred that to me for the

12   entry of an order.  So I'll discuss that all with you.

13        Is it best to start with you, Mr. Post, in terms of

14   the status of discovery?

15        MR. POST:  Yes, Your Honor.  I'd be glad to.

16        THE COURT:  Okay.

17        MR. POST:  May it please the Court?

18        THE COURT:  Yes.

19        MR. POST:  Your Honor, since this Court had the last

20   status conference, we did receive the Cal-Maine transaction

21   documents after we submitted to the Court a consensual

22   protective order.  And so that production has been made.

23        We -- we also -- but not much else has occurred

24   constructively since that date.  We've had discussions with

25   Mr. Wells and his -- on behalf of his clients to find out where

1    we -- what the timeline is for the production of documents and

2    ESI.

3           And as a result of -- primarily as a result of those

4    conversations, we submitted a proposed motion to extend the

5    deadlines in this case, including the trial date, because it

6    appeared to us that, you know, best-case scenario we were not

7    going to get all the documents that we would like until perhaps

8    August 31st on a rolling production basis, if -- assuming that

9    we -- some things break our way as a result going forward.

10          We -- so we -- we have not received, although we

11   believe they are available from Foodonics, the tax returns from

12   2006 to 2012 or the corporate minutes of the company.

13          We -- and, therefore, it is our suggestion -- and,

14   again, we're -- at this hearing, we're not trying to throw

15   anybody under the bus or point fingers.  We're just trying to

16   move this case along.

17          And we would suggest to the Court that a successful

18   status conference here would perhaps result in the extension of

19   the -- the trial date and the deadline dates, which was the

20   subject of a pending motion which is consented to, that the

21   Foodonics parties begin production by July 9th on a rolling

22   production, in phases, with a new production every two weeks

23   until completed, no later -- no later than August 31st.

24          And that production would include the non-privileged,

25   non-duplicative ESI and documents from the GrayRobinson law

1   firm.

2          With respect the DixieEgg.com mail accounts, we still

3   have not gotten a clear understanding as to where they are or

4   what happened to them.  So we would like a disclosure in due --

5   as soon as possible of which former Foodonics employees had

6   copies of Dixie Egg mail -- e-mails on computers, mobile

7   devices, after the Foodonics sales transaction, and whether any

8   of the former Foodonics employees used personal e-mail accounts

9   other than DixieEgg.com before or after the Foodonics sales

10  transaction.

11         And we say that because we know, at least

12  anecdotally, that at least one of those former employees, Dick

13  Still, used his personal e-mail account to transmit information

14  regarding the Foodonics sales transaction and business.

15         Regarding the AS400 server, we are now being told for

16  the first time that there is no information on there other than

17  financial information, that is, there's no e-mails, and that

18  it's been unplugged and it's sitting in the office of -- of

19  GrayRobinson.

20         And we're being told that to plug it back in and to

21  do a search of it would be expensive and take time, but, still,

22  it contains all the accounting information.

23         So we've -- we've asked and we have -- although we

24  were told that this might be possible, we haven't been given

25  confirmation -- we've asked that -- that we -- that someone

with personal knowledge give us a sworn statement that the server only contains accounting information, it doesn't contain any information related to the Foodonics sales transaction, the Cal-Maine transaction, and will continue to be preserved for the duration of the litigation in case we need to go back to it.

With respect to the Cal-Maine Dolph Baker production, as I reported, we did get a consensual protective order agreed to, submitted to the Court as examiner.

As a result, the Cal-Maine transaction documents were marked highly confidential and were produced to us by GrayRobinson.  But that still leaves the required production from Cal-Maine and Dolph Baker.

And we would request that the Court schedule the same deadline, that is, the pro- -- for Cal-Maine and Dolph Baker, that they produce a non-duplicative, non-privileged ESI on the same -- same schedule as Foodonics and Jacques Klempf, without waiting for the production of Foodonics.

But with respect to the duplicative information, they suspect as duplicative -- at a minimum, have them investigate and disclose the sources and locations, the estimated volume of ESI, a list of the duplicative, and how the information is stored and the difficult -- difficulty, if any, of retrieving that information if they should be required to do so, so we would know how much of a problem, if any, it really is.

1    For the non-parties that are the subject of the -- of

2    the motion to quash today, we -- we would ask ideally that this

3    Court deny that motion and require the non-parties to produce

4    documents on the same schedule as Foodonics and Jacques Klempf.

5    And, lastly, we would ask the Court to grant the

6    motion to extend the deadlines in this case, with the

7    understanding that the depositions of the parties -- not

8    non-parties, but the parties -- not be scheduled until after

9    the production is completed on August 31st, because it would be

10   impractical and not useful to take depositions.

11   We certainly don't want to take depositions until we

12   have all the documents that need to be produced by our

13   adversaries and the non-parties.

14   So that in a nutshell, Your Honor, is our -- our view

15   of the status and our suggestion as to how we move forward.

16   THE COURT:  Well, let me ask you this.  The -- the

17   information that you're suggesting Cal-Maine and Dolph Baker

18   produce, would that be pursuant to the subpoenas?

19   MR. POST:  Yes, Your Honor.

20   THE COURT:  In other words, that's all part of the

21   omnibus motion to quash, too, the subpoenas on Cal-Maine and

22   Dolph Baker, also?  Right?

23   MR. POST:  Yes.  We -- my understanding, based on

24   prior conversations with Mr. Cunningham, is that we were beyond

25   the objection stage, it was simply -- their new objection was

1  anyone who produced anything until after Foodonics produced

2  everything.

3      And the give-and-take that we had with

4  Mr. Cunningham -- and, of course, he can speak for himself --

5  as evidenced by the e-mail exchange that we -- we provided to

6  the Court at the last status conference, was that they were

7  offering -- suggesting that they would give us the information

8  that was not duplicative, which -- which would have been --

9  well, which he admitted existed, but -- but he said, "I'll give

10 you that if you don't -- if you walk away and don't ask for

11 anything else."

12     And my -- my suggestion there is that we -- that they

13 do produce at this time the information which is

14 non-duplicative, and that we -- we would wait for the Foodonics

15 production to determine if we could actually do a De-dup- kind

16 of exercise through the use of technology, but -- but in the

17 meantime, they should do the requisite, as required to do by

18 the rules, investigate what sources they have and the location,

19 and estimated volume of where all this information might be,

20 and that it not go anywhere until we can decide whether or not

21 we were going -- how we're going to deal with what they contend

22 to be the duplicative stuff.

