IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

FOODONICS INTERNATIONAL,          Jacksonville, Florida
INC., a Florida corporation,
                                  Case No. 3:17-cv-1054-J-32JRK
     Plaintiff,

                                  August 8, 2018
vs.

                                  2:06 p.m.

DINA KLEMPF SROCHI, as
Trustee of the Laura Jean         Courtroom No. 5D
Klempf Revocable Trust, a
Florida Trust,

     Defendant.
_____

DIGITALLY RECORDED DISCOVERY STATUS HEARING
BEFORE THE HONORABLE JAMES R. KLINDT
UNITED STATES MAGISTRATE JUDGE

COURT REPORTER:

          Shannon M. Bishop, RDR, CRR, CRC
          221 North Hogan Street, #150
          Jacksonville, Florida  32202
          Telephone:  (904)549-1307
          dsmabishop@yahoo.com

     (Proceedings reported by mechanical stenography;
transcript produced by computer.)

                    A P P E A R A N C E S

PLAINTIFF'S COUNSEL:

          **SAMUEL GRIER WELLS, ESQ.**
          GrayRobinson, PA
          50 North Laura Street, Suite 1100
          Jacksonville, FL  32202

DEFENSE COUNSEL:

          **JAMES H. POST, ESQ.**
          **R. CHRISTOPHER DIX, ESQ.**
          Smith, Hulsey & Busey
          One Independent Drive
          Suite 3300
          Jacksonville, FL  32202-3315

ALSO PRESENT:

          David Hancock (via telephone)
          Kevin Jacques Klempf

1                    P R O C E E D I N G S

2    August 8, 2018                                    2:06 p.m.

3                          - - -

4              COURT SECURITY OFFICER:  This Honorable Court is now

5    in session.  The Honorable James R. Klindt is now presiding.

6              Please be seated, everyone.

7              THE COURT:  All right.  Good afternoon.

8              MR. WELLS:  Good afternoon, Your Honor.

9              MR. POST:  Good afternoon.

10             THE COURT:  All right.  We're set for a discovery

11   status hearing in *Foodonics International, Inc., versus Dina*

12   *Klempf Srochi*, *as Trustee of the Laura Jean Klempf Revocable*

13   *Trust*, Defendant, and then the *Dina Klempf Srochi as Trustee of*

14   *the Laura Jean Revocable Trust*, Counter Plaintiffs, *against*

15   *Foodonics International*, Counter Defendants.  It's case

16   3:17-cv-1054-J-32JRK.

17             And if you'd announce your appearances, please, first

18   on behalf of Foodonics.

19             MR. WELLS:  Your Honor, Grier Wells with

20   GrayRobinson.  And Mr. Hancock is on the phone.  And Mr. Klempf

21   is also here as an observer.

22             THE COURT:  All right.  Thank you.

23             Mr. Hancock, can you hear us okay?

24             MR. HANCOCK:  Yes, sir.

25             THE COURT:  All right.  Thank you.

1        Mr. Post?

2        MR. POST:  May it please the Court, Your Honor?

3        Jim Post and Chris Dix with the law firm of Smith

4  Hulsey and Busey on behalf of the Jean Klempf Trust.

5        THE COURT:  All right.  Thank you.

6        All right.  Well, you-all tell me where -- where is

7  the best place to start?

8        Mr. Post?

9        MR. POST:  I would, with your permission, like to

10  advise the Court of what -- from our perspective where -- what

11  has been done pursuant to your request from that -- from the

12  last time we had a hearing to today.

13        THE COURT:  All right.  Is that -- is that all right

14  with you, Mr. Wells?

15        MR. WELLS:  We can start there, Your Honor.  That's

16  fine.

17        THE COURT:  Okay.  Thank you.

18        MR. POST:  I'll be brief, Your Honor.

19        In a nutshell, at the last status conference held on

20  June 27th, this Court directed the Foodonics parties -- and by

21  that I mean Foodonics, Jacques Klempf, and the GrayRobinson law

22  firm, to commence as soon as possible ESI production and to

23  provide a status report to the Court today as to where they

24  are.

25        This Court also directed Cal-Maine to file objections

1    to the subpoena that had been served on it and Dolph Baker by a
2    certain date.  And -- July 20th.
3              And prior to that date, our firm and the Cal-Maine
4    attorneys entered into a stipulation, which was a preliminary
5    resolution of their motion to -- for protective order and to
6    compel, which was by an order by this Court.
7              And this Court directed GrayRobinson to investigate
8    further and disclose which former Foodonics employees had
9    Dixie Egg e-mail -- Dixie Egg e-mail accounts, because they had
10   not yet been located.
11             And, lastly, this Court ruled that the depositions
12   of -- of the parties -- of the Trust should not be taken until
13   Foodonics completed its production of documents.
14             Your Honor, other than the Cal-Maine stipulation,
15   there has been no production by the Foodonics parties.  And the
16   only conversation we had with the Foodonics parties and their
17   counsel was a telephone conference on July 31st, which -- the
18   result of which did not give us any indication as to when, if
19   at all, the ESI production will even start, much less be
20   completed.
21             Your Honor, from our perspective, this status
22   conference needs to address these issues.  And from our
23   perspective, we ask the Court -- we would be asking the Court
24   to require production of the ESI to be completed by the
25   Foodonics parties six weeks from now, September 24, 2018, and

1    that that include the production of the GrayRobinson law firm,

2    and to provide the Court with -- for the Court to provide

3    notification to the Foodonics parties today that the Court will

4    consider appropriate sanctions or such other measures necessary

5    to cure the prejudice resulting from the failure to produce,

6    including the possibility of appointing a special master to

7    review the production by ESI or the award of legal expenses or

8    the dismissal of the Foodonics complaint, as the Court sees

9    fit.

10          We also want -- would ask the Court to continue its

11    ruling that no depositions of parties will be taken until

12    Foodonics completes its production.

13          This Court had broad discretion to control the timing

14    of discovery and limit discovery so to avoid cumulation,

15    duplication, harassment, expense, and burdensomeness, and to

16    direct the sequence of discovery for the parties and for

17    witnesses, or for the interest of justice.

