IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

FOODONICS INTERNATIONAL,         Jacksonville, Florida
INC., a Florida corporation,
                                 Case No. 3:17-cv-1054-J-32JRK
     Plaintiff,

                                 August 16, 2018
vs.

                                 11:10 a.m.
DINA KLEMPF SROCHI, as
Trustee of the Laura Jean        Courtroom No. 5D
Klempf Revocable Trust, a
Florida Trust,

     Defendant.
_____


DIGITALLY RECORDED DISCOVERY STATUS HEARING
BEFORE THE HONORABLE JAMES R. KLINDT
UNITED STATES MAGISTRATE JUDGE


COURT REPORTER:

          Shannon M. Bishop, RDR, CRR, CRC
          221 North Hogan Street, #150
          Jacksonville, Florida  32202
          Telephone:  (904)549-1307
          dsmabishop@yahoo.com

     (Proceedings reported by mechanical stenography;
transcript produced by computer.)

A P P E A R A N C E S

PLAINTIFF'S COUNSEL:

> **SAMUEL GRIER WELLS, ESQ.**
> GrayRobinson, PA
> 50 North Laura Street, Suite 1100
> Jacksonville, FL  32202

DEFENSE COUNSEL:

> **JAMES H. POST, ESQ.**
> **R. CHRISTOPHER DIX, ESQ.** (via telephone)
> Smith, Hulsey & Busey
> One Independent Drive
> Suite 3300
> Jacksonville, FL  32202-3315

ALSO PRESENT:

> David Hancock (via telephone)

                    P R O C E E D I N G S

August 16, 2018                                    11:10 a.m.

                          - - -

          COURT SECURITY OFFICER:  ...Court is once again in
session.  The Honorable James R. Klindt presiding.

          You may be seated.

          THE COURT:  All right.  Good morning.

          MR. WELLS:  Good morning, Your Honor.

          MR. POST:  Good morning, Your Honor.

          THE COURT:  We're scheduled for a discovery status
conference in *Foodonics International, Inc., against Dina
Klempf Srochi, et al.*  It is Case No. 3:17-cv-1054-J-32JRK.

          Mr. Post is here on behalf of the Defendant/Counter
Plaintiffs.

          And, Mr. Dix, are you on the phone, sir?

          MR. DIX:  I am, Your Honor.

          THE COURT:  All right.  So Mr. Dix is also here on
behalf of the Defendant and Counter Plaintiffs.

          Mr. Wells is present in the courtroom on behalf of
Foodonics.

          And, Mr. Hancock, you're on the phone, sir?

          MR. HANCOCK:  Yes, Your Honor.

          THE COURT:  All right.  Thank you.

          We had a status conference last week.  And there was
an issue about the ESI search terms being used by Foodonics.

1  And so what I believe I did was required the parties to get

2  together no later than yesterday, August 15th, to try to reach

3  an agreement on the search terms, and then set today's hearing

4  so that we could discuss that issue.

5          And then I think as we left it, toward the end of the

6  last status conference, we were discussing the contention

7  interrogatories that were served by Foodonics on the

8  Defendant/Counter Plaintiffs.

9          And I wanted an opportunity to read the -- the

10  specific interrogatories and the responses to those, which I've

11  done now.

12          So those are the two matters that I had on my list.

13          And, also, at some point I do want to ask Mr. Post

14  about the notice of filing, document 55 -- it was a filing of

15  a -- an affidavit of Eddie Lee Rosemond -- and what the -- what

16  that -- what he wants the Court to do with that, if anything.

17          So those are the matters that -- that I had.

18          Mr. Post, should we start with you, sir?

19          MR. POST:  Yes, sir.  Thank you.

20          May it please the Court?

21          As instructed, the parties did meet and confer since

22  last week about the ESI search terms.  There was a partial

23  agreement reached.

