IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

FOODONICS INTERNATIONAL, INC., a Florida corporation,

Plaintiff,

vs.

DINA KLEMPF SROCHI, as Trustee of the Laura Jean Klempf Revocable Trust, a Florida Trust,

Defendant.

Jacksonville, Florida

Case No. 3:17-cv-1054-J-32JRK

October 25, 2018

10:25 a.m.

Courtroom No. 5D

DIGITALLY RECORDED DISCOVERY STATUS HEARING
BEFORE THE HONORABLE JAMES R. KLINDT
UNITED STATES MAGISTRATE JUDGE

COURT REPORTER:

Shannon M. Bishop, RDR, CRR, CRC
221 North Hogan Street, #150
Jacksonville, Florida 32202
Telephone: (904)549-1307
dsmabishop@yahoo.com

(Proceedings reported by mechanical stenography; transcript produced by computer.)

                    A P P E A R A N C E S

PLAINTIFF'S COUNSEL:

            **SAMUEL GRIER WELLS, ESQ.**
            GrayRobinson, PA
            50 North Laura Street, Suite 1100
            Jacksonville, FL  32202

DEFENSE COUNSEL:

            **JAMES H. POST, ESQ.**
            **R. CHRISTOPHER DIX, ESQ.**
            Smith, Hulsey & Busey
            One Independent Drive
            Suite 3300
            Jacksonville, FL  32202-3315

ALSO PRESENT:

            David Hancock (via telephone)

P R O C E E D I N G S

October 25, 2018 10:25 a.m.

- - -

COURT SECURITY OFFICER: ...Court in and for the Middle District of Florida is now in session. The Honorable James R. Klindt presiding.

Please be seated.

THE COURT: All right. Good morning.

MR. WELLS: Good morning, Your Honor.

MR. POST: Good morning.

THE COURT: This is *Foodonics International, Inc., against Dina Klempf Srochi, as Trustee of the Laura Jean Klempf Revocable Trust*, Case No. 3:17-cv-1054-J-32JRK.

If you-all would announce your appearances, please, starting with the Plaintiff.

MR. WELLS: Good morning, Your Honor. Grier Wells on behalf of the Plaintiff, Foodonics. And I think Mr. Hancock is on the phone as well.

THE COURT: All right. Good morning.

MR. POST: Good morning, Your Honor. May it please the Court?

James Post and Chris Dix are from Smith Hulsey & Busey, on behalf of the Laura Jean Trust.

THE COURT: All right. Thank you.

We're set for a status regarding discovery. I

think -- I think this is the third one we've had.  And I might
be wrong.  It could be the fourth.  I stopped counting at some
point.

I did receive a notice yesterday, document 68, and
it's -- it was filed ex parte.  And I -- I assumed it was filed
ex parte because the Trust received no input from GrayRobinson
regarding these matters.

Was that the basis of that, Mr. Post?

MR. POST:  That's correct, Your Honor.

THE COURT:  All right.  The one challenge that we
have with the electronic filing system -- as soon as something
is labeled "ex parte," then it's really filed under seal, and
so it's not part of the public docket.

So I understand why you filed it ex parte, but I
think, unless there's an objection, I'll just direct the clerk
to file it on the public record.

MR. POST:  No objection, Your Honor.

And this morning, when I got in the office, I noticed
that that might have been part of the issues.  So I resent it
this morning to GrayRobinson.

THE COURT:  All right.  Thank you.

And you did get it, Mr. Wells?

MR. WELLS:  Yes, sir.  We actually got it last
evening, about the time it was filed.  If I may respond to the
comment about GrayRobinson not having responded?

THE COURT: You can now or later.

MR. WELLS: Okay. I'll do it later.

THE COURT: Yeah, yeah. Everybody will get a chance. Let me just make a couple of comments, though, about this. Because when you-all are addressing these various issues, you can address some of the things that I've noticed or that -- if you choose to.

In paragraph I -- Roman numeral I(1), it states, "The ongoing issues with the deficient production of ESI" -- and then it -- it says, "Including, (a), the failure to provide Jacques Klempf's mobile phone data."

And I wasn't clear what that -- that was meant to -- to be. In other words, what is the phone data?

I did previously order that the -- that the -- that the text messages be produced, but I didn't go beyond that in the order.

So if mobile phone data is meant -- meant to be text message, then -- then we can talk about that. If it goes beyond that, then it may be something that I haven't ordered be produced.

So that's -- that's one thing that I noticed. And I think I ordered that in the -- I ordered that the text messages be produced no later than September 7th, 2018.

That was in the August 22nd, 2018 order.

And then as to (b), "the failure to produce any ESI

from DixieEgg.com e-mail accounts," I was trying to recall the discussion we had last time, but it -- and I don't have a great recollection of it.

But it seemed to me that Mr. Wells was asking that -- that some of this information -- or a search for this information be delayed until it could be determined if other items produced actually covered these matters.

So I don't -- I don't think there was any order -- I don't think I ordered that -- that what is in (b) regarding DixieEgg.com be produced. It seemed to me that was something we were working toward a resolution of that without an order having been entered.

And then as to (c), "the production of a privilege log for the Jacques Klempf Parties which identifies non-privileged ESI," I was -- again, my recollection was that -- that Mr. Wells was going to re-evaluate the privilege log in that regard and -- and possibly submit a revised one.

So those -- those are the comments I wanted to make about that.

And then as to -- as to paragraph (4), requesting the appointment of a special master, again, that's going to have to be done by way of a motion for Judge Corrigan to consider, so -- and I'm going to set a motion deadline today to deal with a number of these issues, because I think that -- I think it's going to be necessary to do that.

So, anyway, Mr. Post, you or Mr. Dix -- who's going to address these matters?

MR. POST: Thank you. Mr. Dix will address them.

THE COURT: All right. Thank you.

MR. DIX: May it please the Court?

