**TAB 8**

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

FOODONICS INTERNATIONAL, INC., )
a Florida corporation, )
           )
  Plaintiff, )
           )
v.           )   Case No. 3:17-cv-1054-J-32JRK
           )
DINA KLEMPF SROCHI, as Trustee )
of the LAURA JEAN KLEMPF )
REVOCABLE TRUST, a Georgia trust, )
           )
  Defendant. )
_____ )

DINA KLEMPF SROCHI, as Trustee )
of the LAURA JEAN KLEMPF )
REVOCABLE TRUST, a Florida trust, )
and DENNIS L. BLACKBURN, as )
Assistant Trustee of the JEAN KLEMPF )
TRUST, )
           )
  Counterclaim Plaintiffs, )
           )
v.           )
           )
FOODONICS INTERNATIONAL, INC., )
a Florida corporation, and KEVIN )
JACQUES KLEMPF, )
           )
  Counterclaim Defendants. )
_____ )

## ANSWER TO THE COMPLAINT,
## AFFIRMATIVE DEFENSES AND COUNTERCLAIM

  Defendant, Dina Klempf Srochi, as Trustee of the Laura Jean Klempf Revocable Trust (the "Jean Klempf Trust" or the "Trust"), answers the complaint (Doc. No. 1) and says:

## I. **Jurisdiction and Venue**

1.      Denied.

2.      Admitted.

3.      Admitted.

4.      Admitted.

5.      Denied.

## II. **General Allegations**

6.      Admitted.

7.      Admitted.

8.      Admitted.

9.      Without knowledge.

10.     Denied.

11.     The Trust denies paragraph 11 as stated.  Jacques Klempf never served as trustee or co-trustee of the Jean Klempf Trust.

12.     Admitted.

13.     Admitted.

14.     Without knowledge.

15.     As to paragraph 15, the referenced Sections of the Internal Revenue Code speak for themselves and plaintiff's legal conclusions do not require a response.

16.     Without knowledge.

17.     Without knowledge.

18.     The Trust admits Foodonics paid estimated taxes on behalf of Jacques Klempf and Mrs. Klempf.  The Trust is without knowledge of Foodonics' ability to estimate the precise amount of tax liability or Foodonics' intention with regard to the payment of estimated taxes.  The Trust denies the remaining allegations of paragraph 18 of the complaint.

19.     The Trust admits that by 2015 disputes had arisen between Jacques Klempf and Mrs. Klempf, but is without knowledge of the remaining allegations of paragraph 19 of the complaint.

20.     The Trust admits that Jacques Klempf became a 98.55% shareholder of Foodonics as a result of the stock redemption from his mother's Trust.

21.     As to paragraph 21, the subject document speaks for itself and plaintiff's legal conclusions do not require a response.

22.     Without knowledge.

23.     The Trust admits that Mrs. Klempf received a refund from the IRS, but is without knowledge of the remaining allegations of paragraph 23 of the complaint.

24.     The Trust admits that the assets of Foodonics included the "Dixie Egg Business" as defined in paragraph 24, but is without knowledge of the remaining allegations of paragraph 24 of the complaint.

25.     Admitted.

26.     Denied

27.     Admitted.

28.     The Trust admits that Mrs. Klempf received a refund from the IRS for taxes paid in 2014 and 2015.  The Trustee denies that the Trust received a refund from the IRS.  The Trust is without knowledge of the other remaining allegations of paragraph 28 of the complaint.

29.     Denied.

30.     The Trust denies paragraph 30 as stated.  The Trust admits that Jacques Klempf and his attorneys made demands on Jean Klempf's attorneys in 2017, but is without knowledge as to when, if ever, direct contact was made with Jean Klempf regarding the 2015 tax refund.

31.     The Trust denies paragraph 31 as stated.  The Trust admits that it delivered, through counsel, a settlement demand letter on Jacques Klempf and Foodonics which was accompanied by a proposed complaint, but denies the characterization of those documents and the remaining allegations of paragraph 31 of the complaint.

32.     The Trust admits that it delivered, through counsel, a settlement demand letter on Jacques Klempf and Foodonics which was accompanied by a proposed complaint, but denies the characterization of those documents and the remaining allegations of paragraph 32 of the complaint.

33.     The Trust admits that on July 14, 2017 it notified Jacques Klempf and Foodonics that, due to their refusal to resolve the claims arising from their wrongful conduct, including their breaches of fiduciary duties and fraudulent omissions, the Trust had exercised its right to setoff by applying the proceeds from the

4

$1,312,342.82 IRS tax refund check dated March 29, 2017 to a portion of the $23,200,000 of damages the Trust incurred as a result of the wrongful conduct of Jacques Klempf and Foodonics.

34.     The Trust admits the Settlement and Redemption Agreement (the "Redemption Agreement") provides for the award of attorneys' fees in the event of litigation to enforce the terms of the Redemption Agreement. The Trustee is without knowledge of the remaining allegations of paragraph 34 of the complaint.

## COUNT I
### Breach of Contract

35.     The Trust incorporates by reference its responses to paragraphs 1-34 of the complaint.

36.     Denied.

37.     Denied.

## COUNT II
### Unjust Enrichment

37.     The Trust incorporates by reference its responses to paragraphs 1-34 of the complaint.

38.     Denied.

39.     Denied.

40.     Denied.

41.     Denied.

## COUNT III
### Conversion

42.     The Trust incorporates by reference its responses to paragraphs 1-34 of the complaint.

43.     Admitted.

44.     Denied.

45.     Denied.

## COUNT IV
### Declaratory Judgment as to Fraud Allegations Made By Defendant in an Unfiled Complaint Against Plaintiff

46.     Denied.

47.     The Trust incorporates by reference its responses to paragraphs 1-34 of the complaint.

48.     The Trust denies paragraph 48 as stated.  The Trust admits that it delivered, through counsel, a settlement demand letter to Jacques Klempf and Foodonics which was accompanied by a proposed complaint, but denies the characterization of those documents and the remaining allegations of paragraph 48 of the complaint.

49.     The Trustee admits a controversy exists among Plaintiff and Defendant. The Trustee denies that this Court can provide declaratory judgment relief to resolve that controversy.

50.     Paragraph 50 is a prayer for relief and does not require a response by the Trust.

51.     Denied.

## AFFIRMATIVE DEFENSES

### First Affirmative Defense
### (Failure to State a Cause of Action as to Count I)

1.      Count I does not allege a plausible breach of contract claim against the Trust because Foodonics does not allege the basis of the Trust's alleged contractual obligation to pay the 2015 Refund to Foodonics. *See Radenbaugh v. State Farm Lloyds*, 4:13-CV-339-A, 2013 WL 4442024, at *4 (N.D. Tex. Aug. 16, 2013) ("No plausible cause of action for breach of contract can be stated unless there is an allegation as to the exact nature of the contract, including a statement as to defendant's obligations under the contract, how defendant failed to comply with its contractual obligations, and how that damaged plaintiff. Plaintiff's pleading fails to include a statement of any of those facts.").

2.      Furthermore, Foodonics does not allege what contractual obligation the Trust had to pay the amount of the 2015 Refund to Foodonics because the Redemption Agreement contains no such requirement.   Section 12(b) of the Redemption Agreement contains the entirety of the parties' obligations with respect to the 2015 tax liabilities, and it says nothing about the Trust or Jean Klempf paying future tax refunds to Foodonics.

3.      Because the Trust does not owe Foodonics a contractual duty to pay the 2015 Refund, Foodonics cannot, as a matter of law, state a cause of action for breach of contract against the Trust. *See Vittitow v. Bank of America*, 2:CV-14-0230-SMJ, 2014 WL 5147565, at *4 (E.D. Wash. Oct. 10, 2014) ("A breach of contract is actionable only if the contract imposes a duty, the duty is breached, and the breach

proximately causes damages to the claimant."); *Atlantic Holdings, Ltd. v. Apollo Metals, Ltd.*, 263 F.Supp.3d 526, 530 (E.D. Pa. 2017) ("'A critical element of every claim for breach of contract requires a showing of a breach of some duty owed.' ... Consequently, in order for there to be a breach of a contract, it must first be determined: was there any duty to be breached?") (quoting *Smithkline Beecham Corp. v. Continental Ins. Co.*, No. Civ. A. 04-2252, 2004 WL 1773713, at *1 (E.D. Pa. Aug. 4, 2004)).

## Second Affirmative Defense
### (Failure to State a Cause of Action as to Count II)

4. Under Florida law, "[i]t is well settled that the law will not imply a contract where an express contract exists concerning the same subject matter." *Kovtan v. Frederiksen*, 449 So. 2d 1, 1 (Fla. 2d DCA 1984). Because the Redemption Agreement addresses the parties' mutual obligations with respect to the payment of the Trust's 2015 taxes, Foodonics cannot resort to unjust enrichment as a remedy for its failure to address in the Redemption Agreement what was a readily foreseeable event.[1]

## Third Affirmative Defense
### (Failure to State a Cause of Action as to Count III)

5. Under Florida law, to sue the Trust for conversion Foodonics would need to have an ownership interest in the 2015 Refund. *See DePrince v. Starboard Cruise Services, Inc.*, 163 So. 3d 586, 597 (Fla. 3d DCA 2015) ("The essence of the

---

[1] Foodonics admits that it purposely overestimated Jean Klempf's 2015 tax liability. Complaint, para. 18.

tort of conversion is the exercise of wrongful dominion or control over property to the detriment of the rights of the actual owner."). Because Foodonics does not allege -- and does not have -- an ownership interest in the 2015 Refund, Foodonics cannot state a cause of action against the Trust for conversion of the 2015 Refund.

### Fourth Affirmative Defense
### (Failure to Sue the Proper Party as to Counts I, II, and III)

6.      Pursuant to the Florida Trust Code, Foodonics' claims in Count I (breach of contract), Count II (unjust enrichment) and Count III (conversion) are barred because, after the death of a settlor (Jean Klempf), no action may be brought against a trust that is dependent on the alleged individual liability of the settlor. Section 736.104(1), Fla. Stat. Such claims must be first presented and enforced against the Settlor's estate. *See Ziino v. Baker*, 5:07-cv-217-Oc-10GRJ, 2007 WL 2433902, at *2 (M.D. Fla. Aug. 22, 2007) (holding that the Trust was not a proper party because the alleged actions were dependent upon the individual liability of the Settlor); *Estate of Read v. A.D.K. Properties*, 766 So. 2d 393 (Fla. 2d DCA 2000) (holding that the plaintiff did not have a cause of action because the alleged contractual obligation did not appear from the record to be a debt of the Trust).[2]

---

[2] *See also, Becklund v. Fleming*, 869 So. 2d 1, at fn. 2 (Fla. 2d DCA 2003) (holding that Florida law prohibits a creditor from filing, after the death of the grantor, a direct action against a revocable trust based on a claim that is dependent on the individual liability of the grantor); *Tobin v. Damian*, 723 So. 2d 396 (Fla. 4th DCA 1999) (holding that a plaintiff could not assert claims directly against a trust because the claims were not yet enforceable); *Klingman Furniture Co., Inc. v. Leslie E. Tassell Trust*, Docket No. 282727, 2009 WL 350871 (Ct. of Appeal, Mich., Feb. 12, 2009) (applying Florida law and holding that the "plain language" of the Florida Statutes barred claims against the Trust because it had to be brought against the decedent's estate).

7.     In this case, the income tax liability for 2015 was not a Trust liability, it was Jean Klempf's individual income tax liability.   The 2015 Refund from the IRS was issued to Jean Klempf in her individual name based on her personal 1040.   Complaint, para. 23.   The Trust did not file tax returns and did not pay taxes. Foodonics is suing the wrong party because the refund did not belong to the Trust.   The Trust had nothing to do with the tax liability for 2015, it had nothing to do with the payment of the Distribution Amount and it had nothing to do with the receipt of the refund from the IRS.   The Trust was simply the recipient of an asset transfer by Jean Klempf in her individual capacity as the Grantor of the Trust.

8.     Paragraph 12(b) of the Redemption Agreement pertains to covenants between the Trust (which was the "Seller") and the Company.   While Jean Klempf made certain representations and warranties in her individual capacity and had obligations in her individual capacity as a "5K Seller," her obligations in an individual capacity were limited. Jean Klempf had no obligation under the Redemption Agreement to return any portion of the income tax refund.

9.     The Redemption Agreement attached to the Foodonics' complaint defines "Seller" as the Trust.   It identifies Jean Klempf separately in her individual capacity as "Jean." Jean Klempf is not referred to in her individual capacity as a "Party." The Redemption Agreement included specific references to Jean Klempf in her individual capacity but she was not referred to in her individual capacity as the "Seller."

10.     As alleged in paragraph 30 of the complaint, the communications from Foodonics and Jacques Klempf to Jean Klempf regarding the refund check were addressed directly to Jean Klempf (not to the Trust).  The complaint does not allege that Foodonics ever attempted to recover the 2015 Refund from the Trust.

11.     Accordingly, the claims asserted by Foodonics in Counts I, II and III of the complaint against the Trust are barred by the Florida Trust Code.

### Fifth Affirmative Defense
**(Failure to State a Cause of Action as to Count IV)**

12.     To survive a motion to dismiss, "[a] party seeking declaratory judgment first is required to file an 'appropriate pleading' that complies with the requirements of Rule 8." *United States v. DeKalb County*, 1:10-cv-4039-WSD, 2011 WL 6369569, at *11 (N.D. Ga. Oct. 11, 2011).

13.     In support of its claim for a declaratory judgment, Foodonics alleges that it received a settlement demand, together with a draft complaint from the Trust which asserted claims for the breaches of its fiduciary duties, fraudulent omissions and violations of Federal and State securities laws.

14.     Those allegations do not satisfy Rule 8 because they do not allege sufficient facts upon which declaratory relief can be granted.  *Foodonics did not even attach the complaint upon which it seeks a declaratory judgment.*

15.     Because Count IV does not allege *any* facts upon which a court could determine whether Foodonics violated state or federal securities laws, committed fraud, made negligent misrepresentations to the Trust or breached its fiduciary duties

to the Trust, Foodonics has failed to allege "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

<u>**Sixth Affirmative Defense**</u>
**(Declaratory Relief Sought for an Improper Purpose as to Count IV)**

16.     Courts have properly declined jurisdiction over declaratory judgment actions when it appears that the plaintiff filed the action to gain a procedural advantage and preempt the forum choice of the defendants:

> The Declaratory Judgment Act was not designed to countenance such procedural manipulation of forums and actions. In fact, the misuse of the Declaratory Judgment Act to gain a procedural advantage and preempt the forum choice of the plaintiff in the coercive action militates in favor of dismissing the declaratory judgment action.

> *Federal Ins. Co. v. May Dep't Stores Co.*, 808 F.Supp. 347, 350 (S.D. N.Y. 1992).

> When a party files a declaratory judgment action for purposes of "procedural fencing," a court should exercise its discretion and dismiss the case. . . . [T]he declaratory remedy is not a tactical device whereby a party who would be a defendant in a coercive action may choose to be a plaintiff if he can beat the other party to the courthouse.

> *Casualty Indemn. Exch. v. High Croft Enter., Inc.*, 714 F.Supp. 1190, 1193 (S.D. Fla. 1989) (citations omitted).

17.     In this case, Foodonics misused the Declaratory Judgment Act by filing this action in an attempt to gain a procedural advantage by beating the Trust to the courthouse and preempting the forum choice of the defendants.   This improper purpose is apparent from the allegations of the complaint.

18.     Accordingly, the Court should dismiss this action because Foodonics has engaged in procedural fencing and raced to the courthouse for tactical advantage.

<u>Seventh Affirmative Defense</u>
**(Failure to Join an Indispensable Party as to Count IV)**

19.     Under Florida law, an indispensable party is one whose interest in the subject matter is such that if he is not joined, a complete and efficient determination of the equities and rights of the other parties is not possible.   *See Grammer v. Roman,* 174 So. 2d 443 (Fla. 2d DCA 1965).

20.     In this case, it affirmatively appears from the face of the complaint that Foodonics is seeking a declaratory judgment as to a complaint it received from "DENNIS BLACKBURN, As Special Trustee of the Laura Jean Klempf Trust." Complaint at para. 48.   It is obvious that Dennis Blackburn, as Special Trustee, is an indispensable party to determine since he is the plaintiff of the very complaint as to which Foodonics is seeking a declaratory order.   In addition, under Florida law the general rule is that Trustees are indispensable parties to litigation involving all actions affecting the assets of a Trust.   *First Nat'l Bank of Hollywood v. Broward Nat'l Bank of Fort Lauderdale,* 265 So.3d 377, 378 (Fla. 4th DCA 1972).

21.     Accordingly, the Court should dismiss this action because Foodonics has failed to join an indispensable party.

### Eighth Affirmative Defense
**(Setoff -- Breach of Fiduciary Duty of Disclosure -- As to All Counts)**

22.     The Jean Klempf Trust realleges and incorporates herein by reference the allegations set forth in paragraphs 1 through 49 and 50 through 61 of the counterclaim set forth in this pleading.

23.     As a direct and proximate result of the wrongful conduct of Jacques Klempf and Foodonics, including their breach of the fiduciary duty of disclosure, the Jean Klempf Trust suffered economic losses and damages in an amount exceeding $23,200,000, exclusive of interest, attorneys' fees, and other costs.

24.     By reason of the foregoing, the Jean Klempf Trust has a right and entitlement to a monetary set-off as to each of the claims asserted by plaintiff in the complaint.

### Ninth Affirmative Defense
**(Setoff -- Breach of Fiduciary Duty of Loyalty -- As to All Counts)**

25.     The Jean Klempf Trust realleges and incorporates herein by reference the allegations set forth in paragraphs 1 through 49 and 62 through 73 of the counterclaim set forth in this pleading.

26.     As a direct and proximate result of the wrongful conduct of Jacques Klempf and Foodonics including their breach of the fiduciary duty of loyalty, the Jean

Klempf Trust suffered economic losses and damages in an amount exceeding $23,200,000, exclusive of interest, attorneys' fees, and other costs.

27.    By reason of the foregoing, the Jean Klempf Trust has a right and entitlement to a monetary set-off as to each of the claims asserted by plaintiff in the complaint.

### Tenth Affirmative Defense
**(Setoff -- Violation of Florida Securities Act -- As to All Counts)**

28.    The Jean Klempf Trust realleges and incorporates herein by reference the allegations set forth in paragraphs 1 through 49 and 74 through 89 of the counterclaim set forth in this pleading.

29.    As a direct and proximate result of the wrongful conduct of Jacques Klempf and Foodonics, including their violation of the Florida Securities Act, the Jean Klempf Trust suffered economic losses and damages in an amount exceeding $23,200,000, exclusive of interest, attorneys' fees, and other costs.

30.    By reason of the foregoing, the Jean Klempf Trust has a right and entitlement to a monetary set-off as to each of the claims asserted by plaintiff in the complaint.

### Eleventh Affirmative Defense
**(Setoff -- Violation of § 10(b) of the Securities Exchange Act and Rule 10b-5 -- As to All Counts)**

31.    The Jean Klempf Trust realleges and incorporates herein by reference the allegations set forth in paragraphs 1 through 49 and 90 through 101 of the counterclaim set forth in this pleading.

32.     As a direct and proximate result of the wrongful conduct of Jacques Klempf and Foodonics, including their violation of § 10(b) of the Securities Exchange Act and Rule 10b-5, the Jean Klempf Trust suffered economic losses and damages in an amount exceeding $23,200,000, exclusive of interest, attorneys' fees, and other costs.

33.     By reason of the foregoing, the Jean Klempf Trust has a right and entitlement to a monetary set-off as to each of the claims asserted by plaintiff in the complaint.

### Twelfth Affirmative Defense
### (Setoff -- Fraud -- As to All Counts)

34.     The Jean Klempf Trust realleges and incorporates herein by reference the allegations set forth in paragraphs 1 through 49 and 109 through 116 of the counterclaim set forth in this pleading.

35.     As a direct and proximate result of the wrongful conduct of Jacques Klempf and Foodonics, including their fraudulent omissions, the Jean Klempf Trust suffered economic losses and damages in an amount exceeding $23,200,000, exclusive of interest, attorneys' fees, and other costs.

36.     By reason of the foregoing, the Jean Klempf Trust has a right and entitlement to a monetary set-off as to each of the claims asserted by plaintiff in the complaint.

## Thirteenth Affirmative Defense
### (Setoff -- Negligent Misrepresentation -- As to All Counts)

37.     The Jean Klempf Trust realleges and incorporates herein by reference the allegations set forth in paragraphs 1 through 49 and 117 through 122 of the counterclaim set forth in this pleading.

38.     As a direct and proximate result of the wrongful conduct of Jacques Klempf and Foodonics, including their negligent misrepresentations, the Jean Klempf Trust suffered economic losses and damages in an amount exceeding $23,200,000, exclusive of interest, attorneys' fees, and other costs.

39.     By reason of the foregoing, the Jean Klempf Trust has a right and entitlement to a monetary set-off as to each of the claims asserted by plaintiff in the complaint.

## Fourteenth Affirmative Defense
### (Setoff -- Breach of Representations and Warranties -- As to All Counts)

40.     The Jean Klempf Trust realleges and incorporates herein by reference the allegations set forth in paragraphs 1 through 49 and 123 through 135 of the counterclaim set forth in this pleading.

41.     As a direct and proximate result of the wrongful conduct of Jacques Klempf and Foodonics, including their breach of representations and warranties, the Jean Klempf Trust suffered economic losses and damages in an amount exceeding $23,200,000, exclusive of interest, attorneys' fees, and other costs.

42.    By reason of the foregoing, the Jean Klempf Trust has a right and entitlement to a monetary set-off as to each of the claims asserted by plaintiff in the complaint.

## COUNTERCLAIM AGAINST FOODONICS
## INTERNATIONAL, INC. AND KEVIN JACQUES KLEMPF

Defendant/counterclaim plaintiff, Dina Klempf Srochi, as Trustee of the Laura Jean Klempf Revocable Trust (the "Jean Klempf Trust" or the "Trust") and counterclaim plaintiff, Dennis L. Blackburn, as Assistant Trustee of the Jean Klempf Trust (collectively, the "counterclaim plaintiffs"), sue plaintiff/counterclaim defendant Foodonics International, Inc. and counterclaim defendant Kevin Jacques Klempf (collectively, the "counterclaim defendants"), and allege:

### The Parties

1.    Dina Klempf Srochi, a resident of Georgia, is the Trustee of the Jean Klempf Trust.

2.    Dennis L. Blackburn, a resident of Florida, is the Assistant Trustee of the Jean Klempf Trust.[3]

3.    Counterclaim defendant, Foodonics International, Inc. ("Foodonics" or the "Company"), is a Florida corporation with its principal place of business in Duval County, Florida.

4.    Counterclaim defendant, Kevin Jacques Klempf ("Jacques Klempf"), is a resident of St. Johns County, Florida, and was at all times relevant to this

---

[3] Dennis Blackburn has been joined in this counterclaim pursuant to Rules 13 and 19, Federal Rules of Civil Procedure.

counterclaim the President of Foodonics, the Chairman of its Board of Directors and its majority shareholder.[4]

5.      Cal-Maine Foods, Inc. ("Cal-Maine") is a Delaware corporation doing business across the United States, including the State of Florida.  Cal-Maine is the largest producer and marketer of shelled eggs in the United States.  Cal-Maine is not, at this time, a named counterclaim defendant.

6.      Adolphus B. Baker ("Dolph Baker") is the President, Chief Executive Officer and Chairman of the Board of Cal-Maine.  Dolph Baker is not, at this time, a named counterclaim defendant.

## General Allegations

7.      In 1948, Edward Klempf started the Dixie Egg Company in Jacksonville, Florida.  Edward Klempf was 21 years old.  The operation grew over the years, from a small buyer and seller of eggs, to a large-scale operation with facilities spreading over three states utilizing the latest technologies to maximize production.  Through a corporate restructure, Dixie Egg ultimately became the marketing arm for its holding company, Foodonics.

8.      Edward Klempf, with the continuous support and assistance of Jean Klempf, provided the leadership and direction for the Company until his death in October, 2002.  By this time, the Company had become one of the preeminent egg producers in the United States, possessing several operating companies, feed mills

---

[4] Jacques Klempf has been joined in this counterclaim pursuant to Rules 13 and 19, Federal Rules of Civil Procedure.

and high-tech processing plants, including operations in Florida, Georgia, Alabama and Puerto Rico. Foodonics also owned valuable franchise rights as a franchisee of Egg-Land's Best, Inc.   As a franchisee of Egg-Land's Best, Foodonics had the exclusive franchise rights to sell eggs under the "Eggland's Best," "EB," and "Land O'Lakes" brand names for markets in Florida, Georgia, Alabama, Puerto Rico, the Bahamas and Cuba.

9.     Edward Klempf and Jean Klempf were married 49 years and had three children:   sons Marc Edward Klempf, Jacques Klempf and their daughter Dina Klempf Srochi.

10.     Following Edward's death, all of the Class A Voting Shares and the Class B Non-Voting Shares of Foodonics were owned directly by or for the benefit of Edward Klempf's widow, Jean Klempf, and their children and grandchildren as follows:

| Shareholder | Class A Voting Shares | Class B Non-Voting Shares |
|---|---|---|
| Jacques Klempf | 738,930 | 756,112 |
| Marc Klempf | 738,930 | 756,112 |
| Dina Klempf Srochi | 738,930 | 756,112 |
| Laura Jean Klempf, as Trustee of the Laura Jean Klempf Rev. Trust | 900,000 | 728,180 |
| Laura Jean Klempf and K. Jacques Klempf, as Trustees of the Marital Trust | 691,177 | 659,251 |
| Laura Jean Klempf and K. Jacques Klempf, as Trustees of the Family Trust | 422,033 | 402,539 |
| Kevin Jacques Klempf, as Trustee of the Julianne M. Klempf Irrevocable Trust | 0 | 17,182 |
| Kevin Jacques Klempf, as Trustee of the Alexandria R. Klempf Irrevocable Trust | 0 | 17,182 |

| Shareholder | Class A Voting Shares | Class B Non-Voting Shares |
|---|---|---|
| Kevin Jacques Klempf, as Trustee of the Heather J. Klempf Irrevocable Trust | 0 | 17,182 |
| Marc Klempf, as Trustee of the Nicholas B. Klempf Irrevocable Trust | 0 | 17,182 |
| Marc Klempf, as Trustee of the Zachary E. Klempf Irrevocable Trust | 0 | 17,182 |
| Dina Srochi, as Trustee of the Sara L. Srochi Irrevocable Trust | 0 | 17,182 |
| Dina Srochi, as Trustee of the Alan J. Srochi Irrevocable Trust | <u>0</u> | <u>17,182</u> |
| **Total** | <u>4,230,000</u> | <u>4,178,580</u> |

11.     At all times material to this counterclaim, Jean Klempf was a member of the Board of Directors of Foodonics. After Edward passed away, and due to Jean Klempf's health and advancing years, Jacques Klempf exercised wide latitude in operating the Company as President.

12.     Between 2002 and 2015, Jacques Klempf was the President of Foodonics, Chairman of the Foodonics Board of Directors and a majority shareholder of this family-owned company.

13.     Jacques Klempf took advantage of his position at the Company to leverage himself into an active role in the Egg Industry Association and to obtain positions on several egg industry boards. He also took advantage of his position at Foodonics to make business connections and friendships in the egg industry -- which was a small fraternity -- including a strong business and close personal friendship with the President of Cal-Maine, Dolph Baker. The Jacques Klempf and Dolph Baker

families often socialized at industry meetings and took family vacations together to Europe and elsewhere.

14.     As President of Foodonics, Jacques Klempf began on or before 2006 to embark on a systematic scheme to acquire all of Foodonics stock from his siblings and his mother at less than fair market value.

15.     Through a series of maneuvers culminating in 2006, Jacques Klempf took advantage of his position at the Company to squeeze out his sister and brother, Dina Klempf Srochi and Marc Klempf, as minority shareholders of the Company. Among other tactics used by Jacques Klempf, he purposely withheld distributions to shareholders (other than each year's allocable tax liability) and thereby precluded his siblings from realizing any return on their stock investment.   In the meantime, Jacques Klempf used Company assets to acquire real and personal property which he used for his personal benefit and extravagant lifestyle, including oceanfront homes and restaurants.

16.     As a result, in 2006 Jacques Klempf exploited his leverage by imposing an agreement on Marc Klempf and Dina Klempf Srochi by which they sold their shares of Foodonics stock to Jacques Klempf (the "2006 Shareholders Agreement"). Although not known to Jean Klempf at that time, Jacques Klempf made this purchase of stock (i) using Foodonics -- not personal -- monies and (ii) at a price which he knew was significantly less than its fair market value at that time.

17.     In the 2006 Shareholders Agreement, Jacques Klempf also strategically maneuvered to obtain from his mother, Jean Klempf, (i) a restriction not to sell her

shares of Foodonics stock during her lifetime and (ii) an agreement by which, on her death, her estate was obligated to sell the shares of her Foodonics stock to Jacques Klempf at a price computed by a formula, with the purchase price to be paid over an eight-year period. This "formula" provided for a 65% discount to the value of the Jean Klempf shares. Of course, this extraordinarily favorable discounted redemption price was designed to inure to the personal benefit of Jacques Klempf.

18. As a result of the 2006 Shareholders Agreement, Jacques Klempf had completed the maneuvers necessary to make himself the majority owner of Foodonics' stock (53.6%) leaving the Jean Klempf Trust as a minority shareholder (45.6%):

| Ownership as of a result of the 2006 Shareholder's Agreement | | | | |
|---|---|---|---|---|
| Shareholder | Class A Voting | Class B Non-Voting | Total Shares | % of Total |
| Laura Jean Klempf Rev. Trust | 1,591,177 | 1,387,431 | 2,978,608 | 45.6266% |
| K. Jacques Klempf | 2,216,790 | 1,281,278 | 3,498,068 | 53.5838% |
| Alexandria R. Klempf Irrev. Trust | - | 17,182 | 17,182 | 0.2632% |
| Julianne M. Klempf Irrev. Trust | - | 17,182 | 17,182 | 0.2632% |
| Heather J. Klempf Irrev. Trust | - | 17,182 | 17,182 | 0.2632% |
| **Total Shares** | **3,807,967** | **2,720,255** | **6,528,222** | **100.00%** |

### Jacques Klempf's Redemption
### Proposal to Jean Klempf

19. In 2008, after Jacques Klempf had completed the purchase of the Foodonics shares of stock owned by his siblings and other family trusts, he began his efforts to buy out the shares of stock owned by his mother through the Jean Klempf

Trust. Jacques Klempf was informed, however, that his mother was not interested in selling her shares at that time and, instead, intended to remain a shareholder and an active member of the Foodonics Board of Directors. Attached as Exhibit A is a letter dated October 10, 2008, by which counsel for Jean Klempf informed counsel for Jacques Klempf that Jean Klempf was "not interested in selling any of her . . . shares at this time."

20.     From 2006 to December 2015, Jacques Klempf was in dominant control of Foodonics as President and a 53.5838% owner of the Company. As a result, the Jean Klempf Trust, as a minority shareholder, could not receive distributions (other than each year's allocable tax liability) without Jacques Klempf's approval. Jean Klempf was therefore at Jacques Klempf's mercy in order for her Trust to realize any return on its investment. The control and actions taken by Jacques Klempf as President, Chairman of the Board and majority shareholder of Foodonics during this period, including the lack of distributions to shareholders, caused Jean Klempf continued concern and discomfort as a director and shareholder of the Company.

