**TAB 21**

| | |
|---|---|
| **From:** | Michael R. Santana <Michael.Santana@gray-robinson.com> |
| **Sent:** | Thursday, May 24, 2018 2:37 PM |
| **To:** | Chris Dix |
| **Cc:** | David A. Hancock, CEDS |
| **Subject:** | RE: Foodonics v. Dina Klempf Srochi, as Trustee |

Chris, sorry for the delayed response. I was in your neck of the woods for a "surprise" (48 hour notice) evidentiary hearing yesterday.

1. That's fine and I think you're right. That's how we had it originally.
2. As we discussed, we understand there may be amending depending on how discovery progresses, what the initial search terms produce, etc. That said, I think mutual cooperation is important to ensure this is within reason. We reserve the right to object to repeated, piecemeal searching although I don't expect that to happen.
3. What about texts to/from Dina regarding Foodonics or Jacques? We would like those too.
4. We may need to discuss this. I'd certainly feel more comfortable with a search as recollections are imperfect.
5. I have to check on the status of where we are in the process of collection, dedupe, etc. At last report, searches were to begin as soon as tomorrow, but probably next week.
6. Let me talk to Dave and Grier. It was my understanding that the Dixie Egg emails were transferred as part of the Asset Purchase Agreement or they were terminated. I'm told Mr. Klempf paid out of his own pocket to keep his Dixie Egg email account.
7. See #6.

**Michael R. Santana | Shareholder**
**G R A Y | R O B I N S O N**

301 East Pine Street, Suite 1400 | Orlando, Florida 32801
**T:** 407-843-8880 | **F:** 407-244-5690
E-mail | Website | Bio | vCard

**Facebook** | **LinkedIn** | **Twitter**

---

**From:** Chris Dix [mailto:cdix@smithhulsey.com]
**Sent:** Tuesday, May 22, 2018 2:12 PM
**To:** Michael R. Santana
**Cc:** David A. Hancock, CEDS
**Subject:** RE: Foodonics v. Dina Klempf Srochi, as Trustee

Mike,

Thank you for your May 15 and 16 emails. Below are a few follow up issues:

1. The revised search terms are acceptable, with one exception. I previously suggested replacing use of the asterisk (*) with an exclamation point (!), because I was under the impression that the asterisk would only replace 1 character, and that the exclamation point would replace 1 or more characters. This search syntax may be correct with some eDiscovery review platforms, but after some further investigation in Relativity (which I assume you are also using in this case), I have learned that (i) the exclamation point may be considered a disregarded non-alphanumeric symbol in some searches and (ii) the asterisk can, in fact, be used to replace zero or more characters. Attached is an updated search term list which changes the exclamation points to

asterisks. If you have a different understanding of how these search operators will function in Relativity when you run the searches, please let me know.

2. As we have discussed previously, because of the inherent challenge of guessing what search terms might generate the ESI responsive to our requests for production, we reserve our right to add additional search terms after the initial production has been made. We similarly agree that you may provide additional search terms after our initial production has been made.

3. We agree to produce all text messages exchanged between Dina and Jacques Klempf, without the need to run search terms.

4. For Dennis Blackburn, who is an attorney, we will be producing both emails and electronic documents from Mr. Blackburn's computer system. Based on Mr. Blackburn's review of your Request for Production and his familiarity with his own file system, we do not anticipate that we will need to run searches across Mr. Blackburn's entire email or computer system in order to produce the non-privileged ESI you requested.

5. Please confirm that you will run the initial searches by the end of this week (May 25th).

6. Attached is an email from Cal-Maine's attorney, Mark Cunningham, which states that Cal-Maine never had access or control of any Foodonics email accounts (emails with the domain @dixieegg.com). This information appears inconsistent with prior representations we received from you indicating that Foodonics had transferred control/access to all @dixieegg.com email accounts to Cal-Maine, except for Jacques Klempf's own email (jklempf@dixieegg.com).

   Can you please tell us which mailboxes from the @dixieegg.com domain you have (i) preserved and (ii) intend to search (e.g., jklempf@dixieegg.com, dstill@dixieegg.com, sholder@dixieegg.com, spstevenson@dixieegg.com, others?)?

7. We request that you run the initial searches and provide the additional information described in #6 above by the end of this week (May 25th).

Thanks,

## Chris Dix

**SMITH HULSEY & BUSEY**

225 Water Street | Suite 1800 | Jacksonville, Florida 32202
904-359-7700 | Direct 904-359-7730
cdix@smithhulsey.com | www.smithhulsey.com



*This message is from a law firm and may contain information that is confidential or legally privileged. If you are not the intended recipient, please immediately advise the sender by reply e-mail that this message has been inadvertently transmitted to you and delete this e-mail from your system. Thank you for your cooperation.*

**From:** Michael R. Santana [mailto:Michael.Santana@gray-robinson.com]
**Sent:** Wednesday, May 16, 2018 2:20 PM
**To:** Chris Dix <cdix@smithhulsey.com>
**Cc:** David A. Hancock, CEDS <David.Hancock@gray-robinson.com>
**Subject:** RE: Foodonics v. Dina Klempf Srochi, as Trustee

Chris,

In follow up to the below, attached please find revised search terms consistent with our call last week.

As far as your proposed search terms are concerned, we are fine with them. We anticipate that you will run the searches and production as you have asked us to do so; i.e.: correspondence requests include texts, objections to be addressed only on production, but not on search, privilege log (or lack of privileged documents withheld).

One other matter that has come to mind re: Blackburn. Are you limiting your search to his email account or does he have computers with potentially responsive information? Certainly, if he has other potential data sources outside of his email, we ask that those be searched.

As to timing, I'll confer with Grier and Dave and will report back shortly. Based upon your proposed timeframe, I anticipate that your side is ready to proceed and will once we do.

Thanks,
Mike

**Michael R. Santana | Shareholder**
**G R A Y | R O B I N S O N**

301 East Pine Street, Suite 1400 | Orlando, Florida 32801
**T:** 407-843-8880 | **F:** 407-244-5690
E-mail | Website | Bio | vCard

**Facebook | LinkedIn | Twitter**

**From:** Michael R. Santana [mailto:Michael.Santana@gray-robinson.com]
**Sent:** Tuesday, May 15, 2018 4:30 PM
**To:** Chris Dix
**Subject:** RE: Foodonics v. Dina Klempf Srochi, as Trustee

Chris,

I haven't forgotten about this. I started amending the terms last week but was waiting for the domains. I'll try to get these back to you tomorrow. As far as the below, that seems to generally comport with my recollection of our call. I assume that the obligations we're undertaking and mentioned in your email will also apply to your side (searching for texts, privilege issues, etc.). Please confirm. I'll also get back to you about your search terms, which I think were fine.
Mike

**Michael R. Santana | Shareholder**
**G R A Y | R O B I N S O N**

301 East Pine Street, Suite 1400 | Orlando, Florida 32801
**T:** 407-843-8880 | **F:** 407-244-5690

E-mail | Website | Bio | vCard

Facebook | LinkedIn | Twitter


This e-mail is intended only for the individual(s) or entity(s) named within the message. This e-mail might contain legally privileged and confidential information. If you properly received this e-mail as a client or retained expert, please hold it in confidence to protect the attorney-client or work product privileges. Should the intended recipient forward or disclose this message to another person or party, that action could constitute a waiver of the attorney-client privilege. If the reader of this message is not the intended recipient, or the agent responsible to deliver it to the intended recipient, you are hereby notified that any review, dissemination, distribution or copying of this communication is prohibited by the sender and to do so might constitute a violation of the Electronic Communications Privacy Act, 18 U.S.C. section 2510-2521. If this communication was received in error we apologize for the intrusion. Please notify us by reply e-mail and delete the original message without reading same. Nothing in this e-mail message shall, in and of itself, create an attorney-client relationship with the sender.

**From:** Chris Dix [mailto:cdix@smithhulsey.com]
**Sent:** Monday, May 14, 2018 2:42 PM
**To:** Michael R. Santana
**Cc:** David A. Hancock, CEDS
**Subject:** RE: Foodonics v. Dina Klempf Srochi, as Trustee

Mike,

Last Monday, we spoke about the following matters:

1. The sources that you intend to search using the proposed search terms (currently I'm assuming that you will search all sources previously identified);

2. The impact of your current reservation of all objections to discovery sought when searching and reviewing ESI;

3. A few additional search terms that we propose to add to your list;

4. The anticipated date by which you expect to complete the "first run" of the searches (assuming we agree today on the initial search terms).

With respect to #1, although some of your proposed search terms originally appeared to be limited to searching just emails, you confirmed that you will be running the search terms across all sources of ESI, including Jacques Klempf's text messages. For example, with respect to the Trust's 1st request (for documents and ESI exchanged between Foodonics/Jacques Klempf and Dolph Baker/Cal-Maine), we discussed that your proposed search for "Email from Jacques to Baker OR Cal-Maine OR email from Baker OR Cal-Maine to Jacques" will be expanded to include text messages exchanged between Mr. Baker and Mr. Klempf.

With respect to #2, you confirmed that (i) your searches will not be subject to any of the objections that have been asserted, (ii) when ESI is produced, you will describe any information withheld due to any objections or, if applicable, state that no information was withheld due to those objections.

With respect to #3, we reviewed the search terms you proposed, and you agreed to revise the search terms for consistency and clarity, including the following:
   a. with respect to the Trust's 2nd request (for closing documents and other agreements relating to the Cal-Maine Sale), you agreed to change the search connectors to reflect a search for Cal-Maine plus a list of additional search terms connected by OR instead of AND;
   b. standardizing the use of the search connector OR, which in some proposed searches is also indicated by a comma;
   c. replacing use of the asterisk (*) with an exclamation point (!), and moving the symbol one character to the left (to avoid unintentionally restrictive searches);

    d.   with respect to the searches involving professionals (including CPAs, appraisers and attorneys), you will use email domains rather than search terms (to avoid false hits). The following are the domains we have identified (not an exclusive list, since the data is in your possession):

- for GlassRatner: @glassratner.com
- for Sheldrick, McGehee & Kohler: @smki.net
- for Stevens Powell & Co.: @stevens-powell-cpa.com
- for GrayRobinson: @gray-robinson.com
- for Cal-Maine: @cmfoods.com

Also with respect to #3, for the Trust's 3rd request (regarding representations or estimates of value of Foodonics' assets or stock), we discussed adding the following search terms based on the "Dream Team" analysis that we have seen in emails produced by third parties:

    a.   dream w/2 team
    b.   price w/2 bird

With respect to #4, we request that you finalize your proposed search terms by the end of this week (by May 18, 2018) so that the initial searches can be performed next week (by May 25, 2018), and an initial phased production can be made by the end of May.

Thanks,

## Chris Dix

### SMITH HULSEY & BUSEY

225 Water Street | Suite 1800 | Jacksonville, Florida 32202
904-359-7700 | Direct 904-359-7730
cdix@smithhulsey.com | www.smithhulsey.com



*This message is from a law firm and may contain information that is confidential or legally privileged. If you are not the intended recipient, please immediately advise the sender by reply e-mail that this message has been inadvertently transmitted to you and delete this e-mail from your system. Thank you for your cooperation.*

---

**From:** Michael R. Santana [mailto:Michael.Santana@gray-robinson.com]
**Sent:** Monday, May 7, 2018 9:38 AM
**To:** Chris Dix <cdix@smithhulsey.com>
**Cc:** David A. Hancock, CEDS <David.Hancock@gray-robinson.com>
**Subject:** RE: Foodonics v. Dina Klempf Srochi, as Trustee

Thanks, Chris.

Here's a brief response to your points, which will hopefully make things more efficient:

1. You are correct (and assume same you'll do the same).
2. Search not subject to objections; only production will be subject to objections (assume same on your side).
3. Happy to consider them.

4. I'd like to get access to the AS400 and have that data subject to the search terms so as to avoid duplicating efforts. Grier has talked to Jim about that recent, I believe, and Grier is still working with Cal-Maine's lawyer.

**Michael R. Santana | Shareholder**
**G R A Y | R O B I N S O N**

301 East Pine Street, Suite 1400 | Orlando, Florida 32801
T: 407-843-8880 | F: 407-244-5690
E-mail | Website | Bio | vCard

**Facebook | LinkedIn | Twitter**

**From:** Chris Dix [mailto:cdix@smithhulsey.com]
**Sent:** Monday, May 07, 2018 9:13 AM
**To:** Michael R. Santana
**Cc:** David A. Hancock, CEDS
**Subject:** RE: Foodonics v. Dina Klempf Srochi, as Trustee

Mike,

Yes, I was drafting an email to you when I received your email below. The items I'd like to discuss are:

1. The sources that you intend to search using the proposed search terms (currently I'm assuming that you will search all sources previously identified);

2. The impact of your current reservation of all objections to discovery sought when searching and reviewing ESI;

3. A few additional search terms that we propose to add to your list;

4. The anticipated date by which you expect to complete the "first run" of the searches (assuming we agree today on the initial search terms).

Please use the following dial-in information for our call at 2:30:

Dial-in #: 1-866-244-8528
Passcode: 864681

Thanks,

Chris Dix

SMITH HULSEY & BUSEY

225 Water Street | Suite 1800 | Jacksonville, Florida 32202
904-359-7700 | Direct 904-359-7730
cdix@smithhulsey.com | www.smithhulsey.com



*This message is from a law firm and may contain information that is confidential or legally privileged. If you are not the intended recipient, please immediately advise the sender by reply e-mail that this message has been inadvertently transmitted to you and delete this e-mail from your system. Thank you for your cooperation.*

**TAB 22**

IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

FOODONICS INTERNATIONAL,
INC., a Florida corporation,

    Plaintiff,

vs.

DINA KLEMPF SROCHI, as
Trustee of the Laura Jean
Klempf Revocable Trust, a
Florida Trust,

    Defendant.

_____

Jacksonville, Florida

Case No. 3:17-cv-1054-J-32JRK

June 5, 2018

2:10 p.m.

Courtroom No. 5D


DIGITALLY RECORDED DISCOVERY STATUS HEARING
BEFORE THE HONORABLE JAMES R. KLINDT
UNITED STATES MAGISTRATE JUDGE


COURT REPORTER:

        Shannon M. Bishop, RDR, CRR, CRC
        221 North Hogan Street, #150
        Jacksonville, Florida  32202
        Telephone:  (904)549-1307
        dsmabishop@yahoo.com

    (Proceedings reported by mechanical stenography;
transcript produced by computer.)

A P P E A R A N C E S

PLAINTIFF'S COUNSEL:

       **SAMUEL GRIER WELLS, ESQ**.
       GrayRobinson, PA
       50 North Laura Street, Suite 1100
       Jacksonville, FL  32202

DEFENSE COUNSEL:

       **JAMES H. POST, ESQ**.
       **R. CHRISTOPHER DIX, ESQ**.
       Smith, Hulsey & Busey
       One Independent Drive
       Suite 3300
       Jacksonville, FL  32202-3315

COUNSEL FOR MOVANT:

       **MARK A. CUNNINGHAM, ESQ**. (via telephone)
       Jones Walker, LLP
       201 St. Charles Avenue, 47th Floor
       New Orleans, LA  70170-5100

ALSO PRESENT:

       David Hancock (via telephone)

1              P R O C E E D I N G S

2    June 5, 2018                              2:10 p.m.

3                        - - -

4         COURT SECURITY OFFICER:  All rise.  The United States

5    District Court in for the Middle District of Florida is now in

6    session.  The Honorable James R. Klindt presiding.

7         You may be seated.

8         THE COURT:  Hi.  Good afternoon, everyone.

9         MR. WELLS:  Good afternoon, Your Honor.

10         MR. POST:  Good afternoon.

11         MR. DIX:  Good afternoon.

12         THE COURT:  This is *Foodonics International, Inc.,*

13    *against Dina Klempf Srochi, as Trustee of the Laura Jean Klempf*

14    *Revocable Trust, a Georgia trust,* Case No. 3:17-cv-1054-J-32JRK.

15         We're set for a -- basically, a status hearing

16    regarding electronic discovery that involves a third party,

17    Cal-Maine.

18         And this is a -- a hearing that was requested by

19    Mr. Post.  And it's pursuant to -- he's making the request

20    pursuant to an order governing ESI issues that the Court

21    entered on March 15th, 2018, document 27, that, in paragraph 4m

22    states, in accordance with Rule 16(b)(3)(B)(v), that no

23    discovery-related motion may be filed unless the moving party

24    attempted in good faith, but without success, to resolve the

25    dispute and has requested a pre-motion conference with the

1    Court to discuss the dispute and to attempt to resolve it.

2          So this is a pre-motion conference.  So let's -- let

3    me go ahead and start with -- if -- with -- well, I'll start

4    with you, Mr. Post.

5          If you could announce your appearance, please.

6          MR. POST:  May it please the Court?  Jim Post and

7    Chris Dix from the law firm of Smith Hulsey & Busey on behalf

8    of the Jean Klempf trust.

9          THE COURT:  All right.  Thank you.

10         And as I understand it, Mark Cunningham is on the

11   telephone representing Cal-Maine.

12         Is that right, Mr. Cunningham?

13         MR. CUNNINGHAM:  Yes, sir, Your Honor.

14         THE COURT:  All right.  Thank you.

15         And then, Mr. Wells?

16         MR. WELLS:  Thank you, Your Honor.

17         Grier Wells with GrayRobinson here in Jacksonville.

18   And we also have Dave Hancock, who is our IT guru with the

19   firm.  He's on the phone as well.

20         THE COURT:  All right.  And, Mr. Hancock, you are,

21   indeed, on the telephone?

22         MR. HANCOCK:  Yes, sir.

23         THE COURT:  All right.  Well, you know, the first

24   question I have is why in the style -- at one point the Trust

25   is referred to as a Georgia trust and in another point a

1  Florida trust.

2        Can someone just answer that for me, and then we can

3  get on to the business that we have?

4        MR. POST:  Your Honor, of course, this complaint was

5  filed by Foodonics.  And they labeled -- mislabeled our trust

6  as a Georgia trust.

7        The Jean Klempf trust is, in fact, a Florida trust.

8  It happens that the primary trustee, Dina Klempf, is a Florida

9  resident.

10       THE COURT:  All right.  Do you agree with that,

11 Mr. Wells?

12       MR. WELLS:  I agree that the trust is a Florida

13 trust, Your Honor, and that Dina Srochi is a Georgia resident.

14 I'm, frankly, not sure how it was labeled as a Georgia trust,

15 but we certainly agree that it is a Florida trust.

16       THE COURT:  All right.  Well, at some point -- and my

17 law clerk will help me figure this out -- we may want to just

18 correct that, because I've had a couple of questions just as

19 we've gone through it about why that might be.  And I probably

20 spent too much time thinking about it when I should have been

21 thinking about other things.

22       But -- well, Mr. Post, you did request this hearing.

23 So it seems to me it would be best to hear from you first.

24       You can use either podium.  If that one is easier for

25 you, you can do that.  Whatever works for you.

1          MR. POST:   Thank you, Your Honor.   And thank you for

2     this opportunity for the discovery conference.   We appreciate

3     it.

4          Last January the Trust served its request for

5     production on Foodonics and a subpoena for documents on Jacques

6     Klempf, Cal-Maine, and Dolph Baker.

7          As of today, we have not received a single document

8     from Foodonics or Jacques Klempf, except for tax returns

9     produced only two weeks ago.   And we have not had a single

10    document from Cal-Maine or Dolph Baker.

11          Although the communications between the firms have

12    been cordial and professional, and some recent progress has

13    been made with the Foodonics and Jacques Klempf group, the

14    delay in the document production has precluded us from taking

15    depositions in this case and is jeopardizing our ability -- or

16    possibly jeopardizing our ability to meet the discovery cutoff

17    in this case, which is October 31st.

18          We're hoping this status conference would help us put

19    some of the document production in this case on a faster track

20    and help dislodge some of the roadblocks we presently face,

21    without the need of discovery motion practice, and -- which

22    would only add more delay and expense to this litigation.

23          Your Honor, as I said, the status of this case is

24    that the -- that the discovery cutoff is December -- is October

25    31st.   Trial is May 6th of 2019.

1          We've already had to move one deadline back, the

2     motion to add or amend parties pursuant to consent order.  It

3     was moved from June 29th to July 31st.

4          And in January the Trust served a request for

5     production on Foodonics and a subpoena for documents on Jacques

6     Klempf and the law firm that represented Jacques Klempf in

7     connection with these transactions at issue, GrayRobinson.

8          And in -- we also served subpoenas on both Dolph

9     Baker and Cal-Maine, Dolph Baker being the president of

10    Cal-Maine.

11         And in March of '18 we served subpoenas on potential

12    fact witnesses, falling into basically two groups, a group

13    we've referred to as the interested non-parties, former

14    business associates and relatives of Jacques Klempf -- there

15    were about seven of them -- and a group of what we've called

16    the classic disinterested non-parties, approximately ten

17    others.

18         With respect to the ten disinterested non-parties, we

19    have received documents.  And we haven't had any problems or

20    issues to speak of, certainly none that would be necessary to

21    bother the Court.

22         But as I said, we have not received any documents

23    from the interested non-parties or the Foodonics group or the

24    Cal-Maine group, other than the four tax returns I mentioned.

25         There is a motion to quash filed by the

1    non-interested parties filed by the GrayRobinson firm.  That

2    was document 30.  We filed a -- the Trust filed a response to

3    that document 34 in April of this year.

4         And one of the primary objections asserted in that

5    omnibus objection is -- by Foodonics group, is that any

6    document or ESI items dated prior to December 1st, 2014,

7    12 months prior to the redemption transaction at issue in this

8    case, is not relevant and should not be produced.  And this

9    argument is being mimicked by the Cal-Maine group as well.

10        And, of course, the Trust's position is that the --

11   the -- the efforts of Jacques Klempf to buy his mother's stock

12   began in 2008 and a one year cutoff is not reasonable.

13        And as we explained in our response, some of the

14   documents we received from the non- -- from the disinterested

15   non-parties outside that one-year period are very material to

16   our case.

17        THE COURT:  How far back?  Do -- do you know?

18        MR. POST:  We're asking that we go back to December

19   of -- September of 2008.

20        THE COURT:  But I -- no.  I meant -- you said you

21   have -- you have gotten some relevant documents from the

22   non-interested parties that go back prior to, obviously, the

23   December 1st, 2014.

24        Do those go all the way back to 2008?

25        MR. POST:  No, Your Honor.  The particular document I

1    referred to in my response was, we believe, generated

2    approximately 8 to 12 months before what they would deem the

3    cutoff date to be.

4           It was a valuation of Jacques Klempf and his company

5    based on 2003 numbers.  And that document was prepared sometime

6    after -- between 2003 and before the redemption, the one-year

7    cutoff.

8           So, again, we -- the communications have been

9    cordial, but -- and professional, but we're -- we're being

10   slow-walked in this case.

11          And we would bring to the Court's attention, of

12   course, you know, the -- the objection -- that those -- the

13   federal rules -- the Florida rules, excuse me -- the Florida

14   Rules of Civil Procedure in the Middle District Handbook of

15   Discovery makes it clear that objections to portions of

16   requests or a subpoena do not excuse a responding party from

17   producing those documents which has no objection.

18          So we would hope as a result of this status

19   conference that -- one thing that we could achieve is that we

20   could obtain an agreement from the Foodonics group and the

21   Cal-Maine group to promptly produce, at a minimum, all the

22   responsive documents to ESI to which there's no objection.

23          And this would include, for example, the

24   non-disclosure agreement between Cal-Maine and Foodonics, as

25   well as all the closing sale documentation.  And -- and that

1    certainly falls -- it's within the time period even they would

2    argue is relevant in this case.

3            That -- that's the big -- that's a big request,

4    but -- big picture request.  But, more specifically, with

5    respect to the Foodonics and -- group, a successful status

6    conference, we believe, would include a commitment from the

7    Foodonics group to produce all the responsive documents, ESI no

8    later than June 15th.

9            And if a phase production is required, to complete

10   their production by June 29th, which would, of course, include

11   the non-disclosure agreement and the Cal-Maine -- Cal-Maine

12   sale documentation.

13           And, also, a disclosure to the Trust during that --

14   as soon as possible of the current status of all the corporate

15   Foodonics e-mail accounts, as well as personal accounts used by

16   the employees of Foodonics for business purposes.

17           The problem there, Your Honor, is that we understand

18   that the Foodonics group has not yet even identified all of the

19   sources of the custodians and the mailboxes likely to contain

20   relevant ESI.  And, of course, you can't do a thorough

21   production unless you know where you're going to look.

22           So those are -- those are the two big things that we

23   would like to achieve, if possible, in connection with this

24   status conference.

25           And with respect to the Cal-Maine group, we would

1    envision a successful status conference would include a

2    commitment by Cal-Maine to produce all responsive,

3    non-duplicative, non-privileged ESI and documents on or before

4    June 20th of this month without waiting for production by

5    Foodonics, and a disclosure by -- by the Cal-Maine group by

6    June 20th of all the sources and locations of the ESI they

7    allege to be -- might be duplicative or -- and how that

8    information is stored, and the difficulty, if any, retrieving

9    or reviewing or producing that information, because the -- what

10   we -- what we learned at the beginning of May from the

11   Cal-Maine group is they don't intend to even look for what

12   might be responsive until the Foodonics production is done

13   and -- and -- and then they would maybe produce stuff if it

14   wasn't duplicative of what was produced by the Foodonics group.

15          And, of course, the problem with that is, Your Honor,

16   there was obviously things in the domain of the Cal-Maine

17   group, which is certainly not duplicative and should be

18   produced at this time without any delay, at a minimum.

19          And, of course, if -- if we wait, we might be waiting

20   a long time before we get stuff from the Foodonics group to --

21   for them -- for there to be a duplicative effort or reduction

22   effort.

23          And the other thing with respect to Cal-Maine group

24   is that they've refused -- or have not agreed to conduct a

25   reasonable inquiry into what the text messages might be on the

1  mobile phone of Dolph Baker.  And so we -- they basically have

2  not done anything in connection with that.

3  We'd like a disclosure by June 20th of whether or not

4  there are cell phone text messages that Dolph Baker has for the

5  period in question related to -- responsive to our document

6  request.

7  So that -- those are the big-picture items, Your

8  Honor.  I'll confess up front that my partner, Chris Dix, is

9  more informed about ESI stuff.

10  So I might have him respond to any other questions

11  that -- or some other questions that might come up, if I can't

12  handle it.

13  THE COURT:  All right.  Thank you.

14  Well, Mr. Wells, why don't I hear from you, because

15  it seems like everyone's -- this is all intertwined or

16  connected somehow.

17  MR. WELLS:  Thank you very much, Your Honor.

18  May it please the Court?

19  THE COURT:  Yes, sir.

20  MR. WELLS:  I don't want to be presumptuous, but I

21  think it may be helpful if I give the Court a very brief

22  overview of the facts of the case that may put some of the

23  positions of Mr. Post on behalf of the Trust and Ms. Srochi in

24  context.

25  Mr. Klempf, who is the president -- or was the

1    president and CEO of Foodonics, purchased his mother's stock,

2    which was essentially held by the Trust, effective in December

3    2015.

4         The purchase agreement involved in that transaction

5    provided that there were no ongoing discussions about the sale

6    of the company within the preceding 12 months, nor have there

7    been any written offers.  And it may be just that there's no

8    written offer within 12 months and no ongoing discussions.

9         That was memorialized in the settlement agreement

10   and -- settlement and redemption agreement with the Trust.  And

11   it also -- that document also included a complete release by

12   the Trust of any claims that existed as of that time.

13        So we began with looking back 12 months from the date

14   of that agreement to -- and the agreement was December 31st,

15   2015.

16        We have contended consistently that the scope of

17   discovery should not be prior to December of 2014.

18   Nevertheless, we have produced some documents prior to that and

19   are agreeable to producing some documents prior to that.

20        The material documents that Mr. Post referred to, if

21   I understand what has occurred thus far, are some documents

22   that were produced by the former employee of Foodonics that

23   were produced -- that were dated in 2014.

24        They may have been somewhat prior to the one-year

25   cutoff from the settlement agreement and the stop purchase

1   transaction, but they were, nevertheless, documents that were

2   produced as of December 2014.  We certainly can take the

3   position at some appropriate time as to the materiality of

4   those documents.

5            We maintain, Your Honor, that documents prior to at

6   least 2013 are not relevant.  They're certainly not

7   proportional and not relevant to any claim or defense in the

8   case.

9            Nevertheless, we are being asked to go back to 2008.

10  A recent subpoena even goes back further than that.  And I

11  note, too, for the record that the Trust has issued 29

12  subpoenas in this case.  One party has been subpoenaed twice.

