# TAB 61

| | |
|---|---|
| **From:** | James H. Post |
| **Sent:** | Wednesday, October 31, 2018 3:55 PM |
| **To:** | grier.wells@gray-robinson.com |
| **Cc:** | david.hancock@gray-robinson.com; Chris Dix |
| **Subject:** | RE: Jean Klempf Trust - Password Protected Documents |

Grier,

As I understand it, the Court's order was directed to the entire production made by Foodonics and Jacques Klempf. For the record, we note that during the meet and confer we had on August 28, 2018, pursuant to paragraph 7.H. of the Order Governing ESI Issues, we asked you and Dave about the presence of password-protected or encrypted files in the original Foodonics production, and you told us that there were none.

To expedite discovery in this case and avoid additional motion practice, we also request that you provide a list of all encrypted or password-protected documents that were produced by GrayRobinson, as well as the corresponding passwords.

Thank you,
Jim

James H. Post

SMITH HULSEY & BUSEY

One Independent Drive | Suite 3300 | Jacksonville, Florida 32202
904-359-7700 | Direct 904-359-7783
jpost@smithhulsey.com | www.smithhulsey.com



*This message is from a law firm and may contain information that is confidential or legally privileged. If you are not the intended recipient, please immediately advise the sender by reply email that this message has been inadvertently transmitted to you and delete this email from your system. Thank you for your cooperation.*

**From:** Grier Wells [mailto:Grier.Wells@gray-robinson.com]
**Sent:** Wednesday, October 31, 2018 1:59 PM
**To:** James H. Post <jpost@smithhulsey.com>; Chris Dix <cdix@smithhulsey.com>
**Cc:** David A. Hancock, CEDS <David.Hancock@gray-robinson.com>
**Subject:** RE: Jean Klempf Trust - Password Protected Documents

If I understand the issue correctly, I assume you are referring to documents produced by Foodonics?

**Grier Wells | Complex Commercial, Employment and Construction Litigation**
**The Florida Bar Board Certified in Civil Trial Law**
**G R A Y | R O B I N S O N**

50 North Laura Street, Suite 1100 | Jacksonville, Florida 32202
**T:** 904-598-9929 | **F:** 904-598-9109 | **D:** 904-632-8478
E-mail | Website | Bio | vCard

1

---

**From:** James H. Post [mailto:jpost@smithhulsey.com]
**Sent:** Wednesday, October 31, 2018 1:56 PM
**To:** Grier Wells; Chris Dix
**Cc:** David A. Hancock, CEDS
**Subject:** RE: Jean Klempf Trust - Password Protected Documents

Grier,

As the Court required, please provide us today with a "list of password protected documents from the recent production". The list should be available from the error report that was generated by KLDiscovery when the data was originally processed.

Thank you, Jim


**From:** Grier Wells [mailto:Grier.Wells@gray-robinson.com]
**Sent:** Wednesday, October 31, 2018 1:18 PM
**To:** James H. Post <jpost@smithhulsey.com>; Chris Dix <cdix@smithhulsey.com>
**Cc:** David A. Hancock, CEDS <David.Hancock@gray-robinson.com>
**Subject:** FW: Jean Klempf Trust - Password Protected Documents


As to the Password Protected files that were produced, we DO NOT know what the passwords are. We have asked our client and, because so much time has passed, he doesn't know what the passwords are. There were other password protected documents in the Foodonics documents from Stevens Powell. We used the password (which was able to be determined by the documents) to open them and produce them without the password.

We Produced other documents in their password protected nature because we thought that, if they were important enough to you, you could engage some password cracking software to try to access them.

Though you quoted Mr. Hancock telling the vendor that Producing them without a password was "kicking the can down the street", what he meant was that, because we don't know the passwords to open them, it would still be an issue down the road.


**Grier Wells | Complex Commercial, Employment and Construction Litigation**
**The Florida Bar Board Certified in Civil Trial Law**
**G R A Y | R O B I N S O N**

50 North Laura Street, Suite 1100 | Jacksonville, Florida 32202
**T:** 904-598-9929 | **F:** 904-598-9109 | **D:** 904-632-8478
E-mail | Website | Bio | vCard

**Facebook | LinkedIn | Twitter**

This e-mail is intended only for the individual(s) or entity(s) named within the message. This e-mail might contain legally privileged and confidential information. If you properly received this e-mail as a client or retained expert, please hold it in confidence to protect the attorney-client or work product privileges. Should the

**TAB 62**

| | |
|---|---|
| **From:** | James H. Post |
| **Sent:** | Monday, November 5, 2018 3:59 PM |
| **To:** | grier.wells@gray-robinson.com |
| **Cc:** | david.hancock@gray-robinson.com; Chris Dix |
| **Subject:** | Foodonics v. Klempf Trust - Meet and Confer |

Grier,

Below is a summary of what we discussed during our meet and confer on Thursday, November 1:

1. **Depositions of Foodonics and Jacques Klempf regarding discovery issues**

We tentatively identified November 28, 2018 as the deposition date for Jacques Klempf and November 29, 2018 as the deposition date for the 30(b)(6) designated representative for Foodonics (presently identified as David Hancock). Please confirm these deposition dates by Wednesday, November 7, 2018.

2. **Jacques Klempf's phone data**

You agreed to (i) identify the phone carrier that Jacques Klempf uses, (ii) find out whether Jacques ever backed up his phone using iTunes or any other method other than iCloud and (iii) produce Jacques Klempf's phone records for his mobile phones during the relevant time period (or consent to a subpoena to Jacques Klempf's phone carrier, to the extent such records are unavailable from Jacques Klempf). Please provide responses or an update on these items by November 12, 2018, or contact me by November 7, to discuss a mutually agreeable alternative date.

3. **Password-protected files**

You agreed to (i) review the emails associated with password-protected files to determine whether additional passwords can be identified (e.g., sites for which the password is a Social Security Number, Tax ID number or was sent by separate email) and (ii) produce a list containing the additional passwords that you identify and the corresponding files that you access using each of those additional passwords. If necessary, we asked you to consider the retention of a vendor to try to crack any passwords that cannot be ascertained. Please provide this information by Monday, November 12 or contact me by November 7, to discuss a mutually agreeable alternative date.

4. **DixieEgg.com emails**

You agreed to produce the approximately 37,000 emails recovered from the DixieEgg.com account. We received those emails on Thursday, November 1 and we will let you know if we have any issues with those records.

As to the email accounts of Dick Still and John Reece, you agreed that Jacques Klempf and David Hancock (or someone with similar technical expertise) will contact Microsoft in an attempt to determine (i) when and how each of the DixieEgg.com email accounts was terminated and recovered; and (ii) why some accounts could be recovered but not others (e.g., Dick Still and John Reece). You also agreed to consider our request that you identify, collect and produce the personal email accounts of Dick Still for ESI which is responsive to our discovery requests to Foodonics. Please contact me on or before November 7 to discuss whether these action items have been agreed to and the mutually agreeable dates by which they can be done.

5. **GrayRobinson subpoena**

In regard to the GrayRobinson subpoena, you told us that your firm recently identified approximately 20,000 additional responsive emails and other ESI from another source which was not previously searched. You agreed to make a supplemental production of that additional ESI in approximately 7 – 10 days, after completion of a privilege review.

Without waiver of your date range objection, you told us that no documents or ESI were withheld from your previous production in response to the GrayRobinson subpoena (and no document or ESI will be withheld from your supplemental production) due to any date range restriction objection. In addition, you told us that GrayRobinson searched (and will search) all available sources for documents and ESI responsive to the GrayRobinson subpoena – using the same search terms that were agreed to by us with respect to Foodonics and Jacques Klempf searches – and that no responsive documents or ESI have been or will be withheld from production for any reason except privilege.

## 6. Privilege Logs

Yesterday we provided you with a list of items identified in the privilege logs of (i) Foodonics and Jacques Klempf and (ii) Gray Robinson, respectively, which we contend are not privileged because they were each disclosed to a non-party. We will send electronic copies of these lists which have been revised to include page numbers for ease of identification.

Under Florida law, the voluntary disclosure of information to non-parties constitutes a waiver of privilege unless the parties share a common legal interest. See, e.g., *Arthrex, Inc. v. Parcus Medical, LLC*, 2012 WL 13098036, M.D.Fla. (September 19, 2012). Therefore, for example, each of the communications from your firm (and CPA firms engaged by Foodonics/Jacques Klempf) which are directed to both Foodonics and BAM are not, as a matter of law, privileged because BAM is not a party to this litigation.

We request that you identify what common legal interest, if any, the non-parties identified in each of these line items have with Foodonics or Jacques Klempf with respect to this case. We request that this be done by Tuesday, November 13. In addition, we request that you produce to us each item you confirm is in fact non-privileged by that same date.

Please let us know by November 7, 2018 whether your firm will agree to proceed in this manner and, if so, if you would like to discuss an alternative mutually agreeable date.

We look forward to your response.

Thank you,
Jim

James H. Post

SMITH HULSEY & BUSEY

One Independent Drive | Suite 3300 | Jacksonville, Florida 32202
904-359-7700 | Direct 904-359-7783
jpost@smithhulsey.com | www.smithhulsey.com



100
YEARS
OF PRACTICE
EXCELLENCE

*This message is from a law firm and may contain information that is confidential or legally privileged. If you are not the intended recipient, please immediately advise the sender by reply email that this message has been inadvertently transmitted to you and delete this email from your system. Thank you for your cooperation.*

**TAB 63**

**From:** James H. Post [mailto:jpost@smithhulsey.com]
**Sent:** Wednesday, November 14, 2018 9:48 AM
**To:** Grier Wells
**Cc:** David A. Hancock, CEDS; Chris Dix
**Subject:** RE: Foodonics v. Klempf Trust - Meet and Confer

Grier,

Your firm was directed by Court Order on October 29, 2018 to meet and confer with us regarding all pending discovery issues. Following our meet and confer on November 1, 2018, we provided you with a summary of the action items your firm agreed to take, or consider taking, to resolve those matters without burdening the Court.

To date, you have not responded to my email below and, specifically, have not provided any of the information requested or performed any of the action items pertaining to the following items:

¶ 3      providing passwords to protected files produced by you and your clients;

¶ 4      providing information about the DixieEgg.com email accounts of Dick Still and John Reese;

¶ 5      producing GrayRobinson ESI and documents dated prior to May 22, 2015); or

¶ 6      producing the non-privileged items identified in the privilege logs of GrayRobinson and the Foodonics Parties.

If we do not receive a satisfactory response to each of the foregoing matters by Thursday, November 15, 2018, we will assume that your firm does not intend to resolve these matters and Court intervention will be necessary.

Thank you,
Jim

**From:** James H. Post
**Sent:** Monday, November 5, 2018 3:59 PM
**To:** grier.wells@gray-robinson.com
**Cc:** david.hancock@gray-robinson.com; Chris Dix <cdix@smithhulsey.com>
**Subject:** Foodonics v. Klempf Trust - Meet and Confer

Grier,
Below is a summary of what we discussed during our meet and confer on Thursday, November 1:
1. **Depositions of Foodonics and Jacques Klempf regarding discovery issues**

We tentatively identified November 28, 2018 as the deposition date for Jacques Klempf and November 29, 2018 as the deposition date for the 30(b)(6) designated representative for Foodonics (presently identified as David Hancock). Please confirm these deposition dates by Wednesday, November 7, 2018.

**2. Jacques Klempf's phone data**

You agreed to (i) identify the phone carrier that Jacques Klempf uses, (ii) find out whether Jacques ever backed up his phone using iTunes or any other method other than iCloud and (iii) produce Jacques Klempf's phone records for his mobile phones during the relevant time period (or consent to a subpoena to Jacques Klempf's phone carrier, to the extent such records are unavailable from Jacques Klempf). Please provide responses or an update on these items by November 12, 2018, or contact me by November 7, to discuss a mutually agreeable alternative date.

**3. Password-protected files**

You agreed to (i) review the emails associated with password-protected files to determine whether additional passwords can be identified (e.g., sites for which the password is a Social Security Number, Tax ID number or was sent by separate email) and (ii) produce a list containing the additional passwords that you identify and the corresponding files that you access using each of those additional passwords. If necessary, we asked you to consider the retention of a vendor to try to crack any passwords that cannot be ascertained. Please provide this information by Monday, November 12 or contact me by November 7, to discuss a mutually agreeable alternative date.

**4. DixieEgg.com emails**

You agreed to produce the approximately 37,000 emails recovered from the DixieEgg.com account. We received those emails on Thursday, November 1 and we will let you know if we have any issues with those records.

As to the email accounts of Dick Still and John Reece, you agreed that Jacques Klempf and David Hancock (or someone with similar technical expertise) will contact Microsoft in an attempt to determine (i) when and how each of the DixieEgg.com email accounts was terminated and recovered; and (ii) why some accounts could be recovered but not others (e.g., Dick Still and John Reece). You also agreed to consider our request that you identify, collect and produce the personal email accounts of Dick Still for ESI which is responsive to our discovery requests to Foodonics. Please contact me on or before November 7 to discuss whether these action items have been agreed to and the mutually agreeable dates by which they can be done.

**5. GrayRobinson subpoena**

In regard to the GrayRobinson subpoena, you told us that your firm recently identified approximately 20,000 additional responsive emails and other ESI from another source which was not previously searched. You agreed to make a supplemental production of that additional ESI in approximately 7 – 10 days, after completion of a privilege review.

Without waiver of your date range objection, you told us that no documents or ESI were withheld from your previous production in response to the GrayRobinson subpoena (and no document or ESI will be withheld from your supplemental production) due to any date range restriction objection. In addition, you told us that GrayRobinson searched (and will search) all available sources for documents and ESI responsive to the GrayRobinson subpoena – using the same search terms that were agreed to by us with respect to Foodonics

and Jacques Klempf searches – and that no responsive documents or ESI have been or will be withheld from production for any reason except privilege.

**6. Privilege Logs**

Yesterday we provided you with a list of items identified in the privilege logs of (i) Foodonics and Jacques Klempf and (ii) Gray Robinson, respectively, which we contend are not privileged because they were each disclosed to a non-party. We will send electronic copies of these lists which have been revised to include page numbers for ease of identification.

Under Florida law, the voluntary disclosure of information to non-parties constitutes a waiver of privilege unless the parties share a common legal interest. See, e.g., *Arthrex, Inc. v. Parcus Medical, LLC*, 2012 WL 13098036, M.D.Fla. (September 19, 2012). Therefore, for example, each of the communications from your firm (and CPA firms engaged by Foodonics/Jacques Klempf) which are directed to both Foodonics and BAM are not, as a matter of law, privileged because BAM is not a party to this litigation.

We request that you identify what common legal interest, if any, the non-parties identified in each of these line items have with Foodonics or Jacques Klempf with respect to this case. We request that this be done by Tuesday, November 13. In addition, we request that you produce to us each item you confirm is in fact non-privileged by that same date.

Please let us know by November 7, 2018 whether your firm will agree to proceed in this manner and, if so, if you would like to discuss an alternative mutually agreeable date.

We look forward to your response.
Thank you,
Jim

James H. Post
<image001.png>
One Independent Drive | Suite 3300 | Jacksonville, Florida 32202
904-359-7700 | Direct 904-359-7783
jpost@smithhulsey.com | www.smithhulsey.com

<image004.png>

*This message is from a law firm and may contain information that is confidential or legally privileged. If you are not the intended recipient, please immediately advise the sender by reply email that this message has been inadvertently transmitted to you and delete this email from your system. Thank you for your cooperation.*

<89 - Amended Notice of Continued Deposition of Foodonics International Inc.pdf>

# TAB 64

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

FOODONICS INTERNATIONAL, INC.,  )
a Florida corporation,           )
                                 )
        Plaintiff,               )
                                 )
v.                               )          Case No. 3:17-cv-1054-J-32JRK
                                 )
DINA KLEMPF SROCHI, as Trustee   )
of the LAURA JEAN KLEMPF         )
REVOCABLE TRUST, a Georgia trust, )
                                 )
        Defendant.               )
_____)

DINA KLEMPF SROCHI, as Trustee   )
of the LAURA JEAN KLEMPF          )
REVOCABLE TRUST, a Florida trust, )
and DENNIS L. BLACKBURN, as       )
Assistant Trustee of the JEAN KLEMPF )
TRUST,                           )
                                 )
        Counterclaim Plaintiffs,  )
                                 )
v.                               )
                                 )
FOODONICS INTERNATIONAL, INC.,   )
a Florida corporation, and KEVIN  )
JACQUES KLEMPF,                  )
                                 )
        Counterclaim Defendants.  )
_____)


**COUNTERCLAIM PLAINTIFFS' REQUEST FOR PRODUCTION
TO COUNTERCLAIM DEFENDANT KEVIN JACQUES KLEMPF**

Counterclaim plaintiffs, Dina Klempf Srochi, as Trustee of the Laura Jean Klempf

Revocable Trust, and Dennis Blackburn, as Assistant Trustee of the Jean Klempf Trust,

(the "Laura Jean Klempf Trust" or the "Trust"), pursuant to Rule 34, Federal Rules of

Civil Procedure, requests that counterclaim defendant, Kevin Jacques Klempf, produce for inspection and copying the documents and electronically stored information described below at the law offices of Smith Hulsey & Busey, One Independent Drive, Suite 3300, Jacksonville, Florida 32202, on November 27, 2018.

## Definitions

As used herein:

1. "Cal-Maine" refers to Cal-Maine Foods, Inc., its officers, directors, affiliates, subsidiaries, employees, agents, attorneys, and representatives.

2. The "Cal-Maine Sale" refers to the sale of the Assets of Foodonics to Cal-Maine on or about October 16, 2016.

3. "Document(s)" shall have the same meaning as in Rule 34, Federal Rules of Civil Procedure and shall include, without limiting the generality of the foregoing, correspondence, contracts, agreements, leases, memoranda, notes, calendar and diary entries, memoranda or notes of conversations and of meetings, studies, reports, offers, inquiries, bulletins, summaries, newsletters, compilations, charts, graphs, photographs, film, microfilm, articles, announcements, books, books of account, ledgers, vouchers, canceled checks, invoices, bills, opinions, certificates, transcripts and all other tangible things upon which any handwriting, typing, printing, drawings, representation, magnetic or electrical impulses or other form of communication is recorded, now or at any time in your possession, custody or control, including but not limited to the originals (or any copy when originals are not available) and drafts of documents and all copies that are different in any way from the original.

4. "Dolph Baker" refers to Adolphus B. Baker, Chairman, Chief Executive Officer and President of Cal-Maine Foods, Inc., his employees, agents, entities, affiliates, attorneys, and representatives.

5. "ESI" means electronically stored information in all forms in which it is stored and communicated, and has the same meaning as in Rule 34, Federal Rules of Civil Procedure. ESI specifically includes emails, word processing files, electronic documents, spreadsheets, presentations, databases, images, movies, audio files, voicemails, text messages, and any other information stored on any computer, laptop, tablet, cell phone, smartphone, external hard drive USB drive, cd drive, dvd drive, backup drive, SharePoint site, file server, or in any remote or "cloud"-based system or

2

location, including Dropbox. ESI specifically includes all of the following electronic file types: *.msg, *.pst, *.eml, *.jpg, *.tif, *.gif, *.mov, *.mpg, *.mpeg, *.wmv, *.avi, *.wav, *.mp3, *.doc, *.docx, *.wpd, *.xls, *.xlsx, *.ppt, *.pptx, *.mdb and *.pdf. ESI also includes social media data, including information stored by you or communicated by you through Facebook, Twitter, LinkedIn, Skype and blogs. ESI also includes business or personal email accounts such as Yahoo Mail, Gmail, Hotmail, Outlook.com, AOL mail and other web-based email services.

6.     "Financial Information" shall refer to any record of the financial activities of a business, person, or other entity, including, but not limited to, income statements, balance sheets, statements of financial positions, profit and loss reports, statements of revenue and expense, cash flow statements, audited financial statements, and compilations of financial information.

7.     "Foodonics" refers to Plaintiff, Foodonics International, Inc. doing business as Dixie Egg Co., its officers, directors, affiliates, subsidiaries, employees, agents, attorneys, and representatives.

8.     "Foodonics' Assets" or "Assets" shall refer to any or all of the assets of Foodonics in existence between September 1, 2008 and December 31, 2016 including, but not limited to, (i) the egg production assets of Foodonics and its related entities and/or (ii) Foodonics' interest in American Egg Products, LLC and the Egg-Land's Best franchise with licensing rights for portions of certain markets in Alabama, Florida, and Georgia as well as Puerto Rico, Bahamas and Cuba.

9.     "Foodonics Complaint" means the complaint filed by Foodonics in the referenced action on September 6, 2017, and any amendments thereto.

10.     "Foodonics' Stock" or "Stock" refers to all Class A Voting Shares and Class B Non-Voting Shares of Foodonics in existence between September 1, 2008 and December 31, 2016.

11.     "Laura Jean Klempf" refers to Laura Jean Klempf, her employees, agents, entities, affiliates, attorneys and representatives.

12.     "Marc Klempf" refers to Marc E. Klempf, his employees, agents, entities, affiliates, attorneys, and representatives.

13.     The "Redemption Sale" refers to the redemption transaction on the Settlement and Redemption Agreement which was closed on December 31, 2015.

14.     "Relate to" and "relating to" mean to make a statement about, refer to, discuss, describe, reflect, contain, comprise, identify, or in any way to pertain to, in whole or in part, or otherwise to be used, considered, or reviewed in any way in

connection with, the specified subject. Thus, documents or information that "relate to" a subject also include those which were specifically rejected and those which were not relied or acted upon.

15. The "Settlement and Redemption Agreement" refers to the Settlement and Redemption Agreement entered into as of December 21, 2005 by and among Foodonics; Jacques Klempf; Laura Jean Klempf, individually; Laura Jean Klempf, in her capacity as Trustee of, and on behalf of, the Laura Jean Klempf Revocable Trust dated April 1, 1992, as Amended (the "Seller"); Jacques Klempf and Laura Jean Klempf as Trustees of the Family Trust under the Edward Klempf Revocable Trust Agreement dated April 1, 1992; Dina Klempf Srochi; and Marc Klempf.

16. "Trust" or "Defendant" refers to Dina Klempf Srochi, including but not limited to in her capacity as Trustee of the Laura Jean Klempf Trust dated April 1, 1992.

17. "You" or "Your" refers to K. Jacques Klempf, his employees, agents, entities, affiliates, attorneys, and representatives.

18. The "relevant time period" shall mean September 1, 2008 through November 8, 2018.

## Instructions

1. These discovery requests are continuing in nature so as to require You to file supplementary responses if You obtain new or different information up to and including the time of trial of this action.

2. Pursuant to Rule 26(b)(5) of the Federal Rules of Civil Procedure, in the event that any document or ESI called for by a request is withheld by You on the basis of claim of privilege, please identify that document or ESI by stating: (a) any addressor or addressee, (b) matter, number of pages, and attachments or appendices, (c) all persons to whom the document or ESI was distributed, shown or explained, (d) its present custodian, and (e) the nature of the privilege asserted.

3. If any responsive document or ESI is no longer in existence, cannot be located, or is not in Your possession, custody, or control, identify it, describe its subject matter, and describe its disposition, including, without limitation, identifying the person having knowledge of the disposition.

4. In each of Your responses to these discovery requests, You are requested to provide not only such information as is in Your possession, but all information as is reasonably available. In the event that You are able to provide only

part of the information called for by any discovery request, please provide all of the information You are able to provide and state the reason for Your inability to provide the remainder.

     5.      Produce ESI in native or near-native format, and do not convert ESI to an imaged format (e.g., *.TIF or *.PDF). Native format requires production in the same format in which the ESI was customarily created, used and stored by you. Near-native format requires production of native format ESI so that the content and metadata are electronically accessible. If the native or near-native format is not compatible with a Microsoft Office Suite software program or application, you should provide a description of a software program or application that may be used to access and view the ESI.

     6.      Documents should be produced in searchable *.PDF format with logical unitization and family relationships preserved.

     7.      No potentially discoverable information contained on your computer systems should be deleted or modified and procedures that may affect such data should not be performed unless all potentially discoverable data has been copied and preserved. The data to be preserved includes not just active data, but archival, backup and residual data.

     8.      All drafts or versions of documents and ESI should be produced in addition to the final document or ESI. All documents and ESI containing written notations, comments, edits or marginalia, or which are in any way different from the original should be produced in addition to the original.

     9.      In response to this request, You are required to furnish all information and documents in Your possession, custody or control, or in the possession, custody or control of Your past or present agents, attorneys, accountants, advisors, employees, or any other persons acting on Your behalf.

## Documents and ESI Requested

1.     Documents or ESI sufficient to identify the make, model and carrier of each of Your mobile devices and the condition and location of each such device during the relevant time period.

2.     Documents or ESI sufficient to identify the location of any backups of data for each of Your mobile devices (iCloud, iTunes, VerizonCloud/ATT Locker, laptop or desktop computer backups, etc.) during the relevant time period.

3. All documents or items of ESI (including receipts, invoices, messages or bills) relating or referring to any iPhone or other mobile device owned by You which was damaged, lost, replaced or otherwise disposed during the relevant time period.

4. The phone records or other documents or ESI sufficient to identify the dates and total number of all phone calls exchanged between You and Dolph Baker on each of Your mobile devices during the relevant time period.

5. The phone records or other documents or ESI sufficient to identify the dates and total number of all text messages exchanged between You and Dolph Baker on each of Your mobile devices during the relevant time period.

SMITH HULSEY & BUSEY

By: /s/ *James H. Post*
     James H. Post
     Michael E. Demont
     R. Christopher Dix

Florida Bar Number 0175460
Florida Bar Number 0364088
Florida Bar Number 0036988
One Independent Drive, Suite 3300
Jacksonville, Florida 32202
(904) 359-7700
(904) 359-7708 (facsimile)
jpost@smithhulsey.com
mdemont@smithhulsey.com
cdix@smithhulsey.com

Attorneys for Dina Klempf Srochi, as
    Trustee, and Dennis L. Blackburn,
    as Assistant Trustee, of the Laura Jean
    Klempf Revocable Trust

<u>Certificate of Service</u>

I certify that on November 9, 2018, a copy of this document has been furnished

by email to:

S. Grier Wells, Esq.
GrayRobinson, P.A.
50 North Laura Street, Suite 1100
Jacksonville, Florida 32202
grier.wells@gray-robinson.com
barbara.rude@gray-robinson.com


_____ */s/ James H. Post* _____
Attorney

1018095

7

**TAB 65**

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

FOODONICS INTERNATIONAL, INC., )
a Florida corporation,
                                )

     Plaintiff,
                                )

v.                                )         Case No. 3:17-cv-1054-J-32JRK

DINA KLEMPF SROCHI, as Trustee )
of the LAURA JEAN KLEMPF
REVOCABLE TRUST, a Georgia trust, )

     Defendant.
_____)

DINA KLEMPF SROCHI, as Trustee )
of the LAURA JEAN KLEMPF
REVOCABLE TRUST, a Florida trust, )
and DENNIS L. BLACKBURN, as
Assistant Trustee of the JEAN KLEMPF )
TRUST,
                                )

     Counterclaim Plaintiffs,
                              )

v.                                )

FOODONICS INTERNATIONAL, INC., )
a Florida corporation, and KEVIN
JACQUES KLEMPF,                )

     Counterclaim Defendants.
_____)

**MOTION TO SHORTEN TIME**
**FOR THE PRODUCTION OF DOCUMENTS**

Counterclaim plaintiffs, Dina Klempf Srochi, as Trustee of the Laura Jean Klempf

Revocable Trust, and Dennis Blackburn, as Assistant Trustee of the Jean Klempf Trust (the

"Trust"), moves the Court for the entry of an order requiring counterclaim defendant,

Kevin Jacques Klempf ("Jacques Klempf"), to produce documents on November 27, 2018, which will be eighteen days rather than within the thirty days allowed by Rule 34, Federal Rules of Civil Procedure (the "Motion"), and in support says:

1.      The Trust has scheduled the deposition of Jacques Klempf in this case for November 28, 2018 and served its request for production on November 9, 2018, a copy of which is attached.

2.      In order to conduct a more effective and thorough deposition of Jacques Klempf regarding the discovery issues (including failure to preserve text messages on his mobile devices), the Trust will need to obtain the requested documents from Jacques Klempf before the scheduled deposition.  The number of items requested are few and should be readily available to Mr. Klempf and, in any event, can be obtained by Mr. Klempf by request to his phone carriers and the Apple Data Privacy web page (https://privacy.apple.com/).

3.      By this Motion, the Trust requests the time for production of the documents be shortened from thirty days to eighteen days (to November 27, 2018) so the Trust can use the documents during the deposition of Jacques Klempf.

## **MEMORANDUM OF LAW**

Under Rule 34, Federal Rules of Civil Procedure, a party is afforded thirty days from receipt of a discovery request in which to answer.  The same Rule also states that a longer or shorter time may be ordered by the court.  The normal thirty-day response period for discovery would not allow the Trust's counsel sufficient time to review the documents prior to the deposition of Jacques Klempf.

2

WHEREFORE, the Trust respectfully requests that this Court enter an order shortening the time within which Jacques Klempf must produce the requested documents to November 27, 2018.

**Local Rule 3.01(g) Certification**

Pursuant to Local Rule 3.01(g), counsel for the Trust certifies that he has conferred in good faith with counsel for Jacques Klempf, who states that he opposes the relief requested in this motion.

SMITH HULSEY & BUSEY


By: ___/s/ *James H. Post*___
    James H. Post
    Michael E. Demont
    R. Christopher Dix

Florida Bar Number 175460
Florida Bar Number 364088
Florida Bar Number 036988
One Independent Drive, Suite 3300
Jacksonville, Florida  32202
(904) 359-7700
(904) 359-7708 (facsimile)
jpost@smithhulsey.com
mdemont@smithhulsey.com
cdix@smithhulsey.com

Attorneys for Dina Klempf Srochi, as
    Trustee, and Dennis L. Blackburn, as
    Assistant Trustee, of the Laura Jean
    Klempf Revocable Trust

<u>Certificate of Service</u>

I certify that on this 9th day of November, 2018, I electronically filed the foregoing with the Clerk of Court through the Court's CM/ECF electronic notification system, which will send a Notice of Electronic Filing to all CM/ECF participants in this case. I further certify that I mailed the foregoing document and the notice of electronic filing by first-class mail to the following non-CM/ECF participants: none.

/s/ <i>James H. Post</i>
Attorney

1018165

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

FOODONICS INTERNATIONAL, INC.,  )
a Florida corporation,

                                   )

       Plaintiff,

                                   )

v.                                    )     Case No. 3:17-cv-1054-J-32JRK

                                   )

DINA KLEMPF SROCHI, as Trustee  )
of the LAURA JEAN KLEMPF
REVOCABLE TRUST, a Georgia trust,  )

                                   )

       Defendant.

_____)

DINA KLEMPF SROCHI, as Trustee  )
of the LAURA JEAN KLEMPF
REVOCABLE TRUST, a Florida trust,  )
and DENNIS L. BLACKBURN, as
Assistant Trustee of the JEAN KLEMPF  )
TRUST,

                                   )

       Counterclaim Plaintiffs,

                                   )

v.                                    )

FOODONICS INTERNATIONAL, INC.,  )
a Florida corporation, and KEVIN
JACQUES KLEMPF,                )

                                   )

       Counterclaim Defendants.