23     THE COURT:  I think, if I'm recalling this now --

24 because you just triggered something in my mind -- that there

25 was a previous motion that Cal-Maine had regarding the

1   subpoena, and then that was withdrawn at some point, that the

2   -- the motion to quash, the Cal-Maine and Dolph Baker subpoena,

3   I think.

4           MR. POST:  Yes, Your Honor.  You're right.  There

5   was -- there was seven subpoenas served on Dolph Baker and

6   Cal-Maine.  And the service of the subpoena on Cal-Maine drew

7   an objection from Mr. Cunningham, because they said it wasn't

8   improperly served on the registered agent.

9           And we -- rather than dispute that, we simply served

10  it again.  And there's no dispute now that it's been -- that

11  the Cal-Maine subpoena has been properly served.

12          THE COURT:  And the omnibus motion that's before the

13  Court right now does not include Cal-Maine or Dolph Baker

14  attempting to quash the -- the subpoena?

15          MR. POST:  That's right.  So the existing -- the one

16  that's on my calendar for today was filed by GrayRobinson on

17  behalf of Foodonics and Jacques Klempf and seven, what we've

18  called, interested non-parties --

19          THE COURT:  Yes.

20          MR. POST:  -- three adult daughters and business

21  associates of Jacques Klempf.

22          THE COURT:  All right.

23          All right.  Well, Mr. Wells, why don't I -- should I

24  hear from you now with regard to where things are, because

25  there were certain things that -- I think other things that you

1   were going to maybe report on.

2          I was under the impression that whatever ESI wasn't

3   objected to you were going to start producing that, or

4   identifying that as of the last hearing, unless I'm misreading

5   the order, that Foodonics shall produce the transaction closing

6   documents discussed during the hearing, including the

7   non-disclosure agreement, along with any electronically stored

8   information, ESI, that can be reasonably retrieved by that date

9   and to which there is no objection.

10         So what's happening with -- with ESI?

11         MR. WELLS:  I may have misread the Court's order.  We

12  have had discussions, ongoing, about the ESI.  And I will

13  address that separately.

14         In addition to the documents that Mr. Post enumerated

15  as having been produced, being the Cal-Maine documents and some

16  other unrelated documents, we've also produced tax returns for

17  the years 2013 through 2016.

18         Keep in mind that the two transactions that are

19  involved in this litigation really are 2015 stock purchase of

20  the Trust stopped by Mr. Klempf in the October 2016 sale of

21  assets to Foodonics.

22         So tax returns prior to 2013, we -- we question

23  whether they have any relevance to any claim or defense in the

24  matter.  But, nevertheless, we have agreed that we will produce

25  those.

1    We are awaiting production of those from the

2  accountant.  We anticipate, if not today, within the next day

3  or so, we'll have those tax returns and we'll produce them to

4  opposing counsel.

5    Same thing with the corporate minutes.  In the

6  transition between Foodonics and Cal-Maine, there simply was

7  not a very good record-keeping process.  But we are finding the

8  corporate minutes and will provide those as well in short

9  order.

10    Again, the same thing with the tax returns.  I would

11  anticipate those could be produced within the next day or so

12  without any difficulty.

13    Let me address the ESI, as the Court pointed out.

14    At the first hearing, last time we were here, we

15  advised the Court that the initial view of the cell phones, the

16  laptop, and the PC of Mr. Klempf, who is the sole shareholder

17  of Foodonics, yielded about 41,000 documents.  That's

18  documents, not pages.

19    At the request of Mr. Post and Mr. Dix, we expanded

20  that research in identifying additional documents from June of

21  2017, which I will note was six months after the Cal-Maine

22  transaction -- we expanded that from June of 2017 to January of

23  2018, which yielded another 15,000 documents.

24    So we've got roughly 61,000 documents that have to be

25  reviewed.  But that's the universe of documents from 2008

1    through January of 2018.

2         We got an estimate for a review of that document --

3    those documents to see how they matched against the search

4    terms the parties have agreed upon.

5         And the estimated cost for that review is $90,000.

6    As a result of that cost estimate, we've had discussions with

7    Mr. Post and Mr. Dix about ways that we can address that.

8         THE COURT:  When you say that cost is 90,000, what

9    does that entail?

10         MR. WELLS:  We contacted special counsel here in

11    Jacksonville.  And they would employ five attorneys and a

12    supervisor who will review the 61,000 documents.  And their

13    estimate for the amount of time involved -- and these are

14    industry standards.  It's not something we made up.  This is

15    what reviewing ESI costs are.

16         It will take them seven weeks to review the 61,000

17    documents and match those against the search terms the parties

18    have agreed upon, to see just the universe of documents that

19    might be relevant to claims or defenses.

20         And then after that, it will, of course, be further

21    winnowing of those documents.  We have no idea how many of

22    those 61,000 documents will be responsive to any of the search

23    terms, but that's what the cost will be just to do the initial

24    review.

25         THE COURT:  And, again, as -- I'll just display my

1    ignorance.  But I thought there was a -- a less expensive way,

2    at least initially, to narrow a universe of documents like that

3    by -- by doing, I guess, what's called a hit -- a hit run or

4    a -- something that would at least give an idea of how many of

5    the documents actually are responsive to the search terms, so

6    that a document-by-document search might not be necessary, or

7    as to at least certain documents or certain search terms.

8            Has that been discussed or --

9            MR. WELLS:  We provided the hit list for both sets of

10   documents to opposing counsel yesterday.  And I am far behind

11   the Court on the level of ignorance about those sorts of

12   things.

13           Mr. Hancock and Mr. Dix can address that.  I have no

14   understanding that a review of the hit list will narrow the

15   search, but it may well.  I don't know.

16           MR. HANCOCK:  Your Honor, can I weigh in here for a

17   moment.  This is David Hancock with GrayRobinson.

18           THE COURT:  Yes.  Go ahead.

19           MR. HANCOCK:  I might be able to shed some light.  So

20   the 62,000 documents that we're talking about are after

21   applying all of the search terms that the parties have agreed

22   upon.

23           So what the contract reviewers would be doing would

24   be reviewing the documents for responsiveness, privilege, and

25   so on.

1    MR. POST:  Your Honor.

2    THE COURT:  Mr. Dix?

3    MR. HANCOCK:  But there were over 300,000 documents

4  initially.  It was winnowed down to about 62,000 after applying

5  the search terms that the parties agreed to.