18          This case was filed -- we served our discovery

19    requests last January.  Here we are in August.  Foodonics

20    started this action by filing a complaint, asking for a

21    declaratory judgment on our -- our claims, but it hasn't

22    produced any documents.  And we have been prejudiced and will

23    continue to be prejudiced until that -- their production has

24    been completed.

25          So that's our position today, Your Honor.

1          THE COURT:  Mr. Post, I thought -- I thought we had

2    addressed the Dixie Egg domain issue at the last hearing?  And

3    I thought that -- I thought that was resolved or that we had

4    moved on past that?

5          Did I -- did I miss that?

6          MR. POST:  My understanding was -- is there's a --

7    and maybe I'm wrong.  At the last hearing no one could -- the

8    Cal-Maine people said they didn't have control of these Dixie

9    Egg mail accounts.

10          And that's why GrayRobinson was directed to

11    investigate further with the individual former employees who

12    they represent on the subpoenas, to see if they have they the

13    Egg mail accounts in their personal possession, whether it's

14    computers or telephones or whatever.

15          Because apparently we're being told that the Dixie

16    Egg mail accounts were terminated, all the -- except for the

17    one owned by Mr. Klempf, Jacques Klempf.

18          So presumably, we would imagine that -- that the

19    former employee, unless they've disposed of their own ESI, have

20    what's left -- have e-mails left in their personal possession

21    on their personal laptops or phones on those accounts that

22    apparently are not in the possession of Foodonics or Cal-Maine

23    at this time.

24          THE COURT:  I must be confusing, then, the Cal-Maine

25    side of that issue with what you just explained.

1    MR. POST:  Yes, Your Honor.

2    That's all I have, Your Honor.

3    THE COURT:  All right.  Thank you.

4    Mr. Wells?

5    MR. WELLS:  May it please the Court?

6    The Court may be surprised to hear that our view of

7    where we are is actually different from where Mr. Post has

8    related to the Court.

9    While it is certainly true that on behalf of

10   Foodonics or GrayRobinson we have not produced actual ESI

11   documents that are the subject of discovery, a lot of other

12   documents have been produced, tax returns, board minutes, other

13   witnesses have produced documents.

14   But we addressed in painstaking detail the ESI

15   documents at the last hearing, at which time we advised the

16   Court that the initial search of the various devices involved

17   had yielded about 62,000 documents that were consistent with

18   the search terms that the parties had agreed upon, and that the

19   costs to -- at that time, the costs to do a review of those

20   documents for relevancy purposes was going to be in excess of,

21   if I recall correctly, 75- or $80,000.

22   And we requested that either that cost be borne by

23   the party seeking the documents or that we reach some other

24   resolution as to how to address the vast number of documents.

25   THE COURT:  How much did you say?  I missed that.

1    MR. WELLS:  The dollar amount?

2    THE COURT:  Yes.

3    MR. WELLS:  And Mr. Hancock can correct me.  But my

4  recollection is on the 62,000 that it was going to be 75- to

5  $80,000.

6    MR. HANCOCK:  That's correct.

7    MR. WELLS:  We have since, Your Honor -- and based on

8  some discussions with opposing counsel, we have reduced the

9  62,000 documents down to about 48,000, based on a review of

10  both privileged documents and a filtering process that filters

11  out what is sometimes referred to as, quote, junk mail, end

12  quote, things that are clearly not -- not at all relevant to

13  the litigation.

14    So we now have 48,000 documents that are subject to

15  review.  And the cost of that review is approximately $50,000.

16    At the last hearing, we expressed concern about the

17  cost, particularly in light of what we believe are not -- are

18  allegations that simply cannot be supported.

19    And my recollection is -- and it's certainly not in

20  the Court's order -- that the Court directed the parties to try

21  to figure out a way to address the number of documents.

22    We are here today with -- having determined through a

23  fairly exhaustive process of eliminating privileged documents

24  and the junk mail documents to reduce the number to what it is

25  currently.

1       We still think that the search terms -- and I

2  provided a copy of the agreed search terms to the Court, that

3  those could be reduced and, therefore, reduce the number of

4  documents and, therefore, the cost of producing the documents.

5       The quote from special counsel, who would be engaged

6  to do the actual document review -- even at the 48,000 number,

7  would take several weeks for them.  And that's employing four

8  or five attorneys on a daily basis.

9       That process can be started.  But we think it would

10  be much more economical and much more relevant to the

11  litigation if the search terms could be reduced, and,

12  therefore, reduce the number of documents.

13       THE COURT:  Can you tell me which -- I have two

14  notebooks.  I can't tell who's is from -- is this yours, or is

15  the -- is it the white one?

16       MR. WELLS:  Well, the black one is Mr. Post's.  The

17  white one is mine.

18       THE COURT:  All right.  And then which -- and then

19  which -- which -- is it under a tab, the -- the search terms

20  are under 4?

21       MR. WELLS:  The search terms are under tab 4.

22       THE COURT:  Okay.

23       MR. WELLS:  There's also -- there's an e-mail from

24  Mr. Dix to one of my partners and to Mr. Hancock, dated

25  May 22nd, which addresses the search terms, which follows the

1   e-mail.

2          THE COURT:  And -- and you're suggesting that the

3   search terms should be limited.  How have you -- ordinarily how

4   have you gone about that?  In other words, what is your

5   approach to narrowing them?  What's your suggestion?

6          MR. WELLS:  We have not actually made a suggestion,

7   because we've been met with, "We're not willing to reduce the

8   search terms at this point."

9          And let me point to just a couple.  If you look

10  hypothetically at No. 23, on the second page, Transfer and

11  Down, Down is a -- a separate company that was set up by

12  Mr. Klempf subsequent to the sale to Cal-Maine.

13         And we feel very comfortable that there's not going

14  to be anything in that one particular category that would have

15  anything to do with any of the allegations by either side in

16  this litigation.

17         And I could go through and we could find others, but

18  we've been met with, "These are the search terms.  We need to

19  follow the search terms."

20         There are other issues that Mr. Post addressed that

21  we would like to address as well.  But I don't know if the

22  Court wants to address those.

23         THE COURT:  No, no.  Go ahead.  Why don't you go

24  ahead with everything.