24          The Court might recall that Chris Dix, my partner,

25  reported to you that our vend- -- our ESI vendor had

1  developed what we call a junk -- a junk term filter, which we

2  recommended that the opposing parties might want to use for

3  their collection.

4       They -- they did apply it.  They were able to cull

5  out 7,000 documents, which they tell us was tested for -- and

6  verified to be almost 9- -- better than 99 percent accurate.

7  And so we accepted that move on their part.

8       There was some further discussions about -- asking us

9  to create different search terms that were, in our opinion, too

10 narrow.  There was no meeting of the minds about those items.

11      And sitting here today, I don't know if -- if the

12 other side has agreed that that's -- that they're not -- that

13 that is -- that they're going to not try to pursue more

14 restrictive search terms or if they're going to make an

15 argument today in that regard.

16      So that's -- that's where we are on the ESI.  And

17 before we go into the interrogatories, I -- I would suggest to

18 the Court we try to deal with this issue.

19      THE COURT:  All right.  Mr. Wells, were you going to

20 address this -- or are you going to?

21      MR. WELLS:  I am, Your Honor.  And thank you very

22 much.

23      May it please the Court?

24      THE COURT:  Yes.

25      MR. WELLS:  Just a couple of points to follow up on

1  what Mr. Post has advised the Court.  What we suggested in our

2  conference call last week was that the original search terms

3  that the parties had discussed be revised in a couple of

4  fashions, one, to reduce the date range from 2008 through

5  January of 2018 to January 2013 through December 2017.

6        That narrowing of the date range was rejected.

7        We suggested that some of the search terms be

8  narrowed because we felt some of them were too broad.  And that

9  was initially rejected.  We've continued discussions.

10        But to make very short order of where we are on this

11  issue -- the Court may recall that I suggested the possibility

12  last week that we would simply turn over the documents we have

13  and that a review be done by the Defendant/Counter Plaintiff.

14        And after conferring with all the folks on our side,

15  we are simply going to turn over all of our ESI documents to

16  the Defendant/Counter Plaintiff, excluding those that we have

17  denominated as privileged or junk mail.

18        We've also done a -- a quick search of documents that

19  would involve communications with Mr. Klempf's spouse --

20  spouses.  There would have been two spouses within the date

21  range that's at issue, so -- but all other documents we'll be

22  turning over.  We're going to do a quick review of a couple of

23  things.  But we anticipate providing roughly 45,000 documents

24  to the Defendant/Counter Plaintiff within ten days.

25        THE COURT:  All right.  Mr. Post, what do you say to

1  that?

2       MR. POST:  Your Honor, I'm going to -- I'm going

3  to -- with your permission, I'd like Mr. Dix to address this

4  revelation.

5       THE COURT:  Yes.  Mr. Dix?

6       MR. DIX:  Your Honor, we do not have any objection to

7  them turning over that information, but we didn't hear -- we

8  assumed that it would be in the format that we've previously

9  agreed pursuant to the ESI order in this case, and that the

10  other unaddressed issue is whether or not GrayRobinson -- the

11  GrayRobinson law firm will be included in that production of

12  non-duplicative, non-privileged documents.

13       That's been our understanding for a while now, but

14  I'd like to hear them say that they're going to do that as

15  well.

16       THE COURT:  Mr. Wells?

17       MR. WELLS:  Candidly, Your Honor, we have not focused

18  on the GrayRobinson documents, because we've got an overall

19  privilege to those asserted.  I can look at that.

20       But in principle, we have no objection to turning

21  over the non-privileged, non-duplicative documents.  I -- I'd

22  have to confer with Mr. Hancock and others about the extent to

23  which those documents -- where we are in the review of those

24  documents.  But principally we don't have an objection to

25  turning those over.

1          THE COURT:  All right.  And you said ten days?

2          MR. WELLS:  Certainly ten days as to the Foodonics

3  ESI documents.

4          THE COURT:  Yes.

5          MR. WELLS:  I can't commit -- I apologize to the

6  Court, but I can't commit on the GrayRobinson documents, since

7  we've been focusing on the Foodonics.