THE COURT: Yes.

MR. DIX: Your Honor, at our last status conference on October 2nd, we did identify and address several issues related to the production of ESI by Foodonics and Jacques Klempf and the attorneys at GrayRobinson.

What we have identified in our notice for today is a combination of issues that have previously been addressed, as well as issues that have either developed or come to light as a result of events that have transpired subsequent to the October 2nd status conference.

And so in some respects you're right that the issues we've identified in our notice don't directly correspond to previous orders that you entered, but they're as the result of new information that we have.

THE COURT: Okay.

MR. DIX: Before we get into all the details, I do want to provide a very high-level summary of what we're asking for today. Two things, Your Honor.

One, that you continue to direct Foodonics, Jacques Klempf, and GrayRobinson to comply with their discovery

obligations in this case.

That includes the specific things that you've directed them to do in previous case management orders, but also their general obligations and general duties of discovery that apply under the federal rules in any case.

THE COURT: Well, let me just say this. You know -- and I've never been known for a great deal of patience anyway, but I'm kind of running out of patience with -- with the whole situation.

And I say -- by way of example, Foodonics was required to produce an amended privilege log and any additional unprivileged documents no later than October 12, 2018.

"A notice of compliance must be filed with the Court by that date as well."

The notice was filed on October 15th. And in the notice they hadn't produced everything by October 12th.

You pointed out last time that my orders seem to mean nothing and -- and I have to say that what has happened, I guess, confirms to some degree what you said.

On -- GrayRobinson was supposed to provide to the trustees no later than October 17th certain documents. A notice of compliance was to be filed by that date.

The compliance notice was filed on October 22nd, 2018, and stated that as of October 19th and 20th the -- the documents had been provided.

So I'm -- you know, I'm kind of at a loss -- I'm not really at a loss. I've got a plan. And I'm going to listen to everything you-all have to say. And it may change my plan.

But I can remind -- I can remind them and tell them, and I can remind you and tell you, but what we're going to have to do is get to a point where there are consequences for not complying with Court orders. And that's just where we have to go with this. And that's as to everyone.

So I'll remind them, but I don't know what good the reminder is going to do. But go ahead.

MR. DIX: Thank you, Your Honor.

The second big thing that we would ask you to do today is direct for depositions to occur.

Now, in this case we have a moratorium on depositions until the discovery is complete, but we're asking for -- we've provided 30(b)(6) notices to Mr. Wells.

We're asking for permission to take limited discovery about what has happened in the discovery in this case from three different parties, Foodonics, Jacques Klempf himself, and also a corporate representative from the GrayRobinson firm, because each of those parties have been involved.

And what's transpired up to this point, we simply don't have enough information at this point to know how the Court -- how we should ask the Court to address and remedy these situations. Is it -- is there things that can be

remediated or are there more severe sanctions that are appropriate?

And so one of the big requests that we would ask is that you provide us permission, and maybe even establish dates here today, for the depositions of those three parties, so that we can get to the bottom of what has been done, what remains to be done, and then at that point we would have a better idea of what kind of relief and sanctions may be appropriate.

So referring to our notice, Your Honor, the first item that we identified was the failure to produce Jacques Klempf's mobile phone data. That was an intentional broadening of what you previously ordered.

The reason for that is that -- you may recall at the last status conference we mentioned that we had not yet reviewed the text messages that Jacques Klempf had produced on September 14th. That was a week past due. And on October 2nd, we hadn't looked at those text messages.

After the October 2nd status conference, we did look at them. There were a total of 467 documents that were produced on September 14th.

Only 90 of those documents were actually text messages. The rest were images and movie files and different things that were attached to the 90 text messages that weren't directly related.

But more importantly, Your Honor, all of the text

messages produced on September 14th were for date ranges between March and April of 2018. That's this year.

There were no text messages at all produced during the relevant time period, which we've talked about the time period many times. It's September 1st, 2008, to January 19th, 2018.

Not a single message in that collection was related to the case or within the date range of the issues in this case. And so we addressed that with Mr. Wells after we realized what we had been provided.

The explanation that we got was even worse than we -- than we had hoped. We found out that the text messages were retrieved from an iCloud backup of Mr. Klempf's phone that apparently was performed sometime earlier this year. And until about two weeks ago, we had no idea that there was an iCloud backup of Mr. Klempf's phone.

You might recall we have an ESI order that we asked for in this case, that you entered back in April -- in March, which required GrayRobinson and Mr. Klempf and Foodonics to designate the sources of information they were going to be looking for when they searched for ESI.

What they told us were there were two iPhones of Mr. Klempf. There's no mention of any of those phones being damaged or destroyed or nonfunctional. They told us there were two iPhones and that was going to be where they pulled the text

messages from.

Now we've learn they never went to those two phones. They went to an iCloud backup. And they never pulled the information from the phones that we thought they were going to be pulling from.

And now we've been told even further that there -- apparently one of these phones is alleged to be damaged. And so potentially no information can be recovered from those -- from at least one of those devices.

So as we stand here today, Your Honor, we're asking for mobile phone data, rather than text messages. Because in some instances it may be necessary for a forensic examiner to extract all of the data from Mr. Klempf's phone and try to recreate or restore information that may have been damaged.

We simply don't know enough about the situation at this point. We think -- that's why we asked for appointment of a forensic examiner.

We think that that would be the best way for all of the parties to get to the bottom of this, is to have someone neutral come in and take possession of those devices, and the iCloud data, take it over, look at it, find out what's there, what can be recovered, and provide a report to everyone, so that we all know what is actually available, what can be recovered and what can be retrieved.

So that's -- as it stands today, Your Honor, we don't

have any text messages during the relevant period. And we haven't heard from Mr. Wells or anyone else when we expect to be produced any text messages during the relevant period or whether that's even possible to be retrieved.