21.     In 2013, Jacques Klempf renewed his efforts to pressure his mother to sell the stock owned by her Trust through a proposed redemption transaction with Foodonics. Jacques Klempf knew that his redemption proposal, if successful, would make him the sole owner of more than 98% of the Foodonics stock. For example, in an October 2013 meeting where Jean Klempf was refusing to sell her shares to Foodonics, Jacques Klempf told Jean Klempf (who was 80 years old at the time), "I

can go a lot longer than you can," knowing that upon Jean Klempf's death, the Company would be able to redeem Jean Klempf and the Trust's shares at the deep 65% discount provided by the 2006 Shareholders Agreement.

22.     In response to Jacques Klempf's efforts to persuade his mother to agree to a redemption transaction, Jean Klempf made it clear to her son that she was not willing to proceed with the redemption transaction if he was contemplating a sale of the Company or its assets after the redemption.  Jacques Klempf knew his mother did not want to sell her stock back to the Company subject to a minority shareholder discount if Jacques Klempf intended to sell the Company or its assets -- or was even considering the possibility of such a sale to a third-party -- within two years or less after the redemption.  Jean Klempf did not want Jacques Klempf to obtain an unjust personal windfall for the sale of Foodonics at the expense of the Jean Klempf Trust and its beneficiaries.

23.     Between December 31, 2014 and December 31, 2015, to induce his mother and her Trust to proceed with the redemption transaction, Jacques Klempf represented to his mother and her representatives that he had not received any offers to purchase the Company and that he would not be seeking to sell the Company for "a good amount of years":

> I have not had any offers to purchase the company, nor are there any offers presently in play, **nor am I seeking to sell the company at this time.**
>
> I actually enjoy the day to day and farm life that this business allows me and hopeful **I have a good amount**

**of years left to create value** so that I can take care of my
family in the future.

> Email from Jacques Klempf dated
> December 31, 2014.

24.     On December 21, 2015, in reliance on (i) Jacques Klempf's
representations that he had not received any offers and would not be seeking to sell
the Company for "a good amount of years" and (ii) his duty to provide full and
current disclosures of all matters concerning Foodonics (including in particular, the
redemption transaction), the Jean Klempf Trust entered into a Settlement and
Redemption Agreement (the "Redemption Agreement"), by which all of the
Foodonics stock owned by the Jean Klempf Trust was to be "redeemed" by
Foodonics for the purchase price of $9,418,500, or approximately $3.16 per share.  A
copy of the Redemption Agreement is attached as Exhibit B.

25.     On December 31, 2015, a closing was held on the Redemption
Agreement by which all of the Foodonics stock owned by the Jean Klempf Trust was
"redeemed" by Foodonics (the "Redemption Sale").  As a result of the Redemption
Sale, Jacques Klempf became the owner of 98.55% of all issued Foodonics stock.

26.     On April 20, 2016, less than four months after Jacques Klempf
completed the redemption transaction with his mother, Foodonics and Cal-Maine
executed a non-disclosure agreement which resulted in a $71.6 million sale of
substantially all of Foodonics' operating assets to Cal-Maine less than 7 months later.

27.     On October 16, 2016, only 10 months after the Redemption Sale, Cal-Maine purchased substantially all of Foodonics' operating assets for the sum of $71,643,000 or $10.97 per share (the "Cal-Maine Sale").[5]

28.     As a result of the Redemption Sale and the Cal-Maine Sale, Jacques Klempf and Foodonics realized the objective of their scheme -- Foodonics had purchased the stock of the Jean Klempf Trust at the price of $3.16 per share and sold the company's egg operating assets less than a year later for an equivalent price of $10.97 per share of Foodonics' stock.  Had Jacques Klempf and Foodonics paid the Jean Klempf Trust for its stock at the same price per share as Jacques Klempf realized from the sale of assets to Cal-Maine, the Trust would have been paid  $32,675,330 -- or $23,200,000 more than the Jean Klempf Trust was paid at the Redemption Sale.

29.     Although Jacques Klempf and Foodonics expressly represented in the Redemption Agreement that "there are no current offers pending nor ongoing discussions ... for the sale of all or substantially all of the assets of the Company," Jacques Klempf admitted after the Cal-Maine sale that there had been prior undisclosed discussions between Cal-Maine and Foodonics occurring on or before the date of the Redemption Agreement which included communications by which, among other things, the "Cal-Maine Foods team . . . had made it known that it wanted to be involved if [Jacques Klempf] ever wanted to sell" Foodonics.

---

[5] Because the Cal-Maine transaction was an asset sale, Foodonics remained responsible for the payment of certain Company debts.  At the time of the Cal-Maine Sale, however, the value of the assets owned by Foodonics that were not part of the Cal-Maine Sale exceeded the amount which would have been necessary to have paid off all such debts and to redeem the stock owned by the Jean Klempf Trust on December 31, 2015.

## Jacques Klempf's Fraud by Omission

30.     Foodonics and Jacques Klempf, as the President and Chairman of the Board of Directors of Foodonics, had a fiduciary duty to disclose all information that Jean Klempf and the Trust might have found material in making the decision whether to allow the redemption of the Trust's stock at the time of redemption including, in particular, all information which could affect the value of stock in the Redemption Sale.

31.     Jacques Klempf and Foodonics also had the fiduciary duties of loyalty and fair dealing with Jean Klempf and the Trust in all matters concerning Foodonics and the Trust's ownership interest in Foodonics.

32.     Jean Klempf and the Trust relied on the faithful performance of these duties by Jacques Klempf and Foodonics which, as set forth below, were breached.

33.     Jean Klempf and the Trust executed the Redemption Agreement and later closed on the Redemption Sale (i) believing that Jacques Klempf had not engaged in any ongoing discussions or received any offers and had no intention, strategy or plan to sell Foodonics for a "good amount of years," and (ii) relying on Jacques Klempf to faithfully perform his fiduciary duties to Jean Klempf and the Trust through the closing on the Redemption Sale.

34.     Unknown to Jean Klempf and the Trust, however, Jacques Klempf had considered and decided well in advance of the Redemption Sale to unfairly enrich himself by acting upon the business opportunity to sell the Foodonics' assets to Cal-Maine -- a known ready, willing and able buyer -- after Jacques Klempf induced his

mother to surrender the Trust's shares for a reduced price through the redemption transaction. As a result, Foodonics and Jacques Klempf enriched themselves, at the expense of the Jean Klempf Trust, by redeeming the Trust's stock at less than fair market value and by collecting additional sale proceeds of approximately $23,200,000 that would have been payable to the Jean Klempf Trust had the Redemption Sale not occurred. Had Jean Klempf known that Cal-Maine expressed on numerous occasions that it was a ready, willing and able buyer of Foodonics, Jean Klempf and the Trust could have (and would have) refused to sell the Trust's stock or, at the very least, inquired of Cal-Maine as to veracity and intensity of its intent to buy Foodonics.[6]

35.    The Trust's investigation has revealed that on numerous business and social occasions between 2009 and 2015, Dolph Baker informed Jacques Klempf that Cal-Maine wanted to buy Foodonics whenever Jacques Klempf was ready to sell. Based on his communications with Dolph Baker and knowledge of the egg industry, Jacques Klempf knew that Cal-Maine had no long term debt and had set aside a substantial amount of cash for the purpose of fulfilling a growth strategy of acquiring

---

[6] During the Redemption Agreement negotiations, Jean Klempf requested a provision by which the Trust would be paid an additional amount for its stock if Jacques Klempf sold Foodonics within two years of the closing of the Redemption Agreement. Although Jacques Klempf rejected the provision, Jean Klempf proceeded with the redemption transaction based on Jacques Klempf's assurances and representations that (i) he would not be seeking to sell the Company for "a good amount of years" and (ii) he had no "ongoing discussions" with anyone to sell the Company. In addition, based on what Jean Klempf thought were bonds of devotion and love between her and her son, she trusted and relied upon Jacques Klempf not to conceal material information from her or engage in deceit.

Subsequent events now reveal that her trust was misplaced and why Jacques Klempf rejected what should have been a provision of no consequence to him -- the requested "sale recapture" provision would have thwarted Jacques Klempf's undisclosed plan to sell the Company so that he could keep for himself all of the sale proceeds that otherwise would have inured to the benefit of the Jean Klempf Trust. Jacques Klempf thereafter consummated his plan only 10 months after the Redemption Sale by selling Foodonics to Cal-Maine for $71.6 million and gobbling up for himself all of the proceeds of the sale as the 98.55% owner of the Foodonics stock.

independent egg producing facilities, hence the name "Cal-Maine" (California and Maine).  As a result of these communications and his knowledge, Foodonics and Jacques Klempf knew prior to the date of the Redemption Agreement and Redemption Sale date -- but intentionally failed to disclose -- that Cal-Maine was a ready, willing and able buyer of Foodonics.

36.    Therefore, during the time that Jacques Klempf and Foodonics owed the highest duties of loyalty and disclosure to Jacques Klempf's mother and the Trust (*i.e.* during the negotiations and ultimate consummation of the Redemption Sale), he and Foodonics intentionally failed to disclose that Cal-Maine was a ready, willing and able buyer of Foodonics and that his long intended sale of the Company to Cal-Maine could go forward -- without further ado -- as soon as Foodonics effected the Redemption Sale -- all for a much higher per share value than he had represented as fair to his mother and the Trust in the Redemption Agreement.

37.    Jacques Klempf's plan to sell Foodonics' assets after the Redemption Sale is further evidenced by and consistent with his long time "goal" to sell the Company when its yearly sales reach the $100 million dollar range:

> My goal is to drive this company's sales to over 100-million dollars one day, which I believe is very doable with many of the opportunities already in the pipeline.  It is certainly doable in the next 3 – 5 years, and if it is achieved I will be punting the proverbial football...I suppose depending on market conditions.
>
> Email from Jacques Klempf to Marc Klempf and Dina Srochi dated October 13, 2009.

It was, therefore, no mere coincidence that Jacques Klempf sold Foodonics to Cal-Maine in 2016 -- by September 30, 2015 the sales of Foodonics had exceeded $89 million and, by December 31, 2015, the sales had exceeded $108 million.

38.     Contrary to Jacques Klempf's prior representations that "he was not seeking to sell the company" and further evidencing his hidden strategy to squeeze Jean Klempf and the Trust out of the Company before the Cal-Maine Sale, Jacques Klempf admitted in a newspaper interview after the Cal-Maine Sale that he had known "the Cal-Maine team" for "a long time" and that Cal-Maine "had made it known it wanted to be involved if Klempf ever wanted to sell" the Company and that Jacques Klempf had "reached out" to his friend, Dolph Baker, to initiate a sales transaction:

> With the egg industry a small fraternity, Klempf said he had known the Cal-Maine Foods team a long time.  The company had made it known it wanted to be involved if Klempf ever wanted to sell Dixie Egg.
>
> . . .
>
> That time had come, Klempf said, because he did not have a succession plan . . .
>
> . . .
>
> So he reached out to Cal-Maine Foods, led by friend Dolph Baker, the CEO.
>
> Daily Record, November 8, 2016; Jacques Klempf on the Sale of Dixie Egg: *"I just think the time is right."*

This is the type of information which Jacques Klempf should have disclosed pursuant to his fiduciary duty to Jean Klempf and the Trust prior to the Redemption Sale so that Jean Klempf could have made an informed decision as to whether to allow the redemption of the Trust's stock upon the terms being proposed by Jacques Klempf and Foodonics. Jacques Klempf failed to honor that duty to his mother and her Trust.

39.    In the Redemption Agreement, Foodonics and Jacques Klempf made the following so-called "representations and warranties" to Jean Klempf and the Trust regarding the prospective sale of the Company after the redemption closing:

> **10.    Representations and Warranties.**
> . . .
> (b)    **From the Foodonics Parties. . . .**
> . . .
> (iii) The Foodonics Parties hereby jointly and severally represent and warrant to the Seller that as of the Closing Date: (i) there are no current offers pending nor ongoing discussions: (A) for the sale of all or substantially all of the assets of the Company; (B) for the sale by Jacques of his stock in the Company or (C) to effect a merger, stock exchange or other transaction which would have the effect of either Jacques no longer holding a majority of the outstanding shares of stock of the Company or the Company no longer owning substantially all of the assets that it currently owns (collectively referred to as a "Realization Event"); (ii) the Foodonics Parties have not received any written offers to effect a Realization Event within the twelve (12) months prior to the date of this Agreement.

> Redemption Agreement, ¶ 10(b)(iii), p. 10, Exhibit B.

The representations that there were no "ongoing discussions" or "current offers pending" regarding the sale of the Company were false -- Jacques Klempf and the President and CEO of Cal-Maine, Dolph Baker, were, in fact, having "ongoing discussions" with each other regarding the possible sale of Foodonics to Cal-Maine. It was from these discussions that Jacques Klempf knew that Cal-Maine was a ready, willing and able buyer of Foodonics as soon as Jacques Klempf "wanted to sell."

40.     Moreover, Jacques Klempf admitted in an email dated January 6, 2017, that "[i]n April 2015, I contacted Cal-Maine to see if they had an interest [in purchasing Foodonics]" . . . 9 months before the Redemption Sale.  This certainly constitutes "ongoing discussions" despite Jacques Klempf's and Foodonics' representations to the contrary.

41.     In addition, these "representations and warranties" were fraudulently misleading because they were, at best, only deceptive "half-truths."  A full disclosure of the facts regarding the prospective sale of Foodonics' assets to Cal-Maine would have disclosed all material information which included:   (i) Jacques Klempf had considered and decided to sell the Company before the Redemption Sale; (ii) Jacques Klempf had a ready, willing and able buyer of the Foodonics' assets waiting on standby; (iii) Jacques Klempf had continuous discussions with Dolph Baker between 2009 and 2015 regarding a prospective sale of Foodonics to Cal-Maine which were not disclosed to Jean Klempf; and (iv) Jacques Klempf had "reached out" to Cal-Maine before the closing on the Redemption Agreement to discuss the Cal-Maine Sale which was ultimately consummated on October 16, 2016.

33

42.     Moreover, and in any event, these "representations and warranties" cannot cure Jacques Klempf and Foodonics' failure to disclose the foregoing material information which was omitted in connection with the Redemption Sale. Instead, the counterclaim defendants had a duty to disclose these facts not only because they were necessary to render other disclosures not misleading, but also because of the fiduciary duties of loyalty and disclosure which they owed to the Trust particularly when, as here, a "closed corporation" is redeeming its own stock. Had the counterclaim defendants disclosed this omitted material information, Jean Klempf and the Trust would not have agreed to the redemption of the stock owned by the Jean Klempf Trust upon the terms proposed by Jacques Klempf and Foodonics.

43.     Jacques Klempf, for example, had a duty to disclose all negotiations or communications he had with Dolph Baker from 2009 to 2015 regarding the sale of Foodonics. The Trust's investigation has now revealed that the sale of Foodonics to Cal-Maine was a constant subject of discussion between Jacques Klempf and Dolph Baker as evidenced by Jacques Klempf's 2009 email in which Jacques Klempf states that Cal-Maine had "approached [him] on more than one occasion" in regard to its interest in acquiring the Company and that he believed $30 million for the Company was "a very real number" that Dolph Baker had "casually thrown around over a drink in Atlanta…":

> The value of the company has increased significantly in the last 3-years. . . . **I have been approached on more than one occasion from Cal-Maine Foods and Land O'Lakes regarding my interest to sell the company.** All three other Florida companies Cal-Maine has purchased, Hillandale Farms 55-million (twice our size

5-years ago), Zephyr Egg Company (29-million, a little smaller than us) and Tampa Farm Service for 60-million (twice our size). **The 30-million dollar figure is in my opinion a very real number, which was casually thrown around over a drink in Atlanta back in January, with Dolph Baker the president of Cal-Maine Foods.** Even more is that Cal-Maine really needs to protect their turf, and an outsider will be a disruption on many fronts with their business in Florida and Georgia. For an outsider looking at Florida, Dixie Egg Company is the only entry into this market.

> Email from Jacques Klempf to Marc Klempf and Dina Srochi dated October 13, 2009.

44.     In addition to the foregoing, Jacques Klempf and Foodonics failed to disclose material information in connection with the Redemption Sale relating to the Company's valuation that was subsequently disclosed by them to Cal-Maine in connection with the Cal-Maine Sale. As reflected in Cal-Maine's Form 10-Q filed with the United States Securities and Exchange Commission after the Redemption Sale, Cal-Maine determined the value of Foodonics' assets to be $71,643,000 "based on significant input that are not observable in the markets":

> [T]he following table presents the preliminary fair value of the assets acquired and liabilities assumed (in thousands):

| | |
|---|---:|
| Inventory | $   7,669 |
| Property, plant and equipment | 38,683 |
| Intangible assets | 24,000 |
| Liabilities assumed | (2,005) |
| Total identifiable net assets | 68,347 |
| Goodwill | 3,296 |
| Purchase price | 71,643 |
| Deferred purchase price | (3,000) |
| Cash consideration paid | $  68,643 |

> These fair value measurements were primarily based on significant input that are not observable in the markets.

> Cal-Maine Foods, Inc., Quarterly Report (Form 10-Q), at 9-10 (Dec. 22, 2016).

The "significant input" Cal-Maine received regarding the "fair value measurement" of Foodonics' assets was provided, in large part, by Jacques Klempf and Foodonics which constituted material information which should have also been provided, but was not, to Jean Klempf or her Trust in connection with the Redemption Sale. As a result of the fraudulent omissions and misconduct of Jacques Klempf and Foodonics, the Jean Klempf Trust agreed to the redemption of its stock at an inopportune time and for far less than it was worth.

45.  On January 6, 2017, Jacques Klempf sent an email to a Trust representative which purported to explain how recent changes in "industry dynamics" caused Jacques Klempf to change his mind and sell all of Foodonics' operating assets only four months after the Redemption Sale (the "January 6, 2017 email"), a copy of which is attached as Exhibit C. The January 6, 2017 email, however, only further evidences Jacques Klempf's deceit and the breach of his fiduciary duties because:

a.  The January 6, 2017 email states that:

> In January of 2016, industry dynamics really started to change when McDonalds announced that they were going 100% cage free.

This statement is false -- McDonald's "announced" that it was going to "cage-free" eggs in a press release dated September 9, 2015 -- four months before

the Redemption Sale.  See McDonald's Corporate Press Release dated September 9, 2015, attached as Exhibit D.

b.      Jacques Klempf further stated in his January 6, 2017 email that the McDonald's announcement in "January of 2016 . . . started a domino effect by almost every single foodservice operator and retail chain in the entire country." This statement was also false -- McDonald's was following an existing market trend of using cage-free eggs which had already been adopted by several national retail operations, including General Mills and Wal-Mart.  See *Los Angeles Times*, July 7, 2015 *"General Mills moving to cage-free eggs, joining Wal-Mart*," a copy of which is attached as Exhibit E.

c.      The "cage-free" market trend and the other "industry dynamics" described by Jacques Klempf in his January 6, 2017 email were all known to Foodonics and Jacques Klempf before he purchased the stock of his mother's Trust at the Redemption Sale on December 31, 2015 -- these were not industry trends which Foodonics and Jacques Klempf only "discovered" during the four month period between December 31, 2015 and April, 2016 (when he purportedly "contacted" Cal-Maine to sell the Company).

d.      Due to these "industry dynamics" -- which Foodonics and Jacques Klempf knew and fully understood before the Redemption Sale -- Jacques Klempf had the motivation and intent -- and had already made the decision -- to sell the Company before the Redemption Sale.

e.      Foodonics and Jacques Klempf breached their fiduciary duties to the Jean Klempf Trust by not disclosing these "industry dynamics" and the impact

37

they had, or at least could have had, on Jacques Klempf's decision to sell the Company -- all of which was information material to the value of the Trust's shares at the time of the Redemption Sale.

46.     By reason of the foregoing, the counterclaim defendants each breached their fiduciary duties -- and engaged in fraud and deceit -- by withholding the following material information from Jean Klempf and the Jean Klempf Trust prior to the Redemption Sale:

(i)     Jacques Klempf knew before the Redemption Agreement was executed that he intended to sell the Company assets after the Redemption Sale;

(ii)    Jacques Klempf falsely represented to the Trust that he had no intention, plan or strategy to sell the Company for "a good amount of years";

(iii)   Jacques Klempf had a ready, willing and able buyer of the Foodonics' assets waiting on standby;

(iv)    Jacques Klempf had regular and consistent discussions with Dolph Baker and Cal-Maine about a prospective sale of Foodonics to Cal-Maine before, during and after the negotiations leading up to the execution of the Redemption Agreement;

(v)     Jacques Klempf "reached out" to Cal-Maine in April 2015 to discuss a sale of the Company (contrary to his representations in the Redemption Agreement);

(vi)     that Jacques Klempf had known "the Cal-Maine team" for "a long time" and that Cal-Maine "had made it known it wanted to be involved if Klempf ever wanted to sell" the Company;

(vii)    that Cal-Maine "had made it known" in "ongoing discussions" that it wanted to be involved if Klempf ever wanted to sell Dixie Egg;

(viii)   that Cal-Maine had expressed an interest "on more than one occasion" to buy the Company, including an "expression of interest" to buy the Company in 2009 for $30 million;

(ix)     Jacques Klempf had a goal to sell the Company when sales reached $100 million dollars;

(x)      Jacques Klempf intended to sell the Company "because he did not have a succession plan";

(xi)     the "cage-free" market trend and other "industry dynamics" which Jacques Klempf considered to be material to the value of the Company;

(xii)    the "cage-free" market trend and other "industry dynamics" which were material to Jacques Klempf's sale of the Company less than 11 months after the Redemption Sale; and

(xiii)   by withholding material information during the Redemption Agreement negotiations relating to the Company's value which was soon provided thereafter to Cal-Maine in connection with the Cal-Maine Sale

(collectively, "the Material Information" or "Concealed Information").

47. The counterclaim defendants each knew or should have known that the Material Information should not have been concealed and, by doing so, acted in bad faith.

48. The counterclaim defendants each knew that by concealing and failing to disclose this Material Information, Jean Klempf and the Trust would be induced to proceed with the redemption transaction.

49. Jacques Klempf and Foodonics each had a duty to disclose the Material Information to Jean Klempf and the Trust because:

> (i) Jacques Klempf and Foodonics owed the Jean Klempf Trust, as a minority shareholder, a duty to fully and fairly disclose all information to the Trust in all dealings, including the redemption transaction;

> (ii) Jacques Klempf and Foodonics owed the Jean Klempf Trust a duty of loyalty not to act in their own self-interest to the detriment of the Trust;

> (iii) Jacques Klempf and Foodonics had special knowledge of the Material Information to which Jean Klempf and the Trust did not have access;

> (iv) Jean Klempf, based on what she thought were bonds of devotion and love between her and her son, trusted and relied upon Jacques Klempf not to conceal material information or engage in deceit in their personal and business transactions; and

> (v)     Foodonics and Jacques Klempf each had a duty to Jean Klempf to make a full and fair disclosure of the undisclosed Material Information and instead, made only partial and misleading statements to Jean Klempf and the Trust including that:
>
>> (a)     Jacques Klempf had no incentive, plan or strategy to sell the Company for "a good amount of years" and
>>
>> (b)     Jacques Klempf had no "ongoing discussions" with anyone regarding the sale of the Company.

50.     Both of the counterclaim defendants participated directly in the breaches of fiduciary duties and fraud by omission as alleged in this counterclaim.

51.     All conditions precedent to the maintenance of this action have occurred, been performed, or have been waived.

### Count One
### (Breach of Fiduciary Duty of Disclosure)

52.     This is an action against Jacques Klempf and Foodonics for damages based on the breach of fiduciary duty of disclosure.

53.     The Jean Klempf Trust realleges and incorporates by reference the allegations set forth in paragraphs 1 through 51 of this counterclaim.

54.     Jacques Klempf acted as a control person of Foodonics by virtue of his position as President and Chairman of the Board of Foodonics.

55.     Jacques Klempf influenced, directed and controlled the actions and fraudulent omissions set forth herein.

56.     By virtue of his position of authority, responsibility and control, Jacques Klempf had the ability to direct the purchase or redemption of securities by Foodonics and to prevent the actions and the concealment of the Material Information as set forth in this counterclaim.

57.     Moreover, Jacques Klempf profited directly or indirectly from the unwarranted and deceptive methods by which Foodonics purchased securities from the Jean Klempf Trust, which methods included the concealment of the Material Information which was important information as to the value of the Company's stock.

58.     Jacques Klempf and Foodonics had actual knowledge of the Concealed Information and fraudulent omissions of material fact set forth herein, or acted with disregard for the truth in that they failed to disclose accurate and complete facts, even though such facts were known to them.

59.     Jacques Klempf and Foodonics' fraudulent omissions were made for the purpose of enriching themselves at the expense of the Jean Klempf Trust.

60.     The Jean Klempf Trust relied upon the counterclaim defendants not to withhold Material Information or engage in fraud by omissions in connection with the Trust's decision to sell its stock to Foodonics pursuant to the Redemption Agreement.

61.     Jacques Klempf and Foodonics owed a fiduciary duty to the Jean Klempf Trust until the Jean Klempf Trust consummated the sale of shares in Foodonics on December 31, 2015.  The Jean Klempf Trust would not have sold its shares of Foodonics' stock pursuant to the Redemption Agreement but for the

fraudulent omissions of Jacques Klempf and Foodonics, which proximately caused the Jean Klempf Trust's damages.

62.    Because Jacques Klempf and Foodonics owed the Jean Klempf Trust fiduciary duties, a presumption of unfairness attaches to the redemption -- a presumption which cannot be overcome unless the counterclaim defendants show that (i) the transaction in question was fair and equitable to the Trust; (ii) the counterclaim defendants made reasonable use of the confidence placed in them by the Trust; (iii) the counterclaim defendants acted in the utmost good faith and exercised the most scrupulous honesty toward the Trust; (iv) the counterclaim defendants placed the Trust's interest before theirs and did not use the advantage of their position to gain any benefit for themselves at the Trust's expense; (v) the counterclaim defendants did not place themselves in any position in which their self-interest might conflict with their obligations to the Trust as fiduciaries; and (vi) the counterclaim defendants fully and fairly disclosed all important information to the Trust concerning the redemption.

63.    As a direct and proximate result of the fraudulent omissions and withholding of Concealed Information by Jacques Klempf and Foodonics, the Jean Klempf Trust suffered economic losses and damages in connection with the investment of their funds in an amount exceeding $23,200,000, exclusive of interest, attorneys' fees, and other costs.

WHEREFORE, the Jean Klempf Trust demands judgment against Jacques Klempf and Foodonics, jointly and severally, in an amount exceeding $23,200,000, together with interest, costs and attorneys' fees.

## Count Two
### (Breach of Fiduciary Duty of Loyalty)

64.     This is an action against Jacques Klempf and Foodonics for damages based upon breach of the fiduciary duty of loyalty.

65.     The Jean Klempf Trust realleges and incorporates by reference the allegations set forth in paragraph 1 through 51 of this counterclaim.

66.     Jacques Klempf acted as a control person of Foodonics by virtue of his position as President and Chairman of the Board of Foodonics.

67.     Jacques Klempf influenced, directed and controlled the actions, and fraudulent omissions set forth herein.

68.     By virtue of his position of authority, responsibility and control, Jacques Klempf had the ability to direct the purchase or redemption of securities by Foodonics and to prevent the actions and the concealment of the Material Information as set forth in this counterclaim.

69.     Moreover, Jacques Klempf profited directly or indirectly from the unwarranted and deceptive methods by which Foodonics purchased securities from the Jean Klempf Trust, which methods included the concealment of the Material Information which was important information as to the value of the Company's stock.

70.     Jacques Klempf and Foodonics had actual knowledge of the Concealed Information and fraudulent omissions of material fact set forth herein, or acted with disregard for the truth in that they failed to disclose accurate and complete facts, even though such facts were known to them.

71.     Jacques Klempf and Foodonics' misrepresentations and omissions were made for the purpose of enriching themselves at the expense of the Jean Klempf Trust.

72.     The Jean Klempf Trust relied upon the counterclaim defendants not to withhold Material Information or engage in fraud by omission in connection with the Trust's decision to sell its shares of stock to Foodonics pursuant to the Redemption Agreement.

73.     The Jean Klempf Trust would not have sold its shares of Foodonics' stock pursuant to the Redemption Agreement but for the fraudulent omissions of Jacques Klempf and Foodonics, which proximately caused the Jean Klempf Trust's damages.

74.     Because Jacques Klempf and Foodonics owed the Jean Klempf Trust fiduciary duties, a presumption of unfairness attaches to the redemption -- a presumption which cannot be overcome unless the counterclaim defendants show that (i) the transaction in question was fair and equitable to the Trust; (ii) the counterclaim defendants made reasonable use of the confidence placed in them by the Trust; (iii) the counterclaim defendants acted in the utmost good faith and exercised the most scrupulous honesty toward the Trust; (iv) the counterclaim defendants placed the Trust's interest before theirs and did not use the advantage of their position to gain any benefit for themselves at the Trust's expense; (v) the counterclaim defendants did not place themselves in any position in which their self-interest might conflict with

their obligations to the Trust as fiduciaries; and (vi) the counterclaim defendants fully and fairly disclosed all important information to the Trust concerning the redemption.

75.     As a direct and proximate result of the fraudulent omissions and withholding of Concealed Information by Jacques Klempf and Foodonics, the Jean Klempf Trust suffered economic losses and damages in connection with the investment of their funds in an amount exceeding $23,200,000, exclusive of interest, attorneys' fees, and other costs.

WHEREFORE, the Jean Klempf Trust demands judgment against Jacques Klempf and Foodonics, jointly and severally, in an amount exceeding $23,200,000, together with interest, costs and attorneys' fees.

## Count Three
### (Violation of Florida Securities Act)

76.     This is an action against Jacques Klempf and Foodonics for damages based upon Sections 517.301 and 517.241, Florida Statutes, Florida's Securities and Investor Protection Act (the "Florida Securities Act").

77.     The Jean Klempf Trust realleges and incorporates by reference the allegations set forth in paragraphs 1 through 51 of this counterclaim.

78.     Section 517.301 of the Florida Securities Act provides that any person (person is defined to include individuals or companies) who offers to buy or buys a security by means of an untrue statement of a material fact or an omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they are made, not misleading, is liable for damages to the person selling the security.

46

79.   The Foodonics stock held by the Jean Klempf Trust were securities within the meaning of the Florida Securities Act.

80.   The redemption by Foodonics of the stock owned by the Jean Klempf Trust was an offer to purchase and a purchase of that stock covered by the Florida Securities Act.

81.   As alleged above, Jacques Klempf and Foodonics violated Section 517.301 of the Florida Statutes in that, in connection with the offer, sale, or purchase of any investment or security, they: (a) employed devices, schemes, or artifices to defraud; (b) omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and (c) engaged in practices or courses of business which operated, or would operate, as a fraud or deceit upon any person, in connection with the sale or redemption of securities by the Trust.

82.   As alleged above, the fraudulent omissions of Jacques Klempf and Foodonics were misleading and omitted to state material facts necessary to make previous statements made, in light of the circumstances under which they were made, not misleading.  But for those fraudulent omissions, the Jean Klempf Trust would not have allowed its stock to be redeemed on the terms and conditions offered by Jacques Klempf and Foodonics.

83.   As alleged above, Jacques Klempf and Foodonics acted at all times with scienter based on an intent to deceive, manipulate or defraud or, at a minimum, negligence.  This scienter was evidenced by, among other things, Foodonics and

Jacques Klempf's breaches of fiduciary duty in withholding material information to which the Trust was entitled all for the personal gain of the counterclaim defendants.