13           In the midst of all that, we have completed a

14  glossary of search terms as of May 22nd.  And the process has

15  begun to use those search terms to -- to pull electronically

16  stored information from various sources.

17           We are in the process on behalf of Foodonics of

18  pulling all of that from a variety of cell phones, laptops,

19  PCs, owned by Mr. Klempf.

20           The only sources that we are aware of that -- are at

21  issue as far as Foodonics is concerned -- there is one e-mail

22  account that was available to a number of employees, not all

23  employees.

24           When the sale to Cal-Maine occurred in October of

25  2015, Cal-Maine came in.  A lot of those e-mails in that one

1   e-mail account were transported to a Cal-Maine system.

2        We are trying to access that account.  We no longer

3   have it.  They're no longer our employees.  We're trying to

4   find out how to access that particular e-mail account.

5        We are in a process of providing documents in

6   response to the discovery requests.  But as I noted a moment,

7   we've only had search terms for the last two weeks.

8        There are probably hard documents that could be

9   produced, but it was our thought that producing the documents

10   generally at the same time would be more efficient than doing

11   so in a piecemeal fashion.

12        I would note, Your Honor, that we also submitted a

13   request to produce to the Defendant/Counter Plaintiffs in the

14   case.  In response to that, we have received trust documents

15   which are pretty basic, pretty axiomatic in the case, but have

16   received no other documents.

17        It has been suggested in their Rule 26 disclosure

18   that they don't really have any documents, even though they

19   have filed a fairly comprehensive counterclaim.

20        We're in the process of working.  We are getting the

21   ESI documents as we speak.  We got information this morning on

22   additional material that we may be able to access, but we are

23   in the process of doing that.

24        We would note, as we have noted in the omnibus motion

25   that we filed, that not only are we looking at a -- what we

1   believe is an unreasonable time range for production, but if

2   the Court were to examine some of the subpoenas, they are not

3   subject-matter related, they are simply produce everything

4   you've got between these people and those people since 2008.

5          So that is also a factor that we are having to deal

6   with.

7          THE COURT:  Anything else?

8          MR. WELLS:  No, sir.  Not at this point.

9          THE COURT:  Well, let me just -- I want to hear from

10  everybody before we get into motions for discussions.  So thank

11  you.

12         Mr. Cunningham?

13         MR. CUNNINGHAM:  Thank you, Judge.

14         As you can see, Judge, Cal-Maine is caught in between

15  these two warring parties.  We don't have a dog in this fight.

16  We're not aware of any dealings or communications between our

17  client and Foodonics in a substantive way prior to the 2015 or

18  '14 time period.

19         We've also cooperated, you know, in this process.

20  Any documents that we would have would be completely

21  duplicative of the documents that Foodonics would have, because

22  this was a transaction between Foodonics and Cal-Maine.

23         So anything of relevance that we might have to this

24  dispute could only be documents related to the transaction that

25  we would have received from Foodonics.

1          And what we've suggested, invited -- and invited the

2     Klempf Trust Plaintiffs or Counter Plaintiffs to do is to just

3     pursue the discovery with Foodonics, and then, if they have a

4     reasonable concern that there's something missing or that we

5     might have something that's not duplicative, then come back to

6     us and talk to us about what that information is, and we'd be

7     happy to work with them.

8          In the meantime, we've cooperated with both parties

9     by coordinating the transfer of a server that we have

10    possession of, but that which goes along to Foodonics.  We've

11    preserved our documents.

12         The Trust had asked us questions about these e-mail

13    accounts from the Jacques Klempf group.  And we were able to

14    confirm that we did not have control or possession over those

15    accounts.

16         We talked to them about the types of documents,

17    sources of documents, that we would have, and the reasons why

18    we think that they are cumulative or duplicative of anything

19    Foodonics has had.

20         And we've ultimately concluded by saying, "Look, you

21    know, what you're asking us to undertake here is a

22    substantial -- substantial efforts and investigation over a

23    very, very long time period."

24         One of the sets of data -- one of the data sets that

25    they're looking for is for us to turn over the cell phone of

1   our CEO.  This is a CEO of a publicly traded company.  He's

2   dealing with sensitive, confidential information every day all

3   the time.

4          The prospect of turning over that kind of data is,

5   you know, obviously of real concern to our company.  And then

6   there's the whole cost piece of it.

7          You know, we would need to go restore data, review

8   data, quantify data, and -- and ultimately produce it in order

9   to satisfy the Plaintiff's or the Trust's request.

10          The Trust, you know, as an inter-measure, has asked

11   us to provide them with details about kind of the volume of

12   information that we have in each data set, to confirm whether

13   we do, in fact, have text messages between our CEO and the

14   Foodonics CEO.

15          But undertaking just that, Judge, requires us to hire

16   an outside consultant, to start processing data, to look at the

17   data, quantify it.

18          And so, really, they're not -- they're asking us to

19   go through the process before even demonstrating any kind of

20   need whatsoever.  And we really are a non-party with no dog in

21   this hunt or interest in this dispute.

22          And until the Trust can come back with a reasonable

23   basis for saying, "Look, we really do need to impose on this

24   non-party in order to get a complete picture of the facts that

25   are in dispute," we'd just assume stay out of the middle of all

1   of this.

2          And you can tell by, you know, how this hearing has

3   gone that we really are caught in the middle.  Most of what is

4   being discussed here is a discovery dispute -- a routine

5   discovery dispute between the parties.

6          And we are a non-party.  We don't want a seat at the

7   table.  And until there's a demonstrated need for us to

8   undertake any efforts in order to satisfy the Court, we'd just

9   assume, you know, we not be required to do that, Judge.

10          That's all that I have, unless you have any

11   questions, Judge.

12          THE COURT:  Mr. Post, do you want to -- you or

13   Mr. Dix want to say anything in response to this?  I haven't

14   really heard anybody address specifically what you've proposed;

15   that is, that you get the closing agreement promptly and the

16   non-disclosure agreement promptly and -- or the sale

17   documentation by June 15th.

18          So I'm just assuming that I'm going to order those

19   things be provided, because there hasn't been any reason not

20   to.

21          So what else do you --

22          MR. CUNNINGHAM:  Judge -- I'm sorry to interrupt,

23   Judge.  I may be able to just kind of cut to the chase then.

24   We -- sir, we don't have an objection.

25          We had asked as an inter-measure to protect the

1  confidentiality of some formulas that are in the transactional

2  documents that the -- the details -- information that is

3  related to how we price transactions be redacted, because we

4  don't think that they need that information.

5          We provided that request for redaction and what

6  specifically we would like to see redacted to Foodonics.  And

7  we certainly don't have any objection to them going forward on

8  that basis.

9          MR. POST:  Your Honor, it's hard for me to comment on

10  what would be an appropriate redaction to a document I've never

11  seen.  It strikes me as something that I -- I'm not inclined to

12  agree to, because it's critical in this case for us to know

13  what information Jacques Klempf gave to Cal-Maine when -- and

14  what information Cal-Maine thought was relevant in coming up

15  with a $70 million purchase price, when 11 months earlier it

16  was represented to Ms. Klempf the company was only worth

17  35 million, so -- and we're not asking for internal documents

18  from Cal-Maine.  We're asking for the closing binder which has

19  the agreements between the two parties, so -- and there was a

20  confidentiality order already in this case entered by this

21  Court.

22          So for all those reasons, we would like the -- those

23  documents prepared -- or produced without redactions at this

24  time.

25          MR. CUNNINGHAM:  And if I might, Judge, just to take

1   another stab at that, the information that we want redacted is

2   highly detailed information.  It's, you know, like number of

3   coops and chickens and, you know, pieces of equipment.

4           Cal-Maine has a strategy and approach to acquisitions

5   that it believes gives it a strategic advantage in the

6   marketplace with respect to acquisitions.

7           Obviously there's a protective order in place.  But

8   ultimately this case may very well go to trial.  Information

9   like that, if it were to reach the public domain, would really

10  destroy the competitive advantage that Cal-Maine has built up

11  over time.

12          And I -- and, you know, I've spoken and -- with

13  Foodonics and the Trust counsel about an approach where we

14  would request certain limited redactions.  They would then see

15  what those redactions were.

16          And if they felt, again, like they needed that kind

17  of detailed line-item information, we could certainly work from

18  there.

19          But I think in the first instance they really need

20  the bottom-line numbers of -- of the purchase, rather than the

21  detailed line items and formulas that are set forth in those

22  transaction documents.

23          THE COURT:  And why doesn't the confidentiality order

24  give you the protection that you need?

25          MR. CUNNINGHAM:  We would be concerned for two

1   reasons, Judge.   One, the protective order is a two-level

2   protective order, in the sense that, you know, there's either

3   confidential or non-confidential information, there's no

4   attorneys' eyes only designation.

5          That kind of designation would certainly give us a

6   lot more comfort, in terms of being able to know and feel

7   assured that the information would not be disclosed

8   inadvertently or -- or otherwise.

9          Two, we're also concerned, Judge, with just mechanics

10  at trial.   You know, this case, you know, may very well go to

11  trial at some point.   And, you know, the handling of documents

12  at trial and the public's right to participate in that trial or

13  to observe the trial may mean that those transaction documents,

14  which are going to be a central part of the case, would then be

15  introduced into evidence into the public record.

16         And so if they're not redacted at this time, there

17  may never be an opportunity to obtain those redactions later

18  before trial, when they're introduced in evidence.

19         THE COURT:   Well, that -- the problem with what you

20  just said to me -- and just in a simple way, if they are

21  essential to the case and that would be a problem at trial,

22  then that's a problem now for the party that wants the

23  documents.

24         So if the confidentiality order needs to be amended,

25  or if there needs to be a second one drafted attorneys' eyes

1    only, I'd be amenable to that.  But -- but I'm not going to

2    look forward all the way to trial and say, gosh, if they really

3    are relevant and they really are necessary, then -- then we

4    have a problem at trial.

5           If they really are relevant and really are necessary,

6    then they need to be produced.  And we won't know that until --

7    until -- until they -- they are produced, with as much

8    protection as we can give you -- or as the Court can give you

9    in that regard.

10          So I -- I don't -- I don't disagree with you that

11   maybe another level -- an attorneys' eyes only level may be

12   appropriate.  But I don't think looking ahead all the way to

13   the trial and what might happen then is a basis to not require

14   that they be produced.

15          Mr. Post, what do you say to an amended

16   confidentiality order that would -- would include an attorneys'

17   eyes only provision?

18          MR. POST:  Your Honor, that would be acceptable.

19          THE COURT:  All right.

20          All right.  So --

21          MR. CUNNINGHAM:  Thank you, Judge.  That certainly

22   would give us a lot of -- greater confidence of assurance.

23          THE COURT:  All right.  Mr. Post, what else?

24          MR. POST:  Just -- so we did -- I want to make sure

25   it didn't get lost in the shuffle here.  You -- I think you

1    heard it.

2              We -- we want to know where the -- where the

3    corporate Foodonics e-mail accounts are and no one can tell us.

4    We were first told by Foodonics that it -- that should be the

5    transfer to Cal-Maine.  Cal-Maine -- Mr. Cunningham told us

6    that they don't have them.  And now Mr. Wells has said again

7    that maybe they're in Cal-Main's possession.

8              We need -- we need to get to the bottom of that,

9    because we can't get a -- a full production of relevant

10   documents unless we have those Foodonics e-mail accounts.

11             And I'd also mention that the principals of

12   Foodonics, the officers, like Dick Still, had a Comcast account

13   where he did business -- he did transact business on that

14   Comcast account.

15             So we need -- we need the Foodonics group to also

16   make sure they get the personal e-mail accounts of employees

17   who used their accounts for business purposes.

18             MR. CUNNINGHAM:  And, Judge, this is Mark Cunningham

19   on behalf of Cal-Maine.  And I can confirm that I've been

20   informed by my -- my general counsel for Cal-Maine -- he's

21   worked with the IT director to confirm that we do not have

22   possession of these accounts and have never had possession of

23   the accounts.

24             THE COURT:  When you say "those accounts," are you

25   talking about the personal accounts this were used for business

1   purposes?

2           MR. CUNNINGHAM:  Well, those accounts, but also these

3   e-mail accounts.  I think that Mr. Post is looking for certain

4   Foodonics e-mail accounts that -- that may have existed, that

5   Foodonics may -- originally thought may have been transferred

6   to Cal-Maine, but they were, in fact, never transferred or

7   required as part of the transaction.

8           MR. POST:  For clarification, Your Honor, there are

9   mailboxes from the @DixieEgg.com domain.

10          THE COURT:  Say that again.

11          MR. POST:  Mailboxes from the @DixieEgg.com domain.

12  We just don't --

13          MR. CUNNINGHAM:  That's my understanding, as well,

14  Your Honor.  And that's the accounts that we do not have

15  possession of.

16          THE COURT:  And then, Mr. Wells, did you -- so you're

17  in the process of figuring this out, what you have and don't

18  have?

19          MR. WELLS:  Yes, sir.  The only thing that we had

20  some question about is this particular Dixie -- @DixieEgg -- I

21  have to confess, I'm not an ESI guy, and today is the first

22  time I've heard about @DixieEgg.

23          I've been operating on DixieEgg.com.  If there's

24  something different, we can sort that out.  But we may be

25  talking semantics, Your Honor, when -- again, it's my

1   understanding when Cal-Maine purchased the assets of Foodonics

2   there were ongoing communications -- e-mail communications, and

3   those communications were somehow transported to Cal-Maine, not

4   under the Dixie Egg domain, but just certain communications.

5           We are trying to identify that.  We know that there

6   were several employees at Dixie Egg, Foodonics, who had access

7   to that particular e-mail domain and were trying to locate

8   that.

9           Keep in mind that we -- we don't employ anyone

10  anymore.  They're not our employees.  They were not our

11  employees when the litigation commenced.  But we're trying to

12  identify where that information is.

13          Mr. Post just mentioned a former employee by the name

14  of Dick Still and a personal e-mail account.  I'm not sure what

15  jurisdiction Foodonics has over a former employee's personal

16  e-mail account.

17          Certainly if it was a company account, we're making

18  the effort to find that.  I don't want to be repetitive, but

19  we're in the process of applying the search terms to over

20  50,000 e-mail transmissions from the 2014 -- excuse me, 20- --

21  all of them, 2008 to 2017 e-mail accounts, and narrowing those

22  down to the 2014 time -- time frame.

23          I can't comment on the date that Mr. Post has

24  requested.  We just got the search terms two weeks ago.  We're

25  in the process of doing that.  I don't know how long it would

1    take to cull the documents out between now and the time frame

2    that Mr. Post has suggested.

3              THE COURT:  Tell me this, what -- what e-mail

4    accounts are you searching?  In other words, you're searching

5    all these e-mail accounts.  What accounts are those?

6              MR. WELLS:  There are -- and Mr. Hancock, who is on

7    the phone, can probably give more information.  But I believe

8    there are three or four e-mail accounts that were used by

9    Mr. Klempf and certain employees of Foodonics/Dixie Egg.

10             Those are an AOL account, a DixieEgg.com account, and

11   I think one other account that we used on Mr. Klempf's cell

12   phone, laptop, PC, as well as the Dixie Egg account on several

13   other employees.

14             And may I invite Mr. Hancock to address that, Your

15   Honor?

16             THE COURT:  Yes.

17             Mr. Hancock?

18             MR. HANCOCK:  Yeah.  So Mr. Wells is right.  So we

19   have collected from Mr. Klempf's Dixie Egg account, because he

20   maintains that separately.

21             We have collected from his gmail account from his BAM

22   Jax account.  And then we have done forensic collections of his

23   three laptops and PC.

24             MR. POST:  Your Honor --

25             MR. HANCOCK:  And his AOL account, if I didn't

1    mention that.  I'm sorry.

2         THE COURT:  Mr. Post?

3         MR. POST:  May I have my -- my liaison discuss that?

4         THE COURT:  Yes.

5         Mr. Dix?

6         MR. DIX:  Your Honor, I didn't hear -- in what

7    Mr. Hancock mentioned, I didn't hear anything about the

8    @DixieEgg.com e-mail accounts at all.  I heard gmail, BAM Jax,

9    the computers and laptops.  But there should be a --

10        MR. HANCOCK:  That's the first thing I said, is we

11   collected from his DixieEgg.com account because he maintains

12   that separately.

13        MR. DIX:  So it's just Jacques Klempf's @DixieEgg.com

14   e-mail.  But there were other people at Foodonics, all of whom

15   had different e-mail accounts.  Those are the ones that we

16   don't have any idea where they are.

17        So if all -- everybody in this room all have an AOL

18   account, we'd each have a different e-mail address.  They're

19   only searching one of all of them.  The rest are saying, "We

20   don't even know where they are."

21        THE COURT:  Mr. Hancock?

22        MR. HANCOCK:  That's correct.  We've not located them

23   yet.  It was our understanding that those -- the contents of

24   those e-mail accounts went with the employees when they

25   transitioned from Foodonics to Cal-Maine.

1      I'm not saying that Cal-Maine had control over those

2  e-mail accounts.  I'm saying that the contents were copied from

3  the @DixieEgg.com domain for each of those employees and

4  brought with them when they started their -- when they

5  transitioned to their employment at Cal-Maine.  That may or may

6  not be the case.  We're still trying to determine that.

7            THE COURT:  And --

8            MR. CUNNINGHAM:  And, Judge, this is Mark Cunningham.

9  We've previously informed the group, both sides, that -- to the

10  extent that Cal-Maine has any documents for any employees that

11  were transitioned to Cal-Maine as part of the transaction that

12  predate the transaction, we certainly have no interest in

13  those, and they can have -- they can have the whole universe of

14  them.  We've just never been able to locate anything like that.

15            THE COURT:  So you've inquired of each of those

16  persons whether they have any of those documents?

17            MR. CUNNINGHAM:  This is the first that we've heard

18  about any transfer of e-mails from one account to another

19  account, so we've not done that inquiry.

20            We were asked to inquire about the DixieEgg.com

21  accounts.  And that's the inquiry that we made, and were able

22  to confirm that we've never had possession or control.

23            If, in fact, somehow e-mails were transferred from

24  that account to a Cal-Maine account, we certainly would be

25  willing to turn those back over.

1          MR. DIX:  Your Honor, the problem is they're saying

2     they're not going to go and look yet, they want to wait until

3     Foodonics finishes.

4          MR. CUNNINGHAM:  Oh, no.  We would go look for that.

5     You know, this, again, is new information that's never been

6     provided to me before, but -- because this, again, is a set of

7     documents or a set of data that is really Foodonics's data.

8          And to the extent that we've dealt with Foodonics

9     data in other contexts, our position has always consistently

10    been, "We have no interest in it, you guys are happy -- you

11    know, we're happy to turn it over to you for you-all's review

12    and analysis of it."

13         But ultimately, if Foodonics informs us, look, there

14    were mails that were, in fact, transferred from the Dixie Egg

15    account to a Cal-Maine account, that would cause us to go

16    collect that data for you.

17         THE COURT:  Mr. Dix, how many people's accounts

18    are -- or how many persons are we talking about?

19         MR. DIX:  That's the thing, Your Honor.  We don't

20    know.  We know of five or six of the top -- vice presidents

21    and, you know, officers of Foodonics.

22         Beyond that, we don't know -- we don't have a list of

23    who their employees were.  That was what we were hoping they

24    would do when we had the requirement in the ESI order that they

25    go and tell us the locations of the potentially discoverable

1   ESI.

2          So we got a list from them, but it didn't have that

3   level of detail.  And we didn't know that they didn't have what

4   they are now saying they don't have.

5          MR. WELLS:  May I respond, Your Honor?

6          THE COURT:  Yes, of course.

7          MR. WELLS:  I think that -- with all respect to

8   Mr. Dix and Mr. Post, I think we're -- we're talking --

9   something that is confusing to us.  Because we know there's a

10   Dixie Egg account.  And we know that Mr. Klempf was essentially

11   the primary user of that account.

12          We've just learned that other employees who have used

13   that account -- that, for whatever reason, did not transfer

14   over to Mr. Klempf's account when -- well, when Cal-Maine

15   purchased the assets.

16          At that point in time, Mr. Klempf continued to pay

17   for his own use of that account.  But the old account had --

18   other employees had access to it, as I understand it.

19          I don't think the -- it's not vice presidents and

20   officers.  They're employees.  And there are probably a handful

21   of employees who had access to that particular account.

22          We're now trying to identify who they were and how we

23   get access to that particular Dixie Egg account from -- again,

24   I think that account has been terminated as to everybody but

25   Mr. Klempf.

1        And so those employees who are now Cal-Maine

2   employees don't have access to that Dixie Egg account, so

3   somewhat suspended in time at the time it was terminated after

4   the acquisition by Cal-Maine.

5        We're trying to find that out.

6        MR. DIX:  Your Honor, it would be helpful if they

7   would just figure out what -- which version of what they've

8   been telling us is the case and tell us so that we can move

9   forward.  That's what we want them to do.

10        THE COURT:  What I'm going to do is, I'm going to

11   order certain things be provided within a -- a reasonable

12   period of time here.

13        And then I'm just going to set another status

14   conference in two weeks and have a list of items that I'll need

15   reported to me, that I'll want -- I'll want to hear about.  It

16   will include some things from Cal-Maine, and also from

17   Foodonics, in terms of the status of a number of these items.

18        I can't -- I can't tell -- I can't tell Foodonics to

19   produce things that they don't have and they haven't been able

20   to determine whether they have them yet.

21        And I appreciate Cal-Main's position that they don't

22   want to -- to -- to provide material that would be duplicative

23   of what Foodonics produces, but we're never -- the dog's never

24   going to catch its tail on that one, so -- so that's -- that's

25   just not going to be workable.

1    But to the extent that this needs to move along, I

2    think that the best -- the best -- the best way to go about

3    this is to order that certain items be provided now that there

4    shouldn't be disagreement about and -- and those things be

5    provided within -- within 15 days.

6    And then -- and then we'll have another status

7    conference either in 15 days or 20 days, whatever -- whatever

8    it is, and give -- give Cal-Maine the opportunity to -- to

9    identify whether there are persons who have the accounts that

10   we've talked about today who were working for them -- Foodonics

11   can -- can continue what it now is telling me that are their

12   efforts in regard to the e-mail accounts, and -- and then I can

13   get some sort of a report.

14   And if we don't make any progress after another

15   status conference, then -- then somebody's going to have to

16   start filing motions and we're going to have to start having

17   evidentiary hearings on these things.

18   I've -- I've run in -- I've had a run of these things

19   lately, the ESI issues, and whether it's spoliation or it's --

20   it's sluggish production, whatever you want to put on it -- I

21   must have two, three, four cases like that right now that are

22   ongoing.  And they're not all exactly the same, but there's a

23   certain pattern to them.

24   And -- and I think part of it is -- and, Mr. Wells,

25   I'm not being critical of you, because I probably am in the

```
 1   same boat you are.  But some of this is just a little bit over
 2   my head until somebody explains it to me.
 3         And that's why oftentimes I have to have an expert
 4   come in here from the parties and explain to me exactly what is
 5   going on.  And so we're just going to have to get to the bottom
 6   of it one way or the other.
 7         MR. WELLS:  May I request, Your Honor, to refer to it
 8   as a new field, rather than over our heads?
 9         THE COURT:  Yeah.  Well, I -- I can't use that excuse
10   now.  I've had too many of these things.  But they all -- they
11   all -- I'll try to -- try to remember that.
12         MR. WELLS:  One other thing, Your Honor.  I
13   apologize.  You indicated a status conference in 15 or 20 days.
14   15 days is the end of -- week after next, which is the annual
15   Bar convention.  And I will be involved in that.  If we could
16   do it 20 days, it would be better.
17         THE COURT:  Mr. Post, did you -- did you want to get
18   Mr. Dix out of there and --
19         MR. DIX:  Yes.
20         THE COURT:  Giving him the hook, or what?
21         MR. POST:  Yes.  Although maybe I shouldn't.
22         Your Honor, we'll accommodate the Bar convention.
23   That's fine.
24         The -- the one thing I wanted to make sure didn't get
25   lost in the mix here is that -- in the e-mail exchange we had
```

1   with Cal-Maine, which we shared with you today --

2          THE COURT:  Yes.  I have it right here.

3          MR. POST:  Yes, sir.

4          They identified a number of areas of documents that

5   may -- or data sources that they had which would not be

6   duplicative of the Foodonics stuff.

7          So with respect to Cal-Maine, I would request that at

8   a minimum they be -- that we leave this conference with the

9   understanding that it's going to actually do an investigation

10  and -- and identify the sources of information that it has so

11  we don't come back here in four weeks from now and -- and

12  they're talking about what -- whether -- what sources they've

13  identified, and actually start producing, if -- if they were

14  producing the stuff that's non-duplicative, at least, that they

15  identified in their e-mails.

16         MR. CUNNINGHAM:  Judge, we've not identified anything

17  in our e-mails that we think is non-duplicative.  The whole

18  point of our position is that it is duplicative.

19         Anything we have other than our own internal

20  communications would be our own analysis of the transaction.

21  It would have nothing to do at all with this dispute, that

22  every -- anything else we have would be purely duplicative of

23  what Foodonics has.

24         If we're going to start, you know, requiring us to

25  produce, you know, what they would describe as non-duplicative

1  documents now and then not produce duplicative documents later,

2  we might as well do the whole thing all at once.  I mean,

3  trying to do ESI piecemeal just increases the cost for

4  everybody.

5          THE COURT:  I'm just looking at the e-mail just a

6  minute.

7          MR. POST:  I was referring to page 5 of the e-mail,

8  Your Honor.

9          THE COURT:  Well, the way these printed out, I'm not

10  sure that -- that your 5 is my 5.

11          MR. POST:  It was -- it says here -- Mr. Cunningham

12  said that -- at our meet-and-confer, we agreed the responsive

13  document categories would generally include 1, 2, 3, and 4.

14  And in order to go forward, we would produce the non-privileged

15  documents calling on 1, 2 -- 1, 2, and 4.

16          THE COURT:  But this is where -- once he found out

17  that you were reserving your right to request other documents,

18  he didn't want to agree to these?

19          MR. POST:  Right, right.  Exactly.

20          THE COURT:  All right.  Let me do this.  I'm going to

21  take a recess.  I've got to look at my calendar and -- and I

22  want to look back over my notes.

23          And then we'll get -- we'll get some timetables here

24  for -- for the production of certain things now.  We'll set a

25  status conference later.  And we'll try to make sure that we

```
 1   have some meaningful goals for the next status conference, in
 2   terms of what we want to identify.
 3          But some -- whether -- whether -- Mr. Wells, whether
 4   you think it's -- it's the best way to do it or not, we're
 5   going to have -- Foodonics is going to have to start producing
 6   what it has that it can produce at this point, and not wait
 7   until it has everything.
 8          And I think a couple of things that have been
 9   identified are things that should be produced as -- as
10   you're -- as you're searching for the other matters.
11          But let me just take a brief recess.  And I'll --
12   I'll have a list of those things that should be produced
13   within -- within -- I'll probably say 15 or 20 days, and then
14   set a status conference shortly after that, so we can follow up
15   on those things, and then follow up on -- on the searches that
16   are going to be conducted by Cal-Maine, in terms of the former
17   Foodonics employees and this DixieEgg.com domain, and -- and
18   then the searches that -- that Foodonics are doing.
19          But let me just take a brief recess and -- and see.
20   And then if you-all can look at your calendars, too.  I'm
21   thinking -- we're probably shooting for about three weeks from
22   now.  So we're probably looking at about the last week in June,
23   is what I'm thinking.
24          So let's -- we'll take a brief recess.
25          COURT SECURITY OFFICER:  All rise.  Court is in
```

1   recess.

2      (Recess from 3:05 p.m. until 3:21 p.m.; all parties are

3   present.)

4         COURT SECURITY OFFICER:  All rise.  This Honorable

5   Court is back in session.

6         Be seated.

7         THE COURT:  Mr. Post, let me ask you a couple of

8   questions, if I may.  You had -- you had said that -- that one

9   of the things that you were hoping for was the -- that the

10  closing agreement sale documentation and non-disclosure

11  agreement -- that those things be produced, basically

12  immediately -- or with -- by June 15th, or whatever you said.

13        MR. POST:  Yes, sir.

14        THE COURT:  Now, are those -- when I'm looking at the

15  e-mail exchange that you referred to earlier, No. 4 is

16  transaction documents.  This is the e-mail communication with

17  Cal-Maine.

18        Are those the same things?

19        MR. POST:  Yes, sir.  I think -- I believe -- that

20  was Mr. Cunningham's term, but I think that -- they mean the

21  same thing, yes.

22        THE COURT:  All right.  So what you're -- in that

23  regard, you're -- you're requesting that -- that Cal-Maine be

24  directed to provide those materials -- or those things to you

25  by June 15th?