_____)

## COUNTERCLAIM PLAINTIFFS' REQUEST FOR PRODUCTION
## TO COUNTERCLAIM DEFENDANT KEVIN JACQUES KLEMPF

      Counterclaim plaintiffs, Dina Klempf Srochi, as Trustee of the Laura Jean Klempf

Revocable Trust, and Dennis Blackburn, as Assistant Trustee of the Jean Klempf Trust,

(the "Laura Jean Klempf Trust" or the "Trust"), pursuant to Rule 34, Federal Rules of

Civil Procedure, requests that counterclaim defendant, Kevin Jacques Klempf,

produce for inspection and copying the documents and electronically stored

information described below at the law offices of Smith Hulsey & Busey, One

Independent Drive, Suite 3300, Jacksonville, Florida 32202, on November 27, 2018.

## Definitions

As used herein:

1.     "Cal-Maine" refers to Cal-Maine Foods, Inc., its officers, directors, affiliates, subsidiaries, employees, agents, attorneys, and representatives.

2.     The "Cal-Maine Sale" refers to the sale of the Assets of Foodonics to Cal-Maine on or about October 16, 2016.

3.     "Document(s)" shall have the same meaning as in Rule 34, Federal Rules of Civil Procedure and shall include, without limiting the generality of the foregoing, correspondence, contracts, agreements, leases, memoranda, notes, calendar and diary entries, memoranda or notes of conversations and of meetings, studies, reports, offers, inquiries, bulletins, summaries, newsletters, compilations, charts, graphs, photographs, film, microfilm, articles, announcements, books, books of account, ledgers, vouchers, canceled checks, invoices, bills, opinions, certificates, transcripts and all other tangible things upon which any handwriting, typing, printing, drawings, representation, magnetic or electrical impulses or other form of communication is recorded, now or at any time in your possession, custody or control, including but not limited to the originals (or any copy when originals are not available) and drafts of documents and all copies that are different in any way from the original.

4.     "Dolph Baker" refers to Adolphus B. Baker, Chairman, Chief Executive Officer and President of Cal-Maine Foods, Inc., his employees, agents, entities, affiliates, attorneys, and representatives.

5.     "ESI" means electronically stored information in all forms in which it is stored and communicated, and has the same meaning as in Rule 34, Federal Rules of Civil Procedure. ESI specifically includes emails, word processing files, electronic documents, spreadsheets, presentations, databases, images, movies, audio files, voicemails, text messages, and any other information stored on any computer, laptop, tablet, cell phone, smartphone, external hard drive USB drive, cd drive, dvd drive, backup drive, SharePoint site, file server, or in any remote or "cloud"-based system or

2

location, including Dropbox. ESI specifically includes all of the following electronic file types: *.msg, *.pst, *.eml, *.jpg, *.tif, *.gif, *.mov, *.mpg, *.mpeg, *.wmv, *.avi, *.wav, *.mp3, *.doc, *.docx, *.wpd, *.xls, *.xlsx, *.ppt, *.pptx, *.mdb and *.pdf. ESI also includes social media data, including information stored by you or communicated by you through Facebook, Twitter, LinkedIn, Skype and blogs. ESI also includes business or personal email accounts such as Yahoo Mail, Gmail, Hotmail, Outlook.com, AOL mail and other web-based email services.

6.      "Financial Information" shall refer to any record of the financial activities of a business, person, or other entity, including, but not limited to, income statements, balance sheets, statements of financial positions, profit and loss reports, statements of revenue and expense, cash flow statements, audited financial statements, and compilations of financial information.

7.      "Foodonics" refers to Plaintiff, Foodonics International, Inc. doing business as Dixie Egg Co., its officers, directors, affiliates, subsidiaries, employees, agents, attorneys, and representatives.

8.      "Foodonics' Assets" or "Assets" shall refer to any or all of the assets of Foodonics in existence between September 1, 2008 and December 31, 2016 including, but not limited to, (i) the egg production assets of Foodonics and its related entities and/or (ii) Foodonics' interest in American Egg Products, LLC and the Egg-Land's Best franchise with licensing rights for portions of certain markets in Alabama, Florida, and Georgia as well as Puerto Rico, Bahamas and Cuba.

9.      "Foodonics Complaint" means the complaint filed by Foodonics in the referenced action on September 6, 2017, and any amendments thereto.

10.      "Foodonics' Stock" or "Stock" refers to all Class A Voting Shares and Class B Non-Voting Shares of Foodonics in existence between September 1, 2008 and December 31, 2016.

11.      "Laura Jean Klempf" refers to Laura Jean Klempf, her employees, agents, entities, affiliates, attorneys and representatives.

12.      "Marc Klempf" refers to Marc E. Klempf, his employees, agents, entities, affiliates, attorneys, and representatives.

13.      The "Redemption Sale" refers to the redemption transaction on the Settlement and Redemption Agreement which was closed on December 31, 2015.

14.      "Relate to" and "relating to" mean to make a statement about, refer to, discuss, describe, reflect, contain, comprise, identify, or in any way to pertain to, in whole or in part, or otherwise to be used, considered, or reviewed in any way in

3

connection with, the specified subject. Thus, documents or information that "relate to" a subject also include those which were specifically rejected and those which were not relied or acted upon.

15.     The "Settlement and Redemption Agreement" refers to the Settlement and Redemption Agreement entered into as of December 21, 2005 by and among Foodonics; Jacques Klempf; Laura Jean Klempf, individually; Laura Jean Klempf, in her capacity as Trustee of, and on behalf of, the Laura Jean Klempf Revocable Trust dated April 1, 1992, as Amended (the "Seller"); Jacques Klempf and Laura Jean Klempf as Trustees of the Family Trust under the Edward Klempf Revocable Trust Agreement dated April 1, 1992; Dina Klempf Srochi; and Marc Klempf.

16.     "Trust" or "Defendant" refers to Dina Klempf Srochi, including but not limited to in her capacity as Trustee of the Laura Jean Klempf Trust dated April 1, 1992.

17.     "You" or "Your" refers to K. Jacques Klempf, his employees, agents, entities, affiliates, attorneys, and representatives.

18.     The "relevant time period" shall mean September 1, 2008 through November 8, 2018.

## Instructions

1.     These discovery requests are continuing in nature so as to require You to file supplementary responses if You obtain new or different information up to and including the time of trial of this action.

2.     Pursuant to Rule 26(b)(5) of the Federal Rules of Civil Procedure, in the event that any document or ESI called for by a request is withheld by You on the basis of claim of privilege, please identify that document or ESI by stating: (a) any addressor or addressee, (b) matter, number of pages, and attachments or appendices, (c) all persons to whom the document or ESI was distributed, shown or explained, (d) its present custodian, and (e) the nature of the privilege asserted.

3.     If any responsive document or ESI is no longer in existence, cannot be located, or is not in Your possession, custody, or control, identify it, describe its subject matter, and describe its disposition, including, without limitation, identifying the person having knowledge of the disposition.

4.     In each of Your responses to these discovery requests, You are requested to provide not only such information as is in Your possession, but all information as is reasonably available. In the event that You are able to provide only

part of the information called for by any discovery request, please provide all of the information You are able to provide and state the reason for Your inability to provide the remainder.

5.      Produce ESI in native or near-native format, and do not convert ESI to an imaged format (e.g., *.TIF or *.PDF). Native format requires production in the same format in which the ESI was customarily created, used and stored by you. Near-native format requires production of native format ESI so that the content and metadata are electronically accessible. If the native or near-native format is not compatible with a Microsoft Office Suite software program or application, you should provide a description of a software program or application that may be used to access and view the ESI.

6.      Documents should be produced in searchable *.PDF format with logical unitization and family relationships preserved.

7.      No potentially discoverable information contained on your computer systems should be deleted or modified and procedures that may affect such data should not be performed unless all potentially discoverable data has been copied and preserved. The data to be preserved includes not just active data, but archival, backup and residual data.

8.      All drafts or versions of documents and ESI should be produced in addition to the final document or ESI. All documents and ESI containing written notations, comments, edits or marginalia, or which are in any way different from the original should be produced in addition to the original.

9.      In response to this request, You are required to furnish all information and documents in Your possession, custody or control, or in the possession, custody or control of Your past or present agents, attorneys, accountants, advisors, employees, or any other persons acting on Your behalf.

## Documents and ESI Requested

1.      Documents or ESI sufficient to identify the make, model and carrier of each of Your mobile devices and the condition and location of each such device during the relevant time period.

2.      Documents or ESI sufficient to identify the location of any backups of data for each of Your mobile devices (iCloud, iTunes, VerizonCloud/ATT Locker, laptop or desktop computer backups, etc.) during the relevant time period.

3.   All documents or items of ESI (including receipts, invoices, messages or bills) relating or referring to any iPhone or other mobile device owned by You which was damaged, lost, replaced or otherwise disposed during the relevant time period.

4.   The phone records or other documents or ESI sufficient to identify the dates and total number of all phone calls exchanged between You and Dolph Baker on each of Your mobile devices during the relevant time period.

5.   The phone records or other documents or ESI sufficient to identify the dates and total number of all text messages exchanged between You and Dolph Baker on each of Your mobile devices during the relevant time period.

SMITH HULSEY & BUSEY

By:   /s/ *James H. Post*
        James H. Post
        Michael E. Demont
        R. Christopher Dix

Florida Bar Number 0175460
Florida Bar Number 0364088
Florida Bar Number 0036988
One Independent Drive, Suite 3300
Jacksonville, Florida 32202
(904) 359-7700
(904) 359-7708 (facsimile)
jpost@smithhulsey.com
mdemont@smithhulsey.com
cdix@smithhulsey.com

Attorneys for Dina Klempf Srochi, as
   Trustee, and Dennis L. Blackburn,
   as Assistant Trustee, of the Laura Jean
   Klempf Revocable Trust

6

Certificate of Service

I certify that on November 9, 2018, a copy of this document has been furnished

by email to:

S. Grier Wells, Esq.
GrayRobinson, P.A.
50 North Laura Street, Suite 1100
Jacksonville, Florida 32202
grier.wells@gray-robinson.com
barbara.rude@gray-robinson.com

_____ */s/ James H. Post* _____
Attorney

1018095

**TAB 66**

IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

FOODONICS INTERNATIONAL, INC.,
a Florida corporation,

        Plaintiff,                    Case No.: 3:17-cv-1054-J-32JRK

v.

DINA KLEMPF SROCHI, as Trustee
of the LAURA JEAN KLEMPF
REVOCABLE TRUST, a Georgia Trust,

        Defendant.
_____/
DINA KLEMPF SROCHI, as Trustee
of the LAURA JEAN KLEMPF
REVOCABLE TRUST, a Florida Trust,
and DENNIS L. BLACKBURN, as
Assistant Trustee of the JEAN KLEMPF
REVOCABLE TRUST, a Florida Trust,

        Counterclaim Plaintiffs,

v.

FOODONICS INTERNATIONAL, INC.,
a Florida corporation, and KEVIN
JACQUES KLEMPF,

        Counterclaim Defendants.
_____/

**RESPONSE TO MOTION TO SHORTEN
TIME FOR THE PRODUCTION OF DOCUMENTS**

Counterclaim Defendant Jacques Klempf ("Mr. Klempf"), through his undersigned

counsel and pursuant to Rule 3.01(b), responds to Counterclaim Plaintiffs' Motion to Shorten

Time for the Production of Documents (Doc.78) ("Motion") filed herein on November 9, 2018.

1.     A copy of the Motion to which was attached a Request for Production was emailed to the undersigned counsel at 6:02 p.m. on Thursday, November 8, 2018 with the request for a response by 4:00 p.m. on November 9, 2018, as to whether the Motion would be agreed to or opposed.

2.     The Motion was forwarded by the undersigned to Mr. Klempf at 9:18 a.m. on Friday November 9. 2018, following which Mr. Klempf immediately began researching and retrieving telephone records from AT&T related to his cell phone(s).

3.     The undersigned advised counsel for the Trust at 1:15 p.m. on November 9, 2018 of Mr. Klempf's willingness and efforts to retrieve mobile telephone records, that whatever records were in his possession or could be reasonably obtained from his mobile telephone carrier would be provided to the Trust and that, accordingly, the Motion was considered unnecessary. Counsel for the Trust was further advised that if Mr. Klempf's agreement to produce records that could be retrieved or reasonably obtained was unacceptable, that Mr. Klempf would oppose the Motion.

4.     The Motion was thereafter filed herein at 3:10 p.m. on November 9, 2018.

5.     The Request for Production to which the Motion is directed seeking comprehensive information related to Mr. Klempf's cell phone service and usage for the "relevant time period" of September 1, 2008 through January, 2018 is overbroad and burdensome. Nonetheless, Mr. Klempf, through counsel, has agreed to produce records that he may have in his possession or can be obtained from his mobile phone service carrier.

6.     Moreover, the circumstances which purportedly compel the Trust to seek the information contemplated by the Request for Production have been known by the Trust for several weeks prior to service of the Motion and Request for Production.

2

## MEMORANDUM OF LAW

Mr. Klempf and counsel are certainly aware of Rule 34, Federal Rules of Civil Procedure, and the discretion of the Court in discovery matters such as those presented by the Motion.  While the Rule clearly provides that the Court may shorten the time for responding to discovery, Mr. Klempf respectfully submits that the relief requested by the Motion is not only overly broad and burdensome but is also unnecessary in light of Mr. Klempf's agreement to provide information in his possession or which can be obtained prior to his scheduled deposition.

WHEREFORE, Mr. Klempf respectfully requests the Court to deny the Motion as moot or to provide such other relief as may be appropriate.

/s/ S. Grier Wells
S. GRIER WELLS, ESQ.
Florida Bar No.: 203238
Primary E-Mail Address:
grier.wells@gray-robinson.com
Secondary E-Mail Address: Barbara.rude@gray-robinson.com
GrayRobinson, P.A.
50 North Laura Street, Suite 1100
Jacksonville, Florida 32202
Phone: (904)-598-9929
JOHN M. BRENNAN
Florida Bar No.: 297951
Primary E-Mail Address:
jay.brennan@gray-robinson.com
Secondary E-Mail Address:
jessica.rolon@gray-robinson.com

MICHAEL R. SANTANA
Florida Bar No.: 42124
Primary E-Mail Address:
michael.santana@gray-robinson.com
Secondary E-Mail Address:
lisandra.acosta@gray-robinson.com
GrayRobinson, P.A.
301 East Pine Street, Suite 1400
Orlando, Florida 32802
Phone: (407) 843-8880
Attorneys for Plaintiff/Counterclaim
Defendants, FOODONICS
INTERNATIONAL, INC., a Florida
Corporation and KEVIN JACQUES
KLEMPF, and Non-Parties HEATHER
JEAN KLEMPF, JULIANNE MARIE
KLEMPF LEE, ALEXANDRA
RENEE KLEMPF, DENNIS HUGHES,
REGGIE DALTON, JOHN REECE,
and RICHARD STILL.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that the foregoing was furnished by email delivery to JAMES H. POST, ESQ., MICHAEL E. DEMONT and R. CHRISTOPHER DIX *(jpost@smithhulsey.com, mdemont@smithhulsey.com, cdix@smithhulsey.com)*, Smith Hulsey & Busey, 225 Water Street, Suite 1800, Jacksonville, Florida 32202 *(Attorneys for Defendant/Counterclaim Plaintiffs)*, this 13th day of November, 2018.

/s/ S. Grier Wells, Esq.
Attorney

\732024\20 - # 1746956 v1

4

**TAB 67**

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

FOODONICS INTERNATIONAL, INC.,  )
a Florida corporation,

                    )

    Plaintiff,

                    )

v.                    )       Case No. 3:17-cv-1054-J-32JRK

                    )

DINA KLEMPF SROCHI, as Trustee
of the LAURA JEAN KLEMPF
REVOCABLE TRUST, a Georgia trust,

                    )

    Defendant.

DINA KLEMPF SROCHI, as Trustee
of the LAURA JEAN KLEMPF
REVOCABLE TRUST, a Florida trust,
and DENNIS L. BLACKBURN, as
Assistant Trustee of the JEAN KLEMPF
TRUST,

    Counterclaim Plaintiffs,

v.

FOODONICS INTERNATIONAL, INC.,
a Florida corporation, and KEVIN
JACQUES KLEMPF,

    Counterclaim Defendants.

## AMENDED NOTICE OF DEPOSITION OF
## JACQUES KLEMPF REGARDING
## THE PRODUCTION OF ESI AND DOCUMENTS
(amended as to location only)

Please take notice that counterclaim plaintiffs, Dina Klempf Srochi, as Trustee of

the Laura Jean Klempf Revocable Trust, and Dennis Blackburn, as Assistant Trustee of the

Jean Klempf Trust, will take the videotaped deposition of counterclaim defendant Kevin

Jacques Klempf ("Jacques Klempf") on November 28, 2018 beginning at 9:30 a.m., at the offices of Hedquist & Associates, 345 East Forsyth Street, Jacksonville, Florida 32202, before an officer authorized by law to administer oaths and take depositions, concerning the areas of inquiry set forth in the attached Exhibit A. This deposition will be videotaped by Advantage Video Productions, Inc., 9951 Atlantic Boulevard, Suite 101, Jacksonville, Florida 32225.

This deposition is being taken for discovery purposes, for use at trial or hearing, or both, and shall continue from day to day until completed.

SMITH HULSEY & BUSEY

By: _____
     James H. Post
     Michael E. Demont
     R. Christopher Dix

Florida Bar Number 175460
Florida Bar Number 364088
Florida Bar Number 036988
One Independent Drive, Suite 3300
Jacksonville, Florida 32202
(904) 359-7700
(904) 359-7708 (facsimile)
jpost@smithhulsey.com
mdemont@smithhulsey.com
cdix@smithhulsey.com

Attorneys for Dina Klempf Srochi, as
    Trustee, and Dennis L. Blackburn,
    as Assistant Trustee, of the Laura Jean
    Klempf Revocable Trust

## Definitions

As used herein:

1.    "Document(s)" shall have the same meaning as in Rule 34, Federal Rules of Civil Procedure and shall include, without limiting the generality of the foregoing, correspondence, contracts, agreements, leases, memoranda, notes, calendar and diary entries, memoranda or notes of conversations and of meetings, studies, reports, offers, inquiries, bulletins, summaries, newsletters, compilations, charts, graphs, photographs, film, microfilm, articles, announcements, books, books of account, ledgers, vouchers, canceled checks, invoices, bills, opinions, certificates, transcripts and all other tangible things upon which any handwriting, typing, printing, drawings, representation, magnetic or electrical impulses or other form of communication is recorded, now or at any time in your possession, custody or control, including but not limited to the originals (or any copy when originals are not available) and drafts of documents and all copies that are different in any way from the original.

2.    "ESI" means electronically stored information in all forms in which it is stored and communicated, and has the same meaning as in Rule 34, Federal Rules of Civil Procedure. ESI specifically includes emails, word processing files, electronic documents, spreadsheets, presentations, databases, images, movies, audio files, voicemails, text messages, and any other information stored on any computer, laptop, tablet, cell phone, smartphone, external hard drive USB drive, cd drive, dvd drive, backup drive, SharePoint site, file server, or in any remote or "cloud"-based system or location, including Dropbox. ESI specifically includes all of the following electronic file types: *.msg, *.pst, *.eml, *.jpg, *.tif, *.gif, *.mov, *.mpg, *.mpeg, *.wmv, *.avi, *.wav, *.mp3, *.doc, *.docx, *.wpd, *.xls, *.xlsx, *.ppt, *.pptx, *.mdb and *.pdf. ESI also includes social media data, including information stored by you or communicated by you through Facebook, Twitter, LinkedIn, Skype and blogs. ESI also includes business or personal email accounts such as Yahoo Mail, Gmail, Hotmail, Outlook.com, AOL mail and other web-based email services.

3.    "Foodonics" refers to plaintiff, Foodonics International, Inc. doing business as Dixie Egg Co., its officers, directors, affiliates, subsidiaries, employees, agents, attorneys, and representatives.

4.    "Jacques Klempf" refers to K. Jacques Klempf, his employees, agents, entities, affiliates, attorneys, and representatives.

# EXHIBIT A

## Areas of Inquiry[1]

1.  **Identification:** The identification of the potentially relevant sources of documents and ESI in the possession, custody or control of Foodonics, Jacques Klempf and their respective agents and employees (collectively, the "Foodonics Parties"), including:

    a.  data maps, custodian questionnaires, and other information describing the locations and types of potentially discoverable information in the possession, custody or control of the Foodonics Parties;

    b.  the name of each person that identified potentially relevant sources of documents and ESI, each person's affiliation with the Foodonics Parties and the location(s) of the particular documents and ESI identified by each such person;

    c.  the date on which the Foodonics Parties began identifying potentially relevant sources of documents and ESI, and the date (if ever) on which the Foodonics Parties finished identifying potentially relevant sources of documents and ESI;

    d.  the policies and procedures (whether written or oral) which relate to retention or destruction of all potentially relevant sources of documents and ESI;

    e.  the potentially discoverable information disclosed by the Foodonics Parties on March 26, 2018, pursuant to the Order Governing ESI Issues; and

    f.  the process of identifying information required to be disclosed by the Foodonics Parties pursuant to Rule 26(a)(1).

2.  **Preservation:** The Foodonics Parties' preservation of potentially relevant sources of documents and ESI, including:

    a.  written or oral legal hold notices sent to custodians of potentially relevant sources of documents or ESI;

---

[1] The categories of matters described below are derived from the Electronic Discovery Reference Model, available at: https://www.edrm.net/frameworks-and-standards/edrm-model/.

b.    the date(s) on which any legal hold notices (written or oral) were sent, and the name of every person that was sent a legal hold notice;

c.    process of deciding on those persons;

d.    the steps taken to follow up with each person that was sent a legal hold notice to ensure that each person understood and complied with the hold process, and the dates on which each of those steps were taken;

e.    automated deletion or archival processes in place affecting any potentially relevant sources of ESI, and if so, what steps were taken (and when) to disable those processes;

f.    the sources and volume (e.g., the total number of electronic files and total amount of data in megabytes/gigabytes) of ESI preserved by the Foodonics Parties;

g.    process by which the Foodonics Parties located and/or preserved inaccessible documents or ESI;

h.    the date(s) on and process by which ESI was preserved by the Foodonics Parties; and

i.    the sources of any potentially relevant ESI not preserved by the Foodonics Parties (regardless of whether the failure to preserve was intentional or inadvertent).

3.    **Collection:** The collection of potentially relevant sources of documents and ESI from the Foodonics Parties, including:

a.    the identity of each person from whom a collection was made or attempted to be made;

b.    the identity of the individuals and technicians that collected ESI;

c.    the particular ESI collected by each individual and technician,

d.    the date(s) on which ESI was collected,

e.    the methods used to collect the ESI; and

f.    the chain of custody for all ESI collected.

4. **Processing:** The Foodonics Parties' processing of ESI, including:

   a. the identity of the individuals and technicians that processed the ESI, the date(s) on which the ESI was processed, and the instructions and methods used to process the ESI;

   b. error reports generated during or after each time ESI was processed, and the steps taken to address and resolve each error; and

   c. any encrypted/password protected files and the password(s) used to access them.

5. **Search and Review:** The search and review of documents and ESI on behalf of the Foodonics Parties, including:

   a. the search terms and other methods used to find documents or ESI responsive to the Trust's request for production to Foodonics and subpoena to Jacques Klempf;

   b. the quality control procedures used to ensure the accuracy and completeness of document or ESI searches;

   c. the date(s) on which ESI was searched, and the individuals involved in the search process; and

   d. the identity of all reviewers of ESI, the date(s) on which ESI was reviewed and the quality control protections used to ensure the accuracy and completeness of the review.

6. **Analysis:** The analysis of the documents and ESI on behalf of the Foodonics Parties, including:

   a. data analytics, predictive coding, technology assisted review, email threading, and any other technology and methods used to analyze documents or ESI;

   b. the identity of all individuals that analyzed ESI and the date(s) on which such analysis occurred;

   c. the process and criteria by which ESI was designated as privileged, work product or otherwise withheld from production; and

   d. the identity of all individuals that decided whether ESI was privileged, work product or otherwise withheld from production and the date(s) on which that work was performed.

7. **Production:** The Foodonics Parties' production of documents and ESI, including:

    a.     The ESI produced to the Trust on August 30, 2018;

    b.     the text messages produced to the Trust on September 14, 2018;

    c.     the ESI produced to the Trust on October 17, 2018; and

    d.     the privilege logs produced by the Foodonics Parties, the individuals that created and edited those logs, and the process by which the logs were created or generated.

8. The actions taken on behalf of the Foodonics Parties related to the discovery status conference orders entered on the following dates:

    a.     March 15, 2018 Order Governing ESI Issues (Doc. No. 27);

    b.     June 6, 2018 Order (Doc. No. 45);

    c.     July 3, 2018 Order (Doc. No. 49);

    d.     August 8, 2018 Clerk's Minutes from Discovery Status Hearing (Doc. No. 53);

    e.     August 22, 2018 Order (Doc. No. 57);

    f.     October 4, 2018 Order (Doc. No. 62); and

    g.     October 22, 2018 status conference.

9. All actions taken by Jacques Klempf personally or on his behalf in connection with the identification, preservation, collection, processing, search and review, analysis and production of ESI and documents as to the documents and ESI requested in this case from Jacques Klempf and Foodonics.

10. The following information with respect to the mobile devices used by Jacques Klempf between September 1, 2008 and January 19, 2018:

    a.     the make, model and carrier of each of Jacques Klempf's mobile devices and the present condition and location of each such device.

    b.     the location of any backups of data for each of Jacques Klempf's mobile devices (iCloud, iTunes, VerizonCloud/ATT Locker, laptop or desktop computer backups, etc.).

c.   who was involved in the collection of Jacques Klempf's telephone text messages in this case? What was done? When?

e.   the date ranges and total number of text messages from Jacques Klempf's mobile devices that were preserved, and the dates on which the preservation occurred.

f.   The dates on which the text messages were collected from Jacques Klempf's mobile devices and the names of the KLDiscovery technicians or other persons that collected the text messages.

g.   To the extent that any of the mobile devices owned by Jacques Klempf between September 1, 2008 and January 19, 2018 were damaged, lost or otherwise disposed of (the "Removed Phones"):

(i)   the date and circumstances relating to the disposition of each Removed Phone and the transfer of the information contained herein, by who and when;

(ii)   the identity of all persons with whom Jacques Klempf discussed or notified of (i) any damaged phones or (ii) the retention or loss of information contained therein; and

(iii)   all documents or ESI which refer or relate to each such discussion or notification.

11.   All facts, events and circumstances which support the claims of privilege in the privilege log furnished by Foodonics and Jacques Klempf on October 17, 2018 (the "Foodonics/Jacques Klempf Privilege Log") which reflects the disclosure or sharing of documents to the persons or email accounts identified in Exhibit 1 attached.

1016614

Exhibit 1

Isaura Costa (icosta@cmfoods.com)
Jeff Hardin (jhardin@cmfoods.com)
Patrice Long (plong@cmfoods.com)
Troy Fernley (tfernley@cmfoods.com)
David Holder (dholder@cmfoods.com)
Dick Still (dstill@cmfoods.com)
Sherman Miller (smiller@cmfoods.com)
dgdorsey@bb&t.com
Ggilley@BBandT.com
Pkay@BBandT.com
Fraser Burns (fburns@forkingamazingrestaurants.com and fburns@ocenture.com)
Lauren Cate (lcate@forkingamazingrestaurants.com)
Matt Mannick (mmannick@forkingamazingrestaurants.com)
Alexandria Klempf (aklempf@forkingamazingrestaurants.com, aklempf@bamjax.com and aklempf@gmail.com)
Lou Vaccaro (lou.vaccaro@amerisbank.com)
Sean Magee (sean.magee@amerisbank.com)
Amy Williamson (amy.williamson@amerisbank.com)
Kendall Spencer (kendall.spencer@amerisbank.com)
Scott Hall (scott.hall@amerisbank.com)
Mark Frisch (mfrisch@seabest.com)
Mail Delivery Subsystem (mailer-daemon@googlemail.com)
Mail Delivery Subsystem (MAILER-DAEMON@mx0a-001d4d01.pphosted.com)
Nancy Ferdman (nferdman@bamjax.com)
Nicole White (nwhite@bamjax.com)
Susan Miller (susan@boldcitybrewery.com)
Colin Edwards (cedwards@burlockandbarrel.com)
Roger Bagalacsa (roger.m.bagalacsa@irs.gov)
Russell Beard (rbeard@brinkmere.com)
Robert Monsky (hrmonsky@firstfloridacapital.com)
Reggie Dalton (rdalton11@tampabay.rr.com)
Billy Morrow (bmorrow@bdo.com)
Heather Klempf (hklempf6@gmail.com)
Mack Craft (mackcraft@yahoo.com)
Mark Carden (mcarden@bankunited.com)
Jim Mattera (james.mattera@cbiz.com)
Mike Robinette (mrobinette@cbiz.com)
Nina Medina (nmedina@bdo.com)
Patrick Wallace (pwallace@bdo.com)
Sam Jacobson (sam@jacobsonwright.com)
Sam Oosterhoudt (sam@lcmg.info and sam@fcgc.info)
Sarah Louviere (slouviere@bdo.com)
Mary Kimbrough (mkimbrough@cmfoods.com)
Rob Holladay (rholladay@cmfoods.com)

Bill Dias (bdias@smki.net)
Dorothy Merrick (dmerrick@hq1.com)
Ian Haensly (ihaensly@burlockandbarrel.com)
Jess Wright (jwright@smki.net)
Joe Indriolo' (jindriolo@pinestreetrps.com)
Karen Koch (kkoch@smki.net)
Lisa Smith (lsmith@smki.net)
Marc Klempf (mklempf@gmail.com)
Scott Moore (focused2be@gmail.com)
Steve Rosenbloom (srosenbloom@smki.net)
Ty Taylor (ttaylor@smki.net)
Zim (zim@oesjax.com)
Chad Munsey ( chad@ovinte.com, chad@wineloungeconcepts.com and
cmunsey@vingevity.com)
ac@hallmarkpartners.com
aida_osmanovic@yahoo.com
gattwood@adf.com
kg@hallmarkpartners.com
colinlackey@ureach.com
aixcater@bistrox.com

<u>Certificate of Service</u>

I certify that on November 14, 2018, a copy of this document has been furnished

by email to:

        S. Grier Wells, Esq.
        GrayRobinson, P.A.
        50 North Laura Street, Suite 1100
        Jacksonville, Florida 32202
        grier.wells@gray-robinson.com
        barbara.rude@gray-robinson.com

                                            Attorney

c:     Hedquist & Associates
       (904) 354-4111
       hedquist@bellsouth.net

       Advantage Video Productions, Inc.
       (904) 724-9006
       scheduling@advantagevideo.com

**TAB 68**

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

FOODONICS INTERNATIONAL, INC., )
a Florida corporation,                          )
                                                )
            Plaintiff,                          )
                                                )
v.                                              )          Case No. 3:17-cv-1054-J-32JRK
                                                )
DINA KLEMPF SROCHI, as Trustee                  )
of the LAURA JEAN KLEMPF                         )
REVOCABLE TRUST, a Georgia trust,               )
                                                )
            Defendant.                          )
_____ )

DINA KLEMPF SROCHI, as Trustee                  )
of the LAURA JEAN KLEMPF                         )
REVOCABLE TRUST, a Florida trust,               )
and DENNIS L. BLACKBURN, as                     )
Assistant Trustee of the JEAN KLEMPF            )
TRUST,                                          )
                                                )
            Counterclaim Plaintiffs,            )
                                                )
v.                                              )
                                                )
FOODONICS INTERNATIONAL, INC.,                  )
a Florida corporation, and KEVIN                )
JACQUES KLEMPF,                                 )
                                                )
            Counterclaim Defendants.            )
_____ )

## AMENDED NOTICE OF RULE 30(b)(6) DEPOSITION OF
## FOODONICS INTERNATIONAL, INC. REGARDING
## THE PRODUCTION OF ESI AND DOCUMENTS
(amended as to location only)

Please take notice that counterclaim plaintiffs, Dina Klempf Srochi, as Trustee of

the Laura Jean Klempf Revocable Trust, and Dennis Blackburn, as Assistant Trustee of

the Jean Klempf Trust, will take the videotaped deposition of Foodonics International,

Inc. ("Foodonics") on November 29, 2018 beginning at 9:30 a.m., at the offices of Hedquist & Associates, 345 East Forsyth Street, Jacksonville, Florida 32202, before an officer authorized by law to administer oaths and take depositions. This deposition will be videotaped by Advantage Video Productions, Inc., 9951 Atlantic Boulevard, Suite 101, Jacksonville, Florida 32225.