6    MR. POST:  Your Honor --

7    MR. WELLS:  I stand corrected.

8    MR. POST:  -- I would like Mr. Dix to respond to

9  this.  The -- we had -- we had this discussion with the

10  GrayRobinson people last Thursday.  And we don't believe

11  they're using the technology that's available.

12    THE COURT:  All right.  I'm going to hear from

13  Mr. Dix, Mr. Hancock.  So you can listen to what he has to say.

14  And then if you want to respond to that, that'd be fine.

15    MR. HANCOCK:  Certainly.

16    MR. DIX:  Your Honor, when we had the discussion last

17  week, one of the first questions we asked was:  Does any of

18  the -- do any of the 61,000 documents -- does that include

19  privileged documents, documents that you're never going to give

20  us because you're going to put them on a privilege log and

21  never produce to us?  They said, "We don't know, but probably."

22    We suspect that there's a good deal of -- of

23  privileged information that could be easily identified by

24  taking a look at things like e-mails to and from Jacques

25  Klempf, from Foodonics, and the GrayRobinson firm.

1     And maybe that's not the end of the way that we would

2 try to cull that down, but that's a starting point.  So --

3     THE COURT:  Do you run a search on that?  Is that how

4 you do it?

5     MR. DIX:  Yes.  You can identify every e-mail that

6 was sent to and from Jacques Klempf and -- and the GrayRobinson

7 firm, anybody at the GrayRobinson.  And you could do that for

8 any -- you could do it for Cal-Maine as well.  So that was one

9 way that we were proposing to do this.

10     Another way that people do this is to take a look at

11 those hit reports.  We got them yesterday.  And I -- I haven't

12 had a look -- had a chance to look at them in great detail.

13     We haven't heard any proposals from Mr. Hancock or

14 Wells about how they might use that hit report to narrow it

15 down, but certainly it would be -- would like to see what they

16 would propose there.

17     I think we probably will have a similar-type approach

18 when we come back and talk about our search -- searches that

19 we're running on the information that they want.

20     Some of the search terms that you see on the hit

21 reports -- there's 20-, 30-, 40,000 documents that are being

22 generated by a search term like "purchase" or "share."

23     The word purchase and share come up in lots of

24 different documents that are totally unrelated to this case.

25 So you take other technologies -- clustering is another way

1 that we do it.

2        Clustering takes different groups of documents and

3 puts them together.  And you can look at the entire cluster and

4 say is this -- when it says share or price, is that because

5 it's a whole bunch of e-mails related to Ticketmaster or

6 Fantasy Football, or something unrelated, or is this related to

7 the Foodonics sale?  And you can group those documents together

8 in clusters and use that technology.

9        And so the review that has been proposed by special

10 counsel, we asked if they're going to use any of these

11 technologies, any of these additional criteria and techniques,

12 to narrow what special counsel is looking at document by

13 document.  And we didn't hear a response that they were -- that

14 we're going to use any of that.

15        And so I think there's still some -- some work that

16 can be done.  And we'd like to hopefully consensually do that

17 to narrow that scope, so that the universe is small.

18        Then when you get that universe, you apply different

19 technologies, like predictive coding, where the -- you review

20 the documents, you're teaching the computer which documents

21 you're looking for and which ones you're not, kind of like

22 Pandora for a music player, if you've ever used Pandora to

23 listen to music.  So we think they should be using that, too.

24        Now, we're not asking the Court to order them to do

25 that.  If they want to do it the old-fashioned way, the long

1 and hard way, then that's -- that's, I guess, their choice, as

2 long as they're not holding back, giving us the documents in a

3 timely manner.  But we would suggest that there's some other

4 things that can still be done here to help expedite and lower

5 the cost of the review.

6          MR. WELLS:  Let me respond briefly from a -- a

7 broader perspective, and then Mr. Hancock can do it from a

8 technical standpoint.

9          We got the estimate from special counsel maybe a

10 week, ten days ago, and we provided it to opposing counsel.  We

11 had a discussion last Thursday, when some of the issues that

12 Mr. Dix just raised were discussed.

13          That was last Thursday.  Today is Wednesday.  We just

14 simply haven't had the time since then to do all that needs to

15 be done.

16          We have identified, I believe -- Mr. Hancock can

17 correct me.  But we have identified documents that could be

18 privileged.

19          And it does not reduce the -- the total number of

20 documents substantially.  We are aware of some of the

21 procedures that Mr. Dix has enumerated.  And we certainly

22 would -- would endorse doing everything we can to reduce that.

23          But the process of learning what the documents were

24 and how much they're going to cost to do them, and what the

25 processes are, is not something that can just be done

1  overnight.

2      THE COURT:  Well, it -- I mean, it sounds to me

3  like -- that some progress has been made and that you-all are

4  still talking about it.  And it would seem to me that the best

5  thing to do is probably set another status conference.

6      I don't know how -- was it a month ago that we had

7  one?

8      I don't know.  Set one sometime in July, and hope

9  that you-all can make progress, it sounds like -- like you

10 have, and see if we can continue -- at least as far as this ESI

11 and Foodonics.

12     On this -- on this somewhat narrow issue, in terms

13 of -- and we still have to talk about a number of other things,

14 because I think this -- we're still -- we're still -- a tension

15 here about what Cal-Maine and -- and, of course, I haven't even

16 heard from -- from -- from Cal-Maine yet.

17     But it's still some tension about what a third party

18 should be required to produce prior to the production by, you

19 know, one or more of the parties.  So we'll take that up.

20     But, hopefully, we -- we're at least moving in the --

21 in the direction of -- of -- of getting the production of ESI

22 from Foodonics.  And so I appreciate what you-all have done in

23 that area.

24     MR. WELLS:  May I address, Your Honor, a couple of

25 the other issues --

1    THE COURT:  Yes.

2    MR. WELLS:  -- that Mr. Post brought up in his

3  opposing comments?

4    There is a domain DixieEgg.com or @DixieEgg.com.

5    THE COURT:  Yes.

6    MR. WELLS:  I think the Court needs to understand

7  that when the sale of Foodonics took place at Cal-Maine, I

8  mean, it was a drop -- the guillotine dropped, so to speak.