25         MR. WELLS:  Okay.  I think it's somewhat

1    disingenuous, Your Honor, that the Court has -- that Mr. Post

2    is complaining that we have not produced documents in the

3    course of this litigation.  We have produced documents.  Other

4    witnesses have produced documents.

5            But we also initiated discovery, Your Honor.  We

6    initiated a request for production in March, prior to the

7    search terms.  And we got a response -- and that's also in the

8    notebook.  We got a timely response in April that they would

9    produce documents within 30 days of an agreement on the search

10   terms.

11           We have received, in response to a request for

12   production, a copy of the Trust and an amendment to the Trust,

13   and a document that purports to appoint Mr. Blackburn as the

14   assistant trustee.

15           We have not gotten any other documents from Mr. Post

16   except for some documents that have been received from other

17   witnesses that we requested copies of.

18           The response to our request for production indicates

19   they would provide responsive documents 30 days after the

20   search terms were agreed upon.  Those were agreed upon on

21   May 22nd.  And we don't have any documents from them.

22           And we understand they're in the same situation we

23   are, Your Honor.  They've got a lot of documents.  They've been

24   through the distillation process.  But they've got a lot of the

25   documents that we don't yet have.

1    We have asked -- as the Court may recall, and as

2  reflected in your order, we asked to take the depositions of

3  Mr. -- for Blackburn and Ms. Srochi and the Court ruled, in

4  June, that we were not able to do that at this time, although

5  it may be revisited during the course of this hearing.

6    Subsequent to the last hearing, we propounded

7  interrogatories to the Defendant/Counter Plaintiff.  They are

8  basically contention interrogatories requesting that they

9  provide facts known in support of various allegations in the

10  counterclaim.

11    Those are standard interrogatories that we -- were

12  met with an objection to all of them on the basis that the

13  Court's order preventing depositions essentially applies to

14  interrogatories, and that they should not be asked to answer

15  interrogatories at this time.

16    The case law is pretty clear that contention

17  interrogatories such as those be propounded, particularly when

18  you've got a counterclaim such as the one founded here --

19  contention interrogatories are, indeed, appropriate and should

20  be answered.

21    If they don't have the information, they can

22  certainly supplement their answers at a later date.  But we've

23  got interrogatories that have not been answered.

24    We've asked to depose other witnesses in the case,

25  specifically an attorney with Smith, Gambrell & Russell, Steven

1    Brust, Dan Edelman, who is a consultant for the Trust, who was

2    very much involved in the stock redemption back in 2015.  He's

3    a fact witness.  Mr. Brust is a fact witness.

4            And we've been met with, "Well, we don't want those

5    depositions to be taken either, because we consider them to be

6    agents of the Plaintiff."

7            We can't -- we've asked for the deposition of Marc

8    Klempf, who is the brother of Dina Srochi and Jacques Klempf.

9    And he's also deemed to be an agent.  He's also a beneficiary

10   under the Trust.

11           So every deposition that we've asked to take, except

12   for some collateral witnesses, we've been met with a

13   declination to provide dates.

14           So between interrogatories and non-party depositions,

15   we've not been able to move forward either.

16           The Court may note as well from our binder -- we

17   served a subpoena on Smith, Gambrell & Russell for various

18   documents.  And Smith, Gambrell & Russell has filed an

19   objection, because it is their understanding that the parties

20   are not in agreement as to what may be privileged or not.

21           From our understanding, Mr. Brust represented

22   Ms. Srochi for a period of time roughly in the 2008/2009 time

23   frame.  And then in the 2013/2014 time frame, he represented

24   Ms. Klempf, the grantor under the Trust.

25           It is our understanding that he was not representing

1    Ms. Srochi during the period of time he was representing

2    Ms. Klempf.  So the communications with Ms. Srochi during that

3    period of time, we feel, would be relevant.  But we're not able

4    to move forward.

5         THE COURT:  All right.  So just so that I understand

6    this, at this point, in terms of how you see discovery, you

7    believe you -- or you're saying you have provided some

8    discovery, that the ESI is on hold because of a disagreement

9    over the search terms, and then you have the request for

10   production that is outstanding, you have the contention

11   interrogatories that haven't been answered.

12        There are depositions that you believe can be taken,

13   notwithstanding the ESI issues that are present, and then

14   there's the Smith Gambrell subpoena.

15        Does that cover your list of areas, basically?

16        MR. WELLS:  It does, Your Honor.  I'm not as

17   concerned about the subpoena to Smith Gambrell at this point.

18   I think Mr. Brust would probably testify without providing the

19   documents in response to a subpoena.

20        But I think we should be able to move forward on

21   those depositions as -- and particularly the contention

22   interrogatories.

23        If I may -- and I apologize.  The Court asked about

24   the DixieEgg.com.

25        THE COURT:  Yes.

1          MR. WELLS:  That was the subject last hearing.  And

2     there's been some -- some activity, movement, and progress on

3     that.

4          When Cal-Maine acquired Foodonics, basically that

5     Dixie Egg account fell into some sort of a never-never land.

6     Employees continued to use it for -- for minor things.

7          The review platform that the documents that we have

8     acquired from Mr. Klempf's devices, cell phone, laptop, PC,

9     would have all of the DixieEgg.com documents.

10          There are several employees who continue to use that

11     domain site for a short period of time after the acquisition.

12     But that account was essentially terminated before this

13     litigation started.

14          As a result of this litigation, even though we

15     questioned whether -- of course, they're no longer our

16     employees.  We questioned whether we have the authority to go

17     to them to get their devices.

18          But nevertheless, Mr. Klempf has reopened that

19     account, changed the administrator from one of the former

20     employees to himself, and we are in the process of going

21     through and getting the DixieEgg.com e-mails from employees

22     that we know would have used it.  So that's in process.

23          But it was delayed because of the termination account

24     and uncertainty over how to reaccess and get into the archives.

25          THE COURT:  All right.  Thank you.

1      Mr. Post, let me just ask you, before I forget,

2  what -- what is your view of the -- the search terms and the

3  ESI production that is being requested of you?

4      MR. POST:  Your Honor, that goes to the heart of what

5  we wanted to discuss today.  For the details, though, I'd like

6  to defer to my -- Mr. Dix, and -- but I would like to address

7  these other -- what I would call new issues that are being

8  brought up today.