8          But I don't think it would be difficult to do --

9  comply with the same time period for the GrayRobinson

10  documents.

11          THE COURT:  Well, why don't we just -- why don't we

12  set -- let's set August 30th -- that's 14 days, but it takes

13  into account weekends.

14          And then we'll just make that Foodonics and

15  GrayRobinson documents.  But if you -- if you need more time on

16  the GrayRobinson documents, you can speak to Mr. Post.  And

17  hopefully you can get an extension on that.

18          MR. WELLS:  Thank you, sir.

19          THE COURT:  Mr. Dix, does that -- does that address

20  your issues?  I'm assuming it's the same format that was agreed

21  upon?

22          MR. WELLS:  Yes, sir.

23          THE COURT:  All right.  Mr. Dix, does that address

24  the issues that you raised?

25          MR. DIX:  Yes, Your Honor.

1          THE COURT:  All right.

2          MR. DIX:  Your Honor, I have one further question.

3          THE COURT:  Yes.

4          MR. DIX:  Will that production include the text

5   messages off Jacques Klempf's phone?

6          MR. WELLS:  Mr. Hancock?

7          MR. HANCOCK:  No, Your Honor.  We're still reviewing

8   that.  This will just be the documents that hit on the mutually

9   agreed-to search terms by the parties.

10          We can produce the -- the text messages at -- I

11  hesitate to give a time frame, but we might be able to make it

12  by the 30th.

13          THE COURT:  Well, let's do this.  Let's set -- let's

14  set another date for the -- why don't we set -- let's set

15  September 7th for the text messages to give you some extra time

16  there.

17          And then, again, you can confer with Mr. Dix and

18  Mr. Post if you-all need additional time.  But I think we do

19  need to have some dates in place.

20          Now, let me just ask -- Mr. Post, what's the status

21  of your production to Foodonics?  Are we on about the same time

22  frame as that?  Or where are we with that?

23          MR. POST:  We are -- rather than dumping documents on

24  our opponent, we're doing our own review.  We're eliminating

25  non-responsive documents from our -- our production.

1    And we expect that that will be -- we're having that

2 done by an outside vendor.  I expect them to turn over what --

3 what they consider to be the responsive documents, the

4 non-privileged documents.  And we would -- we've committed to

5 turn those over, I believe, September 30th.

6    Mr. Dix, correct me if I'm wrong, but I think that's

7 what we agreed to.

8    MR. DIX:  That's right.

9    THE COURT:  All right.  So we'll set that date for

10 the -- so we'll have three dates in place.

11    MR. WELLS:  I do not -- I apologize.  I did not hear

12 the date.

13    THE COURT:  September 30th.

14    All right.  Does that take care of the ESI issue,

15 then, at this point, Mr. Post?

16    MR. POST:  Yes, sir.  Yes, sir.

17    THE COURT:  All right.  Mr. Wells, you agree?

18    MR. WELLS:  Yes, sir.

19    THE COURT:  All right.  Do you want to move on now to

20 the contention interrogatory issues?

21    MR. POST:  Yes, sir.

22    THE COURT:  You had mentioned at the end of the last

23 hearing that the -- that the Middle District of Florida

24 Discovery Handbook does not -- I can't remember the words you

25 used, but favor contention interrogatories.  And then you

1 mentioned you might want to provide some other authority.

2        Was there anything else you wanted to provide?

3        MR. POST:  Yes, Your Honor.  I'm sensitive to the

4 Court's suggestion that we not turn this into legal

5 memorandums.

6        We basically put together a set of legal authorities

7 that we would anticipate -- that we'd like the Court to look

8 at.

9        And it -- it has in it the cases sustaining

10 objections to contention interrogatories and cases directing

11 that answers be given to contention interrogatories.  And I'd

12 like to hand this book up to the Court at this time.