And so we've asked Mr. Wells to consent to the appointment of a neutral forensic examiner to do this part of the case, to take over this issue, and to resolve it. We haven't heard anything from Mr. Wells in response to that request.

In the absence of that, Your Honor, we would ask that the Court direct Mr. Klempf to produce any relevant text messages that he does have and any other phone data responsive to the Trust's discovery request by October 21st, 2018.

So that's the text message and phone data issue, Your Honor.

The second issue is with respect to the DixieEgg.com e-mail accounts. This has been a winding tail from the first status conference. I think we've had five or six, Your Honor, since June. And I think this has been on -- the topic of discussion at each one of those conferences.

At first we heard that the DixieEgg.com e-mail account was only available for Jacques Klempf. Then we heard that it might be that Cal-Maine had possession of those e-mail accounts. And Your Honor directed Cal-Maine to go check and see if Cal-Maine had those accounts. And they came back and

said, "We don't have it. We never did."

So the attention redirected back to Mr. Klempf and Foodonics. And they told us then that, well, the only account that has been preserved is Mr. Klempf's, and that the other employee accounts had been shut down several months after the sale of the Cal-Maine.

At the last status conference, though, we learned that, indeed, through, some miraculous or super efforts, that -- that the accounts might be able to be restored. But at that time the only person that could see the data related to those accounts was Jacques Klempf.

We had several e-mails and calls with Mr. Wells subsequent to the October 2nd hearing. And they confirmed that they have successfully retrieved 130,000 e-mails from -- from employees at the DixieEgg.com domain other than Jacques Klempf. So that's positive.

We've got some data. And they've managed to take the 130,000 e-mails, running the search terms and the data of the junk filter that we talked about before -- they reduced it down to 37,000 e-mails.

So 37,000 e-mails, potentially relevant. We haven't seen a single one, though. They haven't produced them. And the most critical concern that we have related to this is that there are two individuals for which we have no explanation, but that -- there are two critical people that worked at Foodonics.

It's the former CFO, Richard Still, and the general manager of Florida operations, John Reece. For some unexplained reason, neither of those two employees' accounts can be restored.

So we -- we don't know whether that failure to restore those two accounts is -- is explainable or something more intentional.

But the fact of the matter is that we don't have any e-mails -- they now have recovered 37,000 e-mails. We haven't received any of those. We don't have any reason or explanation why two of the key employees at Foodonics still cannot be recovered. So, again, this is a circumstance we think cries out to have a forensic -- neutral forensic examiner appointed.

But in the absence of that, Your Honor, we'd ask that you direct Foodonics and Jacques Klempf to produce those 37,000 e-mails by October 31, 2018 and, to the extent they have answers, file a report with the Court describing why the two individuals can't be recovered, and, furthermore, whether there's additional personal e-mail accounts -- we know Mr. Still had a personal e-mail account -- whether there's personal e-mail accounts or other mobile devices for those two individuals that might be sources that -- from which the ESI can be recovered.

THE COURT: You know, on some of those questions that you want answers to, if the -- if the e-mails aren't produced

or if e-mails of -- of -- of Mr. Still and Mr. Reece aren't produced, are those answers that -- that you suggested that there be some sort of notice filed or some explanation filed with the Court?

Is that something that you would delve into in one or more of these 30(b)(6) depositions?

MR. DIX: Yes. In an ideal world, Your Honor, we'd like to know what they think is the reason, so that we can ask them about it. We'd like to not learn about why they think that that's the reason when we show up for the 30(b)(6) deposition.

THE COURT: Well, I don't think I'm going to be inclined to be the conduit for you to learn things so you can go back and take depos. You can take your depos.

And then if you don't feel like you've learned what you need to learn, you can ask the Court for additional relief from there.

It may be in the end that we just tee this up for an evidentiary hearing. Because I've been dealing with -- with ESI issues and with spoliation and with sluggish discovery in a number of other cases.

And you know what the best thing to do is, put everybody who's responsible right there on the witness stand under oath so I can look them right in the eye and see what the heck is going on here and who's telling the truth and who's

not. That's the best way to resolve this. And that may be what we come to.

But go ahead.

MR. DIX: Thank you, Your Honor.

So the third issue we identified was the -- the deficient privilege log produced by Jacques Klempf from Foodonics. They did produce -- it wasn't on time, but they did produce an amended privilege log. And they revealed to us that 1300 items had been removed from their initial privilege log.

We think that speaks volumes about the extent to which good faith went into the preparation of the first privilege log.

We're thankful that they did remove 1300 documents and they did produce those documents to us. But the revised log still contains a multitude of e-mails and communications with parties that -- so when we look at the log, it doesn't appear that there's any basis for asserting privilege, e-mails sent to Ameris Bank and BB&T, e-mails sent to Jacques Klempf's current and former business partners.

We've provided a list of the people that we don't believe should be within the -- the privilege claim for Mr. Klempf and Foodonics. We provided lists to Mr. Wells, have heard no response.

THE COURT: When did you provide that list?

MR. DIX: We provided the first list the day --

October 2nd, the day that we had the last hearing.  That was for the former log.

Many of those same people that we identified on October 2nd were still on the revised log that was produced to us -- I believe it was on October 17th.

And the same issues go for the privilege log that was produced by GrayRobinson.  That's later in the notice, Your Honor.  But it's the same issue.  There are lots of different communications with individuals.

There's no subject or -- or explanation provided for why communications with non-attorneys, business people, colleagues -- why any of those communications should be on a privilege log.

We've asked them to be declassified and produced.  And we'd ask that you order that to be undertaken yet again, if that will accomplish anything, Your Honor.

And so that -- that's where we are with the privilege log produced by Jacques Klempf and Foodonics.  It needs to be -- there needs to be a reduction of the privilege log to only matters that are actually privileged.

The fourth issue we identified, Your Honor, is a minor one.  But I think it speaks to the effort that the other -- the opposing parties and counsel are applying in this case.