84.     The omitted or misrepresented facts, statements, presentations and communications as alleged herein were material in that there was a substantial likelihood that a reasonable shareholder would consider these facts, statements, information or documents important in making decisions regarding the redemption or sale of the stock owned by the Jean Klempf Trust.

85.     The Jean Klempf Trust, in ignorance of the false and misleading statements and fraudulent omissions of Jacques Klempf and Foodonics as set forth herein and the deceptive and manipulative devices and contrivances employed by Jacques Klempf and Foodonics, relied to its detriment on such misleading statements and fraudulent omissions.

86.     As a result of the misleading statements and fraudulent omissions by the counterclaim defendants to state accurate and complete material facts, the Jean Klempf Trust has been damaged in an amount exceeding $23,200,000, exclusive of interest, attorneys' fees, and other costs.

87.     The Jean Klempf Trust was required to hire the undersigned attorneys to prosecute this action.  The Florida Securities Act provides that the Jean Klempf Trust may recover its reasonable attorneys' fees from the counterclaim defendants.

88.     Jacques Klempf was President of Foodonics, Chairman of its Board of Directors and owned over 53% of the outstanding stock during the period relevant to this action and is or was a control person under the Florida Securities Act who had

fiduciary duties to the Trust and is jointly and severally liable with Foodonics for the acts and omissions described above.

89.     Jacques Klempf also materially aided Foodonics, as the buyer of the Trust's securities, in acquiring the Trust's securities with an intent to deceive or defraud or with reckless disregard for the truth or law, and is jointly and severally liable as if he were the buyer of the Trust's securities.

90.     Pursuant to Section 517.211 of the Florida Statutes, every member, officer, partner, or agent of Foodonics which personally participated or aided in making the sale or purchase, is jointly and severally liable to Jean Klempf and the Trust in an action for damages.

91.     Accordingly, Jacques Klempf is jointly and severally liable to the Jean Klempf Trust for his participation or aiding in the purchase or sale of securities in violation of Section 517.301, Florida Statutes.

WHEREFORE, the Jean Klempf Trust demands judgment against Jacques Klempf and Foodonics, jointly and severally, in an amount exceeding $23,200,000, together with interest, costs and attorneys' fees.

### Count Four
### (Violation of § 10(b) of the Securities Exchange Act and Rule 10b-5)

92.     This is an action against Jacques Klempf and Foodonics for damages pursuant to Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. §78j and 17 C.F.R. § 240, 10b-5 (the "Federal Securities Act").

93.     The Jean Klempf Trust realleges and incorporates by reference the allegations set forth in paragraphs 1 through 51 of this counterclaim.

94.     The Foodonics' stock held by the Jean Klempf Trust were securities within the meaning of the Federal Securities Act.

95.     Foodonics' redemption of the stock owned by the Jean Klempf Trust was an offer to purchase and a purchase of that stock covered by the Federal Securities Act.

96.     As alleged above, Jacques Klempf and Foodonics violated the Federal Securities Act in that, in connection with the offer, sale, or purchase of any investment or security, they: (a) employed devices, schemes, or artifices to defraud; (b) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or (c) engaged in practices or courses of business which operated, or would operate, as a fraud or deceit upon any person, in connection with the sale or redemption of securities by the Trust.

97.     As alleged above, the fraudulent omissions of Jacques Klempf and Foodonics were misleading and omitted to state material facts necessary to make previous statements made, in light of the circumstances under which they were made, not misleading.  But for those misrepresentations and fraudulent omissions, the Jean Klempf Trust would not have allowed its stock to be redeemed on the terms and conditions offered by Jacques Klempf and Foodonics.

98.     As alleged above, Jacques Klempf and Foodonics acted at all times with scienter based on an intent to deceive, manipulate or defraud. This scienter was evidenced by, among other things, Foodonics and Jacques Klempf's breaches of fiduciary duty in withholding material information to which the Trust was entitled all for the direct personal gain of the counterclaim defendants.

99.     The omitted or misrepresented facts, statements, information, presentations and communications as alleged herein were material in that there was a substantial likelihood that a reasonable shareholder would consider these facts, statements, information or documents important in making decisions regarding the redemption or sale of the stock owned by the Jean Klempf Trust.

100.    The Jean Klempf Trust, in ignorance of the false and misleading statements and fraudulent omissions of Jacques Klempf and Foodonics as set forth herein and the deceptive and manipulative devices and contrivances employed by Jacques Klempf and Foodonics, relied to its detriment on such misleading statements and fraudulent omissions.

101.    As a result of the misleading statements and fraudulent omissions by the counterclaim defendants to state accurate and complete material facts, the Jean Klempf Trust has been damaged in an amount exceeding $23,200,000, exclusive of interest, attorneys' fees, and other costs.

102.    The Jean Klempf Trust was required to hire the undersigned attorneys to prosecute this action. The Federal Securities Act provides that the Jean Klempf Trust may recover its reasonable attorneys' fees from counterclaim defendants.

103. As a direct and proximate result of the fraudulent omissions and wrongful conduct of the counterclaim defendants, including violations of Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5, the Jean Klempf Trust suffered economic losses and damages in an amount exceeding $23,200,000, exclusive of interest, attorneys' fees, and other costs.

WHEREFORE, the Jean Klempf Trust demands judgment against Jacques Klempf and Foodonics, jointly and severally, in an amount exceeding $23,200,000, together with interest, costs and attorneys' fees.

## Count Five
### (Control Person Liability - § 20(a) of Securities Exchange Act)

104. This is an action against Jacques Klempf for damages pursuant to Section 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78t(a).

105. The Jean Klempf Trust realleges and incorporates by reference the allegations set forth in paragraphs 1 through 51 and 94 through 102 of this counterclaim.

106. Jacques Klempf acted as a control person, within the meaning of Section 20(a) of the Securities Exchange Act of 1934, of Foodonics by virtue of his position as President of Foodonics, Chairman of its Board of Directors and its majority shareholder.

107. Jacques Klempf influenced, directed and controlled the actions, misrepresentations, and omissions set forth herein.

108.    By virtue of his position of authority, responsibility and control, Jacques Klempf had the ability to direct the Redemption Sale and to prevent the actions and fraudulent omissions set forth in this counterclaim.

109.    Moreover, Jacques Klempf profited directly or indirectly from the unwarranted and deceptive methods by which the Redemption Sale was conducted.

110.    As a direct and proximate result of Jacques Klempf's fraudulent omissions and other wrongful conduct, including violations of Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5, the Jean Klempf Trust suffered economic losses and damages in an amount exceeding $23,200,000, exclusive of interest, attorneys' fees, and other costs.

WHEREFORE, the Jean Klempf Trust demands judgment against Jacques Klempf in an amount exceeding $23,200,000, together with interest, costs and attorneys' fees.

## Count Six
### (Fraud by Omission)

111.    This is an action for damages against Jacques Klempf and Foodonics for fraud by omission.

112.    The Jean Klempf Trust realleges and incorporates by reference the allegations set forth in paragraphs 1 through 51 of this counterclaim.

113.    As alleged herein, Jacques Klempf and Foodonics concealed and failed to disclose all information and material facts necessary for Jean Klempf and the Trust

to make a fully informed decision in regard to the sale of the Trust's stock pursuant to the Redemption Agreement and Sale.

114.    The purpose and effect of this scheme, plan, and unlawful course of conduct was, among other things, to conceal important information affecting the value of the Company's stock and misrepresent facts in order to induce the Jean Klempf Trust to enter into the Redemption Agreement with Jacques Klempf and Foodonics and subsequently close on the Redemption Sale.

115.    Jacques Klempf and Foodonics, pursuant to this scheme, plan, and unlawful course of conduct, knowingly and recklessly (i) withheld and failed to disclose information material to the Redemption Sale and (ii) issued, caused to be issued, or participated in the preparation, issuance and distribution of deceptive and materially false and misleading statements to Jean Klempf and the Jean Klempf Trust.

116.    The omitted and misrepresented facts, statements and communications alleged in this counterclaim were material in that there is a substantial likelihood that a reasonable investor would consider these omitted facts and statements, and all related documents, important in the decision by the Jean Klempf Trust to sell its shares to the counterclaim defendants pursuant to the Redemption Agreement.

117.    The Jean Klempf Trust, in ignorance of the fraudulent omissions set forth herein and the deceptive and manipulative devices and contrivances employed by Jacques Klempf and Foodonics, relied to its detriment on such misleading statements and omissions.

118.     The Jean Klempf Trust has been damaged as a result of the wrongful actions of the counterclaim defendants in an amount exceeding $23,200,000, exclusive of interest, attorneys' fees and other costs.

WHEREFORE, the Jean Klempf Trust demands judgment against Jacques Klempf and Foodonics, jointly and severally, in an amount exceeding $23,200,000, together with interest, costs and attorneys' fees.

### Count Seven
### (Negligent Misrepresentation)

119.     This is an action for damages against Jacques Klempf and Foodonics for negligent misrepresentation.

120.     The Jean Klempf Trust realleges and incorporates by reference the allegations set forth in paragraphs 1 through 51 of this counterclaim.

121.     The Material Information Jacques Klempf and Foodonics concealed and failed to disclose to the Jean Klempf Trust in connection with the Redemption Sale, as alleged above in paragraphs 30 through 44 herein, was material to the Redemption Sale and Jacques Klempf and Foodonics knew, or should have known, that such information was material.

122.     Jacques Klempf and Foodonics had a duty to supply the Trust with correct and complete information regarding the Redemption Sale, but failed to exercise reasonable care or competence in communicating the information described above to the Trust.

123.   The Trust would not have agreed to the redemption of its stock pursuant to the terms of the Redemption Agreement but for the withholding of the Concealed Information which were material omissions.

124.   As a result of the omissions and other actions of Jacques Klempf and Foodonics, as alleged above, the Jean Klempf Trust suffered damages in excess of $23,200,000, exclusive of interest, attorneys' fees, and other costs.

WHEREFORE, the Jean Klempf Trust demands judgment against Jacques Klempf and Foodonics, jointly and severally, in an amount exceeding $23,200,000, together with interest, costs and attorneys' fees.

## Count Eight
### (Breach of Representations and Warranties)

125.   This is an action for damages against Jacques Klempf and Foodonics for breach of representations and warranties.

126.   The Jean Klempf Trust realleges and incorporates by reference the allegations set forth in paragraphs 1 through 51 of this counterclaim.

127.   On December 21, 2015, the Jean Klempf Trust entered into the Redemption Agreement, by which all of the Foodonics stock owned by the Jean Klempf Trust was to be "redeemed" by Foodonics for the purchase price of $9,418,500, or approximately $3.16 per share.  A copy of the Redemption Agreement is attached as Exhibit B.

128.   On December 31, 2015, a closing was held on the Redemption Agreement by which all of the Foodonics stock owned by the Jean Klempf Trust was

"redeemed" by Foodonics (the "Redemption Sale").  As a result of the Redemption Sale, Jacques Klempf became the owner of 98.55% of all issued Foodonics' stock.

129.   In the Redemption Agreement, Foodonics and Jacques Klempf made the following "representations and warranties" to Jean Klempf and the Trust regarding the prospective sale of the Company after the Redemption Closing:

> 10.   **Representations and Warranties.**
> . . .
> (b)   **From the Foodonics Parties.  . . .**
> . . .
> (iii)   The Foodonics Parties hereby jointly and severally represent and warrant to the Seller that as of the Closing Date: (i) **there are no current offers pending nor ongoing discussions: (A) for the sale of all or substantially all of the assets of the Company;** (B) for the sale by Jacques of his stock in the Company or (C) to effect a merger, stock exchange or other transaction which would have the effect of either Jacques no longer holding a majority of the outstanding shares of stock of the Company or the Company no longer owning substantially all of the assets that it currently owns (collectively referred to as a "Realization Event"); (ii) the Foodonics Parties have not received any written offers to effect a Realization Event within the twelve (12) months prior to the date of this Agreement.
>
> Redemption Agreement, ¶ 10(b)(iii), p. 10, Exhibit B (emphasis added).

130.   The representations that there were no "ongoing discussions" or "current offers pending" regarding the sale of the Company were not true -- Jacques Klempf and the President and CEO of Cal-Maine, Dolph Baker, were, in fact, having "ongoing discussions" with each other regarding the possible sale of Foodonics to Cal-Maine.  It was from these discussions that Jacques Klempf knew that Cal-Maine

was a ready, willing and able buyer of Foodonics as soon as Jacques Klempf "wanted to sell."

131. Moreover, Jacques Klempf admitted in an email dated January 6, 2017, that "[i]n April 2015, I contacted Cal-Maine to see if they had an interest [in purchasing Foodonics]" . . . 9 months before the Redemption Sale.

132. In addition, as alleged in paragraphs 23, 24, 27, 28 and 44 above, Jacques Klempf and Foodonics represented to Jean Klempf and the Trust as part of the Redemption Agreement negotiations that Jacques Klempf would not be seeking to sell the Company for "a good amount of years." This representation proved not to be true as evidenced by the fact that less than four months after Jacques Klempf completed the redemption transaction with his mother, Foodonics and Cal-Maine executed a non-disclosure agreement which resulted in a $71.6 million sale of substantially all of Foodonics' operating assets to Cal-Maine less than 7 months later.

133. In addition, these "representations and warranties" were, at best, only deceptive "half-truths" -- a full disclosure of the facts regarding the prospective sale of the assets of Foodonics would have disclosed all material information including that: (i) Jacques Klempf had considered and decided to sell the Company before the Redemption Sale; (ii) Jacques Klempf had a ready, willing and able buyer of the Foodonics' assets waiting on standby; (iii) Jacques Klempf had regular and consistent discussions with Dolph Baker and Cal-Maine about a prospective sale of Foodonics to Cal-Maine before, during and after the negotiations leading up to the execution of the Redemption Agreement which were not disclosed to Jean Klempf; and (iv) Jacques

Klempf had "reached out" to Cal-Maine before the closing on the Redemption Sale to discuss the Cal-Maine Sale which was ultimately consummated on October 16, 2016.

134.   The actions described above were in breach of the representations and warranties of the Redemption Agreement.

135.   As a direct and proximate result of the breach by Jacques Klempf and Foodonics of the Redemption Agreement, the Jean Klempf Trust has suffered damages in excess of $23,200,000, exclusive of interest, attorneys' fees and other costs.

136.   In addition, as a result of the breach of representations and warranties by Jacques Klempf and Foodonics, the Jean Klempf Trust is entitled to indemnity for damages.

137.   In accordance with Section 11(c) of the Redemption Agreement, the Jean Klempf Trust is also entitled to its attorneys' fees and costs incurred by the Trust in connection with this matter, including this litigation.

WHEREFORE, the Jean Klempf Trust demands judgment against Jacques Klempf and Foodonics, jointly and severally, in an amount exceeding $23,200,000, together with interest, costs and attorneys' fees.

**Demand for Jury Trial**

The Jean Klempf Trust demands a trial by jury as to all facts and issues so triable.

SMITH HULSEY & BUSEY


By:   /s/ *James H. Post*
         James H. Post
         Michael E. Demont
         R. Christopher Dix

Florida Bar Number 175460
Florida Bar Number 364088
Florida Bar Number 036988
225 Water Street, Suite 1800
Jacksonville, Florida  32202
(904) 359-7700
(904) 359-7708 (facsimile)
jpost@smithhulsey.com
mdemont@smithhulsey.com
cdix@smithhulsey.com

Attorneys for Dina Klempf Srochi, as
   Trustee, and Dennis L. Blackburn,
   as Assistant Trustee, of the Laura Jean
   Klempf Revocable Trust

Certificate of Service

I certify that on this 16th day of February, 2018, I electronically filed the foregoing with the Clerk of Court through the Court's CM/ECF electronic notification system, which will send a Notice of Electronic Filing to all CM/ECF participants in this case. I further certify that I mailed the foregoing document and the notice of electronic filing by first-class mail to the following non-CM/ECF participants: none.

/s/ *James H. Post*
Attorney

980104.4

**TAB 9**

FOODONICS INTERNATIONAL, INC.,
a Florida corporation,

       Plaintiff,               Case No.: 3:17-cv-1054-J-32JRK

v.

DINA KLEMPF SROCHI, as Trustee
of the LAURA JEAN KLEMPF
REVOCABLE TRUST, a Georgia
trust,

       Defendant,

_____/

## PLAINTIFF'S INITIAL RULE 26(a) DISCLOSURES

Plaintiff FOODONICS INTERNATIONAL, INC. ("**Foodonics**") through its undersigned

counsel and pursuant to Rule 26(a), Fed. R. Civ. P. provides its initial disclosures as follows:

1.    Witnesses:

    a.  Kevin Jacques Klempf
       6440 Southpoint Parkway, Suite 190
       Jacksonville, FL 32216

       Mr. Klempf will have information related to the following: (i) history and
       operations of Foodonics; (ii) Anticipated tax payments made by Foodonics on
       behalf of Laura Jean Klempf and the agreement for a refund of any excess
       payments made on behalf of Jean Klempf for 2015 tax year; (iii) acquisition
       of stock held by Marc Klempf and Dina Klempf Srochi; (iv) acquisition of
       stock by Foodonics held by Laura Jean Klempf Revocable Trust in December,
       2015; (iii) discussions, negotiations and sale of assets of Foodonics to Cal-
       Maine in October, 2016.

    b.  John Stevens, CPA
       8382 Baymeadows Road
       Jacksonville, FL 32256

Mr. Stevens will have information related to: (i) tax payments and related financial matters as between Foodonics and Laura Jean Klempf, including tax payments for 2015 tax year.

c. Dan Edelman, CPA
4417 Beach Blvd., Suite 302
Jacksonville, FL 32207

Mr. Edelman served as the accountant for Laura Jean Klempf and is believed to have information related to: (i) income tax payments made by Foodonics on behalf of Laura Jean Klempf; (ii) participation in negotiations and appraisal of Foodonics stock held by Laura Jean Klempf Revocable Trust and as acquired by Foodonics.

d. Marc Klempf

Mr. Klempf will have information related to: (i) history of Foodonics; (ii) acquisition of Marc Klempf stock; (iii) distributions from Foodonics Asset sale to Cal-Maine.

e. Dina Klempf Srochi

Ms. Srochi will have information related to: (i) history of Foodonics; (ii) acquisition of Dina Klempf Srochi stock; (iii) distributions from Foodonics Asset sale to Cal-Maine.

f. Jess Wright, ASA, CFA
Suite 3140
One Independent Drive
Jacksonville, FL 32202

Ms. Wright will have information related to: the value of stock held by Laura Jean Klempf Revocable Trust as acquired by Foodonics in December, 2015.

g. Adolphus Baker, President, CEO and Chairman of the Board of Cal-Maine Foods
3320 W. Woodrow Wilson Drive
Jackson, MS 39209

Mr. Baker will have information related to: (i) historical relationship of Cal-Maine Foods and Foodonics; (ii) discussions, negotiation and acquisition of Foodonics assets by Cal-Maine Foods in October, 2016.

h. Rob Holladay, Esq., Vice President and General Counsel of Cal-Maine Foods
3320 W. Woodrow Wilson Drive
Jackson, MS 39209

Mr. Holladay will have information related to: (i) the negotiations and acquisition of Foodonics assets by Cal-Maine Foods in October, 2016.

2.     Documents:

    a. Stock Redemption Agreement and related documents for acquisition of stock owned by Laura Jean Klempf Revocable Trust by Foodonics dated December, 2015, in possession of all parties;

    b. Asset Purchase and Sale Agreement and related documents for acquisition of assets of Foodonics by Cal-Maine in possession of Foodonics, the production of which is subject to previously asserted objections;

    c. Documents evidencing anticipated tax payments for 2015 tax year for Laura Jean Klempf in possession of all parties;

    d. Correspondence from Dan Edelman, CPA, related to 2015 tax year payments by Foodonics for Laura Jean Klempf;

    e. Laura Jean Klempf Revocable Trust in possession of all parties;

    f. 2006 Stock Purchase Agreement for acquisition of stock of Dina Srochi and Marc Klempf in possession of all parties;

    g. Correspondence from counsel for Defendant related to Threatened Complaint in possession of all parties;

    h. Correspondence and communications between Foodonics and Cal-Maine related to asset acquisition of Foodonics by Cal-Maine some of which are subject to asserted objections;

    i. Correspondence and communication between Kevin Jacques Klempf and Cal-Maine and its representatives related to acquisition of Foodonics assets by Cal-Maine in possession of Kevin Jacques Klempf, some of which are subject to asserted objections.

3.     Damages:

Foodonics is entitled to approximately $1,200,000.00 from Defendant resulting from overpayment of taxes by Foodonics on behalf of Laura Jean Klempf for tax year 2015.

GRAYROBINSON, P.A.

/s/S. Grier Wells
S. GRIER WELLS, ESQ.
Florida Bar No.: 203238
grier.wells@gray-robinson.com
elizabeth.irvine@gray-robinson.com
50 North Laura Street, Suite 1100
Jacksonville, Florida 32202
Phone: (904)-598-9929
Fax: (904)-598-9109

*Attorney for Plaintiff*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that the foregoing was served electronically on this 16th day of

February, 2018 on James H. Post, Esq., counsel for Plaintiff at jpost@smithhulsey.com.

/s/ S. Grier Wells, Esq.
Attorney

**TAB 10**

# UNITED STATES DISTRICT COURT
### for the
### Middle District of Florida

| | |
|---|---|
| FOODONICS INTERNATIONAL, INC., | ) |
| *Plaintiff* | ) |
| v. | )    Civil Action No.   3:17-cv-1054-J-32JRK |
| DINA KLEMPF SROCHI, as Trustee of the LAURA | ) |
| JEAN KLEMPF REVOCABLE TRUST, | ) |
| *Defendant* | ) |

## SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS
## OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL ACTION

To:

GRAYROBINSON, P.A.

*(Name of person to whom this subpoena is directed)*

☑ *Production:* **YOU ARE COMMANDED** to produce at the time, date, and place set forth below the following documents, electronically stored information, or objects, and to permit inspection, copying, testing, or sampling of the material:   See attached Exhibit A

You may comply with this Subpoena by providing legible copies of the items to be produced to the Attorney whose name appears on this Subpoena on or before the scheduled date of production. You may condition the preparation of the copies upon the payment in advance of the reasonable cost of preparation. You may mail or deliver the copies to the Attorney whose name appears on this Subpoena and thereby ~~eliminate~~ your appearance at the time and place specified below.

| Place: Smith Hulsey & Busey | Date and Time: |
|---|---|
| 225 Water Street, Suite 1800 | |
| Jacksonville, FL 32202 | March 21, 2018 at 10:00 a.m. |

☐ *Inspection of Premises:* **YOU ARE COMMANDED** to permit entry onto the designated premises, land, or other property possessed or controlled by you at the time, date, and location set forth below, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it.

| Place: | Date and Time: |
|---|---|
| | |

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date: 2/27/2018

| CLERK OF COURT | |
|---|---|
| | OR _____ |
| _____ | *Attorney's signature* |
| *Signature of Clerk or Deputy Clerk* | |

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)*   Dina Klempf Srochi, as Trustee of the Laura Jean Klempf Revocable Trust      , who issues or requests this subpoena, are:

James H. Post, Esq., Smith Hulsey & Busey, 225 Water St., Ste 1800, Jacksonville, FL 32202, jpost@smithhulsey.com, (904) 359-7700

### Notice to the person who issues or requests this subpoena

If this subpoena commands the production of documents, electronically stored information, or tangible things or the inspection of premises before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

Civil Action No.  3:17-cv-1054-J-32JRK

# PROOF OF SERVICE
*(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for *(name of individual and title, if any)*

on *(date)*                .

☐ I served the subpoena by delivering a copy to the named person as follows:

on *(date)*                        ; or

☐ I returned the subpoena unexecuted because:

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$                .

My fees are $                for travel and $                for services, for a total of $        0.00        .

I declare under penalty of perjury that this information is true.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc.:

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

**(1) For a Trial, Hearing, or Deposition.** A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
  (A) within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
  (B) within the state where the person resides, is employed, or regularly transacts business in person, if the person
    (i) is a party or a party's officer; or
    (ii) is commanded to attend a trial and would not incur substantial expense.

**(2) For Other Discovery.** A subpoena may command:
  (A) production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
  (B) inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

**(1) Avoiding Undue Burden or Expense; Sanctions.** A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

**(2) Command to Produce Materials or Permit Inspection.**
  (A) Appearance Not Required. A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
  (B) Objections. A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
    (i) At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
    (ii) These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

**(3) Quashing or Modifying a Subpoena.**
  (A) When Required. On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:
    (i) fails to allow a reasonable time to comply;
    (ii) requires a person to comply beyond the geographical limits specified in Rule 45(c);
    (iii) requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
    (iv) subjects a person to undue burden.
  (B) When Permitted. To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:
    (i) disclosing a trade secret or other confidential research, development, or commercial information; or

    (ii) disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
  (C) Specifying Conditions as an Alternative. In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
    (i) shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
    (ii) ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

**(1) Producing Documents or Electronically Stored Information.** These procedures apply to producing documents or electronically stored information:
  (A) Documents. A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
  (B) Form for Producing Electronically Stored Information Not Specified. If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
  (C) Electronically Stored Information Produced in Only One Form. The person responding need not produce the same electronically stored information in more than one form.
  (D) Inaccessible Electronically Stored Information. The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

**(2) Claiming Privilege or Protection.**
  (A) Information Withheld. A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
    (i) expressly make the claim; and
    (ii) describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
  (B) Information Produced. If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

## Definitions

As used herein:

1. The "Counterclaim" refers to the Answer to the Complaint, Affirmative Defenses and Counterclaim filed by the Trust in the above styled action on February 16, 2018, including any and all amendments to the Counterclaim.

2. "Cal-Maine" refers to Cal-Maine Foods, Inc., its officers, directors, affiliates, subsidiaries, employees, agents, attorneys, and representatives.

3. The "Cal-Maine Sale" refers to the sale of the Assets of Foodonics to Cal-Maine on or about October 16, 2016.

4. "Document(s)" shall have the same meaning as in Rule 34, Federal Rules of Civil Procedure and shall include, without limiting the generality of the foregoing, correspondence, contracts, agreements, leases, memoranda, notes, calendar and diary entries, memoranda or notes of conversations and of meetings, studies, reports, offers, inquiries, bulletins, summaries, newsletters, compilations, charts, graphs, photographs, film, microfilm, articles, announcements, books, books of account, ledgers, vouchers, canceled checks, invoices, bills, opinions, certificates, transcripts and all other tangible things upon which any handwriting, typing, printing, drawings, representation, magnetic or electrical impulses or other form of communication is recorded, now or at any time in your possession, custody or control, including but not limited to the originals (or any copy when originals are not available) and drafts of documents and all copies that are different in any way from the original.

5. "Dolph Baker" refers to Adolphus B. Baker, Chairman, Chief Executive Officer and President of Cal-Maine Foods, Inc., his employees, agents, entities, affiliates, attorneys, and representatives.

6. "ESI" means electronically stored information in all forms in which it is stored and communicated, and has the same meaning as in Rule 34, Federal Rules of Civil Procedure. ESI specifically includes emails, word processing files, electronic documents, spreadsheets, presentations, databases, images, movies, audio files, voicemails, text messages, and any other information stored on any computer, laptop, tablet, cell phone, smartphone, external hard drive USB drive, cd drive, dvd drive, backup drive, SharePoint site, file server, or in any remote or "cloud"-based system or location, including Dropbox. ESI specifically includes all of the following electronic file types: *.msg, *.pst, *.eml, *.jpg, *.tif, *.gif, *.mov, *.mpg, *.mpeg, *.wmv, *.avi, *.wav, *.mp3, *.doc, *.docx, *.wpd, *.xls, *.xlsx, *.ppt, *.pptx, *.mdb and *.pdf. ESI

also includes social media data, including information stored by you or communicated by you through Facebook, Twitter, LinkedIn, Skype and blogs. ESI also includes business or personal email accounts such as Yahoo Mail, Gmail, Hotmail, Outlook.com, AOL mail and other web-based email services.

7. "Financial Information" shall refer to any record of the financial activities of a business, person, or other entity, including, but not limited to, income statements, balance sheets, statements of financial positions, profit and loss reports, statements of revenue and expense, cash flow statements, audited financial statements, and compilations of financial information.

8. "Foodonics" refers to Plaintiff, Foodonics International, Inc. doing business as Dixie Egg Co., its officers, directors, affiliates, subsidiaries, employees, agents, attorneys, and representatives.

9. "Foodonics' Assets" or "Assets" shall refer to any or all of the assets of Foodonics in existence between September 1, 2008 and December 31, 2016 including, but not limited to, (i) the egg production assets of Foodonics and its related entities or (ii) Foodonics' interest in American Egg Products, LLC and the Egg-Land's Best franchise with licensing rights for portions of certain markets in Alabama, Florida, and Georgia as well as Puerto Rico, Bahamas and Cuba.

10. "Foodonics' Stock" or "Stock" refers to all Class A Voting Shares and Class B Non-Voting Shares of Foodonics in existence between September 1, 2008 and December 31, 2016.

11. "Jacques Klempf" refers to K. Jacques Klempf, his employees, agents, entities, affiliates, attorneys, and representatives.

12. "Laura Jean Klempf" refers to Laura Jean Klempf, her employees, agents, entities, affiliates, attorneys and representatives.

13. "Marc Klempf" refers to Marc E. Klempf, his employees, agents, entities, affiliates, attorneys, and representatives.

14. The "Redemption Sale" refers to the redemption transaction on the Settlement and Redemption Agreement which was closed on December 31, 2015.

15. "Relate to" and "relating to" mean to make a statement about, refer to, discuss, describe, reflect, contain, comprise, identify, or in any way to pertain to, in whole or in part, or otherwise to be used, considered, or reviewed in any way in connection with, the specified subject. Thus, documents or information that "relate to" a subject also include those which were specifically rejected and those which were not relied or acted upon.

16. The "Settlement and Redemption Agreement" refers to the Settlement and Redemption Agreement entered into as of December 21, 2005 by and among Foodonics; Jacques Klempf; Laura Jean Klempf, individually; Laura Jean Klempf, in her capacity as Trustee of, and on behalf of, the Laura Jean Klempf Revocable Trust dated April 1, 1992, as Amended (the "Seller"); Jacques Klempf and Laura Jean Klempf as Trustees of the Family Trust under the Edward Klempf Revocable Trust Agreement dated April 1, 1992; Dina Klempf Srochi; and Marc Klempf.

17. "Trust" or "Defendant" refers to Dina Klempf Srochi, including but not limited to in her capacity as Trustee of the Laura Jean Klempf Trust dated April 1, 1992.

18. "You," "Your," or "GrayRobinson" refers to GrayRobinson, P.A., its officers, directors, affiliates, subsidiaries, employees, agents, attorneys, and representatives.

19. Unless otherwise specified, the requests contained in this request for production are limited to documents and ESI authored, created, received, revised or sent from September 1, 2008 until the date that this request for production was served.

## Instructions

1. These discovery requests are continuing in nature so as to require You to file supplementary responses if You obtain new or different information up to and including the time of trial of this action.

2. Pursuant to Rule 26(b)(5) of the Federal Rules of Civil Procedure, in the event that any document or ESI called for by a request is withheld by You on the basis of claim of privilege, please identify that document or ESI by stating:

   a. The date of the document or ESI;
   b. The author of the document or ESI;
   c. The identity of each person who received or was furnished a copy of the document or ESI;
   d. The subject matter of the document or ESI;
   e. The custodian;
   f. For ESI items, the size and file type of each item;
   g. For paper items, the number of pages, including attachments and appendices; and
   h. Each ground upon which the privilege is claimed.