1          MR. POST:  Yes, Your Honor.  I -- what I envision --

2    like most corporate transactions, there's a big thick book.

3    It's a binder.  It's got a nice cover page and a tabbed index.

4    Those are the closing documents.

5          And there is also going to be related documents, like

6    the non-disclosure agreement.  So that would be a set of

7    operative documents.  If they were going to sue each other, for

8    example, that's what they'd -- they would look at those

9    documents.

10          THE COURT:  All right.

11          All right.  Well, I wanted to clarify that.  And

12    then -- let's see if I had one other question for you.

13          So I guess my point on that is you're expecting

14    that's going to come from Cal-Maine and not Foodonics?

15          MR. POST:  I don't care which group gives it to me.

16    I asked it from the Foodonics group first and they said, "We

17    can't do it without Cal-Main's consent," because there's some

18    sort of agreement.

19          THE COURT:  Right.  Okay.  I understand.  All right.

20    Well, let's do this -- thank you.

21          Let's do this.  Let's start by setting the -- the

22    next status conference in this matter, and then -- then we can

23    work backwards from there.

24          I was -- I was looking at the week of June 25th.  And

25    you-all tell me what works best for you.  And then I'll tell

1  you if it works for me, because I -- I think I only have one
2  day that doesn't work for me.  And that may only be in the
3  morning.
4          So I think -- I think I'm good every one of those
5  days except -- is it Thursday afternoon?
6          So I'm good every day except Thursday afternoon, in
7  terms of scheduling something that works for, I guess -- how
8  many people do we have here?  We have three here and two on the
9  phone -- the five of us -- or the five of you, and me being
10 six.
11         MR. POST:  Your Honor, I'm good Wednesday through
12 Friday.  But even if you have to have it on Monday or Tuesday,
13 I'll have Mr. Dix cover for me.
14         THE COURT:  Mr. Wells?
15         MR. WELLS:  I presently have depositions set in
16 St. Petersburg on June 29th.  I'm assuming that's -- roughly
17 Thursday of that week.
18         THE COURT:  That's Friday.
19         MR. WELLS:  Friday?  But, otherwise, I think right
20 now I --
21         THE COURT:  All right.  So it looks like we've tried
22 to narrow this to the 27th or 28th.
23         Mr. Cunningham, how do you look, sir?
24         MR. CUNNINGHAM:  Judge, as long as I can participate
25 by telephone, either one of those dates in the afternoon would

1    be fine.  My mornings are tied up with clients and meetings.

2              THE COURT:  All right.  And, Mr. Hancock, how about

3    you?

4              MR. HANCOCK:  Yes.  Either of those dates are fine

5    with me, as well.

6              THE COURT:  All right.  Well, let's do this, then.

7    Why don't we -- why don't we just set it for -- did you say

8    Wednesday, the 27th works, Mr. Post?

9              MR. POST:  Yes, sir.

10             THE COURT:  All right.  So let's set it for

11   Wednesday, the 27th, at 2 o'clock.

12             All right.  So in order to make some progress in the

13   case, let's -- let's do this.  The -- the first thing that I

14   think needs to happen, Mr. Post, is for you to work on an

15   attorneys' eyes only protective order, or -- or amend the one

16   that you have, to add that and submit it to the Court, if

17   that's -- did you -- I can't remember.

18             You submitted the last one to the Court, correct?

19             MR. POST:  That's correct.  That was a joint effort

20   between us and GrayRobinson.  But, yes, I -- we submitted it.

21             THE COURT:  All right.  Well, if you could -- if you

22   could -- you know, if you could get together with

23   Mr. Cunningham and -- and with Mr. Wells, and to the extent

24   Mr. Hancock's involved in this -- I know he's the computer

25   expert.

1            But if you-all could get together and come up with

2    a -- a joint proposal on that, then -- then I can -- I can deal

3    with that.

4            So -- so Cal-Maine will be producing -- I'm going to

5    assume Cal-Maine is going to be producing those documents that

6    are referred to as the transaction documents and the e-mails

7    that were provided to me.

8            And those should be provided no later than June 20th.

9    That's assuming that you have the protective order in place.

10   And that way that will be about a week out.  And we can discuss

11   any -- any issues related to the production of those documents

12   on June 27th, if it's necessary.

13           MR. POST:  Yes, sir.  May I ask -- perhaps

14   Mr. Cunningham might send us the -- some form that he was --

15   that he's interested in that is acceptable to him?

16           THE COURT:  In terms of the protective order?

17           MR. POST:  Some insert, right, for attorneys' eyes

18   only.  If he's willing to do that, we can expedite it.

19           THE COURT:  Mr. Cunningham --

20           MR. CUNNINGHAM:  Yes.

21           THE COURT:  -- can you do that?

22           MR. CUNNINGHAM:  Yeah.  Of course, Judge.  We're

23   happy to do that.

24           I would ask, however, that the transaction documents

25   actually be physically produced by Foodonics, just, again,

1    don't want to set a precedent of Cal-Maine producing documents

2    in this case when we -- when this is a great example of why

3    there would be a duplication of efforts for Cal-Maine to

4    produce documents that Foodonics already has and can produce.

5           THE COURT:  All right.  Well, once the -- well,

6    that's fine.  And that's -- that's probably the best way to

7    proceed.  I was just thinking -- because you were -- you

8    were -- had the concern about the -- the confidentiality

9    situation.

10          But once that order is in place, then Foodonics shall

11   produce those materials and those items that are referred to as

12   transaction documents, but what I see it, as the closing

13   documentation, non-disclosure agreement.  And I think there was

14   also -- sale documentation was another term that was --

15   Mr. Post referred to in his -- in his presentation.

16          All right.  Then -- then the -- and then Cal-Maine

17   should be ready to report on what the former Foodonics

18   employees, who now -- who work for Cal-Maine -- what they have,

19   in terms of -- of ESI from what was the DixieEgg.com domain

20   and, if that domain isn't active, which it sounds like it's

21   not, any content from that domain that was taken by or

22   transferred to any other e-mail account by those former

23   employees.

24          And then we -- it may end up being nothing, but --

25   but Cal-Maine should take steps to investigate that so that we

1    have that information on June 27th.

2            MR. CUNNINGHAM:  We'll be happy to do that, Judge.

3            THE COURT:  All right.  Thank you.

4            And then Foodonics should produce ESI to which there

5    is no objection.  And -- and that should be done again by June

6    20th.  And then they should continue to -- to search the ESI as

7    outlined by Mr. Wells.

8            Now, one of the things that is going -- going to be

9    a -- an issue -- it's already been raised -- is the relevant

10   time period.  And, you know, I do note on page 26 -- let me

11   see.

12           Is it page 26?  Just one minute.

13           Hold on one second.  I lost my place.

14           Page -- page 23, paragraph 19, in the document 20,

15   which is the counterclaim, paragraph 19, in 2008, after Jacques

16   Klempf had completed the purchase of the Foodonics shares of

17   stock owned by his siblings and other family trusts, he began

18   his efforts to buy out the shares of stock owned by his mother

19   through Jean Klempf.  And it goes on from there.

20           And just the gist of what I've read, the

21   Defendant/Counter Plaintiff certainly has framed this that

22   the -- that the claims that are being made, and any -- any

23   alleged fraud was -- and scheme to defraud was hatched back --

24   at least around 2008, if not earlier.

25           At the same time, though, it -- it's unclear to me

1   what the burden would be of -- of the production of documents
2   going back to 2008.

3           So it seems that one of the things that -- that
4   Foodonics should be working on is -- is trying to quantify the
5   number of documents that we're talking about going back to
6   2008.

7           I don't know.  I think I've heard -- I've heard
8   references to a hit report, something that can be done to see
9   how many times certain terms come up, to at least have an idea.

10          Because when we get into -- the -- the whole -- the
11  whole game here in the ESI now is -- is -- is the burden, and
12  what the burden is and the -- the relative value of the
13  discovery versus the burden, which includes the cost of
14  producing it.

15          That's not very artfully said, but I think you-all
16  get the point.  But -- so if Foodonics is going to make some
17  sort of a burden argument, it's going to have to have something
18  to support it other than saying, you know, those are a lot of
19  years.

20          Because it may be a lot of years, but I'll have to
21  have an idea of how many documents we're talking about and what
22  the cost of production of those would be.

23          So that should go into the calculus of -- of what's
24  happening, just -- just looking ahead that -- that the -- that
25  the time period is going to be -- going to be an issue.

1          And it could -- it could be relevancy.  It could be

2     burden.  But in the end, it will probably come to weighing

3     those -- those matters and deciding how far back any of this

4     would have to -- have to go.

5          And so then we'll get together on the -- the 27th and

6     just see where we are with -- with all of this.  And to the

7     extent that you-all can work any of this out, I'll appreciate

8     it.

9          In the meantime, I have looked at the -- at the --

10    and read the -- the omnibus motion regarding the subpoenas and

11    the -- and, also, the -- the response.  And it may very well be

12    that I'll want to hear argument on that, too, at the June 27th

13    hearing.

14         So it won't -- it won't just be a status conference,

15    but it will be argument on that motion, if I don't do something

16    with that motion beforehand.  But it just seems to me that

17    these are intertwined to a degree.

18         But I'll let you-all know that.  I'll have -- I'll

19    have Ms. Wood, my law clerk, call you and alert you to that, or

20    I'll put it in a notice of some sort, so you'll know if we're

21    going to -- to argue all of that at that hearing.  It may be a

22    good idea to do it, but I -- if I put it in the -- I'll send it

23    out in the notice.

24         And I'll do a little order capturing this, so that

25    you-all can have the -- have this in a written -- written form.

 1    And I should be able to get that out in the next day or two.

 2            And, Mr. Wells, are you -- are you representing the

 3    non-parties for the purposes of that motion?

 4            MR. WELLS:  For purposes of the non- -- the

 5    particular parties identified in the motion?

 6            THE COURT:  Yes.

 7            MR. WELLS:  Yes, sir.

 8            THE COURT:  Okay.

 9            MR. WELLS:  And there have been some other subpoenas

10    that have been issued since then that we've not yet determined

11    how we're going to address that.  But for the purpose of that

12    motion, yes, sir.

13            THE COURT:  All right.  Okay.  All right.

14            MR. WELLS:  May I make one further comment, Your

15    Honor?

16            THE COURT:  Yes, of course.

17            MR. WELLS:  Since the Court raised it on the date

18    range -- our concern going back to 2008, at this point in time,

19    is not predicated on the burden of producing documents going

20    back that far.

21            It's totally related to the relevance of that date

22    range, because -- even though the Court read from the

23    counterclaim, it's our position that the counterclaim

24    allegations are not supported by any evidentiary basis that is

25    set forth in the counterclaim itself.  They're conclusions.

1   It's not for today.

2          THE COURT:  No.  I understand.

3          MR. WELLS:  I understand -- I want to make the Court

4   aware, we're not predicating it at this point in time with the

5   burden of producing those documents.

6          THE COURT:  All right.  Well, I appreciate that.

7          MR. CUNNINGHAM:  And, Judge, I hate to prolong

8   things.  But just to confirm, I will be able to participate by

9   telephone on the 27th?

10          THE COURT:  Yes.  Yes.  Of course, you're welcome --

11   you're welcome to come.  But if you want to participate by

12   telephone, that's -- that's fine.

13          MR. CUNNINGHAM:  Thank you very much, Your Honor.

14          THE COURT:  All right.  Well, I think -- I think that

15   covers what we can.

16          And as I said, if you -- if you resolve some of these

17   things, that's great.  If not, we'll move forward on the -- on

18   the 27th.  And I'll get a little order out that -- that tries

19   to capture briefly what we've done today.

20          So, Mr. Post, Mr. Dix, anything else?

21          MR. POST:  No, sir.  Thank you very much for this

22   opportunity.

23          THE COURT:  Yes.  Well -- Mr. Wells, anything?

24          MR. WELLS:  Nothing, Your Honor.

25          Thank you.

1        THE COURT:  Mr. Cunningham, anything else, sir?

2        MR. CUNNINGHAM:  No, sir.  Thank you for your time.

3        THE COURT:  Mr. Hancock, anything?

4        MR. HANCOCK:  No, Your Honor.

5        THE COURT:  All right.  Then we're in recess.

6        COURT SECURITY OFFICER:  All rise.

7     (The digitally recorded proceedings concluded at

8  3:37 p.m.)

9                           - - -

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

## **CERTIFICATE**

UNITED STATES DISTRICT COURT )
                                       )
MIDDLE DISTRICT OF FLORIDA )

        I hereby certify that the foregoing transcript is a true and correct computer-aided transcription from the official electronic sound recording of the proceedings in the above-entitled matter.

        DATED this 21st day of November, 2018.

        s/Shannon M. Bishop

        Shannon M. Bishop, RDR, CRR, CRC

# TAB 23

**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

FOODONICS INTERNATIONAL, INC.,
a Florida corporation,

                Plaintiff,

vs.                                Case No.  3:17-cv-1054-J-32JRK

DINA KLEMPF SROCHI,
as Trustee of the Laura Jean Klempf
Revocable Trust, a Georgia Trust,

                Defendant.

_____

DINA KLEMPF SROCHI,
as Trustee of the Laura Jean Klempf
Revocable Trust, a Florida Trust, et al.,

                Counterclaim Plaintiffs,

vs.

FOODONICS INTERNATIONAL, INC.,
a Florida corporation, et al.,

                Counterclaim Defendants.

_____/

## O R D E R

This cause came before the Court on June 5, 2018 for a discovery status hearing that

included the parties and non-party Cal-Maine Foods, Inc. ("Cal-Maine").  As stated on the

record during the hearing, it is

      **ORDERED:**

1.     The parties have confirmed that the Laura Jean Klempf Revocable Trust ("the Trust") is a Florida (rather than Georgia) trust.[1]  The Clerk shall therefore update the docket accordingly.

2.     By **June 20, 2018**, Foodonics International, Inc. ("Foodonics") shall produce to Ms. Srochi and the Trust the transaction closing documents discussed during the hearing (including the nondisclosure agreement), along with any electronically-stored information ("ESI") that can be reasonably retrieved by that date and to which there is no objection by Foodonics. **Prior to that date**, however, the parties shall work together with Cal-Maine to submit an amended version of the existing Confidentiality and Protective Stipulation and Order (Doc. No. 18) to include an "attorneys' eyes only" provision.[2]

3.     The undersigned will hold another discovery status hearing on **Wednesday, June 27, 2018 at 2:00 p.m.** in Courtroom 5D, Fifth Floor.  Counsel for Cal-Maine may appear telephonically by calling the Court's teleconferencing service at 1-888-684-8852 at least five minutes before the hearing is scheduled to begin. The access code is 2745123; the security code is 0627.  During the hearing, Cal-Maine shall report on its efforts to determine whether former Foodonics employees carried with them email address(es) or content from email address(es) with the domain dixieegg.com. Foodonics shall report on the continued use of the search terms and the production of ESI, including an estimation of the

---

[1]     The Trustee of the Trust, Dina Klempf Srochi, is a resident of Georgia.

[2]     Alternatively, the parties can submit a separate proposed protective order that addresses only the transaction documents to be produced.

number of documents (via a "hit report" or some other means) and cost of retrieving documents dating back to 2008 as opposed to 2014.[3]

4.      Unless the parties are told otherwise prior to the June 27, 2018 hearing, they shall be prepared to argue during the hearing the Omnibus Motion to Quash Subpoena and/or for Protective Order and Other Relief (Doc. No. 30), filed March 22, 2018.

**DONE AND ORDERED** at Jacksonville, Florida on June 6, 2018.

James R. Klindt
**JAMES R. KLINDT**
United States Magistrate Judge

kaw
Copies to:
Counsel of Record

Counsel for Cal-Maine Foods, Inc. (via email)
        Daniel R. Russell, Esq. (drussell@joneswalker.com)
        Mark A. Cunningham, Esq. (mcunningham@joneswalker.com)

---

[3]      Foodonics is not currently raising an "overly burdensome" argument regarding documents dating from 2008 to 2014, but the undersigned still deems it appropriate for Foodonics to estimate these matters.

-3-

**TAB 24**

| | |
|---|---|
| **From:** | Grier Wells <Grier.Wells@gray-robinson.com> |
| **Sent:** | Monday, June 18, 2018 3:57 PM |
| **To:** | James H. Post |
| **Cc:** | Michael R. Santana; David A. Hancock, CEDS; Chris Dix |
| **Subject:** | FW: Special Counsel Estimate - Nebula Review  - GrayRobinson |

Jim:

As discussed, I am providing you with the estimate from Special Counsel to perform a review of the documents from Jacques Klempf's devices.

The conversation on the topic began with my suggestion that we share the cost of the review by Special Counsel.   You suggested that perhaps we could discuss narrowing or reducing the number of documents to be reviewed.  To that end, I believe a conference call between those smarter than you and me is in order.

**Grier Wells | Complex Commercial, Employment and Construction Litigation**
**The Florida Bar Board Certified in Civil Trial Law**
**G R A Y | R O B I N S O N**

50 North Laura Street, Suite 1100 | Jacksonville, Florida 32202
**T:** 904-598-9929 | **F:** 904-598-9109 | **D:** 904-632-8478
E-mail | Website | Bio | vCard

**Facebook | LinkedIn | Twitter**

This e-mail is intended only for the individual(s) or entity(s) named within the message. This e-mail might contain legally privileged and confidential information. If you properly received this e-mail as a client or retained expert, please hold it in confidence to protect the attorney-client or work product privileges. Should the intended recipient forward or disclose this message to another person or party, that action could constitute a waiver of the attorney-client privilege. If the reader of this message is not the intended recipient, or the agent responsible to deliver it to the intended recipient, you are hereby notified that any review, dissemination, distribution or copying of this communication is prohibited by the sender and to do so might constitute a violation of the Electronic Communications Privacy Act, 18 U.S.C. section 2510-2521. If this communication was received in error we apologize for the intrusion. Please notify us by reply e-mail and delete the original message without reading same. Nothing in this e-mail message shall, in and of itself, create an attorney-client relationship with the sender.

**From:** Kotek, Kimberly [mailto:Kimberly.Kotek@specialcounsel.com]
**Sent:** Monday, June 11, 2018 10:57 AM
**To:** David A. Hancock, CEDS
**Subject:** RE: Special Counsel Estimate - Nebula Review - GrayRobinson

Hi Dave,

Hope you had a good weekend!  Here are the updated figures based on the document universe at 61,633:

- Contract attorney rate (staffed in a National Review Center) - $36/hr
- Project Manager (PM)- $140/hr
- Time Estimate based **only** on the 61,633 document universe and a 45 document per hour review rate with 5 contract attorneys and 1 PM:
  - 5 attorneys working 40 hours per week at 45 documents per hour = 9,000 documents per week reviewed
  - 63,611 documents \ 9,000 documents per week = 7 weeks to complete the review

- By your **June 27th production deadline**, it is estimated **you will be able to produce between 18,000-20,000 documents**
- Per week cost estimate for the contract attorneys and PM:
  - 5 Contract attorneys working 40 hours per week at a rate of $36/hr - $7200.00 per week
  - 1 Project Manager working 40 hours per week at $140/hr - $5600.00 per week (*we can discuss and adjust hours to the number you need)

Sincerely,

Kimberly Kotek, Esq.
239-738-2070

**TAB 25**

**Chris Dix**

| | |
|---|---|
| **From:** | James H. Post |
| **Sent:** | Friday, June 22, 2018 12:09 PM |
| **To:** | grier.wells@gray-robinson.com |
| **Cc:** | david.hancock@gray-robinson.com; 'michael.santana@gray-robinson.com'; Chris Dix |
| **Subject:** | FW: Foodonics v. Klempf Trust - Meet and Confer |

Grier,

Thank you for speaking with us yesterday about the following issues:

1.   Foodonics tax returns – We asked—and you agreed—to produce the Foodonics tax returns from 2006 - 2012.  We understand from you that the tax returns have been requested from Jacques Klempf's CPA, John Stevens, who in turn asked for Jacques Klempf's consent prior to production of these documents.  We request that these documents be produced without further delay.

2.   Foodonics corporate minutes – We asked—and you agreed—to produce the Foodonics corporate minutes.  Please produce these documents without further delay.

3.   Date range of production – Your firm acknowledged in the objections and responses to our discovery requests filed by Foodonics and Jacques Klempf that the cutoff date for production would be January 19, 2018.  This cutoff date was again confirmed in an email with your eDiscovery liaison, Mike Santana, on June 7, 2018.

     During the call yesterday, however, you proposed to change the cutoff date from January 19, 2018 to May 31, 2017 in order to avoid review and production of approximately 15,000 documents.  Although we agreed that the number of documents could possibly be reduced by further refinement of the search terms, such as the exclusion of privileged communications, we will not agree to a complete cutoff of that date range because, among other reasons, we are aware that Jacques Klempf has communicated via email and text message during that time frame with potential witnesses and subpoenaed parties in this case.  We therefore expect the production of non-privileged communications to or from Jacques Klempf, or other responsive ESI that match the search terms which were agreed to prior to January 19, 2018.

4.   Hit report – You agreed to produce the "hit report" as referenced in paragraph 3 of the Court's June 6 order.

5.   GrayRobinson documents - You agreed that your firm will produce any non-privileged, non-duplicate documents along with the documents to be produced on behalf of Jacques Klempf and Foodonics.

6.   AS/400 Server – You told us that the AS/400 server (i) contained only accounting information (e.g., invoices, receivables reports and ledgers) and (ii) did not contain any information that was related to the sale of Foodonics to Cal-Maine.  We agreed that if you provide us with a sworn statement concerning the foregoing signed by you each or someone with first-hand knowledge regarding those facts about that server, we will agree that the AS/400 server will not be searched at this time (but will continue to be preserved by GrayRobinson).

7.   DixieEgg.com emails – You told us that with the exception of Jacques Klempf, all other email accounts with the DixieEgg.com domain were terminated by Jacques Klempf approximately 5 months after the sale

of Foodnonics. You told us that your clients do not presently know whether the employees whose email accounts were terminated had copies of their DixieEgg.com emails on computers or mobile devices that were used by those same employees after the sale of Foodonics, but that you or your clients will investigate and provide us with that information. We request that you provide us with an update of your investigation by Tuesday, June 26, so that we can be prepared for the June 27 hearing with the current information.

8. <u>Cost estimate for document review</u> – Other than the date range modification described in #3 above, you did not provide any other proposals for reducing the volume, cost or length of your review of documents. Although you confirmed that the documents you intend to review include privileged communications, you did not know how many of the documents you expected to be privileged.

We continue to be willing to discuss with you possible ways to narrow the range of remaining documents to be reviewed, but we are limited in what we can specifically propose because we are not in possession of the data. In any event, your proposed linear review of approximately 62,000 documents at a cost of approximately $90,000 over a 7-week time frame does not appear to incorporate any technology assisted review tools (e.g., email threading, predictive coding, clustering) that would further reduce the burden, time and expense of your review.

Please let me know if you have any questions regarding the foregoing.

Thank you,
Jim

James H. Post

SMITH HULSEY & BUSEY

225 Water Street | Suite 1800 | Jacksonville, Florida 32202
904-359-7700 | Direct 904-359-7783
jpost@smithhulsey.com | www.smithhulsey.com



*This message is from a law firm and may contain information that is confidential or legally privileged. If you are not the intended recipient, please immediately advise the sender by reply email that this message has been inadvertently transmitted to you and delete this email from your system. Thank you for your cooperation.*

**From:** James H. Post
**Sent:** Thursday, June 21, 2018 10:08 AM
**To:** grier.wells@gray-robinson.com
**Cc:** 'Jay.Brennan@gray-robinson.com' <Jay.Brennan@gray-robinson.com>; 'James.Nolan@gray-robinson.com' <James.Nolan@gray-robinson.com>; Chris Dix <cdix@smithhulsey.com>
**Subject:** FW: Foodonics v. Klempf Trust - Meet and Confer

Grier,

As an additional agenda item for our telephone conference today at 11:00 a.m., we would like to know the status of the production of Foodonics' corporate minutes.

Thank you,

Jim

**From:** Grier Wells [mailto:Grier.Wells@gray-robinson.com]
**Sent:** Tuesday, May 8, 2018 10:21 AM
**To:** James H. Post <jpost@smithhulsey.com>
**Cc:** John M. "Jay" Brennan <Jay.Brennan@gray-robinson.com>; James Nolan <James.Nolan@gray-robinson.com>
**Subject:** RE: Foodonics v. Klempf Trust - Meet and Confer

Jim:

In addition to the issues we discussed last evening regarding your e-mail below, we will be producing the Foodonics corporate minutes from 2012 to date. I am advised that Stevens Powell would have sent the corporate tax returns for years prior to 2015 so you should have those. We will nevertheless produce returns from 2013 through last filed date.

Providing these documents outside our proposed dateline of 2014 to date is not a waiver of the dateline.

**Grier Wells | Complex Commercial, Employment and Construction Litigation**
**G R A Y | R O B I N S O N**

50 North Laura Street, Suite 1100 | Jacksonville, Florida 32202
**T:** 904-598-9929 | **F:** 904-598-9109 | **D:** 904-632-8478
E-mail | Website | Bio | vCard

**Facebook | LinkedIn | Twitter**

**From:** James H. Post [mailto:jpost@smithhulsey.com]
**Sent:** Thursday, May 03, 2018 12:14 PM
**To:** Grier Wells
**Cc:** John M. "Jay" Brennan; James Nolan; Chris Dix
**Subject:** RE: Foodonics v. Klempf Trust - Meet and Confer

Grier,

This is a follow up to our meet and confer on May 2, 2018. Based on our discussion, we understand that the parties have agreed to the following:

1.  Foodonics, Jacques Klempf and GrayRobinson (the "Foodonics Group") has withdrawn the general objections without prejudice.

2.  The parties will promptly proceed with the production and the requested ESI will be produced after conducting a reasonable search and review pursuant to the search terms and other processes agreed to by the parties in compliance with Paragraph 5 of the Order Governing ESI Issues. The next meeting between our respective ESI liaisons will be held next week.

3.  Documents and ESI withheld due to privilege will be identified on a privilege log produced along with the requested documents and ESI.

4.  The parties will produce within 7 business days from today the following documents which do not require an ESI search process:

a. The Foodonics Group will produce (i) all corporate minutes of Foodonics for the years 2012 to date and (ii) all corporate tax returns for Foodonics from the years 2006 to date.

b. The Trust will produce the Trust and all amendments.

c. The Foodonics Group has objected to the production of the closing documents and other agreements relating to the Cal-Maine sale without the consent of Cal-Maine because some of these documents allegedly contain Cal-Maine's proprietary or confidential information (the "Cal-Maine Proprietary Information"). The Foodonics Group will produce all closing documents and other agreements relating to the Cal-Maine sale (the "Cal-Maine Sale Closing Documents") within 7 business days from today, except for those documents which purportedly contain Cal-Maine Proprietary Information.

d. With respect to the Cal-Maine Sale Closing Documents which allegedly contain Cal-Maine Proprietary Information, the Foodonics Group will promptly follow up with the Cal-Maine attorney to determine whether Cal-Maine will allow production of the closing documents and other related information, subject to the execution of a confidentiality agreement in the same form that was entered into by the parties in this case.

5. With respect to Cal-Maine, you will follow up with their attorney to determine the status of their turnover of the AS400 server and provide us with an update in 7 business days.

6. With respect to your request that we furnish copies of the documents (and ESI) that we have obtained to date pursuant to the subpoenas we have issued in this case, we will do so subject to your stipulation that (i) all parties in this case consent to furnish copies of documents and ESI obtained by subpoena to all other parties within 14 days after written request and (ii) the party requesting copies agrees to pay the party producing copies (a) the reasonable cost of preparing the copies and (b) 50% of the cost, if any, incurred by the party producing copies to obtain such information from the non-party. Any party producing copies of ESI pursuant to this stipulation shall produce the ESI in the format in which it has received from the non-party or, for ESI sent to KLDiscovery, the party producing copies shall direct KLDiscovery to deliver a copy of the ESI to the party requesting copies in the same format in which it is maintained by KLDiscovery at the time of production.

7. We agreed to discuss at a later date possible deposition dates for Dina Klempf Srochi, as Trustee of the Laura Jean Klempf Revocable Trust and Dennis Blackburn, as Assistant Trustee of the Trust.

8. With respect to our request for information regarding the work-product privilege asserted by the Foodonics Group as to the SMK subpoena, you requested that your response be deferred until next week so that you could discuss the matter further internally.

Please confirm your agreement to the foregoing by reply email.