This deposition is being taken for discovery purposes, for use at trial or hearing, or both, and shall continue from day to day until completed.

Pursuant to Rule 30(b)(6), Federal Rules of Civil Procedure, Foodonics is required to designate one or more officers, directors, managing agents, or other persons who consent to do so, to testify on its behalf concerning the areas of inquiry set forth in the attached Exhibit A.

SMITH HULSEY & BUSEY

By: _____
James H. Post
Michael E. Demont
R. Christopher Dix

Florida Bar Number 175460
Florida Bar Number 364088
Florida Bar Number 036988
One Independent Drive, Suite 3300
Jacksonville, Florida 32202
(904) 359-7700
(904) 359-7708 (facsimile)
jpost@smithhulsey.com
mdemont@smithhulsey.com
cdix@smithhulsey.com

Attorneys for Dina Klempf Srochi, as
Trustee, and Dennis L. Blackburn,
as Assistant Trustee, of the Laura Jean
Klempf Revocable Trust

2

## Definitions

As used herein:

1.      "Document(s)" shall have the same meaning as in Rule 34, Federal Rules of Civil Procedure and shall include, without limiting the generality of the foregoing, correspondence, contracts, agreements, leases, memoranda, notes, calendar and diary entries, memoranda or notes of conversations and of meetings, studies, reports, offers, inquiries, bulletins, summaries, newsletters, compilations, charts, graphs, photographs, film, microfilm, articles, announcements, books, books of account, ledgers, vouchers, canceled checks, invoices, bills, opinions, certificates, transcripts and all other tangible things upon which any handwriting, typing, printing, drawings, representation, magnetic or electrical impulses or other form of communication is recorded, now or at any time in your possession, custody or control, including but not limited to the originals (or any copy when originals are not available) and drafts of documents and all copies that are different in any way from the original.

2.      "ESI" means electronically stored information in all forms in which it is stored and communicated, and has the same meaning as in Rule 34, Federal Rules of Civil Procedure.  ESI specifically includes emails, word processing files, electronic documents, spreadsheets, presentations, databases, images, movies, audio files, voicemails, text messages, and any other information stored on any computer, laptop, tablet, cell phone, smartphone, external hard drive USB drive, cd drive, dvd drive, backup drive, SharePoint site, file server, or in any remote or "cloud"-based system or location, including Dropbox. ESI specifically includes all of the following electronic file types: *.msg, *.pst, *.eml, *.jpg, *.tif, *.gif, *.mov, *.mpg, *.mpeg, *.wmv, *.avi, *.wav, *.mp3, *.doc, *.docx, *.wpd, *.xls, *.xlsx, *.ppt, *.pptx, *.mdb and *.pdf.  ESI also includes social media data, including information stored by you or communicated by you through Facebook, Twitter, LinkedIn, Skype and blogs.  ESI also includes business or personal email accounts such as Yahoo Mail, Gmail, Hotmail, Outlook.com, AOL mail and other web-based email services.

3.      "Foodonics" refers to plaintiff, Foodonics International, Inc. doing business as Dixie Egg Co., its officers, directors, affiliates, subsidiaries, employees, agents, attorneys, and representatives.

4.      "Jacques Klempf" refers to K. Jacques Klempf, his employees, agents, entities, affiliates, attorneys, and representatives.

## EXHIBIT A

## Areas of Inquiry

Pursuant to Rule 30(b)(6), Federal Rules of Civil Procedure, you are required to designate one or more persons to testify with particularity on behalf of Foodonics concerning all facts, events and circumstances relating to the following matters[1]:

1. **Identification:** The identification of the potentially relevant sources of documents and ESI in the possession, custody or control of Foodonics, Jacques Klempf and their respective agents and employees (collectively, the "Foodonics Parties"), including:

   a. data maps, custodian questionnaires, and other information describing the locations and types of potentially discoverable information in the possession, custody or control of the Foodonics Parties;

   b. the name of each person that identified potentially relevant sources of documents and ESI, each person's affiliation with the Foodonics Parties and the location(s) of the particular documents and ESI identified by each such person;

   c. the date on which the Foodonics Parties began identifying potentially relevant sources of documents and ESI, and the date (if ever) on which the Foodonics Parties finished identifying potentially relevant sources of documents and ESI;

   d. the policies and procedures (whether written or oral) which relate to retention or destruction of all potentially relevant sources of documents and ESI;

   e. the potentially discoverable information disclosed by the Foodonics Parties on March 26, 2018, pursuant to the Order Governing ESI Issues; and

   f. the process of identifying information required to be disclosed by the Foodonics Parties pursuant to Rule 26(a)(1).

---

[1] The categories of matters described below are derived from the Electronic Discovery Reference Model, available at: https://www.edrm.net/frameworks-and-standards/edrm-model/.

2. **Preservation:** The Foodonics Parties' preservation of potentially relevant sources of documents and ESI, including:

   a. written or oral legal hold notices sent to custodians of potentially relevant sources of documents or ESI;

   b. the date(s) on which any legal hold notices (written or oral) were sent, and the name of every person that was sent a legal hold notice;

   c. process of deciding on those persons;

   d. the steps taken to follow up with each person that was sent a legal hold notice to ensure that each person understood and complied with the hold process, and the dates on which each of those steps were taken;

   e. automated deletion or archival processes in place affecting any potentially relevant sources of ESI, and if so, what steps were taken (and when) to disable those processes;

   f. the sources and volume (e.g., the total number of electronic files and total amount of data in megabytes/gigabytes) of ESI preserved by the Foodonics Parties;

   g. process by which the Foodonics Parties located and/or preserved inaccessible documents or ESI;

   h. the date(s) on and process by which ESI was preserved by the Foodonics Parties; and

   i. the sources of any potentially relevant ESI not preserved by the Foodonics Parties (regardless of whether the failure to preserve was intentional or inadvertent).

3. **Collection:** The collection of potentially relevant sources of documents and ESI from the Foodonics Parties, including:

   a. the identity of each person from whom a collection was made or attempted to be made;

   b. the identity of the individuals and technicians that collected ESI;

   c. the particular ESI collected by each individual and technician,

   d. the date(s) on which ESI was collected,

e. the methods used to collect the ESI; and

f. the chain of custody for all ESI collected.

4. **Processing**: The Foodonics Parties' processing of ESI, including:

a. the identity of the individuals and technicians that processed the ESI, the date(s) on which the ESI was processed, and the instructions and methods used to process the ESI;

b. error reports generated during or after each time ESI was processed, and the steps taken to address and resolve each error; and

c. any encrypted/password protected files and the password(s) used to access them.

5. **Search and Review**: The search and review of documents and ESI on behalf of the Foodonics Parties, including:

a. the search terms and other methods used to find documents or ESI responsive to the Trust's request for production to Foodonics and subpoena to Jacques Klempf;

b. the quality control procedures used to ensure the accuracy and completeness of document or ESI searches;

c. the date(s) on which ESI was searched, and the individuals involved in the search process; and

d. the identity of all reviewers of ESI, the date(s) on which ESI was reviewed and the quality control protections used to ensure the accuracy and completeness of the review.

6. **Analysis**: The analysis of the documents and ESI on behalf of the Foodonics Parties, including:

a. data analytics, predictive coding, technology assisted review, email threading, and any other technology and methods used to analyze documents or ESI;

b. the identity of all individuals that analyzed ESI and the date(s) on which such analysis occurred;

c. the process and criteria by which ESI was designated as privileged, work product or otherwise withheld from production; and

3

d.  the identity of all individuals that decided whether ESI was privileged, work product or otherwise withheld from production and the date(s) on which that work was performed.

7. **Production:** The Foodonics Parties' production of documents and ESI, including:

    a.  The ESI produced to the Trust on August 30, 2018;

    b.  the text messages produced to the Trust on September 14, 2018;

    c.  the ESI produced to the Trust on October 17, 2018; and

    d.  the privilege logs produced by the Foodonics Parties, the individuals that created and edited those logs, and the process by which the logs were created or generated.

8. The actions taken on behalf of the Foodonics Parties related to the discovery status conference orders entered on the following dates:

    a.  March 15, 2018 Order Governing ESI Issues (Doc. No. 27);

    b.  June 6, 2018 Order (Doc. No. 45);

    c.  July 3, 2018 Order (Doc. No. 49);

    d.  August 8, 2018 Clerk's Minutes from Discovery Status Hearing (Doc. No. 53);

    e.  August 22, 2018 Order (Doc. No. 57);

    f.  October 4, 2018 Order (Doc. No. 62); and

    g.  October 22, 2018 status conference.

9. All actions taken by Jacques Klempf personally or on his behalf in connection with the identification, preservation, collection, processing, search and review, analysis and production of ESI and documents as to the documents and ESI requested in this case from Jacques Klempf and Foodonics.

10. The following information with respect to the mobile devices used by Jacques Klempf between September 1, 2008 and January 19, 2018:

a.   the make, model and carrier of each of Jacques Klempf's mobile devices and the present condition and location of each such device.

b.   the location of any backups of data for each of Jacques Klempf's mobile devices (iCloud, iTunes, VerizonCloud/ATT Locker, laptop or desktop computer backups, etc.).

c.   who was involved in the collection of Jacques Klempf's telephone text messages in this case? What was done? When?

e.   the date ranges and total number of text messages from Jacques Klempf's mobile devices that were preserved, and the dates on which the preservation occurred.

f.   The dates on which the text messages were collected from Jacques Klempf's mobile devices and the names of the KLDiscovery technicians or other persons that collected the text messages.

g.   To the extent that any of the mobile devices owned by Jacques Klempf between September 1, 2008 and January 19, 2018 were damaged, lost or otherwise disposed of (the "Removed Phones"):

  (i)   the date and circumstances relating to the disposition of each Removed Phone and the transfer of the information contained herein, by who and when;

  (ii)   the identity of all persons with whom Jacques Klempf discussed or notified of (i) any damaged phones or (ii) the retention or loss of information contained therein; and

  (iii)   all documents or ESI which refer or relate to each such discussion or notification.

11.   All facts, events and circumstances which support the claims of privilege in the privilege log furnished by Foodonics and Jacques Klempf on October 17, 2018 (the "Foodonics/Jacques Klempf Privilege Log") which reflects the disclosure or sharing of documents to the persons or email accounts identified in Exhibit 1 attached.

1016031.3

5

Exhibit 1

Isaura Costa (icosta@cmfoods.com)
Jeff Hardin (jhardin@cmfoods.com)
Patrice Long (plong@cmfoods.com)
Troy Fernley (tfernley@cmfoods.com)
David Holder (dholder@cmfoods.com)
Dick Still (dstill@cmfoods.com)
Sherman Miller (smiller@cmfoods.com)
dgdorsey@bb&t.com
Ggilley@BBandT.com
Pkay@BBandT.com
Fraser Burns (fburns@forkingamazingrestaurants.com and fburns@ocenture.com)
Lauren Cate (lcate@forkingamazingrestaurants.com)
Matt Mannick (mmannick@forkingamazingrestaurants.com)
Alexandria Klempf (aklempf@forkingamazingrestaurants.com, aklempf@bamjax.com and aklempf@gmail.com)
Lou Vaccaro (lou.vaccaro@amerisbank.com)
Sean Magee (sean.magee@amerisbank.com)
Amy Williamson (amy.williamson@amerisbank.com)
Kendall Spencer (kendall.spencer@amerisbank.com)
Scott Hall (scott.hall@amerisbank.com)
Mark Frisch (mfrisch@seabest.com)
Mail Delivery Subsystem (mailer-daemon@googlemail.com)
Mail Delivery Subsystem (MAILER-DAEMON@mx0a-001d4d01.pphosted.com)
Nancy Ferdman (nferdman@bamjax.com)
Nicole White (nwhite@bamjax.com)
Susan Miller (susan@boldcitybrewery.com)
Colin Edwards (cedwards@burlockandbarrel.com)
Roger Bagalacsa (roger.m.bagalacsa@irs.gov)
Russell Beard (rbeard@brinkmere.com)
Robert Monsky (hrmonsky@firstfloridacapital.com)
Reggie Dalton (rdalton11@tampabay.rr.com)
Billy Morrow (bmorrow@bdo.com)
Heather Klempf (hklempf6@gmail.com)
Mack Craft (mackcraft@yahoo.com)
Mark Carden (mcarden@bankunited.com)
Jim Mattera (james.mattera@cbiz.com)
Mike Robinette (mrobinette@cbiz.com)
Nina Medina (nmedina@bdo.com)
Patrick Wallace (pwallace@bdo.com)
Sam Jacobson (sam@jacobsonwright.com)
Sam Oosterhoudt (sam@lcmg.info and sam@fcgc.info)
Sarah Louviere (slouviere@bdo.com)
Mary Kimbrough (mkimbrough@cmfoods.com)
Rob Holladay (rholladay@cmfoods.com)

Bill Dias (bdias@smki.net)
Dorothy Merrick (dmerrick@hq1.com)
Ian Haensly (ihaensly@burlockandbarrel.com)
Jess Wright (jwright@smki.net)
Joe Indriolo' (jindriolo@pinestreetrps.com)
Karen Koch (kkoch@smki.net)
Lisa Smith (lsmith@smki.net)
Marc Klempf (mklempf@gmail.com)
Scott Moore (focused2be@gmail.com)
Steve Rosenbloom (srosenbloom@smki.net)
Ty Taylor (ttaylor@smki.net)
Zim (zim@oesjax.com)
Chad Munsey ( chad@ovinte.com, chad@wineloungeconcepts.com and
cmunsey@vingevity.com)
ac@hallmarkpartners.com
aida_osmanovic@yahoo.com
gattwood@adf.com
kg@hallmarkpartners.com
colinlackey@ureach.com
aixcater@bistrox.com

<u>Certificate of Service</u>

I certify that on November 14, 2018, a copy of this document has been furnished by email to:

      S. Grier Wells, Esq.
      GrayRobinson, P.A.
      50 North Laura Street, Suite 1100
      Jacksonville, Florida 32202
      grier.wells@gray-robinson.com
      barbara.rude@gray-robinson.com

                                              Attorney

c:    Hedquist & Associates
      (904) 354-4111
      hedquist@bellsouth.net

      Advantage Video Productions, Inc.
      (904) 724-9006
      scheduling@advantagevideo.com

**TAB 69**

**From:** Grier Wells [mailto:Grier.Wells@gray-robinson.com]
**Sent:** Thursday, November 15, 2018 10:22 AM
**To:** James H. Post <jpost@smithhulsey.com>
**Cc:** David A. Hancock, CEDS <David.Hancock@gray-robinson.com>
**Subject:** FW: Foodonics v. Klempf Trust - Meet and Confer

Jim:

In response to your e-mail from yesterday below, please note the following:

As to ¶3, we have done research and inquired of several people regarding possible passwords for the identified documents. The passwords we have identified have been given to KLDiscovery for them to try to open the documents. For the ones we successfully open, we will produce them. That said, there are several where we still could not ascertain the password either because no human remembers it/them or because the only information we had to go on in the database was verbiage like "the password is on the next email". While it might seem logical and easy to merely go to the next email to find the password, we are finding that "the next email has the password" doesn't exist in our database because it didn't hit on our agreed-upon search terms. We will get you what we can.

As to ¶4, Dick Still's and John Reece's dixieegg.com email accounts are apparently irretrievable. Microsoft has advised that, because of settings and choices selected years ago, the accounts were not set up to be audited and recorded (a setting in the Security and Compliance section) by Eddie Rosemond, Foodonics' IT person. When the assets of Foodonics were sold to Cal-Maine, Jacques Klempf chose to maintain his dixieegg.com account. He asked others if they wanted/needed to maintain theirs. Some said no, and those were deleted. And since the Audit and Record option was not selected, the data from those accounts was permanently deleted after 30 days. Such accounts also stop showing in the Deleted Accounts area after 30 days. For those who either didn't say no or didn't reply at all, accounts were kept (which explains us having access to other accounts).

As to ¶5, we are currently having Special Counsel do a Managed Review of the approximately 20K GrayRobinson documents. They should be done early next week. We will then do a Supplemental Production.

As to ¶ 6, we are reviewing the marked up privilege logs you sent to determine if some can be removed. As we discussed at our meet and confer on November 1, it is our position that if the communication is only between GR and any client entity (or employee of such client entity), such communication is privileged. This would include attachments to the communications. Where we have seen communications with someone included in the To, CC or BCC fields with whom GrayRobinson does NOT have a privileged relationship, we will remove such documents from the privilege logs and do a Supplemental Production, from Foodonics and/or GrayRobinson.

Feel free to call with any questions. I will be tied up most of today with a deposition this afternoon but available tomorrow.

**Grier Wells | Complex Commercial, Employment and Construction Litigation**
**The Florida Bar Board Certified in Civil Trial Law**
G R A Y | R O B I N S O N

50 North Laura Street, Suite 1100 | Jacksonville, Florida 32202
**T:** 904-598-9929 | **F:** 904-598-9109 | **D:** 904-632-8478
E-mail | Website | Bio | vCard

**Facebook | LinkedIn | Twitter**

This e-mail is intended only for the individual(s) or entity(s) named within the message. This e-mail might contain legally privileged and confidential information. If you properly received this e-mail as a client or retained expert, please hold it in confidence to protect the attorney-client or work product privileges. Should the intended recipient forward or disclose this message to another person or party, that action could constitute a waiver of the attorney-client privilege. If the reader of this message is not the intended recipient, or the agent responsible to deliver it to the intended recipient, you are hereby notified that any review, dissemination, distribution or copying of this communication is prohibited by the sender and to do so might constitute a violation of the Electronic Communications Privacy Act, 18 U.S.C. section 2510-2521. If this communication was received in error we apologize for the intrusion. Please notify us by reply e-mail and delete the original message without reading same. Nothing in this e-mail message shall, in and of itself, create an attorney-client relationship with the sender.

**TAB 70**

```
        IN THE UNITED STATES DISTRICT COURT
             MIDDLE DISTRICT OF FLORIDA
               JACKSONVILLE DIVISION

            CASE NO.:  3:17-cv-1054-J-32JRK

FOODONICS INTERNATIONAL, INC.,
a Florida corporation,

            Plaintiff,

     vs.

DINA KLEMPF SROCHI, as Trustee of the
LAURA JEAN KLEMPF REVOCABLE TRUST, a
Georgia trust,

            Defendant.
_____

DINA KLEMPF SROCHI, as Trustee of the
LAURA JEAN KLEMPF REVOCABLE TRUST, a
Florida trust, and DENNIS L. BLACKBURN,
as Assistant Trustee of the JEAN KLEMPF
TRUST,

            Counter Plaintiffs,

     vs.

FOODONICS INTERNATIONAL, INC., a
Florida corporation, and KEVIN
JACQUES KLEMPF,

            Counterclaim Defendants.
_____
```

     Video Deposition of **KEVIN JACQUES KLEMPF**, at 345 E.

Forsyth Street, Jacksonville, Duval County, Florida, on

November 28, 2018, at 9:45 a.m., before Terry T. Hurley,

Registered Professional Reporter, and Notary Public in

and for the State of Florida at Large.

                    - - -

          Hedquist & Associates Reporters, Inc.

---

APPEARANCES


     S. GRIER WELLS, ESQUIRE
     Gray Robinson, P.A.
     50 N. Laura Street, Suite 1100
     Jacksonville, Florida  32202

     Attorney for Plaintiff/Counter Defendant


     JAMES H. POST, ESQUIRE
     MICHAEL E. DEMONT, ESQUIRE
     R. CHRISTOPHER DIX, ESQUIRE
     Smith Hulsey & Busey
     One Independent Drive, Suite 3300
     Jacksonville, Florida  32202

     Attorneys for Defendant/Counterclaim Plaintiff


ALSO PRESENT:  Dennis Blackburn
               David Hancock
               Charlotte Main, Videographer

                    - - -

          Hedquist & Associates Reporters, Inc.

---

INDEX

Witness:  KEVIN JACQUES KLEMPF

Page

DIRECT EXAMINATION
  By Mr. Post--------------------005
  By Mr. Dix---------------------068
CROSS EXAMINATION
  By Mr. Wells-------------------161

EXHIBITS

  No. 01------------------------007
  No. 02------------------------007
  No. 03------------------------008
  No. 04------------------------010
  No. 05------------------------011
  No. 06------------------------023
  No. 07------------------------023
  No. 08------------------------029
  No. 09------------------------076
  No. 10------------------------094
  No. 11------------------------104
  No. 12------------------------106
  No. 13------------------------110
  No. 14------------------------118
  No. 15------------------------119
  No. 16------------------------135
  No. 17------------------------140
  No. 18------------------------143
  No. 19------------------------145

                    - - -

          Hedquist & Associates Reporters, Inc.

---

          THE VIDEOGRAPHER:  This is the video deposition

of Jaques Klempf taken on behalf of the plaintiffs

in the matter of Dina Klempf Srochi versus Foodonics

International, Inc., et al, Case Number

3:17-cv-1054-J-32JRK, being heard in the United

States District Court, Middle District of Florida,

Jacksonville Division.

          The deposition is being held at Hedquist &

Associates, 345 East Forsyth Street, Jacksonville,

Florida 32207, on November 28, 2018, at 9:48 a.m.

          My name is Charlotte Main with Advantage Video.

The court reporter is Terry Hurley with Hedquist &

Associates.

          Counsel, will you now please introduce

yourselves, and the witness will be sworn in.

          MR. POST:  James Post, Chris Dix, Mike Demont,

law firm of Smith Hulsey & Busey, on behalf of the

Jean Klempf Trust.  Also with us today is Dennis

Blackburn, co-trustee of the trust.

          MR. BLACKBURN:  Assistant trustee.

          MR. WELLS:  Grier Wells of Gray Robinson on

behalf of plaintiff and counterclaim defendant

Jaques Klempf, and Dave Hancock also with Gray

Robinson on behalf of Jacques Klempf as counterclaim

defendant.

          Hedquist & Associates Reporters, Inc.

1            KEVIN JACQUES KLEMPF,
2 having been produced and first duly sworn as a witness,
3 testified as follows:
4            DIRECT EXAMINATION
5 BY MR. POST:
6     Q    State your name --
7      MR. WELLS: Jim, before we start asking
8 questions I would like to put something on the
9 record, if I may.
10      MR. POST: I would like to have him state his
11 name for the record, please.
12     **A    I'm Jacques Klempf.**
13      MR. WELLS: The notice of deposition of
14 Jacques, the amended notice as well, has a number of
15 areas of inquiry. We're certainly here to respond
16 as best we can, but to the extent the notice of
17 deposition as to Mr. Klempf individually may be
18 intended to impose some duty that is not appropriate
19 or recognized by a rule or case law we would object.
20      MR. POST: Objection noted.
21     Q    Mr. Klempf, you are the oldest son of Laura
22 Jean Klempf, who is now deceased?
23     **A    No, that's not correct.**
24     Q    How is that not correct?
25     **A    I'm not the oldest son.**

1     Q    Who is the oldest son?
2     **A    My brother.**
3     Q    Okay. That's right. You're the middle
4 child --
5     **A    That's correct.**
6     Q    -- of Laura Jean Klempf, who is now deceased;
7 correct?
8     **A    That is correct.**
9     Q    And you understand that our firm represents
10 your mother's Trust, the Laura Jean Klempf Revocable
11 Trust?
12     **A    I do.**
13     Q    And you also understand that your sister, Dina
14 Klempf Srochi, is the trustee of your mother's Trust?
15     **A    I do.**
16     Q    In addition you're also aware that you're being
17 sued by your mother's Trust based on allegations that,
18 among other things, you concealed material information
19 from your mother on December 31, 2015, when you
20 purchased her stock for millions of dollar less than its
21 fair value; correct?
22     **A    No, I'm not correct with that. I'm not aware**
23 **of that.**
24     Q    Do understand you're being sued for that?
25     **A    I do understand that.**

1      MR. POST: Mark this as Exhibit 1, please.
2      (Exhibit No. 1 was marked for identification.)
3     Q    Mr. Klempf, I'm showing you an order entered by
4 the court in this case on October 29, 2018. Paragraph 4
5 of the order says that the trustee requests
6 authorization to take the deposition of Foodonics, Gray
7 Robinson, an Jack Klempf regarding their compliance with
8 discovery requests in cort orders entered in this case.
9 See Notice Document 68 at 3: Is granted in part and
10 denied in part. The request is granted with respect to
11 Foodonics and Jacques Klempf.
12      So Mr. Klempf, you do understand you're here
13 today for the court-ordered deposition to explain what
14 you've done, if anything, to comply with the Trust's
15 discovery requests and court orders in this case;
16 correct?
17     **A    I understand that.**
18      MR. POST: Mark this as 2, please.
19      (Exhibit No. 2 was marked for identification.)
20     Q    The court's order references the notice filed
21 by the Trust as Court Document 68, which I'm showing you
22 now. It's been marked as Exhibit 2.
23      This notice states, among other things, that
24 the -- that you are to testify regarding the ongoing
25 issues with the deficient production of ESI from Jacques

1 Klempf and Foodonics, the Jacques Klempf parties,
2 including the failure to produce Jacques Klempf's mobile
3 phone data.
4      So you understand that you are here today to
5 discuss, among other things, your failure to produce
6 text messages that you exchanged with people regarding
7 issues in this case?
8     **A    I do understand that.**
9      MR. WELLS: For the record, let me object to
10 the form of the question relating to -- as it may
11 include a presumption as to a failure to produce
12 text messages.
13      MR. POST: Mark this as 3, please.
14      (Exhibit No. 3 was marked for identification.)
15     Q    Mr. Klempf, I'm showing you an amended notice
16 of deposition which was served on you by the Trust
17 pursuant to the court's order, October 15, 2018.
18      Have you reviewed this notice?
19     **A    I don't believe so.**
20      MR. WELLS: For the record, we were operating
21 on the initial notice that was sent calling for the
22 deposition at your offices. He's not reviewed this
23 particular amended notice of deposition.
24     Q    I'll represent to you, Mr. Klempf, that this
25 amended notice simply changes the location of the

1 deposition?
2     A   **I see that. Advantage Video.**
3     Q   Yes, sir. Did you see the original notice for
4 which that was amended?
5     A   **No, I did not.**
6       **Oh, I mean, I -- I -- look, Gray is**
7 **representing me, and as notices come to them they alert**
8 **me that the notices have arrived. I mean, I knew I was**
9 **scheduled to do this video deposition today.**
10     Q   I refer you to paragraph 10 of the order on
11 page 5.
12     A   **Okay.**
13     Q   Paragraph 10(g).
14     A   **Okay. Is this the same one that I've got? I**
15 **just want to see something. Bear with me one second.**
16       MR. WELLS: Mr. Post, you're referring him to
17 what?
18       MR. POST: Page 5, paragraph 10(g).
19     A   **Okay. Yeah, I've got that.**
20     Q   You've got a copy of --
21     A   **Right.**
22     Q   -- the original notice of deposition with you
23 today; right? So you have read this before; correct?
24     A   **Yes. Absolutely.**
25     Q   Paragraph 10(g) says that -- identifies

1 information regarding mobile phones you used between
2 September 1st, 2008 and January 19th, 2018, for your
3 examination today; correct?
4     A   **Correct.**
5     Q   In particular paragraph 10(g) requests
6 information you have regarding mobile phones that might
7 have been destroyed damaged or lost; correct?
8     A   **Correct.**
9       MR. POST: Mark this Exhibit 4, please.
10       (Exhibit No. 4 was marked for identification.)
11     Q   I'm showing you a document produced by the
12 Trust in this case marked as Exhibit 4, which is the
13 e-mail exchange sent by phone, in this case from Dina
14 Klempf to you, on April 22, 2013 -- or 2014.
15       Do you see that?
16     A   **I mean, this -- this is -- I mean. I don't**
17 **recall this, but I'm looking at it now.**
18     Q   All right. I think I said e-mail. I meant --
19 I meant text.
20     A   **Yeah.**
21     Q   It says: Jacques, not sure why you're not
22 responding to my text? All I'm doing is try to help out
23 Mother. This isn't about you or us, it's about Mom, and
24 pretty disappointing that you're incapable of putting
25 our differences aside for the greater good.