9    But there were employees of Foodonics who remained as

10  employee -- who became employees of Cal-Maine, but there were

11  customers of Foodonics and Dixie Egg who were not aware of that

12  transaction, and were dealing with the Dixie Egg folks.  So

13  there were some employees at Dixie Egg who continued to use the

14  DixieEgg.com domain for some period of time.

15    It did not get migrated to Cal-Maine, as there was

16  some thought that it might have, so that Cal-Maine would have

17  access to it.

18    That DixieEgg.com account that was at Foodonics

19  terminated.  Mr. Klempf revived it for himself.  Nobody else is

20  using it but him, on rare occasion.

21    We are trying to work with Microsoft to get whatever

22  e-mails might have been on the DixieEgg.com computers, laptops,

23  whatever, of employees through the date the account was

24  terminated several months after the transaction occurred.

25    That is simply -- and we are working on the exercise

1  of communicating with Microsoft to find out where those

2  archived e-mails might be.

3        The AS400 was raised.  We haven't -- we agreed on

4  Thursday in the conversation that we would get a declaration

5  from a former Foodonics employee that the AS400 has nothing but

6  internal accounting information.  We have identified that

7  employee.  And we are working on getting a declaration from

8  him, as we agreed last week.

9        I'm not going to address the issue that Mr. Post

10  raised regarding Cal-Maine.  Mr. Cunningham is on the phone and

11  he can do that.  However, Mr. Post did reference depositions.

12        Several weeks ago we requested that Mr. Post provide

13  us with dates that we could take the depositions of Ms. Srochi

14  and Mr. Blackburn, who are the Counter Plaintiffs.

15        We have been advised by Mr. Post that he has dates

16  that -- where people are not available, but is -- is declining

17  at this point to allow those depositions to be scheduled.

18        As I understand it, he thinks that -- or it is his

19  position that the documents all ought to be produced before

20  depositions start.

21        We take the position, Your Honor, that the

22  counterclaim filed by Ms. Srochi and Mr. Blackburn contain

23  numerous affirmative, albeit somewhat conclusory, allegations

24  or wrongful conduct on the part of Foodonics and Mr. Klempf.

25        There's a significant amount of inflammatory language

1    in the counterclaim about issues related to non-disclosure and

2    breach of fiduciary duty.

3          We think that we have the right to find what evidence

4    Ms. Srochi and Mr. Blackburn relied upon before they filed

5    their counterclaim.  Documents that we produce in the course of

6    discovery may or may not confirm that.

7          But certainly they had some evidentiary basis to make

8    the allegations that they made in the counterclaim before the

9    counterclaim was filed.  We think we're entitled to know what

10    they knew from an evidentiary standpoint when the counterclaim

11    was filed.  So we would request that we be permitted to take

12    the depositions of Ms. Srochi and Mr. Blackburn.

13          I know we're moving toward disclosing documents, but

14    we don't think that the disclosure of documents is a

15    prerequisite to being able to schedule depositions.

16          And with respect to the motion to extend time, we do

17    not object to that.  We think that would be appropriate.

18          THE COURT:  All right.  Thank you.  Let me hear from

19    Mr. Post, just on the last issue of the depositions --

20          MR. POST:  Yes, Your Honor.

21          THE COURT:  -- before Mr. Cunningham weighs in.

22          MR. POST:  Your Honor, as an initial matter, we would

23    not want to give the depositions of our principals more than

24    one time in this case.

25          The local rules say it's one deposition of seven

1    hours unless the Court orders otherwise.  And we expect that

2    after the documents are produced, after we amend our

3    counterclaim, if we do so, after we add parties, they're going

4    to be pushing us for another deposition of our people.

5            And for case management purposes, for that reason

6    alone, we're recommending -- or suggesting that -- that the

7    deposition of the parties only -- not non-parties, but just

8    parties, be delayed until all the documents have been produced.

9            And as an additional reason, Your Honor, our

10   counterclaim is a fraud by omission case.  We will -- our

11   clients will know better what we weren't told after the

12   deadline for production has been -- of documents has been met.

13           So this -- I don't think it's -- it's practical or

14   fair to take the depositions of my two clients prior to the

15   time that Foodonics have produced the documents that we can

16   review and get a full picture of -- of what we perhaps weren't

17   told, or we suspect was not told to us, and in detail, such as

18   the dream team analysis, which we've attached to our response

19   in opposition to the motion to quash.

20           Those are -- the dream team analysis, the Jacques

21   Klempf estimate of his property -- his company being worth

22   $68 million before he sold it to his -- bought his mother's

23   stock, is something that we now know -- we weren't told at the

24   time of the -- of the redemption transaction.

25           So it's -- and I recognize that ordinarily people can

1    take discovery in whatever order they want.  That's the general

2    rule.  I think in this particular situation it would be

3    impractical and -- and not fair to take the deposition of my

4    two clients before we have the Foodonics production.

5              THE COURT:  All right.  Did you want to say

6    anything -- I want to hear from Mr. Cunningham here on the

7    Cal-Maine issues.

8              MR. WELLS:  Briefly, Your Honor.  And I don't mean to

9    beat a dead horse.  But the dream team issue that Mr. Post

10   raised was simply an idea that Mr. Klempf had that he shared

11   with a former employee and he shared with a couple of other egg

12   producers, which is documented in the documents that are

13   produced.

14             It was, in fact, a dream.  It never went anywhere.

15   It had very, very limited exposure.  It was simply an idea that

16   he had about what might occur in the future.

17             It has -- and it did not include Cal-Maine.  It did

18   not reference acquisition of stock of -- of the Klempf trust.

19   As a matter of fact, Cal-Maine was specifically excluded from

20   any possibility of a dream team.

21             So to -- to put all the eggs in one basket on the

22   dream team as somehow significant we think is -- is fallacious,

23   number one.

24             And, again, without being repetitive, the

25   counterclaim is replete with all sorts of allegations about

1  "embark on a systematic scheme, exploit at his leverage,

2  strategically maneuvered, completed the maneuvers necessary."

3       What's the evidentiary basis for that? And certainly

4  you can't say, "Well, we don't know, but once we get the

5  documents we'll know."

6       That's essentially the position they're taking. And

7  we don't think the depositions should be delayed so that they

8  can educate themselves on what they should have known when they

9  filed the counterclaim.

10      THE COURT: All right. Mr. Cunningham, I think you

11 were -- you -- Cal-Maine was supposed to do a little homework

12 since the last hearing, and then, of course, you heard what

13 Mr. Post suggested. So I'll hear from you.

14      MR. CUNNINGHAM: Thank you, Judge. And we were

15 supposed to do some homework. And like good students, we

16 completed our task.