9      THE COURT:  All right.  Well, let's -- let's take

10  them one at a time.  Let's go to the ESI --

11      MR. POST:  Right.

12      THE COURT:  -- because that seems to be first on the

13  list.

14      MR. POST:  Right.

15      THE COURT:  And I'll hear what Mr. Dix has to say.

16      MR. DIX:  Thank you, Your Honor.

17      So there's two separate issues with the search terms.

18  There are the search terms that we have run, we've negotiated,

19  and we've used -- culled down the data that our clients have.

20  And then there are separate search terms that were agreed to

21  that are being used by Foodonics and Mr. Klempf.

22      THE COURT:  Well, it doesn't sound like they've been

23  agreed to.  That sounds like the crux of the problem, on this

24  side.

25      MR. DIX:  And -- so, yes, Your Honor.  So let me

1  drill down on that a little bit.

2          THE COURT:  Okay.

3          MR. DIX:  You know, we served our discovery back in

4  January.  We asked the Court back in March to enter an ESI

5  order.  And the purpose of that -- one of the purposes was to

6  require the designation of ESI liaison.

7          And the idea of that was me and someone from

8  GrayRobinson, other than Mr. Wells -- to get together and talk

9  about how we were going to do this.  And those discussions did,

10  in fact, take place back in April.

11          Different search terms were exchanged by both sets of

12  parties.  We've included the -- the essence of those

13  discussions, the written discussions, in the notebook we

14  provided.

15          It's at tab -- there's a summary on tab 7, Your

16  Honor.  And then the e-mails are at tab A and B.  And it's a

17  little difficult.  Because there are a chain of e-mails and

18  they're in reverse chronological order.  So you almost have to

19  read from the back.

20          But what happened was that -- that the parties

21  agreed -- not just that we were going to talk about search

22  terms.

23          Turning the Court's attention to tab B -- sorry,

24  tab A.  It's the sixth page.

25          THE COURT:  The sixth page, you said?

1    MR. DIX:  The sixth page.  It's the continuation of

2 an e-mail from the previous page from Mr. Santana, who was the

3 eDiscovery liaison that GrayRobinson designated.

4    And he's -- he and Mr. Hancock, who's on the phone,

5 are the primary people that I discussed these terms with.

6    So if you look at the first full paragraph, Your

7 Honor, Mr. Santana proposed that we finalize our respective

8 search terms and then conduct the first run to see what kind of

9 volume of responses we receive.

10    If excessive, we can get together to modify the

11 search terms further in an effort to obtain more reasonable

12 response volumes.

13    We should then each review our respective data for

14 privilege and relevancy prior to production to avoid

15 document levy.

16    So -- and if you look on page 4, that same tab, down

17 at the very bottom, that's my e-mail back to Mr. Santana

18 confirming that we agree with the same process that Mr. Santana

19 proposed, that being that we get together and talk about an

20 initial set of search terms, and then the parties go back and

21 run those search terms on their data.

22    And if it is determined that there's a high number of

23 hits that are non-responsive, we agreed to get back together

24 and to take steps to further reduce those search terms.

25    And then only after we all agreed about the search

1  terms that were going to be run and we're able to narrow down

2  the documents that -- to a reasonable amount, then we were

3  going to go and review the documents, the remaining documents.

4         And so let me just tell you a little bit about what

5  we've done and compare that to what Foodonics has done.  We

6  collected from our clients approximately 250,000 different

7  documents.

8         Using the search terms that we agreed to run with

9  GrayRobinson, we narrowed that collection down to -- it's

10  actually very close to what they ended up with.  We got about

11  64,000.

12        From the 64,000 e-mails, we took a quick peek at

13  those and realized that a lot of them were what Mr. Wells

14  described as -- as junk.  They were e-mails from HoneyBaked Ham

15  and Best Buy and Domino's Pizza.

16        And the reason that you're getting those hits is

17  because the search terms included search terms like "price" and

18  "share".  And price and share are in e-mails from HoneyBaked

19  Ham and Best Buy, along with the e-mails that we really want

20  from this case.

21        So we engaged our eDiscovery experts at KLDiscovery

22  to come up with a junk filter, take the commonly used phrases

23  that come up in these Best Buy and Domino's Pizza and other

24  e-mails -- come up with a way for us to cull those out.  And

25  they did that.

1    And they were able, using the search terms -- and

2 those are in -- we've got our e-mail -- at tab 6, Your Honor,

3 is my e-mail on July 31st.  It's my e-mail describing this

4 process.  And then the successive pages are those search terms

5 that we used.

6    And I think there's close to 90 of them.  And it's

7 just -- phrases that are not in the communications that are

8 going to be relevant to this case.

9    We were able to go, Your Honor, from 64,000 documents

10 down to 16,500.  That's a huge -- huge reduction.  But we

11 didn't just assume that our search terms were correct.  We took

12 a random sample of about 650 of those e-mails that we wanted to

13 cull and we had somebody review each and every one.

14    And when they reviewed each and every one, they

15 confirmed that, in fact, the junk filter was working correctly

16 and were 99 percent confident that our cull of those search

17 terms reduced the volume down to 16,500.

18    So we got down to 16,500.  We have now engaged -- we

19 have a team of eight document review attorneys.  That team of

20 document review attorneys can get through the remaining 16,500

21 e-mails in about a week or two.

22    And they do what's called a first pass review, which

23 is designed to check for relevance, and also for potential

24 privilege.

25    And consistent with the process that we agreed to

1  months ago, back in April, we're going to -- after we get the

2  first pass review done, then our firm is going to conduct the

3  second pass to look at the -- the documents that were reviewed

4  and confirm that the ones that are privileged are indeed

5  privileged.

6          And we have -- we laid out this entire process

7  transparently to GrayRobinson, to Mr. Wells, in an e-mail after

8  a phone call that we had on July 31st.  It's the e-mail at

9  tab 6.

10          And we have laid out the process that we're going to

11  follow, the steps that we took.  We were completely transparent

12  about the -- the recommendations that we have.

13          We even shared with them our junk filter.  We said,

14  "This will probably work for you.  Try it."

15          And that's, to date, between the last hearing and

16  this hearing, the only proposal we've heard from either side,

17  is us recommending to them how they can reduce their

18  collection.