13        THE COURT:  And did you get a copy of any --

14        MR. WELLS:  I haven't yet, Your Honor.

15        THE COURT:  Okay.  Do you have a copy for Mr. Wells?

16        MR. POST:  I do, Your Honor.

17        If the Court would like me to summarize our position,

18 I'd be glad to, or however you see fit.

19        THE COURT:  Well, I'm just -- I don't know,

20 Mr. Wells, if you brought any authority today or if you would

21 want some -- I don't know, a few days to -- to file any -- or

22 provide at least to chambers any authority that you wanted the

23 Court to consider.

24        MR. WELLS:  Your Honor, I had brought my own

25 authorities at the hearing last week, but they were annotated.

1    And so I did not provide them to the Court or to counsel.  I

2    have the very same authorities that I brought this week.

3              THE COURT:  All right.

4              MR. WELLS:  I did not -- like Mr. Post, I did not

5    anticipate turning this into a motion --

6              THE COURT:  Okay.  Well, I appreciate that.

7              MR. WELLS:  -- but -- and I would note that one of

8    the cases that is there, tab 7, is a Middle District case from

9    2012, which I think...

10             THE COURT:  All right.  Well, if you-all want to

11   argue some, that's fine.  I think you both stated your

12   positions last time.

13             And I'm -- I'm -- I'm willing to just take this

14   authority, read the cases that you-all have cited, and then, as

15   part of an order setting out these deadlines, just indicate the

16   Court's ruling on the contention interrogatories, if there --

17   if you don't object to me handling it that way.

18             Mr. Post?

19             MR. POST:  With the Court's indulgence, I'd like to

20   have five minutes to describe to you our position.

21             THE COURT:  Yeah.  That's fine.  Go ahead.

22             MR. POST:  I appreciate it.

23             If you would look at tab 2 of my -- of the notebook

24   we handed up, please.

25             THE COURT:  Yes.

1    MR. POST:  This is one of the 14 interrogatories

2 that's included in the contention interrogatories, asking us to

3 particularly -- distinguish particularly all facts known by

4 support or linked to allegations -- paragraph 46 of the

5 counterclaim, and identify all witnesses and documents which

6 support or relate to such allegations.

7    And I've duplicated their paragraph 46, which is a

8 summary for prior -- prior pleadings or allegations in the

9 complaint of the material or information -- or pursuant to

10 information that we say should have been disclosed.  And there

11 are 13 discrete different factual allegations there.

12    So the -- what we believe the contention

13 interrogatories has -- are not proper, because they are --

14 they're not narrowing or sharpening the issues of this case.

15    They are -- instead, it requires a detailed narrative

16 of the Trust case, and is, therefore, overbroad and oppressive,

17 as the Middle District Discovery Handbook described them.

18    And this particular interrogatory is -- is actually

19 13 subparts, which makes it 26 interrogatories right here in

20 just this one interrogatory 14.

21    And it's actually double that, 52 -- I'm sorry, it's

22 13.  And you double that to -- to 26, because it also asks for

23 documents.  And that -- and the law is that when you -- if you

24 ask for documents and you want facts to be stated, that's two

25 different interrogatories.

1        So not only does -- not only does the interrogatories

2  ask for a narrative improperly, they go beyond the number of

3  interrogatories improperly.

4        And the -- the firm objection we would have is to do

5  this at this time would be wasteful, because, you know,

6  discovery is -- is not completed in this case, obviously,

7  and -- and -- and as we've told the Court before, this is a

8  fraud violation case.

9        Fraud is often proven by circumstantial evidence.

10  Circumstantial evidence is in -- would be included in the

11  documents that we might -- that we -- we might get by the end

12  of September from them.  And then it will take us time to go

13  through what they give us, since they're not going to cull them

14  themselves.

15        So we would suggest that the -- the contention

16  interrogatories are improper and should be -- should not be --

17  we should not be required to answer for that reason.