We got an e-mail about a week ago from Mr. Hancock,

who's on the phone. And it's an e-mail to his discovery vendor where he's directing them to produce to us password-protected documents without unlocking them.

And he says in the e-mail, and I quote, "This is really just kicking the can down the street, because opposing counsel is sure to ask us for passwords."

So the idea that GrayRobinson is just -- and their clients are just kicking the can down the street, we think that's been going on from day one here.

And so we would ask with respect to that issue that GrayRobinson produce to us a list by October 31st that has all the list -- a list of all the password-protected files that have been produced to us, because we haven't come across them yet, and the passwords that would go with those files, so that we can view them after trying to access them.

The remaining issues in our -- in our notice, Your Honor, relate to GrayRobinson. The first is a date range issue. None of the documents produced by the GrayRobinson firm or identified in their privilege log go any further back than May of 2015.

Obviously the dates that we've been talking about in this case go back to 2008. And so we've asked and received no explanation for why there are no documents or ESI produced by GrayRobinson prior to May of 2015.

But that's a significant concern to us, that -- we

don't know whether they simply failed to produce that inadvertently or whether there is, indeed, no data available during that time period.

That would be something that we would ask about during a deposition, as well, unless we hear from them in the meantime.

The second issue with the GrayRobinson log, I mentioned earlier, is the date range -- I'm sorry, is the inclusion of parties that don't appear to be privileged in the privilege log.

So we would ask for the same relief on the GrayRobinson log that we asked for with respect to the Foodonics log; that is, go back, do it again, declassify the third parties that are not privileged, produce those non-privileged documents, and then for the people you leave on the log, explain to us why those parties are -- remain on the privilege log. We don't understand why those parties are -- are within the privilege.

So that's the last with respect to GrayRobinson, Your Honor.

And item No. 3 in our notice asks that we -- that we have permission to take 30(b)(6) depositions of corporate representatives for Foodonics and for the GrayRobinson firm, and also for Mr. Klempf individually.

We need to take their depositions, find out what they

did, when they did it, why they did it, and what's left to be done, and what could be done.

And once we know that, then we'll know how -- what kind of remedies and relief we should be asking this Court to direct.

And so we did ask, Your Honor, that you appoint a neutral forensic examiner. We understand that -- that Mr. Wells consented to that, that that can be done consensually.

In the absence of that, we understand your position that we would need to file a motion. And we would want to do that after we've had an opportunity to take their depositions.

THE COURT: All right. Let me just ask you this on -- on a different topic.

MR. DIX: Sure.

THE COURT: The last time we were here there was a discussion about this one document that was clawed back. And on October 5th the response was filed to what you had previously filed. And the Court was provided with a document for review.

After having reviewed the response, are you satisfied with the response, or do you take issue with what was set out in the response?

MR. DIX: We do take issue.

THE COURT: All right. I'll set a deadline for you

filing a response to that, then.

MR. DIX: Thank you.

THE COURT: All right. Thank you.

Mr. Wells?

MR. WELLS: Good morning, Your Honor. May it please the Court?

THE COURT: Yes.

MR. WELLS: Let me address, first of all, the -- the initial issue that came up with respect to the filing of the ex parte notice by Mr. Post.

The draft of that notice was sent by e-mail to me at 4:48 yesterday afternoon. I advised Mr. Post on Tuesday that I was having to leave Tuesday at noon and would be out of town for a couple of days and had limited access, so that if they had some issues they wanted to include and a notice of compliance is required by the Court, it would be helpful to -- to try to get with me, but certainly I would have limited availability.

I was actually driving yesterday at 4:48. I did not get back to Jacksonville until almost 7 o'clock, after it had been filed. So we did not have an opportunity to respond to what he sent out at 4:48 yesterday.

Let me also address -- and I -- the Court's observations about the -- what I would characterize as brief delays in filing the documents, the notices of compliance, as

required by the Court.

On the first one I had called Mr. Post and advised him that there would be a day-or-so delay for the filing of the first document the Court referred to. Mr. Post had no objection. We filed it as we said we would, as long -- with the notice of compliance.

As to the second one that the Court required to be filed on October 17th, frankly, I have to fall on my sword. I mis-calendared that. And I thought it was to be filed on the 19th. That's totally my fault. I apologize to the Court.

But we also called and e-mailed counsel for the Trust and advised them where we -- attempted to advise them where we were.

I think -- I'm not certain, but I think they were moving their offices and their communications were down for a couple of days.

We got kickbacks from e-mail where we were trying to communicate with them. And on the phone we would leave phone messages and got no return phone calls.

So a lot of the requests that Mr. Dix indicated that had been made of counsel, me, were only made in the last -- within the last 48 hours.

And so the responses that -- that we would have expected were very, very difficult to make since I was traveling.

Just specifically for records purposes, the issue with the privilege log, with the suggestion that there are a lot of people on there that should not be, we just got that, I think, yesterday. And as I indicated, I was out of town and just did not have the opportunity or the means to respond appropriately.

I will address the individuals on the privilege log specifically, but I would like to point out, if I may, to the Court -- I apologize.

I know the Court is aware of what the issues are in this case. Our client -- after we started to manage the tax refund, we get the threat of the lawsuit for securities and for fiduciary duty based on the stock redemption in 2015 and the subsequent sale of assets to Cal-Maine in 2016.

We had attempted -- it is our position, Your Honor, and always has been our position, since prior to the commencement of litigation, and throughout litigation, that the allegations in the counterclaim have no factual support, that they are violative of Rule 11, that our discovery efforts -- we tried to determine what factual basis there was for the counterclaim the Court has put on hold until the current ESI discovery they were struggling with has been completed.

Against that backdrop, let me point some things out to the Court. Foodonics has produced three separate productions to opposing counsel.

The first on August 30th contained 44,763 documents. It's been described as a data dump. But that hardly is accurate. It was the result of searching and filtering over 685,000 documents. And after application of the search terms, 44,000 were produced.