3. If any responsive document or ESI is no longer in existence, cannot be located, or is not in Your possession, custody, or control, identify it, describe its subject matter, and describe its disposition, including, without limitation, identifying the person having knowledge of the disposition.

4. In each of Your responses to these discovery requests, You are requested to provide not only such information as is in Your possession, but all information as is reasonably available. In the event that You are able to provide only part of the information called for by any discovery request, please provide all of the information You are able to provide and state the reason for Your inability to provide the remainder.

5. Produce ESI in native or near-native format, and do not convert ESI to an imaged format (e.g., *.TIF or *.PDF). Native format requires production in the same format in which the ESI was customarily created, used and stored by you. Near-native format requires production of native format ESI so that the content and metadata are electronically accessible. If the native or near-native format is not compatible with a Microsoft Office Suite software program or application, you should provide a description of a software program or application that may be used to access and view the ESI.

6. Documents should be produced in searchable *.PDF format with logical unitization and family relationships preserved.

7. No potentially discoverable information contained on your computer systems should be deleted or modified and procedures that may affect such data should not be performed unless all potentially discoverable data has been copied and preserved. The data to be preserved includes not just active data, but archival, backup and residual data.

8. All drafts or versions of documents and ESI should be produced in addition to the final document or ESI. All documents and ESI containing written notations, comments, edits or marginalia, or which are in any way different from the original should be produced in addition to the original.

9. In response to each request, You are required to furnish all ESI and documents in Your possession, custody or control, or in the possession, custody or control of Your past or present agents, attorneys, accountants, advisors, employees, or any other persons acting on Your behalf.

## Documents and ESI Requested

1.  All Documents or ESI referring or relating to both Jacques Klempf and:

    a.  Laura Jean Klempf.

    b.  The Trust.

    c.  Cal-Maine.

    d.  Dolph Baker.

    e.  Marc Klempf.

    f.  Dina Klempf Srochi.

    g.  Steven Brust.

    h.  Dennis L. Blackburn.

    i.  GlassRatner Advisory & Capital Group, LLC.

    j.  Ian Ratner.

    k.  Jess W. Wright.

    l.  Sheldrick, McGehee & Kohler, LLC.

    m.  John P. Stevens.

    n.  Stevens, Powell & Company, P.A.

    o.  Robert Monsky.

    p.  First Florida Capital Corporation.

2.  All Documents or ESI referring or relating to both Foodonics and:

    a.  Laura Jean Klempf.

    b.  The Trust.

    c.  Cal-Maine.

d.  Dolph Baker.

e.  Marc Klempf.

f.  Dina Klempf Srochi.

g.  Steven Brust.

h.  Dennis L. Blackburn.

i.  GlassRatner Advisory & Capital Group, LLC.

j.  Ian Ratner.

k.  Jess W. Wright.

l.  Sheldrick, McGehee & Kohler, LLC.

m.  John P. Stevens.

n.  Stevens, Powell & Company, P.A.

o.  Robert Monsky.

p.  First Florida Capital Corporation.

3.      All Documents or ESI referring or relating to the Settlement and Redemption Agreement.

4.      All Documents or ESI referring or relating to the Cal-Maine Sale, including all closing documents and other agreements relating to the Cal-Maine Sale.

5.      All Documents and ESI relating to the sale of Foodonics' Assets or Foodonics' Stock.

6.      All Documents and ESI relating to or containing any representations or estimates made by Jacques Klempf or Foodonics to any person or entity regarding the

value of Foodonics' Stock or Foodonics' Assets from September 1, 2008 through the date of production.

7.     All Documents and ESI relating to the value of Foodonics' Stock or Foodonics' Assets from September 1, 2008 through the date of production.

8.     All Documents and ESI relating to any proposals, offers or discussions Jacques Klempf or Foodonics had with any person or entity regarding any possible purchase or sale of Foodonics' Assets or Foodonics' Stock.

9.     All Documents and ESI referring or relating to the transfer of any Foodonics' Assets to (i) BAM Residential Holdings, LLC; (ii) BAM Commercial Holdings, LLC; or (iii) BAM Investment Group, LLC.

10.     All corporate minutes for Foodonics for the years 2012 through the date of production.

11.     All filings with any state or federal governmental agency, including the Securities and Exchange Commission, referring or relating to Foodonics or Jacques Klempf.

12.     All Documents and ESI referring or relating to any discussions between Jacques Klempf and Dolph Baker or Cal-Maine where the subject matter related to (i) the value of Foodonics' assets or stock or (ii) a potential or actual purchase of Foodonics' assets or stock by Cal-Maine or any related affiliate thereof.

13.     All Documents and ESI exchanged between Dolph Baker and Jacques Klempf regarding the claims asserted by the Trust or Jean Klempf against Jacques Klempf or Foodonics.

14. All Documents and ESI reflecting any communications sent to or sent by Dolph Baker or Cal-Maine regarding a purchase of Foodonics' assets or stock.

15. All documents and ESI relating to the allegations in paragraph 14 of the Foodonics Complaint that "[f]ollowing the 2006 Transaction, Foodonics made estimated income tax payments to the Internal Revenue Service ("IRS") on behalf of Jacques and Mrs. Klempf in amounts equal to their anticipated annual income tax liabilities resulting from the inclusion in their personal income of their relative share of Foodonics' income" for the years 2006 through the date of production.

16. All documents and ESI relating to the allegations in paragraph 16 of the Foodonics Complaint that "Foodonics' income is calculated and reported to the IRS after the end of the relevant tax year. As a result, the estimated tax payments were paid to IRS on behalf of Jacques Klempf, before the end of each taxable year, based on estimates of Foodonics' eventual taxable income."

17. All documents and ESI relating to the allegations in paragraph 18 of the Foodonics Complaint that "for tax year 2015, Foodonics paid estimated taxes on behalf of its shareholders, Jacques and Mrs. Klempf. Because the precise amount of tax liability could not be known at the time of estimated payments, Foodonics intentionally overpaid the estimated taxes for Jacques and Mrs. Klempf to the IRS to avoid imposition of penalties and interest. No additional distribution was authorized by the shareholders and in the event of a substantial overpayment of taxes, Foodonics was to be repaid the amount of such overpayment."

18. All documents and ESI relating to the allegations in paragraph 23 of the Foodonics Complaint that "Foodonics' payment of estimated tax payments on behalf of Jacques and Mrs. Klempf resulted in an overpayment of taxes relative to Foodonics' subsequently-determined income. As a result, both Jacques and Mrs. Klempf received a refund from the IRS."

19. All documents and ESI relating to the allegations in paragraph 13 of the Counterclaim that "Jacques Klempf . . . [made] business connections and friendships in the egg industry -- which was a small fraternity -- including a strong business and close personal friendship with the President of Cal-Maine, Dolph Baker. The Jacques Klempf and Dolph Baker families often socialized at industry meetings and took family vacations together to Europe and elsewhere."

20. All documents and ESI relating to the allegations in paragraph 15 of the Counterclaim that ". . . Jacques Klempf used Company assets to acquire real and personal property which he used for his personal benefit . . ., including oceanfront homes and restaurants."

21. All documents and ESI relating to the allegations in paragraph 19 of the Counterclaim that "[i]n 2008 . . . Jacques Klempf was informed, however, that his mother was not interested in selling her shares at that time and, instead, intended to remain a shareholder and an active member of the Foodonics Board of Directors . . ." and that Jean Klempf was "not interested in selling any of her . . . shares at this time."

22. All documents and ESI relating to the allegations in paragraph 21 of the Counterclaim that ". . . in an October 2013 meeting where Jean Klempf was refusing

to sell her shares to Foodonics, Jacques Klempf told Jean Klempf (who was 80 years old at the time), "I can go a lot longer than you can . . ."

23.     All documents and ESI relating to the allegations in paragraph 22 of the Counterclaim that ". . . Jean Klempf made it clear to her son that she was not willing to proceed with the redemption transaction if he was contemplating a sale of the Company or its assets after the redemption.  Jacques Klempf knew his mother did not want to sell her stock back to the Company subject to a minority shareholder discount if Jacques Klempf intended to sell the Company or its assets -- or was even considering the possibility of such a sale to a third-party -- within two years or less after the redemption."

24.     All documents and ESI relating to the allegations in paragraph 23 of the Counterclaim that "[b]etween December 31, 2014 and December 31, 2015, to induce his mother and her Trust to proceed with the redemption transaction, Jacques Klempf represented to his mother and her representatives that he had not received any offers to purchase the Company and that he would not be seeking to sell the Company for "a good amount of years."

25.     All documents and ESI relating to the allegations in paragraph 26 of the Counterclaim that "[o]n April 20, 2016, less than four months after Jacques Klempf completed the redemption transaction with his mother, Foodonics and Cal-Maine executed a non-disclosure agreement which resulted in a $71.6 million sale of substantially all of Foodonics' operating assets to Cal-Maine less than 7 months later."

26.     All documents and ESI relating to the allegations in paragraph 27 of the Counterclaim that "[o]n October 16, 2016, only 10 months after the Redemption Sale, Cal-Maine purchased substantially all of Foodonics' operating assets for the sum of $71,643,000 or $10.97 per share (the "Cal-Maine Sale")."

27.     All documents and ESI relating to the allegations in paragraph 29 of the Counterclaim that "Cal-Maine Foods team . . . had made it known that it wanted to be involved if [Jacques Klempf] ever wanted to sell" Foodonics."

28.     All documents and ESI relating to the allegations in paragraph 34 of the Counterclaim that ". . . Jacques Klempf had considered and decided well in advance of the Redemption Sale to . . . sell the Foodonics' assets to Cal-Maine -- a known ready, willing and able buyer -- after Jacques Klempf induced his mother to surrender the Trust's shares for a reduced price through the redemption transaction."

29.     All documents and ESI relating to the allegations in paragraph 35 of the Counterclaim that ". . . on numerous business and social occasions between 2009 and 2015, Dolph Baker informed Jacques Klempf that Cal-Maine wanted to buy Foodonics whenever Jacques Klempf was ready to sell."

30.     All documents and ESI relating to the allegations in paragraph 37 of the Counterclaim that "Jacques Klempf's . . . long time "goal" [was] to sell the Company when its yearly sales reach the $100 million dollar range . . ."

31.     All documents and ESI relating to the allegations in paragraph 38 of the Counterclaim that "Jacques Klempf admitted in a newspaper interview after the Cal-Maine Sale that he had known "the Cal-Maine team" for "a long time" and that Cal-

Maine "had made it known it wanted to be involved if Klempf ever wanted to sell" the Company and that Jacques Klempf had "reached out" to his friend, Dolph Baker, to initiate a sales transaction . . ."

32.     All documents and ESI relating to the allegations in paragraph 39 of the Counterclaim that "Jacques Klempf and the President and CEO of Cal-Maine, Dolph Baker, were, in fact, having "ongoing discussions" with each other regarding the possible sale of Foodonics to Cal-Maine. It was from these discussions that Jacques Klempf knew that Cal-Maine was a ready, willing and able buyer of Foodonics as soon as Jacques Klempf "wanted to sell."

33.     All documents and ESI relating to the allegations in paragraph 40 of the Counterclaim that "Jacques Klempf admitted in an email dated January 6, 2017, that "[i]n April 2015, I contacted Cal-Maine to see if they had an interest [in purchasing Foodonics] . . ."

34.     All documents and ESI relating to the allegations in paragraph 43 of the Counterclaim that ". . . the sale of Foodonics to Cal-Maine was a constant subject of discussion between Jacques Klempf and Dolph Baker as evidenced by Jacques Klempf's 2009 email in which Jacques Klempf states that Cal-Maine had "approached [him] on more than one occasion" in regard to its interest in acquiring the Company and that he believed $30 million for the Company was "a very real number" that Dolph Baker had "casually thrown around over a drink in Atlanta..."

35.     All documents and ESI relating to the allegations in paragraph 44 of the Counterclaim that "Jacques Klempf and Foodonics failed to disclose material

information in connection with the Redemption Sale relating to the Company's valuation that was subsequently disclosed by them to Cal-Maine in connection with the Cal-Maine Sale."

983611

# TAB 11

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

FOODONICS INTERNATIONAL, INC., )
a Florida corporation, )
           )
      Plaintiff, )
           )
v. )          Case No. 3:17-cv-1054-J-32JRK
           )
DINA KLEMPF SROCHI, as Trustee )
of the LAURA JEAN KLEMPF )
REVOCABLE TRUST, a Georgia trust, )
           )
      Defendant. )
_____ )

DINA KLEMPF SROCHI, as Trustee )
of the LAURA JEAN KLEMPF )
REVOCABLE TRUST, a Florida trust, )
and DENNIS L. BLACKBURN, as )
Assistant Trustee of the JEAN KLEMPF )
TRUST, )
           )
      Counterclaim Plaintiffs, )
           )
v. )
           )
FOODONICS INTERNATIONAL, INC., )
a Florida corporation, and KEVIN )
JACQUES KLEMPF, )
           )
      Counterclaim Defendants. )
_____ )

## ORDER GOVERNING ESI ISSUES

    This cause came on for consideration on the unopposed motion of defendant and counterclaim plaintiff Dina Klempf Srochi, as trustee of the Laura Jean Klempf Revocable Trust, for an order addressing preliminary ESI issues in this case. The Court having considered the motion and the parties having consented to the entry of this order, it is ORDERED:

EXHIBIT
12
PENGAD 800-631-6989

1.     All parties shall *preserve* ESI related to this case which was created or received on or after September 1, 2008. The parties reserve their respective positions and objections concerning ESI *production* date ranges.

2.     All parties shall designate within 10 days of the entry of this order an e-discovery liaison to be knowledgeable about and responsible for the party's ESI and to work together to help resolve e-discovery disputes without Court intervention.

3.     All parties shall disclose within 10 days of the entry of this order the locations and types of potentially discoverable information in the parties' possession or control and how that information can be (or has already been) collected from the systems and media in which it is stored.

4.     In accordance with ~~in accordance with~~ Rule 16(b)(3)(B)(v), Federal Rules of Civil Procedure:

    (i)    no discovery-related motion may be filed unless the moving party attempted in good faith, but without success, to resolve the dispute and has requested a pre-motion conference with the Court to discuss the dispute and to attempt to resolve it informally;

    (ii)    if the Court does not grant the request for a conference, or if the conference fails to resolve the dispute, then upon approval of the Court, a motion may be filed;

    (iii)    unless otherwise permitted by the Court, discovery-related motions and responses thereto will be filed ~~in letter format and may not exceed three, single-spaced pages, in twelve point font~~ in compliance with the local rules of the Court.

    (iv)    replies will not be filed unless requested by the Court following review of the motion and response;

(v)     unresolved discovery disputes are to be raised as required by this paragraph before the end of discovery and

(vi)    absent a showing of good cause and due diligence, discovery disputes will not be heard after the discovery cutoff.

5.     Within 20 business days of the entry of this order, the parties' e-discovery liaisons shall confer regarding presently served discovery requests in this case to discuss the search methods that will be used to search ESI, identify information that is subject to production and filter out ESI that is not subject to discovery.   The parties' e-discovery liaisons shall also confer regarding the foregoing search methods and issues within 14 business days after any new request for production is served after the entry of this Order. For all presently pending and future discovery requests, the parties' e-discovery liaisons will cooperate in the development of appropriate search methodology and criteria, including the potential use of computer-assisted search methodologies and other analytics-based search and filtering tools.

6.     The parties shall use phasing for any ESI production that cannot be completed within the time period specified in any discovery request involving ESI.

7.     Except as otherwise agreed by the parties, production of ESI shall be made as set forth below:

**A.     TIFF Production**

Except as indicated below, all ESI is to be produced in TIFF format, with each page bearing a unique bates number. TIFF files shall be produced in single-page format, along with the metadata and image load files (.OPT file and .LFP file).

**B.     Native Production / Special Formats**

Microsoft Excel documents and other similar files, as well as any ESI that otherwise cannot be reasonably imaged or produced in TIFF format, shall be produced in native format. (However, if such

material contains privileged information or information subject to any other applicable protection, it may be redacted and produced in TIFF format, as described below.)

The receiving party may request that the producing party provide any ESI in native format upon good cause *(e.g.,* where a document produced in TIFF format, such as a Microsoft Powerpoint presentation, is unreadable or undecipherable).

To the extent a party has discoverable ESI that cannot be reasonably produced in TIFF or native format, such as information contained in a database, the producing party shall produce such ESI in a reasonably usable and exportable format that can best provide all relevant information *(e.g.,* Excel, CSV, or SQL format). The parties shall discuss the production format of such ESI prior to production.

Documents produced in native format or other special format shall each have a unique bates number. Any party that uses ESI produced in native format as an exhibit or for any other purpose shall ensure that the ESI is marked with the proper bates number and confidentiality marking.

C.     Cost

The parties agree that the cost(s) associated with converting ESI from the form in which it is ordinarily maintained (i.e., native or near-native format) into any form required by this order shall itself not be used by either party as a basis to object to discovery. The parties reserve their respective positions and objections concerning whether the cost(s) associated with converting ESI would be recoverable as a prevailing party cost under 28 U.S.C. §1920(4).

D.     Redaction

Any ESI that contains information that is protected by attorney-client privilege or other applicable protection may be produced in TIFF format with reactions applied, even if they would otherwise be produced in native format. Redacted documents shall be disclosed on a privilege log or other log.

4

### E.   Metadata

All produced ESI must be accompanied with all metadata to the extent it is able to be extracted from the document. The metadata must be delivered in standard metadata load files *(e.g.,* .DAT file using standard Concordance delimiters). The producing party shall make reasonable efforts to ensure that the metadata is extracted and formatted consistently across documents and productions.

In addition, the producing party must provide "Custodian" and "Source" data also populated in the metadata load file. With respect to ESI gathered from an individual's computer or other device, the "Custodian" field will provide, to the extent reasonably available, metadata sufficient to identify the custodian from whose device such ESI has been gathered; for ESI gathered from other sources, the "Source" field will provide, to the extent reasonably available, metadata sufficient to identify the location from which such ESI has been gathered *(e.g.,* "network shared drive").

To the extent any ESI contains information subject to a claim of privilege or any other applicable protection, its respective metadata may be redacted or withheld. The producing party shall disclose metadata that is redacted or withheld a privilege log or other applicable log.

### F.   Extracted Text / OCR

All ESI is to be provided with searchable text (.TXT) files extracted directly from the document. Any ESI produced in redacted form may be processed through OCR. These text files should indicate page breaks, to the extent reasonably available.

### G.   De-duplication

The parties shall make reasonable efforts to de-duplicate identical ESI within and across custodians.

**H.**     **Encrypted or Password-Protected ESI**

Upon the reasonable request of the receiving party, for any ESI that exists in encrypted format or is password-protected, the producing party will undertake reasonable efforts to provide the propounding party a means to gain access to those native files *(e.g.,* by supplying passwords, to the extent the producing party possesses such passwords).

DONE and ORDERED in Jacksonville, Florida on 3·15·18, 2018.

JAMES R. KLINDT
UNITED STATES MAGISTRATE JUDGE

Copies to:
Counsel of Record

**TAB 12**

IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

FOODONICS INTERNATIONAL, INC.,
a Florida corporation,

      Plaintiff,

v.

DINA KLEMPF SROCHI, as Trustee
of the LAURA JEAN KLEMPF
REVOCABLE TRUST, a Georgia Trust,

      Defendant.

_____/

DINA KLEMPF SROCHI, as Trustee
of the LAURA JEAN KLEMPF
REVOCABLE TRUST, a Florida Trust,
and DENNIS L. BLACKBURN, as
Assistant Trustee of the JEAN KLEMPF
REVOCABLE TRUST, a Florida Trust,

      Counterclaim Plaintiffs,

v.

FOODONICS INTERNATIONAL, INC.,
a Florida corporation, and KEVIN
JACQUES KLEMPF,

      Counterclaim Defendants.

_____/

Case No.: 3:17-cv-1054-J-32JRK

## ANSWER AND AFFIRMATIVE DEFENSES TO COUNTERCLAIM BY FOODONICS AND KEVIN JACQUES KLEMPF

The Plaintiff/Counterclaim Defendants, FOODONICS INTERNATIONAL, INC.

("Foodonics") and KEVIN JACQUES KLEMPF ("Jacques"), submit this answer and affirmative

defenses in response to the counterclaim filed by the Defendant/Counterclaim Plaintiffs, DINA

KLEMPF SROCHI ("Dina"), as Trustee of the LAURA JEAN KLEMPF REVOCABLE

1

TRUST, a Florida Trust ("Trust"), and DENNIS L. BLACKBURN ("Blackburn"), as Assistant Trustee of the Trust.

## The Parties

1. Admitted.

2. It is admitted that Blackburn is a resident of Florida. Counterclaim Defendants are without knowledge of the remaining allegations of paragraph 2 and said allegations are therefore denied.

3. Admitted.

4. It is admitted that Jacques, is a resident of St. Johns County, Florida, served as president of Foodonics and became its majority shareholder in 2006. All other allegations of paragraph 4 not specifically admitted are denied.

5. The allegations of paragraph 5 are, upon information and belief, admitted. However, Cal-Maine is not a party to this action.

6. The allegations of paragraph 6 are, upon information and belief, admitted. However, Adolphus B. Baker is not a party to this action.

## General Allegations

7. It is denied that Edward Klempf was 21 years old at the time he started Dixie Egg Company. All other allegations of paragraph 7 are admitted.

8. It is admitted that Edward Klempf, with the moral support of Laura Jean Klempf ("Jean"), provided leadership and direction for Dixie Egg Company until 1999 resulting in growth and the acquisition of franchise rights. The remaining allegations and characterizations in paragraph 8 are denied.

9. Admitted.

10.     Admitted.

11.     It is admitted that Jean was a member of the Board of Directors of Foodonics until approximately 2008.  The remaining allegations of paragraph 11 are admitted.

12.     It is admitted that Jacques was president of Foodonics between 2002 and 2015.  All other allegations of paragraph 12 are denied.

13.     It is admitted that Jacques became well known and prominent within the egg industry, including serving on various boards of industry related organizations and developing relationships, both professional and social, with many others active in the industry, including Dolph Baker.  All other allegations of paragraph 13 are denied.

14.     Denied.

15.     Denied.

16.     It is admitted that Jacques purchased the Foodonics stock of Marc Klempf ("Marc") and Dina in 2006 through the 2006 Shareholder Agreement.  All other allegations of paragraph 16 are denied.

17.     The provisions of the 2006 Shareholders Agreement speak for themselves.  All other allegations of paragraph 17 are denied.

18.     It is admitted that Jacques became the majority owner of Foodonics stock as a result of the 2006 Shareholders Agreement, and that the stock ownership as a result of the 2006 Shareholder Agreement is as set forth in paragraph 18.  All other allegations of paragraph 18 are denied.

19.     Denied.

20.     It is admitted that Jacques was the President and majority shareholder of Foodonics following the 2006 Shareholders Agreement.  All other allegations of paragraph 20 are denied.

21.     Denied.

22.     Denied.

23.     The email referenced in paragraph 23 speaks for itself.  All other allegations of paragraph 23 are denied.

24.     The Settlement and Redemption Agreement referenced in paragraph 24 was entered into by the Trust, Jacques and Foodonics and speaks for itself.  All other allegations of paragraph 24 are denied.

25.     Admitted.

26.     It is admitted that Foodonics and Cal-Maine executed a non-disclosure agreement on or about April 20, 2016, and that Foodonics sold substantially all of its assets to Cal-Maine in about October, 2016.  All other allegations of paragraph 26 are denied.

27.     It is admitted that Cal-Maine purchased substantially all of Foodonics' operating assets on or about October 16, 2016 for the sum of $71,643,000.00.  All other allegations of paragraph 27 are denied.

28.     Denied.

29.     Denied.

### Jacques Klempf's Alleged Fraud by Omission

30.     Denied.

31.     The allegations of paragraph 31 constitute legal conclusions to which no response is required.  The allegations are otherwise denied.

4

32.    Denied.

33.    Denied.

34.    Denied.

35.    Denied.

36.    Denied.

37.    The email referenced in paragraph 37 speaks for itself.  Jean, the Trust, Dina, Marc and their team of legal, including Blackburn, tax, accounting and business counsel were all well aware at all material times, that Jacques possessed the legal and corporate authority to sell substantially all of the assets of Foodonics at any time.   The remaining allegations and characterizations of paragraph 37 are denied.

38.    The redacted excerpt from the Daily Business Record set forth in paragraph 38 speaks for itself.  It is admitted that Jacques had known members of the Cal-Maine team for a long time and of Cal-Maine's possible interest in Foodonics.   All other allegations and characterizations in paragraph 38 are denied.

39.    The provision in the Settlement and Redemption Agreement set forth in paragraph 49 speaks for itself.  The referenced provision and all other provisions of the Settlement and Redemption Agreement were negotiated and accepted by Jean, the Trust, and their legal, including Blackburn, tax, accounting, business advisors and counselors.   The remaining allegations and characterizations of paragraph 39 are denied.

40.    Denied.  The reference to April 2015 in the email dated January 6, 2017 was clearly a typographical error.

41.    Denied.

42.    Denied.

43.     The email dated October 13, 2009 is admitted. It is admitted that the Trust, Marc, Dina and their team of legal, including Blackburn, tax, accounting and business counsel were all well aware, at all material times, that Cal-Maine was a prospective purchaser of the assets of Foodonics. The remaining allegations and characterizations set forth in paragraph 43 are denied.

44.     The Cal-Maine quarterly report referenced in paragraph 44 is a matter of public record and speaks for itself. All other allegations in paragraph 44 are denied.

45.     It is admitted that Jacques sent an email in January 2017 which referenced the impact of "industry dynamics" on his decision with regard to the sale of the assets of Foodonics. It is furthermore admitted that "industry dynamics" was a factor in the decision to sell the assets of Foodonics. All other allegations and characterizations in paragraph 45 not specifically admitted herein are denied.

46.     Denied.

47.     Denied.

48.     Denied.

49.     Denied.

50.     Denied.

51.     Counterclaim Defendants are not presently aware of any conditions precedent to be addressed in this action. The allegations of paragraph 51 are therefore denied.

## Count One
### (Breach of Fiduciary Duty of Disclosure)

52.     The allegations of paragraph 52 are admitted as a prefatory statement only. It is specifically denied that any breach of any fiduciary duty of disclosure was committed by Counterclaim Defendants.

53.     Counterclaim Defendants responses to paragraphs 1 through 51 are realleged as if fully set forth herein.

54.     Denied.

55.     Denied.

56.     Denied.

57.     Denied.

58.     Denied.

59.     Denied.

60.     Denied.

61.     Denied.

62.     Denied.

63.     Denied.

## <u>Count Two</u>
### *(Breach of Fiduciary Duty of Loyalty)*

64.     The allegations of paragraph 64 are admitted as prefatory only. It is denied that Counterclaim Defendants committed any breach of any fiduciary duty of loyalty.

65.     Counterclaim Defendants responses to paragraphs 1 through 51 are realleged as if fully set forth herein.

66.     Denied.

67.     Denied.

68.     Denied.

69.     Denied.

70.     Denied.

71.     Denied.

72.    Denied.

73.    Denied.

74.    Denied.

75.    Denied.

## Count Three
### *(Violation of Florida Securities Act)*

76.    The allegations of paragraph 76 are admitted as  prefatory only.  It is denied that Counterclaim Defendants committed any violation of the Florida Securities Act.

77.    Counterclaim Defendants responses to paragraphs 1 through 51 are realleged as if fully set forth herein.

78.    Denied.

79.    Denied.

80.    Denied.

81.    Denied.

82.    Denied.

83.    Denied.

84.    Denied.

85.    Denied.

86.    Denied.

87.    Denied.

88.    Denied.

89.    Denied.

90.    Denied.

91.    Denied.

**Count Four**
*(Violation of § 10(b) of the Securities Exchange Act and Rule 10b-5)*

92.     The allegations of paragraph 92 are admitted as prefatory only.  It is denied that Counterclaim Defendants committed any Violation of Rule 10b-5 of the securities Exchange Act.

93.     Counterclaim Defendants responses to paragraphs 1 through 51 are realleged as if fully set forth herein.

94.     Denied.

95.     Denied.

96.     Denied.

97.     Denied.

98.     Denied.

99.     Denied.

100.    Denied.

101.    Denied.

102.    Denied.

103.    Denied.

**Count Five**
*(Control Person Liability - § 20(a) of Securities Exchange Act)*

104.    The allegations of paragraph 104 are admitted as prefatory only.  It is denied that Counterclaim Defendants committed any violation of § 20(a) of the Securities Exchange Act exists.

105.    Counterclaim Defendants responses to paragraphs 1 through 51 are realleged as if fully set forth herein.

106.   Denied.

107.   Denied.

108.   Denied.

109.   Denied.

110.   Denied.

## Count Six
### *(Fraud by Omission)*

111.   The allegations of paragraph 111 are admitted as prefatory only.  It is denied that Counterclaim Defendants committed any fraud by omission.

112.   Counterclaim Defendants responses to paragraphs 1 through 51 are realleged as if fully set forth herein.

113.   Denied.

114.   Denied.

115.   Denied.

116.   Denied.

117.   Denied.

118.   Denied.

## Count Seven
### *(Negligent Misrepresentation)*

119.   The allegations of paragraph 119 are admitted as prefatory only.  It is denied that Counterclaim Defendants committed any negligent misrepresentation.

120.   Counterclaim Defendants responses to paragraphs 1 through 51 are realleged as if fully set forth herein.

121.   Denied.

122.   Denied.

123.   Denied.

124.   Denied.

### Count Eight
#### *(Breach of Representations and Warranties)*

125.   The allegations of paragraph 125 are admitted as prefatory only.  It is denied that Counterclaim Defendants committed any breach of representations and warranties.

126.   Counterclaim Defendants responses to paragraphs 1 through 51 are realleged as if fully set forth herein.

127.   Denied.

128.   Denied.

129.   Denied.

130.   Denied.

131.   Denied.

132.   Denied.

133.   Denied.

134.   Denied.

135.   Denied.

136.   Denied.

137.   Denied.

### AFFIRMATIVE DEFENSES BY FOODONICS AND JACQUES

Foodonics and Jacques submit the following affirmative defenses to the counterclaim by the Trust.

### Common Allegations to Affirmative Defenses by Foodonics and Jacques

1.      The following common allegations apply to each of the affirmative defenses set forth below.

2.      As of December 21, 2015, Foodonics, Jacques, Jean, individually and as Trustee of and on behalf of the Trust dated April 1, 1992, as Amended, Jacques and Jean, as Trustees of the Family Trust under the Edward Klempf Revocable Trust Agreement dated April 1, 1992, Dina and Marc entered into the Settlement and Redemption Agreement (the "Settlement Agreement"), a copy of which is attached hereto as Exhibit "A." The transactions contemplated by the Settlement Agreement were closed on or about December 31, 2015.

3.      The Background Recitals to the parties' Settlement Agreement explain why the parties entered into the agreement.  Prior to Edward Klempf's death, on October 18, 2002, Jacques had been elected President of Foodonics and served as a member of the Board of Directors.  The 2006 Shareholders Agreement removed Dina and Marc as shareholders of Foodonics and the restricted the right of the Trust and Jacques to sell their shares in Foodonics to third parties. Upon Jean's death, her estate was also required to sell her Foodonics stock to Jacques pursuant to an appraisal-based formula, adjusted for changes in Foodonics' annual revenue.