Thank you,
Jim

**From:** James H. Post
**Sent:** Wednesday, May 2, 2018 10:29 AM
**To:** grier.wells@gray-robinson.com
**Cc:** 'Jay.Brennan@gray-robinson.com' <Jay.Brennan@gray-robinson.com>; 'James.Nolan@gray-robinson.com'
<James.Nolan@gray-robinson.com>
**Subject:** RE: Foodonics v. Klempf Trust - Meet and Confer

Grier,

During our meet and confer scheduled for today at 3:00 p.m., we request the following information in connection with the Plaintiff/Counter-Defendants' Objections and Privilege Log as to Subpoena for Sheldrick McGehee & Kohler, LLC and Jess W. Wright:

1. What business relationships, if any, existed between SMK and Foodonics, Jacques Klempf and/or GrayRobinson between September 1, 2008 and December 31, 2015?

2. What business relationships, if any, existed or now exist between SMK and Foodonics, Jacques Klempf and/or GrayRobinson on or after January 1, 2016?

3. Does GrayRobinson presently have, or in the past had, an attorney-client relationship with SMK or Jess Wright?

4. SMK and Jess Wright are fact witnesses in this case. Has Jess Wright or anyone else at SMK been engaged by you or your clients as consulting or testifying experts in this case? If so, when?

Thank you,
Jim

James H. Post

SMITH HULSEY & BUSEY

225 Water Street | Suite 1800 | Jacksonville, Florida 32202
904-359-7700 | Direct 904-359-7783
jpost@smithhulsey.com | www.smithhulsey.com



*This message is from a law firm and may contain information that is confidential or legally privileged. If you are not the intended recipient, please immediately advise the sender by reply email that this message has been inadvertently transmitted to you and delete this email from your system. Thank you for your cooperation.*

**From:** Grier Wells [mailto:Grier.Wells@gray-robinson.com]
**Sent:** Wednesday, May 2, 2018 7:58 AM
**To:** James H. Post <jpost@smithhulsey.com>
**Cc:** John M. "Jay" Brennan <Jay.Brennan@gray-robinson.com>; James Nolan <James.Nolan@gray-robinson.com>
**Subject:** RE: Foodonics v. Klempf Trust - Meet and Confer

Jim:

Thanks for your e-mail.

The agenda items you listed are generally in line with our discussion last week. However, we also agreed to discuss your provision of copies of documents you have or will receive from subpoenas issued. We understand that Andy Bowers, SMK and possibly others have produced documents. We also agreed to address deposition dates of Ms. Srochi and Dennis Blackburn.

Since our discussion last week, we have also received your response to our request for production. Your responses merit discussion as well.

**Grier Wells | Complex Commercial, Employment and Construction Litigation**
G R A Y | R O B I N S O N

50 North Laura Street, Suite 1100 | Jacksonville, Florida 32202
T: 904-598-9929 | F: 904-598-9109 | D: 904-632-8478
E-mail | Website | Bio | vCard

**Facebook | LinkedIn | Twitter**

This e-mail is intended only for the individual(s) or entity(s) named within the message. This e-mail might contain legally privileged and confidential information. If you properly received this e-mail as a client or retained expert, please hold it in confidence to protect the attorney-client or work product privileges. Should the intended recipient forward or disclose this message to another person or party, that action could constitute a waiver of the attorney-client privilege. If the reader of this message is not the intended recipient, or the agent responsible to deliver it to the intended recipient, you are hereby notified that any review, dissemination, distribution or copying of this communication is prohibited by the sender and to do so might constitute a violation of the Electronic Communications Privacy Act, 18 U.S.C. section 2510-2521. If this communication was received in error we apologize for the intrusion. Please notify us by reply e-mail and delete the original message without reading same. Nothing in this e-mail message shall, in and of itself, create an attorney-client relationship with the sender.

**From:** James H. Post [mailto:jpost@smithhulsey.com]
**Sent:** Tuesday, May 01, 2018 5:18 PM
**To:** Grier Wells
**Subject:** Foodonics v. Klempf Trust - Meet and Confer

Grier,

In regard to the meet and confer scheduled for tomorrow (May 2), the agenda includes the following:

1. The Objections to Discovery Requests served by your firm on behalf of:

   a. Foodonics International, Inc.

   b. Jacques Klempf

   c. GrayRobinson, P.A.

   d. Dennis Hughes
      John Reece
      Dick Still
      Reggie Dalton

      Julianne Marie Klempf Lee
      Alexandria Renee Klempf

6

Heather Jean Klempf

    e.    Sheldrick, McGee & Kohler, LLC
          Jess W. Wright

2.    The prompt production of responsive documents to which you have not objected, if any.

3.    The production of text messages on the mobile phone of Jacques Klempf.

4.    Cal-Maine – The status of Cal-Maine's return of AS400 server to Foodonics/GrayRobinson.

Thank you,
Jim

James H. Post

SMITH HULSEY & BUSEY

225 Water Street | Suite 1800 | Jacksonville, Florida 32202
904-359-7700 | Direct 904-359-7783
jpost@smithhulsey.com | www.smithhulsey.com



*This message is from a law firm and may contain information that is confidential or legally privileged. If you are not the intended recipient, please immediately advise the sender by reply email that this message has been inadvertently transmitted to you and delete this email from your system. Thank you for your cooperation.*

**TAB 26**

IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

FOODONICS INTERNATIONAL,               Jacksonville, Florida
INC., a Florida corporation,
                                       Case No. 3:17-cv-1054-J-32JRK
      Plaintiff,
                                       June 27, 2018
vs.
                                       2:07 p.m.
DINA KLEMPF SROCHI, as
Trustee of the Laura Jean              Courtroom No. 5D
Klempf Revocable Trust, a
Florida Trust,

      Defendant.
_____


DIGITALLY RECORDED DISCOVERY STATUS HEARING
BEFORE THE HONORABLE JAMES R. KLINDT
UNITED STATES MAGISTRATE JUDGE


COURT REPORTER:

            Shannon M. Bishop, RDR, CRR, CRC
            221 North Hogan Street, #150
            Jacksonville, Florida  32202
            Telephone:  (904)549-1307
            dsmabishop@yahoo.com

      (Proceedings reported by mechanical stenography;
transcript produced by computer.)

A P P E A R A N C E S

PLAINTIFF'S COUNSEL:

>            **SAMUEL GRIER WELLS, ESQ.**
>            GrayRobinson, PA
>            50 North Laura Street, Suite 1100
>            Jacksonville, FL  32202

DEFENSE COUNSEL:

>            **JAMES H. POST, ESQ.**
>            **R. CHRISTOPHER DIX, ESQ.**
>            Smith, Hulsey & Busey
>            One Independent Drive
>            Suite 3300
>            Jacksonville, FL  32202-3315

COUNSEL FOR MOVANT:

>            **MARK A. CUNNINGHAM, ESQ.**  (via telephone)
>            Jones Walker, LLP
>            201 St. Charles Avenue, 47th Floor
>            New Orleans, LA  70170-5100

ALSO PRESENT:

>            David Hancock (via telephone)

1                            P R O C E E D I N G S

2       June 27, 2018                                    2:07 p.m.

3                                - - -

4              COURT SECURITY OFFICER:  The United States District

5       Court in and for the Middle District of Florida is now in

6       session.   The Honorable James R. Klindt presiding.

7              Please be seated.

8              THE COURT:  Good afternoon.

9              MR. POST:  Good afternoon.

10             MR. WELLS:  Good afternoon, Your Honor.

11             THE COURT:  Let me go ahead and call the case and

12      make sure we have everyone's appearance.

13             This is *Foodonics International, Inc., against Dina*

14      *Klempf Srochi, as Trustee of the Laura Jean Klempf Revocable*

15      *Trust.*

16             Did we decide it was a Georgia trust?  Is that --

17      or --

18             MR. POST:  It is a Florida trust, but the --

19      Ms. Srochi is a Georgia resident.

20             THE COURT:  Yes.  All right.  So Florida trust.

21             MR. POST:  Right.

22             MR. WELLS:  It's a Florida trust.  But I think the --

23      the Court entered --

24             THE COURT:  Yes.

25             MR. WELLS:  -- that last time, corrected the style of

1   the case.

2           THE COURT:  Yes.  Yes.  Thank you.

3           All right.  And it's Case No. 3:17-cv-1054-J-32JRK.

4   We're set for a status hearing regarding discovery.

5           Mr. Post and Mr. Dix are here on behalf of -- of Jean

6   Klempf.

7           And I'm saying that backwards because I really should

8   be saying that Mr. Wells is here on behalf of Foodonics, the

9   Plaintiff/Counter Defendant in the case, and then Mr. Post and

10  Mr. Dix are here on behalf of the -- the Defendant and the

11  Counter Plaintiff -- or Plaintiffs.

12          Then on the phone is Mr. Hancock and Mr. Cunningham,

13  who represent a third party, Cal-Maine.

14          Is that right?  Are you two gentlemen on the phone?

15          MR. HANCOCK:  I'm on the -- this is David Hancock.

16  I'm on the phone, but I'm with GrayRobinson.

17          THE COURT:  Oh, okay.  Yes.  I'm sorry, Mr. Hancock.

18  I -- yes, you're with GrayRobinson.

19          And then, Mr. Cunningham, you're on the phone?

20          MR. CUNNINGHAM:  Yes.  Good afternoon.

21          THE COURT:  Good afternoon.  Well, I had three

22  matters listed that I wanted to make sure we take up.  That is,

23  of course, the status of the discovery that's really driven by

24  the last hearing that we had and the June 6th, 2018, order that

25  was entered after that.

 1          And then -- then I wanted to address the motion --

 2   the omnibus motion to squash subpoena and/or for protective

 3   order and other relief.  That's document 30.  It was filed on

 4   March 22nd, 2018.  And that was filed by Foodonics, along

 5   with -- and Counterclaim Defendant Jacques -- is it Jacques?

 6          MR. WELLS:  Jacques Klempf.

 7          THE COURT:  Jacques Klempf.  And then -- and then the

 8   non-parties.  And that was, of course, responded to.  And so I

 9   want to make sure we take that up.

10          And then there's the motion to extend deadlines that

11   we'll discuss.  Judge Corrigan has referred that to me for the

12   entry of an order.  So I'll discuss that all with you.

13          Is it best to start with you, Mr. Post, in terms of

14   the status of discovery?

15          MR. POST:  Yes, Your Honor.  I'd be glad to.

16          THE COURT:  Okay.

17          MR. POST:  May it please the Court?

18          THE COURT:  Yes.

19          MR. POST:  Your Honor, since this Court had the last

20   status conference, we did receive the Cal-Maine transaction

21   documents after we submitted to the Court a consensual

22   protective order.  And so that production has been made.

23          We -- we also -- but not much else has occurred

24   constructively since that date.  We've had discussions with

25   Mr. Wells and his -- on behalf of his clients to find out where

1  we -- what the timeline is for the production of documents and

2  ESI.

3         And as a result of -- primarily as a result of those

4  conversations, we submitted a proposed motion to extend the

5  deadlines in this case, including the trial date, because it

6  appeared to us that, you know, best-case scenario we were not

7  going to get all the documents that we would like until perhaps

8  August 31st on a rolling production basis, if -- assuming that

9  we -- some things break our way as a result going forward.

10        We -- so we -- we have not received, although we

11  believe they are available from Foodonics, the tax returns from

12  2006 to 2012 or the corporate minutes of the company.

13        We -- and, therefore, it is our suggestion -- and,

14  again, we're -- at this hearing, we're not trying to throw

15  anybody under the bus or point fingers.  We're just trying to

16  move this case along.

17        And we would suggest to the Court that a successful

18  status conference here would perhaps result in the extension of

19  the -- the trial date and the deadline dates, which was the

20  subject of a pending motion which is consented to, that the

21  Foodonics parties begin production by July 9th on a rolling

22  production, in phases, with a new production every two weeks

23  until completed, no later -- no later than August 31st.

24        And that production would include the non-privileged,

25  non-duplicative ESI and documents from the GrayRobinson law

1    firm.

2         With respect the DixieEgg.com mail accounts, we still

3    have not gotten a clear understanding as to where they are or

4    what happened to them.  So we would like a disclosure in due --

5    as soon as possible of which former Foodonics employees had

6    copies of Dixie Egg mail -- e-mails on computers, mobile

7    devices, after the Foodonics sales transaction, and whether any

8    of the former Foodonics employees used personal e-mail accounts

9    other than DixieEgg.com before or after the Foodonics sales

10   transaction.

11        And we say that because we know, at least

12   anecdotally, that at least one of those former employees, Dick

13   Still, used his personal e-mail account to transmit information

14   regarding the Foodonics sales transaction and business.

15        Regarding the AS400 server, we are now being told for

16   the first time that there is no information on there other than

17   financial information, that is, there's no e-mails, and that

18   it's been unplugged and it's sitting in the office of -- of

19   GrayRobinson.

20        And we're being told that to plug it back in and to

21   do a search of it would be expensive and take time, but, still,

22   it contains all the accounting information.

23        So we've -- we've asked and we have -- although we

24   were told that this might be possible, we haven't been given

25   confirmation -- we've asked that -- that we -- that someone

1  with personal knowledge give us a sworn statement that the

2  server only contains accounting information, it doesn't contain

3  any information related to the Foodonics sales transaction, the

4  Cal-Maine transaction, and will continue to be preserved for

5  the duration of the litigation in case we need to go back to

6  it.

7        With respect to the Cal-Maine Dolph Baker production,

8  as I reported, we did get a consensual protective order agreed

9  to, submitted to the Court as examiner.

10        As a result, the Cal-Maine transaction documents were

11  marked highly confidential and were produced to us by

12  GrayRobinson.  But that still leaves the required production

13  from Cal-Maine and Dolph Baker.

14        And we would request that the Court schedule the same

15  deadline, that is, the pro- -- for Cal-Maine and Dolph Baker,

16  that they produce a non-duplicative, non-privileged ESI on the

17  same -- same schedule as Foodonics and Jacques Klempf, without

18  waiting for the production of Foodonics.

19        But with respect to the duplicative information, they

20  suspect as duplicative -- at a minimum, have them investigate

21  and disclose the sources and locations, the estimated volume of

22  ESI, a list of the duplicative, and how the information is

23  stored and the difficult -- difficulty, if any, of retrieving

24  that information if they should be required to do so, so we

25  would know how much of a problem, if any, it really is.

1        For the non-parties that are the subject of the -- of

2   the motion to quash today, we -- we would ask ideally that this

3   Court deny that motion and require the non-parties to produce

4   documents on the same schedule as Foodonics and Jacques Klempf.

5        And, lastly, we would ask the Court to grant the

6   motion to extend the deadlines in this case, with the

7   understanding that the depositions of the parties -- not

8   non-parties, but the parties -- not be scheduled until after

9   the production is completed on August 31st, because it would be

10  impractical and not useful to take depositions.

11       We certainly don't want to take depositions until we

12  have all the documents that need to be produced by our

13  adversaries and the non-parties.

14       So that in a nutshell, Your Honor, is our -- our view

15  of the status and our suggestion as to how we move forward.

16       THE COURT:  Well, let me ask you this.  The -- the

17  information that you're suggesting Cal-Maine and Dolph Baker

18  produce, would that be pursuant to the subpoenas?

19       MR. POST:  Yes, Your Honor.

20       THE COURT:  In other words, that's all part of the

21  omnibus motion to quash, too, the subpoenas on Cal-Maine and

22  Dolph Baker, also?  Right?

23       MR. POST:  Yes.  We -- my understanding, based on

24  prior conversations with Mr. Cunningham, is that we were beyond

25  the objection stage, it was simply -- their new objection was

1    anyone who produced anything until after Foodonics produced

2    everything.

3         And the give-and-take that we had with

4    Mr. Cunningham -- and, of course, he can speak for himself --

5    as evidenced by the e-mail exchange that we -- we provided to

6    the Court at the last status conference, was that they were

7    offering -- suggesting that they would give us the information

8    that was not duplicative, which -- which would have been --

9    well, which he admitted existed, but -- but he said, "I'll give

10   you that if you don't -- if you walk away and don't ask for

11   anything else."

12        And my -- my suggestion there is that we -- that they

13   do produce at this time the information which is

14   non-duplicative, and that we -- we would wait for the Foodonics

15   production to determine if we could actually do a De-dup- kind

16   of exercise through the use of technology, but -- but in the

17   meantime, they should do the requisite, as required to do by

18   the rules, investigate what sources they have and the location,

19   and estimated volume of where all this information might be,

20   and that it not go anywhere until we can decide whether or not

21   we were going -- how we're going to deal with what they contend

22   to be the duplicative stuff.

23        THE COURT:  I think, if I'm recalling this now --

24   because you just triggered something in my mind -- that there

25   was a previous motion that Cal-Maine had regarding the

1   subpoena, and then that was withdrawn at some point, that the

2   -- the motion to quash, the Cal-Maine and Dolph Baker subpoena,

3   I think.

4         MR. POST:  Yes, Your Honor.  You're right.  There

5   was -- there was seven subpoenas served on Dolph Baker and

6   Cal-Maine.  And the service of the subpoena on Cal-Maine drew

7   an objection from Mr. Cunningham, because they said it wasn't

8   improperly served on the registered agent.

9         And we -- rather than dispute that, we simply served

10  it again.  And there's no dispute now that it's been -- that

11  the Cal-Maine subpoena has been properly served.

12        THE COURT:  And the omnibus motion that's before the

13  Court right now does not include Cal-Maine or Dolph Baker

14  attempting to quash the -- the subpoena?

15        MR. POST:  That's right.  So the existing -- the one

16  that's on my calendar for today was filed by GrayRobinson on

17  behalf of Foodonics and Jacques Klempf and seven, what we've

18  called, interested non-parties --

19        THE COURT:  Yes.

20        MR. POST:  -- three adult daughters and business

21  associates of Jacques Klempf.

22        THE COURT:  All right.

23        All right.  Well, Mr. Wells, why don't I -- should I

24  hear from you now with regard to where things are, because

25  there were certain things that -- I think other things that you

1   were going to maybe report on.

2        I was under the impression that whatever ESI wasn't

3   objected to you were going to start producing that, or

4   identifying that as of the last hearing, unless I'm misreading

5   the order, that Foodonics shall produce the transaction closing

6   documents discussed during the hearing, including the

7   non-disclosure agreement, along with any electronically stored

8   information, ESI, that can be reasonably retrieved by that date

9   and to which there is no objection.

10        So what's happening with -- with ESI?

11        MR. WELLS:  I may have misread the Court's order.  We

12   have had discussions, ongoing, about the ESI.  And I will

13   address that separately.

14        In addition to the documents that Mr. Post enumerated

15   as having been produced, being the Cal-Maine documents and some

16   other unrelated documents, we've also produced tax returns for

17   the years 2013 through 2016.

18        Keep in mind that the two transactions that are

19   involved in this litigation really are 2015 stock purchase of

20   the Trust stopped by Mr. Klempf in the October 2016 sale of

21   assets to Foodonics.

22        So tax returns prior to 2013, we -- we question

23   whether they have any relevance to any claim or defense in the

24   matter.  But, nevertheless, we have agreed that we will produce

25   those.

1      We are awaiting production of those from the

2   accountant.  We anticipate, if not today, within the next day

3   or so, we'll have those tax returns and we'll produce them to

4   opposing counsel.

5      Same thing with the corporate minutes.  In the

6   transition between Foodonics and Cal-Maine, there simply was

7   not a very good record-keeping process.  But we are finding the

8   corporate minutes and will provide those as well in short

9   order.

10      Again, the same thing with the tax returns.  I would

11   anticipate those could be produced within the next day or so

12   without any difficulty.

13      Let me address the ESI, as the Court pointed out.

14      At the first hearing, last time we were here, we

15   advised the Court that the initial view of the cell phones, the

16   laptop, and the PC of Mr. Klempf, who is the sole shareholder

17   of Foodonics, yielded about 41,000 documents.  That's

18   documents, not pages.

19      At the request of Mr. Post and Mr. Dix, we expanded

20   that research in identifying additional documents from June of

21   2017, which I will note was six months after the Cal-Maine

22   transaction -- we expanded that from June of 2017 to January of

23   2018, which yielded another 15,000 documents.

24      So we've got roughly 61,000 documents that have to be

25   reviewed.  But that's the universe of documents from 2008

1    through January of 2018.

2         We got an estimate for a review of that document --

3    those documents to see how they matched against the search

4    terms the parties have agreed upon.

5         And the estimated cost for that review is $90,000.

6    As a result of that cost estimate, we've had discussions with

7    Mr. Post and Mr. Dix about ways that we can address that.

8         THE COURT:  When you say that cost is 90,000, what

9    does that entail?

10        MR. WELLS:  We contacted special counsel here in

11   Jacksonville.  And they would employ five attorneys and a

12   supervisor who will review the 61,000 documents.  And their

13   estimate for the amount of time involved -- and these are

14   industry standards.  It's not something we made up.  This is

15   what reviewing ESI costs are.

16        It will take them seven weeks to review the 61,000

17   documents and match those against the search terms the parties

18   have agreed upon, to see just the universe of documents that

19   might be relevant to claims or defenses.

20        And then after that, it will, of course, be further

21   winnowing of those documents.  We have no idea how many of

22   those 61,000 documents will be responsive to any of the search

23   terms, but that's what the cost will be just to do the initial

24   review.

25        THE COURT:  And, again, as -- I'll just display my

1    ignorance.  But I thought there was a -- a less expensive way,

2    at least initially, to narrow a universe of documents like that

3    by -- by doing, I guess, what's called a hit -- a hit run or

4    a -- something that would at least give an idea of how many of

5    the documents actually are responsive to the search terms, so

6    that a document-by-document search might not be necessary, or

7    as to at least certain documents or certain search terms.

8            Has that been discussed or --

9            MR. WELLS:  We provided the hit list for both sets of

10   documents to opposing counsel yesterday.  And I am far behind

11   the Court on the level of ignorance about those sorts of

12   things.

13           Mr. Hancock and Mr. Dix can address that.  I have no

14   understanding that a review of the hit list will narrow the

15   search, but it may well.  I don't know.

16           MR. HANCOCK:  Your Honor, can I weigh in here for a

17   moment.  This is David Hancock with GrayRobinson.

18           THE COURT:  Yes.  Go ahead.

19           MR. HANCOCK:  I might be able to shed some light.  So

20   the 62,000 documents that we're talking about are after

21   applying all of the search terms that the parties have agreed

22   upon.

23           So what the contract reviewers would be doing would

24   be reviewing the documents for responsiveness, privilege, and

25   so on.

1          MR. POST:  Your Honor.

2          THE COURT:  Mr. Dix?

3          MR. HANCOCK:  But there were over 300,000 documents

4   initially.  It was winnowed down to about 62,000 after applying

5   the search terms that the parties agreed to.

6          MR. POST:  Your Honor --

7          MR. WELLS:  I stand corrected.

8          MR. POST:  -- I would like Mr. Dix to respond to

9   this.  The -- we had -- we had this discussion with the

10  GrayRobinson people last Thursday.  And we don't believe

11  they're using the technology that's available.

12         THE COURT:  All right.  I'm going to hear from

13  Mr. Dix, Mr. Hancock.  So you can listen to what he has to say.

14  And then if you want to respond to that, that'd be fine.

15         MR. HANCOCK:  Certainly.

16         MR. DIX:  Your Honor, when we had the discussion last

17  week, one of the first questions we asked was:  Does any of

18  the -- do any of the 61,000 documents -- does that include

19  privileged documents, documents that you're never going to give

20  us because you're going to put them on a privilege log and

21  never produce to us?  They said, "We don't know, but probably."

22         We suspect that there's a good deal of -- of

23  privileged information that could be easily identified by

24  taking a look at things like e-mails to and from Jacques

25  Klempf, from Foodonics, and the GrayRobinson firm.

1      And maybe that's not the end of the way that we would

2  try to cull that down, but that's a starting point.  So --

3      THE COURT:  Do you run a search on that?  Is that how

4  you do it?

5      MR. DIX:  Yes.  You can identify every e-mail that

6  was sent to and from Jacques Klempf and -- and the GrayRobinson

7  firm, anybody at the GrayRobinson.  And you could do that for

8  any -- you could do it for Cal-Maine as well.  So that was one

9  way that we were proposing to do this.

10     Another way that people do this is to take a look at

11 those hit reports.  We got them yesterday.  And I -- I haven't

12 had a look -- had a chance to look at them in great detail.

13     We haven't heard any proposals from Mr. Hancock or

14 Wells about how they might use that hit report to narrow it

15 down, but certainly it would be -- would like to see what they

16 would propose there.

17     I think we probably will have a similar-type approach

18 when we come back and talk about our search -- searches that

19 we're running on the information that they want.

20     Some of the search terms that you see on the hit

21 reports -- there's 20-, 30-, 40,000 documents that are being

22 generated by a search term like "purchase" or "share."

23     The word purchase and share come up in lots of

24 different documents that are totally unrelated to this case.

25 So you take other technologies -- clustering is another way

1    that we do it.

2         Clustering takes different groups of documents and

3    puts them together.  And you can look at the entire cluster and

4    say is this -- when it says share or price, is that because

5    it's a whole bunch of e-mails related to Ticketmaster or

6    Fantasy Football, or something unrelated, or is this related to

7    the Foodonics sale?  And you can group those documents together

8    in clusters and use that technology.

9         And so the review that has been proposed by special

10   counsel, we asked if they're going to use any of these

11   technologies, any of these additional criteria and techniques,

12   to narrow what special counsel is looking at document by

13   document.  And we didn't hear a response that they were -- that

14   we're going to use any of that.

15        And so I think there's still some -- some work that

16   can be done.  And we'd like to hopefully consensually do that

17   to narrow that scope, so that the universe is small.

18        Then when you get that universe, you apply different

19   technologies, like predictive coding, where the -- you review

20   the documents, you're teaching the computer which documents

21   you're looking for and which ones you're not, kind of like

22   Pandora for a music player, if you've ever used Pandora to

23   listen to music.  So we think they should be using that, too.

24        Now, we're not asking the Court to order them to do

25   that.  If they want to do it the old-fashioned way, the long

1  and hard way, then that's -- that's, I guess, their choice, as

2  long as they're not holding back, giving us the documents in a

3  timely manner.  But we would suggest that there's some other

4  things that can still be done here to help expedite and lower

5  the cost of the review.

6          MR. WELLS:  Let me respond briefly from a -- a

7  broader perspective, and then Mr. Hancock can do it from a

8  technical standpoint.

9          We got the estimate from special counsel maybe a

10  week, ten days ago, and we provided it to opposing counsel.  We

11  had a discussion last Thursday, when some of the issues that

12  Mr. Dix just raised were discussed.

13          That was last Thursday.  Today is Wednesday.  We just

14  simply haven't had the time since then to do all that needs to

15  be done.

16          We have identified, I believe -- Mr. Hancock can

17  correct me.  But we have identified documents that could be

18  privileged.

19          And it does not reduce the -- the total number of

20  documents substantially.  We are aware of some of the

21  procedures that Mr. Dix has enumerated.  And we certainly

22  would -- would endorse doing everything we can to reduce that.

23          But the process of learning what the documents were

24  and how much they're going to cost to do them, and what the

25  processes are, is not something that can just be done

1  overnight.

2          THE COURT:  Well, it -- I mean, it sounds to me

3  like -- that some progress has been made and that you-all are

4  still talking about it.  And it would seem to me that the best

5  thing to do is probably set another status conference.

6          I don't know how -- was it a month ago that we had

7  one?

8          I don't know.  Set one sometime in July, and hope

9  that you-all can make progress, it sounds like -- like you

10  have, and see if we can continue -- at least as far as this ESI

11  and Foodonics.

12          On this -- on this somewhat narrow issue, in terms

13  of -- and we still have to talk about a number of other things,

14  because I think this -- we're still -- we're still -- a tension

15  here about what Cal-Maine and -- and, of course, I haven't even

16  heard from -- from -- from Cal-Maine yet.

17          But it's still some tension about what a third party

18  should be required to produce prior to the production by, you

19  know, one or more of the parties.  So we'll take that up.

20          But, hopefully, we -- we're at least moving in the --

21  in the direction of -- of -- of getting the production of ESI

22  from Foodonics.  And so I appreciate what you-all have done in

23  that area.

24          MR. WELLS:  May I address, Your Honor, a couple of

25  the other issues --

1    THE COURT:  Yes.

2    MR. WELLS:  -- that Mr. Post brought up in his

3    opposing comments?

4    There is a domain DixieEgg.com or @DixieEgg.com.

5    THE COURT:  Yes.

6    MR. WELLS:  I think the Court needs to understand

7    that when the sale of Foodonics took place at Cal-Maine, I

8    mean, it was a drop -- the guillotine dropped, so to speak.