1       The mobile number reflected at the top of this
2 exhibit for you is (904)885-1926; correct?
3     A   **Correct.**
4     Q   Is that your mobile phone number today?
5     A   **It is.**
6     Q   And obviously it was your mobile phone number
7 in 2014; correct?
8     A   **Correct.**
9     Q   And was it your mobile phone number earlier
10 than 2014?
11     A   **I -- I don't know if it was the first number**
12 **that I ever -- I think I might have been with Bellsouth**
13 **when I first got a cell phone, but once I went to the**
14 **iPhone it's always been that number.**
15     Q   Do you remember when you went to the iPhone?
16     A   **Not exactly.**
17       MR. POST: Mark this Exhibit 5.
18       (Exhibit No. 5 was marked for identification.)
19     Q   But you did send texts back and forth on your
20 iPhone in 2014; correct?
21     A   **I'm sure I did.**
22     Q   And you also sent e-mails on your iPhone;
23 correct?
24     A   **I'm sure I did.**
25     Q   I'm showing you what's been marked as Exhibit 5

1 to this deposition.
2     A   **Yeah.**
3     Q   This is a document produced by the Trust in
4 this case. It's an e-mail exchange sent by iPhone
5 between you and Dina Klempf on April 22nd, 2013;
6 correct?
7     A   **I mean, you're showing this. Again I don't**
8 **recall this exact e-mail text, but, yeah.**
9     Q   But you did send e-mails back and forth --
10     A   **Of course.**
11     Q   -- to Dina on your iPhone; correct?
12     A   **Probably did, yes.**
13     Q   Regarding your mother, among other things?
14     A   **Yes. I -- I -- do you want to give me a chance**
15 **to read this or not?**
16     Q   I'm going to refer you down here to the last
17 paragraph where it begins: You've done great things for
18 the company, and I'm sure Dad would be beaming for what
19 you've done, as we all are, but all of it -- but all of
20 it is overshadowed by your misdeeds. I hope one day
21 that we can see what you have done to our family.(sic)
22 You're right. I'm sure Dad would be very proud,
23 especially of your treatment of Mom. Hopefully one day
24 you realize that there are more important things in
25 life. If you ever do, I'm a big enough person to

1  forgive you, but you've shown a side of yourself as
2  incapable of accountability or remorse.
3         Do you see that?
4     A   I do see that.
5     Q   Do you see your response?
6     A   I do see my response.
7     Q   Would you read it for the record?
8         MR. WELLS:  Objection.  Objection.  This
9  deposition is about what he did in discovery.  It's
10 not about content of e-mails or substance of the
11 issues in the case.
12    Q   Do you want to read it for the record?
13    A   Not particularly, but you've cherry picked --
14    Q   I'll read it for you.
15    A   Of course.
16    Q   It says:  Fuck you, and quit e-mailing.  You're
17 a cancer in every way.
18        Do you remember -- do you remember writing
19 that?
20    A   I don't remember writing that, but you cherry
21 picked an e-mail that -- you know, there were many from
22 her that made this look like a nursery rhyme.  I can
23 provide those to you if you would like to have them as
24 well.
25    Q   Well, that's the reason we're here.  This was

1  an e-mail that was sent by your phone, and we didn't get
2  this e-mail in your production.  This is a Trust
3  document.
4     A   I understand.
5     Q   Do you know why this was not produced by you?
6     A   In an e-mail or a text?
7     Q   Either.
8     A   Well, I do know why now.  My iPhone 7 -- when I
9  got married in January 2015 -- I'm much like a lot of
10 people here that don't know how to do all the nuances of
11 an iPhone.  My wife, however, is.  So we got married in
12 January 2015, and I was whining or complaining about
13 something, and she said, well, let me fix your iPhone.
14        This is the iPhone 7 that I had.  And that's
15 probably -- I don't know if I had that phone in 2013.
16 Probably not.  But she changed some of the settings, and
17 one of the settings she changed was text messaging, and
18 she changed it from forever to 30 days.  And I didn't
19 even know she had done it until -- she just did it, and
20 then one day Grier called me, and she was in the car
21 with us, and she said, well, I fixed that for your phone
22 a while back.
23        And so that's why the text messages, only the
24 text messages, would have been not available.
25    Q   Do you have that phone with you today?

1     A   I do not.
2     Q   Do you still own that phone?
3     A   No, I do not.  I replaced it.  I have an iPhone
4  10.
5     Q   You replaced your iPhone 7 with an iPhone 10?
6     A   Correct.
7     Q   When did you do that?
8     A   It was in January.  My 7 fell off the bathroom
9  counter and shattered, and so I went to the iPhone store
10 at the Town Center, and they -- the iPhone 10 had just
11 came out, and so I asked them to make sure that -- that
12 all the data and text e-mails was transferred to the
13 10, all my contacts, because I knew how important it
14 was.  I certainly recognized that I'm under an order to
15 protect and salvage all those messages and texts, and so
16 it was all transferred to the iPhone 10.
17    Q   Including your text messages?
18    A   Yes, but it would be -- there would not
19 have been anything over 30 days in that that would have
20 been salvaged, because the settings were changed back in
21 2015 or '16 when I married my wife.
22    Q   Do you know why Exhibit 5, the e-mail exchange,
23 would not have been produced by you in the form of an
24 e-mail?
25    A   I -- I do not know why.  I mean, KLDiscovery

1  came in and got a hold of all my devices, all of my
2  information, and if it's not in there I have no idea
3  why.
4     Q   We will come back to your visit to the Apple
5  store.  That was in January 2017?
6     A   '18.
7     Q   '18?
8     A   Yes.
9     Q   Do you -- do you still own your -- you
10 presently have an iPhone 10?
11    A   Correct.
12    Q   What happened to your iPhone 7?
13    A   The iPhone 7, it was -- after -- I had Apple
14 Care on the phone, so I did get it repaired, and I
15 thought that -- I kept it, but, again, all the data and
16 everything was transferred over.
17        At the time I thought someone in my office, or
18 something, might be able to utilize it.  It sat for four
19 or five months and nobody used it, and recently, maybe
20 two or three months ago we were involved in trying to
21 help a young professional golfer get on the tour, and he
22 didn't have an iPhone, and so I gave the phone to him,
23 and it was set up -- it was a new phone with nothing on
24 it, an iPhone 7 that had been repaired with nothing on
25 it.  He's got it.  And your -- your -- David Dunn is

1 representing him, David Wicks.
2 Q    What's the golfers's name?
3 A    David Wicks.
4 Q    Who cleaned the information off the 7?
5 A    The technician at the Apple store.
6 Q    At your instruction?
7 A    Yes.  I said I want all of my contacts, all of
8 my data, everything transferred to the 10.  If they
9 could not have done that I would not have purchased the
10 10.
11 Q    Mr. Klempf, there appear -- there is an article
12 in The Daily Record on November 8, 2016, entitled
13 Jacques Klempf:  On the sale of Dixie Egg, I just think
14 the time is right.
15      Do you remember that article?  It had your
16 picture on it.
17 A    I mean, I don't know that I necessarily
18 remember it.  I mean, I -- I -- there were quite a few
19 articles written here and there.
20 Q    You were interviewed for this article; correct?
21 A    You're looking at it.  I mean, I'm assuming I
22 was.
23 Q    I'm going to hand this to you to refresh your
24 recollection.  I'm not going to attach it as a mark --
25 as a copy of your deposition at this time.

1      MR. WELLS:  Do you have an extra copy?
2      MR. POST:  Yes.  I'm sorry.
3 Q    Do you recall this article?
4 A    Yeah.  I know Karen Brune Mathis.
5 Q    And you -- you recall being interviewed for
6 this article; correct?
7 A    I do.
8 Q    At the top of the -- at the beginning of the
9 article it says -- it says that according -- that you
10 were staying at an older hotel in Jackson, Mississippi,
11 where Cal-Maine is based, and one of the nation's
12 largest egg companies used for guests.
13 A    Correct.
14 Q    He went to the bathroom, the door locked behind
15 him.
16 A    Yeah.
17 Q    With his cell phone handy he called the hotel
18 and texted the Cal-Maine CEO, a good friend --
19 A    Correct.
20 Q    -- joking, the company wanted to make sure he
21 did the deal.  You got me locked -- you guys got me
22 locked in the bathroom, Klempf texted.
23      Do you see that?
24 A    Yeah, I do see that.  I remember that.
25 Q    So you texted -- you texted Dolph Baker with

1 your phone as a -- as a friend?
2 A    Well, at the time he -- we -- I was staying at
3 the hotel, and I wasn't sure if I was going to be able
4 to get out of the bathroom.  It was -- I've never been
5 in such a hotel before.
6      But irregardless, I was able to get out, and I
7 didn't have the phone number of the hotel right at hand,
8 and I thought texting him he could have called the
9 hotel.  But eventually I got out.
10 Q    So you used your phone to exchange --
11 A    Oh, I did.
12 Q    -- text messages with Dolph Baker?
13 A    Yes, I did.
14 Q    And that's because he was not only the CEO of
15 Cal-Maine, but he was your good friend too?
16 A    Yeah, he is a good friend.
17 Q    And how long has he been your friend?
18 A    God, that's a good question.  I -- we served on
19 a lot of different poultry boards over the years, and
20 that's how I met him.  I didn't know him prior.
21      As a matter of fact, most of the people in the
22 industry I met either through being on a board or trade
23 show, or something like that.
24      So I would say U.S. Poultry and Egg Association
25 was a board we were both on, and that was the first time

1 I actually spent a little time with him and got to know
2 him.
3 Q    And that would have been, what, in about 2009,
4 '10?
5 A    It may have been before that.  It may have been
6 '5 or '6.  I'm not exactly sure what my tenure was with
7 U.S. Poultry when it started.
8 Q    When you text Dolph Baker did you text to his
9 mobile phone?
10 A    I believe I did, yes.
11 Q    And that's been your practice for a period of
12 time that you've texted with him?
13 A    Yeah, if I was somewhere.  Yeah, I have his
14 cell phone number in my phone.  It's in there now.
15 Q    Have you used that same phone number to text
16 message him since the beginning of your texting with
17 him?
18 A    Since the beginning of my texting with him.  I
19 mean, this phone would have been a different phone than
20 the 10 that I have today.
21 Q    Same phone number?
22 A    I'm assuming it's the same number.  I don't
23 recall changing his phone number in my phone, but I'm
24 assuming it would be the same number.
25 Q    Do you have your phone with you today?

1    A    I do.
2    Q    Could you go to your contact information for
3  Mr. Baker and tell me his cell phone number?
4    A    **Yeah.  I may have -- it's (601)955-7133, or --**
5  **that's got to be it.  Yeah, (601)955-7133.**
6    Q    Do you have other phone numbers for Mr. Baker?
7    A    **Well, under the Cal-Maine would have been in**
8  **here too, and I thought at one time I may have had his**
9  **name and cell in that contact, but it's not.  It's the**
10  **corporate office number.**
11    Q    Do you have any other phone numbers besides the
12  955 number?
13    A    **For Dolph?**
14    Q    Right.
15    A    **For Dolph Baker, no.**
16    Q    What's your e-mail address for Mr. Baker?
17    A    **Well, I haven't sent him an e-mail in a while,**
18  **but it would be DBaker@CMFoods.com.**
19    Q    Do you have any other e-mail addresses for him?
20    A    **Not that -- no.**
21    Q    And you presently have text messages on your
22  phone with Dolph Baker?
23    A    **Presently?**
24    Q    Right.
25    A    **I don't believe so.  I may.  I played golf with**

1  **two or three of his employees that were in Jacksonville**
2  **about a month ago, and it could be that -- and I think I**
3  **probably said something like I had a great round with --**
4  **you know, with your guys.**
5    Q    Well, can you check to see if you have a text
6  exchange with him?
7    A    **Yeah.  Yep.  Nice round of golf with Jeff,**
8  **Darrell, and Scott.  The PET vendor -- PET is a plastic**
9  **carton vendor -- Jeff has some physical issues with his**
10  **arms and hand, but otherwise played pretty well.  It was**
11  **really hot.  I shot a 43 on the front and a 49 on the**
12  **back.  Hope all is well with you and your family.**
13    Q    How far does that go back?
14    A    **This is October 5th.**
15    Q    I mean, if you scroll back to the top of the
16  text message.
17    A    **Well, I sent him some pictures of another egg**
18  **truck competitor a while back, May of -- well, I don't**
19  **know.**
20    Q    If you scroll all the way to the top.
21    A    **Yeah.  I'm not getting -- the signal may be not**
22  **getting here.  Hold on.  I'll -- let me just take it**
23  **off.**
24        **It says -- it's showing here a picture that I**
25  **sent him of some trucks, egg trucks, that are delivering**

1  **eggs in the city, and the date says May 14th, at**
2  **12:09 p.m.**
3    Q    May 14th of this year?
4    A    **I would assume.**
5    Q    Thank you.
6    A    **But it's weird.  It's just still turning like**
7  **there's something.**
8        (Exhibit No. 6 was marked for identification.)
9    Q    I'm showing you what's been marked Exhibit 6 to
10  this deposition.  It's a motion to shorten time for
11  production of documents filed by the Trust asking that
12  you produce at this deposition today information
13  identified on pages 5 and 6 of the document.
14    A    **Okay.**
15    Q    Are you on page 5?
16    A    **You've got it on page 5, so...**
17    Q    Yes.  Okay.
18        MR. WELLS:  For the record, this motion was
19  denied by the court.
20    Q    And the documents requested that you produce
21  are listed here in Paragraphs 1 --
22    A    **Right.**
23    Q    -- through 5; correct?
24    A    **Yes.**
25        (Exhibit No. 7 was marked for identification.)

1  Seven.
2    Q    I'm showing you what's been marked as Exhibit 8
3  to this deposition.  I'm sorry.  7.
4        This is a response filed to that motion by your
5  attorneys on your behalf, and it states on page 2,
6  paragraph 5 that:  Mr. Klempf through counsel has agreed
7  to produce records that he may have in his possession or
8  can be obtained from his mobile phone service carrier.
9        Do you see that?
10    A    **Yeah.**
11    Q    And then again on the next page under the -- it
12  concludes by saying that:  The motion is unnecessary in
13  light of Mr. Klempf's agreement to provide information
14  in his possession, or which could be obtained prior to
15  his scheduled deposition.
16        Do you see that?
17    A    **I don't see that.  Where are you -- where are**
18  **you looking?**
19    Q    It's the last sentence.
20    A    **Oh, the one -- okay.**
21    Q    The memorandum of law.
22        Motion is unnecessary in light of Mr. Klempf's
23  agreement to provide information in his possession, or
24  which can be obtained prior to his scheduled deposition.
25    A    **Okay.**

| | |
|---|---|
| 1 | Q    Do you see that? |
| 2 | A    **I do see it.** |
| 3 | Q    The Trust has not yet provided any of these |
| 4 | records from you. |
| 5 | Did you bring any of these records with you |
| 6 | today? |
| 7 | A    **I'm looking at my counselor. I don't --** |
| 8 | MR. WELLS:  We do not have records today. We |
| 9 | have obtained records -- Mr. Klempf has obtained |
| 10 | records from Apple, but they are -- |
| 11 | THE WITNESS:  Right. |
| 12 | MR. WELLS:  -- as present indecipherable. |
| 13 | A    **Right. You had a link on one of your e-mails** |
| 14 | **that you sent to Grier, and that link, I asked for that** |
| 15 | **information from Apple. I did get it, and I forwarded** |
| 16 | **it to both Dave Hancock and Grier to review.** |
| 17 | **I tried to look at -- in that file that Apple** |
| 18 | **sent, when you download it there's about 15 or 16** |
| 19 | **different things you can click on to download, including** |
| 20 | **photos. But I did not see anything in the messages.** |
| 21 | **There wasn't a message like download. There was a lot** |
| 22 | **of stuff in the Cloud, and maybe it's in there. I don't** |
| 23 | **know.** |
| 24 | Q    Well, what records other than what you did -- |
| 25 | tried to do on the Apple situation, what records, if |

| | |
|---|---|
| 1 | any, did you bring me to help me identify the make, |
| 2 | model, or carrier of your mobile device? Any? |
| 3 | A    **I mean, I didn't know I was supposed to** |
| 4 | **bring -- bring them today.** |
| 5 | Q    Did you bring me any records today that |
| 6 | identified the location of your backup data for your |
| 7 | mobile devices? |
| 8 | A    **No.** |
| 9 | Q    Did you bring me any records today that relate |
| 10 | to the iPhone that you say that was damaged? |
| 11 | A    **No. I mean, you -- the answer is going to be** |
| 12 | **no to anything that you think I have today. I don't** |
| 13 | **have anything.** |
| 14 | Q    Let's make sure the record is clear then. |
| 15 | Did you bring me any records that identify the |
| 16 | dates and total number of phone calls that you exchanged |
| 17 | with Dolph Baker? |
| 18 | A    **No.** |
| 19 | Q    Did you bring any records today that identify |
| 20 | the total number of text messages you exchanged with |
| 21 | Dolph Baker during the relevant time period? |
| 22 | A    **Just what I showed you.** |
| 23 | Q    Nothing other than what you showed me? |
| 24 | A |
| 25 | MR. POST:  So, Mr. Wells, are we going to get |

| | |
|---|---|
| 1 | those records? |
| 2 | MR. WELLS:  Be glad to provide them to you -- |
| 3 | MR. POST:  I'm sorry? |
| 4 | MR. WELLS:  -- but there's nothing there. I |
| 5 | mean, I'll be glad to provide them to you. |
| 6 | THE WITNESS:  The entire file -- |
| 7 | MR. WELLS:  Let me rephrase. Let me make sure |
| 8 | we're clear. |
| 9 | Mr. Klempf has already testified as to the |
| 10 | status of text messages prior to discovering the |
| 11 | 30-day policy that his wife had put on his phone. |
| 12 | We will provide the records that he has requested |
| 13 | from his carrier, or from Apple, in our effort to |
| 14 | respond to the items in your motion. We can provide |
| 15 | those, but it is our belief and view from reviewing |
| 16 | those that there's nothing there. |
| 17 | We note again -- |
| 18 | MR. POST:  I -- I -- I simply note that in the |
| 19 | response you say that Klempf through counsel has |
| 20 | agreed to produce records that they have in their |
| 21 | possession, or can be obtained from the mobile phone |
| 22 | carrier, and that the granting of the motion is |
| 23 | unnecessary in light of Mr. Klempf's agreement to |
| 24 | provide information. |
| 25 | MR. WELLS:  Thank you. I'm aware of the |

| | |
|---|---|
| 1 | response. |
| 2 | MR. POST:  We have not received a single |
| 3 | document, and I'm asking you are we going to or not? |
| 4 | MR. WELLS:  As I have responded, we will |
| 5 | provide the records that were sent to Mr. Klempf |
| 6 | from Apple, but I'm suggesting to you that the |
| 7 | records you will get do not contain anything, and |
| 8 | our response to your motion was that we would make a |
| 9 | reasonable effort to obtain the records. The only |
| 10 | thing we've got is something that we believe is not |
| 11 | useful. |
| 12 | MR. POST:  Well, I suggest to you that that's |
| 13 | incomplete, because we have also asked for billing |
| 14 | records, and certainly Mr. Klempf can get billing |
| 15 | records. |
| 16 | THE WITNESS:  Would that be in that -- what |
| 17 | they sent me? Would the billing records be in that |
| 18 | link? |
| 19 | MR. WELLS:  They may be, yeah. |
| 20 | A    **I don't keep bills. I mean, I'm sure AT&T** |
| 21 | **probably has a record, but I don't keep them. Once I** |
| 22 | **pay something I just discard it.** |
| 23 | Q    Who is your carrier, Mr. Klempf? |
| 24 | A    **AT&T is my carrier, and I don't know exactly** |
| 25 | **how long they've been my carrier, but for quite a while.** |

1  Since I've had the iPhone.

2  Q    When did you get your iPhone 7, if you recall?

3  A    I don't recall the exact date. I don't change

4  phones that often, so I would say, you know, whenever it

5  came out, you know. I don't know. I don't have an

6  exact date.

7  Q    Referring back to Exhibit 3, the amended notice

8  of deposition.

9  A    3. I'm getting pretty good at this.

10  Q    Going to page 5, paragraph 11, it states that,

11  among other things that we are going to ask you about

12  today are the facts, events, and circumstances to

13  support the claims of privilege and the privilege log

14  that was furnished to us by your counsel which reflects,

15  in our view, disclosure or sharing documents or persons

16  who are not parties to this litigation.

17      MR. POST: Can I have this marked as the next

18  exhibit, please.

19      (Exhibit No. 8 was marked for identification.)

20      MR. POST: You can set that aside if you want,

21  if that will help you.

22  Q    So what you have in front of you is a copy of a

23  schedule produced to the Trust by your attorney in this

24  case, which purports to be a schedule of the documents

25  belonging to Foodonics or you which are relevant to this

1  case but have not been produced because of claims of

2  privilege, attorney/client privilege, work product

3  privilege, or accountant/client privilege.

4      And as we have informed your counsel, our

5  position is that a privilege claim cannot be made as to

6  any document or item of ESI which is disclosed to a

7  third party not -- having no common interest with the

8  defendants, that is Foodonics and you. And with that in

9  mind I would like to look at some of these -- these

10  entries.

11      So this log is in date order. You can see the

12  dates in --

13  A    Yeah.

14  Q    -- the left-hand column. And if we can turn to

15  the entry for September 18, 2013. 9/18/2013.

16  A    Okay. Is it okay if I write on this?

17  Q    You're welcome to.

18      Looking at the line item where -- about halfway

19  down the page, it's --

20  A    9/11/2013?

21  Q    9/18 -- 9/19/2013.

22  A    Okay. I've got it.

23  Q    You'll see on the far right-hand -- the first

24  column is who sent or generated the e-mail or ESI, the

25  second column is who it was sent, and the third column

1  is people who got copies.

2  A    Got a copy. Okay.

3  Q    Okay. This particular e-mail shows a copy

4  going to an R. Beard at Brinkmere.

5  A    Yeah.

6  Q    Who is -- who is R. Beard?

7  A    R. Beard is -- it was a -- he's a private

8  equity guy. I can't remember his first name. Robert

9  Beard.

10      From what I understand, when Florida Rock sold

11  their business they opened up a private equity practice,

12  and this guy Beard was running it for them.

13  Q    So and the private equity practice was called

14  Brinkmere?

15  A    I believe so, yes.

16  Q    And it shows another copy going to Robert

17  Monsky; right?

18  A    Correct.

19  Q    And who is Robert Monsky?

20  A    Robert Monsky and his father have a -- they are

21  a business transaction firm. They -- they try and do

22  deals, and for a long time he was trying to put some

23  deal together for Dixie Egg Company/Foodonics, and it

24  just never came to fruition.

25  Q    What period of time was that?

1  A    I'm -- I'm assuming it's 9/18/2013. Around

2  that -- around that time.

3  Q    So was Brinkmere -- Brinkmere is not a party to

4  this litigation; correct?

5  A    I'm not -- I mean, you've pretty much canvassed

6  the entire country, but I don't think Brinkmere was in

7  that group.

8  Q    So there is no common legal interest between

9  Foodonics and Brinkmere, is there?

10  A    No. He -- he had interest in what we were

11  doing, but it never went very far at all. They had just

12  started, and it was a huge learning curve for him and

13  that organization.

14  Q    So the Brinkmere and Robert -- and Robert

15  Monsky's company, First Florida Capital, are not -- are

16  not involved in this litigation; correct?

17  A    I think First Florida Capital and the Monskys,

18  you did ask for discovery items from them.

19  Q    But they're not parties?

20  A    No, I guess not.

21  Q    By parties I mean people who --

22  A    Who are being sued?

23  Q    Right. Plaintiffs or defendants.

24  A    No, I don't believe they are --

25  Q    Right.

1    A   -- yet.

2    Q   So going to December 13, 2013.

3    A   **Okay.**

4    Q   Near the top of the page there's e-mails from

5 Alice Holt to D.G. Dorsey at BB&T.

6    A   **Right.**

7    Q   Copy to you.

8    A   **Uh-huh.**

9    Q   Who is D.G. Dorsey?

10    A   **She was our banker at BB&T, Dawn Dorsey. I**

11 **don't know what her middle name is. She was our banker.**

12    Q   When you say our who do you mean?

13    A   **Foodonics.**

14    Q   Foodonics only, or your personal --

15    A   **Not my personal, no.**

16    Q   Was it -- are they the banker of anyone other

17 than Foodonics in your group?

18    A   **I'm -- I'm not aware if they are, but Dawn was**

19 **just our -- my -- the personal banker, our -- you know,**

20 **for our company.**

21    Q   What -- what -- does that relationship still

22 exist?

23    A   **No.**

24    Q   When was it terminated?

25    A   **On the sale of the company.**

1    Q   Okay. If you go to March 14, 2014.

2    A   **March 14, 2014?**

3    Q   Let's see. Excuse me. Let's -- September 25,

4 2014.

5    A   **Okay.**

6    Q   This shows a communication from John Stevens to

7 Alexandria Klempf and copy to you.

8       Who is Alexandria Klempf?

9    A   **That would be my daughter.**

10    Q   And in September 2014 what would have been her

11 relationship to Foodonics and you?

12    A   **I -- yeah, I -- I'm fairly certain that would**

13 **have some kind of tax -- something to do with taxes, I**

14 **would -- I would assume, because we normally filed our**

15 **corporate tax by October 15th every year. We would ask**

16 **for extensions so that we could. So I -- that's the**

17 **only thing I could think. Something to do with the**

18 **return. Maybe she had to sign something or --**

19    Q   Did she hold a position with Foodonics --

20    A   **No.**

21    Q   -- in April -- September 2014?

22    A   **No, she was in school. She was at University**

23 **of Massachusetts.**

24    Q   Well, if you go up to the top of that page it

25 shows an e-mail from Fraser Burns to Chad Munsey, you,

1 with a copy to Alexandria.

2    A   **Yeah.**

3    Q   Why would she be getting a copy of this e-mail

4 if she wasn't involved in the business?

5    A   **Well, this -- and again she -- I'm not exactly**

6 **sure when she left the University of Massachusetts. She**

7 **was coming back, and she was involved with, you know,**

8 **some of our restaurant ventures, and so she might have**

9 **been communicating with them about that. That's what**

10 **I'm assuming.**

11       **I -- I don't recall the e-mail, but she was --**

12 **we had talked about her coming in and helping us with**

13 **marketing and digital advertising and different things**

14 **with our restaurant side.**

15    Q   When you say our restaurant side, do you mean

16 Foodonics' restaurant side?

17    A   **At that time, yes.**

18    Q   Did it change?

19    A   **Did it change?**

20    Q   Right. Did Foodonics -- does Foodonics no

21 longer have restaurants?

22    A   **Foodonics continues to have investments in**

23 **restaurants.**

24    Q   How does -- what is the relationship between

25 Foodonics and its restaurant side of the business?

1    A   **They've got investments in restaurants.**

2    Q   Are they -- do they have equity ownership?

3    A   **Yes.**

4    Q   Could you describe that for me? What is that?

5    A   **I mean, I don't know the exact percentage, but**

6 **they have equity interest, yes.**

7    Q   Does Foodonics have equity interest in, for

8 example, the Cowford restaurant?

9    A   **In the building, yes.**

10    Q   Can you a explain that to me?

11    A   **I mean, they have an equity interest in the**

12 **building.**

13    Q   Do they have an equity interest in the company

14 that owns the real estate that the building is located?

15    A   **I don't think I understand your question.**

16       MR. WELLS: Object to the form.

17    A   **They have an interest in the -- they have an**

18 **equity interest in the land and property.**

19    Q   And is that legal title, or do they have an

20 equity interest in the company that holds legal title?

21    A   **I believe it's legal title.**

22    Q   So does this date refresh your recollection,

23 September 2014, was Alex Klempf involved in your

24 restaurant ventures?

25    A   **Well, she was going to be involved to some**

1  degree. When she first came back she was actually
2  teaching at UNF, and -- and then we got her involved
3  in -- you know, this probably, is my guess, had
4  something to do with Ovinte, because Chad would have
5  only been involved in Ovinte, and Fraser certainly was
6  as well. So that would be my -- that would be my
7  recollection.
8      Q    How, if at all, was Ovinte related to
9  Foodonics?
10     A    It really wasn't. It was owned by a separate
11 LLC.
12     Q    Of which you were -- you were a personal
13 member?
14     A    And so was Chad and so was Fraser.
15     Q    But Foodonics was not a member of that LLC?
16     A    No.
17     Q    Going to May 14, 2015.
18     A    Okay.
19     Q    There is an e-mail to you from Terry Moore,
20 copies to various people, including Colin Edwards,
21 Burlock and Barrel.
22         Who is Colin Edwards?
23     A    Colin Edwards is a partner in a whiskey
24 distillery business.
25         THE VIDEOGRAPHER: Excuse me, Mr. Klempf. You

1  keep rubbing your mic with your hands.
2          THE WITNESS: Okay. I guess -- I'm sorry. I'm
3  not doing it intentionally.
4      Q    Whiskey distillery business?
5      A    Correct.
6      Q    How is Foodonics related to that business?
7      A    They are not.
8      Q    Do you have ownership interest in that
9  business?
10     A    I do.
11     Q    What is that?
12     A    Well, actual -- it's an equity ownership
13 between Fraser, myself, and Colin and Ian Haensly. And
14 it's -- I don't know the exact percentages, but it's the
15 four of us.
16     Q    Same page. At the bottom of the page there's
17 an e-mail from Terry Moore to Ray Driver, an attorney.
18     A    Yeah.
19     Q    Is Ray Driver an attorney for Foodonics or you?
20     A    No.
21     Q    Going to June 2nd.
22     A    Okay.
23     Q    There's an e-mail from you to Gray -- to Grier
24 Wells, with a copy to Alex Klempf, June 2, 2015.
25     A    I -- I don't -- I don't know what that would

1  be.
2          MR. WELLS: I'm sorry, Jim. What was the date
3  of that?
4          THE WITNESS: June 2nd.
5          MR. POST: June 2nd.
6      Q    Well, as of June 2nd, 2015, was Alex part of
7  Foodonics?
8      A    No, she was not.
9      Q    Was she part of your restaurant group at that
10 time?
11     A    I can't say the exact date that she started
12 working with us. Like I said, when she first got back
13 she was teaching at UNF, and then we offered her sort of
14 a marketing/advertising/director at some point, but I
15 don't know the exact date.
16     Q    When you say we offered, who is we?
17     A    Fraser and myself.
18     Q    For which entity?
19     A    At that time it probably would have just been
20 Ovinte.
21     Q    Going to August 20, 2015, here's an e-mail from
22 you to Terry Moore at Gray Robinson, with a copy to Alex
23 Klempf. But here she has an e-mail address of
24 forkingamazingrestaurants.com.
25     A    Right. Which was the -- we -- we formed that

1  when we -- we acquired a couple other restaurants, and
2  so we formed that group, and she oversaw the marketing
3  for that, for those group of restaurants.
4      Q    When you say we acquired, who is we?
5      A    Fraser and myself, for the most part, yes.
6      Q    Did Foodonics have any interest in that, in
7  Forking Amazing Restaurants?
8      A    I don't believe so. They were separate
9  entities with separate ownership.
10     Q    There are also two entities called Foodonics
11 Equities 1 and 2.
12     A    Right.
13     Q    How do they relate to Foodonics?
14     A    Well, that was some real estate purchases, and
15 we formed separate LLC's under advice of counsel just
16 because the properties -- we needed to do different type
17 of Phase 1 and Phase 2 type surveys to determine if
18 there was hazardous materials. So we were just trying
19 to be protective of Foodonics, Inc.
20     Q    So again when you say we, you mean Foodonics
21 formed these Equities 1 and 2?
22     A    Correct.
23     Q    And so Equities 1 and 2 were owned --
24     A    By Foodonics.
25     Q    100 percent by Foodonics?

1    A    Yes.

2    Q    What properties were acquired by Food Equities

3  1 and 2?

4    A    It was two properties in the Brooklyn area.

5  One was on May Street, one is on Magnolia.  They were

6  former automotive repair shops.

7    Q    Which Foodonics entity acquired the property

8  that the Cowford restaurant sits on?

9    A    It would be just Foodonics, Inc.

10    Q    Going down to September 11, 2015, there's an

11  e-mail from you to Daniel Bean at Holland & Knight;

12  correct?

13    A    Let me just -- okay.

14    Q    Was Holland & Knight also one of your

15  attorneys?

16    A    No.

17    Q    So there was no client relationship --

18    A    None.

19    Q    -- between you and Holland & Knight?

20    A    No.

21    Q    Didn't Foodonics provide funding for Forking

22  Amazing Restaurants?

23    A    I -- I believe so, some, yes.  The answer I

24  believe is yes, and it's on our tax returns, which I

25  believe you have copies of.