17      I can report to the Court that I've confirmed with

18 the head of IT at Cal-Maine that Cal-Maine has not had -- we

19 have never had access to the DixieEgg.com domain, that no

20 employees migrated their e-mail accounts with the DixieEgg.com

21 domain to Cal-Maine in any way.

22      It is possible that employees forwarded individual

23 e-mails from their DixieEgg.com accounts to Cal-Maine. But we

24 would have no way of knowing that without doing a full-blown

25 review of each individual's accounts.

1    So the main question that you were interested in is,

2    you know, did we migrate any of those e-mail material, this ESI

3    from the DixieEgg.com domain.  And the answer is no.

4         THE COURT:  All right.

5         MR. CUNNINGHAM:  And, Judge, I --

6         THE COURT:  Go ahead.

7         MR. CUNNINGHAM:  I was just going to move on to the

8    second issue that Mr. Post raised, which were, as I understood

9    it, you know, two different requests or alternative requests,

10   one that Cal-Maine begin a production of ESI or documents along

11   the same deadlines for these proposed for Foodonics, or

12   alternatively that Cal-Maine be ordered to disclose information

13   about the source of location and volume of data that may be

14   responsive to the subpoena.

15        And with respect to that issue, Judge, there is no

16   motion to compel pending.  And so there's no basis for ordering

17   anything at this point.

18        We have properly and timely asserted detailed

19   objections to each of their requests.  We've been working very

20   hard with the parties in this litigation to help facilitate

21   their discovery efforts.

22        But, again, Cal-Maine is not a party to this process

23   and is now kind of getting caught up in this whole set of

24   discovery proceedings, with this being the second status

25   conference that we are attending.

1    And when I start, you know, hearing about Foodonics

2 identifying 62,000 documents and whittling that number down

3 from over 300,000, (unintelligible) and clustering, predictive

4 coding, I mean, that -- that is the type of ESI discovery that

5 would be a significant financial burden and cost to Cal-Maine.

6    And it's the very reason why we asserted objections

7 and we believe it's an expense that -- that Mr. Post believes

8 that he needs to move the case forward, is seeking that

9 information now, before he even has an opportunity to know

10 whether he even needs those documents based on a future

11 production by Foodonics, that he be directed to file an

12 appropriate motion and that we will file a timely response, so

13 that each of the individual objections and requests that have

14 been made part of the subpoena can be addressed, you know,

15 individually by the Court and not be kind of wrapped up in this

16 much broader fight between the parties.

17    You know, Cal-Maine, we just want to emphasize, is

18 not a party to this proceeding, and has no financial interest

19 whatsoever in the outcome of this litigation, and just think

20 it's unfair for us to continue to kind of pull Cal-Maine into

21 -- into the process.

22    THE COURT:  Well, let me ask both you and Mr. Post

23 this question, because I am concerned about duplicative or

24 duplicitous production.

25    Are there -- in terms of the subpoena, are there, in

1  your view -- and I'm asking Mr. Post and Mr. Cunningham --

2  documents that will not be duplicitous, in other words,

3  documents that -- that Mr. Post is seeking that Cal-Maine and

4  most likely only Cal-Maine will have?

5       Because if that's the case, then I think that those

6  should be produced.  And if they -- and if you've been served a

7  subpoena and the subpoena requires production, then -- then --

8  then absent you filing a motion to quash the subpoena, then --

9  then I think it should be produced.

10       I understand the -- the -- the concern about

11  duplicating the discovery that -- that Foodonics is doing, and

12  the burden that that could be, and it might be unnecessary in

13  the end.

14       So -- so I'm very sympathetic to your argument there.

15  But if there are documents that Cal-Maine has that will not be

16  duplicative -- or duplicitous of documents that Foodonics was

17  producing, then I would -- I would think that those need to be

18  produced, because it's not necessarily a -- an all or none.

19       I know you were trying -- you-all were trying to work

20  something out where there was an agreement about what would be

21  produced, and then there wouldn't be any additional requests,

22  or whatever it was.  I read it before the last hearing.

23       So, Mr. Post, let me start with you.  Are there -- in

24  terms of the subpoena that you served on Cal-Maine, are there

25  portions of it that -- that seek documents or ESI that

1  Cal-Maine and only Cal-Maine would have?

2       MR. POST:  Yes, Your Honor.  I think there's three --

3  at least three buckets.  One is as set forth in

4  Mr. Cunningham's e-mail of May 23rd to me.  He offered to

5  produce such documents if I agreed to drop the rest of my

6  request.

7       So I think, based on this e-mail, that he is

8  admitting there would be some documents that would obviously

9  not be duplicative.  And common sense tells you that that's the

10 case as well.

11      Because certainly they were -- they were

12 communicating with people other than Cal-Maine -- or, excuse

13 me, other than Foodonics, about the Cal-Maine transaction, not

14 the least of which includes board of directors minutes and --

15 and other communications they might have had with persons of --

16 non-privileged communications regarding the transaction.

17      And as we just heard, apparently Foodonics cannot

18 produce all of these accounts from the Dixie Egg world domains.

19 And so presumably a lot, if -- a large -- I would imagine a

20 large majority of those communications on those exchanges went

21 to the -- went to Cal-Maine for -- not just the migration of

22 those accounts, but actual e-mails in -- in the Cal-Maine

23 system from Foodonics employees on the Dixie Egg domain.

24      So -- so I'm sure there is -- if they did a proper

25 ESI search, that they would come up with certainly the -- in my

1  view, a significant number of documents that would not -- that

2  would be -- would not qualify as duplicative of what we may or

3  may not get through Foodonics.

4         And I would also add, Your Honor, that there is some

5  law to the effect that -- that even if it was duplicative, it

6  still should be produced.  But we were trying to make this as

7  easy and as inexpensive as possible for all the parties.

8         And I understand that there are hash values that we

9  can -- once we get documents from ESI from Foodonics, we can

10 share with Cal-Maine and they can run those hash values against

11 whatever production -- or collection they've pulled together

12 and use that to eliminate duplicates.

13         THE COURT:  All right.  Mr. Cunningham?

14         MR. CUNNINGHAM:  Yeah.  So, Judge, this kind of

15 highlights the absurdity of some of these subpoena requests and

16 why I really think it's an issue that needs to be part of a

17 motion -- motion practice to specifically address this that I

18 think Rule 25 contemplates.