19          We have -- Mr. Wells described some different terms

20  earlier, talking about BAM and Transfer.  But we've heard no

21  proposal from anyone on the other side as to what might work.

22  They have the data.

23          We can't tell them whether their search terms that

24  are designed to eliminate documents are going to work because

25  they have the data.  They've got to try that out.

1    They have to get their people, like we did, to come

2 up with some search terms that reduce the volume.

3 Alternatively, they've got to get started reviewing the

4 documents.

5    So there's basically two -- two options here.  And

6 they are choosing the third, which is to do nothing.  And so --

7    THE COURT:  Can -- I don't mean to interrupt you.

8    MR. DIX:  Sure.

9    THE COURT:  But I just lost you for a minute there

10 when you said something about what they need to do to the

11 search terms to reduce the search terms.  Because from what I'm

12 hearing Mr. Wells -- he -- he's saying there are too many

13 search terms.

14    So is it up to you to reduce the search terms or up

15 to them?  Or when you two are using "reduce," are you using

16 that word differently?

17    MR. DIX:  Your Honor, maybe I spoke unclearly.  I

18 mean the number of documents.  The search terms can be -- we

19 can add more search terms to reduce the number of documents.

20    THE COURT:  All right.

21    MR. DIX:  So our -- our junk filter that we ran -- we

22 added 93 more search terms.  But using those additional search

23 terms, we excluded 47,500 e-mails.

24    So the same thing needs to happen -- if they've got

25 62,000 e-mails that they still don't want to review, they've

1   got to -- they've got to be the ones -- they have the data.

2   They've got to propose what they're going to do to reduce that.

3   They were their search terms to begin with.

4        And we don't know that -- we don't know the examples

5   of the HoneyBaked Hams and the Best Buys and the different

6   things that are causing the hits that they believe are

7   over-responsive.  We don't know how to tell them to reduce it.

8        But we certainly would entertain any suggestions.

9   And I think at the last hearing, Your Honor, I laid out several

10   different types of technologies, with clustering and e-mail

11   threading and predictive coding, that are commonly used to do

12   this kind of thing.

13        We just can't make them do it.  And they're just

14   sitting, doing nothing, taking the position that because they

15   don't understand -- or don't know how to reduce the search

16   terms, they can't start their review.  And that's simply not

17   the case.  They're just choosing not to do it.

18        THE COURT:  Let me ask you this.  Do you -- in terms

19   of the 16,500 documents and the review process and all of

20   that --

21        MR. DIX:  Right.

22        THE COURT:  -- what dollar figure do you put on that?

23        MR. DIX:  It's going to be about $20,000, I believe,

24   using a team of eight review attorneys over a week or two, with

25   project management time included in that.

1    I think our document reviewers -- the rate that we're

2  paying is higher than what special counsel -- I think special

3  counsel's quoted rate was $38 an hour.  Ours is $45 an hour.

4    But our people are using technology predictive

5  coding.  They're using different tools to prioritize the

6  review.  And so we think there's value in paying a little bit

7  more to get a better review.

8    THE COURT:  And so what is your projected date of

9  turning over whatever documents you turn over out of the

10  16,500?

11    MR. DIX:  By the end of September, Your Honor.  It's

12  well laid out in our e-mail at tab 6.  They're going to do the

13  first pass review.  It's going to take them one to two weeks to

14  do.  And then we're going to take the second pass before

15  producing the documents.

16    Part of the delay in there in September is both

17  Mr. Post and I are going to be out of town for some period of

18  that time.

19    THE COURT:  I'm not being critical of anyone.  But if

20  there's ever a transcript made of this, I don't want it to look

21  like I didn't look at these -- these binders that you gave me.

22  They were provided shortly before the hearing.

23    And I did glance through them.  And I did see this

24  July 31st e-mail, but -- but -- it's helpful for me to have it

25  in the argument, but I don't want it to look like I was sitting

1  on these for a week or two and not paying attention to them,

2  but I -- but I appreciate that.

3       All right. Well, let me hear again from Mr. Wells on

4  the issue, because I'd like to just take it an issue at a time.

5  And I -- and I think this ESI issue is one that -- once that

6  starts rolling, a lot of these other things are going to

7  hopefully take care of themselves.

8       So, Mr. Wells, what do you say to this general notion

9  that you-all aren't doing enough with various programs that are

10  available to you to cull these documents?

11       MR. WELLS: Well, the Court asked me what I think

12  about it -- I'm hesitant to say. We had a phone conversation

13  last week, Your Honor, that I initiated, to see where we are

14  with all we're discussing right here right now.

15       And in that phone conversation is the first time we

16  heard about them having -- the first time we heard anything at

17  all about the number of documents they had. And we've been

18  telling them from day one, "We've got 62,000 documents we've

19  got to deal with."

20       We heard last week that they've got a large number

21  that were culled down to 62-. And they applied this junk

22  filter. And it came down -- oh, he may have said 16,5- here.

23  I don't recall.

24       THE COURT: Yes.

25       MR. WELLS: It's the first time we heard this.

1        So from that phone conversation, we did the same

2   thing they did, and applied the filter to our 62,000 documents,

3   and reduced it by about 8,000, based on HoneyBaked Ham and Best

4   Buy, whatever, Neiman Marcus, whatever.

5        Plus, when you add in the privileged documents that

6   we've identified, of about 6,000, it takes us down to 48,000.

7   And that's where we are.

8        Before the phone conversation last week, we had three

9   of our summer associates going through, identifying privilege.

10  We've done a two-level review of privileges.  We've done the

11  same filtering that they've done and run the sampling.  But

12  we're left with 48,000 documents.

13       Perhaps it's a matter of communication.  But every

14  time we've suggested we need to reduce the search terms, we're

15  met with, "Well, let's try this.  Let's do this instead."

16       We'll be glad to give them the 48,000 documents and

17  let them do whatever they want to with it.  But I don't think

18  that's what we're here to do.

19       THE COURT:  I think they'll take the 48,000 if you

20  send them today.

21       MR. DIX:  They're -- we're using the same eDiscovery

22  vendor.  It's literally press a button.