18  Alternatively, they should be put off until after discovery

19  is -- is made by Foodonics.

20        THE COURT:  Thank you.

21        Mr. Wells?

22        MR. WELLS:  Thank you, Your Honor.

23        I acknowledge that neither Mr. Post has had an

24  opportunity to review the authorities we have provided to the

25  Court nor have we had an opportunity to review theirs.

1    I would note that Rule 11 is very specific. And in

2  cases that interpret Rule 11 -- is that a -- that a party,

3  including the party's attorney, must have a good-faith basis

4  for the allegations in an initial pleading.

5    And our view of the counterclaim is that it is

6  replete with specific allegations as to alleged wrongful

7  conduct on the part of Foodonics and Mr. Klempf.

8    Mr. Post has focused on interrogatory No. 46. But

9  all the interrogatories -- or not interrogatory 46, but

10  paragraph 46 that we have requested information on -- every

11  single interrogatory we've propounded is lifted from the

12  specific allegations of the counterclaim.

13    The cases in Florida in the Southern District and

14  Middle District that we have cited all cite to Rule 11, and the

15  fact that a party must have sufficient factual basis for the

16  allegations in an initial pleading.

17    Frankly, I don't know why counterclaiming plaintiffs

18  take the position that they've got to have our documents before

19  they can support their allegations.

20    You don't file a complaint and then seek to find the

21  cause of action through discovery.

22    We've not asked for anything that is at all

23  inappropriate. And I would specifically cite a decision by

24  Judge Chappell from the Middle District that's in the material

25  that I provided to the Court, *Arthrex versus Parcus Medical*.

1        The interrogatory under dispute there was to identify

2   and describe the basis for, and in the analysis undertaken in

3   support of -- of Arthrex's pre-litigation investigation and

4   asking for document -- to identify documents, to identify

5   witnesses, much as what we have done.

6        And Judge Chappell in the case ruled that the -- I

7   think it was a plaintiff in that case, must answer the

8   contention interrogatories, the same holding in the other two

9   cases we provided from the Southern District, as well as from

10  other jurisdictions.

11       We think that it is time for the interrogatories to

12  be answered, not wait until all the documents have been

13  discovered and analyzed to support.  The allegations were filed

14  back last summer.

15       THE COURT:  This is under tab 7, I believe.

16       MR. WELLS:  Yes, sir.  Yeah.  Tab 7.  And then tab 5

17  and 6 are the Southern District cases from Florida.

18       THE COURT:  Yes, yes.

19       MR. WELLS:  And the -- I think the -- the California

20  case at tab 3 is -- is a case that is cited quite frequently in

21  a lot of the cases that are considering the -- considering

22  contention interrogatories.

23       THE COURT:  All right.  Did you want to say anything

24  else, Mr. Post?  Otherwise, what I'm going to do is, I'm going

25  to read all of the cases and the material that you-all

1  submitted, and then get something out with regard to the

2  contention interrogatories pretty quickly, as I also enter an

3  order setting these dates.

4          MR. POST:  Thank you, Your Honor.  That would be

5  fine.

6          THE COURT:  All right.  Now, do you want to address

7  this affidavit, Mr. Post?

8          MR. POST:  Yes, Your Honor.

9          This is one of the positive things that have come out

10  of the discovery conferences that we've had.  We -- there was

11  some -- a lot of -- we were in a -- in the dark about what was

12  on this EES server.

13          And -- and we -- and then after a lot of discussion

14  about who had possession of it and where was it and all that

15  stuff, we finally were told that -- that they -- that the

16  Foodonics group thinks that there is nothing on here that would

17  be responsive to our request.

18          We said, "Put it in an affidavit."

19          They did.  We accepted that affidavit.

20          I filed it for the record.  I didn't file it for any

21  court action.

22          THE COURT:  All right.  Did you want to say anything

23  about it, Mr. Wells?