The cost of doing that was -- the cost of doing a total review of that was 7,000. So rather than incur that cost, we simply gave them all the documents we had that were subject to the search terms.

Our second production on October 1st were a category of documents that we needed to look at further because they appeared to be personal. There were a number of those. We went through them and produced an additional 228 documents after that additional search.

Our third production was completed on October 17th, and consisted of documents removed from the original privilege log, the 1300 documents that Mr. Dix has alluded to. And, candidly, the initial privilege log, Your Honor, was between 5- and 6,000 entries, documents.

We looked at it and we saw that there were 1300 that were not privileged. And we have produced those documents. There may be others. And we -- we are happy to continue going back and looking through it again.

I can tell you, in opposition to their suggestion that we may be hiding things, a lot of the individuals that

they have outlined as not being subject to the privilege, we
believe are, in fact, privileged.

They are business partners of Mr. Klempf
communicating -- that our firm is representing, that -- with
Mr. Klempf and those partners communicating with us.  These are
entities such as BAM Jax, Aventi, Forking Amazing Restaurants,
Burlock and Barrel.

A lot of the entries that they questioned the
privilege were, in fact, entities that were being represented
by this law firm.

Mr. Klempf's brother, Marc Klempf -- we have
represented him on certain matters at Mr. Klempf's request.
His daughters are all involved in the BAM Jax and matters that
are related to the various business entities that he's involved
in.

So, yes, there may be some that need to be removed
further -- need to be reviewed further, and we're happy to do
that, but the effort -- the errors that may have been committed
are errors of commission, not omission -- excuse me, omission,
rather that commission.

There has been no effort whatsoever to hide any
documents, to withhold any documents that are at all relevant
or non-privileged.  And we have no problem in continuing our
efforts to do that.

Let me address the DixieEgg.com.  I hate to be

repetitive. The Court's aware that that's an account that was closed, had to be reopened.

After a great deal of effort, we were finally able to access the accounts of both of the former employees of Dixie Egg. We culled it down to 37,000 for about 10 or 15 employees.

It did -- it did not include two privileged employees. We don't know why. But rather than not producing the documents, as Mr. Dix asserts, I advised Mr. Post that we had the 37,000 documents, that it included people who had no involvement whatsoever in management or operational decisions, and suggested that we look at that and produce selected individuals' accounts. We've not had a response to that.

So we're happy to turn over an additional 37,000 documents if they want to conduct a review of that. We were actually trying to reduce the work that all parties are involved in by suggesting that they consider a limited production.

Certainly a limited production with management people would be far more -- potentially going to yield relevant evidence than folks who had no involvement whatsoever.

The text -- with respect to the two employees, Mr. Still and Mr. Reece, clearly they were key employees. But through the production that's already occurred through Mr. Klempf, through Foodonics, they would have gotten the e-mails from those two people.

What they may not have is e-mails that those two people may have sent outside. But any internal e-mails that those folks would have sent, Mr. Still, Mr. Reece, would be within other documents we've already produced.

And I think the Court made a note of that at the outside. We suggested earlier, and we still maintain, that whatever e-mails Mr. Still and Mr. Reece would have sent would have been produced in the documents of Foodonics.

Text messages, very early on in the case we were under the impression that Mr. -- Mr. Klempf had two cell phones. We knew that one had been damaged and that he had gotten another cell phone.

We have learned in this process that the damaged phone was actually shattered. We were under the impression that it had been -- that whatever data could be retrieved from that phone had been transferred to the new phone, but apparently it hasn't.

So these are text messages that probably are not available. And Mr. Klempf no longer has the shattered phone. But we certainly made the phone he does have available to them. It's a phone he purchased in March. So there wouldn't be anything on there that could not be transferred previously.

THE COURT: What about the iCloud?

MR. WELLS: Pardon me?

THE COURT: What about the iCloud?

 MR. WELLS: Your Honor, that's a technical issue that I'll have -- have to let Mr. Hancock address. We do have an issue with turning over the current cell phone or -- if there's another search that can be done by our vendor, the same vendor that opposing counsel is using, rather than having to turn over a cell phone that is part of his daily critical business life -- we would object to turning it over to a forensic examiner.

Mr. Hancock, can you address the iCloud issue that Mr. Dix raised?

MR. HANCOCK: Yes. Your Honor, as a firm, in many of our cases involving ESI and cell phones, collect from iPhones by collecting from the iCloud backup. It's considered a forensically sound method of collecting that data.

So it's not necessary to collect the data from the device itself. Where I think Mr. Dix is saying he wants the device looked at is to look and see if there's some data that was deleted or something like that.

But, I mean, as far as the iCloud collection, that is a forensically sound method that is -- is used throughout the industry. And it's -- it's not been drawn into question other than the -- you know, as a way to collect that data.

THE COURT: Well, what if you don't sign on to the iCloud? What happens to the data?

MR. HANCOCK: Well, I mean, certainly if your setting

is that you choose to not have your data backed up to the iCloud, when you go to the iCloud it will be empty.

But clearly Mr. Klempf has the settings that -- to back things up. And that's where we grabbed all of that data. There would have been nothing there, is what I'm saying, if -- if it wasn't backing up to the iCloud.

THE COURT: But it would be on the phone, right?

MR. HANCOCK: Correct.

THE COURT: And what about the phone that was broken? Was that backed up to the iCloud?

MR. HANCOCK: That I don't know, Your Honor.

THE COURT: All right. Go ahead, Mr. Wells.

MR. WELLS: Let me address Mr. Dix's comments, Your Honor, about the production by GrayRobinson. The production from May of 2015 through the -- the date is not at all inconsistent with what -- the position that we've maintained in the case.

GrayRobinson received a subpoena for production of the documents that are at issue here. And GrayRobinson objected to the subpoena, general objections and specific objections.