4.      The Background Recitals to the parties' Settlement Agreement, which refers to Foodonics as "the Company", provide as follows:

### Background Recitals

A.      Jean is the mother of Jacques, Marc and Dina. The Company was begun by Jean's husband, and the children's father, Edward Klempf. Following his death on October 18, 2002, Jean and Jacques became the primary shareholders of the Company.  In 2006, various of the Parties and some third parties to this Agreement entered into a number of transactions, including the execution of a shareholder agreement among the Company's shareholders (**the "2006 S/H Agreement"**). The 2006 S/H Agreement restricts Jean's ability to sell her shares of Company

stock, and requires that at her death, her estate must sell her shares of Company stock to Jacques for consideration computed by a formula, with the purchase price to be paid over an eight year period. That formula price is based in part on an appraisal of the Company's shares of stock conducted by Sheldrick, McGehee & Kohler of Jacksonville, Florida ("SMK").

**Disputes have arisen concerning the corporate governance of the Company, the lack of distributions to shareholders, over and above income tax distributions, and related matters (collectively, "Disputed Matters"). As a result Jean has threatened to file a lawsuit concerning those Disputed Matters and has incurred significant legal and accounting expenses in investigating and asserting those claims. Recognizing the legal and accounting fees the Parties have already incurred and that litigation would be very costly and disruptive, and desiring to avoid further family conflict, and expensive legal fees, the Parties desire to resolve the Disputed Matters. This Agreement affords the Parties the opportunity to accomplish these aims as well as allowing them to separate completely their joint business interests. (Emphasis added).[1]**

**After extensive, protracted and costly adversarial negotiations that have occurred for more than two (2) years among the Parties and their legal, accounting and tax advisors, the Parties are now motivated, in part, to enter into this Agreement to secure for Jean and her eventual beneficiaries, the adequate and full consideration for her shares of Company stock based upon an appraisal fairly conducted according to usual and customary valuation practices. (Emphasis added).[1]**

B.      The Seller owns 1,591,177 of the Company's issued and outstanding Class A Voting Shares (collectively referred to as the **"Class A Shares"**).

C.      The Seller owns 1,387,431 of the Company's issued and outstanding Class B Non-Voting Shares (collectively referred to as the **"Class B Shares"**). (The Seller's Class A Shares and the Seller's Class B Shares are sometimes referred to herein collectively as the **"Seller's Shares"**).

D.      The Seller and Jacques each own a one-half undivided interest in that certain real property located at 5139 Edgewood Court, Jacksonville, Florida 32254 (the **"Edgewood Court Property"**).

E.      Jean owns an undivided forty percent (40%) interest (**"Jean's 5K Interest"**) as a partner in 5K's General Partnership (**"5K Partnership"**).

F.      Marc owns an undivided twenty percent (20%) interest (**"Marc's 5K Interest"**) as a partner in 5K Partnership.

G.      Dina owns an undivided twenty percent (20%) interest (**"Dina's 5K Interest"**) as a partner in 5K Partnership.

---

[1] The Trust's claim that Jean accepted the terms of the Settlement Agreement based upon what she "thought were bonds of devotion and love between her and her son" (page 29, footnote 6 of counterclaim) is contrary to these express recitals in the parties' Settlement Agreement.

H.   The sole material asset of 5K Partnership is a parcel of real property owned by the 5K Sellers and Jacques. That real property is more particularly described as set forth on Exhibit A attached hereto (the **"5K Property"**).

I.   The Company owes the Family Trust $489,207.29 as of December 31, 2015, pursuant to that certain Promissory Note dated June 30, 2006 (the **"2006 Promissory Note"**), which indebtedness is secured, pursuant to that certain Stock Pledge Agreement of even date therewith (the **"2006 Stock Pledge"**), by a pledge of 422,033 shares of Class A Voting Common Stock, par value $0.003, and a pledge of 402,539 shares of Class B Non-Voting Common Stock, par value $0.003.   Collectively, the 2006 Promissory Note and the 2006 Stock Pledge are referred to as the **"2006 Documents"**.

**J.   The Seller, as a shareholder of the Company, on behalf of Jean individually, have threatened litigation against the Foodonics Parties concerning the Disputed Matters. This Agreement is intended, among other things, to settle absolutely and forever all known and unknown bases for such threatened litigation. (Emphasis added).**

K.   The Policy Owners own that certain life insurance policy issued by Massachusetts Mutual Life Insurance Company or its affiliate (the **"Insurance Company"**), policy number 15,587,790, with a specified face amount of Two Million Dollars ($2,000,000), together with internal fund value and cash surrender value (the **"Insurance Policy"**).

L.   SMK has performed an appraisal of the Seller's Shares, as set forth in a valuation report dated December, 2015 (the **"2015 SMK Valuation Report"**).   Moody Appraisal Group has performed an appraisal of (i) the 5Ks Seller's interests in the 5K Property, and (ii) Jean's interest in the Edgewood Court Property dated October, 2015 (the **"Moody Appraisals"**). These appraisals have been used to determine adequate and full consideration and to allocate the purchase price in Section 8 below.

M.   The Parties desire to accomplish the following transactions, on terms as more specifically described within this Agreement:

1.   **In full and complete settlement of all threatened litigation (emphasis added),** the Company desires to redeem from the Seller, and Seller desires to have redeemed, all of the Seller's Shares (the **"Stock Redemption"**);

2.   The 5K Sellers desire to sell to Jacques, and Jacques desires to acquire from the 5K Sellers, all of the 5K Sellers' respective interests in 5K Partnership and the 5K Property;

3.   Jean desires to sell to Jacques, and Jacques desires to acquire from Jean, all of her interest in the Edgewood Court Property;

4.   Jean, Jacques, Marc and Dina as beneficiaries of the Family Trust, and the Family Trust Trustees, desire to terminate and distribute the corpus of the Family Trust

14

for the benefit of Jean (as to the value of her income interest), and the remainder to Jacques, Marc and Dina equally.

5.      Jacques, Marc and Dina desire to create a new partnership whereby the Insurance Policy will be held by partnership, the terms of which will allow one or more of the Policy Owners to contribute funds to the partnership from time to time, and to provide for the repayment of those contributions upon the event of Jean's death, the liquidation of the partnership at that time, and the disbursement of the partnership's remaining assets to the partners;

6.      The Company and Jean wish to provide for the payment of income taxes attributable to the taxable income of the Company for any period of time in which the Seller was an owner of the Company; and

**7.      On the various terms and conditions set forth below, the Parties desire to settle any legal claims or disputes, including without limitation the Disputed Matters, that they may have against each other concerning the Company, its shares of stock, outstanding promissory notes, the Edgewood Court Property, the 5Ks Property, and the threatened litigation. (Emphasis added).**

5.      The parties acknowledged that the above-referenced "Background Recitals" to the Settlement Agreement were true and correct, and they incorporated these recitals into the body of the Settlement Agreement. The parties expressly agreed to include the above-referenced recitals as terms of their agreement. The parties further acknowledged their various agreements, obligations, terms, conditions, waivers and releases described in the Settlement Agreement, as well as the receipt and sufficiency of valuable consideration for the same.

6.      Jean, individually, and as Trustee, was represented throughout the negotiation, execution and closing of the Settlement Agreement by Blackburn, a highly experienced business, estate, trust and tax attorney and by Daniel Edelman ("Edelman"), a sophisticated certified public accountant, business valuation expert and business consultant with substantial skills and experience in the resolution of complex business problems and the valuation and transfer of business assets. With his valuation and forensic certification, Edelman has been involved in over 200 business valuation and litigation matters.

7.      Pursuant to the Settlement Agreement, and conditioned upon the release of various claims, the waiver of various rights, and the settlement of various disputes, all as more particularly described in the agreement, Foodonics and Jacques paid the sum of $9,418,500 for the redemption of all Foodonics stock held by the Trust.  In addition, the ownership of two (2) Lexus vehicles was transferred from Foodonics to Jean.  Foodonics also paid $489,207.29, representing the remaining, as-yet undue balance of the 2006 Promissory Note as defined in Background Recital 'I', to the Family Trust (one of the parties to the Settlement Agreement, the then beneficiary of which was Jean).  Further, Jacques paid Jean the sum of $221,500 for her interest in real property located in Jacksonville, Florida pursuant to an appraisal.  Jacques also paid Jean, Marc, and Dina the sum of $360,000 for their interest in real property located in Georgia pursuant to an appraisal.

8.      The beneficiaries of the Trust and Estate were Dina and Marc.

9.      Moreover, as part of the consideration for the Settlement Agreement, the parties agreed to very detailed, specific mutual releases as follows:

7.      **Mutual Releases.**

(a)     As partial consideration for payment of the aggregate Purchase Price by the Foodonics Parties to the Seller and the 5K Sellers as described in Section 8 below, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, each of the Seller, each 5K Seller, the Family Trust Trustees, as well as Jean both individually and in her capacity as trustee of any trust under the Edward Klempf Revocable Trust dated April 1, 1982, (collectively, the **"Releasing Parties"**), effective as of the Closing Date **hereby release and waive any and all claims, causes of action, suits, rights or damages each has or may have, and represents, warrants and agrees that it has no colorable claims against, any of the Foodonics Parties or any of their affiliates, including any arising under the 2006 Documents (emphasis added)** except:

(i)      with respect to any rights and obligations under that certain Agreement Regarding Condominium Use between the Company, Jacques, Dina and Mark dated September 2006 (the **"Condo Agreement"**) pertaining to

16

condominium Unit 615, located at Surf Villas Condominiums, 615 Summer Place, Ponte Vedra Beach, Florida 32082, including without limitation the purchase option set forth in the Condo Agreement; and

(ii)     the rights and obligations of the parties set forth in this Agreement and related documents.

(iii)    the rights and obligations under the 2006 Documents as modified in accordance with this Agreement.

**Without limiting the foregoing, each of the Releasing Parties hereby forever waives, releases and terminates, and shall treat as fully performed, all agreements, obligations and understandings each may have with Jacques or the Company not specifically set forth in this Agreement or in the Condo Agreement. (Emphasis added).**

(b)     For good and valuable consideration, the Seller, Jean and the Family Trust Trustees (i) hereby waive and release the Company and all other Parties from any default or breach which may otherwise occur under the 2006 Documents as a result of the transactions contemplated by this Agreement as a "Change in Control Transaction," as such term is referred to in the 2006 Documents, and (ii) hereby represent, warrant and agree that no such breach or default exists, and no set of facts exist that would, with the passage of time or otherwise, constitute a default, under the 2006 Documents, and (iii) agree that the 2006 Documents are hereby deemed terminated to permit the transactions contemplated hereby.

(c)     For good and valuable consideration, the Foodonics Parties hereby release Jean in her individual capacity or any other capacity, from any and all claims, causes of action, suits, rights or damages that the Foodonics Parties have or may have against her, and each of the Foodonics Parties represents, warrants and agrees that it has no colorable claims against Jean, except the rights and obligations of the Parties set forth in this agreement and related transactions. Without limiting the foregoing, each of the Foodonics Parties waives, releases and terminates, and shall treat as fully performed, all agreements and understandings each may have with Jean not specifically set forth in this Agreement.

10.     The Foodonics Parties made the following representations and warranties as part

of the Settlement and Redemption Agreement:

10.     **Representations and Warranties.**

(b)     **From the Foodonics Parties.**   The Foodonics Parties hereby jointly and severally represent and warrant to the Seller and the 5K Sellers that the

statements in this Section 10(b) are correct and complete as of the date of this Agreement (except as expressly noted herein) and will be correct and complete as of the Closing Date (as though made then and as though the Closing Date were substituted for the date of this Agreement throughout this Section 10(b)):

(i)     The execution, delivery and performance of this Agreement and the other documents and agreements contemplated hereby, and the consummation of the transactions contemplated hereby and thereby, will not result in any violation on the part of any of the Foodonics Parties or be in conflict with, or constitute (with or without the passage of time and giving of notice) a default on the part of any of the Foodonics Parties under: (i) the organizational documents of such Foodonics Party; (ii) any material contract, agreement, mortgage, note, bond, indenture or lease to which such Foodonics Party is a Party; or (iii) any law, rule, regulation, instrument, contract, judgment, order, writ, or decree to which any of the Foodonics Parties is a Party, or (iv) result in the acceleration of any indebtedness or in the creation of any encumbrance upon such Foodonics Party's assets.

(ii)    Each of the Foodonics Parties has the right, power, and authority to enter into and perform its obligations under this agreement and the other documents and agreements contemplated hereby. Each of the Foodonics Parties has duly authorized, executed and delivered this Agreement, and this Agreement is, and each of such other documents and agreements contemplated hereby when executed will be, a valid and binding agreement of each of the Foodonics Parties, enforceable against each of the Foodonics Parties in accordance with its terms, except as such enforcement may be subject to bankruptcy, insolvency, reorganization, moratorium, or other similar laws now or hereafter in effect relating to creditor's rights and general principles of equity.

**(iii)    The Foodonics Parties hereby jointly and severally represent and warrant to the Seller that as of the Closing Date: (i) there are no current offers pending nor ongoing discussions: (A) for the sale of all or substantially all of the assets of the Company; (B) for the sale by Jacques of his stock in the Company or (C) to effect a merger, stock exchange or other transaction which would have the effect of either Jacques no longer holding a majority of the outstanding shares of stock of the Company or the Company no longer owning substantially all of the assets that it currently owns (collectively referred to as a "Realization Event"); (ii) the Foodonics Parties have not received any written offers to effect a Realization Event within the twelve (12) months prior to the date of this Agreement. (Emphasis added).**

18

11.     The representations and warranties made by the Foodonics Parties in Paragraph 10(b)(iii) of the Settlement Agreement were true and correct.  There were "no current offers pending nor ongoing discussions" for the sale of all or substantially all of the assets of Foodonics, for the sale by Jacques of his stock in Foodonics, or to effect a merger, stock exchange or other "Realization Event" as of the Closing Date of December 31, 2015.  Moreover, the Foodonics Parties had not received any written offers to effect a Realization Event within twelve (12) months prior to the date of the parties' Settlement Agreement.  In fact, the Trust, in paragraph 40 of the Counterclaim, has erroneously relied on a typographical date error of one-year in a January 6, 2017 email by Jacques.  The email erroneously references April, 2015 which is in fact a reference to April 2016 when the email is considered in context and in its entirety.

12.     The Trust, represented by sophisticated legal, including Blackburn, tax, accounting and business counsel, could have negotiated for broader representations and warranties from the Foodonics Parties, or could have negotiated for participation rights in a future sale of the assets of Foodonics.  Instead, the Trust, knowingly, voluntarily and with professional advisors, entered into the Settlement Agreement, containing the referenced contractual provisions, for valuable consideration.

13.     In fact, the Trust admits, at page 29, footnote 6 of the counterclaim, that during the parties' negotiations of the Settlement Agreement, it requested a "sale recapture" provision by which it would be "paid an additional amount for its stock if Jacques sold Foodonics within two years of closing the Redemption Agreement."  This "sale recapture" provision was not agreed to by the parties and was not included in the final Settlement Agreement.  Instead, the Trust, for valuable consideration and with the advice of highly sophisticated legal, including

Blackburn, tax, accounting and business counsel, agreed to the above referenced terms and representations set forth in the Settlement Agreement.

14.    The Trust, its beneficiaries Jean, Dina and Marc and its team of legal, including Blackburn, tax, accounting and business counsel were all well aware, at all material times, that Jacques Klempf possessed the legal and corporate authority to sell substantially all of the assets of Foodonics at any time following the closing of the Settlement Agreement, with no compensation owed to the Trust, so long as the sale, at the time of closing, was not made to a buyer which had made a written offer to purchase within the twelve (12) month period prior to closing, nor to a buyer with whom the Foodonics Parties had received a pending current offer or were engaged in ongoing discussions concerning such sale.

15.    The Trust, Jean, Dina, Marc and their team of legal, including Blackburn, tax, accounting and business advisors were all well aware of Cal-Maine and its prominence in the egg industry at all material times to this case. In fact, the Trust has admitted, at paragraph 43 of its counterclaim, the October 13, 2009 email from Jacques stating that "I have been approached on more than one occasion from Cal-Maine Foods… regarding my interest to sell the company," that Cal-Maine had acquired several other companies, and that Dixie Egg Company might be a very strategic acquisition target for Cal-Maine to block entry into the Florida/Georgia market by one if its competitors.

16.    In paragraph 14 of the Settlement Agreement, each of the parties agreed that they will take no action that is inconsistent with any of the provisions or requirements of that agreement. The Trust has materially breached its release and this provision by asserting its counterclaims.

20

17.    Moreover, the Settlement Agreement expressly provides in paragraph 16(b) that the Settlement Agreement shall be governed by and construed in accordance with the laws of the State of Florida.

18.    The Trust entered into the parties' Settlement Agreement freely, voluntarily, knowingly, for valuable consideration and with the advice of highly sophisticated legal, including Blackburn, tax, accounting and business counsel.

19.    The Settlement Agreement is a complex business transaction involving substantial consideration moving between the various parties to the agreement.  All parties were *sui juris* and represented by expert legal, including Blackburn, accounting, tax and business counsel.  The Settlement Agreement is clear and unambiguous.  Therefore, the parties' Settlement Agreement should be enforced as written under Florida law.

20.    Furthermore, settlement agreements are highly favored under Florida law as a means of resolving disputes and conserving judicial resources.  Accordingly, Florida public policy strongly supports the enforcement of settlement agreements whenever possible. Similarly, Florida courts enforce general releases within settlement agreements to further the public policy of encouraging settlements.

21.    The Trust is wrongfully asking the Court to disregard and rewrite the parties' Settlement Agreement and thereby interfere with the parties' freedom of contract.  The Trust asks this Court to grant the Trust the benefit of terms and conditions to which the parties to the agreement did not agree.    Although the parties have agreed to very specific terms, representations, warranties and contractual provisions, in complex, multi-faceted, multi-party commercial transaction, the Trust now asks this court to find liability against one party for

breach of a provision of the Trust asked for and wished had been included in the Settlement Agreement, but which was not agreed to by the parties.

22.     In addition, the parties expressly agreed, at paragraphs 16 (d), (e) and (f) of their Settlement Agreement, as follows:

(d)     This Agreement and the other writings referred to herein contain the entire understanding of the Parties with respect to its subject matter.   This Agreement supersedes all prior agreements and understanding among the Parties with respect to its subject matter.

(e)     This Agreement may be amended only by a written instrument duly executed by the Parties hereto.   This Agreement (including without limitation this Section 16(e)) may not be amended by oral agreement, waiver or course of dealing among the Parties.

(f)     The Parties have participated jointly in the negotiation and drafting of this Agreement. In addition, all Parties have been represented by their own legal counsel in the negotiation and preparation of this Agreement. Each Party has had the opportunity to consult counsel prior to executing this Agreement.

23.     Paragraph 16(d) of the Settlement Agreement eliminates any extraneous terms of the parties' agreement not included in the document.   Moreover, paragraph 16(e) precludes changes to the agreement absent consent by all parties; and that no party was without the benefit of counsel.

24.     In approximately March or April, 2016, due to changing industry and market conditions prevailing at that time, Jacques decided to explore a possible sale of substantially all of the assets of Foodonics. A nondisclosure agreement between Foodonics and Cal-Maine was executed in April or May, 2016. A Letter of Intent was executed between Foodonics and Cal-Maine for the purchase and sale of substantially all of the assets of Foodonics on about August 3, 2016.

25.     In about November of 2016, Cal-Maine purchased substantially all of the assets of Foodonics for $71,643,000. Since the transaction was structured as an asset purchase and sale rather than a stock purchase and sale, Foodonics was obligated to pay all of its liabilities and debts which were not assumed by Cal-Maine. The Trust claims that, had it remained a shareholder of Foodonics at the time of the Cal-Maine transaction, it would have received $32,675,330 of the $71,643,000, or about $23,200,000 more than the Trust was paid for its stock through the Settlement Agreement. This assertion is wrong for many reasons, among which is that the assertion obviously overlooks the payment of liabilities and debts of Foodonics from the $71,643,000 sale proceeds.   The Trust's assertion grossly mischaracterizes the subject transactions.

26.     Jacques devoted his full and extraordinary efforts to the business of Foodonics and made the major decisions for the Company for many years prior to the sale to Cal-Maine. As a consequence of the considerable efforts, sweat and toil of Jacques over a period of many years, substantial value was created which provided significant economic benefit in the millions of dollars to the Trust, to Jean personally, and to Dina and Marc.

27.     The 2006 purchase of the Foodonics stock owned by Dina and Marc, the limitation of shareholder distributions to allocable tax liability, the compensation of Jacques for his services, and the restrictions and terms for the sale of the Foodonics stock owned by the Trust are irrelevant to this action but were all established lawfully, for valuable consideration and with all parties represented by competent legal, including Blackburn, accounting, tax and business counsel.

28.     Foodonics and Jacques complied with all of their obligations under the 2006 Agreement, as well as under the Settlement Agreement. Foodonics and Jacques fulfilled all of

their legal, contractual and disclosure obligations to the Trust at the time of the Settlement Agreement. Foodonics and Jacques are not guilty of any non-disclosure of material facts in their dealings with the Trust. Moreover, Foodonics and Jacques had no intent to deceive, manipulate or defraud the Trust in connection with the parties' Settlement Agreement. Furthermore, the Trust did not reasonably rely on any alleged non-disclosure by Foodonics and Jacques. The Settlement Agreement provided the Trust with an opportunity for liquidity that was not otherwise available. There is no legal or equitable basis for the Trust to obtain a windfall by taking unfair advantage of events subsequent to the parties' Settlement Agreement for which it waived and released any claim, in direct contravention of the Settlement Agreement.

30.     At paragraph 15 of the Settlement Agreement, the parties agreed "In the event of any litigation to construe or enforce this Agreement (or the agreements contemplated herein), the prevailing Party shall be entitled to recover the prevailing Party's reasonable attorney's fees and costs from the non-prevailing Party, whether at trial or on appeal."

### First Affirmative Defense
*(Settlement)*

The Trust's counterclaim is without merit and should be dismissed with prejudice because of the settlement between the parties set forth in the Settlement Agreement attached hereto as Exhibit "A."

### Second Affirmative Defense
*(Accord and Satisfaction)*

The Trust's counterclaim is without merit and should be dismissed with prejudice based on the principle of accord and satisfaction as a consequence of the parties' Settlement Agreement attached hereto as Exhibit "A."

### Third Affirmative Defense
### *(Release)*

The Trust's counterclaim is without merit and should be dismissed with prejudice because of the release set forth in the Settlement Agreement attached hereto as Exhibit "A."

### Fourth Affirmative Defense
### *(Waiver)*

The Trust's counterclaim is without merit and should be dismissed with prejudice based on the principle of waiver as a consequence of the settlement, release, merger and other terms of the Settlement and Redemption Agreement attached hereto as Exhibit "A."

### Fifth Affirmative Defense
### *(Estoppel)*

The Trust's counterclaim is without merit and should be dismissed with prejudice based on the principle of estoppel as a consequence of the settlement, release, merger and other terms of the Settlement Agreement attached hereto as Exhibit "A."

### Sixth Affirmative Defense
### *(Assumption of Risk)*

The Trust entered into the Settlement Agreement knowingly, voluntarily and with the advice of experienced legal, including Blackburn, accounting, tax and business counsel.  The Trust, acting knowingly, voluntarily and with the advice of experienced legal, including Blackburn, accounting, tax and business counsel, gave up its request for a "sale recapture" provision in the Settlement Agreement and therefore assumed the risk of a later sale of the stock or assets of Foodonics.

### Seventh Affirmative Defense
#### *(Jean Klempf Trust's Material Breach)*

The Trust's counterclaim is without merit and should be dismissed with prejudice because of its material and substantial breaches of the provisions of the Settlement Agreement attached hereto as Exhibit "A."

### Eighth Affirmative Defense
#### *(Performance by Foodonics and Jacques)*

The Trust's counterclaim is without merit and should be dismissed with prejudice because Foodonics and Jacques have duly performed all of their obligations under the Settlement Agreement attached hereto as Exhibit "A."

### Ninth Affirmative Defense
#### *(Failure to State Any Claim Upon Which Relief Can Be Granted)*

For all of the foregoing reasons, the Trust fails to state any claim upon which relief can be granted.

WHEREFORE, Foodonics and Jacques request that the Trust's counterclaim be dismissed with prejudice and that Foodonics and Jacques be granted the relief set forth in its Complaint, including an award of all attorneys' fees and costs incurred in this case.

Dated this 9th day of March, 2018.

/s/ S. Grier Wells
S. GRIER WELLS, ESQ.
Florida Bar No.: 203238
Primary E-Mail Address:
grier.wells@gray-robinson.com
Secondary E-Mail Address:
elizabeth.irvine@gray-robinson.com
GrayRobinson, P.A.
50 North Laura Street, Suite 1100
Jacksonville, Florida 32202
Phone: (904)-598-9929
Fax: (904)-598-9109
JOHN M. BRENNAN
Florida Bar No.: 297951
Primary E-Mail Address:
jay.brennan@gray-robinson.com
Secondary E-Mail Address:
jessica.rolon@gray-robinson.com
MICHAEL R. SANTANA
Florida Bar No.: 42124
Primary E-Mail Address:
michael.santana@gray-robinson.com
Secondary E-Mail Address:
lisandra.acosta@gray-robinson.com
GrayRobinson, P.A.
301 East Pine Street, Suite 1400
Orlando, Florida  32802
Phone:  (407) 843-8880
Fax:     (407) 244-5690
Attorneys for Plaintiff/ Counterclaim
Defendants, FOODONICS
INTERNATIONAL, INC., a Florida
Corporation and KEVIN JACQUES
KLEMPF

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that the foregoing was served electronically filed with the Clerk of the Court through the Court's CM/ECF electronic notification system and furnished by email delivery to JAMES H. POST, ESQ., MICHAEL E. DEMONT and R. CHRISTOPHER DIX (*jpost@smithhulsey.com, mdemont@smithhulsey.com, cdix@smithhulsey.com*), Smith Hulsey & Busey, 225 Water Street, Suite 1800, Jacksonville, Florida 32202 (*Attorneys for Defendant/Counterclaim Plaintiffs*), this 9th day of March, 2018.

/s/ S. Grier Wells, Esq.
Attorney

**TAB 13**

IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

FOODONICS INTERNATIONAL, INC.,
a Florida corporation,

        Plaintiff,               Case No.: 3:17-cv-1054-J-32JRK

v.

DINA KLEMPF SROCHI, as Trustee
of the LAURA JEAN KLEMPF
REVOCABLE TRUST, a Georgia
trust,

        Defendant,

_____/

## GRAYROBINSON'S OBJECTIONS AND RESPONSE TO SUBPOENA

        GrayRobinson, P.A., an non-party to this action, submits its objections and response to

the subpoena served upon it by Defendant/Counterclaimant on or about March 2, 2018.

## PRELIMINARY STATEMENT

        1.     GrayRobinson, P.A. has served as counsel for Plaintiff Foodonics International,

Inc. ("Foodonics") and, from time to time, its principal, Kevin Jacques Klempf ("Jacques"),

since approximately 2006. During the course of its representation of Foodonics and/or Jacques,

GrayRobinson has been engaged in a variety of matters, the vast majority of which are totally

unrelated to the instant litigation.

        2.     Through GrayRobinson, Foodonics filed a Complaint in this Court claiming

damages related to a 2015 tax refund and declaratory relief based on a draft complaint presented

on behalf of Defendant to Foodonics alleging it committed fraud in redeeming shares of

Foodonics stock from the Laura Jean Klempf Revocable Trust ("Trust") prior to a sale of

Foodonics' assets to Cal-Maine Foods, Inc. ("Defendant's Threatened Complaint").

3.     A Counterclaim has now been filed on behalf of Defendant and other Counter Plaintiffs essentially incorporating the allegations in the Threatened Complaint and which relates to the acquisition of the Trust stock in December 2015 by virtue of a Settlement and Redemption Agreement ("Settlement Agreement") and a subsequent sale of Foodonics assets to Cal-Maine.

4.     GrayRobinson was engaged by Foodonics and Jacques to negotiate, document and otherwise close the transaction involving the Settlement Agreement on behalf of Foodonics and Jacques which included significant communications with representatives of the Trust, including Dennis L. Blackburn ("Blackburn"), a Counterclaim Party, and Daniel Edelman ("Edelman"), an accountant representing the Trust.

5.     GrayRobinson was also engaged by Foodonics to negotiate, document and otherwise close the transaction involving the sale of Foodonics assets to Cal-Maine beginning in or about April 2016, and which asset sale concluded in October 2016, well subsequent to the closing of the transaction surrounding the Settlement Agreement in December 2015.

6.     The Counterclaim is rife with conclusory allegations of alleged fraud and contains no material allegations to support its claims. The only purpose served by the subpoena to GrayRobinson is to conduct a fishing expedition for nonexistent evidence.

7.     The definitions set forth in the subpoena include multiple parties within the identification of one party, individual, or entity – thereby necessitating responses on behalf of parties, individuals or entities which are not subject to the subpoena.

8.     The Settlement Agreement entered into as of December 21, 2015 and referred to in the Complaint and Counterclaim contains representations that "the Foodonics Parties have not received any written offers to effect a Realization Event [e.g. a sale of the assets or stock of Foodonics] within the twelve (12) months prior to the date of this Agreement."

9. The Definitions in the Subpoena include multiple parties within the specification of one party, individual, or entity – thereby necessitating responses on behalf of parties, individuals, or entities which are not the sole party subject to the Subpoena.

10. By objecting to this Subpoena, GrayRobinson does not waive or intend to waive: (a) any objections as to the competency, relevancy, materiality, privilege, or admissibility as evidence, for any purpose, of any documents or information produced in response to the Subpoena; (b) the right to object on any ground to the use of the documents or information produced in response to the Subpoena at any hearing, trial, or other point during the litigation; (c) the right to object on any ground at any time to a demand for further response to the Subpoena; or (d) the right at any time to revise, correct, add to, supplement, or clarify any of the responses to the Subpoena consistent with the applicable rules.

11. The information and objections asserted herein are for use in this litigation and for no other purposes or litigation.

12. No objection made herein, or lack thereof, is an admission by GrayRobinson as to the existence or non-existence of any information.

13. GrayRobinson will produce Documents and ESI, subject to these Objections, to the extent they are in its possession.

## GENERAL OBJECTIONS

1. GrayRobinson expressly incorporates all of the General Objections below into the specific objections to each of the enumerated Subpoena requests. Any specific objections provided below are made in addition to these General Objections, and the failure to reiterate a General Objection below does not constitute a waiver of that or any other objection.

2. The Subpoena is overbroad, unduly burdensome, and not proportional to the needs or issues of the case in that its enumerated requests are not relevant to any claim or defense

presented in the Complaint or Counterclaim. The Subpoena and each enumerated request is not sufficiently limited in scope or subject matter, with the only limiting factor being certain time periods which themselves are excessive, unreasonable, overbroad, unduly burdensome, and not proportional to the needs or issues of the case.

3.     The Requests are overbroad, unduly burdensome, and not proportional to the needs or issues of the case in that they seek information subject to both the attorney client privilege and work product privilege and otherwise regarding confidential, trade secret, commercially sensitive, and/or other proprietary or competitively sensitive information concerning Foodonics and Jacques' business activities or operations, the disclosure or dissemination of which could cause harm or prejudice, and otherwise fail to provide a mechanism for documents containing commercially sensitive and confidential information to be designated as confidential pursuant to a protective order.

4.     The Subpoena seeks information not proportional to the needs or issues of the case considering (a) the marginal importance of the materials to the claims and defenses in this litigation and (b) the probable substantial cost to identify responsive materials balanced against the amount in controversy.

5.     The Subpoena is overbroad, unduly burdensome, and not proportional to the needs or issues of the case. The Subpoena seeks documents from GrayRobinson which relate to virtually every matter for which GrayRobinson was engaged on behalf of Foodonics or Jacques since September 2008.