9    But there were employees of Foodonics who remained as

10   employee -- who became employees of Cal-Maine, but there were

11   customers of Foodonics and Dixie Egg who were not aware of that

12   transaction, and were dealing with the Dixie Egg folks.  So

13   there were some employees at Dixie Egg who continued to use the

14   DixieEgg.com domain for some period of time.

15   It did not get migrated to Cal-Maine, as there was

16   some thought that it might have, so that Cal-Maine would have

17   access to it.

18   That DixieEgg.com account that was at Foodonics

19   terminated.  Mr. Klempf revived it for himself.  Nobody else is

20   using it but him, on rare occasion.

21   We are trying to work with Microsoft to get whatever

22   e-mails might have been on the DixieEgg.com computers, laptops,

23   whatever, of employees through the date the account was

24   terminated several months after the transaction occurred.

25   That is simply -- and we are working on the exercise

1   of communicating with Microsoft to find out where those

2   archived e-mails might be.

3          The AS400 was raised.  We haven't -- we agreed on

4   Thursday in the conversation that we would get a declaration

5   from a former Foodonics employee that the AS400 has nothing but

6   internal accounting information.  We have identified that

7   employee.  And we are working on getting a declaration from

8   him, as we agreed last week.

9          I'm not going to address the issue that Mr. Post

10  raised regarding Cal-Maine.  Mr. Cunningham is on the phone and

11  he can do that.  However, Mr. Post did reference depositions.

12         Several weeks ago we requested that Mr. Post provide

13  us with dates that we could take the depositions of Ms. Srochi

14  and Mr. Blackburn, who are the Counter Plaintiffs.

15         We have been advised by Mr. Post that he has dates

16  that -- where people are not available, but is -- is declining

17  at this point to allow those depositions to be scheduled.

18         As I understand it, he thinks that -- or it is his

19  position that the documents all ought to be produced before

20  depositions start.

21         We take the position, Your Honor, that the

22  counterclaim filed by Ms. Srochi and Mr. Blackburn contain

23  numerous affirmative, albeit somewhat conclusory, allegations

24  or wrongful conduct on the part of Foodonics and Mr. Klempf.

25         There's a significant amount of inflammatory language

1   in the counterclaim about issues related to non-disclosure and

2   breach of fiduciary duty.

3          We think that we have the right to find what evidence

4   Ms. Srochi and Mr. Blackburn relied upon before they filed

5   their counterclaim.  Documents that we produce in the course of

6   discovery may or may not confirm that.

7          But certainly they had some evidentiary basis to make

8   the allegations that they made in the counterclaim before the

9   counterclaim was filed.  We think we're entitled to know what

10  they knew from an evidentiary standpoint when the counterclaim

11  was filed.  So we would request that we be permitted to take

12  the depositions of Ms. Srochi and Mr. Blackburn.

13         I know we're moving toward disclosing documents, but

14  we don't think that the disclosure of documents is a

15  prerequisite to being able to schedule depositions.

16         And with respect to the motion to extend time, we do

17  not object to that.  We think that would be appropriate.

18         THE COURT:  All right.  Thank you.  Let me hear from

19  Mr. Post, just on the last issue of the depositions --

20         MR. POST:  Yes, Your Honor.

21         THE COURT:  -- before Mr. Cunningham weighs in.

22         MR. POST:  Your Honor, as an initial matter, we would

23  not want to give the depositions of our principals more than

24  one time in this case.

25         The local rules say it's one deposition of seven

1    hours unless the Court orders otherwise.  And we expect that

2    after the documents are produced, after we amend our

3    counterclaim, if we do so, after we add parties, they're going

4    to be pushing us for another deposition of our people.

5           And for case management purposes, for that reason

6    alone, we're recommending -- or suggesting that -- that the

7    deposition of the parties only -- not non-parties, but just

8    parties, be delayed until all the documents have been produced.

9           And as an additional reason, Your Honor, our

10   counterclaim is a fraud by omission case.  We will -- our

11   clients will know better what we weren't told after the

12   deadline for production has been -- of documents has been met.

13          So this -- I don't think it's -- it's practical or

14   fair to take the depositions of my two clients prior to the

15   time that Foodonics have produced the documents that we can

16   review and get a full picture of -- of what we perhaps weren't

17   told, or we suspect was not told to us, and in detail, such as

18   the dream team analysis, which we've attached to our response

19   in opposition to the motion to quash.

20          Those are -- the dream team analysis, the Jacques

21   Klempf estimate of his property -- his company being worth

22   $68 million before he sold it to his -- bought his mother's

23   stock, is something that we now know -- we weren't told at the

24   time of the -- of the redemption transaction.

25          So it's -- and I recognize that ordinarily people can

1   take discovery in whatever order they want.  That's the general

2   rule.  I think in this particular situation it would be

3   impractical and -- and not fair to take the deposition of my

4   two clients before we have the Foodonics production.

5              THE COURT:  All right.  Did you want to say

6   anything -- I want to hear from Mr. Cunningham here on the

7   Cal-Maine issues.

8              MR. WELLS:  Briefly, Your Honor.  And I don't mean to

9   beat a dead horse.  But the dream team issue that Mr. Post

10  raised was simply an idea that Mr. Klempf had that he shared

11  with a former employee and he shared with a couple of other egg

12  producers, which is documented in the documents that are

13  produced.

14             It was, in fact, a dream.  It never went anywhere.

15  It had very, very limited exposure.  It was simply an idea that

16  he had about what might occur in the future.

17             It has -- and it did not include Cal-Maine.  It did

18  not reference acquisition of stock of -- of the Klempf trust.

19  As a matter of fact, Cal-Maine was specifically excluded from

20  any possibility of a dream team.

21             So to -- to put all the eggs in one basket on the

22  dream team as somehow significant we think is -- is fallacious,

23  number one.

24             And, again, without being repetitive, the

25  counterclaim is replete with all sorts of allegations about

1    "embark on a systematic scheme, exploit at his leverage,

2    strategically maneuvered, completed the maneuvers necessary."

3            What's the evidentiary basis for that?  And certainly

4    you can't say, "Well, we don't know, but once we get the

5    documents we'll know."

6            That's essentially the position they're taking.  And

7    we don't think the depositions should be delayed so that they

8    can educate themselves on what they should have known when they

9    filed the counterclaim.

10           THE COURT:  All right.  Mr. Cunningham, I think you

11   were -- you -- Cal-Maine was supposed to do a little homework

12   since the last hearing, and then, of course, you heard what

13   Mr. Post suggested.  So I'll hear from you.

14           MR. CUNNINGHAM:  Thank you, Judge.  And we were

15   supposed to do some homework.  And like good students, we

16   completed our task.

17           I can report to the Court that I've confirmed with

18   the head of IT at Cal-Maine that Cal-Maine has not had -- we

19   have never had access to the DixieEgg.com domain, that no

20   employees migrated their e-mail accounts with the DixieEgg.com

21   domain to Cal-Maine in any way.

22           It is possible that employees forwarded individual

23   e-mails from their DixieEgg.com accounts to Cal-Maine.  But we

24   would have no way of knowing that without doing a full-blown

25   review of each individual's accounts.

1    So the main question that you were interested in is,

2  you know, did we migrate any of those e-mail material, this ESI

3  from the DixieEgg.com domain.  And the answer is no.

4         THE COURT:  All right.

5         MR. CUNNINGHAM:  And, Judge, I --

6         THE COURT:  Go ahead.

7         MR. CUNNINGHAM:  I was just going to move on to the

8  second issue that Mr. Post raised, which were, as I understood

9  it, you know, two different requests or alternative requests,

10  one that Cal-Maine begin a production of ESI or documents along

11  the same deadlines for these proposed for Foodonics, or

12  alternatively that Cal-Maine be ordered to disclose information

13  about the source of location and volume of data that may be

14  responsive to the subpoena.

15         And with respect to that issue, Judge, there is no

16  motion to compel pending.  And so there's no basis for ordering

17  anything at this point.

18         We have properly and timely asserted detailed

19  objections to each of their requests.  We've been working very

20  hard with the parties in this litigation to help facilitate

21  their discovery efforts.

22         But, again, Cal-Maine is not a party to this process

23  and is now kind of getting caught up in this whole set of

24  discovery proceedings, with this being the second status

25  conference that we are attending.

1        And when I start, you know, hearing about Foodonics

2   identifying 62,000 documents and whittling that number down

3   from over 300,000, (unintelligible) and clustering, predictive

4   coding, I mean, that -- that is the type of ESI discovery that

5   would be a significant financial burden and cost to Cal-Maine.

6        And it's the very reason why we asserted objections

7   and we believe it's an expense that -- that Mr. Post believes

8   that he needs to move the case forward, is seeking that

9   information now, before he even has an opportunity to know

10  whether he even needs those documents based on a future

11  production by Foodonics, that he be directed to file an

12  appropriate motion and that we will file a timely response, so

13  that each of the individual objections and requests that have

14  been made part of the subpoena can be addressed, you know,

15  individually by the Court and not be kind of wrapped up in this

16  much broader fight between the parties.

17       You know, Cal-Maine, we just want to emphasize, is

18  not a party to this proceeding, and has no financial interest

19  whatsoever in the outcome of this litigation, and just think

20  it's unfair for us to continue to kind of pull Cal-Maine into

21  -- into the process.

22       THE COURT:  Well, let me ask both you and Mr. Post

23  this question, because I am concerned about duplicative or

24  duplicitous production.

25       Are there -- in terms of the subpoena, are there, in

1   your view -- and I'm asking Mr. Post and Mr. Cunningham --

2   documents that will not be duplicitous, in other words,

3   documents that -- that Mr. Post is seeking that Cal-Maine and

4   most likely only Cal-Maine will have?

5           Because if that's the case, then I think that those

6   should be produced.  And if they -- and if you've been served a

7   subpoena and the subpoena requires production, then -- then --

8   then absent you filing a motion to quash the subpoena, then --

9   then I think it should be produced.

10          I understand the -- the -- the concern about

11  duplicating the discovery that -- that Foodonics is doing, and

12  the burden that that could be, and it might be unnecessary in

13  the end.

14          So -- so I'm very sympathetic to your argument there.

15  But if there are documents that Cal-Maine has that will not be

16  duplicative -- or duplicitous of documents that Foodonics was

17  producing, then I would -- I would think that those need to be

18  produced, because it's not necessarily a -- an all or none.

19          I know you were trying -- you-all were trying to work

20  something out where there was an agreement about what would be

21  produced, and then there wouldn't be any additional requests,

22  or whatever it was.  I read it before the last hearing.

23          So, Mr. Post, let me start with you.  Are there -- in

24  terms of the subpoena that you served on Cal-Maine, are there

25  portions of it that -- that seek documents or ESI that

1    Cal-Maine and only Cal-Maine would have?

2         MR. POST:  Yes, Your Honor.  I think there's three --

3    at least three buckets.  One is as set forth in

4    Mr. Cunningham's e-mail of May 23rd to me.  He offered to

5    produce such documents if I agreed to drop the rest of my

6    request.

7         So I think, based on this e-mail, that he is

8    admitting there would be some documents that would obviously

9    not be duplicative.  And common sense tells you that that's the

10   case as well.

11        Because certainly they were -- they were

12   communicating with people other than Cal-Maine -- or, excuse

13   me, other than Foodonics, about the Cal-Maine transaction, not

14   the least of which includes board of directors minutes and --

15   and other communications they might have had with persons of --

16   non-privileged communications regarding the transaction.

17        And as we just heard, apparently Foodonics cannot

18   produce all of these accounts from the Dixie Egg world domains.

19   And so presumably a lot, if -- a large -- I would imagine a

20   large majority of those communications on those exchanges went

21   to the -- went to Cal-Maine for -- not just the migration of

22   those accounts, but actual e-mails in -- in the Cal-Maine

23   system from Foodonics employees on the Dixie Egg domain.

24        So -- so I'm sure there is -- if they did a proper

25   ESI search, that they would come up with certainly the -- in my

1  view, a significant number of documents that would not -- that

2  would be -- would not qualify as duplicative of what we may or

3  may not get through Foodonics.

4         And I would also add, Your Honor, that there is some

5  law to the effect that -- that even if it was duplicative, it

6  still should be produced.  But we were trying to make this as

7  easy and as inexpensive as possible for all the parties.

8         And I understand that there are hash values that we

9  can -- once we get documents from ESI from Foodonics, we can

10 share with Cal-Maine and they can run those hash values against

11 whatever production -- or collection they've pulled together

12 and use that to eliminate duplicates.

13        THE COURT:  All right.  Mr. Cunningham?

14        MR. CUNNINGHAM:  Yeah.  So, Judge, this kind of

15 highlights the absurdity of some of these subpoena requests and

16 why I really think it's an issue that needs to be part of a

17 motion -- motion practice to specifically address this that I

18 think Rule 25 contemplates.

19        There are -- if you look at, say, just DixieEgg.com

20 e-mails that may have gone back and forth between Cal-Maine and

21 Foodonics over, you know, this lengthy period of time that

22 constitutes the relevant time period, you're looking at

23 probably thousands, if not tens of thousands, if not more,

24 documents.

25        Cal-Maine was Foodonics's largest customer for years

 1   and years.  I mean, they're transacting business on a daily

 2   basis using, you know, this domain.

 3          So it makes no sense and will result in no

 4   information of any relevance to this proceeding for us to just

 5   start blindly looking for DixieEgg.com e-mails.

 6          The other types of documents that he described,

 7   mainly internal documents, related to Cal-Main's own internal

 8   analysis of, you know, this transaction, I mean -- you know,

 9   how each transaction, how -- whether we wanted to go forward

10   with a transaction.

11          All that information, again, has no relevance to the

12   dispute between Foodonics and the Trust.  That is between those

13   two.  And how -- how Cal-Maine viewed these issues internally

14   isn't going to shed any light on whether they were some kind

15   of, you know, fraud by omission or any other misconduct on the

16   part of Foodonics or Mr. Klempf.  It only will shed light on

17   our internal workings with respect to the transaction.

18          So anything we have is, again, either going to be

19   totally non-responsive, non-relevant to the -- this particular

20   lawsuit, or it's going to, you know, duplicate what is already

21   out there between Foodonics and -- and the Trust, to the

22   extent -- again, if they come back and say, "Look, that -- you

23   know, we couldn't find DixieEgg.com -- or domain e-mails, and

24   we would like this kind of narrow set of e-mails with respect

25   to these custodians, because we think these custodians have X

1  information that's relevant to our fraud by omission claim,"

2  you know, that I think is -- there should be the beginning of

3  discussion, not any, kind of, wild goose chase into our

4  internal, you know, business, which is, again, you know, highly

5  confidential.

6          I mean, this is an acquisition.  How we go about that

7  acquisition, our views of the acquisition, why we were doing

8  it, why we weren't doing it, is, you know, very, very sensitive

9  to -- to Cal-Maine.  At the end of the day, it really, again,

10 does not shed any light on any qualified omissions.

11         THE COURT:  All right.  Well, I -- I think that --

12 and I'm going to -- we're going to get to the -- the

13 third-party subpoenas here, the non-parties -- excuse me,

14 non-party subpoenas here in a minute and the motion -- omnibus

15 motion to quash.

16         But, I mean, Cal-Maine was brought into this, at

17 least in part, because of the whole -- the whole issue

18 regarding the e-mail migration.

19         And if -- if Cal-Maine doesn't want to be part of

20 this anymore or -- or doesn't want to be part of this at all,

21 then I think that Cal-Maine is going to have to file a motion

22 to quash the subpoena, and -- and then that will be -- that

23 issue will be dealt with by the Court in a more

24 compartmentalized way.

25         Because I want to -- I want to try to -- I want to

1    try to get the Cal-Maine issue or issues somewhat separated so

2    they're not bleeding over into the -- the aspect of the case

3    that actually involves the parties.

4            And so I think -- I think the appropriate course of

5    action will be for Cal-Maine to file a motion to quash the

6    subpoena, because I -- I don't want to hear from -- really,

7    from -- from the Counter Plaintiffs.  I don't -- I really don't

8    think it -- that they should be in a position to -- having to

9    file a motion to compel at this point.

10           You know what -- Mr. Cunningham, you know what

11   involvement, if any, you think Cal-Maine should have in this.

12   And -- and I think the appropriate action would be for you to

13   file a motion to quash, if you and Mr. Post and Mr. Dix cannot

14   work this out.

15           And so in a few minutes, I'll just give you a

16   deadline to file the motion and a deadline for the response.

17   And the Court will just resolve that -- basically separately

18   from the -- the Foodonics situation, to the extent it can.

19           And I --

20           MR. CUNNINGHAM:  Thank you, Judge.  I think that

21   makes a lot of sense.

22           THE COURT:  And I think, really, in terms of the

23   non-party subpoenas and the omnibus motion to quash those -- I

24   mean, I've taken a -- I've taken a pretty hard look at it.  And

25   I'm ready to rule on the motion, unless anybody has anything

 1   else to say about it.

 2          And I've already heard, really, from both of you, to

 3   some degree, on it last time and this time.  So -- and it's

 4   really not any type of a brilliant ruling, believe me.  It's --

 5   I'm trying to be practical about all of this.

 6          So -- so, anyway, my intention -- first of all, it's

 7   a little bit of -- I don't want to say it's an odd motion, but

 8   I haven't seen it too often when a party and non-parties file a

 9   motion together, because -- because the motion to quash under

10   Rule 35 is generally what you see the non-parties file.

11          And then, of course, the parties file a motion for

12   protective order, that is, unless -- unless a third-party

13   subpoena affects the rights of a party, and then you see a

14   motion to quash a third-party subpoena.

15          But in terms of every -- of the non-parties and

16   the -- parties teaming up in one motion, it's a bit of a

17   hybrid.

18          But I -- I really do think in reviewing the -- the --

19   the subpoenas that -- that the appropriate way to do this --

20   and what I'm inclined to do is grant the -- grant the motion to

21   quash, but with leave for the -- for the Counter Plaintiffs to

22   reissue the subpoenas, with a little guidance from the Court at

23   this point.

24          I think -- and I -- I was hoping there was going to

25   have been a greater production at this point, so that there

1    could be a re-evaluation of what might be duplicative.

2           And I know that's not necessarily a bar to -- to --

3    you know, to requiring -- I said Rule 35.  I meant Rule 45, in

4    terms of the motion to quash.

5           But at the same time, there's -- it's going to cost a

6    lot of money here to litigate this.  So to the extent the Court

7    can keep an eye on it, I'd like to.

8           And then I -- I do think that the -- that the

9    requests need to be narrowed as to the non-parties to a degree.

10   I think they -- some of the requests need to be more specific

11   with regard to subject matter.

12          And I think the subpoenas need to be tailored to the

13   individuals, rather than basically the same request to all of

14   the individuals, because some of those individuals just -- just

15   won't have what is -- what is being requested.

16          And I think those are two of the areas -- or at least

17   the -- the subject matter area and the request as to each

18   non-party were -- were objections that were raised in the

19   motion to quash.

20          And then there was an -- an issue about the time and

21   the time period.  I'm inclined at this point to believe that

22   the -- that the time period that the Counter Plaintiffs were

23   traveling on, that information related to that is relevant.

24          So I'm -- I'm not going to -- to, at least at this

25   point, look too favorably on -- on a -- on a -- on an objection

1    to the subpoenas because they're too broad in terms of time.

2          But in terms of the subject matter as to requests and

3    as to specific recipients of the subpoenas, I think that those

4    can be more -- can be tailored more narrowly to -- to the

5    individuals from whom the Counter Plaintiffs are seeking

6    information and evidence.

7          And I'm thinking that if you-all talk about this

8    some, too, and discuss this some, that -- that you might be

9    able to -- to narrow those subpoena requests.

10         And at this point, even though -- you know, and you

11   read cases on this -- and, of course, there aren't too many

12   cases that are binding in these areas, because -- because these

13   things have to be case specific.

14         But my -- my -- a good friend and former colleague,

15   Judge Morris, in 2003, in a review of case law, noted in -- in

16   *C-y-t-o-d-y-n-e Technologies against Biogenic Technologies* --

17   this was at 2:16-FRD-533, that -- and it was a 2003 case, that

18   the limited case law in this area, talking about -- talking

19   about non-parties in relation to Rule 26(b), reveals a

20   case-specific balancing test, wherein the Court must weigh

21   factors such as relevance, the need of the party for the

22   documents, the breadth of the document request, and the time

23   period covered by the request against the burden imposed on the

24   person ordered to produce the desired information.

25         And if a single subpoena as broad as these are -- are

1   issued to all these non-parties, it's hard to make that

2   case-by-case analysis that Judge Morris suggested and that --

3   that I agree with.

4            So I was hoping, though, there would be more

5   discovery having been provided.  So I'm reluctant to put any

6   kind of a time limit on when you, Mr. Post and Mr. Dix,

7   might -- might reissue your subpoenas.

8            I was going to suggest that you do it within two

9   weeks.  But you may want to wait some time -- of course, this

10  leads us right into our next issue, the scheduling.

11           But you may want to -- to see what progress you make

12  with the other documents.  But -- but you can reissue those as

13  soon as you address some of the issues -- or the issues raised

14  by the Court with regard to the subpoenas.  And then at this

15  point, I would -- I would order that the non-parties comply

16  with the subpoenas within 45 days.

17           That's right in the middle of the 30 and the 60 that

18  was requested.  So I don't know any better way than to just

19  split it in half at this point and see where we go.

20           MR. WELLS:  Your Honor, I'm certainly cognizant of

21  the Court's position at this point as to the date range for

22  this discovery from 2008 through the present.

23           We understand that.  We certainly will comply with

24  that.  But we'd like the Court to be aware of our continuing

25  objection to that broad date range.

1          THE COURT:  Yes.  I think that was the first

2    objection I heard a couple of weeks ago.  And it's the last one

3    I'm hearing today.

4          But, no, I appreciate it.  And I understand where

5    you're coming from on it.  I mean, you -- I think you started

6    today with that, in terms of the tax returns that you have --

7    you've produced and that -- and they bookend the two

8    transactions that are at issue.  But -- but I also understand

9    the Counter Plaintiffs' position, at least at this point.

10         I'm convinced that it's -- this information is

11   relevant, as that is defined -- as that term is defined, and

12   has now been redefined and rediscussed and all of that.

13         But I'm trying to look at practical solutions here

14   and trying to move this forward.  And I think that's the best

15   way to do it at this point.

16         Now, let's talk -- let's talk about timing.  The only

17   thing I wanted to do -- because I looked at your dates.  And

18   you-all have set out -- you know, you've put the right amount

19   of time between the filing of certain things and the setting of

20   the trial and all of that, so you -- you've -- you've done

21   that.

22         I just want to -- to try to make sure -- and I know

23   it's almost impossible, so I almost feel foolish asking this.

24   But are you pretty confident in that schedule?

25         In other words -- I know you don't want this to go on

1  forever, but -- but I think what Judge Corrigan would like --

2  of course, I'd like the discovery to end tomorrow and then I'd

3  be done, and then it would -- this would be his problem, but --

4  but I also -- you know, and he also wants to make sure that

5  there -- there is sufficient time and we're not -- you know,

6  we're not starting and then having to restart again.

7         And maybe -- maybe we -- maybe you would rather just

8  go with these dates that you have, and then, you know, if

9  something comes up down the road, you'll have to -- have to

10 address it then.

11        What do you think, Mr. Post?

12        MR. POST:  Well, Your Honor, we -- this -- we served

13 our draft complaint on the -- on Mr. Jacques Klempf and

14 Foodonics in July of 2017.  And they filed this case in

15 September 2017.  We filed our counterclaim in January.  And we

16 served all our discovery in January on Foodonics and Cal-Maine.

17 And just -- just this month we're getting some documents.

18        So if -- if they -- if we don't get more effective

19 and -- response from them, according to the rules and all the

20 things we know should be done in discovery like this, then

21 we -- we might -- we might not -- this amount of time might not

22 be signif- -- sufficient.

23        But if -- if they turn -- if they turn the corner and

24 they start producing stuff as they should, then perhaps -- then

25 I think this -- these time lines would work, and -- but, yes, I

1    mean -- and we want to get to a trial as soon as possible, but

2    we can't get to a trial without documents and depositions.

3           THE COURT:  So do I interpret that as that you're

4    cautiously optimistic and we should go ahead with the schedule

5    you've proposed, but you're giving the Court a heads-up that

6    you may move later to extend the deadlines again?

7           MR. POST:  I --

8           THE COURT:  And that's fine.

9           MR. POST:  Yes, Your Honor.  I mean, if -- you know,

10   if -- if we get more of the same, then these deadlines aren't

11   going to work either.

12          THE COURT:  Okay.  All right.

13          MR. WELLS:  Your Honor, I might want to address the

14   matter in which Mr. Post responded to the Court's inquiry.  He

15   asked us if we would agree to it, and we agreed to it.  So

16   we're fine with it.

17          THE COURT:  All right.  Well, then I'll -- I'll enter

18   an order, then, granting the motion, and basically adopting

19   the -- the -- the dates that you have here, and then fill in

20   the final pretrial conference date.

21          Then the last -- the last issue, I think, that --

22   that I -- that I think I need to address at this point is

23   that -- that I -- I agree with Mr. Post that -- that the

24   depositions of the parties should not go forward at this point.

25          Now, whether -- whether it's a complete production,

1   or whatever it is, I just -- I just think that, given the --

2   the type of case that this is and the allegations that have

3   been made -- not to turn what you said on you, Mr. Wells, but I

4   think that -- at this point that -- that additional discovery

5   is warranted before the deposition of the parties.

6          And what I plan to do is set a status conference for

7   next month, but I want to see where things are, and then we can

8   revisit that issue and see -- see where we are, because I --

9   you know, this -- this delay -- and I'm not casting any stones

10  at anyone at this point and blaming anyone, but the discovery

11  has got to start moving in the case.

12         And it -- I feel like -- I feel like we've made

13  progress since last time.  I don't know if you-all do.  But, of

14  course, I want to look at the glass half full, not half empty.

15  Otherwise I'd be discouraged by this, and a lot of things.

16         So -- so let's -- we'll revisit that issue.  But at

17  this point, I think that a delay of the -- of the parties'

18  depositions is appropriate.

19         So what are you-all looking like in July?  Are you on

20  vacation maybe or...

21         MR. WELLS:  My wife hasn't told me yet, Judge.

22         THE COURT:  What's that?

23         MR. WELLS:  My wife hasn't told me yet.

24         THE COURT:  Well --

25         MR. WELLS:  Right now I'm fairly free in July.

1          THE COURT:  I was just thinking -- well -- and it

2    could be early August, too, because it's already the end of --

3    end of July.  So it's up to you-all.  And I'd like to make sure

4    something's moving, not just, you know, come back for...

5          MR. POST:  Your Honor, I'm generally open the entire

6    last week of July and the first week of August.

7          MR. WELLS:  I'm fine with that.

8          THE COURT:  You're fine with that?

9          MR. WELL:  We'll make it happen.

10          THE COURT:  Mr. Cunningham, I'm not going to ask you,

11    because I'm hoping you won't have to attend.

12          MR. CUNNINGHAM:  Thank you, Judge.

13          THE COURT:  And, by the way, I don't -- should we

14    set a -- should we set a deadline for you filing your motion to

15    quash?

16          MR. CUNNINGHAM:  I think that makes sense, Judge.

17          THE COURT:  Okay.  Well, let's see.  Today is the

18    27th of June.  How about -- is two weeks enough time?

19          MR. CUNNINGHAM:  Judge, if you could give me three

20    weeks here, only because I'm on vacation next week, and then I

21    have Fifth Circuit argument the following week and I'll need to

22    do that (inaudible) and put the motion together.

23          THE COURT:  All right.  So why don't we just do --

24    why don't we make it -- do you want to make it July 20th?

25          MR. CUNNINGHAM:  Yeah.  That's what I'm thinking.

1    THE COURT:  And then, Mr. Post, do you want two

2  weeks, three weeks, to respond?  What would you like?

3    MR. POST:  If you'd grant me three weeks, I'll try to

4  file it before then.

5    THE COURT:  All right.  Did we just say the 20th?

6    COURTROOM DEPUTY:  Yes, sir.

7    THE COURT:  So why don't we make it August 10th.

8    And I would hope to some degree, if there are -- if

9  there are documents, Mr. Cunningham, that -- that -- that only

10  Cal-Maine would have, and that -- and that -- that after a

11  discussion with Mr. Post you believe are relevant, then they

12  wouldn't have to be addressed in your motion, but I'll let

13  you-all handle that.

14    You made a lot of progress in -- the four of you in

15  discussing it, so hopefully -- hopefully you will again.

16    All right.  Let's now look at the calendar.

17    Mr. Hancock, how are you looking the end of July and

18  early August?

19    MR. HANCOCK:  That's fine, Your Honor.  I'll make

20  myself available to the Court.

21    THE COURT:  All right.  Thank you.  I didn't mean to

22  leave you out before.