1    Q    Going to October 14, 2015.

2    A    Okay.

3    Q    There's an e-mail from John Stevens to Mark

4  Klempf, copy to you.

5    A    Uh-huh.

6    Q    Did you have financial dealings with Mark

7  Klempf?

8    A    Yes.

9    Q    I'm trying to find out why this is on a

10  privilege log, but --

11    A    Yeah.

12    Q    -- what -- what -- were those financial

13  dealings between Foodonics and Mark Klempf?

14    A    Could have been.  Again I'm not exactly sure

15  what's in this, but -- but, yeah, it probably was

16  Foodonics under my direction.

17    Q    And what was that?

18    A    Excuse me?  What was that?

19    Q    Right.

20    A    There's a couple things that we did with Mark.

21  He went through a very difficult divorce, as well as

22  some of us, and he had to -- he needed a loan to keep

23  his house, and he was between a rock and a hard place,

24  and Foodonics loaned him the money to keep his house,

25  and there's a mortgage set, you know, that he's abided

1  by since we did it.

2    Q    Is that mortgage still outstanding?

3    A    Yes, it is.

4    Q    Were there any other transactions between

5  Foodonics and --

6    A    There was another transaction.  Mark, over the

7  course of 30 years, was a videographer for the

8  University of Georgia football, and other programs at

9  Georgia.  He had a business called Cutting Edge.  And so

10  he found out through some tax law that you can donate

11  that video footage to the University of Georgia

12  archives.  It has to be appraised by an outside third

13  party appraiser, and then that appraisal, if University

14  of Georgia accepts it then you can use it as a tax

15  deduction to offset income.

16    Mark didn't have enough income to really

17  warrant all the video production he had, so we made a

18  deal to buy Cutting Edge.

19    Q    And -- and thereby utilized the tax deduction?

20    A    Correct.

21    Q    Any other transactions between Foodonics and

22  Mark Klempf?

23    A    And Mark?  Not that I'm aware of.  I mean, you

24  know, no.

25    Q    Go to November 23, 2015.

1    A    Okay.

2    Q    November 23rd, there is an e-mail from Terry

3  Moore of the Gray Robinson firm to you and others

4  showing a copy to you and Susan@boldcitybrewery.com.

5    A    Correct.

6    Q    Who is Susan at Bold City?

7    A    Well, Susan and her family own Bold City

8  Brewery, and they lease a space from us right next to

9  the Cowford Chophouse.

10    Q    Other than that lease arrangement, is Bold City

11  Brewery or Susan part of the Foodonics group of

12  companies?

13    A    No.

14    Q    And at this point in time, in November 2015,

15  was there any litigation pending?

16    A    Wait.  November 2015?

17    Q    November 23, 2015.

18    A    Oh, okay.

19    Q    Was there any litigation with Bold City

20  Brewery, or related to Bold City Brewery.

21    A    I don't recall.  What kind of litigation?

22    Q    I don't know.

23    A    I don't either.

24    Q    Okay.

25    A    I don't believe there's any that I recall with

1  Bold City.
2      Q    They certainly -- Susan or Bold City Brewery
3  are not involved in the litigation between you and the
4  Trust; correct?
5      A    Oh, no.
6      Q    Going down to November -- December 9, 2015,
7  there is an e-mail from you to Terry Moore, with a copy
8  to Kate Stanley at Florida Network Realty?
9      A    Okay.
10     Q    Who is Kate Stanley?
11     A    She's a Realtor.
12     Q    Do you know why she would be included in a
13  privilege communication?
14     A    I mean, I don't know that it's necessarily
15  privileged, because it was just a house that I think my
16  daughter was looking at the time, or something.
17  Again, I don't know why it would be privileged.  There
18  is nothing there.
19     Q    Okay.  Going down the same page to December 28,
20  2015, an e-mail from you to Mark Camden at Bank United.
21     A    Mark Carden.
22     Q    Carden?
23     A    Uh-huh.
24     Q    Mark Carden.  What relation did Bank United
25  have with Foodonics?

1      A    Yeah, Bank United has got the note on the
2  Ovinte property.  Or it's now Kamiya property.
3      Q    Is that the only --
4      A    That's the only thing.
5      Q    -- relationship?
6      A    Uh-huh.
7      Q    Going to September 1, 2016.
8      A    Hang on.
9      Q    There's e-mails here from -- well, I say
10  they're e-mails.  There seems to be privileged documents
11  relating to Tim Dawson.
12     Tim Dawson was with Cal-Maine?
13     A    Correct.  He was the CFO at the time.  Since
14  retired.
15     Q    The -- well, Cal-Maine is not -- is not in a
16  corporate group with Foodonics at this time; correct?
17     A    No.  They're not -- they're not involved in
18  anything that we're doing today.
19     Q    It's a separate legal entity from Foodonics?
20     A    Yes, it is.
21     Q    And all the other companies you own?
22     A    That's correct.
23     Q    So do you know why an e-mail from Tim Dawson
24  would be on a privilege log?
25     A    You know, I'm -- I'm assume -- I don't know why

1  it would be on the privilege log.  It looks like I'm
2  trying -- this one came from Tim to -- to who?  To me
3  and Jim?
4      Q    It's not clear.
5      A    Yeah, it's not clear for me either.  You know,
6  it may have been, you know, Jim was representing us
7  during the transaction, so it may have been
8  communication they needed to have regarding the
9  transaction.
10     MR. WELLS:  Jim, can we take a short break?
11     MR. POST:  Sure.
12     MR. WELLS:  Thank you.
13     THE VIDEOGRAPHER:  We are off the record.  The
14  time is 10:55 a.m.
15     (Short break.)
16     THE VIDEOGRAPHER:  Please stand by.  We are
17  back on the record.  The time is 11:09 a.m.
18     Q    Mr. Klempf, continuing with this exhibit of the
19  privilege log, I would like to go back in time.  I
20  skipped over January 14, 2011.
21     A    January 14th.  Oh, 2011?
22     Q    Yes, sir.  Midway down the page there's e-mails
23  from Sam Jacobson to you.  Sam Jacobson was your wife's
24  attorney in the divorce case; right?
25     A    Correct.

1      Q    Do you have any understanding why an e-mail
2  from him to you would be on a privilege log?
3      A    Other than it's my personal -- I mean, do you
4  want to know about my divorce with my ex-wife?  I mean,
5  it's personal to me, but --
6      Q    Sam was not your lawyer; correct?
7      A    No, he was not.  So Sam sent me an e-mail.
8  Yeah, that -- that would also be related to my wife's
9  sobriety.  You know, there were many times that she was
10  not available, and he would e-mail me.  It was an odd
11  relationship.
12     Q    Why would -- we were operating under the
13  assumption that the only documents on this privilege log
14  would be documents that are relevant to the case.
15     A    Yeah.
16     Q    So I wouldn't be asking you about it if we
17  didn't think it was -- we assume it was relevant to the
18  case.
19     So if we go to November 1, 2016, please.
20  Back --
21     A    Yeah.
22     Q    -- the way we were going.
23     A    November 1st is the --  okay.
24     Q    There's an e-mail about two-thirds the way down
25  the page from Alice Holt to Amy Williamson at Ameris

1   Bank.
2         So who is Amy Williamson and why --
3     **A**   **Yeah, Ameris Bank has the note on my home in**
4   **Ponte Vedra. I'm not sure why Alice -- maybe she wanted**
5   **my tax return, or something of that nature, would be my**
6   **guess.**
7     **Q**   Ameris Bank. Does it have any other commercial
8   relationship with you or Foodonics?
9     **A**   **No.**
10     **Q**   At one time did you on behalf of Foodonics try
11   to get financing from Ameris Bank?
12     **A**   **I don't believe so. BB&T was our lead bank, so**
13   **any type of financing related to production or poultry**
14   **equipment almost, I would say, 90 percent came from**
15   **BB&T.**
16     **Q**   Did you -- did there come a point in time that
17   you tried to -- did you consider switching to Ameris
18   Bank?
19     **A**   **No.**
20     **Q**   Go to -- move to the next page. Let's see.
21   Yeah, the next page, November 14th.
22     **A**   **November 14th?**
23     **Q**   Correct. 2016.
24     **A**   **Okay.**
25     **Q**   About two-thirds down I see copied on these

1   e-mail exchanges is Dick Still of CM Foods.
2     **A**   **Right.**
3     **Q**   So that's -- who is Dick Still, and how did he
4   go from Foodonics to CM Foods?
5     **A**   **When Cal-Maine purchased the company -- and**
6   **that date would have been after the sale was**
7   **completed -- Dick Still was our CFO at the time, and so**
8   **Cal-Maine hired every employee that we had that wanted**
9   **to stay on, and so at that time -- and again I wasn't an**
10   **employee of Cal-Maine -- so at that time I'm assuming**
11   **that Dick changed his e-mail address from the Dixie Egg**
12   **to CM Foods. I don't know.**
13     **Q**   The sale was closed earlier that month, in
14   December 2016?
15     **A**   **That's correct.**
16     **Q**   So at the time these e-mails would have been
17   exchanged Dick Still would have been an employee of
18   Cal-Maine Foods?
19     **A**   **That is correct.**
20     **Q**   You -- you did -- you did enter into a -- into
21   an agreement with Cal-Maine to provide them with
22   services; correct?
23     **A**   **Right. You know, the way it was explained to**
24   **me is that there are a lot of things that I knew that**
25   **they didn't about the business, and they wanted to keep**

1   me on a noncompete, slash, consulting for a period of
2   five years.
3     **Q**   And that went into effect at the time that this
4   transaction was closed in November 2016?
5     **A**   **Correct.**
6     **Q**   Go to February 6, 2017, please. I'm sorry.
7   Back up one page. December 7, 2016.
8     **A**   **December 7th?**
9     **Q**   Correct. 2016. Halfway down the page.
10     **A**   **Okay.**
11     **Q**   E-mail from Terry Moore of Gray Robinson to --
12   to what appears to be for Ameris Bank -- well, to an
13   Ameris Bank employee, Lou Vaccaro, and copies to two
14   other Ameris Bank employees.
15         Do you know who Lou Vaccaro is?
16     **A**   **I do.**
17     **Q**   And who is he, and what's his relationship to
18   Foodonics or you, if any?
19     **A**   **Lou Vaccaro is an officer with Ameris Bank, and**
20   **so is Kendall Spencer, and everyone copied there. They**
21   **were providing, I guess it's -- I'm not exactly --**
22   **there's a transaction whereby we invested in a**
23   **mitigation bank, and so they provided letters of credit**
24   **that the Department of Environmental Protection requires**
25   **for a mitigation bank. So they were involved in**

1   providing those letters of credit.
2     **Q**   I think previously in today's deposition you
3   said Ameris Bank only had a mortgage on one of your
4   pieces of property.
5     **A**   **They don't have a mortgage. And that's my**
6   **personal property. That's correct.**
7     **Q**   Well, okay. Besides the two we have talked
8   about now, what other relationships, if any, did
9   Foodonics and you have with Ameris Bank?
10     **A**   **Only, again, they have letters of credit that**
11   **have to be maintained at the Department of Environmental**
12   **Protection, but we've never accessed them. They just --**
13   **it's just a letter of credit that they provide.**
14     **Q**   Those are the only -- you now have explained
15   everything that you or Foodonics have with Ameris Bank?
16     **A**   **I believe so. I don't know what else is behind**
17   **this page, but I believe so, yes.**
18     **Q**   Go to February 6, 2017, please.
19     **A**   **Okay.**
20     **Q**   Two-thirds down the page is an e-mail from John
21   Stevens to you and others?
22     **A**   **Hang on. I'm just marking this. Okay.**
23     **Q**   BB&T -- BB&T, and copies to other BB&T people
24   and Cal-Maine people; correct?
25     **A**   **I mean, that's what it says. I'm not sure what**

1  that would be. I'm not sure what that would be about.
2  It might be satisfaction of loans, or something along
3  those lines.
4      Q    In any event, you're not aware of any reason
5  why this communication would be privileged, are you?
6      A    No.
7      Q    Cal-Maine -- your position is Cal-Maine and
8  Foodonics are separate legal entities; correct?
9      A    They are.
10     Q    Going to February 14, 2017.
11     A    There's a lot of them there.
12     Q    Two-thirds down the page on February 14th, it's
13 number 3724.
14     A    Oh, okay.
15     Q    E-mail from Alex Klempf to you and others, with
16 a copy to Troy Fernley.
17     A    That doesn't look like that went to Troy. That
18 was to Jim and myself.
19     Q    I'm sorry. You're right. I misread that line.
20 It's an e-mail from you to John Stevens, with a copy
21 to --
22     A    Troy.
23     Q    -- Troy, right, at Cal-Maine Foods?
24     A    Yeah.
25     Q    What position -- who is Troy Fernley and what

1  position did he have?
2      A    Troy Fernley was assistant controller with
3  Foodonics prior to the sale, and then was kept with
4  Cal-Maine after the sale.
5      Q    So at the time this e-mail was sent on
6  February 14, 2017, he was an employee of Cal-Maine
7  Foods?
8      A    Yes.
9      Q    Up on the same page, same date, item 3718,
10 there's an e-mail from James Nolan to you and
11 Alexandria.
12          This time Alexandria has an e-mail of BAM Jax.
13     A    Right.
14     Q    What -- what was the relationship, or is the
15 relationship between Foodonics and BAM Jax?
16     A    When -- when Cal-Maine purchased Foodonics and
17 Dixie Egg they produced only the egg and production
18 related assets. So any other assets they didn't have
19 any interest in. So those assets are now being managed
20 by Foodonics as the holding and BAM Jax as sort of a --
21 it's -- it's -- they do the work as far as managing
22 properties and other investments.
23     Q    And I think you mentioned earlier, funding is
24 provided by Foodonics to BAM Jax; correct?
25     A    Yes, that would be correct, and from income

1  from the operations of the investments and properties.
2      Q    The investments and properties owned by BAM
3  Jax?
4      A    Some.
5      Q    Besides BAM Jax, what other groups are under
6  this umbrella?
7      A    Oh, God, it's -- well, there's the Foodonics
8  International that is still the umbrella, and underneath
9  that would be, you know, all the different LLC's, and
10 then BAM Jax and the different investments.
11     Q    I think we've already talked about the fact
12 that under the umbrella is Foodonics Equities 1;
13 correct?
14     A    Right.
15     Q    Foodonics Equities 2?
16     A    Correct.
17     Q    BAM commercial holdings?
18     A    Correct.
19     Q    BAM residential holdings; correct?
20     A    Correct.
21     Q    Cowford Chophouse?
22     A    Correct.
23     Q    What about -- and Forking Amazing Restaurants;
24 correct?
25     A    Yeah. I mean, yes. Of course, two of the

1  restaurants have closed, and so there's basically --
2  yeah, Forking Amazing would have been under there.
3  That's correct.
4      Q    And Bistro Aix?
5      A    Correct.
6      Q    If we go to again -- let's see, February 22nd,
7  which is the next page, there's an e-mail from Alex
8  Klempf using a G-mail account --
9      A    Yeah.
10     Q    -- to Alice Stevens, with a copy to you and a
11 copy to N. Ferdman.
12          Who is N. Ferdman?
13     A    Nancy Ferdman is our controller at BAM Jax.
14     Q    Does she work only for BAM Jax, or does she do
15 controlling work for Foodonics International too?
16     A    Just -- she oversees -- she's controller for --
17 I think it's for Foodonics as well, yes, and BAM Jax.
18 All entities. She's -- you know --
19     Q    So I've seen I guess at least three different
20 e-mail addresses for Alex Klempf. One is a BAM Jax, I
21 see this G-mail, we saw the Forking Amazing.
22          Is there -- do you -- do you make an effort to
23 communicate with her with respect to e-mail pertaining
24 to what business activity you've got going on?
25     A    No.

1    **Q**    Or is that an update?

2    **A**    **No. If I was to draw up her name, everything**

3    **goes to her BAM Jax that I would send to her. I think**

4    **she's had that G-mail account for many, many years, just**

5    **like I've had an AOL account for many years.**

6    **Q**    So you don't make an effort to send her an

7    e-mail dealing with a certain --

8    **A**    **No.**

9    **Q**    -- business venture on one e-mail as opposed to

10    another?

11    **A**    **No.**

12    **Q**    Same with you. You have more than one e-mail

13    address.

14    **A**    **Right. Yeah. I chose to keep my Dixie Egg**

15    **e-mail address and my AOL. I had AOL because it was**

16    **like the first internet provider of e-mails back in the**

17    **day, and so I just always kept it. Really the only**

18    **thing that comes to it is mostly junk, but I just kept**

19    **it.**

20    **Q**    So you have no standard operating procedure as

21    to how you want people to send you e-mails. For

22    example, I want you to use this address as opposed to

23    one of your other addresses?

24    **A**    **I mean, I don't have any standard operating**

25    **procedure. I mean, you could send it to any address you**

1    **want, but I mostly use the BAM Jax today. The Dixie**

2    **address, I still get some e-mails, but not anything**

3    **relevant.**

4    **Q**    Understood. Going to November -- March 14,

5    2017.

6    **A**    **Okay.**

7    **Q**    Very top of the page. E-mail from you to John

8    Stevens, with a copy to -- I guess that's Steve Holder

9    at Cal-Maine Foods.

10    **A**    **It's from Steve Holder, copying me and Judy.**

11    **Is that correct?**

12    **Q**    That's the one above. Yeah, that's -- okay.

13    Yes.

14    **A**    **Okay.**

15    **Q**    The one above has DixieEgg.com.

16    **A**    **I know.**

17    **Q**    But the one below shows a copy being sent to

18    Mr. Holder at Cal-Maine Foods; correct?

19    **A**    **I don't see the one from Mr. Holder for**

20    **Cal-Maine Foods.**

21    **Q**    If you go down, it's the one you sent on

22    March 14th, item 3861.

23    **A**    **3861. Oh, it's on the next page. I'm sorry.**

24    **Yeah, yeah. Well, he -- you know, when I -- so**

25    **what's your question?**

1    **Q**    I think we have already talked about the fact

2    at this point in time, or subsequent to the sale, Steve

3    Holder because an employee of Cal-Maine Foods.

4    **A**    **He did.**

5    **Q**    So if you're sharing this information with an

6    employee of Cal-Maine Foods why would it be privileged?

7         MR. WELLS: Object to form.

8    **A**    **You would have to ask my counselor. I don't**

9    **know what the e-mail was about.**

10    **Q**    If you go to April 11, 2017, please.

11    **A**    **Okay.**

12    **Q**    Halfway down the page it seems like there are a

13    lot of entries, a lot of documents relating to Dick

14    Still at Cal-Maine Foods.

15    Do you see that?

16    **A**    **April 11th, 2017. What is the item number?**

17    **Q**    Start at item number 3974, and you go down all

18    the way to 3996, and it picks up again at 3999 and goes

19    down to 4005.

20    **A**    **I see.**

21    **Q**    And continues on the next page.

22    **A**    **Uh-huh.**

23    **Q**    At this point in time Dick Still is an employee

24    of Cal-Maine Foods; correct?

25    **A**    **Yeah. Dick left Cal-Maine. I don't know the**

1    **exact date when he left. He stayed on for a while. So**

2    **again I do not know the exact date that he left, but**

3    **I -- I don't know.**

4    **It doesn't have his e-mail address there, so I**

5    **don't know if that's -- he may -- he may have left, you**

6    **know.**

7    **Q**    If you look up at item 3974.

8    **A**    **Okay. He was an employee on that day. I see**

9    **that.**

10    **Q**    Right.

11    **A**    **Okay.**

12    **Q**    When did Dick Still leave Cal-Maine Foods, if

13    you know?

14    **A**    **I don't know exactly when.**

15    **Q**    Is he working for you or for Alex at this time?

16    **A**    **No.**

17    **Q**    Go to May 10, 2017, please.

18    **A**    **Okay.**

19    **Q**    This shows an e-mail from you to Gray Robinson.

20    Now you're sending this by a BAM Jax e-mail account.

21    **A**    **Okay.**

22    **Q**    When do you use that account?

23    **A**    **I mean, that's the account I pretty much have**

24    **converted over to since I don't really use the**

25    **DixieEgg.com account very much.**

1    I suppose -- I don't know exactly when I
2  converted over.  I had the e-mail address and I just
3  started using it.  It's a much better platform than the
4  AOL or the other one I'm on.
5    Q    So you've kept your other e-mail accounts, but
6  that's the one you use primarily now?
7    A    That's the one I use primarily now, yes.
8    Q    All right.  Going to down that same page, May
9  25, 2017, item 4278, John Stevens to you, and there
10  appears to be a copy to P. Long at CM Foods, Inc.
11    Do you know who that is?
12    A    Yes.  Patrice Long.  She was an employee of
13  Dixie Egg Company, one of our clerks that, you know,
14  entered in, you know, payables.
15    Q    But as of May 2017 she was an employee of
16  Cal-Maine Foods; correct?
17    A    Probably prior to that, I mean, but on that
18  date she was.  They kept all the employees after the
19  transaction.
20    Q    Bottom of that page is an e-mail from you using
21  your Dixie Egg e-mail account --
22    A    Yeah.
23    Q    -- to John Stevens, with a copy to Burns.
24    A    Uh-huh.
25    Q    As of -- as of May 2017 were you still --

1  was -- was --
2    A    And there's probably -- looks like it was
3  probably a response where John had sent me an e-mail to
4  a Dixie Egg address and I just responded back.  But,
5  yeah.  I mean, if someone sends an e-mail to my Dixie
6  Egg address or my AOL address I'm going to respond from
7  that address.
8    Q    Were you and Mr. Burns still engaged in a
9  business venture together in June 2017?
10    A    Yes.
11    Q    What is that?
12    A    We were involved in Ovinte, Bistro Aix, and II
13  Desco.
14    Q    Are any of those ventures still viable today?
15    A    Yes.
16    Q    Which ones?
17    A    Bistro Aix.
18    Q    Is Mr. Burns still involved in Bistro Aix?
19    A    He is.
20    Q    And I think you said before that's an entity
21  that's not under the Foodonics umbrella.
22    A    Foodonics has an investment in that, yes.
23    Q    Oh, it does.
24    Okay.  And again, when you say investment, what
25  does that mean?

1    A    They have invested money in the business.
2    Q    So they're an equity --
3    A    Yes.
4    Q    Part equity owner?
5    A    Yes.
6    Q    Are they an LLC member?
7    A    Yes.
8    Q    Going to June 16, 2017.
9    A    Okay.
10    Q    E-mail from Alice Holt to you and others.
11    A    Okay.  Which item number?
12    Q    4337.  People included was L. Costa, CM Foods.
13    Do you know who L. Costa is?
14    A    Yeah.  That's our HR -- Isaura was her name
15  and --
16    Q    Oh, it's I. Costa?
17    A    Yeah.  Isaura Costa.  And she was our HR person
18  at Dixie Egg.
19    Q    As of June 2017 she employed by Cal-Maine
20  Foods?
21    A    She was employed by Cal-Maine again at the time
22  of the transaction.  She was at that time too.
23    Q    Go to August 5, 2017.
24    A    Okay.
25    Q    Near the top, item 4761 and 4762, again e-mails

1  from you, copying Ms. Costa at Cal-Maine Foods; correct?
2    A    Correct.
3    Q    And down on -- in paragraph -- on that same
4  page, item 4795, August 11, 2017, an e-mail from Alice
5  Stevens to you, copies again to two Cal-Maine employees?
6    A    Right.
7    Q    Or three Cal-Maine employees.
8    A    Correct.
9    Q    We have talked about Ms. Costa.  I think we
10  have talked about Mr. Holder.
11    What about Fernley?
12    A    Troy Fernley.  We did mention him.  He was
13  assistant controller for Dixie Egg when we were
14  operating.
15    Q    Do you know why there would be privilege e-mail
16  communication between Stevens & Powell, and you, and
17  these three Cal-Maine employees?
18    MR. WELLS:  Object to form.
19    A    I do not know why.
20    Q    Going to September -- September.  I'm sorry.
21  August 24, 2017.
22    A    Okay.
23    Q    Item 4890?
24    A    4890.  Okay.
25    Q    E-mail from you to someone at Sam@fcgc.

1    Do you know who Sam is?
2    A    I don't.  I don't know who Sam@fcgc.info is.
3    That e-mail address, I have no idea, but maybe -- I
4    don't -- I don't even -- I wouldn't even -- I have no
5    idea, but I copied Gray, so it's possibly something
6    legal.  I don't know.
7    Q    Going down that same page, on September 7,
8    2017, e-mail from you to someone, P. Wallace at BDO.
9    A    Right.
10    Q    Who is that?
11    A    That's our -- we switched firms from John
12    Stevens to BDO.  So they're our new accountants.
13    Q    Does Mr. Stevens have any business with any
14    Foodonics entity at this time?
15    A    No, not at this time.
16    Q    Does he have any business with you personally
17    at this time?
18    A    No.
19    Q    Going to September -- I'm sorry -- December 18,
20    2017.
21    A    December 18th?
22    Q    Correct.  Item 5361.
23    A    I see it.
24    Q    Makes reference to Dick Still.  Dick Still
25    being a Cal-Maine employee; correct?

1    A    He wasn't at that time, but 2016 he was.
2    Q    Right.
3    A    And our 2016 return was not filed until --
4    because of Hurricane Irma they gave a period of time.  I
5    mean, it wasn't filed until late 2017, I think.  Like
6    the end of 2017 possibly.
7    I don't know exactly why, but I would assume
8    it's a document that she needed for the note they have.
9    Q    But in any event, in January of 2018 John
10    Stevens wasn't employed by you or anybody --
11    A    No, but he still had a lot of information that
12    was needed by different sources.
13    Q    Do you know, did he charge you for his time on
14    January 4, 2018?
15    A    I don't recall.
16    Q    And again the reference here as to being sent
17    to Ameris Bank.
18    A    Right.
19    Q    You're assuming that's because Ameris Bank had
20    a mortgage on your residence?
21    A    Yeah, they have a note, and have certain
22    requirements, that I'm filing my tax returns, and those
23    kind of things.
24    Q    And you might have mentioned this before.  They
25    have a mortgage -- Ameris Bank has a mortgage on what

1    A    I don't know.  I think we -- I mean, there was
2    previous e-mails from Dick.  I don't know when he
3    exactly left Cal-Maine.  So I don't know.
4    Q    But I think you testified that even though he
5    left Cal-Maine, he was not employed by you or any of
6    your companies; correct?
7    A    No, he was not.
8    Q    January 4, 2018.
9    A    Okay.
10    Q    E-mail exchange.
11    A    Which item number?
12    Q    You were copied.  I'm sorry.  5484.
13    A    5484.  Okay.
14    Q    John Stevens to Amy Williamson.
15    A    Uh-huh.
16    Q    Do you know why John Stevens would be --
17    A    Yeah.
18    Q    -- sending information?
19    A    I'm sure it had to do with the tax return, copy
20    of the tax return that they would require to have a copy
21    of -- you know, on the note that they have on our home
22    in Ponte Vedra.
23    Q    Oh, so it's your understanding that John
24    Stevens would not be doing accountant work for you in
25    January 2018?

1    property?
2    A    My -- my home that I live in now.
3    Q    Last page.  January 17, 2018.
4    A    Which item number?
5    Q    5615.  It shows an e-mail from John Stevens to
6    you and someone named Mike Robinette.
7    Do you know who that is?
8    A    I do.
9    Q    Who is he?
10    A    Mike Robinette.  We had a -- I was advised that
11    I could have a cash balance plan as a single-entity
12    owner, and so he was one of the ones involved in setting
13    up a cash balance plan for me personally.
14    Q    What entity does he work for?
15    A    Me personally.
16    Q    I mean C-B-I-Z.  What company does he work for?
17    A    It's called CBIZ.
18    MR. POST:  Let's go off the record.
19    THE VIDEOGRAPHER:  Off the record.  The time is
20    11:47 a.m.
21    (Lunch break.)
22    THE VIDEOGRAPHER:  We're back on the record.
23    The time is 12:57 p.m.
24    (The examination conducted now by Mr. Dix.)
25    BY MR. DIX:

1    Q    Mr. Klempf, if you will, could you turn to the
2  exhibit we marked earlier as Exhibit 3.
3    A    Okay.
4    Q    Earlier today you said that you had never seen
5  that document before.
6    A    I may not have seen the amended version, but I
7  saw the exhibit. I may have seen the first version, I
8  don't know if I actually saw the amended version with
9  the change of address, or anything like that.
10   Q    Would you turn to the fourth page of that
11 document labeled Exhibit A. It has a series of areas of
12 inquiry?
13   A    Okay. This may be -- this is document 75. Is
14 that the same? I don't know if it's the same one.
15 Looks the same.
16   Q    So on the successive four or five pages there
17 are a series of areas of inquiry listed.
18        Do you see those?
19   A    I do.
20   Q    Have you had an opportunity to look at those
21 areas of inquiry?
22   A    Yes.
23   Q    And are you prepared to talk with us today
24 about each of those areas of inquiry?
25   A    To the best of my ability.

1    Q    Is there anything -- any area of inquiry that
2  you're not prepared to talk about today?
3    A    No. I'm prepared to talk about all of it.
4    Q    Did you prepare at all in order to testify here
5  today?
6    A    No, other than, you know, communication with
7  counsel. Yesterday we talked about this process.
8    Q    And everything you said earlier to Mr. Post was
9  the truth; is that right?
10   A    Absolutely.
11   Q    Okay. I want to understand a little bit more
12 about your background and experience with technology.
13        So how experienced are you with technology?
14   A    Not very. You know, between my kids and my
15 wife, they're pretty much the ones that have helped me
16 with technology. When I went to college I had one
17 course in computer science. That's forty years ago.
18 And so I -- other than that, you know, just whatever
19 little bit of training I might have gotten at work from
20 our IT person, or, you know, we get a new system in, you
21 know, they tell me how to do the things I need to do.
22   Q    So as CEO of Foodonics --
23   A    Right.
24   Q    -- and even now who helped you with computer
25 issues and IT issues for your companies?