19         There are -- if you look at, say, just DixieEgg.com

20 e-mails that may have gone back and forth between Cal-Maine and

21 Foodonics over, you know, this lengthy period of time that

22 constitutes the relevant time period, you're looking at

23 probably thousands, if not tens of thousands, if not more,

24 documents.

25         Cal-Maine was Foodonics's largest customer for years

1    and years.  I mean, they're transacting business on a daily

2    basis using, you know, this domain.

3            So it makes no sense and will result in no

4    information of any relevance to this proceeding for us to just

5    start blindly looking for DixieEgg.com e-mails.

6            The other types of documents that he described,

7    mainly internal documents, related to Cal-Main's own internal

8    analysis of, you know, this transaction, I mean -- you know,

9    how each transaction, how -- whether we wanted to go forward

10   with a transaction.

11           All that information, again, has no relevance to the

12   dispute between Foodonics and the Trust.  That is between those

13   two.  And how -- how Cal-Maine viewed these issues internally

14   isn't going to shed any light on whether they were some kind

15   of, you know, fraud by omission or any other misconduct on the

16   part of Foodonics or Mr. Klempf.  It only will shed light on

17   our internal workings with respect to the transaction.

18           So anything we have is, again, either going to be

19   totally non-responsive, non-relevant to the -- this particular

20   lawsuit, or it's going to, you know, duplicate what is already

21   out there between Foodonics and -- and the Trust, to the

22   extent -- again, if they come back and say, "Look, that -- you

23   know, we couldn't find DixieEgg.com -- or domain e-mails, and

24   we would like this kind of narrow set of e-mails with respect

25   to these custodians, because we think these custodians have X

1    information that's relevant to our fraud by omission claim,"

2    you know, that I think is -- there should be the beginning of

3    discussion, not any, kind of, wild goose chase into our

4    internal, you know, business, which is, again, you know, highly

5    confidential.

6            I mean, this is an acquisition.  How we go about that

7    acquisition, our views of the acquisition, why we were doing

8    it, why we weren't doing it, is, you know, very, very sensitive

9    to -- to Cal-Maine.  At the end of the day, it really, again,

10   does not shed any light on any qualified omissions.

11           THE COURT:  All right.  Well, I -- I think that --

12   and I'm going to -- we're going to get to the -- the

13   third-party subpoenas here, the non-parties -- excuse me,

14   non-party subpoenas here in a minute and the motion -- omnibus

15   motion to quash.

16           But, I mean, Cal-Maine was brought into this, at

17   least in part, because of the whole -- the whole issue

18   regarding the e-mail migration.

19           And if -- if Cal-Maine doesn't want to be part of

20   this anymore or -- or doesn't want to be part of this at all,

21   then I think that Cal-Maine is going to have to file a motion

22   to quash the subpoena, and -- and then that will be -- that

23   issue will be dealt with by the Court in a more

24   compartmentalized way.

25           Because I want to -- I want to try to -- I want to

1    try to get the Cal-Maine issue or issues somewhat separated so

2    they're not bleeding over into the -- the aspect of the case

3    that actually involves the parties.

4           And so I think -- I think the appropriate course of

5    action will be for Cal-Maine to file a motion to quash the

6    subpoena, because I -- I don't want to hear from -- really,

7    from -- from the Counter Plaintiffs.  I don't -- I really don't

8    think it -- that they should be in a position to -- having to

9    file a motion to compel at this point.

10          You know what -- Mr. Cunningham, you know what

11   involvement, if any, you think Cal-Maine should have in this.

12   And -- and I think the appropriate action would be for you to

13   file a motion to quash, if you and Mr. Post and Mr. Dix cannot

14   work this out.

15          And so in a few minutes, I'll just give you a

16   deadline to file the motion and a deadline for the response.

17   And the Court will just resolve that -- basically separately

18   from the -- the Foodonics situation, to the extent it can.

19          And I --

20          MR. CUNNINGHAM:  Thank you, Judge.  I think that

21   makes a lot of sense.

22          THE COURT:  And I think, really, in terms of the

23   non-party subpoenas and the omnibus motion to quash those -- I

24   mean, I've taken a -- I've taken a pretty hard look at it.  And

25   I'm ready to rule on the motion, unless anybody has anything

1    else to say about it.

2           And I've already heard, really, from both of you, to

3    some degree, on it last time and this time.  So -- and it's

4    really not any type of a brilliant ruling, believe me.  It's --

5    I'm trying to be practical about all of this.

6           So -- so, anyway, my intention -- first of all, it's

7    a little bit of -- I don't want to say it's an odd motion, but

8    I haven't seen it too often when a party and non-parties file a

9    motion together, because -- because the motion to quash under

10   Rule 35 is generally what you see the non-parties file.

11          And then, of course, the parties file a motion for

12   protective order, that is, unless -- unless a third-party

13   subpoena affects the rights of a party, and then you see a

14   motion to quash a third-party subpoena.

15          But in terms of every -- of the non-parties and

16   the -- parties teaming up in one motion, it's a bit of a

17   hybrid.

18          But I -- I really do think in reviewing the -- the --

19   the subpoenas that -- that the appropriate way to do this --

20   and what I'm inclined to do is grant the -- grant the motion to

21   quash, but with leave for the -- for the Counter Plaintiffs to

22   reissue the subpoenas, with a little guidance from the Court at

23   this point.

24          I think -- and I -- I was hoping there was going to

25   have been a greater production at this point, so that there

1   could be a re-evaluation of what might be duplicative.

2         And I know that's not necessarily a bar to -- to --

3   you know, to requiring -- I said Rule 35. I meant Rule 45, in

4   terms of the motion to quash.

5         But at the same time, there's -- it's going to cost a

6   lot of money here to litigate this. So to the extent the Court

7   can keep an eye on it, I'd like to.

8         And then I -- I do think that the -- that the

9   requests need to be narrowed as to the non-parties to a degree.

10   I think they -- some of the requests need to be more specific

11   with regard to subject matter.

12         And I think the subpoenas need to be tailored to the

13   individuals, rather than basically the same request to all of

14   the individuals, because some of those individuals just -- just

15   won't have what is -- what is being requested.

16         And I think those are two of the areas -- or at least

17   the -- the subject matter area and the request as to each

18   non-party were -- were objections that were raised in the

19   motion to quash.