23       MR. WELLS:  Well, I thought I heard him say it's

24  going to take several weeks for his -- whoever is doing the

25  review of their 16- to do the review there.

1       We're talking -- special counsel is telling us it's

2  going to take five weeks for their attorneys to review the

3  48,000.

4       But we are at the point where that process can begin,

5  if we stick with the current search terms and the current

6  levels of documents.

7       The question becomes, in our mind, "Who pays for it?"

8       These are documents they're seeking.  I know in --

9  ordinarily the party producing documents pays for it.  But we

10  think that it should be -- should and could be reduced.

11       MR. DIX:  Your Honor, if I may?

12       THE COURT:  Yeah.

13       MR. DIX:  I'm not aware of a single proposal, other

14  than a date restriction that they previously agreed not to make

15  and then they tried to make it -- I'm not aware of any search

16  term proposal we've ever gotten from them, at all, much less

17  one that we've said, "No, we're not going to do that."

18       We remain open, but we said that last hearing.  We

19  said, "Tell us what you're going to do to reduce that volume.

20  And pursuant to the ESI order, you're going to at least tell us

21  what you're going to do before you do it.  But tell us and then

22  do it."

23       So the problem is that they're not doing it.  I don't

24  know of any -- Mr. Wells, show me the e-mail where I said no,

25  we're not going to run that search term, or not going to let

1    you run a search term to reduce e-mails that are unrelated to

2    the case.  It simply hasn't happened.  So --

3              THE COURT:  Well, let me just ask you this.

4              If you were reducing the search terms to run to try

5    to reduce the number of documents, I mean, how would you go

6    about that?  Would you go about -- would you go about -- in

7    your own mind, taking -- for instance, the one with BAM that

8    you showed -- would you go -- in your own mind, would you

9    eliminate, at least initially, ones that you thought would

10   produce irrelevant documents?

11             I mean, is that how -- I'm trying to think of what --

12   in other words, if he -- if Mr. Wells and his team wants to

13   reduce the search terms, what's the -- how do you -- how do you

14   approach that?

15             Do you approach it with, you know, terms that you

16   think are irrelevant or that are going to produce -- because I

17   know there's a -- there's a disagreement over certain matters

18   as to the relevancy, giving time periods and other things like

19   that.

20             Is that how you do it?

21             MR. WELLS:  In my limited knowledge, Your Honor,

22   that's where I would start, is look at the search terms that we

23   have and make a judgment, discuss with opposing counsel about

24   things that we think are not going to produce -- could not

25   produce anything.

1       And the one I gave you, I think, is a clear one.

2   There are probably -- there have to be others.

3       I think a combination of Mr. Hancock, who's on the

4   line, and a partner of mine who's reflected in some of the

5   documents, Mike Santana, would be the ones that have to do it.

6   But for --

7       MR. HANCOCK:  Your Honor, can I weigh in on this?

8   This is Mr. Hancock.

9       THE COURT:  Yes.  Go ahead.

10      MR. HANCOCK:  So two things.  It's not about reducing

11  the number of search terms.  It's reducing the broadness of the

12  search terms.

13      For example, some of the search terms are sale,

14  purchase, proposal.  Those are so broad that they're returning

15  a lot of what we call false hits.  So those words exist in the

16  documents, but they don't pertain to this -- to the issue at

17  hand.

18      So that's really the issue with the search terms.

19  They're too broad.  And the way to limit that is -- sometimes

20  you include proximity terms, which means a sale within three

21  words of stock, or something like that.  So that's as to the

22  search terms.

23      The other thing I wanted to address is -- we have

24  approached the other side and asked them to -- or tried to

25  reduce the number of hits here.  They have asked that we extend

1   the date range to January 2018. And in so doing, that added

2   15,000 documents.

3         We've provided them with our search results for that

4   time frame, that was just the additional from late -- I think

5   it was from late 2017 until January of 2018, added 15,000

6   documents.

7         We've provided them with the reporting and asked them

8   that -- and told them that our position is that anything

9   that that's late in the process, that far removed from these

10   transactions, is very, very, very unlikely to have any

11   responsive documents. They were supposed to get back with us

12   to tell us what their position was. And we have never heard

13   back from them on that.

14         THE COURT: Well, you know, this is part of the

15   problem, because -- you know, it's a he said/she said on some

16   of this. And so it's -- it -- I mean, I feel like -- I'm just

17   going to set some deadlines here in a few minutes.

18         And then if the parties don't like the deadlines,

19   they can file whatever they want to do whatever they want. But

20   this is -- this has to move. It just has to move.

21         And then -- and, you know, there's a lot of money at

22   stake here, a lot of money at stake. So I'm not overwhelmed by

23   $50,000 for that work to be done, just sitting here at this

24   point.

25         Now, if there is a way to -- to limit those

1    documents, the number of documents, so that money is not being

2    wasted, then that should be done.

3         But -- but if -- if Mr. Dix's memory on this and --

4    is accurate, and he's recalling it accurately, he -- he's of

5    the view that there hasn't been any attempt to confer to limit

6    the search terms or -- or make efforts to -- to even -- if it's

7    not limit the terms, as Mr. Hancock said, to discuss the --

8    reducing the broadness of the terms.

9         Mr. Hancock believes there have been discussions

10   about ways to limit the number of documents that are ultimately

11   produced, at least in a time range.

12        So before we're done here today, I'm just going

13   to set -- I'm going to set a deadline for next week for there

14   to be a meet-and-confer on these -- on these -- on the search

15   terms being used to -- and give the parties a week to agree --

16   to agree on the search terms.

17        And then -- and I'm -- I'm going to set another

18   status conference a lot quicker than this one.  And then

19   you-all can come in here and tell me again.

20        But if the same thing happens again, I'm just going

21   to order that -- I'm going to set a date and then -- and then

22   that's just going to have to happen.

23        Because these -- once these documents start flowing

24   back and forth, on the ESI, I'm convinced that these other

25   issues -- every one that you -- you listed -- and I'm not

1   saying that -- that -- Mr. Wells, that you're wrong about

2   contention interrogatories.

3         I mean, just without seeing them, it would seem to me

4   that those could be answered without the ESI.  I agree with

5   you.