24          MR. WELLS:  Nothing that's necessary, Judge.

25          THE COURT:  All right.

1          MR. WELLS:  Thank you.

2          THE COURT:  All right.  Is there anything else we

3    need to do today?

4          MR. POST:  No, sir, except maybe schedule another

5    status conference, if -- if the Court would be so kind.

6          THE COURT:  Let's see.

7          It's hard to object to a status conference, isn't it?

8          MR. WELLS:  It depends on when it is.

9          THE COURT:  Yes.  That's a good point.

10         Let me just look.

11         MR. WELLS:  Your Honor, I do have one issue I'd like

12   to raise once we get a status conference date -- I should

13   readdress.

14         THE COURT:  All right.  Let me just look at the...

15         What do you-all think of September 19th?  It's a

16   little over a month from now.

17         MR. POST:  That's clear on my calendar, Your Honor.

18         THE COURT:  Mr. Dix?

19         MR. DIX:  Your Honor, I am out of the country from

20   the 15th through the 23rd.  And we have a hearing in London on

21   the 19th.

22         THE COURT:  All right.  Let me see.

23         You're back on the 23rd?

24         MR. DIX:  Yeah.  So anytime that following week would

25   be fine.

1    THE COURT:  Well, let's look at the following week

2  and see how everyone looks on Tuesday, the 25th.

3    Are you out, Mr. Wells?

4    MR. WELLS:  I'm not out.  I'm just back the preceding

5  evening.  I have a grandson being christened in D.C. that

6  weekend.  And I intend to come back late Monday.

7    THE COURT:  All right.  Well, then what about

8  Thursday, the 27th?

9    MR. WELLS:  That's fine.

10    THE COURT:  Mr. Post?

11    MR. POST:  That's fine by my calendar, Your Honor.

12    THE COURT:  Let me just double-check mine.

13    Mr. Dix, Mr. Hancock, how did -- does that date look

14  for you, the 27th?

15    MR. HANCOCK:  I'm available, Your Honor.  This is

16  Mr. Hancock.

17    MR. DIX:  (Unintelligible), Your Honor.  Mr. Dix.

18    THE COURT:  Did you say yes, Mr. Dix?  You were

19  fading on me.

20    MR. DIX:  Yes.  I'm sorry.  The 27th would be fine

21  for me.

22    THE COURT:  All right.  Can we do it in the morning,

23  at 10:30?

24    MR. POST:  Yes, Your Honor.

25    MR. WELLS:  That's fine.

1    THE COURT:  All right.  I was thinking what might be

2  helpful for me, because -- I have the -- this MDL that I've

3  been working on.  And Judge Schlesinger ordered monthly status

4  conferences.

5    And what the parties did was the evening before, by

6  5 o'clock, they just -- I think it was filed, actually.  It was

7  just a notice of issues.

8    And so the parties got together and -- and then -- it

9  just gave me at least a little bit of a heads-up of what we

10  might be discussing.

11    I mean, I -- I don't mind -- generally speaking, I've

12  had an idea of what we're going to be discussing in these

13  status conferences.

14    But if there -- if you-all could file a notice,

15  the -- it helps if it's by 5 o'clock the day before, because

16  then I can look at it.

17    If I need to look at anything, I can do it that

18  evening.  But if you-all would do that, I think it would -- it

19  would help me some.  I'd appreciate it.

20    And, Mr. Post, since you're the one who's asked for

21  these, maybe you could take the lead in that.

22    MR. POST:  Yes, Your Honor.  I'll -- I'll be glad to

23  do that.

24    THE COURT:  Yes.

25    MR. WELLS:  Let me make an observation, if I may,

1 Your Honor.

2 THE COURT: Yes.

3 MR. WELLS: And although I'm fine with September 27th

4 at 10:30 and doing the notice of issues, if the

5 Defendant/Counter Plaintiff is going to be producing its ESI

6 documents by September 30th, it may make sense to schedule this

7 next status conference for a few days after that, because that

8 could very well be -- at this point in time, that would be one

9 of the issues that -- that may arise.