But with respect to most of the items, we objected without an agreement to produce documents. There were certain categories of documents we agreed to produce involving the actual stock redemption in 2015, the account and maintenance

sales, communications with Cal-Maine, and valuations.

I believe those documents within that -- and keep in mind that the stock redemption occurred in December of 2015. The negotiations for that began probably in September. They had documents from May of 2015 through the 2018 date range.

Be that as it may, we've been -- we have produced documents that probably fall outside the objections that we served on opposing counsel.

There may be additional documents prior to 2015. Despite our objections pursuant to the subpoena that was issued on GrayRobinson, we can go back and try to produce additional documents prior to that.

The Court may recall that we have always objected to the date range 2008 for transactions that occurred in 2015 and 2016.

The same thing -- same comments on the privilege log. There are a lot of individuals who are listed on the privilege log who are, in fact, privileged because they are either employees or officers in related entities.

I will make -- with respect to some of those -- for example, Your Honor -- and I have no problem producing them, but there's several current employees with Cal-Maine who were employees of Foodonics who have continued to communicate with Mr. Klempf about matters related to Foodonics.

Some of those individuals that they have

questioned -- we did a certain privilege as to those individuals.

I can assure the Court there's nothing in any of this communication that is particularly relevant to this litigation. But they do maintain the privilege that we believe they're entitled to.

THE COURT: Anything else?

MR. WELLS: We do have an objection, Your Honor, to the notice 30(b)(6). We actually got the notices before we were advised of an intent or desire to take them. They've not been scheduled. I think notice has just been sent.

We are on the brink -- we've produced everything that we have access to, Your Honor. We don't have access to text messages prior to March. We currently don't have access, but we are searching for additional e-mails in the DixieEgg.com account for Mr. Still and Mr. Reece. But we have produced what we have, what we have access to.

And so we think that the 30(b)(6) depositions that are being requested are not at all necessary.

THE COURT: All right. Thank you.

Mr. Post, Mr. Dix, is there anything else you want to say?

MR. POST: May I remain here, Your Honor?

THE COURT: Yes. Of course. Yes.

MR. POST: Your Honor, the position taken by

Mr. Wells here today that the (unintelligible) of the subpoena is -- is only a limited production by date because of their objections is contrary to my understanding that the Gray- -- that the GrayRobinson firm agreed to produce their documents notwithstanding their general objections.

And -- and I -- I'm very surprised that -- we're hearing for the first time today that they've taken some position about a date limitation in their response to our subpoena. And, obviously, had we known that that was going to be their position, we would have brought it up a long time before today.

MR. WELLS: I have a copy that's contained in our response, if the Court would like to see it. But we objected. There were certain things that we agreed to produce notwithstanding our objections.

And those were the -- the various communications with Cal-Maine, the various communications surrounding the stock redemption and the asset sale, and business valuation.

There may be some business valuations that I -- I would have to look and see -- that have not been produced, but they -- anything related -- that we would have related to business valuations at the time of these transactions have been produced.

MR. POST: Your Honor, I -- I can represent to the Court -- I have e-mails from Mr. Wells that says that they are

going to produce the documents pursuant to the subpoena without relying on the general objections that he's referring to. And, obviously, again, had we known that was their position, we would have brought it up a long time ago.

THE COURT: Well, I'm -- the way I hear what Mr. Wells is saying is that -- as I understand it -- although there were these objections, that he has produced many documents that -- that otherwise he was objecting to as part of the production.

But I don't know if that means -- does that mean that there are some that you're withholding because of those objections and others you're giving up even though you -- you've made the objection?

MR. WELLS: There are -- there are probably documents prior to May of 2015. I'm sure there are documents prior to May of 2015 that we can pull and review.

And, again, we're not trying to hide anything. We're -- we're more than willing to produce what we've got. But to suggest that there's some issue or some problem or intentional withholding of documents prior to that we think flies in the face of the objections that we asserted.

There may be documents within that date range. I think Mr. -- Mr. Hancock learned after communication from Mr. Dix that there may be documents within May 2015 that were not pulled by KM. We'll pull them. We'll produce them.

THE COURT: Well, just with regard to this date range situation, I thought -- and, again, I only thought we had had -- I don't know, three -- two or three or four of these. If we've had six or seven of these status conferences, I may not be remembering this actually.

But I thought -- I don't know -- three or four months ago we discussed this date range issue and you -- you, Mr. Wells, voiced your objection to the broad range, you addressed your position that you don't think there's evidence supporting the whole theory that -- that we're dealing with here in terms of the Counter Plaintiffs.

And I think preliminarily I ruled that -- that the date range -- that I was recognizing that documents back to 2008, I believe, were relevant.

So -- so in terms of that, if you're withholding -- if you're withholding documents because you -- because they're -- that you don't think that's an appropriate date range, then -- then that's contrary to what I've previously ruled.

MR. WELLS: May I respond?

THE COURT: Yes.

MR. WELLS: And I apologize, Your Honor. That's not what I'm asserting. I'm -- the subpoena requested -- and I'll be glad to provide a copy to the Court.

THE COURT: Well, go ahead and just tell me. I'm a

better learner when I hear it than read it.

MR. WELLS: All document -- this is request for production No. 3.

"All documents for ESI referring or relating to the settlement and redemption agreement."

That's what occurred in December of 2015.

We had (unintelligible) general objections. We will produce those documents subject to the attorney/client privilege.

Those are documents that have a finite time limit. The stock redemption and sale occurred in December. We agreed to produce those documents. You can go on through the subpoena. There are specific documents, all documents in ESI relating to the sale of Foodonics assets or Foodonics stock. We agreed to produce those and we produced them.

It's those kinds of -- it's not a date range. It's a subject matter issue that we've agreed to produce and that have been produced.

THE COURT: Well, you see it as subject matter and the Counter Plaintiffs see it as a date range, because that's what they've raised in this -- in this notice.