6.     GrayRobinson objects to each request in the Subpoena to the extent that it seeks information protected by the attorney–client privilege, the work product privilege or any other applicable privileges and protections.

4

7.     GrayRobinson objects to each request in the Subpoena to the extent that Defendant/Counterclaimant has made the same request to the named Plaintiff/Counter defendant in this litigation.  It is more appropriate for such requests to be made to Foodonics and/or Jacques.

8.     GrayRobinson objects to each request in the Subpoena to the extent that it seeks information that Mr. Klempf licensed or obtained from third parties and/or cannot disclose without prior approval of the third parties.

9.     GrayRobinson objects to Defendant's "Definitions" and "Instructions" in the Subpoena and to the Subpoena requests themselves to the extent they expand upon, alter, or are inconsistent with GrayRobinson's obligations under the Federal Rules of Civil Procedure or the Local Rules of this Court.

10.     GrayRobinson objects to each Definition and/or request in the Subpoena as overbroad, unduly burdensome, and interposed for an improper purpose to the extent the definition and/or request purports to require GrayRobinson to produce documents or information held or controlled by parties other than GrayRobinson.

11.     GrayRobinson objects to the definition of "Documents" as set forth in Definition No. 4 to the extent it attempts to expand upon or is inconsistent with its obligations under the Federal Rules of Civil Procedure and the Local Rules of this District.

12.     GrayRobinson objects to the definition of "ESI" as set forth in Definition No. 6 as overbroad and unduly burdensome in that it seeks to compel GrayRobinson to engage in the collection, processing and review of a virtually unlimited scope of ESI without narrowing the terms, subject matter, or dates of the ESI – such failure to limit the scope does not comply with Fed. R. Civ. P. 45 and the Middle District of Florida's Handbook on Civil Discovery Section

VIII(C), and attempts to unnecessarily add substantially to the burden and expense imposed on GrayRobinson.

13.    GrayRobinson objects to the definition of "Financial Information" as set forth in Definition No. 7 as overbroad, vague, and unduly burdensome.

14.    GrayRobinson objects to the definitions of "You" and "Your" as set forth in Definition No. 18 as vague, overly broad, unduly burdensome, incorrect and improper. GrayRobinson will interpret the terms "You" and "Your" to mean only GrayRobinson's attorneys and employees, unless otherwise explicitly stated.

15.    GrayRobinson objects to the time period described in Definition No. 19, particularly the start date, as overbroad, unduly burdensome, and not relevant to the claims or defenses in this case in that it seeks to establish a relevant time period of September 1, 2008 to the date of this response. The claim for the 2015 tax refund concerns calendar year 2015. The purchase of stock from the Trust by Foodonics occurred on December 31, 2015 with a "look back" of one year. The sale of assets from Foodonics to Cal-Maine occurred on October 16, 2016. Documents prior to December 2014 are not reasonably calculated to lead to the discovery of admissible evidence nor relevant to any party's claim or defense, and would require GrayRobinson, a nonparty, to undertake an unnecessary and expensive burden which exceeds the scope of permissible discovery to a nonparty. Even a request for preservation of documents created prior to December 1, 2014 would be objectionable for the same reasons provided hereinabove.

16.    GrayRobinson objects to Instruction No. 1 regarding the discovery requests being "continuing in nature" to the extent that it is a non-party to which such obligation is not required.

17.     GrayRobinson objects to Instruction No. 2 regarding identification of a privileged document or ESI to the extent that it attempts to expand upon or is inconsistent with its obligations under the Federal Rules of Civil Procedure and the Local Rules of this District.

18.     GrayRobinson objects to Instruction No. 3 to the extent that it attempts to expand upon, or is inconsistent with, its obligations under the Federal Rules of Civil Procedure and the Local Rules of this District.

19.     GrayRobinson objects to Instruction No. 4 to the extent that it attempts to expand upon, or is inconsistent with, its obligations under the Federal Rules of Civil Procedure and the Local Rules of this District.

## DOCUMENT REQUESTS

Subject to the foregoing General Objections, and without waiving and expressly preserving all such objections, which are hereby incorporated into the response to each Request, GrayRobinson responds to the Requests as follows:

1.     All Documents or ESI referring or relating to both Jacques Klempf and:

    a.     Laura Jean Klempf.

    b.     The Trust.

    c.     Cal-Maine.

    d.     Dolph Baker.

    e.     Marc Klempf.

    f.     Dina Klempf Srochi.

    g.     Steven Brust.

    h.     Dennis L. Blackburn.

    i.     GlassRatner Advisory & Capital Group, LLC.

    j.     Ian Rather.

k.   Jess W. Wright.

l.    Sheldrick, McGehee & Kohler, LLC.

m.   John P. Stevens.

n.   Stevens, Powell & Company, P.A.

o.   Robert Monsky.

p.   First Florida Capital Corporation.

**Response:**   The forgoing general objections notwithstanding, GrayRobinson objects to the production of documents and ESI identified in request #1 as over broad, vague, unduly burdensome and not proportional to the needs or issues of the case in that the request for all documents relating to Jacques Klempf and 16 individuals or entities for a period of almost 10 years, the overwhelming majority of which documents would be wholly irrelevant to any of the issues in this litigation and not relevant to any claim or defense presented herein.

**Request for Production No. 2:**   All Documents or ESI referring or relating to both

Foodonics and:

a.   Laura Jean Klempf.

b.   The Trust.

d.   Cal-Main

e.   Dolph Baker.

f.   Marc Klempf.

g.   Dina Klempf Srochi.

h.   Steven Brust.

i.   Dennis L. Blackburn.

j.   GlassRatner Advisory & Capital Group, LLC.

k.   Ian Ratner.

l.   Jess W. Wright.

m.   Sheldrick, McGehee & Kohler, LLC.

n.  John P. Stevens.

o.  Stevens, Powell & Company, P.A.

p.  Robert Monsky.

q.  First Florida Capital Corporation.

**Response:**   The forgoing general objections notwithstanding, GrayRobinson objects to the production of documents and ESI identified in request #1 as over broad, vague, unduly burdensome and not proportional to the needs or issues of the case in that the request for all documents relating to Jacques Klempf and 16 individuals or entities for a period of almost 10 years, the overwhelming majority of which documents would be wholly irrelevant to any of the issues in this litigation and not relevant to any claim or defense presented herein.

**Request for Production No. 3:**   All Documents or ESI referring or relating to the Settlement and Redemption Agreement.

**Response:**   Subject to the foregoing General Objections, specifically including objections as to documents within the attorney client privilege and the work product privilege, documents or ESI responsive to the request will be produced.

**Request for Production No. 4:**   All Documents or ESI referring or relating to the Cal-Maine Sale, including all closing documents and other agreements relating to the Cal-Maine Sale.

**Response:**   Subject to the foregoing General Objections, specifically including objections as to documents within the attorney client privilege and the work product privilege, documents or ESI responsive to the request will be produced to the extent such documents are in the possession of GrayRobinson.

**Request for Production No. 5:**   All Documents and ESI relating to the sale of Foodonics' Assets or Foodonics' Stock.

**Response:**   Subject to the foregoing General Objections, specifically including objections as documents within to the attorney client privilege and the work product privilege, documents or ESI responsive to the request will be produced to the extent such documents are in the possession of GrayRobinson.

**Request for Production No. 6:**   All Documents and ESI relating to or containing any representations or estimates made by Jacques Klempf or Foodonics to any person or entity regarding the value of Foodonics' Stock or Foodonics' Assets from September 1, 2008 through the date of production.

**Response:**   Subject to the foregoing General Objections, specifically including objections as to documents within the attorney client privilege, the work product privilege and

the overbroad date range, documents responsive to the request will be produced for the period from December 2014 to the extent such documents are in the possession of GrayRobinson.

**Request for Production No. 7:**    All Documents and ESI relating to the value of Foodonics' Stock or Foodonics' Assets from September 1, 2008 through the date of production.

**Response:**    Subject to the foregoing General Objections, specifically including objections as to documents within the attorney client privilege the work product privilege and the overbroad date range, documents or ESI responsive to this request will be produced from the period from December 2014 to the extent such documents are in the possession of GrayRobinson.

**Request for Production No. 8:**    All Documents and ESI relating to any proposals, offers or discussions Jacques Klempf or Foodonics had with any person or entity regarding any possible purchase or sale of Foodonics' Assets or Foodonics' Stock.

**Response:**    Subject to the foregoing General Objections, specifically including objections as to documents within the attorney client privilege, the work product privilege and the overbroad date range, documents or ESI responsive to this request will be produced for the period from December 2014 to the extent such documents are in the possession of GrayRobinson.

**Request for Production No. 9:**    All Documents and ESI referring or relating to the transfer of any Foodonics' Assets to (i) BAM Residential Holdings, LLC; (ii) BAM Commercial Holdings, LLC; or (iii) BAM Investment Group, LLC.

**Response:**    Subject to the foregoing General Objections, specifically including objections as to documents within the attorney client privilege, the work product privilege, the overbroad date range, and proprietary or confidential objections, documents or ESI responsive to this request will be produced to the extent such documents are in the possession of GrayRobinson.

**Request for Production No. 10:**    All corporate minutes for Foodonics for the years 2012 through the date of production.

**Response:**    Subject to the foregoing General Objections, corporate minutes for Foodonics which refer or relate to the Settlement Agreement or the sale of assets to Cal-Maine will be produced.

**Request for Production No. 11:**    All filings with any state or federal governmental agency, including the Securities and Exchange Commission, referring or relating to Foodonics or Jacques Klempf.

**Response:**    Subject to the foregoing General Objections, to the extent any such documents exist and are in the possession of GrayRobinson, they will be produced for the period of December, 2014 through the present.

**Request for Production No. 12:**     All Documents and ESI referring or relating to any discussions between Jacques Klempf and Dolph Baker or Cal-Maine where the subject matter related to (i) the value of Foodonics' assets or stock or (ii) a potential or actual purchase of Foodonics' assets or stock by Cal-Maine or any related affiliate thereof.

**Response:**     Subject to the foregoing General Objections, specifically including objections as to documents within the attorney client privilege, the work product privilege and the overbroad date range, documents or ESI responsive to the request will be produced for the period from December 2014 to the present to the extent they are in the possession of GrayRobinson.

**Request for Production No. 13:**     All Documents and ESI exchanged between Dolph Baker and Jacques Klempf regarding the claims asserted by the Trust or Jean Klempf against Jacques Klempf or Foodonics.

**Response:**     Subject to the foregoing General Objections, specifically including objections as to documents within the attorney client privilege, the work product privilege and the overbroad date range documents or ESI responsive to the request will be produced to the extent they are in the possession of GrayRobinson.

**Request for Production No. 14:**     All Documents and ESI reflecting any communications sent to or sent by Dolph Baker or Cal-Maine regarding a purchase of Foodonics' assets or stock.

**Response:**     Subject to the foregoing General Objections, specifically including objections as to documents within the attorney client privilege, the work product privilege and the overbroad date range, documents or ESI responsive to the request will be produced for the period from December 2014 to the present to the extent they are in the possession of GrayRobinson.

**Request for Production No. 15:**     All documents and ESI relating to the allegations in paragraph 14 of the Foodonics Complaint that "[f]ollowing the 2006 Transaction, Foodonics made estimated income tax payments to the Internal Revenue Service ("IRS") on behalf of Jacques and Mrs. Klempf in amounts equal to their anticipated annual income tax liabilities resulting from the inclusion in their personal income of their relative share of Foodonics' income" for the years 2006 through the date of production.

**Response:**     Subject to the foregoing General Objections, specifically including objections as to documents within the attorney client privilege and the work product privilege, documents or ESI responsive to this request will be produced to the extent they are in the possession of GrayRobinson.

**Request for Production No. 16:**     All documents and ESI relating to the allegations in paragraph 16 of the Foodonics Complaint that "Foodonics' income is calculated and reported to the IRS after the end of the relevant tax year. As a result, the estimated tax payments were paid to IRS on

behalf of Jacques Klempf, before the end of each taxable year, based on estimates of Foodonics' eventual taxable income."

**Response:** Subject to the foregoing General Objections, specifically including objections as to documents within the attorney client privilege, the work product privilege and the overbroad date range documents or ESI responsive to the request will be produced to the extent they are in the possession of GrayRobinson.

**Request for Production No. 17:** All documents and ESI relating to the allegations in paragraph 18 of the Foodonics Complaint that "for tax year 2015, Foodonics paid estimated taxes on behalf of its shareholders, Jacques and Mrs. Klempf. Because the precise amount of tax liability could not be known at the time of estimated payments, Foodonics intentionally overpaid the estimated taxes for Jacques and Mrs. Klempf to the IRS to avoid imposition of penalties and interest. No additional distribution was authorized by the shareholders and in the event of a substantial overpayment of taxes, Foodonics was to be repaid the amount of such overpayment."

**Response:** Subject to the foregoing General Objections, specifically including objections as to documents within the attorney client privilege, the work product privilege and the overbroad date range, documents or ESI responsive to the request will be produced to the extent they are in the possession of GrayRobinson.

**Request for Production No. 18:** All documents and ESI relating to the allegations in paragraph 23 of the Foodonics Complaint that "Foodonics' payment of estimated tax payments on behalf of Jacques and Mrs. Klempf resulted in an overpayment of taxes relative to Foodonics' subsequently-determined income. As a result, both Jacques and Mrs. Klempf received a refund from the IRS."

**Response:** Subject to the foregoing General Objections, specifically including objections as to documents within the attorney client privilege, the work product privilege and the overbroad date range, documents or ESI responsive to the request will be produced to the extent they are in the possession of GrayRobinson.

**Request for Production No. 19:** All documents and ESI relating to the allegations in paragraph 13 of the Counterclaim that "Jacques Klempf . . . [made] business connections and friendships in the egg industry -- which was a small fraternity -- including a strong business and close personal friendship with the President of Cal-Maine, Dolph Baker. The Jacques Klempf and Dolph Baker families often socialized at industry meetings and took family vacations together to Europe and elsewhere."

**Response:** Subject to the foregoing General Objections, specifically including objections as to documents within the attorney client privilege, the work product privilege and the overbroad date range documents or ESI responsive to the request will be produced for the period from December 2014 to the present to the extent they are in the possession of GrayRobinson.

**Request for Production No. 20:**     All documents and ESI relating to the allegations in paragraph 15 of the Counterclaim that ". . . Jacques Klempf used Company assets to acquire real and personal property which he used for his personal benefit . . ., including oceanfront homes and restaurants."

**Response:**     The foregoing general objections notwithstanding GrayRobinson specifically objects to request to #20 as being overbroad, unduly burdensome and not proportional to the needs or issues of the case and not relevant to any claim or defense presented in the Complaint or Counterclaim.

**Request for Production No. 21:**     All documents and ESI relating to the allegations in paragraph 19 of the Counterclaim that "[i]n 2008 . . . Jacques Klempf was informed, however, that his mother was not interested in selling her shares at that time and, instead, intended to remain a shareholder and an active member of the Foodonics Board of Directors . . ." and that Jean Klempf was "not interested in selling any of her . . . shares at this time."

**Response:**     The foregoing general objections notwithstanding GrayRobinson specifically objects to request to #21 as being overbroad, unduly burdensome and not proportional to the needs or issues of the case and not relevant to any claim or defense presented in the Complaint or Counterclaim. Moreover, such documents, to the extent they may exist, are more likely to be in the possession of Counterclaimants.

**Request for Production No. 22:**     All documents and ESI relating to the allegations in paragraph 21 of the Counterclaim that ". . . in an October 2013 meeting where Jean Klempf was refusing to sell her shares to Foodonics, Jacques Klempf told Jean Klempf (who was 80 years old at the time), "I can go a lot longer than you can . . ."

**Response:**     The foregoing general objections notwithstanding GrayRobinson specifically objects to request to #22 as being overbroad, unduly burdensome and not proportional to the needs or issues of the case and not relevant to any claim or defense presented in the Complaint or Counterclaim. Moreover, such documents, to the extent they may exist, are more likely to be in the possession of Counterclaimants.

**Request for Production No. 23:**     All documents and ESI relating to the allegations in paragraph 22 of the Counterclaim that ". . . Jean Klempf made it clear to her son that she was not willing to proceed with the redemption transaction if he was contemplating a sale of the Company or its assets after the redemption. Jacques Klempf knew his mother did not want to sell her stock back to the Company subject to a minority shareholder discount if Jacques Klempf intended to sell the Company or its assets -- or was even considering the possibility of such a sale to a third-party -- within two years or less after the redemption."

**Response:**     The foregoing general objections notwithstanding GrayRobinson specifically objects to request to #23 as being overbroad, unduly burdensome and not proportional to the needs or issues of the case and not relevant to any claim or defense presented in the Complaint or Counterclaim. Moreover, such documents, to the extent they may exist, are more likely to be in the possession of Counterclaimants.

**Request for Production No. 24:**     All documents and ESI relating to the allegations in paragraph 23 of the Counterclaim that "[b]etween December 31, 2014 and December 31, 2015, to induce his mother and her Trust to proceed with the redemption transaction, Jacques Klempf represented to his mother and her representatives that he had not received any offers to purchase the Company and that he would not be seeking to sell the Company for "a good amount of years."

**Response:**     Subject to the foregoing General Objections, specifically including objections as to documents within the attorney client privilege, the work product privilege and the overbroad date range, the request is vague and calls for GrayRobinson to opine on another's state of mind.

**Request for Production No. 25:**     All documents and ESI relating to the allegations in paragraph 26 of the Counterclaim that "[o]n April 20, 2016, less than four months after Jacques Klempf completed the redemption transaction with his mother, Foodonics and Cal-Maine executed a non-disclosure agreement which resulted in a $71.6 million sale of substantially all of Foodonics' operating assets to Cal-Maine less than 7 months later."

**Response:**     Subject to the foregoing General Objections, specifically including objections as to documents within the attorney client privilege, the work product privilege and the overbroad date range documents or ESI responsive to the request will be produced to the extent they are in the possession of GrayRobinson.

**Request for Production No. 26:**     All documents and ESI relating to the allegations in paragraph 27 of the Counterclaim that "[o]n October 16, 2016, only 10 months after the Redemption Sale, Cal-Maine purchased substantially all of Foodonics' operating assets for the sum of $71,643,000 or $10.97 per share (the "Cal-Maine Sale")."

**Response:**     The foregoing general objections notwithstanding, GrayRobinson specifically objects to producing documents subject to attorney/client privilege or work product privilege or any confidential or proprietary privileges that may by asserted by third parties

**Request for Production No. 27:**     All documents and ESI relating to the allegations in paragraph 29 of the Counterclaim that "Cal-Maine Foods team . . . had made it known that it wanted to be involved if [Jacques Klempf] ever wanted to sell" Foodonics."

**Response:**     Subject to the foregoing General Objections, specifically including objections as to documents within the attorney client privilege, the work product privilege and the overbroad date range documents or ESI responsive to the request will be produced to the extent they are in the possession of GrayRobinson.

**Request for Production No. 28:**     All documents and ESI relating to the allegations in paragraph 34 of the Counterclaim that ". . . Jacques Klempf had considered and decided well in advance of the Redemption Sale to . . . sell the Foodonics' assets to Cal-Maine -- a known ready, willing and able buyer -- after Jacques Klempf induced his mother to surrender the Trust's shares for a reduced price through the redemption transaction."

**Response:**     No such documents are known to exist.

**Request for Production No. 29:**     All documents and ESI relating to the allegations in paragraph 35 of the Counterclaim that ". . . on numerous business and social occasions between 2009 and 2015, Dolph Baker informed Jacques Klempf that Cal-Maine wanted to buy Foodonics whenever Jacques Klempf was ready to sell."

**Response:**     Subject to the foregoing General Objections, the only such documents in the possession of GrayRobinson would be such documents as provided by Counterclaimants in this litigation and therefore more readily in the possession of Counterclaimants.

**Request for Production No. 30:**     All documents and ESI relating to the allegations in paragraph 37 of the Counterclaim that "Jacques Klempf s . long time "goal" [was] to sell the Company when its yearly sales reach the $100 million dollar range . . ."

**Response:**     Subject to the foregoing General Objections, the only such documents the possession of GrayRobinson would be such documents as provided by Counterclaimants in this litigation and therefore more readily in the possession of Counterclaimants.

**Request for Production No. 31:**     All documents and ESI relating to the allegations in paragraph 38 of the Counterclaim that "Jacques Klempf admitted in a newspaper interview after the Cal-Maine Sale that he had known "the Cal-Maine team" for "a long time" and that Cal-Maine "had made it known it wanted to be involved if Klempf ever wanted to sell" the Company and that Jacques Klempf had "reached out" to his friend, Dolph Baker, to initiate a sales transaction . . ."

**Response:**     Subject to the foregoing General Objections, the only such documents in the possession of GrayRobinson would be such documents as provided by Counterclaimants in this litigation and therefore more readily in the possession of Counterclaimants.

**Request for Production No. 32:**     All documents and ESI relating to the allegations in paragraph 39 of the Counterclaim that "Jacques Klempf and the President and CEO of Cal-Maine, Dolph Baker, were, in fact, having "ongoing discussions" with each other regarding the possible sale of Foodonics to Cal-Maine. It was from these discussions that Jacques Klempf knew that Cal-Maine was a ready, willing and able buyer of Foodonics as soon as Jacques Klempf "wanted to sell."

**Response:**     Subject to the foregoing general objections, GrayRobinson is not in possession of any such documents described in request #32.

**Request for Production No. 33:**     All documents and ESI relating to the allegations in paragraph 40 of the Counterclaim that "Jacques Klempf admitted in an email dated January 6, 2017, that "[On April 2015, I contacted Cal-Maine to see if they had an interest [in purchasing Foodonics] . . ."

**Response:**     Subject to the foregoing General Objections, the only such documents in the possession of GrayRobinson would be such documents as provided by Counterclaimants in

this litigation and therefore more readily in the possession of Counterclaimants. Such document is based on a typographical error as to "April 2015."

**Request for Production No. 34:** All documents and ESI relating to the allegations in paragraph 43 of the Counterclaim that ". . . the sale of Foodonics to Cal-Maine was a constant subject of discussion between Jacques Klempf and Dolph Baker" as evidenced by Jacques Klempf s 2009 email in which Jacques Klempf states that Cal-Maine had "approached [him] on more than one occasion" in regard to its interest in acquiring the Company and that he believed $30 million for the Company was "a very real number" that Dolph Baker had "casually thrown around over a drink in Atlanta..."

**Response:** Subject to the foregoing general objections, GrayRobinson is not in possession of any such documents except anecdotal references asserted by Counterclaimants.

**Request for Production No. 35:** All documents and ESI relating to the allegations in paragraph 44 of the Counterclaim that "Jacques Klempf and Foodonics failed to disclose material information in connection with the Redemption Sale relating to the Company's valuation that was subsequently disclosed by them to Cal-Maine in connection with the Cal-Maine Sale."

**Response:** Subject to the foregoing general objections, no such documents are known to exist.

GRAYROBINSON, P.A.

/s/S. Grier Wells
S. GRIER WELLS, ESQ.
Florida Bar No.: 203238
grier.wells@gray-robinson.com
elizabeth.irvine@gray-robinson.com
50 North Laura Street, Suite 1100
Jacksonville, Florida 32202
Phone: (904)-598-9929
Fax: (904)-598-9109

*Attorney for Plaintiff*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that the foregoing was filed and served electronically on this 6th day of February, 2018 through the Florida E-Portal on James H. Post, Esq., counsel for Plaintiff at jpost@smithhulsey.com.

/s/ S. Grier Wells, Esq.
Attorney

16

**TAB 14**

IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

FOODONICS INTERNATIONAL, INC.,
a Florida corporation,

        Plaintiff,                         Case No.: 3:17-cv-1054-J-32JRK

v.

DINA KLEMPF SROCHI, as Trustee
of the LAURA JEAN KLEMPF
REVOCABLE TRUST, a Georgia Trust,

        Defendant.
_____/

DINA KLEMPF SROCHI, as Trustee
of the LAURA JEAN KLEMPF
REVOCABLE TRUST, a Florida Trust,
and DENNIS L. BLACKBURN, as
Assistant Trustee of the JEAN KLEMPF
REVOCABLE TRUST, a Florida Trust,

        Counterclaim Plaintiffs,

v.

FOODONICS INTERNATIONAL, INC.,
a Florida corporation, and KEVIN
JACQUES KLEMPF,

        Counterclaim Defendants.
_____/

## OMNIBUS MOTION TO
## QUASH SUBPOENA AND/OR
## FOR PROTECTIVE ORDER
## AND OTHER RELIEF

Plaintiff Foodonics International, Inc. ("**Foodonics**"), Counterclaim Defendant Kevin

Jacques Klempf ("**Jacques**"), and non-parties Heather Jean Klempf, Julianne Marie Klempf Lee,

Alexandra Renee Klempf, Dennis Hughes, Reggie Dalton, John Reece, and Richard Still, (such

non-parties are collectively referred to herein as the **"Non-Parties"**, and the Non-Parties, Foodonics, and Jacques are collectively referred to herein as the **"Movants"**) through their undersigned counsel and pursuant to Fed. R. Civ. P. 26(C) and/or 45(d) and Rule 3.01 of this Court, respectfully move this Court for entry of an order quashing those certain Subpoenas to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action, which were served individually to each Non-Party as identified below by and on behalf of Defendant and Counterclaim Plaintiff Dina Klempf Srochi, as Trustee of the Laura Jean Klempf Revocable Trust (the **"Subpoena(s)"**), and/or, alternatively, for a protective order concerning the Subpoenas, and, in all cases should the Subpoenas not be quashed in full, (i) shift the costs of production to the Defendant and Counterclaim Plaintiff, and (ii) extend the time for each non-party to respond to the Subpoena by a minimum of 30 days, preferably 60 days, following receipt of an order in response to this Motion. In support hereof, the Movants state as follows:

## I. THE SUBPOENAED NON-PARTIES

### A.    The Daughters

- Heather Jean Klempf.
  - Daughter of Jacques and granddaughter of Laura Jean Klempf.
  - Subpoena served on March 8, 2018 and was required to respond by March 21, 2018.
- Julianne Marie Klempf Lee.
  - Daughter of Jacques and granddaughter of Laura Jean Klempf.
  - Subpoena served on March 8, 2018 and was required to respond by March 21, 2018.
- Alexandra Renee Klempf.
  - Daughter of Jacques and granddaughter of Laura Jean Klempf.
  - Subpoena served on March 15, 2018 and was required to respond by March 21, 2018.

### B.    The Former Employees

- Dennis Hughes.

- o Former employee of Foodonics.
- o Currently unemployed.
- o Subpoena served on March 10, 2018 and was required to respond by March 21, 2018.
- Reggie Dalton.
  - o Former employee of Foodonics.
  - o Current employee of Cal-Maine Foods, Inc. ("**Cal-Maine**") through March 21, 2018.
  - o Subpoena served on _____ and was required to respond by March 21, 2018.
- John Reece.
  - o Former employee of Foodonics.
  - o Current employee of Cal-Maine.
  - o Subpoena served on March 6, 2018 and was required to respond by March 21, 2018.
- Richard Still
  - o Former employee of Foodonics.
  - o Subpoena served on ____, 2018 and was required to respond March 21, 2018.

## II. RELEVANT FACTUAL BACKGROUND

Foodonics filed a Complaint in this Court claiming damages related to a 2015 tax refund and declaratory relief (the "**Claim**") based on a draft complaint presented on behalf of Defendant to Foodonics alleging it committed fraud in redeeming shares of Foodonics stock from the Laura Jean Klempf Revocable Trust ("**Trust**") ("**Defendant's Threatened Complaint**").

A counterclaim (the "Counterclaim") has now been filed on behalf of Defendant and other Counterclaim Plaintiffs essentially incorporating the allegations in Defendant's Threatened Complaint and which relates to the redemption of the Trust's Foodonics stock in December 2015 by virtue of a Settlement and Redemption Agreement ("**Settlement Agreement**"), and a subsequent sale of Foodonics assets to Cal-Maine.

The asset sale to Cal-Maine concluded in October 2016, well subsequent to the closing of the redemption transaction as part of the Settlement Agreement in December 2015.

The Counterclaim is rife with conclusory allegations of alleged fraud and contains no material allegations to support its claims.

The definitions set forth in the Subpoenas include multiple parties within the identification of one party, individual, or entity, thereby necessitating responses on behalf of parties, individuals or entities which are not subject to the Subpoenas.

The Settlement Agreement entered into as of December 21, 2015 and referred to in the Complaint and Counterclaim contains representations that "the Foodonics Parties have not received any written offers to effect a Realization Event [e.g. a sale of the assets or stock of Foodonics] within the twelve (12) months prior to the date of this Agreement." Such twelve month time period is instructive for consideration of the appropriate discovery time limits in this case.

### III. THE SUBPOENAS

Attached as Exhibit 'A' to this Motion is the Subpoena served on the Daughters. Each of the Daughters received identical Subpoenas.

Attached as Exhibit 'B' to this Motion is the Subpoena served on the Former Employees. Each of the Former Employees received identical Subpoenas.

On March 20, 2018, counsel for Foodonics and Jacques delivered a prior draft version of this Motion to counsel for Defendant and Counterclaim Plaintiffs.

On March 21, 2018, the Non-Parties delivered to counsel for Defendant and Counterclaim Plaintiffs the Non-Parties' Objections to the Subpoenas.

The documents requested in the Subpoenas are beyond the scope of permitted discovery as limited by Rule 26(b)(1) and case law. In addition, the Subpoenas present an undue burden upon the non-parties and fail to allow a reasonable time to comply, and as such, this court must

quash or modify the Subpoenas pursuant to Rule 45(d)(3)(A) and/or, in the alternative, issue a protective order pursuant to Rule 26(c)(1). The following are excerpts of some of the requests in the Subpoenas which should be quashed or subjected to a protective order:

### A.    Improper requests in the Subpoenas delivered to the Daughters

a) The most glaring impropriety is that the Daughters were subpoenaed at all – they had nothing to do with the tax refund or stock redemption, nor with the operations or decisions of Foodonics generally.

b) Further, the Definitions portion of the Subpoenas specifies a time period for production of Documents and ESI (as described therein) to extend from *September 1, 2008* through the date of service of the Subpoena. This time period is unduly burdensome and seeks irrelevant information.

c) Request #1 demands all documents or ESI referring or relating to both Jacques Klempf and over a dozen individually listed people or entities, all of which are non-parties except for the Defendant. Request #2 is identical, save for replacing Jacques Klempf with Foodonics. These requests are unduly burdensome and seek irrelevant information.

d) Request #3 seeks "all Documents and ESI referring or relating to the Settlement and Redemption Agreement" without a time period limitation or subject matter limitation which could make such request relevant to a claim or defense.

e) Request #5 seeks "all Documents and ESI relating to the sale of Foodonics' Assets or Foodonics' Stock." The scope of this request is unduly burdensome and seeks irrelevant information.

f) Request #8 is for all "Documents and ESI relating to any proposals, offers or discussions Jacques Klempf or Foodonics had with any person or entity regarding any possible purchase or sale of Foodonics' Assets or Foodonics' stock." The scope of this request is unduly burdensome and seeks irrelevant information.

g) The following nonexclusive list of requests seek Documents and ESI from non-parties when Jacques Klempf and Foodonics have already been served with discovery on the subject of such requests and are the appropriate parties to provide such discovery: 5, 6, 8-13, 15-18, 25, 26, 33, and 34.