23    MR. HANCOCK:  That's okay.  Nothing personal.

24    THE COURT:  All right.  Let's see now.

25    What is August -- is it August 8th?

1    Is August 8th okay with everyone?

2    MR. POST:  Yes, Your Honor.

3    MR. WELLS:  Yes, sir.

4    THE COURT:  All right.  Mr. Hancock, that's good for

5    you?

6    MR. HANCOCK:  Yes, sir.

7    THE COURT:  Should we just do it at 2 o'clock?

8    MR. POST:  Yes, sir.

9    THE COURT:  All right.

10   MR. HANCOCK:  Thank you.

11   THE COURT:  All right.  Now, I suppose I'm going to

12   enter some sort of order capturing this -- this in some way, in

13   some shape or form.

14   If nothing else, it gives me a little road map to

15   what we need to do next time and what we need to look at.  But

16   I appreciate the efforts you-all are making.

17   I think that -- I think that -- that the real -- the

18   key here is going to be those -- those -- the $90,000 tab and

19   how maybe you can whittle that down by a narrowing of those

20   documents and seeing if -- if you can do that.

21   Because that seems to -- might break the dam here in

22   terms of getting -- getting things really rolling, if -- if

23   that can be produced.

24   All right.  Mr. Post, anything else?

25   MR. POST:  No, sir.  Thank you very much.

1          THE COURT:  Mr. Wells, anything?

2          MR. WELLS:  No, sir.  Thank you.

3          THE COURT:  Mr. Dix, anything?

4          MR. DIX:  No, Your Honor.

5          THE COURT:  Mr. Cunningham, anything else, sir?

6          MR. CUNNINGHAM:  No, sir.  Thank you so much for your

7   time.

8          THE COURT:  Mr. Hancock?

9          MR. HANCOCK:  No, Your Honor.

10          THE COURT:  All right.  Then we're in recess.

11          COURT SECURITY OFFICER:  All rise.

12      (The digitally recorded proceedings concluded at

13   3:16 p.m.)

14                              - - -

**<u>CERTIFICATE</u>**

UNITED STATES DISTRICT COURT      )
                                  )
MIDDLE DISTRICT OF FLORIDA        )


      I hereby certify that the foregoing transcript is a true and correct computer-aided transcription from the official electronic sound recording of the proceedings in the above-entitled matter.


      DATED this 20th day of November, 2018.



      s/Shannon M. Bishop

      Shannon M. Bishop, RDR, CRR, CRC

**TAB 27**

**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

FOODONICS INTERNATIONAL, INC.,
a Florida corporation,

Plaintiff,

vs.                                                    Case No.  3:17-cv-1054-J-32JRK

DINA KLEMPF SROCHI,
as Trustee of the Laura Jean Klempf
Revocable Trust, a Florida Trust,

Defendant.

_____

DINA KLEMPF SROCHI,
as Trustee of the Laura Jean Klempf
Revocable Trust, a Florida Trust, et al.,

Counterclaim Plaintiffs,

vs.

FOODONICS INTERNATIONAL, INC.,
a Florida corporation, et al.,

Counterclaim Defendants.
_____/

<u>O R D E R</u>

This cause came before the Court on June 27, 2018 for a discovery status hearing that included the parties and non-party Cal-Maine Foods, Inc. ("Cal-Maine"). During the hearing, the undersigned also heard argument regarding and ruled on the Omnibus Motion to Quash Subpoena and/or for Protective Order and Other Relief (Doc. No. 30), filed March 22, 2018, to which the Trust and trustees responded in opposition on April 12, 2018 (Doc. No. 34). As stated on the record during the hearing, it is

**ORDERED:**

1.      The Omnibus Motion to Quash Subpoena and/or for Protective Order and Other Relief (Doc. No. 30) is **GRANTED** to the extent that the subpoenas, as issued, are quashed.  However, the Trust and trustees have leave to re-issue the subpoenas and may do so as soon as desired in light of the current status of discovery.  In re-issuing, the Trust and trustees shall be mindful that the requests need to be more specific regarding the subject matter and should be tailored to the individuals being served.  The Trust, trustees, and non-parties shall work together in determining the universe of responsive documents, bearing in mind that the Court likely will not look favorably on objections regarding the requested time period.  The non-parties shall respond to the subpoenas within **forty-five (45) days** of service.

2.      If the Trust and trustees are unable to resolve their dispute(s) with Cal-Maine about the subpoenas issued to Cal-Maine and/or its CEO, Cal-Maine shall file a motion to quash (or for whatever relief it deems appropriate) no later than **July 20, 2018**.  The Trust and trustees shall respond in opposition to any motion by **August 10, 2018**.

3.      The undersigned will hold another discovery status hearing on **Wednesday, August 8, 2018 at 2:00 p.m.** in Courtroom 5D, Fifth Floor.  Counsel for Cal-Maine is not required to appear or otherwise participate. For now, given the status of discovery, party depositions shall not go forward. This ruling may be revisited during the next status hearing.

4.     The Unopposed Motion to Extend Case Management Deadlines (Doc. No. 46),

filed June 15, 2018, is **GRANTED**.  A separate Amended Case Management and Scheduling

Order will enter.

**DONE AND ORDERED** at Jacksonville, Florida on July 2, 2018.

_James R. Klindt_
**JAMES R. KLINDT**
United States Magistrate Judge

kaw
Copies to:
Counsel of Record

Counsel for Cal-Maine Foods, Inc. (via email)
    Daniel R. Russell, Esq. (drussell@joneswalker.com)
    Mark A. Cunningham, Esq. (mcunningham@joneswalker.com)

**TAB 28**

**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

FOODONICS INTERNATIONAL, INC.,
a Florida corporation,

                         Plaintiff,

vs.                                              Case No.  3:17-cv-1054-J-32JRK

DINA KLEMPF SROCHI,
as Trustee of the Laura Jean Klempf
Revocable Trust, a Florida Trust,

                         Defendant.
_____

DINA KLEMPF SROCHI,
as Trustee of the Laura Jean Klempf
Revocable Trust, a Florida Trust, et al.,

                         Counterclaim Plaintiffs,

vs.

FOODONICS INTERNATIONAL, INC.,
a Florida corporation, et al.,

                         Counterclaim Defendants.
_____/

## AMENDED CASE MANAGEMENT AND SCHEDULING ORDER

The Court, having granted the Unopposed Motion to Extend Case Management

Deadlines (Doc. Nos. 46, 49), now imposes the following deadlines and settings:

| | | |
|---|---|---|
| Motions to Add Parties or to Amend Pleadings | | December 31, 2018 |
| Disclosure of Expert Reports | Initial:<br>Rebuttal: | January 28, 2019<br>March 11, 2019 |
| Discovery Deadline | | April 30, 2019 |

| Dispositive and Daubert Motions (Responsedue 21 days after service unless otherwise ordered) | | May 30, 2019 |
|---|---|---|
| All Other Motions Including Motions In Limine | | October 17, 2019 |
| Joint Final Pretrial Statement | | October 17, 2019 |
| Final Pretrial Conference | Date:<br>Time:<br>Judge: | October 23, 2019<br>10:00 a.m.<br>Hon. Timothy J. Corrigan |
| Trial | Term beginning:<br>Time:<br>Judge:<br>Courtroom:<br>Type/Estimated Length: | November 4, 2019<br>9:00 a.m.<br>Hon. Timothy J. Corrigan<br>10D<br>Jury/10 days |

In addition to the above deadlines and settings, the parties shall be governed by all other terms set forth in the Case Management and Scheduling Order (Doc. No. 17), entered February 2, 2018.

**DONE AND ORDERED** at Jacksonville, Florida on July 3, 2018.

*James R. Klindt*

**JAMES R. KLINDT**
United States Magistrate Judge

kaw
Copies to:
Courtroom Deputy to Hon. Timothy J. Corrigan
Counsel of Record

-2-

**TAB 29**

IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

FOODONICS INTERNATIONAL,                Jacksonville, Florida
INC., a Florida corporation,
                                        Case No. 3:17-cv-1054-J-32JRK
        Plaintiff,

                                        August 8, 2018
vs.

                                        2:06 p.m.
DINA KLEMPF SROCHI, as
Trustee of the Laura Jean               Courtroom No. 5D
Klempf Revocable Trust, a
Florida Trust,

        Defendant.
_____


DIGITALLY RECORDED DISCOVERY STATUS HEARING
BEFORE THE HONORABLE JAMES R. KLINDT
UNITED STATES MAGISTRATE JUDGE


COURT REPORTER:

        Shannon M. Bishop, RDR, CRR, CRC
        221 North Hogan Street, #150
        Jacksonville, Florida  32202
        Telephone:  (904)549-1307
        dsmabishop@yahoo.com

    (Proceedings reported by mechanical stenography;
transcript produced by computer.)

A P P E A R A N C E S

PLAINTIFF'S COUNSEL:

        **SAMUEL GRIER WELLS, ESQ.**
        GrayRobinson, PA
        50 North Laura Street, Suite 1100
        Jacksonville, FL  32202

DEFENSE COUNSEL:

        **JAMES H. POST, ESQ.**
        **R. CHRISTOPHER DIX, ESQ.**
        Smith, Hulsey & Busey
        One Independent Drive
        Suite 3300
        Jacksonville, FL  32202-3315

ALSO PRESENT:

        David Hancock (via telephone)
        Kevin Jacques Klempf

P R O C E E D I N G S

August 8, 2018                                      2:06 p.m.

- - -

COURT SECURITY OFFICER:  This Honorable Court is now in session.  The Honorable James R. Klindt is now presiding.

Please be seated, everyone.

THE COURT:  All right.  Good afternoon.

MR. WELLS:  Good afternoon, Your Honor.

MR. POST:  Good afternoon.

THE COURT:  All right.  We're set for a discovery status hearing in *Foodonics International, Inc., versus Dina Klempf Srochi, as Trustee of the Laura Jean Klempf Revocable Trust*, Defendant, and then the *Dina Klempf Srochi as Trustee of the Laura Jean Revocable Trust*, Counter Plaintiffs, *against Foodonics International*, Counter Defendants.  It's case 3:17-cv-1054-J-32JRK.

And if you'd announce your appearances, please, first on behalf of Foodonics.

MR. WELLS:  Your Honor, Grier Wells with GrayRobinson.  And Mr. Hancock is on the phone.  And Mr. Klempf is also here as an observer.

THE COURT:  All right.  Thank you.

Mr. Hancock, can you hear us okay?

MR. HANCOCK:  Yes, sir.

THE COURT:  All right.  Thank you.

1          Mr. Post?

2          MR. POST:  May it please the Court, Your Honor?

3          Jim Post and Chris Dix with the law firm of Smith

4   Hulsey and Busey on behalf of the Jean Klempf Trust.

5          THE COURT:  All right.  Thank you.

6          All right.  Well, you-all tell me where -- where is

7   the best place to start?

8          Mr. Post?

9          MR. POST:  I would, with your permission, like to

10  advise the Court of what -- from our perspective where -- what

11  has been done pursuant to your request from that -- from the

12  last time we had a hearing to today.

13         THE COURT:  All right.  Is that -- is that all right

14  with you, Mr. Wells?

15         MR. WELLS:  We can start there, Your Honor.  That's

16  fine.

17         THE COURT:  Okay.  Thank you.

18         MR. POST:  I'll be brief, Your Honor.

19         In a nutshell, at the last status conference held on

20  June 27th, this Court directed the Foodonics parties -- and by

21  that I mean Foodonics, Jacques Klempf, and the GrayRobinson law

22  firm, to commence as soon as possible ESI production and to

23  provide a status report to the Court today as to where they

24  are.

25         This Court also directed Cal-Maine to file objections

1    to the subpoena that had been served on it and Dolph Baker by a

2    certain date.  And -- July 20th.

3          And prior to that date, our firm and the Cal-Maine

4    attorneys entered into a stipulation, which was a preliminary

5    resolution of their motion to -- for protective order and to

6    compel, which was by an order by this Court.

7          And this Court directed GrayRobinson to investigate

8    further and disclose which former Foodonics employees had

9    Dixie Egg e-mail -- Dixie Egg e-mail accounts, because they had

10   not yet been located.

11         And, lastly, this Court ruled that the depositions

12   of -- of the parties -- of the Trust should not be taken until

13   Foodonics completed its production of documents.

14         Your Honor, other than the Cal-Maine stipulation,

15   there has been no production by the Foodonics parties.  And the

16   only conversation we had with the Foodonics parties and their

17   counsel was a telephone conference on July 31st, which -- the

18   result of which did not give us any indication as to when, if

19   at all, the ESI production will even start, much less be

20   completed.

21         Your Honor, from our perspective, this status

22   conference needs to address these issues.  And from our

23   perspective, we ask the Court -- we would be asking the Court

24   to require production of the ESI to be completed by the

25   Foodonics parties six weeks from now, September 24, 2018, and

1    that that include the production of the GrayRobinson law firm,

2    and to provide the Court with -- for the Court to provide

3    notification to the Foodonics parties today that the Court will

4    consider appropriate sanctions or such other measures necessary

5    to cure the prejudice resulting from the failure to produce,

6    including the possibility of appointing a special master to

7    review the production by ESI or the award of legal expenses or

8    the dismissal of the Foodonics complaint, as the Court sees

9    fit.

10          We also want -- would ask the Court to continue its

11    ruling that no depositions of parties will be taken until

12    Foodonics completes its production.

13          This Court had broad discretion to control the timing

14    of discovery and limit discovery so to avoid cumulation,

15    duplication, harassment, expense, and burdensomeness, and to

16    direct the sequence of discovery for the parties and for

17    witnesses, or for the interest of justice.

18          This case was filed -- we served our discovery

19    requests last January.  Here we are in August.  Foodonics

20    started this action by filing a complaint, asking for a

21    declaratory judgment on our -- our claims, but it hasn't

22    produced any documents.  And we have been prejudiced and will

23    continue to be prejudiced until that -- their production has

24    been completed.

25          So that's our position today, Your Honor.

1          THE COURT:  Mr. Post, I thought -- I thought we had

2   addressed the Dixie Egg domain issue at the last hearing?  And

3   I thought that -- I thought that was resolved or that we had

4   moved on past that?

5          Did I -- did I miss that?

6          MR. POST:  My understanding was -- is there's a --

7   and maybe I'm wrong.  At the last hearing no one could -- the

8   Cal-Maine people said they didn't have control of these Dixie

9   Egg mail accounts.

10          And that's why GrayRobinson was directed to

11   investigate further with the individual former employees who

12   they represent on the subpoenas, to see if they have they the

13   Egg mail accounts in their personal possession, whether it's

14   computers or telephones or whatever.

15          Because apparently we're being told that the Dixie

16   Egg mail accounts were terminated, all the -- except for the

17   one owned by Mr. Klempf, Jacques Klempf.

18          So presumably, we would imagine that -- that the

19   former employee, unless they've disposed of their own ESI, have

20   what's left -- have e-mails left in their personal possession

21   on their personal laptops or phones on those accounts that

22   apparently are not in the possession of Foodonics or Cal-Maine

23   at this time.

24          THE COURT:  I must be confusing, then, the Cal-Maine

25   side of that issue with what you just explained.

1        MR. POST:  Yes, Your Honor.

2        That's all I have, Your Honor.

3        THE COURT:  All right.  Thank you.

4        Mr. Wells?

5        MR. WELLS:  May it please the Court?

6        The Court may be surprised to hear that our view of

7    where we are is actually different from where Mr. Post has

8    related to the Court.

9        While it is certainly true that on behalf of

10   Foodonics or GrayRobinson we have not produced actual ESI

11   documents that are the subject of discovery, a lot of other

12   documents have been produced, tax returns, board minutes, other

13   witnesses have produced documents.

14       But we addressed in painstaking detail the ESI

15   documents at the last hearing, at which time we advised the

16   Court that the initial search of the various devices involved

17   had yielded about 62,000 documents that were consistent with

18   the search terms that the parties had agreed upon, and that the

19   costs to -- at that time, the costs to do a review of those

20   documents for relevancy purposes was going to be in excess of,

21   if I recall correctly, 75- or $80,000.

22       And we requested that either that cost be borne by

23   the party seeking the documents or that we reach some other

24   resolution as to how to address the vast number of documents.

25       THE COURT:  How much did you say?  I missed that.

1      MR. WELLS:  The dollar amount?

2      THE COURT:  Yes.

3      MR. WELLS:  And Mr. Hancock can correct me.  But my

4  recollection is on the 62,000 that it was going to be 75- to

5  $80,000.

6      MR. HANCOCK:  That's correct.

7      MR. WELLS:  We have since, Your Honor -- and based on

8  some discussions with opposing counsel, we have reduced the

9  62,000 documents down to about 48,000, based on a review of

10  both privileged documents and a filtering process that filters

11  out what is sometimes referred to as, quote, junk mail, end

12  quote, things that are clearly not -- not at all relevant to

13  the litigation.

14      So we now have 48,000 documents that are subject to

15  review.  And the cost of that review is approximately $50,000.

16      At the last hearing, we expressed concern about the

17  cost, particularly in light of what we believe are not -- are

18  allegations that simply cannot be supported.

19      And my recollection is -- and it's certainly not in

20  the Court's order -- that the Court directed the parties to try

21  to figure out a way to address the number of documents.

22      We are here today with -- having determined through a

23  fairly exhaustive process of eliminating privileged documents

24  and the junk mail documents to reduce the number to what it is

25  currently.

1          We still think that the search terms -- and I

2   provided a copy of the agreed search terms to the Court, that

3   those could be reduced and, therefore, reduce the number of

4   documents and, therefore, the cost of producing the documents.

5          The quote from special counsel, who would be engaged

6   to do the actual document review -- even at the 48,000 number,

7   would take several weeks for them.  And that's employing four

8   or five attorneys on a daily basis.

9          That process can be started.  But we think it would

10  be much more economical and much more relevant to the

11  litigation if the search terms could be reduced, and,

12  therefore, reduce the number of documents.

13          THE COURT:  Can you tell me which -- I have two

14  notebooks.  I can't tell who's is from -- is this yours, or is

15  the -- is it the white one?

16          MR. WELLS:  Well, the black one is Mr. Post's.  The

17  white one is mine.

18          THE COURT:  All right.  And then which -- and then

19  which -- which -- is it under a tab, the -- the search terms

20  are under 4?

21          MR. WELLS:  The search terms are under tab 4.

22          THE COURT:  Okay.

23          MR. WELLS:  There's also -- there's an e-mail from

24  Mr. Dix to one of my partners and to Mr. Hancock, dated

25  May 22nd, which addresses the search terms, which follows the

1    e-mail.

2          THE COURT:  And -- and you're suggesting that the

3    search terms should be limited.  How have you -- ordinarily how

4    have you gone about that?  In other words, what is your

5    approach to narrowing them?  What's your suggestion?

6          MR. WELLS:  We have not actually made a suggestion,

7    because we've been met with, "We're not willing to reduce the

8    search terms at this point."

9          And let me point to just a couple.  If you look

10   hypothetically at No. 23, on the second page, Transfer and

11   Down, Down is a -- a separate company that was set up by

12   Mr. Klempf subsequent to the sale to Cal-Maine.

13         And we feel very comfortable that there's not going

14   to be anything in that one particular category that would have

15   anything to do with any of the allegations by either side in

16   this litigation.

17         And I could go through and we could find others, but

18   we've been met with, "These are the search terms.  We need to

19   follow the search terms."

20         There are other issues that Mr. Post addressed that

21   we would like to address as well.  But I don't know if the

22   Court wants to address those.

23         THE COURT:  No, no.  Go ahead.  Why don't you go

24   ahead with everything.

25         MR. WELLS:  Okay.  I think it's somewhat

1   disingenuous, Your Honor, that the Court has -- that Mr. Post

2   is complaining that we have not produced documents in the

3   course of this litigation.  We have produced documents.  Other

4   witnesses have produced documents.

5          But we also initiated discovery, Your Honor.  We

6   initiated a request for production in March, prior to the

7   search terms.  And we got a response -- and that's also in the

8   notebook.  We got a timely response in April that they would

9   produce documents within 30 days of an agreement on the search

10  terms.

11         We have received, in response to a request for

12  production, a copy of the Trust and an amendment to the Trust,

13  and a document that purports to appoint Mr. Blackburn as the

14  assistant trustee.

15         We have not gotten any other documents from Mr. Post

16  except for some documents that have been received from other

17  witnesses that we requested copies of.

18         The response to our request for production indicates

19  they would provide responsive documents 30 days after the

20  search terms were agreed upon.  Those were agreed upon on

21  May 22nd.  And we don't have any documents from them.

22         And we understand they're in the same situation we

23  are, Your Honor.  They've got a lot of documents.  They've been

24  through the distillation process.  But they've got a lot of the

25  documents that we don't yet have.

1          We have asked -- as the Court may recall, and as

2    reflected in your order, we asked to take the depositions of

3    Mr. -- for Blackburn and Ms. Srochi and the Court ruled, in

4    June, that we were not able to do that at this time, although

5    it may be revisited during the course of this hearing.

6          Subsequent to the last hearing, we propounded

7    interrogatories to the Defendant/Counter Plaintiff.  They are

8    basically contention interrogatories requesting that they

9    provide facts known in support of various allegations in the

10   counterclaim.

11         Those are standard interrogatories that we -- were

12   met with an objection to all of them on the basis that the

13   Court's order preventing depositions essentially applies to

14   interrogatories, and that they should not be asked to answer

15   interrogatories at this time.

16         The case law is pretty clear that contention

17   interrogatories such as those be propounded, particularly when

18   you've got a counterclaim such as the one founded here --

19   contention interrogatories are, indeed, appropriate and should

20   be answered.

21         If they don't have the information, they can

22   certainly supplement their answers at a later date.  But we've

23   got interrogatories that have not been answered.

24         We've asked to depose other witnesses in the case,

25   specifically an attorney with Smith, Gambrell & Russell, Steven

1  Brust, Dan Edelman, who is a consultant for the Trust, who was

2  very much involved in the stock redemption back in 2015.  He's

3  a fact witness.  Mr. Brust is a fact witness.

4          And we've been met with, "Well, we don't want those

5  depositions to be taken either, because we consider them to be

6  agents of the Plaintiff."

7          We can't -- we've asked for the deposition of Marc

8  Klempf, who is the brother of Dina Srochi and Jacques Klempf.

9  And he's also deemed to be an agent.  He's also a beneficiary

10  under the Trust.

11          So every deposition that we've asked to take, except

12  for some collateral witnesses, we've been met with a

13  declination to provide dates.

14          So between interrogatories and non-party depositions,

15  we've not been able to move forward either.

16          The Court may note as well from our binder -- we

17  served a subpoena on Smith, Gambrell & Russell for various

18  documents.  And Smith, Gambrell & Russell has filed an

19  objection, because it is their understanding that the parties

20  are not in agreement as to what may be privileged or not.

21          From our understanding, Mr. Brust represented

22  Ms. Srochi for a period of time roughly in the 2008/2009 time

23  frame.  And then in the 2013/2014 time frame, he represented

24  Ms. Klempf, the grantor under the Trust.

25          It is our understanding that he was not representing

1    Ms. Srochi during the period of time he was representing

2    Ms. Klempf.  So the communications with Ms. Srochi during that

3    period of time, we feel, would be relevant.  But we're not able

4    to move forward.

5           THE COURT:  All right.  So just so that I understand

6    this, at this point, in terms of how you see discovery, you

7    believe you -- or you're saying you have provided some

8    discovery, that the ESI is on hold because of a disagreement

9    over the search terms, and then you have the request for

10   production that is outstanding, you have the contention

11   interrogatories that haven't been answered.

12          There are depositions that you believe can be taken,

13   notwithstanding the ESI issues that are present, and then

14   there's the Smith Gambrell subpoena.

15          Does that cover your list of areas, basically?

16          MR. WELLS:  It does, Your Honor.  I'm not as

17   concerned about the subpoena to Smith Gambrell at this point.

18   I think Mr. Brust would probably testify without providing the

19   documents in response to a subpoena.

20          But I think we should be able to move forward on

21   those depositions as -- and particularly the contention

22   interrogatories.

23          If I may -- and I apologize.  The Court asked about

24   the DixieEgg.com.

25          THE COURT:  Yes.

1        MR. WELLS:   That was the subject last hearing.   And

2   there's been some -- some activity, movement, and progress on

3   that.

4        When Cal-Maine acquired Foodonics, basically that

5   Dixie Egg account fell into some sort of a never-never land.

6   Employees continued to use it for -- for minor things.

7        The review platform that the documents that we have

8   acquired from Mr. Klempf's devices, cell phone, laptop, PC,

9   would have all of the DixieEgg.com documents.

10        There are several employees who continue to use that

11   domain site for a short period of time after the acquisition.

12   But that account was essentially terminated before this

13   litigation started.

14        As a result of this litigation, even though we

15   questioned whether -- of course, they're no longer our

16   employees.   We questioned whether we have the authority to go

17   to them to get their devices.

18        But nevertheless, Mr. Klempf has reopened that

19   account, changed the administrator from one of the former

20   employees to himself, and we are in the process of going

21   through and getting the DixieEgg.com e-mails from employees

22   that we know would have used it.   So that's in process.

23        But it was delayed because of the termination account

24   and uncertainty over how to reaccess and get into the archives.

25        THE COURT:   All right.   Thank you.

1          Mr. Post, let me just ask you, before I forget,

2    what -- what is your view of the -- the search terms and the

3    ESI production that is being requested of you?

4          MR. POST:  Your Honor, that goes to the heart of what

5    we wanted to discuss today.  For the details, though, I'd like

6    to defer to my -- Mr. Dix, and -- but I would like to address

7    these other -- what I would call new issues that are being

8    brought up today.

9          THE COURT:  All right.  Well, let's -- let's take

10   them one at a time.  Let's go to the ESI --

11         MR. POST:  Right.

12         THE COURT:  -- because that seems to be first on the

13   list.

14         MR. POST:  Right.

15         THE COURT:  And I'll hear what Mr. Dix has to say.

16         MR. DIX:  Thank you, Your Honor.

17         So there's two separate issues with the search terms.

18   There are the search terms that we have run, we've negotiated,

19   and we've used -- culled down the data that our clients have.

20   And then there are separate search terms that were agreed to

21   that are being used by Foodonics and Mr. Klempf.

22         THE COURT:  Well, it doesn't sound like they've been

23   agreed to.  That sounds like the crux of the problem, on this

24   side.

25         MR. DIX:  And -- so, yes, Your Honor.  So let me

1    drill down on that a little bit.

2             THE COURT:  Okay.

3             MR. DIX:  You know, we served our discovery back in

4    January.  We asked the Court back in March to enter an ESI

5    order.  And the purpose of that -- one of the purposes was to

6    require the designation of ESI liaison.

7             And the idea of that was me and someone from

8    GrayRobinson, other than Mr. Wells -- to get together and talk

9    about how we were going to do this.  And those discussions did,

10   in fact, take place back in April.

11            Different search terms were exchanged by both sets of

12   parties.  We've included the -- the essence of those

13   discussions, the written discussions, in the notebook we

14   provided.

15            It's at tab -- there's a summary on tab 7, Your

16   Honor.  And then the e-mails are at tab A and B.  And it's a

17   little difficult.  Because there are a chain of e-mails and

18   they're in reverse chronological order.  So you almost have to

19   read from the back.

20            But what happened was that -- that the parties

21   agreed -- not just that we were going to talk about search

22   terms.

23            Turning the Court's attention to tab B -- sorry,

24   tab A.  It's the sixth page.

25            THE COURT:  The sixth page, you said?

1      MR. DIX:   The sixth page.   It's the continuation of

2  an e-mail from the previous page from Mr. Santana, who was the

3  eDiscovery liaison that GrayRobinson designated.

4      And he's -- he and Mr. Hancock, who's on the phone,

5  are the primary people that I discussed these terms with.

6      So if you look at the first full paragraph, Your

7  Honor, Mr. Santana proposed that we finalize our respective

8  search terms and then conduct the first run to see what kind of

9  volume of responses we receive.

10      If excessive, we can get together to modify the

11  search terms further in an effort to obtain more reasonable

12  response volumes.

13      We should then each review our respective data for

14  privilege and relevancy prior to production to avoid

15  document levy.

16      So -- and if you look on page 4, that same tab, down

17  at the very bottom, that's my e-mail back to Mr. Santana

18  confirming that we agree with the same process that Mr. Santana

19  proposed, that being that we get together and talk about an

20  initial set of search terms, and then the parties go back and

21  run those search terms on their data.

22      And if it is determined that there's a high number of

23  hits that are non-responsive, we agreed to get back together

24  and to take steps to further reduce those search terms.

25      And then only after we all agreed about the search

1   terms that were going to be run and we're able to narrow down

2   the documents that -- to a reasonable amount, then we were

3   going to go and review the documents, the remaining documents.