1        MR. WELLS: Object to form.
2    Q    Let me rephrase that.
3    A    Yeah, it was a little vague.
4    Q    For Foodonics who helped you; who was
5  responsible for IT issues?
6    A    At the time Eddie Rosemond was our IT person
7  that was in place that set up our e-mail accounts and
8  worked with Microsoft to -- you know, to manage that.
9    Q    Was there anyone other than Eddie Rosemond that
10 handled IT issues for Foodonics?
11   A    I do not believe so. Isaura in HR maybe, but
12 hers would be more -- I don't believe so. I think Eddie
13 was pretty much the sole person. There may have been --
14 our operation in Georgia there may have been.
15 Everything was -- everything pretty much went through
16 Eddie. I -- I don't know anyone else.
17   Q    What would you say his job responsibilities
18 were?
19   A    He did the IT administration, and he also did
20 some -- he helped some with some payables and different
21 computer entry items.
22   Q    Did Eddie Rosemond work for Cal-Maine after the
23 sale of Foodonics assets?
24   A    He did. He did.
25   Q    And now that Eddie works for Cal-Maine, or

1  worked for Cal-Maine --
2    A    Right.
3    Q    -- who helps you with your company's IT issues
4  now?
5    A    You know, I don't really have any IT issues.
6  You know, I have -- if I have to do something that I'm
7  not familiar with doing on my laptop or iPhone I'll
8  either go to my wife, or we have a director of
9  operations at the BAM office. Her name is Nicole White.
10 She's pretty good with, you know, laptops and that kind
11 of stuff.
12   Q    So the BAM Jax e-mail account that you have --
13   A    Correct.
14   Q    -- several different employees have BAM Jax
15 e-mail accounts; is that right?
16   A    Correct.
17   Q    And who set those e-mails up?
18   A    Nicole White.
19   Q    Is there anybody else other than Nicole White
20 that was involved with e-mail?
21   A    Not -- not the BAM Jax e-mail.
22   Q    You don't have a manage service provider or
23 some third party that helps you with IT issues or cyber
24 security?
25   A    Not to my knowledge. We may have a third party

1 that assisted in setting up, or maybe it went through --
2 we're on Outlook with our BAM Jax e-mail. So, other
3 than setting up that part of it, I don't believe there
4 was anyone else.
5     Q    Okay. Before I ask you some more questions I
6 want to draw your attention to a couple of terms that I
7 think will be helpful in asking and answering the
8 questions.
9        The first is on the document I mentioned
10 earlier, Exhibit 3, on the areas of inquiry, in
11 paragraph 1 there's a definition of the term Foodonics
12 parties. So if I say Foodonics parties that means
13 Foodonics International, or you, or any of your agents
14 or employees.
15     A    Okay.
16     Q    The next term is ESI. ESI is an abbreviation
17 for electronically stored information. In the notice
18 of deposition we included a lengthier definition of what
19 ESI is in case there's any questions about that, but
20 when I say ESI I mean electronically stored information
21 as opposed to docu- -- paper documents. So if we say
22 documents, that means papers.
23        The last term I want to define is if we're
24 talking about the litigation that we're here in
25 connection with here today I'll simply call that the

1 Trust litigation. That way we don't have to talk about
2 case parties and counter-plaintiffs, and all the
3 different layers of that. Anything related to the
4 litigation I'll simply use the term Trust litigation.
5        Is that clear to you?
6     A    Yes.
7     Q    Okay. So the first area of inquiry I want to
8 ask you about is identification.
9     A    Okay.
10     Q    Would you take a minute, just look at that
11 paragraph 1 and the subparts and review that for me and
12 let me know when you're done.
13     A    I've read it. You're talking about all the --
14 everything underneath 1?
15     Q    That's right.
16     A    Okay. It may take a minute.
17        Okay. I've read through it.
18     Q    So what role, if any, did you have in
19 identification of documents and ESI related to the Trust
20 litigation?
21     A    Well, I mean I turned over all of my devices,
22 laptops, my personal PC that I used for 20 years. I
23 turned all those devices over to Gray Robinson, who had
24 a third party come in and collect all the data.
25     Q    When did you turn the devices over to Gray

1 Robinson?
2     A    Soon after we got this -- this notice that we
3 needed to, you know, to protect all those doc- -- those
4 devices and the documents within it. I mean, we
5 determined what those devices were, and then I let them
6 know where they were. I brought them all to my office,
7 and KLDiscovery went through them and collected all the
8 data.
9     Q    When you say this notice, what are you
10 referring to?
11     A    One of these notices that asked us to preserve
12 documents related to this matter.
13     Q    Can you give me a date?
14     A    No.
15     Q    Was it 2018? Was it 2017? Give me the year
16 that you turned over --
17     A    I believe it was 2017 when this started. I --
18 I -- I can't tell you exactly. I just knew once this
19 began that I needed to preserve everything that I had.
20 I don't -- you would have the date.
21     Q    Well, I'm asking you the questions. I'm asking
22 you to tell me what you did.
23     A    Okay. I just did.
24     Q    I hear that you don't remember.
25     A    No, I don't remember the exact date. I know

1 that this litigation started in 2017. I'm not exactly
2 sure when you sent out the notice to protect. You know,
3 this Exhibit A. But as soon as we received this that is
4 when we would have started maintaining everything, or
5 the notice -- the letter that you sent.
6     Q    Can you tell me what you mean by the letter
7 that we sent?
8        THE WITNESS: Can you help me with that Grier?
9 The letter that you showed me.
10        MR. WELLS: I can't.
11        THE WITNESS: Oh, okay.
12     A    So there was a letter that you sent to us
13 that -- that stated that you wanted us to preserve these
14 documents because there was pending litigation, and on
15 that, that is when we were put on notice, and that is
16 when we started protecting everything.
17        I don't know the exact date of that letter.
18 I -- I seem to recall it was June or July of '17. I --
19 I'm not positive.
20     Q    Let me show you a composite exhibit here.
21     A    Okay.
22     Q    See if this helps refresh your recollection.
23        MR. DIX: Let's mark this as Exhibit 9.
24        (Exhibit No. 9 was marked for identification.)
25     Q    On the first page of this document is an e-mail

1  to you from yourself; is that right?  See at the top?
2      A    I'm not as quick as you.  Just give me a chance
3  to follow.
4          Yeah, it's one from Dixie Egg to -- okay.
5      Q    And the e-mail was sent on July 14, 2017; is
6  that right?
7      A    Okay.
8      Q    There's an attachment there, a June 23rd, 2017
9  letter --
10     A    Right.
11     Q    -- to Jacques Klempf.
12     A    Right.
13     Q    And then if you look below, there's an e-mail
14  from Jim Nolan to you?
15     A    Uh-huh.
16     Q    See that?
17     A    Yes.
18     Q    And if you flip, on the second page --
19     A    Yeah.
20     Q    -- an e-mail from Jim Nolan to Grier Wells --
21     A    Yes.
22     Q    -- saying calling you shortly?
23     A    Right.
24     Q    And then about the middle of the page an e-mail
25  from Jim Post to Jim Nolan.

1      A    Okay.
2      Q    And attached to that e-mail was a letter, which
3  is the third page in your document there.
4      A    Right.
5      Q    Would you take a look at that letter from Jim
6  Post dated June 23rd, 2017.
7          Is that the letter you're referring to?
8      A    This is the letter I'm referring to.
9      Q    Okay.  Would you turn to the third page.
10  It's -- the number at the bottom is 79084.
11     MR. WELLS:  Chris, was this attached as an
12  exhibit, this document?
13     MR. DIX:  I don't understand your question.
14     MR. WELLS:  Is this an exhibit to the
15  deposition?
16     MR. DIX:  Yes, Exhibit 9.  The entire package.
17     MR. WELLS:  Okay.
18     MR. DIX:  It's an e-mail forwarding several
19  other e-mails, and attached to that is a letter with
20  another series of documents.
21     Q    The document with the page labeled 79084, do
22  you see that?
23     A    Yes.
24     Q    What does it say at the top?
25     A    Notice of duty to preserve documents and

1  electronic evidence.
2      Q    Okay.  And in paragraph 4 it says:  We also
3  demand that you take affirmative steps to preserve and
4  suspend any deletion, overriding, modification, or other
5  destruction of all relevant electronic data under your
6  control.
7          Did you comply with that demand?
8      A    Yes.
9      Q    Okay.  The next sentence says:  ESI includes,
10  among other things, text messages.  Is that right?
11     A    Yes.
12     Q    Paragraph 5 says:  Preservation obligations
13  also extend to the preservation of relevant data on
14  external media, including, among other things, mobile
15  devices and cell phones and tablets.  Is that right?
16     A    That's correct.
17     Q    So your position today is that you took
18  affirmative steps to preserve the ESI under your
19  control, including text messages and mobile devices?
20     A    Yes.
21     Q    What steps did you take after receiving the
22  letter on June 23rd, 2017?
23     A    Well, I didn't erase anything.  I didn't delete
24  anything.  I made sure that all of the devices were, you
25  know, readily available for, you know, observation or

1  KLDiscovery when they would -- when they came in to get
2  it.  I didn't -- I didn't -- I mean, again I'm not
3  technologically inclined to do anything.  I mean, I just
4  didn't delete anything or get rid of anything.  I kept
5  everything as is.
6      Q    So you understand what the word affirmative
7  means; right?
8      A    I do.
9      Q    So when it instructs you to take affirmative
10  steps, you told me earlier that you took -- that you
11  complied with that request.  What affirmative steps did
12  you take?
13     A    I don't know that I -- I don't know what affirm
14  -- affirmative steps to me would have been to just
15  secure that data and make sure that it is not deleted,
16  erased, or anything happens to it.
17     Q    And how did you secure the data to make sure
18  that it wasn't deleted or anything happened to it?
19     A    Well, the PC that was at my office, I brought
20  it, along with the hard drive, to my new office and just
21  put it in a corner until KL could come get the
22  information.
23         I just made sure that it was all available.  I
24  didn't do anything.  I don't know if I really understand
25  what you're trying to ask.

1    **Q**    I'm referring to the instruction we provided to

2 you, which you said you complied with.

3    **A**    **Right.**

4    **Q**    I'm asking what the affirmative steps. I

5 haven't heard you say that you did anything

6 affirmatively, but tell me if there was anything that

7 you did other than --

8    **A**    **Well, maybe I didn't --**

9    **Q**    -- maintain the status quo.

10    **A**    **I just maintained the status quo, made sure**

11 **that nothing was deleted. But I don't know that I did**

12 **anything affirmative. I was leaning on my counsel to**

13 **assist me in that endeavor.**

14    **Q**    Did counsel advise you to take any affirmative

15 steps?

16    MR. WELLS: Object to form. Instruct him not

17    to answer. Attorney/client privilege.

18    **A**    **Not that I'm aware of, other than to make**

19 **sure --**

20    MR. WELLS: Jacques, listen to my objection.

21    THE WITNESS: Okay.

22    MR. WELLS: I objected on the basis of

23    attorney/client privilege.

24    THE WITNESS: Okay.

25    MR. WELLS: So you don't have to answer that

1 question.

2    **Q**    You're not going to tell me whether your

3 attorney ever told you to preserve evidence?

4    **A**    **Based on what --**

5    MR. WELLS: Objection.

6    **Q**    Okay. Do you see on paragraph 9 of the letter

7 we have been looking at, the bottom of page is 9085?

8    **A**    **Yes.**

9    **Q**    It says -- the instruction says: Do not

10 dispose of any electronic media storage devices replaced

11 due to failure and/or upgrade that may contain

12 electronic data having any relation to this matter.

13    Did you comply with that instruction?

14    **A**    **I believe I did.**

15    **Q**    How did you comply with that instruction?

16    **A**    **I made sure that all the data was preserved and**

17 **kept on current devices.**

18    **Q**    What proof do you have, what records do you

19 have that you took some sort of affirmative step?

20    **A**    **I mean --**

21    MR. WELLS: Object to the form of the question.

22    **Q**    Let me finish the question.

23    What proof do you have, what documentation do

24 you have that reflects that you preserved and did not

25 dispose of electronic media related to this matter?

1    MR. WELLS: Object to the form. You can

2    answer.

3    **A**    **As far as the iPhone goes, I mean, I have a**

4 **receipt from the St. Johns Town Center that shows the**

5 **purchase of a new phone, and that the old phone data,**

6 **I -- I -- I don't know exactly what the invoice says,**

7 **but all that data and everything was trans- -- went**

8 **right to the 10.**

9    **Q**    Do have you that receipt with you today?

10    **A**    **I do not have that receipt with me today, but**

11 **I'm sure we can get that receipt to you.**

12    **Q**    If what you're telling me is that you replaced

13 your phone, that suggests that you violated paragraph 9,

14 not complied with it.

15    **A**    **I couldn't use the phone.**

16    MR. WELLS: Is that a question?

17    **Q**    Did you violate paragraph 9 --

18    **A**    **I would say no.**

19    **Q**    -- when you replaced your phone?

20    **A**    **If your phone broke would you go and replace**

21 **it?**

22    **Q**    I'm not -- I'm not being deposed here.

23    **A**    **I'm undeposing you. No.**

24    **I mean, everybody uses their phone today. I**

25 **mean, you can't be without a phone. I mean, it was**

1 **damaged. I mean, it was.**

2    **Q**    You got a new phone; is that right?

3    **A**    **Correct.**

4    **Q**    And what did you do with the old one?

5    **A**    **The old one, I got it repaired, just like I**

6 **said to Mr. Post earlier, and once the data and contacts**

7 **and all that information was transferred to the 10, they**

8 **cleaned it, and then I brought it back to the office to**

9 **see if anyone needed a phone. But there was nothing on**

10 **it. It had all transferred over to the 10.**

11    **Q**    What proof do you have that the data that was

12 on your old phone made it to your iPhone 10?

13    **A**    **We -- we probably would have to talk to the**

14 **Apple technician that did the transfer. I didn't do it.**

15 **I mean, I asked for it to be done. I can tell you that**

16 **every contact in my phone, e-mails, and texts that I did**

17 **have, did transfer.**

18    **Q**    At the time you replaced the phone -- what was

19 the date that you replaced the phone; do you recall?

20    **A**    **It was in January 2018.**

21    **Q**    That was after the letter on June 23rd; is that

22 correct?

23    **A**    **Yes, that would be correct.**

24    **Q**    So between June 23rd and the time you replaced

25 your phone did you ever make any copies of the data from

1   the phone that got replaced?
2       A   Of all the data that was in the phone?
3       Q   All or any of the data.
4       A   There -- there could be something in the Cloud.
5   You know, I -- I -- I have a Cloud-based I guess
6   storage, so there could be something in the Cloud.  I
7   don't know how that works, but I signed up -- I don't
8   know exactly when I signed up for Cloud storage.
9   Something my wife again helped me do.  It's $9 dollars a
10   month, or something.  So there could be something in the
11   Cloud.
12       All that information would be there, and we've
13   got that link that was attached to one of your e-mails
14   to Grier that we did get -- we did get all of that
15   information, and it's being reviewed now.
16       I tried to download some of it.  It didn't.  I
17   wasn't able to do it.
18       Q   You say you weren't able to do it.  What do you
19   mean by that?
20       A   Well, when I got the information back from
21   Apple -- and it took about a week or so -- I would click
22   on -- like, there was one that said iCloud storage, and
23   I'm thinking, well, great, maybe all this information --
24   maybe it's there.  So I clicked on it, and -- and maybe
25   my laptop is not powerful enough, or maybe it doesn't

Hedquist & Associates Reporters, Inc.

1   have enough of whatever you need, but it just didn't
2   download.
3       I did download some other things.  There was
4   photos of my wife and I on a trip somewhere.  There was
5   -- but as far as data, I -- I don't know how to access
6   it.
7       Q   How do you know that you actually gave what
8   Apple gave you to Gray Robinson?
9       A   Because it's the e-mail from Apple.
10       Q   So talk to me about that.  You sent the e-mail
11   that Apple sent to you to Gray Robinson?
12       A   Yes, I did.
13       Q   And what did they do with it?
14       A   I believe they're in the review of it now.
15       Q   But you don't know?
16       A   I don't.  I'm a -- I don't know for a fact that
17   they're doing that, but they very recently got that
18   e-mail.
19       Q   And before that download that you got from
20   Apple --
21       A   Correct.
22       Q   -- at any point between June 23rd, 2017, and
23   that point had you ever made any other efforts to
24   examine your phone or your Apple data?
25       A   No.

Hedquist & Associates Reporters, Inc.

1       Q   I want to follow up a couple questions
2   regarding what you told Mr. Post about your previous
3   phone.
4       You said you had an iPhone 7?
5       A   I believe it was an iPhone 7, yes.
6       Q   And that was the phone that you believe was
7   damaged?
8       A   No, I didn't believe it was damaged.  It was
9   shattered.
10       Q   The screen was shattered?
11       A   The screen was shattered, and something -- you
12   know, it was just a mess, yeah.
13       Q   After you gave it to Apple, was Apple able to
14   restore that phone?
15       A   When you say restore it, they repaired the --
16   they repaired it.  It took them a period of time.  It
17   wasn't done that day.
18       The first thing was to make sure I could get
19   all of that data, contacts and everything transferred to
20   the new phone.  When they were able to do that, then I
21   said, okay, go ahead and repair the 7.
22       Q   So I'm trying to understand what the damage to
23   the phone was.  You said it was shattered, but you also
24   said they were able to get the data off of it.
25       So what was wrong?  What did Apple tell you was

Hedquist & Associates Reporters, Inc.

1   wrong with the phone?
2       A   I don't -- I don't know -- I don't know that
3   there was anything necessarily wrong with the phone,
4   other than there was an opportunity to go to the 10 and
5   have all of my data on a 10, that's an upgraded phone,
6   than the 7.
7       I mean, in hindsight they could have had the 7
8   and repaired it, and possibly could have continued to
9   use it.  I don't know really what Apple did to the phone
10   once they had it.
11       Q   When did you get the iPhone 7?
12       A   That's -- I couldn't give you an exact date,
13   but --
14       Q   You said you had it when your wife -- when you
15   got married.
16       A   Yeah, I had it.  I know I had it then, and I
17   probably had it --
18       Q   Sometime before then?
19       A   Yeah, I had it sometime before then for sure.
20       Q   When did you get married?
21       A   January 23rd, 2015.
22       Q   What did you have before the iPhone 7?
23       A   I'm not sure.
24       Q   Was it a different --
25       A   No, it was an iPhone.  It was an iPhone.  I

Hedquist & Associates Reporters, Inc.

1 believe it was probably -- I don't know.  I don't know
2 exactly which model, but it was definitely an iPhone.
3 I've been on the iPhone for as long as I've had AT&T.
4     Q    When your wife changed the settings --
5     A    Right.
6     Q    -- for the text messages, when did she do that?
7     A    It would have been sometime -- I don't know the
8 exact date.  I was complaining about the phone not going
9 fast enough and she said, let me see it, I can help you,
10 and she -- I don't -- I don't even know that she -- she
11 didn't tell me what she did.  She just did some things
12 to it to make it work better.
13    Q    When did you learn that your wife changed that
14 setting on the --
15    A    About two months ago.
16    Q    And why did you learn it two months?
17    A    Counselor called, and I was in my car with my
18 wife, and he asked about the cell phone, and, you know,
19 it was a -- I didn't understand why the message -- the
20 one text message that we're all looking for wasn't
21 there.  I didn't understand why, and she said, I know
22 why.  She goes, I changed your phone a while back to 30
23 days instead of forever.  And -- and that's when I --
24 that's when I learned.
25    Q    Your wife doesn't know -- your wife didn't tell

1 you when she made that change?
2     A    No, but it -- it would have occurred well
3 before the letter.  It would have occurred sometime --
4     Q    Shortly after you got married?
5     A    Probably.  Once I could trust her with the
6 phone.
7     Q    Can you pull out your phone.
8     A    Yeah.
9     Q    Do you know where that setting is?
10    A    I do know where it is now.
11    Q    When did you learn about where it was?
12    A    When my wife showed me.
13    Q    About two months ago?
14    A    About two months ago.
15    Q    Will you show me on your phone what the setting
16 is right now?
17    A    Yeah.
18    Q    Can you -- for the record, can you describe
19 what steps you're taking?
20    A    I went to settings, I went to messages, and
21 once I go to messages I scrolled down to keep messages,
22 and now it says forever.
23    Q    Now it says forever?
24    A    Yes.
25    Q    Did it say forever two months ago when your

1 wife told you that she changed the setting?
2     A    No, it did not.
3     Q    So between two months ago and now you've
4 changed --
5     A    Yeah, I've changed it --
6     Q    -- the setting --
7     A    -- back to forever.
8     Q    -- back to forever?
9     A    Yes.
10    THE REPORTER:  Y'all have to speak one --
11    Q    Why?
12    THE REPORTER:  -- at a time, please.
13    Q    Why did you change it back to forever?
14    A    I -- I don't know if you're going to continue
15 to ask for more information that could go, so I figured
16 I would save whatever text messages that I get, so I put
17 it back on forever.
18    Q    You put it back on forever two months ago?
19    A    Well, my wife showed me how to do it, yes.
20    Q    Okay.  I want to go back to talking about
21 identification of the ESI.
22        After you got the letter on June 23rd, 2017,
23 other than what you've already told me, did you do
24 anything else since that time to identify ESI related to
25 the Trust litigation?

1     A    Did I do anything else.
2     Q    Other than what you've already told me?
3     A    Not that I'm aware of.  Not that I can recall,
4 no.
5     Q    Did you ever receive any kind of questionnaire
6 from Mr. Hancock related to identification of
7 information?
8     A    I'm sure we had a conversation, probably a
9 conference call, on what I needed to do and what I
10 needed to preserve.  I don't recall a document.
11    Q    How are you sure that that conversation
12 happened?
13    A    Well, we've had numerous conference meetings at
14 the Gray office, and phone calls.
15    Q    What record do you have of when those meetings
16 occurred?
17    A    I don't have a record of it.
18    Q    Would the time records of Gray Robinson's law
19 firm reflect those meetings --
20    A    I would think so.
21    Q    -- and when they occurred?
22    A    Yeah, their -- their billing would probably
23 reflect it.
24    Q    So if Gray Robinson met with you to
25 discuss identification --

1    A    Oh, yes.

2    Q    -- of ESI --

3    A    Oh, yes.

4    Q    -- there would be --

5    THE REPORTER:  You've got to speak one at a

6  time.

7    Q    --  there would be an invoice from Gray

8  Robinson reflecting that meeting?

9    A    I'm sure.

10    Q    Do you recall whether those meetings, any of

11  them, happened in 2017?

12    A    I -- I -- I'm sure there was.  I would have to

13  go back to their billing statement to reaffirm that, but

14  I'm sure we were assessing what we needed to do.  And

15  like I said, we had conference calls and meetings at the

16  Gray Robinson offices.

17    Q    There was a period of time between June 23rd,

18  2017, and when the Trust litigation was commenced by

19  you.

20    A    Correct.

21    Q    Did you identify any ESI related to the Trust

22  litigation between those time periods?

23    A    Between June --

24    Q    Of 2017.

25    A    -- and when we filed?

---

1    Q    Yes.

2    A    Ask the question one more -- say the question

3  one more time.

4    Q    Between June 23rd, 2017 and the date on which

5  you commenced the Trust litigation --

6    A    Right.

7    Q    -- did you have any meetings with Gray Robinson

8  to discuss identification of ESI?

9    A    Again I would have to go back to the -- the

10  billing statement to -- to really know for sure.  I

11  can't recall if we did or not.

12    MR. DIX:  Exhibit 10.

13    (Exhibit No. 10 was marked for identification.)

14    Q    I'm going to hand you a document marked as

15  Exhibit 10.

16    Will you look at that document and tell me if

17  you recognize it.

18    A    Yes, I recognize it.

19    Q    What is it?

20    A    It's a flowchart of employees that work for me,

21  and their responsibilities for the operations that we

22  operate.

23    Q    Which of these employees would have information

24  related to the allegations or defenses in the Trust

25  litigation?

---

1    MR. WELLS:  Object to the form.  You can

2  answer.

3    A    Oh, okay.  And I'm not sure -- when you say the

4  Trust litigation, certainly some of these folks are

5  aware that I'm being sued because they got served as

6  well.

7    So, you know, I don't know what information

8  they would have, you know, but certainly the ones that

9  you served, John Reece and Dennis and Dick, would have

10  knowledge of this matter.  Not -- not current.  They

11  just -- they -- they got served.

12    Q    Which of these employees would have information

13  related to the Cal-Maine sale?

14    A    I mean Dick probably more than any, only

15  because he was providing them with financial

16  information, you know, during the transaction.

17    You know, Dennis and John and others, they --

18  they -- they weren't -- they didn't provide Cal-Maine

19  with any information.  They were interviewed by

20  Cal-Maine, you know, when they were hired, but they

21  didn't provide Cal-Maine with any information.

22    Q    You mentioned Dick Still as having information

23  relating to the Cal-Maine sale.

24    A    Yeah.  I mean, he was under -- under my -- yes,

25  he would have had information.

---

1    Q    Have you made any efforts to identify

2  information that Dick Still has related to the Trust

3  litigation?

4    A    I have.

5    Q    What efforts have you made?

6    A    I've tried to -- you know, when we sold the

7  company our website was one of the assets that Cal-Maine

8  purchased, but the e-mail addresses, we still maintained

9  them for a period of time.

10    So around March of '17 Eddie Rosemond asked me

11  if -- and this would have been before your letter --

12  asked me if I wanted to keep my DixieEgg.com e-mail

13  address, to which I said yes.

14    I then said, you know, I don't know if anyone

15  else in the company is still using it.  If they are, I'm

16  happy to pay for a period of time until this transition

17  is done.

18    So at that time Eddie would have, you know,

19  paid the fee to keep mine.  And I told him -- I said,

20  ask the others if they want to keep their e-mail

21  addresses or not.

22    Q    In March 2017 was Eddie an employee of

23  Cal-Maine?

24    A    Yes.

25    Q    Why was Eddie asking you about the Dixie Egg

1 e-mail accounts in March 2017?
2    A    Right.  Well, I mean, there was a period of
3 time that, you know, we were still utilizing that e-mail
4 address.  I was still going into the office probably
5 through June or July of '17.  I was still going in.
6        There were a lot of changes that were going on,
7 so I was still utilizing my e-mail address.  Eddie was
8 the admin for the e-mail addresses, and so, he -- he's
9 -- I guess that's why he did it.
10   Q    Who is currently the admin user for the Dixie
11 Egg e-mail accounts?
12   A    Me.
13   Q    When did you become the admin user for the
14 Dixie Egg e-mail accounts?
15   A    Again in a quest to try to find these e-mail
16 addresses I went -- I had to reactivate the account.  I
17 did not realize the account had lapsed, because -- and
18 again I say the -- I don't know if it really lapsed.
19 There was money due for e-mail addresses, and I got
20 online, I talked to Eddie, I talked to Microsoft Help
21 desk, and I figured out how to become the admin.  And I
22 would say that was, oh, God, maybe four or five months
23 ago.
24   Q    What records do you have that reflect your
25 communications with Microsoft and Eddie about the Dixie

1 Egg e-mail accounts?
2    A    I don't know if I have records on Eddie.  I
3 have Eddie -- I have his cell phone number, and I spoke
4 to him on the cell phone, so there's probably a cell
5 phone record somewhere.
6        Microsoft Help desk, I have numerous e-mails
7 from them assisting me in trying to get into the portal
8 and be the admin.
9    Q    Once you became the admin user on the account
10 what did you do?
11   A    I went through trying to find e-mails, because,
12 you know, again I do not know when certain employees
13 transitioned from the Dixie Egg e-mail to the Cal-Maine
14 e-mail.  I don't know which employees -- at the time I
15 didn't know which ones even still had a Dixie Egg
16 e-mail, but when I got onto the portal and went to the
17 admin side I could see current users or users, and I
18 clicked on it, and I was surprised there were about 14,
19 15 users on that log, including Dennis Hughes and a lot
20 of employees that -- I don't even know if they're still
21 there.  They might be, but for whatever reason they
22 still had an e-mail, an active e-mail address.  Dick
23 Still and John Reece were not on that log.
24        I then went to deleted users to see if they
25 were deleted, and if so, could I reactivate them.  And

1 when I went to it, it did not have -- there was nothing
2 in that -- there was nothing in that log.  There was
3 nothing in the deleted users log.
4        So that's when I needed help, because I -- I
5 knew they had e-mail addresses.  I had no idea what
6 happened.
7        So that's when I started reaching out to
8 Microsoft, and they eventually, again with my limited
9 knowledge, walked me through.  They actually sort of
10 took control of my screen to help me.
11       But there's a security tab under the admin, and
12 when I went on it prior to getting Microsoft taking
13 control of my, you know, screen, when I saw the security
14 thing I clicked on it just to see what was in there, and
15 there's a recording function that's in there, and so I
16 figured -- you know, I didn't know if there was stuff
17 that was recorded.  I didn't really know what it was,
18 but I clicked on record.  Maybe it was a day or so --
19 and I couldn't find anything in there -- but a day or so
20 after I talked to Microsoft Help, and I have the e-mail,
21 and they -- they walked -- they were in my screen, they
22 went through that, and he says, I see where you turned it
23 on the recording function just the other day at this
24 time.  He had the whole thing.  And I said, yes, I
25 thought that's what I needed do.  I don't know.

1        And apparently when Eddie was the IT he never
2 had that recording function on.  He would have been the
3 only one to have done it.  And so when I turned it on
4 it's only going to record from the date that I turned it
5 on forward.
6        I then asked Microsoft Help about users that
7 were not in the deleted log.  I said where do they go,
8 and he said that once you delete a user that all their
9 information goes after 30 days.  And I -- you know, I
10 said, so there's no way to retrieve it, and he said no.
11       He said if the recording function had been on
12 then they would have been able to retrieve it.  And --
13   Q    What documents do you have, if any, to reflect
14 the information you just told me?
15   A    I have some e-mails from Microsoft that
16 describe that.  Certainly if you were to ask Microsoft
17 they would probably -- I don't know why they wouldn't
18 share the same thing with anyone.
19   Q    If you're the account admin --
20   A    Right.
21   Q    -- you have to authorize it.
22   A    Right.  Well, I'm just -- anybody with a
23 Microsoft Outlook portal.
24   Q    Did you ever ask Mr. Hancock to help you or
25 provide any assistance related to the Dixie Egg e-mail

1 accounts?

2     A    Yes, we -- we -- we definitely. And -- and --

3 and it was very complicated if you've never done it

4 before. I mean, I needed assistance, but that's -- we

5 definitely had discussions about it.

6     Q    When did those discussions happen?

7     A    Once I became the admin a lot of those

8 discussions took place in some e-mails back and forth.

9     Q    So until about four months ago --

10     A    Four or five months ago.

11     Q    -- no effort was made to identify information

12 related to the Dixie Egg e-mail accounts; is that right?

13     A    I don't know if that's exactly right. I mean,

14 we -- we had some information. We just didn't know the

15 whole story. Now we know.

16     Q    Prior to four months ago when you became the

17 admin user, what information did you have about the

18 Dixie Egg e-mail accounts?

19     A    We knew some people that -- we knew there were

20 some e-mails that were still active. You know, I

21 know -- and I don't know that they were ever used, but I

22 know Dennis Hughes kept his open. But when you -- I

23 don't think that -- prior to four or five months ago

24 there would just -- it would be mine. I definitely had

25 my e-mail address that was working. So I don't know

1 what else -- I don't know how to answer your question.

2     Q    When you -- when you became the admin user and

3 you went in and starred looking at accounts that were

4 available and deleted information that you told me

5 about, were those actions taken at the direction of

6 anyone other than your own volition?

7     A    I was just trying to -- it was my -- I wanted

8 to find out where those e-mail addresses went.

9     Q    Even though you don't have any technical

10 expertise in dealing with e-mails --

11     A    No.

12     Q    -- you logged in, started changing settings,

13 and exploring what information --

14     A    I had help from Microsoft to become -- and

15 Eddie -- to become the admin. I mean, I -- again, I

16 signed in.

17           If I just signed in to my e-mail address I

18 would just see the e-mail side, but on the admin side I

19 had to get authorization from Microsoft. I had to jump

20 through a lot of hoops to become the admin. They just

21 don't -- you know.

22           So once I became the admin I signed in, I had a

23 separate password for the admin, and that allowed me to

24 get in.