20         And then there was an -- an issue about the time and

21   the time period. I'm inclined at this point to believe that

22   the -- that the time period that the Counter Plaintiffs were

23   traveling on, that information related to that is relevant.

24         So I'm -- I'm not going to -- to, at least at this

25   point, look too favorably on -- on a -- on a -- on an objection

1   to the subpoenas because they're too broad in terms of time.

2          But in terms of the subject matter as to requests and

3   as to specific recipients of the subpoenas, I think that those

4   can be more -- can be tailored more narrowly to -- to the

5   individuals from whom the Counter Plaintiffs are seeking

6   information and evidence.

7          And I'm thinking that if you-all talk about this

8   some, too, and discuss this some, that -- that you might be

9   able to -- to narrow those subpoena requests.

10          And at this point, even though -- you know, and you

11   read cases on this -- and, of course, there aren't too many

12   cases that are binding in these areas, because -- because these

13   things have to be case specific.

14          But my -- my -- a good friend and former colleague,

15   Judge Morris, in 2003, in a review of case law, noted in -- in

16   *C-y-t-o-d-y-n-e Technologies against Biogenic Technologies* --

17   this was at 2:16-FRD-533, that -- and it was a 2003 case, that

18   the limited case law in this area, talking about -- talking

19   about non-parties in relation to Rule 26(b), reveals a

20   case-specific balancing test, wherein the Court must weigh

21   factors such as relevance, the need of the party for the

22   documents, the breadth of the document request, and the time

23   period covered by the request against the burden imposed on the

24   person ordered to produce the desired information.

25          And if a single subpoena as broad as these are -- are

1 issued to all these non-parties, it's hard to make that

2 case-by-case analysis that Judge Morris suggested and that --

3 that I agree with.

4 So I was hoping, though, there would be more

5 discovery having been provided. So I'm reluctant to put any

6 kind of a time limit on when you, Mr. Post and Mr. Dix,

7 might -- might reissue your subpoenas.

8 I was going to suggest that you do it within two

9 weeks. But you may want to wait some time -- of course, this

10 leads us right into our next issue, the scheduling.

11 But you may want to -- to see what progress you make

12 with the other documents. But -- but you can reissue those as

13 soon as you address some of the issues -- or the issues raised

14 by the Court with regard to the subpoenas. And then at this

15 point, I would -- I would order that the non-parties comply

16 with the subpoenas within 45 days.

17 That's right in the middle of the 30 and the 60 that

18 was requested. So I don't know any better way than to just

19 split it in half at this point and see where we go.

20 MR. WELLS: Your Honor, I'm certainly cognizant of

21 the Court's position at this point as to the date range for

22 this discovery from 2008 through the present.

23 We understand that. We certainly will comply with

24 that. But we'd like the Court to be aware of our continuing

25 objection to that broad date range.

1      THE COURT:  Yes.  I think that was the first

2 objection I heard a couple of weeks ago.  And it's the last one

3 I'm hearing today.

4      But, no, I appreciate it.  And I understand where

5 you're coming from on it.  I mean, you -- I think you started

6 today with that, in terms of the tax returns that you have --

7 you've produced and that -- and they bookend the two

8 transactions that are at issue.  But -- but I also understand

9 the Counter Plaintiffs' position, at least at this point.

10      I'm convinced that it's -- this information is

11 relevant, as that is defined -- as that term is defined, and

12 has now been redefined and rediscussed and all of that.

13      But I'm trying to look at practical solutions here

14 and trying to move this forward.  And I think that's the best

15 way to do it at this point.

16      Now, let's talk -- let's talk about timing.  The only

17 thing I wanted to do -- because I looked at your dates.  And

18 you-all have set out -- you know, you've put the right amount

19 of time between the filing of certain things and the setting of

20 the trial and all of that, so you -- you've -- you've done

21 that.

22      I just want to -- to try to make sure -- and I know

23 it's almost impossible, so I almost feel foolish asking this.

24 But are you pretty confident in that schedule?

25      In other words -- I know you don't want this to go on

1  forever, but -- but I think what Judge Corrigan would like --

2  of course, I'd like the discovery to end tomorrow and then I'd

3  be done, and then it would -- this would be his problem, but --

4  but I also -- you know, and he also wants to make sure that

5  there -- there is sufficient time and we're not -- you know,

6  we're not starting and then having to restart again.

7          And maybe -- maybe we -- maybe you would rather just

8  go with these dates that you have, and then, you know, if

9  something comes up down the road, you'll have to -- have to

10  address it then.

11          What do you think, Mr. Post?

12          MR. POST:  Well, Your Honor, we -- this -- we served

13  our draft complaint on the -- on Mr. Jacques Klempf and

14  Foodonics in July of 2017.  And they filed this case in

15  September 2017.  We filed our counterclaim in January.  And we

16  served all our discovery in January on Foodonics and Cal-Maine.

17  And just -- just this month we're getting some documents.

18          So if -- if they -- if we don't get more effective

19  and -- response from them, according to the rules and all the

20  things we know should be done in discovery like this, then

21  we -- we might -- we might not -- this amount of time might not

22  be signif- -- sufficient.

23          But if -- if they turn -- if they turn the corner and

24  they start producing stuff as they should, then perhaps -- then

25  I think this -- these time lines would work, and -- but, yes, I

1    mean -- and we want to get to a trial as soon as possible, but

2    we can't get to a trial without documents and depositions.

3              THE COURT:  So do I interpret that as that you're

4    cautiously optimistic and we should go ahead with the schedule

5    you've proposed, but you're giving the Court a heads-up that

6    you may move later to extend the deadlines again?

7              MR. POST:  I --

8              THE COURT:  And that's fine.

9              MR. POST:  Yes, Your Honor.  I mean, if -- you know,

10   if -- if we get more of the same, then these deadlines aren't

11   going to work either.

12             THE COURT:  Okay.  All right.

13             MR. WELLS:  Your Honor, I might want to address the

14   matter in which Mr. Post responded to the Court's inquiry.  He

15   asked us if we would agree to it, and we agreed to it.  So

16   we're fine with it.

17             THE COURT:  All right.  Well, then I'll -- I'll enter

18   an order, then, granting the motion, and basically adopting

19   the -- the -- the dates that you have here, and then fill in

20   the final pretrial conference date.

21             Then the last -- the last issue, I think, that --

22   that I -- that I think I need to address at this point is

23   that -- that I -- I agree with Mr. Post that -- that the

24   depositions of the parties should not go forward at this point.