6         But the ESI needs to be produced one way or the

7   other.  And that seems to me to be a threshold issues that

8   we've got to address, so -- so I'll just -- what is today?

9         Today is the -- the 8th.  I mean, let's -- let's just

10  do this, that the parties meet and agree, or attempt to agree,

11  on -- on the search terms to be used no later than -- than

12  August 15th.

13        And if you-all do agree on the search terms by then,

14  then you can -- you can file a notice that -- that you've

15  resolved the issue, and then I'll -- I'll cancel the hearing

16  that I'm about to set.  But I just feel like we've got to move

17  this along.  And I don't want to wait another month to do it.

18        MR. DIX:  Your Honor, could I clarify one thing on

19  that?

20        THE COURT:  Yes.

21        MR. DIX:  Our review is underway.  I'm not aware of

22  any search terms that -- that we need to propose or adjust in

23  order to keep moving forward and end up producing documents.

24        THE COURT:  So as long as -- if Mr. Wells agrees with

25  that and Mr. Hancock, then I'm talking about then the

```
1   Foodonics -- the Foodonics -- the search terms that Foodonics
2   is using that have, at this point, produced -- well, I guess
3   we're in the neighborhood of about 45- to 48,000 documents that
4   are still at issue.  And so those are the documents I'm talking
5   about.
6               And then -- and then I don't know -- of course, I
7   know you-all are going to be out of town some and all of that.
8   So if we have to do it by telephone, we can.  But, you know, I
9   can set this next Thursday morning for a -- for a -- for a
10  status -- another discovery status conference, so that we
11  don't -- don't let too much time get out from under us here.
12              Is that -- is that not a good time?
13              MR. DIX:  I could do it by phone.  I'll be in Tampa.
14  I'm speaking about electronic discovery Thursday afternoon.
15  But I could do it in the morning.
16              MR. WELLS:  If we have a meet-and-confer on the 15th,
17  which is next Wednesday --
18              THE COURT:  Yes.
19              MR. WELLS:  -- you're proposing to have a conference
20  the next day?
21              THE COURT:  If you-all don't resolve the issues.
22              MR. WELLS:  Okay.
23              THE COURT:  Mr. Post, how are you looking next
24  Thursday?
25              MR. POST:  I'll make myself available, Your Honor.
```

1    THE COURT:  All right.  I'll just set -- then I'm
2  going to set it at 11 o'clock.

3    Mr. Hancock, are you available then, sir?

4    MR. HANCOCK:  I will make myself available.

5    THE COURT:  All right.  So we'll just set it at
6  11 o'clock.

7    All right.  So let's move past the ESI at this point
8  and move on to the -- Mr. Post wanted to comment on some of the
9  other issues that you raised, Mr. Wells.  So let me let him do
10  that, and then...

11    MR. POST:  Your Honor, with respect to -- to
12  depositions -- he mentioned Steve Brust.  Steve Brust was an
13  attorney for Laura Jean Klempf.  And certainly the matters
14  between him and Laura Jean Klempf are subject to many privilege
15  issues.

16    He mentioned Dan Edelman of Dixon Hughes.  He's a CPA
17  and advisor to Jean Klempf, both while she was living -- and
18  now he's an advisor to the trust in this litigation.

19    Marc Klempf is the son of Jean Klempf and an advisor
20  to her as well, in connection with the -- the matters that are
21  in litigation.  All of these people are within the common
22  interest privilege of the Trust.

23    And we -- and so for the same reason we suggested to
24  the Court that it was not fair and perhaps burdensome to let
25  depositions go forward until we have the documents is -- is

1  inapplicable to these people as well.

2          And the reason it's burdensome is because

3  inevitably -- in all likelihood, if not inevitably, these

4  depositions are going to be incomplete.

5          We -- they're going to take depositions of people.

6  How can we cross-examine them, if we need to, with -- and -- if

7  we haven't got all the information that Foodonics has in its --

8  it's been hiding in connection with this litigation?

9          So these people are going to be deposed twice, once

10  by them and once by us.  That wouldn't be -- that would be

11  prohibitively expensive, it would be messy, and would be unfair

12  to -- to the Trust.

13          It's -- and it is especially wrong, if you will,

14  because the -- the Trust filed this complaint -- they filed

15  this complaint asking for a declaratory judgment on the issues

16  that we've brought now in our counterclaim.

17          So it's -- they filed this action.  They should

18  be able -- you can't -- you can't unfairly hide the ball until

19  they take depositions that we -- and we don't have the

20  opportunity to educate ourselves about the case and -- and also

21  expose these people to two -- at least maybe two depositions in

22  the case.

23          So it just makes -- it makes sense that Foodonics

24  filed this complaint back in -- last year.  They need to

25  produce their documents.  And then we can go about taking

37

depositions in a systematic fashion.  Hopefully the fewer the
better, all within the seven hours provided by the rules.

With respect to the contention interrogatories,
those -- those were -- those were filed on July 2nd, three or
four days after you -- you ruled that these -- that they
couldn't take my client's deposition.

And now they -- all they did was pose these same
deposition questions in writing.  This is -- this is written
deposition questions.

And it's -- it's -- I'm not going to use the word
disingenuous.  I'm told that's not -- we shouldn't use that
word.  I'm not going to use that word.  But it's not kosher, I
guess, for them to have done this, and --

MR. WELLS:  Or disingenuous.

MR. POST:  The objection that we filed simply said
that.  We're not -- we're not saying they did -- we're never
going to file -- answer these interrogatories, but it -- but it
violated the -- the spirit, if not the intent, of this Court's
order precluding depositions until Foodonics produces the
documents.

Lastly, it gives incentive to Foodonics to produce
their documents.  Instead of -- of, you know, spending the last
time for this last hearing issuing subpoenas and sending out
interrogatories, they should have been focusing on keeping
these documents together and producing them.

1          I think that covers the other issues.

2          THE COURT:  What about the -- there was a request for

3   production that -- that Mr. Wells raised.

4          Didn't you, Mr. Wells?  Wasn't there a request for

5   production you also raised an issue about?

6          MR. WELLS:  I did, Your Honor.  But I think it was

7   generally addressed in Mr. Dix's comments.