10 So although I'm fine with the 27th, it may be best if

11 we did the next status conference in early October.

12 THE COURT: You know, I thought about that, actually,

13 but my calendar I had in front of me runs out in September.

14 And I thought we -- we could just get a confirmation.

15 But I don't mind doing that. We could do it the

16 first week in October. And then -- well, I can actually look

17 on my electronic calendar, which seems fitting that I do that.

18 So let me just show my skills here.

19 Okay. I think I have to be in Tampa on Friday in

20 that -- for something.

21 MR. HANCOCK: Your Honor, this is Mr. Hancock. I'm

22 unavailable on October 4th and 5th. I'm actually getting

23 married.

24 THE COURT: Oh, my gosh. Well --

25 MR. WELLS: So what's your point?

1    THE COURT:  So we don't want to do it on the 3rd,
2  then, either.
3    MR. HANCOCK:  My new wife said I'm not available.
4    THE COURT:  How about October 2nd, on Tuesday?
5    MR. HANCOCK:  That works for me.
6    THE COURT:  Mr. Dix?
7    MR. DIX:  Yes.  That works for me, too, Your Honor.
8    THE COURT:  Mr. Post?
9    MR. POST:  Yes, sir.
10    THE COURT:  Mr. Wells?
11    MR. WELLS:  Yes, sir.
12    THE COURT:  All right.  So we'll do it October 2nd.
13  And let's do it at 10:30, if we can do it, that day.
14    MR. WELLS:  Thank you, Your Honor.
15    THE COURT:  All right.  Well, that was a good
16  suggestion.  I was just being lazy, not wanting to flip my
17  calendar.
18    All right.  Now, you said there was something else,
19  Mr. Wells?
20    MR. WELLS:  Yes, sir.  And I realize that we've
21  already addressed this previously, but I would like to bring it
22  to the Court's attention.
23    At the last hearing we addressed depositions that the
24  Plaintiff/Counter Defendant had requested of Steven Brust, Dan
25  Edelman and Marc Klempf.

1     The Court ruled at that time that those depositions

2 would have to be delayed until the ESI production.

3     I simply want to note for the record that the

4 Defendant/Counter Plaintiffs' argument that they are agents of

5 the Defendant/Counter Plaintiff -- whatever documents are

6 relevant to those individuals' testimony, they would have,

7 either the individuals would have or the Defendant/Counter

8 Plaintiff would have.

9     They're not our documents.

10     Mr. Brust was at various times representing

11 Ms. Srochi individually.  He represented Ms. Klempf

12 individually.  I do not know if he ever represented the Trust.

13 I do not believe so.

14     And Mr. Edelman similarly represented Ms. Srochi and

15 Ms. Klempf at different times, and apparently is serving as a

16 consultant in this case.

17     Because they -- whatever information they have is

18 within the knowledge of the Defendant/Counter Plaintiff, we

19 think their deposition should be permitted to go forward.

20     THE COURT:  What do you say to that, Mr. Post?

21     MR. POST:  Your Honor, those -- those individuals are

22 within the scope of the Jim Klempf advisors and professionals.

23 The depositions that will be taken, we'll ask them what they

24 knew and when they knew it.

25     The cross-examination, if any, I'd be able to take

1   through the deposition would include the documents that I'd get

2   from Foodonics and Cal-Maine, which -- which perhaps would have

3   an e-mail from -- internal e-mail from Jacques Klempf to his

4   CFO, with a piece of information.

5         And I would take that document and I'd ask them the

6   cross-examination, "Did you ever see that document?  Would that

7   have been material to you," that sort of thing, Your Honor.