MR. WELLS: Well, I think we have a disagreement. Our position is that we've produced the documents that we agreed to produce in the -- GrayRobinson produced the documents we agreed to produce in the subpoena.

THE COURT: All right. Mr. Post, you want to say anything else about that?

MR. POST: Your Honor, obviously this is the kind of thing that counsel should meet and confer on without having to bring it up for the first time in front of a judge.

I intend to meet and confer with Mr. Wells after this hearing to try to work this out. And if it can't be, then I would -- I would -- well, I'd ask the Court to -- to direct the law firm to respond with the other documents and the other date range to the extent it's responsive to the subpoena.

And if I miss -- if I did something in the subpoena that was too narrow, I'll just serve a second subpoena.

THE COURT: Well, I -- just in listening, the -- there was some language in the subpoena relating to the sale. All right? And, now, that could be interpreted narrowly or it could be interpreted broadly.

MR. POST: Correct.

THE COURT: And so it seems to me maybe those are the kinds of things -- if you-all tried to work that out, you could make some progress on it.

MR. POST: Yes, sir.

MR. WELLS: The specific request for production No. 5 in the subpoena, Your Honor, is documents and ESI relating to the sale of Foodonics assets or Foodonics stock. And we believe we produced those documents.

MR. POST: Your Honor, if there was a discussion about a sale of assets in 2009 or 2010, that would be responsive to the subpoena.

MR. WELLS: If there were one, it may be responsive. We don't believe there are any.

THE COURT: All right. Well, then -- I mean, that would -- that would -- you -- and have you -- have you stated that in writing?

MR. WELLS: We have maintained throughout this litigation, Your Honor, both with the Court, and with counsel prior to litigation, that there were no discussions about a sale of Foodonics assets prior to the spring of 2016.

THE COURT: All right. Well, I understand what you're maintaining. So that -- maintaining something and searching and representing something are -- can be two different things, right?

Because -- look, I don't -- I don't want to get into a long discussion about some of this stuff. But, you know, I see a pattern in these cases.

And the pattern in the cases -- this is -- this is what I see -- and I'm -- I'm getting more and more of these, as I've told you. And -- and I suppose it's just the way things are now, because of ESI and because of other matters.

But the pattern I see is the party that's being requested to produce the ESI and the party that -- that is

being accused of not producing it -- it starts like this.

They say -- the party says, "There is no evidence to support what the other side is saying happened. There's no evidence to support it. It didn't happen that way."

Like you're saying here, in terms of going back in 2008 and what's been -- all the way through, and what's been alleged about -- about the -- the so-called fraud that went on, for a lack of a better way of saying it -- right? And that's what your position is.

I'm not saying that's wrong. I'm just saying the pattern I see is that the party that's accused of the wrongdoing in a situation like this -- they say there's no evidence to support the claim.

They don't produce evidence. They say they can't produce evidence, or they've spoliated evidence. And then when it gets down to summary judgment, they -- they -- they point to the other side and they say there is no evidence.

And the problem is in a number of those cases there should have been evidence or there -- or there -- there was evidence not produced and was eventually produced.

And a lot of times -- and I'll just say it like it is -- it's not the fault of the lawyer. It's not the fault of the lawyer that it wasn't necessarily produced.

I have seen where -- where there is, you know, some -- in terms of sluggish discovery, lawyers have -- have --

have been involved in that for various reasons, but -- but I'm talking about -- that it's -- it's -- so you get to these -- these things where there's -- there's circumstantial evidence that something went on that looks like it, it smells like it, it may have.

And so allowing discovery of it and then producing the discovery by the party being asked for it is necessary to get to the bottom of it, is how I view it.

Now, you know, maybe that's wrong. Maybe it's -- maybe it's not. But here you're saying there is no evidence to support the claims.

I think based on what they've alleged, that a reasonable person could infer -- could infer -- I'm not saying it would be nece- -- I'm not saying it's mandatory.

I'm just saying, a reasonable inference from what's been inferred is that there were some shenanigans going on here. And so I think that the Counter Plaintiffs here have a right to that discovery and to get it. And so that's -- that's really what it's about, trying to get that discovery.

MR. WELLS: May I respond, Your Honor?

THE COURT: Yeah. Of course.

MR. WELLS: I understand and completely agree with the Court's analysis of the cases from an overall perspective.

Foodonics has produced 47,000 documents, including documents, e-mails, some text messages. Cal-Maine has produced

about 1,000 documents.  Several other parties have produced documents.

I'm not aware of any document that will suggest that there was a sale contemplated prior to the stock redemption, that there were any communications with Cal-Maine or any other entity about an actual sale.

We acknowledge there were discussions by Mr. Klempf with his family members that something's going to have to occur in the future.

In one of the prior hearings Mr. Post mentioned a document relating to a dream team, which was something Mr. Post -- Mr. Klempf was putting together with other egg producers to, in fact, compete with Cal-Maine.

That dream team never materialized.  And it was fully discussed with his family members.  That will all come out.

We are not -- we are not aware -- I'm not going to say there are no documents.  We haven't looked at every -- I haven't looked at every single document.

But we are not aware of any documents that would suggest that Cal-Maine and Foodonics had any discussions prior to the spring of 2016 about a sale of accounts -- a sale of the assets.

All that being said, the Court is absolutely correct, the allegations may create an inference that would give rise to the discovery.  We think we've produced what we've got.  We're

happy to -- to continue to produce if things come up that we're not aware of.

THE COURT: All right. Thank you.

Mr. Post?

MR. POST: Obviously, Mr. Wells is not going to be a witness -- well, he will be a witness at the trial. But he doesn't know what -- what evidence is out there, because they haven't looked. They haven't done their job.

And the -- the text messages alone scream that this is a -- there's some -- either serious misconduct or -- or serious omission going on that -- that need -- that we need to get to the bottom of.