**B.**      **Improper requests in the Subpoenas delivered to the  Former Employees**

a) As an initial matter, the Definitions portion of the Subpoenas specify a time period for production of Documents and ESI (as described therein) to extend from *September 1, 2008* through the date of service of the Subpoena.  This time period is unduly burdensome and seeks irrelevant information.

b) The following nonexclusive list of requests seek Documents and ESI from non-parties when Jacques Klempf and Foodonics have already been served with discovery on the subject of such requests and are the appropriate parties to provide such discovery: Requests # 1, 3, 5, 6-19, 22, 24-26, 28, 47, 48   (to the extent these requests seek Documents and ESI not only from "You" but also from Foodonics or Jacques).

c) Requests #1 and 3 through 19 seek Documents and ESI from non-parties relating to valuation of Foodonics' Assets and Foodonics' Stock, and the potential sale thereof, without a specific limitation to the Settlement Agreement or the sale of assets to Cal-Maine.

## IV. MEMORANDUM OF LAW

**A.**      **General scope of information that may be requested via subpoena**

The scope of information that may be sought via a subpoena is the same as the scope of discovery generally under Rule 26(b). Ubiquiti Networks, Inc. v. Kozumi USA Corp., 295 F.R.D. 517, 521 (N.D. Fla. 2013). A subpoena must describe the documents requested with particularity. See American Federation of Musicians of the United States and Canada v. Skodam Films, LLC, 313 F.R.D. 39, 43 (N.D. Tex. 2015).

Effective December 1, 2015, the scope of discovery permitted under Rule 26(b)(1) was substantially modified, and now provides as follows:

> (1) *Scope in General*. Unless otherwise limited by court order, the scope of discovery is as follows: Parties may obtain discovery regarding any nonprivileged matter that is **relevant to any party's claim or defense** and proportional to the needs of the case, considering the importance of the issues at stake in the action, the

> amount in controversy, the parties' relative access to relevant
> information, the parties' resources, the importance of the discovery
> in resolving the issues, and whether the burden or expense of the
> proposed discovery outweighs its likely benefit. Information within
> this scope of discovery need not be admissible in evidence to be
> discoverable.

(Emphasis added).   The operative scope of discovery is that any discovery sought must be

"relevant to any party's claim or defense", without the expansive gloss that previously permitted

discovery that was merely "reasonably calculated" to lead to admissible evidence.   One purpose

of the 2015 amendments was to provide parties with effective access to information needed to

prove a claim or defense while eliminating "'unnecessary or wasteful discovery.'"  See O'Boyle

v. Sweetapple, 2016 WL 492655, at *3 n.2 (quoting Chief Justice's 2015 Year-End Report on

the Federal Judiciary, www.supremecourt.gov/publicinfo/year-end/2015year-endreport.pdf at p.

7)).   Chief Justice Roberts, in his 2015 Year-End Report on the Federal Judiciary, observed

regarding Rule 26(b)(1)'s 2015 amendment:

> The amended rule states, as a fundamental principal, that lawyers
> must size and shape their discovery requests to the requisites of a
> case.
>
> See id.

**B.      Legal standard for Order to Quash under Rule 45**

A district court **must** quash or modify a subpoena that subjects a persons to undue

burden.  Rule 45(d)(3)(A)(iv).

Further, the party or attorney issuing a subpoena **must** attempt to avoid undue burden or

expense on the recipient, and may face penalties for failure to meet such obligation.   The court

**must** enforce such duty.

> A party or attorney responsible for issuing and serving a subpoena
> **must** take reasonable steps to **avoid** imposing **undue burden or**
> **expense** on a person subject to the subpoena. The court for the

district where compliance is required **must** enforce this duty and impose an appropriate **sanction**--which may include lost earnings and reasonable attorney's fees--on a party or attorney who fails to comply.

Rule 45(d)(1) (emphasis added).

### C.    Legal standard for Protective Order under Rule 26

Pursuant to Rule 26(c)(1), a "court may, for good cause, issue an order to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense." Among other options, the order may forbid the discovery, specify the terms of discovery, allocate discovery expenses, or limit the scope of discovery to certain matters.

The court **must** limit the frequency or extent of discovery if it determines that:

> (i) the discovery sought is unreasonably cumulative or duplicative, or can be obtained from some other source that is more convenient, less burdensome, or less expensive; (ii) the party seeking discovery has had ample opportunity to obtain the information by discovery in the action; or (iii) the proposed discovery is outside the scope permitted by Rule 26(b)(1).

Rule 26(b)(2)(C).

### D.    Special Considerations for discovery requests to a non-party

"A non-party may invoke the inherent power of the court to secure protection from discovery which ... would cause undue burden on the non-party." Fadalla v. Life Automotive Products, Inc., 258 F.R.D. 501, 504 (M.D. Fla. 2007). "The status of a person as a non-party is a factor that weighs against disclosure." Id.

"[N]on-party status is considered by the court in weighing the burdens imposed in providing the requested discovery." See Cytodyne Technologies, Inc. v. Biogenic Technologies, Inc., 216 F.R.D. 533, 535 (M.D. Fla. 2003). Further case law has revealed "a case-specific balancing test wherein the court must weigh factors such as relevance, the need of the party for

the documents, the breadth of the document request, and the time period covered by the request against the burden imposed on the person ordered to produce the desired information." Id.

## V. EXPLANATION OF REQUESTS THAT NECESSITATE ORDER TO QUASH AND/OR PROTECTIVE ORDER

The Subpoenas subject the Non-Parties to undue burden and do not request relevant documents, and therefore good cause exists for the Non-Parties to be excused from responding to the Subpoenas. To the extent any portion of the Subpoenas may be relevant to the claims and defenses in the Claim and Counterclaim, the document requests should be limited to a relevant time period and relevant subject matter without causing undue burden upon the Non-Parties.

The Non-Parties have nothing to do with the claims or defenses in any part of the Claim or Counterclaim. The Non-Parties were not involved in the Settlement Agreement, and had no decision making power on whether to sell assets of Foodonics. They were not even privy to deliberations of such sale. In addition, they were not involved in any portion of the alleged improper actions taken by Jacques asserted in the Counterclaim.

The Daughters have never had anything to do with the operations or decisions made by Foodonics, have never held decision making positions with Foodonics, and had nothing to do with the tax refund that is the subject of Plaintiff's suit nor the stock redemption and asset sale that is the subject of the Counterclaim. Neither Defendant nor Counterclaim Plaintiffs have pled any facts that would suggest otherwise. The Daughters are merely Jacques' daughters, and were subpoenaed as a form of harassment against each of the daughters and against their father, Jacques.

A September 1, 2008 start date for discovery is not proportional to the needs of the case, and has the effect of requesting information not relevant to claims or defenses. All time periods

for production, regardless of any time period currently appearing within a request, should begin December 1, 2014, which is one year prior to the representations made in the Settlement Agreement.

Further, each request should include the reasonable subject limitation, as appropriate, of Documents and ESI related to (i) the tax refund, (ii) the redemption of shares by Foodonics from the Trust, or (iii) the sale of Foodonics assets to Cal-Maine.

Request #5 in the Subpoenas to the Daughters is one example of a request that needs a relevant subject matter limitation, as it seeks "all Documents and ESI relating to the sale of Foodonics' Assets or Foodonics' Stock." This vague request may be read to require the non-parties to search through decades of irrelevant files, as well as files related to the most minor sale of assets and immaterially small sales of stock. In its current form, Request #5 is unduly burdensome.

Another example of the undue burden caused by these requests is that they, when read along with the Subpoenas' expansive definition of "Documents", arguably have the effect of requesting nearly every family, social, financial or estate planning conversation between Jacques and his three daughters, Laura Jean Klempf, Dina Klempf Srochi, and Marc Klempf, which is not only an undue burden but also not proportional to the needs of the case.

Request # 8 in the Subpoenas to the Daughters should be limited to proposals, offers or discussions with Cal-Maine, not "any person or entity" as only the proposals, offers, or discussions with Cal-Maine are relevant.

Request # 1 and 3-19 in the Subpoenas to the Former Employees are irrelevant and unduly burdensome to the extent they seek Documents and ESI concerning *asset valuations*, as the Counterclaim concerning consideration paid by Foodonics to Defendant was for *shares* of

Foodonics in connection with the Settlement Agreement, and thus such requests for Documents and ESI related to valuation should be stricken.

Further, all Documents or ESI requested of Former Employees which they produced or obtained in the scope of their employment are controlled by Foodonics, and therefore such Documents and ESI must be requested to and produced by Foodonics instead.

Moreover, the Subpoenas improperly included requests to produce documents that were already requested, or should be requested, of Foodonics by Defendant and Counterclaim Plaintiff, as well as documents in the possession of Defendant or Counterclaim Plaintiff. Such requests include Request # 5, 6, 8-13, 15-18, 25, 26, 33, and 34 in the Subpoenas to the Daughters, and Request # 1, 3, 5, 6-19, 22, 24-26, 28, 47, 48 in the Subpoenas to the Former Employees.

## VI. RELIEF REQUESTED

### A.    Order to Quash and Sanctions

Movants request that the Subpoenas issued to the Non-Parties be quashed in full, as they subject the Non-Parties to undue burden, fail to allow a reasonable time to comply, and do not request relevant documents. If not quashed in full, Movants request the Subpoenas be sufficiently modified so as to conform with the requirements of Rule 26 and Rule 45.

For the reasons described above and upon a review of the Subpoenas and the circumstances surrounding the non-parties receiving such Subpoenas, it is apparent that Defendant and/or its attorneys did not satisfy the duty to take reasonable steps to avoid imposing an undue burden or expense on these non-parties, and therefore this court must enforce such duty and impose appropriate sanctions on the Defendant and/or its attorneys pursuant to Rule 45(d)(1).

### B.    Protective Order

Good cause exists to protect Non-Parties from responding to the Subpoenas which subject the Non-Parties to undue burden and expense.  Further, the requests are irrelevant to claims or defenses in the Claim and the Counterclaim.

If the court does not quash the Subpoenas issued to the Non-Parties as requested above, and if the court finds any portion of such Subpoenas to be relevant to claims or defenses in the Claim or the Counterclaim, then a protective order should be issued for the Subpoenas, limiting the scope of the documents requested of the Non-Parties to a relevant time period and relevant subject matter without causing undue burden upon the Non-Parties.

### C.    In the event the Court orders production of documents, the Non-Parties should be afforded at minimum 30 days, preferably 60 days, after the Court rules on this Motion and specifies what documents must be produced.

The Subpoenas required the Non-Parties to respond by the dates as specified above.  The response deadlines were all roughly a mere 14 days.  For individuals who have no relation to the Claim and Counterclaim, such deadline is unreasonable.  Pursuant to Rule 34, if the non-parties *were* instead parties to this action, they would have had at least 30 days to respond to a request for production seeking the same information.  At a minimum, the Non-Parties should be afforded the same 30 days, and preferably 60 days, especially considering there is no immediate need for the subpoenaed information that would require such a short turn-around time.

### D.    Cost shifting for past and future costs related to the Subpoenas

In the event this Court orders the Non-Parties to produce certain documents, the Non-Parties request that, pursuant to Rule 26(c)(1)(B), this Court orders Defendant and Counterclaim Plaintiffs to reimburse the Non-Parties for costs and expenses in reviewing files, producing

documents, and seeking counsel and other third party assistance in complying with the Subpoenas.

## VII. CONCLUSION

For the reasons stated above, the Movants respectfully request that the Court enter an order quashing the Subpoena, or, in the alternative, enter a protective order.

In any case, if the Court determines that the Non-Parties must produce any of the requested documents, the Non-Parties request that (i) they are provided at minimum 30 days, preferably 60 days, following the Court's order on this Motion that specifies what documents must be produced, and (ii) costs and expenses related to complying with the Subpoenas be shifted to Defendant and Counterclaim Plaintiffs.

## CERTIFICATE OF COMPLIANCE WITH FED. R. CIV. P. 26(c)(1)

Undersigned counsel has conferred in good faith with Defendant and Counterclaim Plaintiffs' counsel in an effort to resolve this dispute without court action, but was unsuccessful in such effort.

/s/ S. Grier Wells
S. GRIER WELLS, ESQ.
Florida Bar No.: 203238
Primary E-Mail Address:
grier.wells@gray-robinson.com
Secondary E-Mail Address:
elizabeth.irvine@gray-robinson.com
GrayRobinson, P.A.
50 North Laura Street, Suite 1100
Jacksonville, Florida 32202
Phone: (904)-598-9929
Fax: (904)-598-9109
JOHN M. BRENNAN
Florida Bar No.: 297951
Primary E-Mail Address:
jay.brennan@gray-robinson.com
Secondary E-Mail Address:

jessica.rolon@gray-robinson.com
MICHAEL R. SANTANA
Florida Bar No.: 42124
Primary E-Mail Address:
michael.santana@gray-robinson.com
Secondary E-Mail Address:
lisandra.acosta@gray-robinson.com
GrayRobinson, P.A.
301 East Pine Street, Suite 1400
Orlando, Florida 32802
Phone:  (407) 843-8880
Fax:     (407) 244-5690
Attorneys for Plaintiff/Counterclaim
Defendants, FOODONICS
INTERNATIONAL, INC., a Florida
Corporation and KEVIN JACQUES
KLEMPF, and Non-Parties HEATHER
JEAN KLEMPF, JULIANNE MARIE
KLEMPF LEE, ALEXANDRA
RENEE KLEMPF, DENNIS HUGHES,
REGGIE DALTON, JOHN REECE,
and RICHARD STILL.

## CERTIFICATE OF SERVICE

I hereby certify that on this 22nd day of March, 2018, I electronically filed the foregoing

document with the Clerk of the Court using CM/ECF.  I also certify that the foregoing document

is being served this day on all counsel of record identified on this Service List in the manner

specified, either via transmission of Notices of Electronic Filing generated by CM/ECF and via

U.S. mail.


/s/ S. Grier Wells, Esq.
Attorney

**TAB 15**

**Chris Dix**

| | |
|---|---|
| **From:** | Michael R. Santana <Michael.Santana@gray-robinson.com> |
| **Sent:** | Monday, March 26, 2018 4:30 PM |
| **To:** | Chris Dix |
| **Cc:** | Grier Wells; David A. Hancock, CEDS; James H. Post; John M. "Jay" Brennan |
| **Subject:** | RE: Foodonics v. Klempf: Reminder regarding designation and disclosure requirements under Order Governing ESI Issues |

Chris,

Pursuant to Paragraph 2, I will be the e-discovery liaison. Dave has far more technical expertise and he will be involved as well. Pursuant to Paragraph 3, and as related to you previously by Dave and/or Grier, we believe that the following items may have discoverable information: Mr. Klempf's desktop while he was at Foodonics/Dixie Egg, which is located at the Dixie Egg office in Jacksonville, may have documents and/or correspondence, 2 personal Apple laptops in Mr. Klempf's possession may have documents and/or correspondence, and two of Mr. Klempf's cellphones, which are in his possession. One is his current cellphone and one is his old cell phone. He believes the data from the old was transferred to the new when obtained in early 2017. The old cell phone was replaced due to being dropped and a cracked screen. The following email addresses may have discoverable information: jklempf@dixieegg.com; kjkeggs@aol.com; and jklempf@bamjax.com.

Although not technically in our client's possession, in the interest of full disclosure, Cal-Maine is in possession of an AS400 server, which Foodonics used to run its business. That may contain documents and/or correspondence. We are working to find out exactly who administers and/or hosts the Dixie Egg email account, but we understand it is hosted by a 3rd party. We believe that our e-discovery vendor, KLDiscovery, will be able to mine the data from the sources in Mr. Klempf's possession. We may need to coordinate with Cal-Maine on the information and data in its possession.

Regards,
Mike

**Michael R. Santana | Shareholder**
G R A Y | R O B I N S O N

301 East Pine Street, Suite 1400 | Orlando, Florida 32801
T: 407-843-8880 | F: 407-244-5690
E-mail | Website | Bio | vCard

**Facebook | LinkedIn | Twitter**

This e-mail is intended only for the individual(s) or entity(s) named within the message. This e-mail might contain legally privileged and confidential information. If you properly received this e-mail as a client or retained expert, please hold it in confidence to protect the attorney-client or work product privileges. Should the intended recipient forward or disclose this message to another person or party, that action could constitute a waiver of the attorney-client privilege. If the reader of this message is not the intended recipient, or the agent responsible to deliver it to the intended recipient, you are hereby notified that any review, dissemination, distribution or copying of this communication is prohibited by the sender and to do so might constitute a violation of the Electronic Communications Privacy Act, 18 U.S.C. section 2510-2521. If this communication was received in error we apologize for the intrusion. Please notify us by reply e-mail and delete the original message without reading same. Nothing in this e-mail message shall, in and of itself, create an attorney-client relationship with the sender.

**From:** Chris Dix [mailto:cdix@smithhulsey.com]
**Sent:** Friday, March 23, 2018 9:43 AM
**To:** Michael R. Santana
**Cc:** Grier Wells; David A. Hancock, CEDS; James H. Post

1



PENGAD 800-631-6989

**EXHIBIT**
13

**Subject:** Foodonics v. Klempf: Reminder regarding designation and disclosure requirements under Order Governing ESI Issues

Michael,

This is a reminder regarding Monday's deadline in the referenced case for the parties to comply with Paragraphs 2 and 3 of the Order Governing ESI Issues. Paragraph 2 requires designation of an e-discovery liaison. Paragraph 3 requires disclosure of the locations and types of potentially discoverable information in the parties' possession or control and how that information can be (or has already been) collected from the systems and media in which it is stored.

The order requires compliance within 10 days of the entry of the order. Since the order was entered on March 15, 2018, and the 10th day (March 25th) is a Sunday, the deadline for compliance is Monday.

Thanks,

Chris Dix
Smith Hulsey & Busey
225 Water Street, Suite 1800
Jacksonville, FL 32202
Direct: (904) 359-7730
Fax: (904) 359-7708
cdix@smithhulsey.com

# TAB 16

FOODONICS INTERNATIONAL, INC.,
a Florida corporation,

      Plaintiff,

v.

DINA KLEMPF SROCHI, as Trustee
of the LAURA JEAN KLEMPF
REVOCABLE TRUST, a Georgia Trust,

      Defendant.

Case No.: 3:17-cv-1054-J-32JRK

_____/

DINA KLEMPF SROCHI, as Trustee
of the LAURA JEAN KLEMPF
REVOCABLE TRUST, a Florida Trust,
and DENNIS L. BLACKBURN, as
Assistant Trustee of the JEAN KLEMPF
REVOCABLE TRUST, a Florida Trust,

      Counterclaim Plaintiffs,

v.

FOODONICS INTERNATIONAL, INC.,
a Florida corporation, and KEVIN
JACQUES KLEMPF,

      Counterclaim Defendants.

_____/

## SUPPLEMENTAL RULE 26 DISCLOSURES OF PLAINTIFF/COUNTER-DEFENDANT FOODONICS INTERNATIONAL, INC. AND INITIAL RULE 26 DISCLOSURE OF COUNTER-DEFENDANT KEVIN JACQUES KLEMPF

      Plaintiff/Counter-Defendant, FOODONICS INTERNATIONAL, INC. ("FOODONICS")

submits its supplemental response to Rule 26, Fed. R. Civ. P. as set forth below. Further,

Counter-Defendant KEVIN JACQUES KLEMPF ("JACQUES"), submits his initial disclosures

pursuant to Rule 26.



EXHIBIT
15

1

1. Supplemental Disclosures of FOODONICS:

   A. Witnesses:

   1. Steven E. Brust, Esq., Smith Gambrell & Russell, LLP, Suite 2600, 50 North Laura Street, Jacksonville, Florida 32202.

   Upon information and belief, Mr. Brust formerly represented Defendant Dina Srochi in her individual capacity and, subsequent thereto, represented Laura Jean Klempf. Mr. Brust is expected to have knowledge regarding his investigation of FOODONICS and JACQUES during such representations, his communications with Dina Srochi in her individual capacity during his representation of Laura Jean Klempf and his communications with E.A. Nolan, Dennis Blackburn, FOODONICS and FOODONICS' counsel during his representation of Laura Jean Klempf.

   2. E. A. Nolan, 4135 Marianna Road, Jacksonville, Florida 32217.

   Mr. Nolan is the brother of Laura jean Klempf and served on the Board of Directors of FOODONICS for a number of years prior to his resignation in or about 2007. He is expected to have knowledge of board discussions about the operation of FOODONICS and of the relationship of FOODONICS with Cal-Maine. Mr. Nolan may also have knowledge regarding his discussions with Laura Jean Klempf about the sale of her stock in December, 2015, as well as her view about the sale of FOODONICS' assets to Cal-Maine in October, 2016.

   B. Documents.

   Smith Gambrell & Russell may have documents related to the representation of Dina Srochi in her individual capacity and Laura Jean Klempf by one of its Shareholders, Steven E. Brust, Esq. It is likely that Smith Gambrell & Russell will have documents

2

relating to communications between Mr. Brust and Dina Srochi in her individual capacity during Mr. Brust's representation of Laura Jean Klempf as well as communications with GrayRobinson, P.A., Dennis Blackburn and attorneys for Smith Hulsey & Busey.

2.    Initial disclosures of JACQUES.

Counter-Defendant, as his Initial Rule 26 Disclosure, incorporates the Initial Disclosures submitted by FOODONICS on or about February 16, 2018 and this supplemental disclosure of FOODONICS hereinabove.

Respectfully submitted this 29th day of March, 2018.

/s/ S. Grier Wells
S. GRIER WELLS, ESQ.
Florida Bar No.: 203238
Primary E-Mail Address:
grier.wells@gray-robinson.com
Secondary E-Mail Address:
barbara.rude@gray-robinson.com
GrayRobinson, P.A.
50 North Laura Street, Suite 1100
Jacksonville, Florida 32202
Phone: (904)-598-9929
JOHN M. BRENNAN
Florida Bar No.: 297951
Primary E-Mail Address:
jay.brennan@gray-robinson.com
Secondary E-Mail Address:
jessica.rolon@gray-robinson.com
MICHAEL R. SANTANA
Florida Bar No.: 42124
Primary E-Mail Address:
michael.santana@gray-robinson.com
Secondary E-Mail Address:
lisandra.acosta@gray-robinson.com
GrayRobinson, P.A.
301 East Pine Street, Suite 1400
Orlando, Florida 32802
Phone: (407) 843-8880
Attorneys for Plaintiff/Counterclaim
Defendants

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that the foregoing was furnished by email delivery to JAMES H. POST, ESQ., MICHAEL E. DEMONT and R. CHRISTOPHER DIX *(jpost@smithhulsey.com, mdemont@smithhulsey.com, cdix@smithhulsey.com)*, Smith Hulsey & Busey, 225 Water Street, Suite 1800, Jacksonville, Florida 32202 *(Attorneys for Defendant/Counterclaim Plaintiffs)*, this 29th day of March, 2018.

/s/ S. Grier Wells, Esq.
Attorney

\732024\20 - # 1653275 v1

# TAB 17

| | |
|---|---|
| **From:** | James H. Post |
| **Sent:** | Thursday, May 3, 2018 12:14 PM |
| **To:** | grier.wells@gray-robinson.com |
| **Cc:** | 'Jay.Brennan@gray-robinson.com'; 'James.Nolan@gray-robinson.com'; Chris Dix |
| **Subject:** | RE: Foodonics v. Klempf Trust - Meet and Confer |

Grier,

This is a follow up to our meet and confer on May 2, 2018. Based on our discussion, we understand that the parties have agreed to the following:

1. Foodonics, Jacques Klempf and GrayRobinson (the "Foodonics Group") has withdrawn the general objections without prejudice.

2. The parties will promptly proceed with the production and the requested ESI will be produced after conducting a reasonable search and review pursuant to the search terms and other processes agreed to by the parties in compliance with Paragraph 5 of the Order Governing ESI Issues. The next meeting between our respective ESI liaisons will be held next week.

3. Documents and ESI withheld due to privilege will be identified on a privilege log produced along with the requested documents and ESI.

4. The parties will produce within 7 business days from today the following documents which do not require an ESI search process:

   a. The Foodonics Group will produce (i) all corporate minutes of Foodonics for the years 2012 to date and (ii) all corporate tax returns for Foodonics from the years 2006 to date.

   b. The Trust will produce the Trust and all amendments.

   c. The Foodonics Group has objected to the production of the closing documents and other agreements relating to the Cal-Maine sale without the consent of Cal-Maine because some of these documents allegedly contain Cal-Maine's proprietary or confidential information (the "Cal-Maine Proprietary Information"). The Foodonics Group will produce all closing documents and other agreements relating to the Cal-Maine sale (the "Cal-Maine Sale Closing Documents") within 7 business days from today, except for those documents which purportedly contain Cal-Maine Proprietary Information.

   d. With respect to the Cal-Maine Sale Closing Documents which allegedly contain Cal-Maine Proprietary Information, the Foodonics Group will promptly follow up with the Cal-Maine attorney to determine whether Cal-Maine will allow production of the closing documents and other related information, subject to the execution of a confidentiality agreement in the same form that was entered into by the parties in this case.

5. With respect to Cal-Maine, you will follow up with their attorney to determine the status of their turnover of the AS400 server and provide us with an update in 7 business days.

6. With respect to your request that we furnish copies of the documents (and ESI) that we have obtained to date pursuant to the subpoenas we have issued in this case, we will do so subject to your stipulation that (i) all parties in this case consent to furnish copies of documents and ESI obtained by subpoena to all other parties within 14 days after written request and (ii) the party requesting copies agrees to pay the party producing copies (a) the reasonable cost of preparing the copies and (b) 50% of the cost, if any, incurred by the party producing copies to obtain such information from the non-party. Any party producing copies of ESI pursuant to this stipulation shall produce the ESI in the format in which it has received from the non-party or, for ESI sent to KLDiscovery, the party producing copies shall direct KLDiscovery to deliver a copy of the ESI to the party requesting copies in the same format in which it is maintained by KLDiscovery at the time of production.

7. We agreed to discuss at a later date possible deposition dates for Dina Klempf Srochi, as Trustee of the Laura Jean Klempf Revocable Trust and Dennis Blackburn, as Assistant Trustee of the Trust.

8. With respect to our request for information regarding the work-product privilege asserted by the Foodonics Group as to the SMK subpoena, you requested that your response be deferred until next week so that you could discuss the matter further internally.

Please confirm your agreement to the foregoing by reply email.

Thank you,
Jim

**From:** James H. Post
**Sent:** Wednesday, May 2, 2018 10:29 AM
**To:** grier.wells@gray-robinson.com
**Cc:** 'Jay.Brennan@gray-robinson.com' <Jay.Brennan@gray-robinson.com>; 'James.Nolan@gray-robinson.com'
<James.Nolan@gray-robinson.com>
**Subject:** RE: Foodonics v. Klempf Trust - Meet and Confer

Grier,

During our meet and confer scheduled for today at 3:00 p.m., we request the following information in connection with the Plaintiff/Counter-Defendants' Objections and Privilege Log as to Subpoena for Sheldrick McGehee & Kohler, LLC and Jess W. Wright:

1. What business relationships, if any, existed between SMK and Foodonics, Jacques Klempf and/or GrayRobinson between September 1, 2008 and December 31, 2015?

2. What business relationships, if any, existed or now exist between SMK and Foodonics, Jacques Klempf and/or GrayRobinson on or after January 1, 2016?

3. Does GrayRobinson presently have, or in the past had, an attorney-client relationship with SMK or Jess Wright?

4. SMK and Jess Wright are fact witnesses in this case. Has Jess Wright or anyone else at SMK been engaged by you or your clients as consulting or testifying experts in this case? If so, when?

Thank you,
Jim

James H. Post

SMITH HULSEY & BUSEY

225 Water Street | Suite 1800 | Jacksonville, Florida 32202
904-359-7700 | Direct 904-359-7783
jpost@smithhulsey.com | www.smithhulsey.com



*This message is from a law firm and may contain information that is confidential or legally privileged. If you are not the intended recipient, please immediately advise the sender by reply email that this message has been inadvertently transmitted to you and delete this email from your system. Thank you for your cooperation.*

**From:** Grier Wells [mailto:Grier.Wells@gray-robinson.com]
**Sent:** Wednesday, May 2, 2018 7:58 AM
**To:** James H. Post <jpost@smithhulsey.com>
**Cc:** John M. "Jay" Brennan <Jay.Brennan@gray-robinson.com>; James Nolan <James.Nolan@gray-robinson.com>
**Subject:** RE: Foodonics v. Klempf Trust - Meet and Confer

Jim:

Thanks for your e-mail.

The agenda items you listed are generally in line with our discussion last week. However, we also agreed to discuss your provision of copies of documents you have or will receive from subpoenas issued. We understand that Andy Bowers, SMK and possibly others have produced documents. We also agreed to address deposition dates of Ms. Srochi and Dennis Blackburn.

Since our discussion last week, we have also received your response to our request for production. Your responses merit discussion as well.

**Grier Wells | Complex Commercial, Employment and Construction Litigation**
**G R A Y | R O B I N S O N**

50 North Laura Street, Suite 1100 | Jacksonville, Florida 32202
**T:** 904-598-9929 | **F:** 904-598-9109 | **D:** 904-632-8478
E-mail | Website | Bio | vCard

**Facebook | LinkedIn | Twitter**

This e-mail is intended only for the individual(s) or entity(s) named within the message. This e-mail might contain legally privileged and confidential information. If you properly received this e-mail as a client or retained expert, please hold it in confidence to protect the attorney-client or work product privileges. Should the intended recipient forward or disclose this message to another person or party, that action could constitute a waiver of the attorney-client privilege. If the reader of this message is not the intended recipient, or the agent responsible to deliver it to the intended recipient, you are hereby notified that any review, dissemination, distribution or copying of this communication is prohibited by the sender and to do so might constitute a violation of the Electronic Communications Privacy Act, 18 U.S.C. section 2510-2521. If this communication was received in error we apologize for the intrusion. Please notify us by reply e-mail and delete the original message without reading same. Nothing in this e-mail message shall, in and of itself, create an attorney-client relationship with the sender.

**From:** James H. Post [mailto:jpost@smithhulsey.com]
**Sent:** Tuesday, May 01, 2018 5:18 PM
**To:** Grier Wells
**Subject:** Foodonics v. Klempf Trust - Meet and Confer

Grier,

In regard to the meet and confer scheduled for tomorrow (May 2), the agenda includes the following:

1.   The Objections to Discovery Requests served by your firm on behalf of:

    a.   Foodonics International, Inc.

    b.   Jacques Klempf

    c.   GrayRobinson, P.A.

    d.   Dennis Hughes
        John Reece
        Dick Still
        Reggie Dalton

        Julianne Marie Klempf Lee
        Alexandria Renee Klempf
        Heather Jean Klempf

    e.   Sheldrick, McGee & Kohler, LLC
        Jess W. Wright

2.   The prompt production of responsive documents to which you have not objected, if any.

3.   The production of text messages on the mobile phone of Jacques Klempf.

4.   Cal-Maine – The status of Cal-Maine's return of AS400 server to Foodonics/GrayRobinson.

Thank you,
Jim

James H. Post

S M I T H   H U L S E Y & B U S E Y

225 Water Street | Suite 1800 | Jacksonville, Florida 32202
904-359-7700 | Direct 904-359-7783
jpost@smithhulsey.com | www.smithhulsey.com



*This message is from a law firm and may contain information that is confidential or legally privileged. If you are not the intended recipient, please immediately advise the sender by reply email that this message has been inadvertently transmitted to you and delete this email from your system. Thank you for your cooperation.*

# TAB 18

| | |
|---|---|
| **From:** | Michael R. Santana <Michael.Santana@gray-robinson.com> |
| **Sent:** | Monday, May 7, 2018 9:38 AM |
| **To:** | Chris Dix |
| **Cc:** | David A. Hancock, CEDS |
| **Subject:** | RE: Foodonics v. Dina Klempf Srochi, as Trustee |

Thanks, Chris.