4           And so let me just tell you a little bit about what

5   we've done and compare that to what Foodonics has done.  We

6   collected from our clients approximately 250,000 different

7   documents.

8           Using the search terms that we agreed to run with

9   GrayRobinson, we narrowed that collection down to -- it's

10  actually very close to what they ended up with.  We got about

11  64,000.

12          From the 64,000 e-mails, we took a quick peek at

13  those and realized that a lot of them were what Mr. Wells

14  described as -- as junk.  They were e-mails from HoneyBaked Ham

15  and Best Buy and Domino's Pizza.

16          And the reason that you're getting those hits is

17  because the search terms included search terms like "price" and

18  "share".  And price and share are in e-mails from HoneyBaked

19  Ham and Best Buy, along with the e-mails that we really want

20  from this case.

21          So we engaged our eDiscovery experts at KLDiscovery

22  to come up with a junk filter, take the commonly used phrases

23  that come up in these Best Buy and Domino's Pizza and other

24  e-mails -- come up with a way for us to cull those out.  And

25  they did that.

1        And they were able, using the search terms -- and

2   those are in -- we've got our e-mail -- at tab 6, Your Honor,

3   is my e-mail on July 31st.  It's my e-mail describing this

4   process.  And then the successive pages are those search terms

5   that we used.

6        And I think there's close to 90 of them.  And it's

7   just -- phrases that are not in the communications that are

8   going to be relevant to this case.

9        We were able to go, Your Honor, from 64,000 documents

10  down to 16,500.  That's a huge -- huge reduction.  But we

11  didn't just assume that our search terms were correct.  We took

12  a random sample of about 650 of those e-mails that we wanted to

13  cull and we had somebody review each and every one.

14        And when they reviewed each and every one, they

15  confirmed that, in fact, the junk filter was working correctly

16  and were 99 percent confident that our cull of those search

17  terms reduced the volume down to 16,500.

18        So we got down to 16,500.  We have now engaged -- we

19  have a team of eight document review attorneys.  That team of

20  document review attorneys can get through the remaining 16,500

21  e-mails in about a week or two.

22        And they do what's called a first pass review, which

23  is designed to check for relevance, and also for potential

24  privilege.

25        And consistent with the process that we agreed to

1    months ago, back in April, we're going to -- after we get the

2    first pass review done, then our firm is going to conduct the

3    second pass to look at the -- the documents that were reviewed

4    and confirm that the ones that are privileged are indeed

5    privileged.

6              And we have -- we laid out this entire process

7    transparently to GrayRobinson, to Mr. Wells, in an e-mail after

8    a phone call that we had on July 31st.  It's the e-mail at

9    tab 6.

10             And we have laid out the process that we're going to

11   follow, the steps that we took.  We were completely transparent

12   about the -- the recommendations that we have.

13             We even shared with them our junk filter.  We said,

14   "This will probably work for you.  Try it."

15             And that's, to date, between the last hearing and

16   this hearing, the only proposal we've heard from either side,

17   is us recommending to them how they can reduce their

18   collection.

19             We have -- Mr. Wells described some different terms

20   earlier, talking about BAM and Transfer.  But we've heard no

21   proposal from anyone on the other side as to what might work.

22   They have the data.

23             We can't tell them whether their search terms that

24   are designed to eliminate documents are going to work because

25   they have the data.  They've got to try that out.

1          They have to get their people, like we did, to come

2     up with some search terms that reduce the volume.

3     Alternatively, they've got to get started reviewing the

4     documents.

5          So there's basically two -- two options here.  And

6     they are choosing the third, which is to do nothing.  And so --

7          THE COURT:  Can -- I don't mean to interrupt you.

8          MR. DIX:  Sure.

9          THE COURT:  But I just lost you for a minute there

10    when you said something about what they need to do to the

11    search terms to reduce the search terms.  Because from what I'm

12    hearing Mr. Wells -- he -- he's saying there are too many

13    search terms.

14         So is it up to you to reduce the search terms or up

15    to them?  Or when you two are using "reduce," are you using

16    that word differently?

17         MR. DIX:  Your Honor, maybe I spoke unclearly.  I

18    mean the number of documents.  The search terms can be -- we

19    can add more search terms to reduce the number of documents.

20         THE COURT:  All right.

21         MR. DIX:  So our -- our junk filter that we ran -- we

22    added 93 more search terms.  But using those additional search

23    terms, we excluded 47,500 e-mails.

24         So the same thing needs to happen -- if they've got

25    62,000 e-mails that they still don't want to review, they've

1  got to -- they've got to be the ones -- they have the data.

2  They've got to propose what they're going to do to reduce that.

3  They were their search terms to begin with.

4  　　　　　And we don't know that -- we don't know the examples

5  of the HoneyBaked Hams and the Best Buys and the different

6  things that are causing the hits that they believe are

7  over-responsive.  We don't know how to tell them to reduce it.

8  　　　　　But we certainly would entertain any suggestions.

9  And I think at the last hearing, Your Honor, I laid out several

10  different types of technologies, with clustering and e-mail

11  threading and predictive coding, that are commonly used to do

12  this kind of thing.

13  　　　　　We just can't make them do it.  And they're just

14  sitting, doing nothing, taking the position that because they

15  don't understand -- or don't know how to reduce the search

16  terms, they can't start their review.  And that's simply not

17  the case.  They're just choosing not to do it.

18  　　　　　THE COURT:  Let me ask you this.  Do you -- in terms

19  of the 16,500 documents and the review process and all of

20  that --

21  　　　　　MR. DIX:  Right.

22  　　　　　THE COURT:  -- what dollar figure do you put on that?

23  　　　　　MR. DIX:  It's going to be about $20,000, I believe,

24  using a team of eight review attorneys over a week or two, with

25  project management time included in that.

1        I think our document reviewers -- the rate that we're

2   paying is higher than what special counsel -- I think special

3   counsel's quoted rate was $38 an hour.  Ours is $45 an hour.

4        But our people are using technology predictive

5   coding.  They're using different tools to prioritize the

6   review.  And so we think there's value in paying a little bit

7   more to get a better review.

8        THE COURT:  And so what is your projected date of

9   turning over whatever documents you turn over out of the

10  16,500?

11       MR. DIX:  By the end of September, Your Honor.  It's

12  well laid out in our e-mail at tab 6.  They're going to do the

13  first pass review.  It's going to take them one to two weeks to

14  do.  And then we're going to take the second pass before

15  producing the documents.

16       Part of the delay in there in September is both

17  Mr. Post and I are going to be out of town for some period of

18  that time.

19       THE COURT:  I'm not being critical of anyone.  But if

20  there's ever a transcript made of this, I don't want it to look

21  like I didn't look at these -- these binders that you gave me.

22  They were provided shortly before the hearing.

23       And I did glance through them.  And I did see this

24  July 31st e-mail, but -- but -- it's helpful for me to have it

25  in the argument, but I don't want it to look like I was sitting

1  on these for a week or two and not paying attention to them,

2  but I -- but I appreciate that.

3          All right.  Well, let me hear again from Mr. Wells on

4  the issue, because I'd like to just take it an issue at a time.

5  And I -- and I think this ESI issue is one that -- once that

6  starts rolling, a lot of these other things are going to

7  hopefully take care of themselves.

8          So, Mr. Wells, what do you say to this general notion

9  that you-all aren't doing enough with various programs that are

10  available to you to cull these documents?

11          MR. WELLS:  Well, the Court asked me what I think

12  about it -- I'm hesitant to say.  We had a phone conversation

13  last week, Your Honor, that I initiated, to see where we are

14  with all we're discussing right here right now.

15          And in that phone conversation is the first time we

16  heard about them having -- the first time we heard anything at

17  all about the number of documents they had.  And we've been

18  telling them from day one, "We've got 62,000 documents we've

19  got to deal with."

20          We heard last week that they've got a large number

21  that were culled down to 62-.  And they applied this junk

22  filter.  And it came down -- oh, he may have said 16,5- here.

23  I don't recall.

24          THE COURT:  Yes.

25          MR. WELLS:  It's the first time we heard this.

1          So from that phone conversation, we did the same

2    thing they did, and applied the filter to our 62,000 documents,

3    and reduced it by about 8,000, based on HoneyBaked Ham and Best

4    Buy, whatever, Neiman Marcus, whatever.

5          Plus, when you add in the privileged documents that

6    we've identified, of about 6,000, it takes us down to 48,000.

7    And that's where we are.

8          Before the phone conversation last week, we had three

9    of our summer associates going through, identifying privilege.

10   We've done a two-level review of privileges.  We've done the

11   same filtering that they've done and run the sampling.  But

12   we're left with 48,000 documents.

13         Perhaps it's a matter of communication.  But every

14   time we've suggested we need to reduce the search terms, we're

15   met with, "Well, let's try this.  Let's do this instead."

16         We'll be glad to give them the 48,000 documents and

17   let them do whatever they want to with it.  But I don't think

18   that's what we're here to do.

19         THE COURT:  I think they'll take the 48,000 if you

20   send them today.

21         MR. DIX:  They're -- we're using the same eDiscovery

22   vendor.  It's literally press a button.

23         MR. WELLS:  Well, I thought I heard him say it's

24   going to take several weeks for his -- whoever is doing the

25   review of their 16- to do the review there.

1        We're talking -- special counsel is telling us it's

2   going to take five weeks for their attorneys to review the

3   48,000.

4        But we are at the point where that process can begin,

5   if we stick with the current search terms and the current

6   levels of documents.

7        The question becomes, in our mind, "Who pays for it?"

8        These are documents they're seeking.  I know in --

9   ordinarily the party producing documents pays for it.  But we

10  think that it should be -- should and could be reduced.

11        MR. DIX:  Your Honor, if I may?

12        THE COURT:  Yeah.

13        MR. DIX:  I'm not aware of a single proposal, other

14  than a date restriction that they previously agreed not to make

15  and then they tried to make it -- I'm not aware of any search

16  term proposal we've ever gotten from them, at all, much less

17  one that we've said, "No, we're not going to do that."

18        We remain open, but we said that last hearing.  We

19  said, "Tell us what you're going to do to reduce that volume.

20  And pursuant to the ESI order, you're going to at least tell us

21  what you're going to do before you do it.  But tell us and then

22  do it."

23        So the problem is that they're not doing it.  I don't

24  know of any -- Mr. Wells, show me the e-mail where I said no,

25  we're not going to run that search term, or not going to let

 1   you run a search term to reduce e-mails that are unrelated to

 2   the case.  It simply hasn't happened.  So --

 3           THE COURT:  Well, let me just ask you this.

 4           If you were reducing the search terms to run to try

 5   to reduce the number of documents, I mean, how would you go

 6   about that?  Would you go about -- would you go about -- in

 7   your own mind, taking -- for instance, the one with BAM that

 8   you showed -- would you go -- in your own mind, would you

 9   eliminate, at least initially, ones that you thought would

10   produce irrelevant documents?

11           I mean, is that how -- I'm trying to think of what --

12   in other words, if he -- if Mr. Wells and his team wants to

13   reduce the search terms, what's the -- how do you -- how do you

14   approach that?

15           Do you approach it with, you know, terms that you

16   think are irrelevant or that are going to produce -- because I

17   know there's a -- there's a disagreement over certain matters

18   as to the relevancy, giving time periods and other things like

19   that.

20           Is that how you do it?

21           MR. WELLS:  In my limited knowledge, Your Honor,

22   that's where I would start, is look at the search terms that we

23   have and make a judgment, discuss with opposing counsel about

24   things that we think are not going to produce -- could not

25   produce anything.

1          And the one I gave you, I think, is a clear one.

2    There are probably -- there have to be others.

3          I think a combination of Mr. Hancock, who's on the

4    line, and a partner of mine who's reflected in some of the

5    documents, Mike Santana, would be the ones that have to do it.

6    But for --

7          MR. HANCOCK:  Your Honor, can I weigh in on this?

8    This is Mr. Hancock.

9          THE COURT:  Yes.  Go ahead.

10         MR. HANCOCK:  So two things.  It's not about reducing

11   the number of search terms.  It's reducing the broadness of the

12   search terms.

13         For example, some of the search terms are sale,

14   purchase, proposal.  Those are so broad that they're returning

15   a lot of what we call false hits.  So those words exist in the

16   documents, but they don't pertain to this -- to the issue at

17   hand.

18         So that's really the issue with the search terms.

19   They're too broad.  And the way to limit that is -- sometimes

20   you include proximity terms, which means a sale within three

21   words of stock, or something like that.  So that's as to the

22   search terms.

23         The other thing I wanted to address is -- we have

24   approached the other side and asked them to -- or tried to

25   reduce the number of hits here.  They have asked that we extend

1   the date range to January 2018.  And in so doing, that added

2   15,000 documents.

3         We've provided them with our search results for that

4   time frame, that was just the additional from late -- I think

5   it was from late 2017 until January of 2018, added 15,000

6   documents.

7         We've provided them with the reporting and asked them

8   that -- and told them that our position is that anything

9   that that's late in the process, that far removed from these

10   transactions, is very, very, very unlikely to have any

11   responsive documents.  They were supposed to get back with us

12   to tell us what their position was.  And we have never heard

13   back from them on that.

14         THE COURT:  Well, you know, this is part of the

15   problem, because -- you know, it's a he said/she said on some

16   of this.  And so it's -- it -- I mean, I feel like -- I'm just

17   going to set some deadlines here in a few minutes.

18         And then if the parties don't like the deadlines,

19   they can file whatever they want to do whatever they want.  But

20   this is -- this has to move.  It just has to move.

21         And then -- and, you know, there's a lot of money at

22   stake here, a lot of money at stake.  So I'm not overwhelmed by

23   $50,000 for that work to be done, just sitting here at this

24   point.

25         Now, if there is a way to -- to limit those

1   documents, the number of documents, so that money is not being

2   wasted, then that should be done.

3          But -- but if -- if Mr. Dix's memory on this and --

4   is accurate, and he's recalling it accurately, he -- he's of

5   the view that there hasn't been any attempt to confer to limit

6   the search terms or -- or make efforts to -- to even -- if it's

7   not limit the terms, as Mr. Hancock said, to discuss the --

8   reducing the broadness of the terms.

9          Mr. Hancock believes there have been discussions

10  about ways to limit the number of documents that are ultimately

11  produced, at least in a time range.

12         So before we're done here today, I'm just going

13  to set -- I'm going to set a deadline for next week for there

14  to be a meet-and-confer on these -- on these -- on the search

15  terms being used to -- and give the parties a week to agree --

16  to agree on the search terms.

17         And then -- and I'm -- I'm going to set another

18  status conference a lot quicker than this one.  And then

19  you-all can come in here and tell me again.

20         But if the same thing happens again, I'm just going

21  to order that -- I'm going to set a date and then -- and then

22  that's just going to have to happen.

23         Because these -- once these documents start flowing

24  back and forth, on the ESI, I'm convinced that these other

25  issues -- every one that you -- you listed -- and I'm not

1    saying that -- that -- Mr. Wells, that you're wrong about

2    contention interrogatories.

3            I mean, just without seeing them, it would seem to me

4    that those could be answered without the ESI.  I agree with

5    you.

6            But the ESI needs to be produced one way or the

7    other.  And that seems to me to be a threshold issues that

8    we've got to address, so -- so I'll just -- what is today?

9            Today is the -- the 8th.  I mean, let's -- let's just

10   do this, that the parties meet and agree, or attempt to agree,

11   on -- on the search terms to be used no later than -- than

12   August 15th.

13           And if you-all do agree on the search terms by then,

14   then you can -- you can file a notice that -- that you've

15   resolved the issue, and then I'll -- I'll cancel the hearing

16   that I'm about to set.  But I just feel like we've got to move

17   this along.  And I don't want to wait another month to do it.

18           MR. DIX:  Your Honor, could I clarify one thing on

19   that?

20           THE COURT:  Yes.

21           MR. DIX:  Our review is underway.  I'm not aware of

22   any search terms that -- that we need to propose or adjust in

23   order to keep moving forward and end up producing documents.

24           THE COURT:  So as long as -- if Mr. Wells agrees with

25   that and Mr. Hancock, then I'm talking about then the

1     Foodonics -- the Foodonics -- the search terms that Foodonics

2     is using that have, at this point, produced -- well, I guess

3     we're in the neighborhood of about 45- to 48,000 documents that

4     are still at issue.  And so those are the documents I'm talking

5     about.

6            And then -- and then I don't know -- of course, I

7     know you-all are going to be out of town some and all of that.

8     So if we have to do it by telephone, we can.  But, you know, I

9     can set this next Thursday morning for a -- for a -- for a

10     status -- another discovery status conference, so that we

11     don't -- don't let too much time get out from under us here.

12            Is that -- is that not a good time?

13            MR. DIX:  I could do it by phone.  I'll be in Tampa.

14     I'm speaking about electronic discovery Thursday afternoon.

15     But I could do it in the morning.

16            MR. WELLS:  If we have a meet-and-confer on the 15th,

17     which is next Wednesday --

18            THE COURT:  Yes.

19            MR. WELLS:  -- you're proposing to have a conference

20     the next day?

21            THE COURT:  If you-all don't resolve the issues.

22            MR. WELLS:  Okay.

23            THE COURT:  Mr. Post, how are you looking next

24     Thursday?

25            MR. POST:  I'll make myself available, Your Honor.

```
 1              THE COURT:  All right.  I'll just set -- then I'm
 2   going to set it at 11 o'clock.
 3              Mr. Hancock, are you available then, sir?
 4              MR. HANCOCK:  I will make myself available.
 5              THE COURT:  All right.  So we'll just set it at
 6   11 o'clock.
 7              All right.  So let's move past the ESI at this point
 8   and move on to the -- Mr. Post wanted to comment on some of the
 9   other issues that you raised, Mr. Wells.  So let me let him do
10   that, and then...
11              MR. POST:  Your Honor, with respect to -- to
12   depositions -- he mentioned Steve Brust.  Steve Brust was an
13   attorney for Laura Jean Klempf.  And certainly the matters
14   between him and Laura Jean Klempf are subject to many privilege
15   issues.
16              He mentioned Dan Edelman of Dixon Hughes.  He's a CPA
17   and advisor to Jean Klempf, both while she was living -- and
18   now he's an advisor to the trust in this litigation.
19              Marc Klempf is the son of Jean Klempf and an advisor
20   to her as well, in connection with the -- the matters that are
21   in litigation.  All of these people are within the common
22   interest privilege of the Trust.
23              And we -- and so for the same reason we suggested to
24   the Court that it was not fair and perhaps burdensome to let
25   depositions go forward until we have the documents is -- is
```

1    inapplicable to these people as well.

2            And the reason it's burdensome is because

3    inevitably -- in all likelihood, if not inevitably, these

4    depositions are going to be incomplete.

5            We -- they're going to take depositions of people.

6    How can we cross-examine them, if we need to, with -- and -- if

7    we haven't got all the information that Foodonics has in its --

8    it's been hiding in connection with this litigation?

9            So these people are going to be deposed twice, once

10   by them and once by us.  That wouldn't be -- that would be

11   prohibitively expensive, it would be messy, and would be unfair

12   to -- to the Trust.

13           It's -- and it is especially wrong, if you will,

14   because the -- the Trust filed this complaint -- they filed

15   this complaint asking for a declaratory judgment on the issues

16   that we've brought now in our counterclaim.

17           So it's -- they filed this action.  They should

18   be able -- you can't -- you can't unfairly hide the ball until

19   they take depositions that we -- and we don't have the

20   opportunity to educate ourselves about the case and -- and also

21   expose these people to two -- at least maybe two depositions in

22   the case.

23           So it just makes -- it makes sense that Foodonics

24   filed this complaint back in -- last year.  They need to

25   produce their documents.  And then we can go about taking

1 depositions in a systematic fashion.  Hopefully the fewer the

2 better, all within the seven hours provided by the rules.

3 With respect to the contention interrogatories,

4 those -- those were -- those were filed on July 2nd, three or

5 four days after you -- you ruled that these -- that they

6 couldn't take my client's deposition.

7 And now they -- all they did was pose these same

8 deposition questions in writing.  This is -- this is written

9 deposition questions.

10 And it's -- it's -- I'm not going to use the word

11 disingenuous.  I'm told that's not -- we shouldn't use that

12 word.  I'm not going to use that word.  But it's not kosher, I

13 guess, for them to have done this, and --

14 MR. WELLS:  Or disingenuous.

15 MR. POST:  The objection that we filed simply said

16 that.  We're not -- we're not saying they did -- we're never

17 going to file -- answer these interrogatories, but it -- but it

18 violated the -- the spirit, if not the intent, of this Court's

19 order precluding depositions until Foodonics produces the

20 documents.

21 Lastly, it gives incentive to Foodonics to produce

22 their documents.  Instead of -- of, you know, spending the last

23 time for this last hearing issuing subpoenas and sending out

24 interrogatories, they should have been focusing on keeping

25 these documents together and producing them.

1     I think that covers the other issues.

2         THE COURT:  What about the -- there was a request for

3  production that -- that Mr. Wells raised.

4         Didn't you, Mr. Wells?  Wasn't there a request for

5  production you also raised an issue about?

6         MR. WELLS:  I did, Your Honor.  But I think it was

7  generally addressed in Mr. Dix's comments.

8         THE COURT:  All right.

9         MR. WELLS:  They got their 16,500 documents that

10  presumably would be responsive to requests for production.  I

11  think we've addressed that and we can continue to do so.

12         I think the remaining issues relate to the

13  interrogatories and the requested depositions of certain

14  people.

15         THE COURT:  Okay.  Well, let's do this.  I mean, it

16  seems to me at this point that -- that given that -- I'm hoping

17  that these documents are going to be -- the ESI documents are

18  going to be produced near the end of September -- if not, by no

19  later than mid October -- I don't see any reason to go forward

20  with any depositions at this point.

21         And then in terms of the -- in terms of the -- the

22  interrogatories -- you made those part of your -- part of your

23  book, I think, didn't you?

24         MR. WELLS:  Yes, sir.  They are at tab 5.

25         THE COURT:  Yes.  I want to take -- I want to take an

1    opportunity to look over these things.  And so -- so I'm --

2    what I'm thinking is that -- that when we get together next

3    week, even -- even if you-all have resolved the ESI issue,

4    we'll still get together for a little bit of time to talk about

5    those issues.  And that will give me a chance to look at these

6    documents that you-all have given.

7            MR. POST:  Your Honor, in the notebook we gave you,

8    it had interrogatories and our objection to the interrogatory.

9            THE COURT:  Yes.  Yes.  All right.

10           MR. POST:  All right.

11           MR. WELLS:  And the notebook that I gave you has the

12   same thing.

13           MR. POST:  Good.

14           MR. WELLS:  So, Your Honor, I wonder if --

15           THE COURT:  So it doesn't matter which color it is?

16           MR. WELLS:  You can just take half of each notebook

17   and throw it away and still have questions.  I wonder if I

18   might address the -- and I understand the Court's position on

19   the interrogatories.

20           But I -- I also brought a research binder with a lot

21   of cases on contention interrogatories at this stage of the

22   proceedings.

23           And all the cases talk about the obligation under

24   Rule 11 to have a good faith factual basis in filing an

25   additional pleading.

1          And our interrogatories address that initial

2     pleading, and certain -- not all allegations, but certain

3     allegations in the counterclaim.

4          And we think under the overwhelming case law,

5     contention interrogatories at this point, even without the need

6     for additional discovery, are entirely appropriate.

7          THE COURT:  Now, is that -- is that an extra set

8     of -- of case -- authority of cases or --

9          MR. WELLS:  It's not an extra.  I mean, I didn't know

10    we were going to be arguing -- I can provide a copy to both

11    sides, if the Court would like.

12         THE COURT:  Well, I'd like -- I'd like to take a

13    look -- at least as a starting point of looking at some things.

14         MR. POST:  I'd like the opportunity to submit my own

15    authorities, Your Honor.  We would take the -- you know, the

16    local discovery rules talk about contention interrogatories not

17    being favored by the Middle District of Florida.

18         THE COURT:  Yes.  Well, I'm trying to avoid filing

19    motions and doing all of that.  We've taken care of so many

20    issues already in this case, because of, you know, how well

21    you-all have worked together on some things, and -- and -- and

22    just discussing these issues.

23         So I don't want to necessarily blast into a --

24    require you to file a motion, then a response, and do all of

25    that if we're going to talk about this next time.

1        So why don't you just keep those until next time.

2   And we'll take a look at some things ourselves and then -- and

3   then -- and then, Mr. Post, you can bring some -- some of your

4   own authority next time, just -- if we get into that.  All

5   right?

6        MR. POST:  Yes, sir.  Does "next time" mean like

7   August 16th?

8        THE COURT:  Yeah.  When we get together next week, I

9   want to talk about this some more.  But I want to at least have

10  a chance to read the interrogatories of the -- your opposition

11  to them.  And then I'll look at a little bit of law on that --

12  on that too.

13       And then -- and then if we can't resolve it -- or if

14  it's not resolved at the next status hearing, then -- then

15  you-all can file motions related to it.

16       MR. POST:  Thank you, Your Honor.

17       THE COURT:  But we'll -- I think we -- we've got to

18  get this ESI flowing.  And it's got -- it has to flow both

19  ways.  And you-all are making progress.  Both sides are making

20  progress.

21       It's just -- you know, it's just not -- it's not as

22  quickly as either side wants.  So -- but I -- I think if

23  you-all -- and you don't have to wait until Wednesday to get

24  together next week.

25       If you get together, you know, tomorrow or Friday, or

 1   Monday or Tuesday, that would be good, too.  And in terms of

 2   the contention interrogatories -- I mean, on any of these

 3   issues, if you reach an agreement as to timing of these

 4   things -- not necessarily whether the -- the questions

 5   themselves -- the interrogatories themselves -- whether the

 6   objections are well-taken -- but if you-all agree that, "All

 7   right.  We're going to get this ESI done by October 10th, so

 8   we'll wait until October 10th to get the time ticking on the

 9   contention interrogatories or anything" -- if you each -- in

10   other words, if there aren't any issues to talk about next

11   Thursday, if you -- if you call my chambers and let

12   Ms. Chaddock or Ms. Wood know that, then we won't have to get

13   together.

14            But, if not -- if I don't get a call from you, I'll

15   just assume we're going to take up one or more of these issues.

16   Okay?

17            Is that sufficiently unclear?

18            MR. POST:  That's fine, Your Honor.  Thank you very

19   much.

20            THE COURT:  Okay.  All right.

21            MR. WELLS:  Thank you.

22            THE COURT:  All right.  Well, thank you-all.  And

23   I'll see you back here next week.  But if not, that will be

24   fine too.  All right?

25            MR. WELLS:  Thank you, Your Honor.

1          MR. POST:  Thank you, sir.

2          THE COURT:  We're in recess.

3          COURT SECURITY OFFICER:  All rise.

4      (The digitally recorded proceedings concluded at

5  3:02 p.m.)

6                              -  -  -

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

### <u>CERTIFICATE</u>

UNITED STATES DISTRICT COURT    )
    )
MIDDLE DISTRICT OF FLORIDA     )


       I hereby certify that the foregoing transcript is a true and correct computer-aided transcription from the official electronic sound recording of the proceedings in the above-entitled matter.


       DATED this 20th day of November, 2018.



       s/Shannon M. Bishop

       Shannon M. Bishop, RDR, CRR, CRC

**TAB 30**

IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

FOODONICS INTERNATIONAL,
INC., a Florida corporation,

     Plaintiff,

vs.

DINA KLEMPF SROCHI, as
Trustee of the Laura Jean
Klempf Revocable Trust, a
Florida Trust,

     Defendant.

_____

Jacksonville, Florida

Case No. 3:17-cv-1054-J-32JRK

August 16, 2018

11:10 a.m.

Courtroom No. 5D

DIGITALLY RECORDED DISCOVERY STATUS HEARING
BEFORE THE HONORABLE JAMES R. KLINDT
UNITED STATES MAGISTRATE JUDGE

COURT REPORTER:

       Shannon M. Bishop, RDR, CRR, CRC
       221 North Hogan Street, #150
       Jacksonville, Florida  32202
       Telephone:  (904)549-1307
       dsmabishop@yahoo.com

    (Proceedings reported by mechanical stenography;
transcript produced by computer.)

A P P E A R A N C E S

PLAINTIFF'S COUNSEL:

**SAMUEL GRIER WELLS, ESQ.**
GrayRobinson, PA
50 North Laura Street, Suite 1100
Jacksonville, FL  32202

DEFENSE COUNSEL:

**JAMES H. POST, ESQ.**
**R. CHRISTOPHER DIX, ESQ.** (via telephone)
Smith, Hulsey & Busey
One Independent Drive
Suite 3300
Jacksonville, FL  32202-3315

ALSO PRESENT:

David Hancock (via telephone)

1          P R O C E E D I N G S

2    August 16, 2018                                    11:10 a.m.

3                        - - -

4          COURT SECURITY OFFICER:  ...Court is once again in

5    session.  The Honorable James R. Klindt presiding.