25     Q    Why did you take all the actions that you just

1 described four months ago? What prompted you to do

2 that?

3     A    The fact that these other e-mails were not

4 available. We were all frustrated trying to find them.

5 Didn't understand why they weren't there.

6     Q    When you say we were all frustrated, who is we?

7     A    My counselors and myself. I -- I was

8 particularly frustrated.

9     Q    Why were you frustrated?

10     A    Because I don't have anything to hide.

11     Q    No one said you did. What was frustrating

12 about the process?

13     A    Just the whole process of trying -- if you're

14 not familiar with something and you get throw into the

15 lion pit, I mean, it's very difficult to navigate

16 through. I mean, it wasn't something that came that

17 easy to me. It was -- it was -- it took time and lots

18 of phone calls and e-mails. And I finally got to where,

19 you know, I can get and see who's -- who's there.

20           But the deleted users, it didn't have any

21 because the recording function was not turned on, and

22 that would have been something Eddie would have done

23 when he set up the accounts.

24         MR. DIX: Let me show you a document we're

25     going to mark as Exhibit 11.

1         (Exhibit No. 11 was marked for identification.)

2     Q    Have you ever seen this communication?

3     A    Yeah. I mean, I don't know that I've seen this

4 communication. I mean, I'm familiar with all these

5 people.

6     Q    So at the top it says there's an e-mail from

7 David Hancock --

8     A    Right.

9     Q    -- to Jim Post and Grier Wells.

10     A    Yeah. I -- I don't --

11     Q    See it?

12     A    Yes, I do.

13     Q    October 24, 2018?

14     A    Right.

15     Q    And the second paragraph says: The names and

16 job titles are as follows.

17           Those names and job titles are names and job

18 titles of what?

19     A    Well, they're job titles at -- at our

20 business -- at our operations when they were with my

21 company.

22     Q    Are these individuals the individuals for which

23 Dixie Egg e-mail accounts were recovered?

24     A    I'm -- I'm not sure if it's all of these, but

25 they do look familiar, like a lot of these for sure are

1 in -- were in the active users.
2     Q    E-mail from Mr. Hancock says:  Names and job
3 titles are as follows, with total docs collected from
4 their accounts.
5     A    I didn't -- he doesn't have all of their job
6 titles here.  I mean, I -- Dennis Hughes was my general
7 manager, Isaura was HR, Mario was operations, Charissa
8 was a -- she was in our pullet houses, I believe.  Hulan
9 was in our -- was our contract grower guy.  Patrice Long
10 was a clerk, Steve Greeson was a contract grower
11 manager.  Nancy Henderson was a secretary, Nancy Walker
12 was in accounting up in Georgia.
13        I mean, so, yeah.  I mean, I know who these
14 people are.
15     Q    Which of these individuals have information
16 related to the Cal-Maine sale?
17     A    I would say none, because Dick Still is not on
18 here, and in my mind he would be the only one that would
19 have information regarding the Cal-Maine transaction.
20        Dennis.  He might.  You know, he communicated
21 with some of the Cal-Maine folks because he was the
22 general manager of our Georgia operations, which, you
23 know, had 180 or 200 employees, you know, that he
24 oversaw.  So -- but he -- but again, his communication
25 would have been with Cal-Maine's field guys in relation

1 to, you know, how they wanted to change things and
2 operate going forward.
3     Q    Which of the individuals in this e-mail have
4 information related to the value of Foodonics' assets or
5 stock?
6     A    None.
7        MR. DIX:  Let's mark this 12.
8        (Exhibit No. 12 was marked for identification.)
9     Q    Have you ever seen this document we have marked
10 as Exhibit 12?
11     A    I can't recall.  Maybe.  What was the date?
12 March 15, 2018, is that the date?
13     Q    At the top of the document it reflects it was
14 filed on March 15th, yes.
15     A    I may have seen this.  I'm not positive.
16     Q    Paragraph 1 on the second page states:  All
17 parties shall preserve ESI related to this case which
18 was created or received on or after September 1, 2008.
19        Do you see that?
20     A    I do, yes.
21     Q    Did you comply with that provision in the
22 order?
23     A    I believe I did.
24     Q    Did Foodonics comply with that provision?
25     A    Yes.

1     Q    How do you know that?
2     A    Just based on my knowledge of -- you know, of
3 not destroying or deleting anything purposefully.  I
4 mean, we -- we preserved all the documents.
5        You know, from September 2008?  I mean, I don't
6 know.  I mean, we've got stuff going back prior to 2008,
7 but I -- we never made any attempt to not share 100
8 percent of what you're asking for.
9     Q    Paragraph 2 of the order says:  All parties
10 shall designate within ten days of the entry of this
11 order an E-discovery liaison to be knowledgeable about
12 and responsible for the party's ESI.
13        Do you see that?
14     A    I do.
15     Q    Are you aware of who the E-discovery liaison
16 for you was?
17     A    I believe it was KLDiscovery -- well, I mean,
18 Dave Hancock and Gray, but the third party was
19 KLDiscovery.
20     Q    What about an attorney named Mike Santana?
21     A    Had some conference calls with Mike Santana.
22     Q    When did you have conference calls with Mike
23 Santana?
24     A    I mean, he was on the phone yesterday.  We were
25 on a conference call regarding this today.  And prior to

1 that I can't tell you the exact date or time.
2     Q    Would the billing records of Gray Robinson --
3     A    I'm sure they would reflect it.  They're very
4 good at that.
5     Q    Would reflect phone calls regarding with Mike
6 Santana?
7     A    I'm sure it would.  I'm sure there's some
8 billings to Mike Santana.
9     Q    Paragraph 3 of the order says:  All parties
10 shall disclose within ten days of the entry of this
11 order the locations and types of potentially
12 discoverable information in the party's possession or
13 control, and how that information can be or has already
14 been collected from the systems and media in which it is
15 stored.
16        Do you see that?
17     A    I do see that.
18     Q    Do you recall any discussions with Mike Santana
19 or anyone else at Gray Robinson regarding the locations
20 and types of potentially discoverable information?
21     A    Yes.
22     Q    Do you recall whether those conversations
23 happened on or about March 15, 2018?
24     A    I don't recall the exact date.  I know that for
25 sometime there was a lot of communication about our

1  AS400, which was our server that pretty much just did
2  accounting, payroll.  It never had any e-mails or any
3  personal information, and at the time, you know, that
4  was the system that the company was operating on.  It
5  eventually transferred to the Cal-Maine system.
6       But, so, yeah, we had lots of discussions about
7  different devices, where they were, and how they were
8  going to be collected and maintained.
9    Q    When you say that it transitioned to the
10 Cal-Maine system, are you referring to the accounting
11 system?
12   A    Their accounting system, yes.
13   Q    So information was transferred from Foodonics,
14 the AS400 system, to Cal-Maine?
15   A    No, no.  Cal-Maine never -- never operated the
16 AS400 at all.
17   Q    What was transferred to Cal-Maine in accounting
18 related information?
19   A    Just financial information.  You know, the tax
20 returns and, you know, current financial information.
21       The AS400, they were not going -- our -- before
22 they took over they had their people in place to sign in
23 to their system.  So once there -- there was just a
24 cutoff at a certain day.
25       MR. DIX:  This is Exhibit 13.

1       (Exhibit No. 13 was marked for identification.)
2    Q    The document we just marked Exhibit 13 is an
3  e-mail from Michael Santana to me on March 26, 2018.
4       Do you see that?
5    A    I do.
6    Q    And in the e-mail Mike says that he will be the
7  E-discovery liaison; that Dave has far more technical
8  expertise and will be involved as well.
9       Is that true?
10   A    That's true, although it's been complicated.
11   Q    The next sentence in that e-mail says:
12 Pursuant to paragraph 3 -- he's referring to the ESI
13 order we just talked about --
14   A    Okay.
15   Q    -- and as related to you previously by Dave
16 and/or Grier, we believe that the following items may
17 have discoverable information.
18       Then there's a list.
19   A    Yeah.
20   Q    Mr. Klempf's desktop while he was at
21 Foodonics/Dixie Egg, which is located at the Dixie Egg
22 office in Jacksonville, may have documents and/or
23 correspondence.
24   A    That's true.
25   Q    At the time this e-mail was sent on March 26,

1  2018, had KLDiscovery collected information from your
2  computer?
3    A    On or before March 26th?
4    Q    Right.
5    A    I'm not exactly sure when KLDiscovery collected
6  all that data.  I would -- I don't think it was before.
7  Again I'll refer to the billings and the backup invoices
8  from KLDiscovery that we have.
9    Q    Did your desktop computer have information,
10 documents, and correspondence relating to the Trust
11 litigation?
12   A    Yes.
13   Q    What did it have on it?
14   A    E-mails.  Mostly e-mails.  It would be e-mails.
15 There -- there might have been some Word documents on
16 there, but for the most part it would have just been
17 e-mail correspondence, I believe.
18   Q    How did Foodonics store its documents, other
19 than e-mail?
20   A    Well, Foodonics didn't; individuals did.  I
21 mean, we didn't have any -- we're not a -- we weren't a
22 huge company, I mean, by -- you know.  So, you know, if
23 someone had a Word document, you know, if they felt like
24 they needed to save it they would save it on their own
25 personal computer, which is what I would do.

1    Q    Did employees at Foodonics use their own
2  personal computers for work?
3    A    It was the company's computers, but it was --
4  yeah, each person had their own PC at their desk.
5    Q    What about working from home; did employees of
6  Foodonics work from home?
7    A    I mean, we didn't -- I'm sure some work was
8  done from their home, you know, with cell phones,
9  laptops, and communication and that kind of stuff, but
10 we didn't necessarily, you know, have a work-at-home
11 policy, so to speak.
12   Q    After the litigation was filed did you make any
13 efforts to contact any former Foodonics employees to
14 identify documents or ESI related to the Trust
15 litigation?
16   A    I did not.  The only thing -- you know, when
17 they got served, my former employees, you know, they
18 called me, and I tried to share or explain what I
19 thought I knew about the litigation.  I -- I said, you
20 know, if you don't have anything, you know, just say you
21 don't have anything.  If you've got something, you know,
22 share it.
23       I don't believe anyone had anything, but there
24 again, I don't know.  I didn't see --
25   Q    Which individuals did you contact and have

1 those conversations with?

2     **A**     **Well, a lot of them contacted me, including**

3 **others that you've subpoenaed, or deposed, or sent**

4 **notice to.**

5     **I know Reggie Dalton called me really upset.**

6 **John Reece called me upset. Dennis called me. You**

7 **know, and then, you know, some of the companies that you**

8 **guys sent things out to.**

9     **Q**     The next item on the list in Mr. Santana's

10 e-mail are two personal Apple laptops in Mr. Klempf's

11 possession --

12     **A**     **Right.**

13     **Q**     -- may have documents and/or correspondence.

14     In March 2018 did you have two personal Apple

15 laptops in your possession?

16     **A**     **Yes. I -- I -- I have one at my house and one**

17 **in my office.**

18     **Q**     And were those laptops turned over to

19 KLDiscovery?

20     **A**     **They were.**

21     **Q**     When did that occur?

22     **A**     **It all occurred on the same day. I had all the**

23 **devices at my office, including the PC. I took it from**

24 **-- when I did the deal with Cal-Maine I told them I**

25 **needed my own personal computer because it had a lot of**

1 documents that were mine, and they said that's no

2 problem.

3     So I had all the devices at my office, and it

4 took him -- took him a good while to -- to -- to get

5 everything off of everything.

6     **Q**     Someone from KLDiscovery came to your office?

7     **A**     **Yes.**

8     **Q**     Which is located where?

9     **A**     **It's in the Southpoint area near Dennis.**

10     **Q**     And what happened when the KLDiscovery person

11 arrived? What did they do?

12     **A**     **I gave them my office and I said, here are the**

13 **laptops, here is my PC, and here is my cell phone.**

14     **Q**     And what did they do when you told them that?

15     **A**     **They started taking things apart. The hard**

16 **drive on my PC he actually took out of the box and he**

17 **hooked something up to it and I guess got everything on**

18 **my hard drive, and then he did some other things. I**

19 **can't tell you the process, but he -- it took him time**

20 **to get each one done.**

21     **Q**     The next item in Mr. Santana's e-mail says:

22 And two of Mr. Klempf's cell phones which are in his

23 possession.

24     **A**     **I'm sorry. Okay.**

25     **Q**     Two personal laptops, and then two of

1 Mr. Klempf's cell phones, which are in his possession.

2     Were you in possession of two cell phones on

3 March 26, 2018?

4     **A**     **I probably was, but again, one had been**

5 **repaired, okay, and cleaned, and all the data**

6 **transferred to the 10.**

7     **Q**     Did you give two cell phones to the person --

8 the KLDiscovery person that came to your office,

9 whenever that happened?

10     **A**     **I'm not positive. I probably did. I know I**

11 **gave him the current one that I have. I'm sure they**

12 **would have a record of that. I'm not positive. I --**

13 **I -- if it was in the office I would have given it to**

14 **him.**

15     **Q**     Do you have any records that reflect the

16 devices that you gave to KLDiscovery to be copied?

17     **A**     **I -- I assume it would be in their billing, and**

18 **the day that they did it, and what they retrieved.**

19     **Q**     The next sentence in this e-mail says: One is

20 his current cell phone and one is his old cell phone.

21     Would the current cell phone have been your

22 iPhone 10 and the old cell phone be your iPhone 7?

23     **A**     **Yes.**

24     **Q**     The next sentence says: He believes the data

25 from the old was transferred to the new when obtained in

1 early 2017.

2     **A**     **No.**

3     **Q**     Is that a true statement?

4     **A**     **I think he's got a wrong date there. He**

5 **believes the data from the old was transferred to the**

6 **new when obtained.**

7     **It was early '18. It was January of 2018 that**

8 **the new iPhone, the 10, was purchased. I think that's**

9 **just a bad date.**

10     **Q**     So you never obtained a new phone in 2017?

11     **A**     **No.**

12     **Q**     The next sentence says: The old cell phone was

13 replaced due to it being dropped and a cracked screen.

14     Is that a true statement?

15     **A**     **Yes.**

16     **Q**     The next e-mail -- the next sentence in that

17 e-mail says: The following e-mail addresses may have

18 discoverable information: JKlempf@DixieEgg.come,

19 KJKeggs@AOL.com, and JKlempf@BAMJax.com.

20     **A**     **Yeah.**

21     **Q**     Is that a true statements?

22     **A**     **Those are the only three e-mail addresses I've**

23 **overused.**

24     **Q**     Have you ever used G-mail?

25     **A**     **Not to my knowledge. I don't recall. I don't**

1    think I've overused a G-mail address.  My daughter has
2    my same initial, JKlempf@gmail.  Juliann.  But it's not
3    my e-mail address.
4        Q    So in March of 2018 you had two cell phones in
5    your possession.
6        A    **Correct.**
7        Q    Is that right?
8        A    **(Nods head.)**
9        Q    And you gave both of those cell phones to
10    KLDiscovery; is that right?
11        A    **If they were in the office I believe I did, but**
12    **again, one cell phone had not even been -- it was like a**
13    **new cell phone.  It had a phone number attached to it,**
14    **but it had not -- there was nothing on it.  And then the**
15    **10 would have had all the information on it.**
16        THE WITNESS:  Excuse me.  Can I just take a
17    break?  My wife just called me and we were supposed
18    to meet somewhere at 2:30.  I know that's not going
19    to happen, so I'm going to have her Uber here.  Is
20    it okay if I take just a minute to call her real
21    quick?
22        MR. DIX:  Yeah.
23        THE VIDEOGRAPHER:  We are off the record.  The
24    time is 2:02 p.m.
25        (Short break.)

1        THE VIDEOGRAPHER:  We are back on the record.
2    The time is 2:08 p.m.
3        (Exhibit No. 14 was marked for identification.)
4        Q    Showing you a document we have marked
5    Exhibit 14.  The title of this document is Plaintiff's
6    Initial Rule 26(a) Disclosures.
7        Do you see that?
8        A    **I do see it.**
9        Q    Paragraph 1 says witnesses, and lists you as
10    the first witness.
11        A    **Okay.**
12        Q    Have you ever seen this document before?
13        A    **I don't know when this document would have been**
14    **disclosed, but I don't recall necessarily seeing this**
15    **document.**
16        Q    If you turn to the last page, it was signed
17    electronically with a certificate of service --
18        A    **I see.**
19        Q    -- February 16, 2018.
20        A    **Okay.**
21        Q    Do you recall having any conversations with
22    Mr. Wells or anyone at Gray Robinson regarding this
23    document?
24        A    **I don't know if it's specifically about this**
25    **document, but we probably had discussions about this.**

1        Q    When you say you probably had discussions, why
2    do you think you probably had discussions?
3        A    **I mean, obviously this is a document that I**
4    **guess Rule 26 disclosures.  I mean, I know that -- I**
5    **know that we have had some discussions about this,**
6    **because John Stevens and different folks on this we have**
7    **talked about.**
8        Q    So you're aware that as part of a federal case
9    there is a rule of civil procedure that requires
10    disclosures of certain information?
11        A    **Uh-huh.**
12        Q    Information related to the individuals that
13    have information about the case?
14        A    **Yes.**
15        (Exhibit No. 15 was marked for identification.)
16        Q    We have just marked Exhibit 15.  Take a look at
17    that document and tell me if you've ever seen that
18    document.
19        A    **Again, I don't know that I've necessarily seen**
20    **this document, but I know that we have discussed Steve**
21    **Brust and my uncle as it relates to this matter.**
22        Q    Did you have discussions with your -- strike
23    that.
24        If you would turn to the third page of the
25    document, paragraph 2 states:  Counter-defendant, as his

1    initial Rule 26 disclosure, incorporates the initial
2    disclosures submitted by Foodonics on or about
3    February 16, 2018, and this supplemental disclosure of
4    Foodonics hereinabove.
5        Do you see that?
6        A    **I do see it.  I'm not sure I know what it**
7    **means, but I see it.**
8        Q    Would you go back to Document 14, the paragraph
9    that describes the information, you know, right there on
10    the front, would you read that and tell me if that is
11    accurate and complete?
12        A    **Yes, it's accurate.**
13        Q    And complete?
14        MR. WELLS:  Object to the form.
15        A    **I don't know what else you would want to add,**
16    **but I don't -- I think it's pretty thorough.**
17        Q    I want to move on to the second area of inquiry
18    in the notice of deposition, which is preservation?
19        A    **Okay.**
20        Q    We have talked about some preservation issues
21    already, but I want to make sure we cover the areas that
22    we noticed for your deposition today.
23        Will you take a minute and look at paragraph 2,
24    the areas of inquiry, including the subparts.  There's
25    part A through part I on the second page.

1    A    (Witness complied.)
2    Q    What role, if any, did you have in preservation
3  of potentially relevant sources of material and ESI
4  related to the Trust litigation?
5    A    I mean, I worked with Gray Robinson and their
6  team to get all of the documents and data related to
7  preservation.
8    Q    Did you ever receive instructions from Gray
9  Robinson regarding preservation of ESI?
10        MR. WELLS:  Object to form.
11    A    I'm sure I did.
12        MR. WELLS:  Actually, I object.
13  Attorney/client privilege, but I'll let you answer
14  without waiving the objection.  Go ahead.
15    A    Yeah, we definitely had conversations about
16  preservation of the ESI documents.
17    Q    Did those conversations take place -- when did
18  those conversations take place?
19    A    From the very beginning through today.  I mean,
20  certainly their billing records would -- would show
21  that.
22    Q    When you received the letter from Mr. Post
23  dated June 23rd, 2017, did you communicate with any
24  friends, family members, or business associates
25  regarding preservation of their information?

1    A    Not on that day.  I -- I -- I don't believe I
2  would have communicated with -- the letter wasn't
3  written to me.  I mean, it was written and Grier shared
4  it with me.  But I don't believe I communicated with
5  anybody at that time personally.
6    Q    Other than your attorneys, have you ever had
7  conversations with anyone else regarding preservation of
8  ESI related to the Trust litigation?
9    A    Only after they were served notice, you know,
10  from your firm to preserve these documents and any
11  information they might have.
12    Q    And which individuals did you communicate with
13  regarding preservation of ESI?
14    A    My daughters.
15    Q    Anyone else?
16    A    Certainly, you know, John Reece and Reggie
17  Dalton that called.  Dennis.  And then the egg companies
18  that you sent notices to throughout the country, I had a
19  few conversations with them.  You know, I told them if
20  they have anything to share it.
21    Q    Was there any record of the conversations --
22  the communications you had with the people you just
23  listed?
24    A    I believe it was all phone conversations.  I
25  don't believe there was anything, e-mail or -- I don't

1  think there was any e-mail or texting.  I think it was
2  just phone calls.
3    Q    Did you ever instruct any of the individuals
4  you just mentioned to preserve ESI related to the Trust
5  litigation?
6    A    If they had anything related to this, yes, I
7  told them to please preserve it.
8    Q    Who did you tell to preserve ESI?
9    A    Everyone that I just mentioned.
10    Q    So when you spoke to John Reece you told him to
11  preserve ESI?
12    A    I said if you have anything to please preserve
13  it and hand it over to Gray Robinson.
14    Q    And when up spoke to Reggie Dalton you told
15  Reggie Dalton --
16    A    Yes.
17    Q    -- to preserve ESI?
18    A    And they were -- they were a little
19  dumbfounded.  The go, we don't have anything.  I mean,
20  then that's what you need to tell Gray Robinson.
21    Q    Why would they tell Gray Robinson?
22    A    Well, Gray Robinson was collecting all of the
23  data.
24    Q    How do you know that Gray Robinson was
25  collecting data related to John Reece and Reggie Dalton

1  and egg companies?
2    A    Because they -- they communicated with them.
3    Q    When you say they communicated with them, who
4  is they and who is them?
5    A    Grier Wells and Dave Hancock.  Mostly Grier I
6  think communicated with them.
7    Q    Are Dave and Grier they or them in your
8  sentence?
9    A    Wow.
10    Q    Who communicated with who?
11    A    I don't know exactly.  I just know that they
12  were communicating with the Gray Robinson team.  I can't
13  tell you if they spoke to Dave, Grier, or anyone else.
14  I know that there was communication.
15    Q    How do you know there was communication?
16    A    I know today is November 28th, and I know that
17  -- I mean, I know because we had conversations about it.
18    Q    When you say we had conversations, you mean you
19  had conversations with Gray Robinson or you had
20  conversations with the people you told to preserve
21  information?
22    A    Both.
23    Q    Okay.  Did any of the people you spoke to about
24  preservation of ESI tell you that they were not going to
25  preserve ESI?

1    A    No.  Everybody wanted to comply.

2    Q    Do any of your daughters have any information

3 related to the Trust litigation?

4    A    Other than what you served them, no, they have

5 nothing.

6    Q    When you say other than what you served them --

7    A    What you served them.

8    Q    I don't know what you mean by that.  Can you

9 explain your comment?

10    A    Yeah.  They were -- they were served subpoenas

11 to -- you know, at their homes by different individuals

12 to preserve documents, and it had the entire manifesto

13 that you guys wrote up.

14    Q    So your daughters, each of them, do have

15 information related to the Trust litigation; is that

16 right?

17    A    Each of them do not.  Each of them received a

18 subpoena from you regarding the Trust litigation, and if

19 they had anything, to preserve it.

20    Q    How do you know that your daughters don't have

21 any information related to the Trust litigation?

22    A    They weren't involved in the -- in the

23 litigation.  They weren't involved in the Cal-Maine

24 transaction.  They weren't involved at all.

25    Q    You understand that the litigation is broader

1 than just the Cal-Maine transaction?

2    A    Yes, I do understand it's broad.

3    Q    You understand there are issues about the

4 valuation of Foodonics?

5    A    They have no idea about that.

6    Q    None of your daughters have any information

7 regarding the value of Foodonics or the Foodonics stock?

8    A    The Foodonics stock.  There were some stock

9 options, and -- and Dina's kids and my brother's kids

10 and my kids had stock options, yes.

11    Q    So there's information about the value of those

12 stock options that your daughters have; is that correct?

13    A    Yes, but you know that.

14    Q    How do I know that?

15    A    Because you're smart.

16    Q    Have the -- have the documents that you're

17 referring to -- has the information that you're

18 referring to, has that been produced in connection with

19 this case already?

20    A    I can't tell you if it's been produced or not.

21 I -- I know that all the -- all those documents are in

22 tax returns, that everybody has seen them and knows what

23 they are all about.  I don't know if they have been

24 produced for you or not.  I assume they have been.

25    Q    After you initially spoke with your daughters

1 and the other people that you listed regarding

2 preservation --

3    A    Yeah.

4    Q    -- did you ever follow up with them after

5 that --

6    A    No.

7    Q    -- point to talk to them about information that

8 they had preserved?

9    A    We had a conference call, Grier and my three

10 daughters on the phone, to walk through all this.

11    Q    When did that conversation occur?

12    A    Oh, God, I don't have the exact date.  I would

13 say it was sometime in 2018.  It was a conference call

14 with my three daughters and myself and Grier, and he

15 walked through line item by line item by line item by

16 line item.

17    Q    And your daughters represented that they did

18 not have any information related to the Trust

19 litigation?

20    A    They did.

21    Q    How did they know that?  Had they searched

22 their e-mail and their texts?

23    A    I mean, they were -- I don't believe any of

24 them would have ever had a text or e-mail to go to a

25 Cal-Maine employee.  I would not have shared anything

1 directly with them about the transaction.  They didn't

2 know -- yeah, I don't know.  The only thing that they

3 got, they had some stock options.  That was it.

4    Q    What information did your daughters have about

5 the stock options of Foodonics?

6    A    They had -- everybody had a certificate.

7    Q    Was there any information other than the

8 certificate --

9    A    No.

10    Q    -- regarding the valuation of Foodonics?

11    A    (No response.)

12    Q    Were there any disclosures ever made to your

13 daughters by Foodonics other than with respect to the

14 stock options?

15    A    What kind of disclosures?

16    Q    Were there any disclosures made pursuant to

17 Florida statutes that were made to your daughters?

18    A    Other than a conference call again with Grier

19 stating that he needed to walk through these one by one,

20 I don't know that there was anything else disclosed.

21    Q    Do each of your daughters have -- did any of

22 your daughters have DixieEgg.com e-mail accounts?

23    A    No.

24    Q    Which of your daughters have BAM Jax e-mail

25 accounts.

1    A    Just my oldest daughter, Alexandria.
2    Q    And is BAM Jax -- the e-mail address for BAM
3  Jax, is that used for all of the BAM entities that you
4  discussed with Mr. Post earlier?
5    A    I mean, it's used with the BAM employees that
6  we have.
7    Q    Is there an entity named BAM Jax?
8    A    No.
9    Q    For any business related to any BAM business --
10   A    There's no BAM Jax.
11   Q    -- the BAM Jax e-mail account would be used; is
12 that right?
13   A    For any business related to it, yes.
14   Q    Are you aware of any documents or ESI that were
15 located and preserved, but could not be produced to the
16 Trust in connection with the Trust litigation?
17   A    So I'm not sure I understand the question.
18 You're asking if a document was preserved, but not
19 produced.
20   Q    That's right.
21   A    Produced?
22   Q    To the Trust.
23   A    I'm not aware of anything that was preserved
24 and not produced.
25        MR. WELLS:  Other than what may be on a

Hedrequist & Associates Reporters, Inc.

1  privilege log.
2    Q    What information do you have about the
3  preservation of ESI by Foodonics?
4    A    I mean, the only thing -- I mean, we have
5  e-mails, tax returns, you know, financial records, those
6  type of documents that have certainly been preserved and
7  certainly made available.
8    Q    Are you aware of any ESI that existed at the
9  time that the Trust litigation began, but which is no
10 longer available today?
11   A    Yes, I am.
12   Q    What information is that?
13   A    It's the two e-mail addresses that we can't
14 retrieve that were deleted, and then because the
15 recording function on the portal wasn't activated their
16 data is gone.  So I'm aware of that.
17   Q    One note I made to ask you about earlier.  When
18 you were talking with Mr. Post you mentioned that your
19 wife told you that she changed the setting related to
20 retention of text messages, and that she had fixed the
21 problem.
22   A    Well, you know --
23   Q    Is that what she told you?
24   A    -- again, I was using a lot of data.  I was
25 using a lot of data, and I was running out, and it

Hedequist & Associates Reporters, Inc.

1  was -- you know, AT&T dings you every time you run out,
2  so she -- I don't know what she did, but she said she
3  fixed it, or did some things to help give me more data
4  availability.
5    Q    So the problem that she fixed was that you had
6  too much data on your phone?
7    A    Yeah, I believe that's it.  I -- I -- you know,
8  she did some other things to it.  I -- I --
9  notifications, or something.  I -- I don't know
10 everything that she did.  I just let her do what she
11 wanted to do.
12   Q    I thought you told me you didn't know about it
13 when she did it.
14   A    I didn't.
15   Q    You just said you let her do it.  I don't
16 understand.  Did you let her do it and you knew about it
17 at the time, or did you only learn about it after?
18   A    I handed her my cell phone and I said go ahead
19 and fix it.  I mean, I think we've been over this.
20 Okay.  I don't know what she did, but I know she did
21 something when I handed her the phone, and she gave the
22 phone back to me.
23   Q    And then you later learned that one of the
24 things she changed was the setting --
25   A    Right.  I later learned when I got a phone call

Hedequist & Associates Reporters, Inc.

1  and she was in the car and said I'm the one that changed
2  that setting.
3    Q    All right.  I want to move on to collection of
4  ESI.
5        What role if any did you have in the collection
6  of potentially relevant sources of documents and ESI
7  related to the Trust litigation?
8    A    I mean, I -- I had all my devices available,
9  and they scheduled KLDiscovery to come in and collect
10 all the data.
11   Q    You don't recall when that collection was made?
12   A    Not exactly, but I believe it was April or May
13 possibly of '18.  I'm not exactly sure, but I'm sure we
14 have records that would show that from KL and Gray.
15   Q    Can you identify each of the people from which
16 ESI was collected in connection with the Trust
17 litigation?
18   A    I believe KLDiscovery was the only outsourced
19 company to collect that data.
20   Q    Let me rephrase.
21   A    I don't understand.
22   Q    Who did KLDiscovery collect data from other
23 than you?
24   A    I don't know.
25   Q    Are you aware -- you're not aware of any

Hedequist & Associates Reporters, Inc.

1   information being collected by KLDiscovery related to
2   the Trust litigation?
3       A    Other than -- other than everything that
4   Foodonics and I had personally.
5       Q    Are you aware of any information being
6   collected from Gray Robinson?
7       A    No, I'm not.
8       Q    You're not aware that Gray Robinson received a
9   subpoena and produced documents?
10      A    I know they produced documents. I don't know
11  if KLDiscovery did it. I can't speak for Gray and who
12  they used to find their documents. I don't know if they
13  have their own in-house or -- but I know they did
14  produce documents.
15      Q    You don't have any information related to the
16  collection of ESI by Gray Robinson; right?
17      A    No.
18      Q    Do you know anything about the methods that
19  KLDiscovery used to collect the ESI?
20      A    I definitely don't know anything about the
21  methods.
22      Q    Did you give them any specifics instructions
23  when KLDiscovery collected the ESI?
24      A    I said here's all the devices. Do whatever you
25  want to do.