25             Now, whether -- whether it's a complete production,

1 or whatever it is, I just -- I just think that, given the --

2 the type of case that this is and the allegations that have

3 been made -- not to turn what you said on you, Mr. Wells, but I

4 think that -- at this point that -- that additional discovery

5 is warranted before the deposition of the parties.

6           And what I plan to do is set a status conference for

7 next month, but I want to see where things are, and then we can

8 revisit that issue and see -- see where we are, because I --

9 you know, this -- this delay -- and I'm not casting any stones

10 at anyone at this point and blaming anyone, but the discovery

11 has got to start moving in the case.

12           And it -- I feel like -- I feel like we've made

13 progress since last time.  I don't know if you-all do.  But, of

14 course, I want to look at the glass half full, not half empty.

15 Otherwise I'd be discouraged by this, and a lot of things.

16           So -- so let's -- we'll revisit that issue.  But at

17 this point, I think that a delay of the -- of the parties'

18 depositions is appropriate.

19           So what are you-all looking like in July?  Are you on

20 vacation maybe or...

21           MR. WELLS:  My wife hasn't told me yet, Judge.

22           THE COURT:  What's that?

23           MR. WELLS:  My wife hasn't told me yet.

24           THE COURT:  Well --

25           MR. WELLS:  Right now I'm fairly free in July.

1    THE COURT:  I was just thinking -- well -- and it

2  could be early August, too, because it's already the end of --

3  end of July.  So it's up to you-all.  And I'd like to make sure

4  something's moving, not just, you know, come back for...

5    MR. POST:  Your Honor, I'm generally open the entire

6  last week of July and the first week of August.

7    MR. WELLS:  I'm fine with that.

8    THE COURT:  You're fine with that?

9    MR. WELL:  We'll make it happen.

10    THE COURT:  Mr. Cunningham, I'm not going to ask you,

11  because I'm hoping you won't have to attend.

12    MR. CUNNINGHAM:  Thank you, Judge.

13    THE COURT:  And, by the way, I don't -- should we

14  set a -- should we set a deadline for you filing your motion to

15  quash?

16    MR. CUNNINGHAM:  I think that makes sense, Judge.

17    THE COURT:  Okay.  Well, let's see.  Today is the

18  27th of June.  How about -- is two weeks enough time?

19    MR. CUNNINGHAM:  Judge, if you could give me three

20  weeks here, only because I'm on vacation next week, and then I

21  have Fifth Circuit argument the following week and I'll need to

22  do that (inaudible) and put the motion together.

23    THE COURT:  All right.  So why don't we just do --

24  why don't we make it -- do you want to make it July 20th?

25    MR. CUNNINGHAM:  Yeah.  That's what I'm thinking.

```
 1              THE COURT:  And then, Mr. Post, do you want two
 2    weeks, three weeks, to respond?  What would you like?
 3              MR. POST:  If you'd grant me three weeks, I'll try to
 4    file it before then.
 5              THE COURT:  All right.  Did we just say the 20th?
 6              COURTROOM DEPUTY:  Yes, sir.
 7              THE COURT:  So why don't we make it August 10th.
 8              And I would hope to some degree, if there are -- if
 9    there are documents, Mr. Cunningham, that -- that -- that only
10    Cal-Maine would have, and that -- and that -- that after a
11    discussion with Mr. Post you believe are relevant, then they
12    wouldn't have to be addressed in your motion, but I'll let
13    you-all handle that.
14              You made a lot of progress in -- the four of you in
15    discussing it, so hopefully -- hopefully you will again.
16              All right.  Let's now look at the calendar.
17              Mr. Hancock, how are you looking the end of July and
18    early August?
19              MR. HANCOCK:  That's fine, Your Honor.  I'll make
20    myself available to the Court.
21              THE COURT:  All right.  Thank you.  I didn't mean to
22    leave you out before.
23              MR. HANCOCK:  That's okay.  Nothing personal.
24              THE COURT:  All right.  Let's see now.
25              What is August -- is it August 8th?
```

1          Is August 8th okay with everyone?

2          MR. POST:  Yes, Your Honor.

3          MR. WELLS:  Yes, sir.

4          THE COURT:  All right.  Mr. Hancock, that's good for

5     you?

6          MR. HANCOCK:  Yes, sir.

7          THE COURT:  Should we just do it at 2 o'clock?

8          MR. POST:  Yes, sir.

9          THE COURT:  All right.

10         MR. HANCOCK:  Thank you.

11         THE COURT:  All right.  Now, I suppose I'm going to

12    enter some sort of order capturing this -- this in some way, in

13    some shape or form.

14         If nothing else, it gives me a little road map to

15    what we need to do next time and what we need to look at.  But

16    I appreciate the efforts you-all are making.

17         I think that -- I think that -- that the real -- the

18    key here is going to be those -- those -- the $90,000 tab and

19    how maybe you can whittle that down by a narrowing of those

20    documents and seeing if -- if you can do that.

21         Because that seems to -- might break the dam here in

22    terms of getting -- getting things really rolling, if -- if

23    that can be produced.

24         All right.  Mr. Post, anything else?

25         MR. POST:  No, sir.  Thank you very much.

1          THE COURT:  Mr. Wells, anything?

2          MR. WELLS:  No, sir.  Thank you.

3          THE COURT:  Mr. Dix, anything?

4          MR. DIX:  No, Your Honor.

5          THE COURT:  Mr. Cunningham, anything else, sir?

6          MR. CUNNINGHAM:  No, sir.  Thank you so much for your

7   time.

8          THE COURT:  Mr. Hancock?

9          MR. HANCOCK:  No, Your Honor.

10          THE COURT:  All right.  Then we're in recess.

11          COURT SECURITY OFFICER:  All rise.

12      (The digitally recorded proceedings concluded at

13   3:16 p.m.)

14                              - - -

15

16

17

18

19

20

21

22

23

24

25

## <u>CERTIFICATE</u>

UNITED STATES DISTRICT COURT     )
                                 )
MIDDLE DISTRICT OF FLORIDA       )


       I hereby certify that the foregoing transcript is a true and correct computer-aided transcription from the official electronic sound recording of the proceedings in the above-entitled matter.


       DATED this 20th day of November, 2018.



       s/Shannon M. Bishop

       Shannon M. Bishop, RDR, CRR, CRC