8          THE COURT:  All right.

9          MR. WELLS:  They got their 16,500 documents that

10  presumably would be responsive to requests for production.  I

11  think we've addressed that and we can continue to do so.

12         I think the remaining issues relate to the

13  interrogatories and the requested depositions of certain

14  people.

15         THE COURT:  Okay.  Well, let's do this.  I mean, it

16  seems to me at this point that -- that given that -- I'm hoping

17  that these documents are going to be -- the ESI documents are

18  going to be produced near the end of September -- if not, by no

19  later than mid October -- I don't see any reason to go forward

20  with any depositions at this point.

21         And then in terms of the -- in terms of the -- the

22  interrogatories -- you made those part of your -- part of your

23  book, I think, didn't you?

24         MR. WELLS:  Yes, sir.  They are at tab 5.

25         THE COURT:  Yes.  I want to take -- I want to take an

1  opportunity to look over these things.  And so -- so I'm --

2  what I'm thinking is that -- that when we get together next

3  week, even -- even if you-all have resolved the ESI issue,

4  we'll still get together for a little bit of time to talk about

5  those issues.  And that will give me a chance to look at these

6  documents that you-all have given.

7       MR. POST:  Your Honor, in the notebook we gave you,

8  it had interrogatories and our objection to the interrogatory.

9       THE COURT:  Yes.  Yes.  All right.

10      MR. POST:  All right.

11      MR. WELLS:  And the notebook that I gave you has the

12 same thing.

13      MR. POST:  Good.

14      MR. WELLS:  So, Your Honor, I wonder if --

15      THE COURT:  So it doesn't matter which color it is?

16      MR. WELLS:  You can just take half of each notebook

17 and throw it away and still have questions.  I wonder if I

18 might address the -- and I understand the Court's position on

19 the interrogatories.

20      But I -- I also brought a research binder with a lot

21 of cases on contention interrogatories at this stage of the

22 proceedings.

23      And all the cases talk about the obligation under

24 Rule 11 to have a good faith factual basis in filing an

25 additional pleading.

1         And our interrogatories address that initial

2  pleading, and certain -- not all allegations, but certain

3  allegations in the counterclaim.

4         And we think under the overwhelming case law,

5  contention interrogatories at this point, even without the need

6  for additional discovery, are entirely appropriate.

7         THE COURT:  Now, is that -- is that an extra set

8  of -- of case -- authority of cases or --

9         MR. WELLS:  It's not an extra.  I mean, I didn't know

10  we were going to be arguing -- I can provide a copy to both

11  sides, if the Court would like.

12         THE COURT:  Well, I'd like -- I'd like to take a

13  look -- at least as a starting point of looking at some things.

14         MR. POST:  I'd like the opportunity to submit my own

15  authorities, Your Honor.  We would take the -- you know, the

16  local discovery rules talk about contention interrogatories not

17  being favored by the Middle District of Florida.

18         THE COURT:  Yes.  Well, I'm trying to avoid filing

19  motions and doing all of that.  We've taken care of so many

20  issues already in this case, because of, you know, how well

21  you-all have worked together on some things, and -- and -- and

22  just discussing these issues.

23         So I don't want to necessarily blast into a --

24  require you to file a motion, then a response, and do all of

25  that if we're going to talk about this next time.

1          So why don't you just keep those until next time.

2     And we'll take a look at some things ourselves and then -- and

3     then -- and then, Mr. Post, you can bring some -- some of your

4     own authority next time, just -- if we get into that.  All

5     right?

6          MR. POST:  Yes, sir.  Does "next time" mean like

7     August 16th?

8          THE COURT:  Yeah.  When we get together next week, I

9     want to talk about this some more.  But I want to at least have

10    a chance to read the interrogatories of the -- your opposition

11    to them.  And then I'll look at a little bit of law on that --

12    on that too.

13         And then -- and then if we can't resolve it -- or if

14    it's not resolved at the next status hearing, then -- then

15    you-all can file motions related to it.

16         MR. POST:  Thank you, Your Honor.

17         THE COURT:  But we'll -- I think we -- we've got to

18    get this ESI flowing.  And it's got -- it has to flow both

19    ways.  And you-all are making progress.  Both sides are making

20    progress.

21         It's just -- you know, it's just not -- it's not as

22    quickly as either side wants.  So -- but I -- I think if

23    you-all -- and you don't have to wait until Wednesday to get

24    together next week.

25         If you get together, you know, tomorrow or Friday, or

1  Monday or Tuesday, that would be good, too.  And in terms of

2  the contention interrogatories -- I mean, on any of these

3  issues, if you reach an agreement as to timing of these

4  things -- not necessarily whether the -- the questions

5  themselves -- the interrogatories themselves -- whether the

6  objections are well-taken -- but if you-all agree that, "All

7  right.  We're going to get this ESI done by October 10th, so

8  we'll wait until October 10th to get the time ticking on the

9  contention interrogatories or anything" -- if you each -- in

10 other words, if there aren't any issues to talk about next

11 Thursday, if you -- if you call my chambers and let

12 Ms. Chaddock or Ms. Wood know that, then we won't have to get

13 together.

14         But, if not -- if I don't get a call from you, I'll

15 just assume we're going to take up one or more of these issues.

16 Okay?

17         Is that sufficiently unclear?

18         MR. POST:  That's fine, Your Honor.  Thank you very

19 much.

20         THE COURT:  Okay.  All right.

21         MR. WELLS:  Thank you.

22         THE COURT:  All right.  Well, thank you-all.  And

23 I'll see you back here next week.  But if not, that will be

24 fine too.  All right?

25         MR. WELLS:  Thank you, Your Honor.

1          MR. POST:  Thank you, sir.

2          THE COURT:  We're in recess.

3          COURT SECURITY OFFICER:  All rise.

4      (The digitally recorded proceedings concluded at

5  3:02 p.m.)

6                              - - -

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

## CERTIFICATE

UNITED STATES DISTRICT COURT     )
                                 )
MIDDLE DISTRICT OF FLORIDA       )


       I hereby certify that the foregoing transcript is a true and correct computer-aided transcription from the official electronic sound recording of the proceedings in the above-entitled matter.


       DATED this 20th day of November, 2018.



       s/Shannon M. Bishop

       Shannon M. Bishop, RDR, CRR, CRC