8         So the -- it is -- it is -- it is -- would be a waste

9   of time and resources to take these people's deposition under

10   those circumstances, because they would not have all the facts

11   that they would need to have to testify, and the -- and the --

12   and we might -- it might require having to take their

13   deposition twice or -- or -- especially the -- the SMK people.

14         The SMK people that -- the -- is the valuation firm

15   that Foodonics hired to do a valuation -- to give a valuation

16   at the redemption transaction, that said that the -- the

17   company had a value of $35 million; whereas, we showed you a

18   dream team analysis done by Jacques Klempf less than a year

19   earlier where he said the company had a value of $68 million,

20   and then he sold the company for $70 million 11 months after he

21   redeemed his mother's stock.

22         What did SMK know?  What were they given?  What were

23   they -- what were they told?  Those are documents we would need

24   to have for their depositions as well.

25         So we're putting the cart before the horse.  We need

1  to -- we -- we served these document requests on Cal-Maine and

2  Foodonics in January of this year.

3       Other than the transaction documents and tax returns,

4  we don't have anything from them.  And this is a circumstantial

5  evidence case because it's fraud.  And you can prove fraud by

6  circumstantial evidence.

7       We want to improve -- we already have a strong

8  circumstantial evidence case.  We have Jacques Klempf saying

9  that the company is worth $68 million a year the year before he

10  redeems his mom's stock.  Then he represents through SMK that

11  it's worth 35 million.  And then he sells it for 70 million.

12       That in and of itself will get us to a jury.  But we

13  want to get more information.  What else weren't we told

14  besides the dream team analysis?

15       So if -- if -- if the GrayRobinson firm is trying to

16  do this in a manner to create a summary judgment issue, they

17  can go ahead and file a summary judgment now.

18       They can put affidavits together and we'll collect

19  the affidavits that we can.  And we'll see which will survive

20  summary judgment.

21       But there's no reason to -- to complicate this case

22  by taking multiple depositions or possibly taking multiple

23  depositions and confusing what -- what is already a convoluted

24  case, as far as production of documents is concerned.

25       THE COURT:  Did you want to say anything else,

1  Mr. Wells?

2         MR. WELLS:  No, sir.

3         THE COURT:  Well, I think I've already ordered that

4  the depositions would not take place until after the production

5  of ESI.  And I'm going to just stick with that.

6         All right.  Anything -- is there anything else, then,

7  Mr. Post?

8         MR. POST:  No, sir.  Thank you very much.

9         THE COURT:  Mr. Wells?

10        MR. WELLS:  No, thank you, sir.

11        THE COURT:  All right.  And that notice will be a

12 joint notice.  You'll get together with Mr. Wells and then just

13 list out whatever issues you-all want to discuss at the next

14 status.

15        MR. POST:  I was going to maybe contact someone in

16 your office and get the case style or the case number and I

17 would see how they did it.

18        THE COURT:  Yes.  All right.  That's fine.  Yes.

19 Just -- if Ms. Chaddock or Ms. Wood -- either one will be able

20 to give you that information.

21        All right.  Well, thank you all.  And I'll see you

22 all on -- did we say October 2nd?

23        MR. POST:  Yes, sir.

24        MR. WELLS:  Yes, sir.

25        THE COURT:  All right.  Thank you.  We're in recess.

1          MR. POST:  Thank you, Your Honor.

2          MR. WELLS:  Thank you, Your Honor.

3          COURT SECURITY OFFICER:  All rise.

4      (The digitally recorded proceedings concluded at

5   11:49 a.m.)

6                        - - -

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

## **CERTIFICATE**

UNITED STATES DISTRICT COURT    )
                                )
MIDDLE DISTRICT OF FLORIDA      )


      I hereby certify that the foregoing transcript is a true and correct computer-aided transcription from the official electronic sound recording of the proceedings in the above-entitled matter.


      DATED this 21st day of November, 2018.



      s/Shannon M. Bishop
      Shannon M. Bishop, RDR, CRR, CRC