And he wants to paint our case as -- very narrowly. But it's more than just the -- what conversations were -- with Cal-Maine existed pre- -- pre-redemption.

At the redemption sale it was represented by Mr. Klempf and -- that the company was only worth $35 million when he failed to disclose to a minority shareholder that he, in fact, thought it was worth $70 million, as the dream team analysis reflected a year earlier.

So this case is more -- is -- it is a breach of fiduciary duty fraud case and -- for which we need to get the discovery.

And the fact they gave us 47,000 documents, we're not counting by numbers. They could -- they can say, "Here's a

warehouse full of documents, have a nice day."

But if they don't give us the right ones, the ones that are responsive, then that makes our case more difficult. The Court knows all this.

And we respectfully request that we be allowed to take the depositions that we've asked and to bring this part of the case to a conclusion as quick as possible, the discovery part.

THE COURT: All right. Well, let me take -- I'm going to take a brief recess. And I want to walk through what it is you've asked and what you've responded here and see where we go from here.

Because I -- I'm about at the point that -- that -- you know, these -- these ESI status conferences that we're having here were supposed to -- to resolve issues.

And I feel like -- I feel like -- that -- that we're having difficulty resolving issues because it's -- they keep expanding.

It's like the -- the creek is rising and it continues to rise. And the whole idea here was to try to keep the creek from flooding.

And I just don't think that we're -- we're making the kind of progress that I had hoped in having these. And so I'm thinking that -- that it's time to -- to go about it the old-fashioned way, of filing motions and having hearings on

motions and, if necessary, take evidence.

And then if there's something going on with the discovery that -- that shouldn't be going on, then we get to the bottom of it, so...

But, anyway, I'm going to take about a ten-minute recess.

COURT SECURITY OFFICER: All rise.

(Recess from 11:47 a.m. until 12:02 p.m.; all parties present.)

THE COURT: (No audio)...issue, you shall file a response, the Defendants/Counter Plaintiffs, no later than November 5th, 2018.

Then I am -- I'm going to direct that the parties meet and confer prior to November 5th, 2018, on the following: all issues related to GrayRobinson, privilege log issues, date range of production issues and -- and the in general compliance with the subpoena that you-all were discussing and that we were all discussing earlier.

And the same as to -- as to the telephone data from Jacques Klempf's phone and the iCloud issues and those types of things. You shall meet and confer about those issues, again no later than November 5th, 2018.

And then as to the privilege log regarding Foodonics and Mr. Klempf, again, you should meet and confer on those issues no later than November 5th, 2018.

I'm going to order that the passwords that are -- that are discussed in the notice and a list of password-protected documents be provided no later than October 31st, 2018.

That's subparagraph (d) of Roman I(1), the production of documents that are password protected and the necessary passwords to -- to get to those.

And then as to the -- as to the request for the depositions, I'm going to grant that request to the extent that the depositions of Foodonics and Jacques Klempf can be taken for the limited purposes listed. I'm going to deny the request as to GrayRobinson.

I think at this point that -- that a meet and confer and an attempt to resolve those issues is appropriate prior to granting any request for a deposition as to GrayRobinson.

And then the -- you-all will set those depositions. And once you do, there should be a notice filed with the Court stating the date or dates of the depositions.

Once I receive that notice, then I'm going to set a deadline for filing motions. And that will be motions to compel, motions related to privilege logs, any motions for sanctions, and any motion for a special master.

But I don't want to set that until after I know when the depositions are set, because I want to give you time to take the depositions, get the transcripts, and then file any

motion that you think is appropriate.

And at this point I'm going to suspend holding these status conferences, because I just -- I just think that -- that for a whole host of reasons, many of which we've discussed already today, it -- we've got to get down now to -- to dealing with -- with specific issues.

And -- and one -- one of the examples today -- I mean, for instance, the -- you know, there are issues here, but, you know, some of the issues have only become evident a couple of days or 48 hours ago, and then they're provided to Mr. Wells, and Mr. Wells hasn't had time to respond, and we're here discussing issues that he hasn't had time to deal with.

So I -- I think right now, especially the way things are, we're going to be best suited to go forward in this -- in this situation.

And with respect to these various meet and confers -- or the meet and confer -- discussing these issues, I'm assuming if you don't work those things out they'll be the subject of motions that are filed when I set the motion deadline.

So, Mr. Post, Mr. Dix, anything else?

MR. POST: Can we set an outside date for the taking of these depositions? We'll try to work with Mr. Wells' schedule. But we'd agree, for example, that they will take no -- take place no later than the end of November?

THE COURT: Well, I thought -- I saw -- I think --

didn't you propose a date of around November 7th, or something like that?

MR. POST: Yes, Your Honor.

THE COURT: Well, I'm thinking that -- that they should be taken no later than the end of December. I was thinking it would be before that.

MR. POST: You mean November?

THE COURT: Yes. What did I say?

MR. POST: You said December.

THE COURT: Oh. Well, I'm a month ahead.

Well, I'll include in the order, that there be -- I'll go look at the calendar, but some sort of -- of outside date, that they should take place no later than a certain date.

MR. POST: Thank you, sir.

THE COURT: All right. Mr. Dix, anything else?

MR. DIX: No, Your Honor.

THE COURT: Mr. Wells?

MR. WELLS: No, Your Honor.

THE COURT: All right. Then we're in recess.

COURT SECURITY OFFICER: All rise.

(The digitally recorded proceedings concluded at 12:07 p.m.)

- - -

**CERTIFICATE**

UNITED STATES DISTRICT COURT )
)
MIDDLE DISTRICT OF FLORIDA )

I hereby certify that the foregoing transcript is a true and correct computer-aided transcription from the official electronic sound recording of the proceedings in the above-entitled matter.

DATED this 20th day of November, 2018.

s/Shannon M. Bishop

Shannon M. Bishop, RDR, CRR, CRC