Here's a brief response to your points, which will hopefully make things more efficient:

1. You are correct (and assume same you'll do the same).
2. Search not subject to objections; only production will be subject to objections (assume same on your side).
3. Happy to consider them.
4. I'd like to get access to the AS400 and have that data subject to the search terms so as to avoid duplicating efforts. Grier has talked to Jim about that recent, I believe, and Grier is still working with Cal-Maine's lawyer.

**Michael R. Santana | Shareholder**
**G R A Y | R O B I N S O N**

301 East Pine Street, Suite 1400 | Orlando, Florida 32801
T: 407-843-8880 | F: 407-244-5690
E-mail | Website | Bio | vCard

**Facebook | LinkedIn | Twitter**

**From:** Chris Dix [mailto:cdix@smithhulsey.com]
**Sent:** Monday, May 07, 2018 9:13 AM
**To:** Michael R. Santana
**Cc:** David A. Hancock, CEDS
**Subject:** RE: Foodonics v. Dina Klempf Srochi, as Trustee

Mike,

Yes, I was drafting an email to you when I received your email below. The items I'd like to discuss are:

1.  The sources that you intend to search using the proposed search terms (currently I'm assuming that you will search all sources previously identified);

2.  The impact of your current reservation of all objections to discovery sought when searching and reviewing ESI;

3.  A few additional search terms that we propose to add to your list;

4.  The anticipated date by which you expect to complete the "first run" of the searches (assuming we agree today on the initial search terms).

Please use the following dial-in information for our call at 2:30:

Dial-in #: 1-866-244-8528
Passcode: 864681

Thanks,

## Chris Dix



SMITH HULSEY & BUSEY

225 Water Street | Suite 1800 | Jacksonville, Florida 32202
904-359-7700 | Direct 904-359-7730
cdix@smithhulsey.com | www.smithhulsey.com

*This message is from a law firm and may contain information that is confidential or legally privileged. If you are not the intended recipient, please immediately advise the sender by reply e-mail that this message has been inadvertently transmitted to you and delete this e-mail from your system. Thank you for your cooperation.*

**From:** Michael R. Santana [mailto:Michael.Santana@gray-robinson.com]
**Sent:** Monday, May 7, 2018 8:51 AM
**To:** David A. Hancock, CEDS <David.Hancock@gray-robinson.com>
**Cc:** Chris Dix <cdix@smithhulsey.com>
**Subject:** RE: Foodonics v. Dina Klempf Srochi, as Trustee

Chris, we never heard back from you. Are we on for 2:30 and can you please tell us what you want to talk about?

**Michael R. Santana | Shareholder**
**G R A Y | R O B I N S O N**

301 East Pine Street, Suite 1400 | Orlando, Florida 32801
**T:** 407-843-8880 | **F:** 407-244-5690
E-mail | Website | Bio | vCard

**Facebook | LinkedIn | Twitter**

**From:** David A. Hancock, CEDS
**Sent:** Thursday, May 03, 2018 4:07 PM
**To:** Michael R. Santana
**Cc:** Chris Dix
**Subject:** Re: Foodonics v. Dina Klempf Srochi, as Trustee

I can do 2:30.

Sent from my iPhone. Please excuse my typos as you would have me forgive yours.

On May 3, 2018, at 4:00 PM, Michael R. Santana <Michael.Santana@gray-robinson.com> wrote:

Good afternoon,

2

How about Monday at 2:30? Can you give us some specific insight as to what you want to discuss. Feel free to make whatever changes you feel necessary to our proposed search terms and we'll gladly consider them.

**From:** David A. Hancock, CEDS
**Sent:** Thursday, May 03, 2018 11:57 AM
**To:** 'Chris Dix'; Michael R. Santana
**Subject:** RE: Foodonics v. Dina Klempf Srochi, as Trustee

I'm out this afternoon and tomorrow.

I believe Mike is out all this week.

**From:** Chris Dix [mailto:cdix@smithhulsey.com]
**Sent:** Thursday, May 03, 2018 11:05 AM
**To:** Michael R. Santana
**Cc:** David A. Hancock, CEDS
**Subject:** RE: Foodonics v. Dina Klempf Srochi, as Trustee

Michael,

Can we schedule a time to discuss the search terms you proposed? I am available tomorrow afternoon from 2:00 – 5:00 and Monday afternoon from 2:00 – 5:00. I will be out of the office on Tuesday and Wednesday next week, so I'd like to speak before then if possible.

Thanks,

## Chris Dix
<image001.png>
225 Water Street | Suite 1800 | Jacksonville, Florida 32202
904-359-7700 | Direct 904-359-7730
cdix@smithhulsey.com | www.smithhulsey.com

<image002.png>

*This message is from a law firm and may contain information that is confidential or legally privileged. If you are not the intended recipient, please immediately advise the sender by reply e-mail that this message has been inadvertently transmitted to you and delete this e-mail from your system. Thank you for your cooperation.*

**From:** Michael R. Santana [mailto:Michael.Santana@gray-robinson.com]
**Sent:** Friday, April 20, 2018 2:30 PM
**To:** Chris Dix <cdix@smithhulsey.com>
**Cc:** David A. Hancock, CEDS <David.Hancock@gray-robinson.com>
**Subject:** RE: Foodonics v. Dina Klempf Srochi, as Trustee

Chris,

Attached please find our proposed search list responsive to your RFP. Like you, we reserve all objections to the scope of discovery and production. I'll be out all of next week, so please confer with Dave or Grier if necessary. Notably, we had some difficulty with requests 20 and 22 as you did with a few of ours. We are open and welcome your suggestions there.

Mike

**Michael R. Santana | Shareholder**
**G R A Y | R O B I N S O N**

301 East Pine Street, Suite 1400 | Orlando, Florida 32801
T: 407-843-8880 | F: 407-244-5690
E-mail | Website | Bio | vCard

**Facebook | LinkedIn | Twitter**

**From:** Chris Dix [mailto:cdix@smithhulsey.com]
**Sent:** Tuesday, April 17, 2018 4:35 PM
**To:** Michael R. Santana
**Cc:** David A. Hancock, CEDS; Grier Wells; James H. Post; John M. "Jay" Brennan
**Subject:** RE: Foodonics v. Dina Klempf Srochi, as Trustee

Mike,

After we conferred last week, we reviewed your proposed search terms in your email below in light of your clients' First Request for Production of Documents by Foodonics and Jacques Klempf. Although we have not yet tested your search terms across all of our clients' data, below is our initial analysis of the search terms you proposed for our clients' response:

1. For Request No.'s 1 – 8, 11 – 18, 22 and 29 – 33, the first two search terms you proposed ("Jacques" and "Foodonics") are expected to produce all of the information you have requested.

2. For Request No. 9, your proposed search term "Redemption" is expected to produce the information requested.

3. For Request No. 10, we do not see any search terms on point, but we propose using "2015 & tax w/2 refund".

4. For Request No. 19, your proposed search terms "Price" and "Share" are expected to produce the information requested.

5. For Request No. 20, your proposed search term "Cal-Maine" is expected to produce the information requested.

6. For Request No. 21, your proposed search terms "Jacques" and "Foodonics" and "Shareh!" are expected to produce the information requested.

7. For Request No. 23, the requested documents can be produced without using any search terms.

4

8.  For Request No. 24, we do not see any search terms on point, but we propose using "Blackburn w/5 Assistant Trustee".

9.  For Request No. 25, although your request is very broad, the first two search terms you proposed ("Jacques" and "Foodonics") are expected to produce all of the information you have requested.

10. For Request No.'s 26, 27 and 28, the requested documents can be produced without using any search terms.

11. For Request No. 33, the requested documents can be produced by searching for emails exchanged between the Cal-Maine email domain (@cmfoods.com) and the email addresses you specified for Jacques Klempf (jklempf@dixieegg.com; kjkeggs@aol.com and jklempf@bamjax.com).

The foregoing searches relate to Dina Klempf's email accounts. We will supplement the foregoing proposed searches with any additional search parameters that specifically relate to Dennis Blackburn's email account.

Like you, we are still in the process of collecting the ESI from our clients, and we reserve all objections (including burden and cost) until we have run the proposed search terms across the collected data. We agree with the process outlined in your email below to (i) finalize our respective search terms, (ii) conduct a first run to see what kind and volume of responses we receive, (iii) if excessive, we can get together to modify the search terms further in an effort to obtain more reasonable response volumes and (iv) each review our respective data for privilege and relevancy prior to production to avoid doc dumping.

I had hoped to send this email to you earlier, but a close family member died last week, and the funeral was earlier today. I am generally available any time the rest of this week if you would like to schedule a time to talk further about these issues.

Thanks,

## Chris Dix
<image001.png>
225 Water Street | Suite 1800 | Jacksonville, Florida 32202
904-359-7700 | Direct 904-359-7730
cdix@smithhulsey.com | www.smithhulsey.com

<image003.png>

*This message is from a law firm and may contain information that is confidential or legally privileged. If you are not the intended recipient, please immediately advise the sender by reply e-mail that this message has been inadvertently transmitted to you and delete this e-mail from your system. Thank you for your cooperation.*

**From:** Michael R. Santana [mailto:Michael.Santana@gray-robinson.com]
**Sent:** Wednesday, April 11, 2018 9:29 AM
**To:** Chris Dix <cdix@smithhulsey.com>

Chris, how about 11 am or 2:30 pm today? Otherwise, here's a status update to either satisfy the order's requirement or to narrow the issues for discussion.

Dave has been working with KL to get them the data sources in our client's possession (his computers and phones identified below). I believe KL now has the items we disclosed that were in Mr. Klempf's possession. We were working with KL last week, but the conflict waiver issue bogged us down until Monday morning. As to the AS400 possessed by Cal-Maine, we're working on obtaining custody. We've sent Cal-Maine's lawyer a chain of custody form, but he hasn't sent it back. We're working on this.

As far as protocol for data retrieval, I'll defer to Dave and ask him to chime in as necessary. However, I understand that we're obtaining a mirror/forensic imagining.

As we discussed a few weeks ago, I think it would be helpful if we exchanged search terms. More specifically, I think it would be helpful if I send you the terms we would like searched in your data (and vice versa). I think your disclosed data was more personal in nature (personal computer and personal emails, etc.) and is probably far more limited in volume. Thus, I think we're going to have far more data than your side and we'll probably need to work more closely to refine your search terms if they produce excessive hits. In furtherance of this strategy, I've copied below search terms we would like run on your client's data. You can probably utilize some of the same terms, but we'll need more connectors, ranges, and other methods to limit the hits on the more common words.

I propose that we finalize our respective search terms and then conduct a first run to see what kind and volume of responses we receive. If excessive, we can get together to modify the search terms further in an effort to obtain more reasonable response volumes. We should then each review our respective data for privilege and relevancy prior to production to avoid doc dumping.

Mike

**Search Terms**:

Jacques
Foodonics
Dixie
Cal-Maine (also "CM" in case its abbreviated anywhere)
Transaction
Acquir!
Merger
Share
Shareh!
Stock
Asset
Redemption
Offer

Price
Sale
Seller
Dolph
Baker
Trust!

**Michael R. Santana | Shareholder**
**G R A Y | R O B I N S O N**

301 East Pine Street, Suite 1400 | Orlando, Florida 32801
**T: 407-843-8880 | F: 407-244-5690**
E-mail | Website | Bio | vCard

**Facebook | LinkedIn | Twitter**

This e-mail is intended only for the individual(s) or entity(s) named within the message. This e-mail might contain legally privileged and confidential information. If you properly received this e-mail as a client or retained expert, please hold it in confidence to protect the attorney-client or work product privileges. Should the intended recipient forward or disclose this message to another person or party, that action could constitute a waiver of the attorney-client privilege. If the reader of this message is not the intended recipient, or the agent responsible to deliver it to the intended recipient, you are hereby notified that any review, dissemination, distribution or copying of this communication is prohibited by the sender and to do so might constitute a violation of the Electronic Communications Privacy Act, 18 U.S.C. section 2510-2521. If this communication was received in error we apologize for the intrusion. Please notify us by reply e-mail and delete the original message without reading same. Nothing in this e-mail message shall, in and of itself, create an attorney-client relationship with the sender.

**From:** Chris Dix [mailto:cdix@smithhulsey.com]
**Sent:** Tuesday, April 10, 2018 11:26 AM
**To:** Michael R. Santana
**Cc:** David A. Hancock, CEDS; Grier Wells; James H. Post
**Subject:** Foodonics v. Dina Klempf Srochi, as Trustee

Mike,

We would like to schedule a time to confer with you as provided in Paragraph 5 of the Order Governing ESI Issues regarding the search methods that will be used by you and your clients to search ESI, identify information that is subject to production and filter out ESI that is not subject to discovery.

Are you available for a call either tomorrow (April 11) or Thursday (April 12)?

Thanks,

Chris Dix
<image001.png>
225 Water Street | Suite 1800 | Jacksonville, Florida 32202
904-359-7700 | Direct 904-359-7730
cdix@smithhulsey.com | www.smithhulsey.com

<image003.png>

*This message is from a law firm and may contain information that is confidential or legally privileged. If you are not the intended recipient, please immediately advise the sender by reply e-mail that this message has been inadvertently transmitted to you and delete this e-mail from your system. Thank you for your cooperation.*

7

# TAB 19

| | |
|---|---|
| **From:** | Chris Dix |
| **Sent:** | Monday, May 14, 2018 2:42 PM |
| **To:** | Michael R. Santana |
| **Cc:** | David A. Hancock, CEDS |
| **Subject:** | RE: Foodonics v. Dina Klempf Srochi, as Trustee |

Mike,

Last Monday, we spoke about the following matters:

1. The sources that you intend to search using the proposed search terms (currently I'm assuming that you will search all sources previously identified);

2. The impact of your current reservation of all objections to discovery sought when searching and reviewing ESI;

3. A few additional search terms that we propose to add to your list;

4. The anticipated date by which you expect to complete the "first run" of the searches (assuming we agree today on the initial search terms).

With respect to #1, although some of your proposed search terms originally appeared to be limited to searching just emails, you confirmed that you will be running the search terms across all sources of ESI, including Jacques Klempf's text messages. For example, with respect to the Trust's 1st request (for documents and ESI exchanged between Foodonics/Jacques Klempf and Dolph Baker/Cal-Maine), we discussed that your proposed search for "Email from Jacques to Baker OR Cal-Maine OR email from Baker OR Cal-Maine to Jacques" will be expanded to include text messages exchanged between Mr. Baker and Mr. Klempf.

With respect to #2, you confirmed that (i) your searches will not be subject to any of the objections that have been asserted, (ii) when ESI is produced, you will describe any information withheld due to any objections or, if applicable, state that no information was withheld due to those objections.

With respect to #3, we reviewed the search terms you proposed, and you agreed to revise the search terms for consistency and clarity, including the following:

a. with respect to the Trust's 2nd request (for closing documents and other agreements relating to the Cal-Maine Sale), you agreed to change the search connectors to reflect a search for Cal-Maine plus a list of additional search terms connected by OR instead of AND;

b. standardizing the use of the search connector OR, which in some proposed searches is also indicated by a comma;

c. replacing use of the asterisk (*) with an exclamation point (!), and moving the symbol one character to the left (to avoid unintentionally restrictive searches);

d. with respect to the searches involving professionals (including CPAs, appraisers and attorneys), you will use email domains rather than search terms (to avoid false hits). The following are the domains we have identified (not an exclusive list, since the data is in your possession):

- for GlassRatner: @glassratner.com
- for Sheldrick, McGehee & Kohler: @smki.net
- for Stevens Powell & Co.: @stevens-powell-cpa.com
- for GrayRobinson: @gray-robinson.com
- for Cal-Maine: @cmfoods.com

Also with respect to #3, for the Trust's 3rd request (regarding representations or estimates of value of Foodonics' assets or stock), we discussed adding the following search terms based on the "Dream Team" analysis that we have seen in emails produced by third parties:

   a. dream w/2 team
   b. price w/2 bird

With respect to #4, we request that you finalize your proposed search terms by the end of this week (by May 18, 2018) so that the initial searches can be performed next week (by May 25, 2018), and an initial phased production can be made by the end of May.

Thanks,

## Chris Dix

SMITH HULSEY & BUSEY

225 Water Street | Suite 1800 | Jacksonville, Florida 32202
904-359-7700 | Direct 904-359-7730
cdix@smithhulsey.com | www.smithhulsey.com


YEARS

*This message is from a law firm and may contain information that is confidential or legally privileged. If you are not the intended recipient, please immediately advise the sender by reply e-mail that this message has been inadvertently transmitted to you and delete this e-mail from your system. Thank you for your cooperation.*

**From:** Michael R. Santana [mailto:Michael.Santana@gray-robinson.com]
**Sent:** Monday, May 7, 2018 9:38 AM
**To:** Chris Dix <cdix@smithhulsey.com>
**Cc:** David A. Hancock, CEDS <David.Hancock@gray-robinson.com>
**Subject:** RE: Foodonics v. Dina Klempf Srochi, as Trustee

Thanks, Chris.

Here's a brief response to your points, which will hopefully make things more efficient:

1. You are correct (and assume same you'll do the same).
2. Search not subject to objections; only production will be subject to objections (assume same on your side).
3. Happy to consider them.
4. I'd like to get access to the AS400 and have that data subject to the search terms so as to avoid duplicating efforts. Grier has talked to Jim about that recent, I believe, and Grier is still working with Cal-Maine's lawyer.

**Michael R. Santana | Shareholder**
**G R A Y | R O B I N S O N**

301 East Pine Street, Suite 1400 | Orlando, Florida 32801

2

**T:** 407-843-8880 | **F:** 407-244-5690
E-mail | Website | Bio | vCard


**Facebook** | **LinkedIn** | **Twitter**

**From:** Chris Dix [mailto:cdix@smithhulsey.com]
**Sent:** Monday, May 07, 2018 9:13 AM
**To:** Michael R. Santana
**Cc:** David A. Hancock, CEDS
**Subject:** RE: Foodonics v. Dina Klempf Srochi, as Trustee

Mike,

Yes, I was drafting an email to you when I received your email below. The items I'd like to discuss are:

1. The sources that you intend to search using the proposed search terms (currently I'm assuming that you will search all sources previously identified);

2. The impact of your current reservation of all objections to discovery sought when searching and reviewing ESI;

3. A few additional search terms that we propose to add to your list;

4. The anticipated date by which you expect to complete the "first run" of the searches (assuming we agree today on the initial search terms).

Please use the following dial-in information for our call at 2:30:

Dial-in #: 1-866-244-8528
Passcode: 864681

Thanks,

## Chris Dix



SMITH HULSEY & BUSEY

225 Water Street | Suite 1800 | Jacksonville, Florida 32202
904-359-7700 | Direct 904-359-7730
cdix@smithhulsey.com | www.smithhulsey.com

YEARS

*This message is from a law firm and may contain information that is confidential or legally privileged. If you are not the intended recipient, please immediately advise the sender by reply e-mail that this message has been inadvertently transmitted to you and delete this e-mail from your system. Thank you for your cooperation.*

**TAB 20**

| | |
|---|---|
| **From:** | Michael R. Santana <Michael.Santana@gray-robinson.com> |
| **Sent:** | Wednesday, May 16, 2018 2:20 PM |
| **To:** | Chris Dix |
| **Cc:** | David A. Hancock, CEDS |
| **Subject:** | RE: Foodonics v. Dina Klempf Srochi, as Trustee |
| **Attachments:** | Search Terms for the Trust_s First RFP.DOCX |

Chris,

In follow up to the below, attached please find revised search terms consistent with our call last week.

As far as your proposed search terms are concerned, we are fine with them. We anticipate that you will run the searches and production as you have asked us to do so; i.e.: correspondence requests include texts, objections to be addressed only on production, but not on search, privilege log (or lack of privileged documents withheld).

One other matter that has come to mind re: Blackburn. Are you limiting your search to his email account or does he have computers with potentially responsive information? Certainly, if he has other potential data sources outside of his email, we ask that those be searched.

As to timing, I'll confer with Grier and Dave and will report back shortly. Based upon your proposed timeframe, I anticipate that your side is ready to proceed and will once we do.

Thanks,
Mike


**Michael R. Santana | Shareholder**
**G R A Y | R O B I N S O N**

301 East Pine Street, Suite 1400 | Orlando, Florida 32801
**T:** 407-843-8880 | **F:** 407-244-5690
E-mail | Website | Bio | vCard

**Facebook | LinkedIn | Twitter**

**From:** Michael R. Santana [mailto:Michael.Santana@gray-robinson.com]
**Sent:** Tuesday, May 15, 2018 4:30 PM
**To:** Chris Dix
**Subject:** RE: Foodonics v. Dina Klempf Srochi, as Trustee

Chris,

I haven't forgotten about this. I started amending the terms last week but was waiting for the domains. I'll try to get these back to you tomorrow. As far as the below, that seems to generally comport with my recollection of our call. I assume that the obligations we're undertaking and mentioned in your email will also apply to your side (searching for texts, privilege issues, etc.). Please confirm. I'll also get back to you about your search terms, which I think were fine.
Mike

**Michael R. Santana | Shareholder**
**G R A Y | R O B I N S O N**

301 East Pine Street, Suite 1400 | Orlando, Florida 32801
**T:** 407-843-8880 | **F:** 407-244-5690
E-mail | Website | Bio | vCard

**Facebook | LinkedIn | Twitter**

This e-mail is intended only for the individual(s) or entity(s) named within the message. This e-mail might contain legally privileged and confidential information. If you properly received this e-mail as a client or retained expert, please hold it in confidence to protect the attorney-client or work product privileges. Should the intended recipient forward or disclose this message to another person or party, that action could constitute a waiver of the attorney-client privilege. If the reader of this message is not the intended recipient, or the agent responsible to deliver it to the intended recipient, you are hereby notified that any review, dissemination, distribution or copying of this communication is prohibited by the sender and to do so might constitute a violation of the Electronic Communications Privacy Act, 18 U.S.C. section 2510-2521. If this communication was received in error we apologize for the intrusion. Please notify us by reply e-mail and delete the original message without reading same. Nothing in this e-mail message shall, in and of itself, create an attorney-client relationship with the sender.

**From:** Chris Dix [mailto:cdix@smithhulsey.com]
**Sent:** Monday, May 14, 2018 2:42 PM
**To:** Michael R. Santana
**Cc:** David A. Hancock, CEDS
**Subject:** RE: Foodonics v. Dina Klempf Srochi, as Trustee

Mike,

Last Monday, we spoke about the following matters:

1. The sources that you intend to search using the proposed search terms (currently I'm assuming that you will search all sources previously identified);

2. The impact of your current reservation of all objections to discovery sought when searching and reviewing ESI;

3. A few additional search terms that we propose to add to your list;

4. The anticipated date by which you expect to complete the "first run" of the searches (assuming we agree today on the initial search terms).

With respect to #1, although some of your proposed search terms originally appeared to be limited to searching just emails, you confirmed that you will be running the search terms across all sources of ESI, including Jacques Klempf's text messages. For example, with respect to the Trust's 1st request (for documents and ESI exchanged between Foodonics/Jacques Klempf and Dolph Baker/Cal-Maine), we discussed that your proposed search for "Email from Jacques to Baker OR Cal-Maine OR email from Baker OR Cal-Maine to Jacques" will be expanded to include text messages exchanged between Mr. Baker and Mr. Klempf.

With respect to #2, you confirmed that (i) your searches will not be subject to any of the objections that have been asserted, (ii) when ESI is produced, you will describe any information withheld due to any objections or, if applicable, state that no information was withheld due to those objections.

With respect to #3, we reviewed the search terms you proposed, and you agreed to revise the search terms for consistency and clarity, including the following:

a. with respect to the Trust's 2nd request (for closing documents and other agreements relating to the Cal-Maine Sale), you agreed to change the search connectors to reflect a search for Cal-Maine plus a list of additional search terms connected by OR instead of AND;

2

b.  standardizing the use of the search connector OR, which in some proposed searches is also indicated by a comma;

c.  replacing use of the asterisk (*) with an exclamation point (!), and moving the symbol one character to the left (to avoid unintentionally restrictive searches);

d.  with respect to the searches involving professionals (including CPAs, appraisers and attorneys), you will use email domains rather than search terms (to avoid false hits). The following are the domains we have identified (not an exclusive list, since the data is in your possession):

- for GlassRatner: @glassratner.com
- for Sheldrick, McGehee & Kohler: @smki.net
- for Stevens Powell & Co.: @stevens-powell-cpa.com
- for GrayRobinson: @gray-robinson.com
- for Cal-Maine: @cmfoods.com

Also with respect to #3, for the Trust's 3rd request (regarding representations or estimates of value of Foodonics' assets or stock), we discussed adding the following search terms based on the "Dream Team" analysis that we have seen in emails produced by third parties:

a.  dream w/2 team
b.  price w/2 bird

With respect to #4, we request that you finalize your proposed search terms by the end of this week (by May 18, 2018) so that the initial searches can be performed next week (by May 25, 2018), and an initial phased production can be made by the end of May.

Thanks,

Chris Dix

SMITH HULSEY & BUSEY

225 Water Street | Suite 1800 | Jacksonville, Florida 32202
904-359-7700 | Direct 904-359-7730
cdix@smithhulsey.com | www.smithhulsey.com



YEARS

*This message is from a law firm and may contain information that is confidential or legally privileged. If you are not the intended recipient, please immediately advise the sender by reply e-mail that this message has been inadvertently transmitted to you and delete this e-mail from your system. Thank you for your cooperation.*

**From:** Michael R. Santana [mailto:Michael.Santana@gray-robinson.com]
**Sent:** Monday, May 7, 2018 9:38 AM
**To:** Chris Dix <cdix@smithhulsey.com>
**Cc:** David A. Hancock, CEDS <David.Hancock@gray-robinson.com>
**Subject:** RE: Foodonics v. Dina Klempf Srochi, as Trustee

Thanks, Chris.

Here's a brief response to your points, which will hopefully make things more efficient:

1. You are correct (and assume same you'll do the same).
2. Search not subject to objections; only production will be subject to objections (assume same on your side).
3. Happy to consider them.
4. I'd like to get access to the AS400 and have that data subject to the search terms so as to avoid duplicating efforts. Grier has talked to Jim about that recent, I believe, and Grier is still working with Cal-Maine's lawyer.

**Michael R. Santana | Shareholder**
**G R A Y | R O B I N S O N**

301 East Pine Street, Suite 1400 | Orlando, Florida 32801
**T:** 407-843-8880 | **F:** 407-244-5690
<u>E-mail</u> | <u>Website</u> | <u>Bio</u> | <u>vCard</u>

**<u>Facebook</u> | <u>LinkedIn</u> | <u>Twitter</u>**

**From:** Chris Dix [<u>mailto:cdix@smithhulsey.com</u>]
**Sent:** Monday, May 07, 2018 9:13 AM
**To:** Michael R. Santana
**Cc:** David A. Hancock, CEDS
**Subject:** RE: Foodonics v. Dina Klempf Srochi, as Trustee

Mike,

Yes, I was drafting an email to you when I received your email below. The items I'd like to discuss are:

1. The sources that you intend to search using the proposed search terms (currently I'm assuming that you will search all sources previously identified);

2. The impact of your current reservation of all objections to discovery sought when searching and reviewing ESI;

3. A few additional search terms that we propose to add to your list;

4. The anticipated date by which you expect to complete the "first run" of the searches (assuming we agree today on the initial search terms).

Please use the following dial-in information for our call at 2:30:

Dial-in #: 1-866-244-8528
Passcode: 864681

Thanks,

## Chris Dix
**S M I T H   H U L S E Y   &   B U S E Y**

225 Water Street | Suite 1800 | Jacksonville, Florida 32202
904-359-7700 | Direct 904-359-7730
<u>cdix@smithhulsey.com</u> | <u>www.smithhulsey.com</u>



*This message is from a law firm and may contain information that is confidential or legally privileged. If you are not the intended recipient, please immediately advise the sender by reply e-mail that this message has been inadvertently transmitted to you and delete this e-mail from your system. Thank you for your cooperation.*

## <u>Search Terms for the Trust's First Request for Production to Foodonics</u>

These search terms are prepared and/or exchanged for discussion purposes. Foodonics' maintains and/or reserves all of its objections to the discovery sought.

1.      Email from Jacques to Baker OR Cal-Maine OR email from Baker OR Cal-Maine to Jacques (correspondence searches will include text message searches)

2.      Cal-Maine AND asset! OR purchas! OR agreemen! OR closin!

3.      valu! OR stock OR asset! OR estimat!; dream w/2 team; price w/2 bird

4.      Results of No. 3 will cover this request

5.      proposa! OR offer! OR purchas! OR sale!

6.      Email from Jacques to Marc Klempf OR email from Marc Klempf to Jacques (correspondence searches will include text message searches)

7.      Email from Jacques to Dina OR email from Dina to Jacques (Dina's emails should already be in the Trust's possession, custody, or control) (correspondence searches will include text message searches)

8.      Email from Jacques to Steven Brust OR email from Steven Brust to Jacques (correspondence searches will include text message searches)

9.      Email from Jacques to Dennis Blackburn OR email from Dennis Blackburn to Jacques (correspondence searches will include text message searches)

10.     Email from Jacques to Laura Jean OR email from Laura Jean to Jacques (correspondence searches will include text message searches)

11 + 12 Email from Jacques to Ian Ratner OR GlassRatner Advisory & Capital Group, LLC OR email from Ian Ratner OR GlassRatner Advisory & Capital Group, LLC to Jacques (note: will use GRA domain for search -@glassratner.com)

13.     Email from Jacques to Jess W. Wright OR email from Jess W. Wright to Jacques

14.     Email from Jacques to Sheldrick, McGehee & Kohler, LLC OR email from Sheldrick, McGehee & Kohler, LLC to Jacques (note: will use SMK domain for search - @smki.net)

15 + 16 Email from Jacques to John P. Stevens OR Stevens, Powell & Company OR email from John P. Stevens OR Stevens, Powell & Company to Jacques (note: will use SPC domain for search - @stevens-powell-cpa.com )

17.     Email from Jacques to Robert Monsky OR email from Robert Monsky to Jacques

18. First Florida Capital Corporation OR First Florida AND valu! OR sal! OR stock! OR asset!

19. Email from Jacques to Grier Wells OR James Nolan OR Jeff Rood OR email from Grier Wells OR James Nolan OR Jeff Rood to Jacques AND Settlement and Redemption Agreement OR Laura Jean Klempf OR Trust OR Cal-Maine OR Dolph OR Baker OR sale OR asset! OR stock! OR valu!

20. Although very broad, we propose: Foodonics AND financ! OR profit! OR loss! OR statemen! OR valu!

21. Financial Statement AND Jacques

22. Although very broad, we propose: Foodonics AND financ! OR profit! OR loss! OR statemen! OR stock! OR asset!

23. transfer AND BAM

24. General Ledger AND Foodonics

25. Corporate Minut! AND Foodonics

26. Tax Return AND Foodonics

27. Foodonics AND dividen! OR distributio!

28. Foodonics AND shareholde! OR tax OR incom!

29. Foodonics AND shareholde! OR tax OR incom! OR IRS

30. Foodonics AND shareholde! OR tax OR incom!

31. Foodonics AND shareholde! OR tax OR incom! OR estimat!

32. Foodonics AND shareholde! OR tax OR incom! OR overpay! OR refun!