6          You may be seated.

7          THE COURT:  All right.  Good morning.

8          MR. WELLS:  Good morning, Your Honor.

9          MR. POST:  Good morning, Your Honor.

10         THE COURT:  We're scheduled for a discovery status

11   conference in *Foodonics International, Inc., against Dina*

12   *Klempf Srochi, et al.*  It is Case No. 3:17-cv-1054-J-32JRK.

13         Mr. Post is here on behalf of the Defendant/Counter

14   Plaintiffs.

15         And, Mr. Dix, are you on the phone, sir?

16         MR. DIX:  I am, Your Honor.

17         THE COURT:  All right.  So Mr. Dix is also here on

18   behalf of the Defendant and Counter Plaintiffs.

19         Mr. Wells is present in the courtroom on behalf of

20   Foodonics.

21         And, Mr. Hancock, you're on the phone, sir?

22         MR. HANCOCK:  Yes, Your Honor.

23         THE COURT:  All right.  Thank you.

24         We had a status conference last week.  And there was

25   an issue about the ESI search terms being used by Foodonics.

1    And so what I believe I did was required the parties to get

2    together no later than yesterday, August 15th, to try to reach

3    an agreement on the search terms, and then set today's hearing

4    so that we could discuss that issue.

5           And then I think as we left it, toward the end of the

6    last status conference, we were discussing the contention

7    interrogatories that were served by Foodonics on the

8    Defendant/Counter Plaintiffs.

9           And I wanted an opportunity to read the -- the

10   specific interrogatories and the responses to those, which I've

11   done now.

12          So those are the two matters that I had on my list.

13          And, also, at some point I do want to ask Mr. Post

14   about the notice of filing, document 55 -- it was a filing of

15   a -- an affidavit of Eddie Lee Rosemond -- and what the -- what

16   that -- what he wants the Court to do with that, if anything.

17          So those are the matters that -- that I had.

18          Mr. Post, should we start with you, sir?

19          MR. POST:  Yes, sir.  Thank you.

20          May it please the Court?

21          As instructed, the parties did meet and confer since

22   last week about the ESI search terms.  There was a partial

23   agreement reached.

24          The Court might recall that Chris Dix, my partner,

25   reported to you that our vend- -- our ESI vendor had

1   developed what we call a junk -- a junk term filter, which we

2   recommended that the opposing parties might want to use for

3   their collection.

4           They -- they did apply it.  They were able to cull

5   out 7,000 documents, which they tell us was tested for -- and

6   verified to be almost 9- -- better than 99 percent accurate.

7   And so we accepted that move on their part.

8           There was some further discussions about -- asking us

9   to create different search terms that were, in our opinion, too

10  narrow.  There was no meeting of the minds about those items.

11          And sitting here today, I don't know if -- if the

12  other side has agreed that that's -- that they're not -- that

13  that is -- that they're going to not try to pursue more

14  restrictive search terms or if they're going to make an

15  argument today in that regard.

16          So that's -- that's where we are on the ESI.  And

17  before we go into the interrogatories, I -- I would suggest to

18  the Court we try to deal with this issue.

19          THE COURT:  All right.  Mr. Wells, were you going to

20  address this -- or are you going to?

21          MR. WELLS:  I am, Your Honor.  And thank you very

22  much.

23          May it please the Court?

24          THE COURT:  Yes.

25          MR. WELLS:  Just a couple of points to follow up on

1    what Mr. Post has advised the Court.  What we suggested in our

2    conference call last week was that the original search terms

3    that the parties had discussed be revised in a couple of

4    fashions, one, to reduce the date range from 2008 through

5    January of 2018 to January 2013 through December 2017.

6              That narrowing of the date range was rejected.

7              We suggested that some of the search terms be

8    narrowed because we felt some of them were too broad.  And that

9    was initially rejected.  We've continued discussions.

10             But to make very short order of where we are on this

11   issue -- the Court may recall that I suggested the possibility

12   last week that we would simply turn over the documents we have

13   and that a review be done by the Defendant/Counter Plaintiff.

14             And after conferring with all the folks on our side,

15   we are simply going to turn over all of our ESI documents to

16   the Defendant/Counter Plaintiff, excluding those that we have

17   denominated as privileged or junk mail.

18             We've also done a -- a quick search of documents that

19   would involve communications with Mr. Klempf's spouse --

20   spouses.  There would have been two spouses within the date

21   range that's at issue, so -- but all other documents we'll be

22   turning over.  We're going to do a quick review of a couple of

23   things.  But we anticipate providing roughly 45,000 documents

24   to the Defendant/Counter Plaintiff within ten days.

25             THE COURT:  All right.  Mr. Post, what do you say to

 1   that?

 2            MR. POST:  Your Honor, I'm going to -- I'm going

 3   to -- with your permission, I'd like Mr. Dix to address this

 4   revelation.

 5            THE COURT:  Yes.  Mr. Dix?

 6            MR. DIX:  Your Honor, we do not have any objection to

 7   them turning over that information, but we didn't hear -- we

 8   assumed that it would be in the format that we've previously

 9   agreed pursuant to the ESI order in this case, and that the

10   other unaddressed issue is whether or not GrayRobinson -- the

11   GrayRobinson law firm will be included in that production of

12   non-duplicative, non-privileged documents.

13            That's been our understanding for a while now, but

14   I'd like to hear them say that they're going to do that as

15   well.

16            THE COURT:  Mr. Wells?

17            MR. WELLS:  Candidly, Your Honor, we have not focused

18   on the GrayRobinson documents, because we've got an overall

19   privilege to those asserted.  I can look at that.

20            But in principle, we have no objection to turning

21   over the non-privileged, non-duplicative documents.  I -- I'd

22   have to confer with Mr. Hancock and others about the extent to

23   which those documents -- where we are in the review of those

24   documents.  But principally we don't have an objection to

25   turning those over.

1          THE COURT:  All right.  And you said ten days?

2          MR. WELLS:  Certainly ten days as to the Foodonics

3    ESI documents.

4          THE COURT:  Yes.

5          MR. WELLS:  I can't commit -- I apologize to the

6    Court, but I can't commit on the GrayRobinson documents, since

7    we've been focusing on the Foodonics.

8          But I don't think it would be difficult to do --

9    comply with the same time period for the GrayRobinson

10   documents.

11         THE COURT:  Well, why don't we just -- why don't we

12   set -- let's set August 30th -- that's 14 days, but it takes

13   into account weekends.

14         And then we'll just make that Foodonics and

15   GrayRobinson documents.  But if you -- if you need more time on

16   the GrayRobinson documents, you can speak to Mr. Post.  And

17   hopefully you can get an extension on that.

18         MR. WELLS:  Thank you, sir.

19         THE COURT:  Mr. Dix, does that -- does that address

20   your issues?  I'm assuming it's the same format that was agreed

21   upon?

22         MR. WELLS:  Yes, sir.

23         THE COURT:  All right.  Mr. Dix, does that address

24   the issues that you raised?

25         MR. DIX:  Yes, Your Honor.

1          THE COURT:  All right.

2          MR. DIX:  Your Honor, I have one further question.

3          THE COURT:  Yes.

4          MR. DIX:  Will that production include the text

5    messages off Jacques Klempf's phone?

6          MR. WELLS:  Mr. Hancock?

7          MR. HANCOCK:  No, Your Honor.  We're still reviewing

8    that.  This will just be the documents that hit on the mutually

9    agreed-to search terms by the parties.

10          We can produce the -- the text messages at -- I

11    hesitate to give a time frame, but we might be able to make it

12    by the 30th.

13          THE COURT:  Well, let's do this.  Let's set -- let's

14    set another date for the -- why don't we set -- let's set

15    September 7th for the text messages to give you some extra time

16    there.

17          And then, again, you can confer with Mr. Dix and

18    Mr. Post if you-all need additional time.  But I think we do

19    need to have some dates in place.

20          Now, let me just ask -- Mr. Post, what's the status

21    of your production to Foodonics?  Are we on about the same time

22    frame as that?  Or where are we with that?

23          MR. POST:  We are -- rather than dumping documents on

24    our opponent, we're doing our own review.  We're eliminating

25    non-responsive documents from our -- our production.

1    And we expect that that will be -- we're having that

2    done by an outside vendor.  I expect them to turn over what --

3    what they consider to be the responsive documents, the

4    non-privileged documents.  And we would -- we've committed to

5    turn those over, I believe, September 30th.

6    Mr. Dix, correct me if I'm wrong, but I think that's

7    what we agreed to.

8    MR. DIX:  That's right.

9    THE COURT:  All right.  So we'll set that date for

10   the -- so we'll have three dates in place.

11   MR. WELLS:  I do not -- I apologize.  I did not hear

12   the date.

13   THE COURT:  September 30th.

14   All right.  Does that take care of the ESI issue,

15   then, at this point, Mr. Post?

16   MR. POST:  Yes, sir.  Yes, sir.

17   THE COURT:  All right.  Mr. Wells, you agree?

18   MR. WELLS:  Yes, sir.

19   THE COURT:  All right.  Do you want to move on now to

20   the contention interrogatory issues?

21   MR. POST:  Yes, sir.

22   THE COURT:  You had mentioned at the end of the last

23   hearing that the -- that the Middle District of Florida

24   Discovery Handbook does not -- I can't remember the words you

25   used, but favor contention interrogatories.  And then you

 1    mentioned you might want to provide some other authority.

 2            Was there anything else you wanted to provide?

 3            MR. POST:  Yes, Your Honor.  I'm sensitive to the

 4    Court's suggestion that we not turn this into legal

 5    memorandums.

 6            We basically put together a set of legal authorities

 7    that we would anticipate -- that we'd like the Court to look

 8    at.

 9            And it -- it has in it the cases sustaining

10    objections to contention interrogatories and cases directing

11    that answers be given to contention interrogatories.  And I'd

12    like to hand this book up to the Court at this time.

13            THE COURT:  And did you get a copy of any --

14            MR. WELLS:  I haven't yet, Your Honor.

15            THE COURT:  Okay.  Do you have a copy for Mr. Wells?

16            MR. POST:  I do, Your Honor.

17            If the Court would like me to summarize our position,

18    I'd be glad to, or however you see fit.

19            THE COURT:  Well, I'm just -- I don't know,

20    Mr. Wells, if you brought any authority today or if you would

21    want some -- I don't know, a few days to -- to file any -- or

22    provide at least to chambers any authority that you wanted the

23    Court to consider.

24            MR. WELLS:  Your Honor, I had brought my own

25    authorities at the hearing last week, but they were annotated.

1   And so I did not provide them to the Court or to counsel.  I

2   have the very same authorities that I brought this week.

3            THE COURT:  All right.

4            MR. WELLS:  I did not -- like Mr. Post, I did not

5   anticipate turning this into a motion --

6            THE COURT:  Okay.  Well, I appreciate that.

7            MR. WELLS:  -- but -- and I would note that one of

8   the cases that is there, tab 7, is a Middle District case from

9   2012, which I think...

10           THE COURT:  All right.  Well, if you-all want to

11  argue some, that's fine.  I think you both stated your

12  positions last time.

13           And I'm -- I'm -- I'm willing to just take this

14  authority, read the cases that you-all have cited, and then, as

15  part of an order setting out these deadlines, just indicate the

16  Court's ruling on the contention interrogatories, if there --

17  if you don't object to me handling it that way.

18           Mr. Post?

19           MR. POST:  With the Court's indulgence, I'd like to

20  have five minutes to describe to you our position.

21           THE COURT:  Yeah.  That's fine.  Go ahead.

22           MR. POST:  I appreciate it.

23           If you would look at tab 2 of my -- of the notebook

24  we handed up, please.

25           THE COURT:  Yes.

1        MR. POST:   This is one of the 14 interrogatories

2    that's included in the contention interrogatories, asking us to

3    particularly -- distinguish particularly all facts known by

4    support or linked to allegations -- paragraph 46 of the

5    counterclaim, and identify all witnesses and documents which

6    support or relate to such allegations.

7        And I've duplicated their paragraph 46, which is a

8    summary for prior -- prior pleadings or allegations in the

9    complaint of the material or information -- or pursuant to

10   information that we say should have been disclosed.  And there

11   are 13 discrete different factual allegations there.

12       So the -- what we believe the contention

13   interrogatories has -- are not proper, because they are --

14   they're not narrowing or sharpening the issues of this case.

15       They are -- instead, it requires a detailed narrative

16   of the Trust case, and is, therefore, overbroad and oppressive,

17   as the Middle District Discovery Handbook described them.

18       And this particular interrogatory is -- is actually

19   13 subparts, which makes it 26 interrogatories right here in

20   just this one interrogatory 14.

21       And it's actually double that, 52 -- I'm sorry, it's

22   13.  And you double that to -- to 26, because it also asks for

23   documents.  And that -- and the law is that when you -- if you

24   ask for documents and you want facts to be stated, that's two

25   different interrogatories.

1         So not only does -- not only does the interrogatories

2  ask for a narrative improperly, they go beyond the number of

3  interrogatories improperly.

4         And the -- the firm objection we would have is to do

5  this at this time would be wasteful, because, you know,

6  discovery is -- is not completed in this case, obviously,

7  and -- and -- and as we've told the Court before, this is a

8  fraud violation case.

9         Fraud is often proven by circumstantial evidence.

10  Circumstantial evidence is in -- would be included in the

11  documents that we might -- that we -- we might get by the end

12  of September from them.  And then it will take us time to go

13  through what they give us, since they're not going to cull them

14  themselves.

15         So we would suggest that the -- the contention

16  interrogatories are improper and should be -- should not be --

17  we should not be required to answer for that reason.

18  Alternatively, they should be put off until after discovery

19  is -- is made by Foodonics.

20         THE COURT:   Thank you.

21         Mr. Wells?

22         MR. WELLS:   Thank you, Your Honor.

23         I acknowledge that neither Mr. Post has had an

24  opportunity to review the authorities we have provided to the

25  Court nor have we had an opportunity to review theirs.

1          I would note that Rule 11 is very specific.  And in

2  cases that interpret Rule 11 -- is that a -- that a party,

3  including the party's attorney, must have a good-faith basis

4  for the allegations in an initial pleading.

5          And our view of the counterclaim is that it is

6  replete with specific allegations as to alleged wrongful

7  conduct on the part of Foodonics and Mr. Klempf.

8          Mr. Post has focused on interrogatory No. 46.  But

9  all the interrogatories -- or not interrogatory 46, but

10  paragraph 46 that we have requested information on -- every

11  single interrogatory we've propounded is lifted from the

12  specific allegations of the counterclaim.

13          The cases in Florida in the Southern District and

14  Middle District that we have cited all cite to Rule 11, and the

15  fact that a party must have sufficient factual basis for the

16  allegations in an initial pleading.

17          Frankly, I don't know why counterclaiming plaintiffs

18  take the position that they've got to have our documents before

19  they can support their allegations.

20          You don't file a complaint and then seek to find the

21  cause of action through discovery.

22          We've not asked for anything that is at all

23  inappropriate.  And I would specifically cite a decision by

24  Judge Chappell from the Middle District that's in the material

25  that I provided to the Court, *Arthrex versus Parcus Medical*.

1          The interrogatory under dispute there was to identify

2     and describe the basis for, and in the analysis undertaken in

3     support of -- of Arthrex's pre-litigation investigation and

4     asking for document -- to identify documents, to identify

5     witnesses, much as what we have done.

6          And Judge Chappell in the case ruled that the -- I

7     think it was a plaintiff in that case, must answer the

8     contention interrogatories, the same holding in the other two

9     cases we provided from the Southern District, as well as from

10    other jurisdictions.

11         We think that it is time for the interrogatories to

12    be answered, not wait until all the documents have been

13    discovered and analyzed to support.  The allegations were filed

14    back last summer.

15         THE COURT:  This is under tab 7, I believe.

16         MR. WELLS:  Yes, sir.  Yeah.  Tab 7.  And then tab 5

17    and 6 are the Southern District cases from Florida.

18         THE COURT:  Yes, yes.

19         MR. WELLS:  And the -- I think the -- the California

20    case at tab 3 is -- is a case that is cited quite frequently in

21    a lot of the cases that are considering the -- considering

22    contention interrogatories.

23         THE COURT:  All right.  Did you want to say anything

24    else, Mr. Post?  Otherwise, what I'm going to do is, I'm going

25    to read all of the cases and the material that you-all

1  submitted, and then get something out with regard to the

2  contention interrogatories pretty quickly, as I also enter an

3  order setting these dates.

4  MR. POST:  Thank you, Your Honor.  That would be

5  fine.

6  THE COURT:  All right.  Now, do you want to address

7  this affidavit, Mr. Post?

8  MR. POST:  Yes, Your Honor.

9  This is one of the positive things that have come out

10  of the discovery conferences that we've had.  We -- there was

11  some -- a lot of -- we were in a -- in the dark about what was

12  on this EES server.

13  And -- and we -- and then after a lot of discussion

14  about who had possession of it and where was it and all that

15  stuff, we finally were told that -- that they -- that the

16  Foodonics group thinks that there is nothing on here that would

17  be responsive to our request.

18  We said, "Put it in an affidavit."

19  They did.  We accepted that affidavit.

20  I filed it for the record.  I didn't file it for any

21  court action.

22  THE COURT:  All right.  Did you want to say anything

23  about it, Mr. Wells?

24  MR. WELLS:  Nothing that's necessary, Judge.

25  THE COURT:  All right.

1           MR. WELLS:  Thank you.

2           THE COURT:  All right.  Is there anything else we

3   need to do today?

4           MR. POST:  No, sir, except maybe schedule another

5   status conference, if -- if the Court would be so kind.

6           THE COURT:  Let's see.

7           It's hard to object to a status conference, isn't it?

8           MR. WELLS:  It depends on when it is.

9           THE COURT:  Yes.  That's a good point.

10          Let me just look.

11          MR. WELLS:  Your Honor, I do have one issue I'd like

12  to raise once we get a status conference date -- I should

13  readdress.

14          THE COURT:  All right.  Let me just look at the...

15          What do you-all think of September 19th?  It's a

16  little over a month from now.

17          MR. POST:  That's clear on my calendar, Your Honor.

18          THE COURT:  Mr. Dix?

19          MR. DIX:  Your Honor, I am out of the country from

20  the 15th through the 23rd.  And we have a hearing in London on

21  the 19th.

22          THE COURT:  All right.  Let me see.

23          You're back on the 23rd?

24          MR. DIX:  Yeah.  So anytime that following week would

25  be fine.

```
 1              THE COURT:  Well, let's look at the following week
 2   and see how everyone looks on Tuesday, the 25th.
 3              Are you out, Mr. Wells?
 4              MR. WELLS:  I'm not out.  I'm just back the preceding
 5   evening.  I have a grandson being christened in D.C. that
 6   weekend.  And I intend to come back late Monday.
 7              THE COURT:  All right.  Well, then what about
 8   Thursday, the 27th?
 9              MR. WELLS:  That's fine.
10              THE COURT:  Mr. Post?
11              MR. POST:  That's fine by my calendar, Your Honor.
12              THE COURT:  Let me just double-check mine.
13              Mr. Dix, Mr. Hancock, how did -- does that date look
14   for you, the 27th?
15              MR. HANCOCK:  I'm available, Your Honor.  This is
16   Mr. Hancock.
17              MR. DIX:  (Unintelligible), Your Honor.  Mr. Dix.
18              THE COURT:  Did you say yes, Mr. Dix?  You were
19   fading on me.
20              MR. DIX:  Yes.  I'm sorry.  The 27th would be fine
21   for me.
22              THE COURT:  All right.  Can we do it in the morning,
23   at 10:30?
24              MR. POST:  Yes, Your Honor.
25              MR. WELLS:  That's fine.
```

1          THE COURT:  All right.  I was thinking what might be

2     helpful for me, because -- I have the -- this MDL that I've

3     been working on.  And Judge Schlesinger ordered monthly status

4     conferences.

5          And what the parties did was the evening before, by

6     5 o'clock, they just -- I think it was filed, actually.  It was

7     just a notice of issues.

8          And so the parties got together and -- and then -- it

9     just gave me at least a little bit of a heads-up of what we

10    might be discussing.

11         I mean, I -- I don't mind -- generally speaking, I've

12    had an idea of what we're going to be discussing in these

13    status conferences.

14         But if there -- if you-all could file a notice,

15    the -- it helps if it's by 5 o'clock the day before, because

16    then I can look at it.

17         If I need to look at anything, I can do it that

18    evening.  But if you-all would do that, I think it would -- it

19    would help me some.  I'd appreciate it.

20         And, Mr. Post, since you're the one who's asked for

21    these, maybe you could take the lead in that.

22         MR. POST:  Yes, Your Honor.  I'll -- I'll be glad to

23    do that.

24         THE COURT:  Yes.

25         MR. WELLS:  Let me make an observation, if I may,

1   Your Honor.

2   THE COURT:  Yes.

3   MR. WELLS:  And although I'm fine with September 27th

4   at 10:30 and doing the notice of issues, if the

5   Defendant/Counter Plaintiff is going to be producing its ESI

6   documents by September 30th, it may make sense to schedule this

7   next status conference for a few days after that, because that

8   could very well be -- at this point in time, that would be one

9   of the issues that -- that may arise.

10   So although I'm fine with the 27th, it may be best if

11   we did the next status conference in early October.

12   THE COURT:  You know, I thought about that, actually,

13   but my calendar I had in front of me runs out in September.

14   And I thought we -- we could just get a confirmation.

15   But I don't mind doing that.  We could do it the

16   first week in October.  And then -- well, I can actually look

17   on my electronic calendar, which seems fitting that I do that.

18   So let me just show my skills here.

19   Okay.  I think I have to be in Tampa on Friday in

20   that -- for something.

21   MR. HANCOCK:  Your Honor, this is Mr. Hancock.  I'm

22   unavailable on October 4th and 5th.  I'm actually getting

23   married.

24   THE COURT:  Oh, my gosh.  Well --

25   MR. WELLS:  So what's your point?

1          THE COURT:  So we don't want to do it on the 3rd,
2    then, either.
3          MR. HANCOCK:  My new wife said I'm not available.
4          THE COURT:  How about October 2nd, on Tuesday?
5          MR. HANCOCK:  That works for me.
6          THE COURT:  Mr. Dix?
7          MR. DIX:  Yes.  That works for me, too, Your Honor.
8          THE COURT:  Mr. Post?
9          MR. POST:  Yes, sir.
10         THE COURT:  Mr. Wells?
11         MR. WELLS:  Yes, sir.
12         THE COURT:  All right.  So we'll do it October 2nd.
13   And let's do it at 10:30, if we can do it, that day.
14         MR. WELLS:  Thank you, Your Honor.
15         THE COURT:  All right.  Well, that was a good
16   suggestion.  I was just being lazy, not wanting to flip my
17   calendar.
18         All right.  Now, you said there was something else,
19   Mr. Wells?
20         MR. WELLS:  Yes, sir.  And I realize that we've
21   already addressed this previously, but I would like to bring it
22   to the Court's attention.
23         At the last hearing we addressed depositions that the
24   Plaintiff/Counter Defendant had requested of Steven Brust, Dan
25   Edelman and Marc Klempf.

1    The Court ruled at that time that those depositions

2  would have to be delayed until the ESI production.

3        I simply want to note for the record that the

4  Defendant/Counter Plaintiffs' argument that they are agents of

5  the Defendant/Counter Plaintiff -- whatever documents are

6  relevant to those individuals' testimony, they would have,

7  either the individuals would have or the Defendant/Counter

8  Plaintiff would have.

9        They're not our documents.

10        Mr. Brust was at various times representing

11  Ms. Srochi individually.  He represented Ms. Klempf

12  individually.  I do not know if he ever represented the Trust.

13  I do not believe so.

14        And Mr. Edelman similarly represented Ms. Srochi and

15  Ms. Klempf at different times, and apparently is serving as a

16  consultant in this case.

17        Because they -- whatever information they have is

18  within the knowledge of the Defendant/Counter Plaintiff, we

19  think their deposition should be permitted to go forward.

20        THE COURT:  What do you say to that, Mr. Post?

21        MR. POST:  Your Honor, those -- those individuals are

22  within the scope of the Jim Klempf advisors and professionals.

23  The depositions that will be taken, we'll ask them what they

24  knew and when they knew it.

25        The cross-examination, if any, I'd be able to take

1   through the deposition would include the documents that I'd get

2   from Foodonics and Cal-Maine, which -- which perhaps would have

3   an e-mail from -- internal e-mail from Jacques Klempf to his

4   CFO, with a piece of information.

5           And I would take that document and I'd ask them the

6   cross-examination, "Did you ever see that document?  Would that

7   have been material to you," that sort of thing, Your Honor.

8           So the -- it is -- it is -- it is -- would be a waste

9   of time and resources to take these people's deposition under

10  those circumstances, because they would not have all the facts

11  that they would need to have to testify, and the -- and the --

12  and we might -- it might require having to take their

13  deposition twice or -- or -- especially the -- the SMK people.

14          The SMK people that -- the -- is the valuation firm

15  that Foodonics hired to do a valuation -- to give a valuation

16  at the redemption transaction, that said that the -- the

17  company had a value of $35 million; whereas, we showed you a

18  dream team analysis done by Jacques Klempf less than a year

19  earlier where he said the company had a value of $68 million,

20  and then he sold the company for $70 million 11 months after he

21  redeemed his mother's stock.

22          What did SMK know?  What were they given?  What were

23  they -- what were they told?  Those are documents we would need

24  to have for their depositions as well.

25          So we're putting the cart before the horse.  We need

1  to -- we -- we served these document requests on Cal-Maine and

2  Foodonics in January of this year.

3         Other than the transaction documents and tax returns,

4  we don't have anything from them.  And this is a circumstantial

5  evidence case because it's fraud.  And you can prove fraud by

6  circumstantial evidence.

7         We want to improve -- we already have a strong

8  circumstantial evidence case.  We have Jacques Klempf saying

9  that the company is worth $68 million a year the year before he

10  redeems his mom's stock.  Then he represents through SMK that

11  it's worth 35 million.  And then he sells it for 70 million.

12         That in and of itself will get us to a jury.  But we

13  want to get more information.  What else weren't we told

14  besides the dream team analysis?

15         So if -- if -- if the GrayRobinson firm is trying to

16  do this in a manner to create a summary judgment issue, they

17  can go ahead and file a summary judgment now.

18         They can put affidavits together and we'll collect

19  the affidavits that we can.  And we'll see which will survive

20  summary judgment.

21         But there's no reason to -- to complicate this case

22  by taking multiple depositions or possibly taking multiple

23  depositions and confusing what -- what is already a convoluted

24  case, as far as production of documents is concerned.

25         THE COURT:  Did you want to say anything else,

1    Mr. Wells?

2              MR. WELLS:  No, sir.

3              THE COURT:  Well, I think I've already ordered that

4    the depositions would not take place until after the production

5    of ESI.  And I'm going to just stick with that.

6              All right.  Anything -- is there anything else, then,

7    Mr. Post?

8              MR. POST:  No, sir.  Thank you very much.

9              THE COURT:  Mr. Wells?

10             MR. WELLS:  No, thank you, sir.

11             THE COURT:  All right.  And that notice will be a

12   joint notice.  You'll get together with Mr. Wells and then just

13   list out whatever issues you-all want to discuss at the next

14   status.

15             MR. POST:  I was going to maybe contact someone in

16   your office and get the case style or the case number and I

17   would see how they did it.

18             THE COURT:  Yes.  All right.  That's fine.  Yes.

19   Just -- if Ms. Chaddock or Ms. Wood -- either one will be able

20   to give you that information.

21             All right.  Well, thank you all.  And I'll see you

22   all on -- did we say October 2nd?

23             MR. POST:  Yes, sir.

24             MR. WELLS:  Yes, sir.

25             THE COURT:  All right.  Thank you.  We're in recess.

1          MR. POST:  Thank you, Your Honor.

2          MR. WELLS:  Thank you, Your Honor.

3          COURT SECURITY OFFICER:  All rise.

4      (The digitally recorded proceedings concluded at

5  11:49 a.m.)

6                              - - -

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**CERTIFICATE**

UNITED STATES DISTRICT COURT      )
                                  )
MIDDLE DISTRICT OF FLORIDA        )

      I hereby certify that the foregoing transcript is a true and correct computer-aided transcription from the official electronic sound recording of the proceedings in the above-entitled matter.

      DATED this 21st day of November, 2018.


      s/Shannon M. Bishop

      Shannon M. Bishop, RDR, CRR, CRC