1       Q    And the instructions came from Gray Robinson?
2       A    Yeah, they had -- they had a list of what they
3   needed to do, and I'm assuming they did it all.
4       Q    Do you ever use iTunes?
5       A    I do.
6       Q    What computer or device do you use iTunes on?
7       A    It's on a lap -- my home laptop, and it's just
8   -- I actually looked through it last night, because it
9   was mentioned to me that maybe there could be data on
10  it. I didn't find any. I found my music. You know, I
11  think there were some pictures, but there was not any
12  data. And I say there wasn't. I looked to the best of
13  my ability and could not find anything.
14      Q    You admitted earlier though that you don't have
15  any technical expertise in collecting --
16      Q    No.
17      Q    -- information?
18      A    No. I mean, if I find it it's just luck.
19      Q    When you plug your phone into that computer
20  does it synchronize?
21      A    Yes. I've noticed -- yeah, like I said, I have
22  the Cloud, so even the computer at my office and my
23  phone, if I download music, or even e-mails, everything
24  is on every device.
25      Q    Other than the laptops and iPhones we have

1   talked about, do you have an iPad?
2       A    I have one that I've never activated. I got it
3   as a gift, and I never put an e-mail address in there,
4   never did anything. It's in my briefcase now. I've
5   never used. It's not in my briefcase, it's at my
6   office, but I've never used it. I got it as a gift. I
7   didn't need it.
8       Q    You've never turned it on?
9       A    I have turned it on now because I was curious
10  if there was anything on it.
11      Q    When did you do that?
12      A    Just a couple weeks ago. It was dead as a
13  doornail. I plugged it in, and it's charged, but there
14  was nothing on it. There was no e-mails, there's no --
15  there's nothing on it. I've never, you know, put in my
16  e-mail addresses, or anything like that to -- to
17  retrieve.
18      Q    Have you ever backed up your phone using
19  iTunes?
20      A    I'm sure I have. I'm not sure how I did it,
21  but I'm sure I have.
22           Does it do it automatically when you plug in
23  sometimes, or does it -- I don't know.
24           (Exhibit No. 16 was marked for identification.)
25      Q    The document we just marked as Exhibit 16 is an

1   e-mail from Mr. Wells to Mr. Post on October 15, 2018.
2           Do you see that?
3       A    I do see it.
4       Q    Paragraph 2 of that e-mail from Mr. Wells,
5   Mr. Wells is responding to some questions about your
6   mobile phone.
7       A    Okay.
8       Q    He says: The cell phone data collection was
9   performed by Kirk Crabb of KLDiscovery's collection team
10  via the iCloud on April 8, 128(sic) at 5:01 a.m.
11          Do you see that?
12      A    Yeah. I don't know. 5:01 a.m., I mean, I
13  don't know where that comes from. It wasn't at 5:01
14  a.m., not in my office.
15      Q    The e-mail from Mr. Wells refers to collecting
16  data from the iCloud, not the iPhone.
17      A    They definitely had my phone, but -- but -- but
18  you know, my phone, I guess, everything is tied to the
19  Cloud, I'm assuming.
20      Q    To your knowledge, did KLDiscovery ever collect
21  data from your iPhone 10?
22      A    I believe, yes, they did.
23      Q    And to your knowledge, did KLDiscovery ever
24  collect information from your iPhone 7?
25      A    I can't say for certain. I -- again, would

1 all -- my question to you, because I don't know, is all
2 that information in the Cloud?
3    Q    I don't know about your Cloud.
4    A    Isn't it the same Cloud?  It's just one big
5 Cloud.  I mean, I don't know.  I -- I don't know if it's
6 -- yeah, I can't speak.  That would be a KLDiscovery
7 question.
8    Q    Did you ever provide information to KLDiscovery
9 to permit them to access the iCloud for your account?
10    A    Yeah.  I gave them all passwords, all sign-ins,
11 everything to do whatever they needed to do.
12    Q    When you provided that information was that
13 when they were in your office?
14    A    Yes, but I've also shared that information with
15 counselors, both Dave and Grier, for different, you
16 know, accounts.
17    Q    I want to go back to paragraph 1, because
18 there's more information about the phone.
19        Paragraph 1 says:  At the time of our
20 conference call this past Friday it was our
21 understanding that all text messages had been provided.
22        Second sentence:  In the face of a possibility
23 that messages from another cell phone had not been
24 collected, we advised we would look into the issue and
25 get back to.

1        Do you know what Mr. Wells was referring to
2 when he said that?
3    A    Not exactly, no.
4    Q    Is there a possibility that messages from
5 another cell phone have not been collected?
6    A    You know, what was available on the cell phones
7 was collected.  I don't know.  I mean, obviously if
8 there was -- if the data had -- or the text had been
9 changed to the 30-day hold there wouldn't be anything
10 prior to that.  But -- but, you know, everything that
11 was on the phone, in my opinion, or my -- at least I
12 believe -- was collected.
13    Q    Mr. Wells, at the end of paragraph 1 says:  I
14 also discussed the cell phone issue with Jacques.
15        What cell phone issue was he referring to?
16    A    I'm sure it was the damaged iPhone 7 that I
17 took to the Town Center to replace.
18    Q    How did that phone get damaged?
19    A    It was in the bathroom and it just fell
20 directly onto the tile floor.
21    Q    Where were you?  What -- what city were you
22 located in?
23    A    I was in New York.
24    Q    You broke the phone in New York, but then
25 replaced it when you got back to Jacksonville?

1    A    Yes.
2    Q    How much later after you broke it did you
3 replace it?
4    A    I'd -- I'd have to go back and look at our
5 travel dates and the date on the receipt from the iTunes
6 store.  I don't know exactly, but it was soon after.
7    Q    Why were you in New York?
8    A    We like to go to New York.
9    Q    Did you use any other phone between the time
10 that you broke your iPhone 7 and when you replaced it at
11 the iPhone store?
12    A    No.
13    Q    The last -- second-to-last sentence from Mr.
14 Wells says:  He -- you -- were under the impression that
15 all data from his old damaged phone had been transferred
16 to the new phone.
17    A    Correct.
18    Q    How are you under that impression?
19    A    With my communication with the Apple technician
20 that -- you know, I made sure that all that information,
21 all my contacts, all my everything transferred over to
22 the iPhone 10.
23        I think we have discussed this many times.
24        MR. DIX:  Let's do another e-mail, another
25    document.

1        (Exhibit No. 17 was marked for identification.)
2    Q    The document we just marked Exhibit 17 is
3 another e-mail from Mr. Wells to Mr. Post and me on
4 October 22nd, 2018.
5        Have you ever seen this e-mail before?
6    A    I don't believe so.
7    Q    The last sentence of the e-mail says:  As to
8 text messages, Jacques had to replace his cell phone,
9 which was damaged.  He thought the data on the phone had
10 been retained, but apparently -- but it apparently was
11 not.
12    A    Yeah.  I think he's referring to the text
13 messages that would have been over 30 days after, again,
14 I became aware that it had been changed to that setting.
15    Q    So between October 15th, the last e-mail I just
16 showed you, and October 22nd, was that when you learned
17 that the phone -- the text message data had not been
18 retained?
19    A    It was sometime in early October.  I don't know
20 exactly what date it was that Grier called and my wife
21 was in the car, but it was just -- it was -- it wasn't
22 that long ago.
23    Q    Let's move on to the next area of inquiry,
24 processing, on page 3 of Exhibit A.
25    A    Okay.

1    Q    Take a minute and read that section.
2    A    I've read it.
3    Q    What role, if any, did you have in the
4 processing of ESI related to the Trust litigation?
5    A    Just providing the devices so that they could
6 do what they needed to do.  I -- that's all I did.  I
7 mean, a lot of these things seem very interrelated.
8    Q    Were there any files that were collected by
9 KLDiscovery that were password protected or encrypted?
10   A    There were some passwords, you know, to get
11 into my laptop and to get into different e-mail accounts
12 and different things, yes.
13   Q    And did you provide KLDiscovery with the
14 passwords --
15   A    Yes.
16   Q    -- that you had?
17   A    Yes.
18   Q    Within the last month or so we've had meetings
19 with Mr. Wells and Mr. Hancock and discussed some
20 password protected files that were produced to us.
21   A    Okay.
22   Q    And in some of those e-mails there was a
23 reference to what the password might be, either your
24 Social Security number or some other information.
25   A    Yeah, Seminoles.

1    Q    Have you had any --
2    A    I know that's not popular on this side of the
3 table, by the way, or that side.
4    Q    Have you made any additional efforts within the
5 last month to provide additional passwords for files
6 that were produced to us?
7    A    Yes, yes.  I just -- just yesterday I provided
8 my iTunes account information and, you know, whatever --
9 whatever Gray has asked.  I've given them everything.
10   Q    What have they asked for?
11   A    Last night?  ITunes account information, the
12 file that we got from Apple.  Once you try to access it
13 I got a message that said someone's trying to access
14 your information from Tampa, and I clicked allow, and
15 then it sent me a code, and about the time I got the
16 code I got an e-mail from Dave saying I need the code,
17 so I called him and gave him the code.
18   Q    Why did you give Gray Robinson your iTunes
19 information?
20   A    I believe it was an inquiry that there could be
21 data in there, and if there was I wanted them to have
22 access to it.
23   Q    Do you know anything more about that inquiry
24 other than they asked you for your password?
25   A    No.

1    Q    All right.  Let's move on to the next category,
2 search and review.  Take a minute and review that area
3 of inquiry.
4    A    I've read it.
5         (Exhibit No. 18 was marked for identification.)
6    Q    The document we just marked as Exhibit 18 is
7 the subpoena that was served on you by the Trust on
8 January 12th, 2018.
9         Have you seen that subpoena before?
10   A    January.  This says February 12, 2018.  Did you
11 say January earlier?
12   Q    The date on the front page is January 12, 2018.
13 The date for production is February 12, 2018.
14   A    Okay.  Yeah, I mean I -- it looks very
15 familiar.  I mean, there's been so many.  I'm sure I've
16 seen it.
17   Q    Are you aware that the Trust served you with a
18 subpoena which requested documents and ESI related to
19 the Trust litigation?
20   A    Yes.
21   Q    What role, if any, did you have in searching
22 for the information that was responsive to the subpoena
23 that the Trust served on you?
24   A    I mean, as it relates to my personal documents
25 and Foodonics documents I was the one that directed the

1 Gray Robinson team and myself in the collection of this.
2 That's not -- but I'm the one that told them where
3 everything was.
4    Q    So you just mentioned collection.  What I'm
5 asking about --
6    A    Search.
7    Q    -- is searching.
8         So once KLDiscovery collected the information
9 from you --
10   A    Right.
11   Q    -- then did you have any further role in
12 looking for the information that the Trust was asking
13 for?
14   A    I had a role in finding things that were
15 missing that -- that I think your team requested from
16 Gray.  I didn't have any other role, you know, once KL
17 had -- had collected everything that they -- they got.
18   Q    So after collection, other than issues
19 identified by my firm --
20   A    Right.
21   Q    -- after production, you had no role in
22 searching or reviewing ESI related to the Trust
23 litigation?
24   A    No.  I mean, we talked about -- I mean, the
25 Gray Robinson team and I talked about certain things

1  that might be privileged or personal that, you know,
2  would not need to be shared.
3        Other than that, really nothing else.
4        (Exhibit No. 19 was marked for identification.)
5    Q    The document we just marked as Exhibit 19 are
6  the objections to defendant's subpoena of nonparty
7  Jacques Klempf.
8        Have you ever seen this document before?
9    A    It looks a lot like all the other documents.
10  I'm sure I have seen it. I'm not sure how it's that
11  much different than some of the others.
12    Q    This document is the response that your
13  attorneys filed to the subpoena from the Trust.
14    A    Okay.
15    Q    And I want to take a look at a couple of the
16  specific responses.
17    A    Okay.
18    Q    If you look at page 7 --
19    A    Okay.
20    Q    -- the first request is listed up there at the
21  top: All documents and ESI that you and/or Foodonics,
22  on the one hand, and Dolph Baker and/or Cal-Maine, on
23  the other hand, including but not limited to -- then
24  there's a list of different documents that are being
25  asked about.

1        Are you aware of any documents that were
2  produced by you or Foodonics that are responsive to
3  request number 1?
4    A    Am I aware of any documents that were produced?
5    Q    Did you or Foodonics ever produce any documents
6  responsive to request number 1?
7    A    Yes.
8    Q    Which documents?
9    A    The transactional documents, tax returns. I
10  mean, I don't know every single document that was
11  produced, but it certainly would have been anything
12  related to what's -- what's in here. I mean, I don't
13  know every document.
14    Q    Did you ever direct Gray Robinson not to
15  produce any documents that were responsive to any of the
16  requests in the subpoena that was served on you?
17    A    No.
18        THE VIDEOGRAPHER: We have ten minutes of
19  record time remaining.
20    Q    Look down at the bottom, request number 2, it
21  says: Any and all closing documents and other
22  agreements related to the Cal-Maine sale.
23        Your response says: Subject to the foregoing
24  general objections Mr. Klempf will produce closing
25  documents and other agreements in his possession, if

1  any, relating to the Cal-Maine sale, though Mr. Klempf
2  believes such documents and agreements are under the
3  possession and control of Foodonics.
4        Was there anyone other than you that's an
5  employee of Foodonics?
6    A    Not as it related to that transaction. No,
7  there is no one else. It's just me.
8    Q    So are you aware of any way that Foodonics, but
9  not you, could have possession of certain documents
10  responsive to the subpoena?
11    A    No.
12    Q    Turn to page 8, please. Request number 6
13  refers to all documents and ESI that you or Foodonics
14  sent to or received from Mark Klempf referring or
15  relating to -- and there are several different
16  categories of information.
17        Did you produce the information requested in
18  request number 6?
19    A    If it was available I'm sure we did. Again, I
20  don't recall each and every document that was produced,
21  but I believe -- I'm quite certain that some of those
22  documents were definitely produced.
23    Q    Turn please to page 12, Request For
24  Production 19.
25    A    Okay.

1    Q    All documents and ESI that you or Foodonics
2  sent to or received from Gray Robinson relating or
3  referring to the settlement redemption agreement, Laura
4  Jean Klempf or the Trust, Cal-Maine or Dolph Baker,
5  Cal-Maine sale, the value of Foodonics assets or
6  Foodonics stocks, and/or potential sale of Foodonics
7  assets or Foodonics stocks.
8        The response below is: Pursuant to the
9  foregoing general objections, specifically as to
10  attorney/client privilege and proprietary and
11  confidentiality privileges, Mr. Klempf objects to this
12  request.
13        Do you know whether you produced any documents
14  in response to request number 19?
15    A    I can't say for sure if you've got those
16  documents or not. I would assume you've got most of
17  those documents, but I can't say for sure. I don't -- I
18  don't know what you have.
19    Q    Request number 21 down at the bottom of page 12
20  asks for all documents and ESI constituting, referring,
21  or relating to any personal financial information
22  prepared by or for Foodonics, delivered to the financial
23  institutions, potential purchasers of Foodonics, or the
24  like, during January 1st, 2012 through January 1, 2017.
25        The response which carries over into the next

1 page, the last sentence says: Additionally, Mr. Klempf
2 objects to this request, as it seeks documents
3 controlled and possessed by Foodonics.
4          Is there any way that Foodonics could control
5 or possess documents that you did also -- that you also
6 did not control and possess?
7     **A   I don't believe there would be anything. I**
8 **mean, you've -- you've reached out to different folks**
9 **that would have received some of this information, so...**
10    Q   Would it be safe to say that you and Foodonics
11 are one and the same when responding to these requests?
12    **A   Yes.**
13    Q   So for request number 23 and 24 you would have
14 a similar response, that there's no difference between
15 you and Foodonics in responding to --
16    **A   There isn't. I'm the -- I'm the last person**
17 **standing.**
18         MR. DIX: All right. Let's stop there so she
19 can change the video.
20         THE VIDEOGRAPHER: We are off the record. The
21 time is 2:59 p.m.
22         (Short break.)
23         THE VIDEOGRAPHER: We are back on the record.
24 The time is 3:04 p.m.
25    Q   Mr. Klempf, what role, if any, did you have in

1 the analysis of the documents and ESI that were
2 collected from you to be produced to the Trust?
3     **A   Very little. I mean, there were questions I**
4 **suppose on some of the documents from -- that were**
5 **collected, you know, that Gray would inquire about and**
6 **ask, and I would share what I knew.**
7     Q   Some of the documents that were collected from
8 you were categorized as privileged --
9     **A   Right.**
10    Q   -- and then put on a privilege log that you
11 went through earlier with Mr. Post.
12         What knowledge do you have about the
13 preparation of those privilege logs and the items that
14 were contained on it?
15    **A   Not much, other than I -- I -- I did see this**
16 **privilege log. Gray showed me it. I didn't really look**
17 **through it. You know, there's a lot of information**
18 **there that -- yeah, but I didn't have anything to do**
19 **with what they felt was privileged or not.**
20    Q   Do you know who prepared those privilege logs?
21    **A   No.**
22    Q   Do you know who analyzed the ESI that was
23 collected from you related to the Trust litigation?
24    **A   I believe it was KLDiscovery. Well -- well,**
25 **KLDiscovery I guess presented the information. I**

1 **believe the Gray team went through the analytical part**
2 **of the data.**
3     Q   Was there ever a time when a team of review
4 attorneys were retained to look through information that
5 was collected from you?
6     **A   Not to my knowledge.**
7     Q   All right. Let's talk about the next area of
8 inquiry, which is production. Will you take a minute
9 and look at that section and tell me when you're done.
10    **A   I mean, I've read 7, yeah.**
11    Q   So what role if any did you have in the
12 production of documents and ESI related to the Trust
13 litigation?
14    **A   Again, they're all so related. I provided the**
15 **devices so that all the production documents could be**
16 **attained.**
17    Q   Any delays or errors in the productions would
18 have been someone's fault other than your own; is that
19 right?
20    **A   Yes. I had no problem complying with time,**
21 **date, although there wasn't any collection at 5:01 a.m.**
22    Q   Are you aware of any issues that arose during
23 the production of documents or ESI related to the Trust
24 litigation?
25    **A   I'm not.**

1         MR. WELLS: Object to the form.
2     **A   I'm not aware.**
3     Q   So paragraph 7(a), (b), (c) refer to production
4 of ESI on certain dates: August 30th, September 14th,
5 and October 17th --
6     **A   Right.**
7     Q   -- each of 2018.
8     **A   Right.**
9     Q   The subpoena we served on you, which we
10 discussed earlier, was served in January 2018.
11         Do you know why it took from January until
12 August, September, and October to produce the documents
13 related to the Trust litigation?
14    **A   I don't know exactly why it took that long. I**
15 **would say probably a contributing factor is the amount**
16 **and volume that your firm wanted to collect.**
17    Q   Let's talk about text messages then.
18    **A   Okay.**
19    Q   Text messages that were produced. Are you
20 aware of what was produced to the Trust in connection
21 with this case?
22    **A   No.**
23    Q   I want to move on to area of inquiry number 8.
24    **A   Okay.**
25    Q   There's no title there, but the description is:

1 The actions taken on behalf of Foodonics parties related
2 to the discovery status conference orders entered on the
3 following dates. Then there's a list of the status
4 conferences.
5    A    Yeah.
6    Q    You attended some of those status conferences.
7    A    I did. Yeah, I was sort of curious how it all
8 worked.
9    Q    So the first status conference was on June 6th.
10 The most recent status conference was October 22nd.
11        Which of the status conferences did you attend;
12 do you recall?
13   A    I don't remember. I believe -- I believe at
14 least one in October, and probably the one in August, I
15 believe are one -- two that I attended.
16   Q    After each of the status conferences the judge
17 would enter an order reflecting the items that were
18 agreed to --
19   A    Right.
20   Q    -- at each of the status conferences.
21        Did you ever take any action pursuant to the
22 orders that the court entered after those status
23 conferences?
24   A    I mean, Gray Robinson and -- and I discussed
25 what -- what was needed by your team, and I did -- and

1 which -- which I think we have addressed as it relates
2 to e-mail -- DixieEgg.com e-mail addresses and the
3 iPhone. I think -- yeah, we've -- we've had
4 conversations and -- and tried to get resolution.
5    Q    Is it your understanding that as we sit here
6 today that you and Foodonics have produced all of the
7 documents and ESI that relate to the Trust litigation?
8    A    I believe they have. I -- again, I don't know
9 if with every one of these orders if they have all been
10 completely complied with or not, but I do believe
11 we've -- we've tried, we've made our best effort. I
12 don't know if 100 percent. I can't say.
13   Q    I want to just talk about the Dixie Egg e-mail
14 accounts for a little bit more, because those are the
15 subject of multiple status conferences.
16   A    Right.
17   Q    It seems like the story changed from status
18 conference to status conference as new information came
19 available.
20        As we sit here today is there any additional
21 information from the DixieEgg.com accounts that can be
22 produced?
23        MR. WELLS: Object to the form.
24   A    Yeah, I -- the -- you know, what I described
25 with Mr. Post earlier, or maybe it was you, it's been a

1 long day. Once I was able to get into the admin, and
2 once I had communication with Microsoft Help desk, I was
3 able to determine what happened to those e-mail
4 addresses based on information Microsoft gave me. And
5 that's -- so in my eyes, 100 percent of what is
6 available from the DixieEgg.com e-mails was provided.
7    Q    You said earlier that you use AT&T as your
8 provider for your mobile phone.
9    A    That's correct.
10   Q    Do you know whether AT&T backs up any of the
11 data from your phone to an AT&T source?
12   A    Wow. I do not.
13   Q    Have you ever asked AT&T whether they back up
14 any of your data?
15   A    I have not.
16   Q    Would you be willing to make such a request --
17   A    Absolutely.
18   Q    -- to find out if there's anything else from
19 your phone that can be recovered?
20   A    Yes. I've -- I've made -- I would absolutely
21 do that.
22   Q    One other question about the backups.
23        Which was the computer -- how would you
24 identify the computer that has iTunes on it?
25   A    It's the one that I use at my house mostly.

1 I'm -- I'm real big on Shazamming music that I hear and
2 then buying it.
3    Q    The desktop computer?
4    A    It's a laptop.
5    Q    So it's one of the two laptops --
6    A    Correct.
7    Q    -- that we discussed earlier?
8    A    That's correct.
9    Q    And that entire laptop at some point was
10 copied --
11   A    Yes.
12   Q    -- by KLDiscovery?
13   A    Yes. And then Dave Hancock has got my iTunes
14 sign-in and password to -- to retrieve whatever is in
15 there.
16   Q    So is it your understanding that there is still
17 some information that you might be able to produce if
18 something can be recovered from iTunes?
19   A    Again, I looked myself, could not find
20 anything. So then I gave it to the professional for him
21 to do what he can do. And so that -- that's all I
22 can...
23   Q    Other than the iTunes investigation, is there
24 any other ongoing effort that you're aware of to
25 identify, collect, or produce ESI related to the Trust

1  litigation?

2  A    No.

3  MR. WELLS:  From him or from Foodonics?

4  A    Again we have sort of said it's sort of the

5  same thing, but not that I can -- not that I can -- I

6  don't believe there's anything else.

7  Foodonics didn't have an iTunes account,

8  Foodonics didn't have a, you know, a company iPhone, so

9  I don't know.

10  Q    Do you ever log into AT&T to see your mobile

11  account on line?

12  A    I have done it on occasion when we traveled out

13  of the country to get the -- again with my wife's

14  assistance -- to get on an international, you know,

15  calling plan.

16  I think now if you sign up for it, once you

17  cross it automatically kicks in.  Before you had to

18  actually sign up and access it.  So, yes, I've done that

19  before.

20  Q    Are you aware that by logging into AT&T you can

21  see past billing statements from your account?

22  A    I've never really looked at it, so I'm not

23  really aware, but if it's there, yeah, I guess it's

24  there.

25  Q    Earlier Mr. Post asked you about documents that

1  we were hoping you would bring to this deposition today.

2  Are the billing records with AT&T something

3  that you could --

4  A    Yes.

5  Q    -- still look for and produce to us?

6  A    It's the first thing I wrote down here, is the

7  AT&T billing.

8  Q    Do you have paper copies of any of those

9  billing records?

10  A    No.  I get notification that I've got a new

11  bill.  It comes to my personal bank account, and then I

12  just -- I just pay it.  I never really look at it.  It's

13  always about the same amount.  I just pay it.

14  Q    When you looked at the information that you

15  downloaded from Apple --

16  A    Yeah.

17  Q    I know you said you weren't able to make much

18  sense of it.

19  A    No.

20  Q    Did you see a file in there labeled as a call

21  log?

22  A    No, but again I shared that with Dave and Grier

23  yesterday.  I mean, I -- again, I requested the

24  information, it took about a week, Apple sent it to me,

25  I opened it up, signed into my iTunes, and then it

1  showed me, I think it was 16 different files.  Okay.

2  And I just clicked on a couple of them just to see what

3  was in there.  I don't recall the name of each file.  I

4  know there was an iCloud file.  There was -- I don't

5  recall -- what did you say it was, a call log?

6  Q    A call log.

7  A    I don't recall seeing that.  I mean, I could

8  probably open it up now if you want me to.

9  Q    Well, how would you open it up?

10  A    I've got the e-mail.  Okay.  I could go into it

11  and say, you know, open the data, sign into my iTunes

12  account and look.

13  Q    When you look -- after you click the link and

14  look isn't it a file that has to be downloaded --

15  A    Yes.

16  Q    -- somewhere?

17  A    Yes.

18  Q    Wouldn't it be pretty hard to look at that on

19  an iPhone?

20  A    It absolutely would.

21  Q    Did -- did you -- did you only look at a couple

22  of the files that Apple gave you, or did you look at

23  every single one?

24  A    I didn't look at every single one.  I looked at

25  one, and when it opened up it -- it -- it just looked

1  like a bunch of scribbling.  It didn't really make any

2  sense to me.  And then the iCloud file, which I thought

3  probably would be the most -- it seemed like it had the

4  most -- it had a big number next to it, so I figured it

5  had the most data in it.  I clicked on it, and it

6  never -- it never downloaded properly I don't believe,

7  because I could see the little bar, but the little bar

8  was never finished.

9  And I -- and I -- I did that the first day that

10  I got it.  And again, my computer may not be -- may not

11  be able to do it.  I don't know.

12  MR. DIX:  Let's take a quick break.  I think

13  we're getting close to the end here.

14  THE VIDEOGRAPHER:  We're off the record.  The

15  time is 3:21 p.m.

16  (Short break.)

17  THE VIDEOGRAPHER:  We are back on the record.

18  The time is 3:36 p.m.

19  Q    Mr. Klempf, earlier we talked about KLDiscovery

20  and the work that they did.  You mentioned their

21  information about the work that they did would be in

22  their invoices.

23  A    I -- I -- yes.  I mean, I've got copies of the

24  invoices because they were attached to the Gray bill.

25  Q    Would you be willing to produce the KLDiscovery

1  invoices to us to reflect the work that they did?
2      MR. WELLS:  Subject to attorney review and
3  potential objection.  I don't know what's in those,
4  but assuming no privilege issue, certainly.
5   A   Gray's got the documents too.
6   Q   Would you agree to produce those within two
7  weeks?
8      MR. WELLS:  Assuming no privilege issues in
9  them, yes.
10     MR. DIX:  We have no further questions.
11     MR. WELLS:  Just a couple of clarification-type
12  questions, Mr. Klempf.
13              CROSS EXAMINATION
14 BY MR. WELLS:
15  Q   Mr. Post went through the privilege log and
16 showed you some privileges of some privileged entries,
17 one of which reflected an individual by the name of Ray
18 Driver.
19  A   Right.
20  Q   Do you know Mr. Driver to be the principal in
21 the firm of Driver McAffee?
22  A   I know he's with the firm.
23  Q   And has that law firm represented you in other
24 capacities unrelated to Foodonics?
25  A   Yes.

1   Q   And there was also an entry on the privilege
2  log involving a Daniel Bean.
3      Did you not consult with Mr. Bean about
4  possible legal representation sometime in 2015?
5   A   I don't know the exact date, but I did consult
6  with him.
7   Q   Okay.  Do you know an individual named Sam
8  Oosterhaut?
9   A   Yes, I do.
10  Q   Are you and Mr. Oosterhaut in business together
11 in an entity known as Bayfield Mitigation?
12  A   We are.
13  Q   Mr. Dix asked you a question toward the end of
14 his examination as to whether or not you and/or
15 Foodonics had produced everything that had been
16 requested.
17     Do you know of anything that has been withheld
18 by either you or Foodonics except that which may be
19 listed on a privilege log?
20  A   I'm not aware of anything.
21  Q   Have you ever instructed anyone to withhold any
22 documents?
23  A   No.
24  Q   By way of documents, I'm using the word
25 documents broadly:  Text messages, e-mails, documents,

1  tax returns.
2   A   No.
3      MR. WELLS:  I have no further questions for
4  Mr. Klempf.
5      THE VIDEOGRAPHER:  This completes today's
6  deposition.  The time it 3:40 p.m.
7      MR. WELLS:  We will read and sign.
8      (Witness excused.)
9      (The deposition concluded at 3:40 p.m.)
10                  - - -
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

1  **CERTIFICATE OF OATH**
2
3  STATE OF FLORIDA)
                    )
4  COUNTY OF DUVAL )
5
6      I, the undersigned authority, certify that
7  JACQUES KLEMPF personally appeared before me and was
8  duly sworn.
9
10     WITNESS my hand and official seal this 17th day
11 of December 2018.
12
13
14     _____
       Terry T. Hurley, RPR
15
16
17
18
19
20
21
22
23
24
25

**REPORTER'S DEPOSITION CERTIFICATE**

1

2

3  STATE OF FLORIDA)
                   )
4  COUNTY OF DUVAL )

5

6       I, Terry T. Hurley, Registered Professional
   Reporter, certify that I was authorized to and did
   stenographically report the deposition of JACQUES
7  KLEMPF; that a review of the transcript was requested;
   and that the transcript is a true and complete record of
8  my stenographic notes.

9       I further certify that I am not a relative,
   employee, attorney, or counsel of any of the parties,
10 nor am I a relative or employee of any of the parties'
   attorney or counsel connected with the action, nor am I
11 financially interested in the action.

12      DATED this 17th day of December 2018.

13

14

15       _____
          Terry T. Hurley, RPR
16
17
18
19
20
21
22
23
24
25

Hedquist & Associates Reporters, Inc.

---

1                  ERRATA SHEET

2       DO NOT WRITE ON TRANSCRIPT - ENTER CHANGES HERE

3  In re:  Foodonics v Klempf
           Date of deposition:  November 28, 2018
4

5  PAGE NO.  LINE NO.    CHANGE        REASON

6    _____

7    _____

8    _____

9    _____

10   _____

11   _____

12   _____

13   _____

14   _____

15   _____

16   _____

17   _____

18   _____

19   _____

20   _____

21

22  Under penalties of perjury, I declare that I have read
    my deposition and that it is true and correct, subject
23  to any changes in form or substance entered here.

24  _____         _____
    DATE                JACQUES KLEMPF
25  (th)

        Hedquist & Associates Reporters, Inc.