**TAB 71**

| | |
|---|---|
| **From:** | David A. Hancock, CEDS <David.Hancock@gray-robinson.com> |
| **Sent:** | Wednesday, November 28, 2018 6:02 PM |
| **To:** | James H. Post; Chris Dix |
| **Cc:** | Grier Wells |
| **Subject:** | Jean Klempf Trust - Production of previously encrypted documents |
| **Attachments:** | DECRYPTED FILES |

Attached is an email containing a link where you can download 33 files that were decrypted based on research related to ascertaining their passwords.

The password will be sent via another email.

They are being Produced as searchable PDFs so that you can have their images overlaid in your Relativity database. You will note that they are identified by their FOODONICS Production IDs.

Please note that, as to FOODONICS_ESI-10115794 and FOODONICS_ESI-10117344, they are being designated as HIGHLY CONFIDENTIAL. They are the 2010 personal tax return of Jacques and Shelly Klempf. They are CLEARLY NOT RESPONSIVE but since their parent documents have already been Produced, we are Producing them with a higher Confidentiality designation rather than challenge their Responsiveness.

Though there are other password protected/encrypted documents Produced by Foodonics, I have been unable to ascertain their passwords. I have inquired of Isaura Costa (from whom many of them were sent) and she doesn't recall. There are also others where the parent states the password is on the next email (or verbiage to that effect). Those emails are not in our database (since they merely state the password and thus don't hit on the agreed-upon search terms). I have been advised by KLDiscovery that finding them would be a lengthy and costly process.

Dave

**David A. Hancock, CEDS | Manager of Litigation Support and eDiscovery Services**
**G R A Y | R O B I N S O N**

401 East Jackson Street, Suite 2700 | Tampa, Florida 33602
**T:** 813-273-5000 | **F:** 813-273-5145 | **D:** 813-273-5150
E-mail | Website | vCard

**Facebook | LinkedIn | Twitter**

This e-mail is intended only for the individual(s) or entity(s) named within the message. This e-mail might contain legally privileged and confidential information. If you properly received this e-mail as a client or retained expert, please hold it in confidence to protect the attorney-client or work product privileges. Should the intended recipient forward or disclose this message to another person or party, that action could constitute a waiver of the attorney-client privilege. If the reader of this message is not the intended recipient, or the agent responsible to deliver it to the intended recipient, you are hereby notified that any review, dissemination, distribution or copying of this communication is prohibited by the sender and to do so might constitute a violation of the Electronic Communications Privacy Act, 18 U.S.C. section 2510-2521. If this communication was received in error we apologize for the intrusion. Please notify us by reply e-mail and delete the original message without reading same. Nothing in this e-mail message shall, in and of itself, create an attorney-client relationship with the sender.

**TAB 72**

**Page 1**

IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

CASE NO.:  3:17-cv-1054-J-32JRK

FOODONICS INTERNATIONAL, INC.,
a Florida corporation,

          Plaintiff,

     vs.

DINA KLEMPF SROCHI, as Trustee of the
LAURA JEAN KLEMPF REVOCABLE TRUST, a
Georgia trust,

          Defendant.
_____

DINA KLEMPF SROCHI, as Trustee of the
LAURA JEAN KLEMPF REVOCABLE TRUST, a
Florida trust, and DENNIS L. BLACKBURN,
as Assistant Trustee of the JEAN KLEMPF
TRUST,

          Counter Plaintiffs,

     vs.

FOODONICS INTERNATIONAL, INC., a
Florida corporation, and KEVIN
JACQUES KLEMPF,

          Counterclaim Defendants.
_____

     Video Deposition of **DAVID HANCOCK**, pursuant to
30(b)(6) notice, at 345 E. Forsyth Street, Jacksonville,
Florida, on November 29, 2018, at 9:35 a.m., before
Terry T. Hurley, Registered Professional Reporter, and
Notary Public in and for the State of Florida at Large.

                    - - -

**Page 2**

APPEARANCES


     S. GRIER WELLS, ESQUIRE
     Gray Robinson, P.A.
     50 N. Laura Street, Suite 1100
     Jacksonville, Florida  32202

     Attorney for Plaintiff/Counter Defendant


     JAMES H. POST, ESQUIRE
     BRANDON COOK, ESQUIRE
     R. CHRISTOPHER DIX, ESQUIRE
     Smith Hulsey & Busey
     One Independent Drive, Suite 3300
     Jacksonville, Florida  32202

     Attorneys for Defendant/Counterclaim Plaintiff


ALSO PRESENT:  Charlotte Main, Videographer

                    - - -

**Page 3**

INDEX


Witness:  DAVID HANCOCK


Page

DIRECT EXAMINATION
  By Mr. Dix--------------------005


EXHIBITS

     No. 20-----------------------006
     No. 21-----------------------064
     No. 22-----------------------065
     No. 23-----------------------107
     No. 24-----------------------109
     No. 25-----------------------110
     No. 26-----------------------122
     No. 27-----------------------119
     No. 28-----------------------123
     No. 29-----------------------124

                    - - -

**Page 4**

1      THE VIDEOGRAPHER:  This is the video deposition
2  of David Hancock taken on behalf of the plaintiff in
3  the matter of Dina Klempf Srochi versus Foodonics
4  International, Inc., et al, Case Number
5  3:17-cv-1054-J-32JRK, being heard in the United
6  States District Court, Middle District of Florida,
7  Jacksonville Division.
8      The deposition is being held at Hedquist &
9  Associates, 345 East Forsyth Street, Jacksonville,
10  Florida 32207 on November 29, 2018, at 9:39 a.m.
11      My name is Charlotte Main with Advantage Video.
12  The court reporter is Terry Hurley with Hedquist &
13  Associates.
14      Counsel will you now please introduce
15  yourselves, and the witness will be sworn in.
16      MR. DIX:  My name is Chris Dix.  I'm here with
17  Jim Post and Brandon Cook, from Smith Hulsey &
18  Busey, on behalf of the Jean Klempf Trust.
19      MR. WELLS:  This is Grier Wells with Gray
20  Robinson.  I'm here with the witness and Mr. Jacques
21  Klempf on behalf of Foodonics International, Inc.
22  and Mr. Klempf.
23      I don't know that it makes any difference, but
24  I think the ZIP code is 32202.

1        DAVID HANCOCK,
2  having been produced and first duly sworn as a witness,
3  testified as follows:
4            DIRECT EXAMINATION
5  BY MR. DIX:
6      Q    Would you please state your name for the
7  record.
8      A    **David Hancock.**
9      Q    Mr. Hancock, were you at the deposition
10 yesterday of Mr. Jacques Klempf?
11     A    **I was.**
12     Q    During the course of that deposition we
13 introduced a number of exhibits to use for that
14 deposition, and for the record, I'm going to continue
15 with the numbering that we used yesterday and I'm going
16 to refer to several of the exhibits here today.  I would
17 like to start with the document we labeled yesterday as
18 Exhibit 1.
19          Would you please take a look at that?
20     A    **Sure.**
21     Q    Would you turn, please, to the second page of
22 Exhibit 1.  This is an order dated October 29, 2018,
23 arising out of a status conference that took place on
24 October 25, 2018.
25          In paragraph 4 of that order the court ordered

1  that the -- ordered the depositions of both Foodonics
2  and Jacques Klempf to take place, and the language from
3  the order is:  The trustees request for authorization to
4  take depositions of Foodonics, Gray Robinson, Jacques
5  Klempf regarding their compliance with the discovery
6  requests and court orders entered in the case is granted
7  in part and denied in part.  The request is granted with
8  respect to Foodonics and Jacques Klempf.
9          So the purpose of the deposition here today is
10 to comply with paragraph 4 of the order with respect to
11 Foodonics; is that right?
12     A    **That's my understanding.**
13          MR. DIX:  I would like to mark a new document.
14 I believe we're on Exhibit 20.
15          (Exhibit No. 20 was marked for identification.)
16     Q    The document I just handed you that we marked
17 as Exhibit 20 is an amended notice of deposition of
18 Foodonics International that was served pursuant to the
19 order that we just discussed.
20          Have you seen this document before?
21     A    **I believe I have.**
22     Q    Would you turn to page 2 of the document.
23     A    **(Witness complied.)**
24     Q    The last paragraph says:  Pursuant to
25 Rule 30(b)(6) Federal Rules of Civil Procedure Foodonics

1  is required to designate one or more officers,
2  directors, managing agents, or other persons who consent
3  to do so to testify on its behalf concerning the areas
4  of inquiry set forth in the attached Exhibit A.
5          Are you the person that Foodonics has
6  designated to testify regarding the areas of inquiry set
7  forth on Exhibit A?
8      A    **Yes, I believe that's correct.**
9      Q    Would you please turn to the fourth page of
10 this document labeled Exhibit A.
11     A    **Okay.**
12     Q    Exhibit A contains the areas of inquiry for
13 today's deposition.
14          Have you reviewed each of the areas of inquiry
15 in preparation for your testimony here today?
16     A    **I have.**
17     Q    And are you prepared to testify with respect to
18 each of those areas of inquiry?
19     A    **Yes.**
20     Q    How did you prepare for your testimony here
21 today?
22     A    **I reviewed this exhibit, and I reviewed notes**
23 **and e-mails and correspondence, things that have**
24 **occurred throughout the pendency of this case.**
25     Q    Did you talk to anybody in preparation for

1  today's deposition?
2      A    **I spoke briefly with Mr. Wells.**
3      Q    Did you talk to anybody else?
4      A    **I conferred with our vendor KLDiscovery about**
5  **some matters.**
6      Q    Did you talk to Mr. Klempf?
7      A    **Yes, we spoke.**
8      Q    And didn't you talk to Mr. Santana?
9      A    **We did, yes.**
10     Q    So other than those people, was there anybody
11 else that you spoke to to prepare for today's
12 deposition?
13     A    **I don't believe so.**
14     Q    Okay.  Mr. Hancock, do you have personal
15 knowledge regarding each of the areas of inquiry that we
16 have designated here today?
17     A    **No.**
18     Q    Which items do you not have personal knowledge
19 of, which areas of inquiry?
20     A    **Well, some in several areas.  I don't have**
21 **personal knowledge of the settings that were done on the**
22 **cell phones.  I don't have personal knowledge of, you**
23 **know, some of the things that Mr. Klempf testified to**
24 **yesterday.**
25          **What I do have personal knowledge about are the**

1 steps that we took as a firm to deal with the ESI in
2 this case.
3    Q    So you've been designated to testify about the
4 knowledge that Foodonics has regarding these areas of
5 inquiry.
6         Do you have sufficient knowledge to testify
7 about the knowledge that Foodonics has regarding these
8 issues?
9    A    Yes.
10        MR. WELLS:  To the extent Mr. Hancock does not
11 have sufficient knowledge, Mr. Klempf is here.
12 However, he was deposed yesterday and established
13 that he was there on behalf of both Foodonics and
14 himself pursuant to the questioning by counsel.
15    Q    Let me ask a question about that.
16        You heard Mr. Klempf testify yesterday; is that
17 right?
18    A    Yes.
19    Q    Do you agree with everything that Mr. Klempf
20 said yesterday?
21        MR. WELLS:  Object to the form.
22    A    He said a lot of things.  It was a long day.  I
23 think that -- that there were a couple things that he
24 mis-remembered that I can clarify.
25    Q    Which are those things?

1    A    So, for example, I believe when KLDiscovery
2 came up to Jacksonville to do the physical collection of
3 his devices Mr. Klempf mentioned that his cell phone was
4 collected at that time, and it wasn't.  He was mistaken
5 about that.  It was collected, but not at that time.
6    Q    When was it collected?
7    A    It was collected I believe in early April.
8    Q    When was the prior KLDiscovery collection?
9    A    It wasn't prior.  It was after that.  It was
10 toward the end of may.  When they were physically in
11 Jacksonville, you mean?
12    Q    Yes.
13    A    Yes.
14    Q    So KLDiscovery came to collect information from
15 Mr. Klempf's devices, except for his cell phone --
16    A    In late May.
17    Q    -- in late May.
18        But information was collected from his phone --
19    A    The iCloud --
20    Q    --in April.
21    A    -- collection was early April.
22    Q    Has KLDiscovery ever collected any information
23 from Mr. Klempf's phones directly?
24    A    No.
25    Q    Mr. Hancock, give me a little bit of background

1 about how familiar you are with technology.
2         Do you have a background in IT and technology?
3    A    I do not.  So as -- before there was
4 E-discovery there was litigation support.  A lot of
5 people came to litigation support from an IT background.
6 That's not my background.  My background is I was a
7 litigation paralegal for fifteen years.  I attended law
8 school.  I did not graduate from law school, I -- I left
9 before graduation.  But my background is in the
10 litigation side of it as opposed to the technical side.
11        Now, over the years, because of just what it is
12 that I do, I've picked up some technology.  I don't want
13 to call it expertise, but some abilities regarding
14 technology.  So -- but I do not have an IT background.
15    Q    You have a certification in E-discovery, don't
16 you?
17    A    I do.
18    Q    What is that certification?
19    A    I'm a certified electronic discovery
20 specialist.  It's a certification that is awarded after
21 a fairly rigorous four-hour exam, as you know, by a
22 group called the Association For Certified Electronic
23 Discovery Specialists, or ACEDS.
24    Q    Are you familiar with a term called the
25 electronic discovery reference model?

1    A    Yes.
2    Q    What is that?
3    A    That is basically the life cycle of a case that
4 involves ESI.
5    Q    And you're aware that we modeled the areas of
6 inquiry today after that electronic discovery reference
7 model?
8    A    Verbatim, yes.
9    Q    Before we get into some of the specifics about
10 the areas of inquiry I would like to do the same thing I
11 did with Mr. Klempf yesterday, to define a couple of
12 terms so that we can talk easier about those items.
13    A    Okay.
14    Q    The first term that I would like to define was
15 defined on Exhibit A of the deposition notice.  That
16 term is the Foodonics parties.  So if I refer to the
17 Foodonics parties I'll be referring to Foodonics
18 International, Jacques Klempf, and his respective -- and
19 their respective agents and employees.
20    A    Okay.
21    Q    If I refer to the term ESI that's an
22 abbreviation for electronically stored information.  We
23 included a definition in the deposition notice of what
24 ESI means, but it's more to clarify what it includes,
25 but it's an abbreviation for ESI.

1    A   **Understood.**

2    Q   If I say documents that means I'm referring to

3 paper.

4    A   **Okay.**

5    Q   The last term is the Trust litigation. When we

6 talk about the case that we're here in connection with

7 here today instead of naming all the parties and

8 discussing that in detail I'll just refer to the

9 litigation as the Trust litigation.

10   A   **Understood.**

11   Q   You understand those terms?

12   A   **Yes.**

13   Q   Earlier today you told me that there were a

14 couple of areas where you disagreed with Mr. Klempf and

15 his testimony yesterday. You mentioned one of them

16 regarding KLDiscovery's collection of phones.

17       What other areas did you not agree with

18 Mr. Klempf's testimony yesterday?

19   A   **That's the one that comes to mind. You know,**

20 **as we're going through this if there's something else**

21 **that comes to light I'll let you know, but as you know**

22 **it was several hours ago, so it's hard for me to**

23 **remember exactly any one statement that was made that I**

24 **disagreed with.**

25   Q   Are there any statements Mr. Klempf made

1 yesterday that you're aware of were untrue?

2    A   **Well, just what I mentioned.**

3    Q   Other than what you mentioned, are there any

4 statements?

5    A   **Not at this time.**

6    Q   Let's start with area of inquiry number 1,

7 identification.

8       What did Foodonics -- what did the Foodonics

9 parties do to identify potentially relevant sources of

10 documents and ESI related to the Trust litigation?

11   A   **We spoke with Jacques, who is the main**

12 **custodian of almost all of the data related here, and**

13 **he -- during that interview it came to light what the**

14 **possible data sources would be.**

15   Q   When did you interview Mr. Klempf?

16   A   **I think it was very late '17, probably**

17 **December.**

18   Q   Why did you interview --

19   A   **Maybe November.**

20   Q   Why did you interview Mr. Klempf in November or

21 December of 2017?

22   A   **It was his company. No one would know better**

23 **than he.**

24   Q   Mr. Klempf testified yesterday that he received

25 a letter from our firm containing a notice regarding

1 preservation of electronic information. That letter was

2 sent in June 2017.

3    A   **Okay.**

4    Q   Why did you wait until November or December to

5 talk with Mr. Klempf about information that had to be

6 preserved as of June 2017?

7    A   **I wasn't -- I'm not the one that provided that**

8 **letter, and I wasn't involved with this matter until**

9 **late '17.**

10   Q   In preparing for your interview did you send

11 him a questionnaire and ask him questions about -- about

12 the sources of information that he had?

13   A   **I did not.**

14   Q   Have you ever sent Mr. Klempf a questionnaire

15 about the sources of information that the Foodonics

16 parties have?

17   A   **I have not.**

18   Q   What were the sources of information, ESI in

19 particular, that Mr. Klempf identified during your

20 interview with him?

21   A   **He had two Apple laptops, a PC, he had three**

22 **e-mail accounts, and then there were the Dixie Egg**

23 **accounts, and then there was the AS400.**

24   Q   I didn't hear you mention a mobile device. Did

25 he not mention a mobile device when you spoke with him

1 in 2017?

2    A   **Yeah, and his cell phone.**

3    Q   You say his cell phone. Do you mean he

4 identified a single cell phone, or more than one?

5    A   **I've looked back at my notes, and all my notes**

6 **refer to one cell phone initially.**

7    Q   Are you aware that Mr. Klempf had two cell

8 phones?

9    A   **Well, he had two devices, but one was**

10 **essentially a brick because it had been wiped and set**

11 **back to factory -- factory settings. So, yes,**

12 **technically he had two at one point, but only one had**

13 **data on it.**

14   Q   So the cell phone that Mr. Klempf told you

15 about in late 2017, that would have been the iPhone 7;

16 is that correct?

17   A   **Yeah, I guess so.**

18   Q   So after you spoke with Mr. Klempf about his

19 cell phone in 2017, subsequent to that discussion his

20 phone was damaged?

21   A   **That's what I understand.**

22   Q   Did you hear him testify?

23   A   **Another thing I don't have personal knowledge**

24 **of.**

25   Q   Between the time you spoke with Mr. Klempf

1   about his iPhone 7 in December 2017 and when the phone
2   was damaged, according to him, in early 2018, were there
3   any efforts to preserve the information on his cell
4   phone?
5       A    No.
6       Q    Why not?
7       A    We weren't at that stage yet.  It was still
8   very early in the case and my involvement, and so we --
9   we didn't get to that point yet.
10          I mean, he certainly was aware of the
11  preservation requirement.  He was told and understood
12  not to delete anything, and he didn't.
13      Q    When you say he didn't, we heard testimony from
14  Mr. Klempf yesterday about his wife changing the
15  settings on his phone.
16          Do you have any information about that event?
17      A    Nothing more than what he testified to.
18      Q    So you don't know when those settings were
19  allegedly changed?
20      A    I do not.
21      Q    Isn't it possible then that the settings were
22  changed after Mr. Klempf's duty to preserve arose in
23  June 2017?
24          MR. WELLS:  Object to the form.
25      A    I mean, anything's possible I suppose.

1       Q    Do you have any evidence to suggest that the
2   settings were changed prior to June 2017?
3       A    I do not.
4       Q    Other than Mr. Klempf, who else was identified
5   by Foodonics as a potential source of ESI related to the
6   Trust litigation?
7       A    Well, as far as identification goes, we also
8   interviewed Eddie Rosemond, not as a potential
9   custodian, but because he knew the most about the AS400,
10  the e-mail accounts and such.
11      Q    What did you learn from Eddie Rosemond?
12      A    We learned that the AS400 only had financial
13  information on it.  We learned that it was currently in
14  the possession of Cal-Maine Foods.  We learned that he
15  was the administrator of the DixieEgg.com domain.
16      Q    For all the items you just mentioned you
17  learned, were those items all learned at the same time?
18      A    Yes, I believe so.
19      Q    And what time was that?
20      A    That was -- I don't have a date, but it was
21  after the interview of Mr. Klempf.
22      Q    And when did the interview of Mr. Klempf occur?
23      A    I think it was November.
24      Q    November or December 2017?
25      A    Yes.

1       Q    So you spoke with Eddie Rosemond sometime after
2   your interview with Jacques Klempf?
3       A    Correct.
4       Q    Was it within a month, or was it later in maybe
5   2018?
6       A    I think it was within a month or two.  We were
7   really trying to get to the bottom of the AS400 because
8   it was -- it was a challenging endeavor.
9       Q    And when did you get to the bottom of the
10  AS400?
11      A    After we spoke -- well, in -- and Mr. Klempf
12  backed him up that the data, the only data on the AS400,
13  all it was used for was financials.  So once we
14  determined that then we spoke with your firm and made
15  that representation.
16      Q    And the affidavit that Mr. Rosemond provided to
17  us is true, to your knowledge?
18      A    To my knowledge, yes.  And we still have
19  possession of the AS400.  It's just not been accessed.
20  It's an old Legacy system.
21      Q    And to your knowledge there's no information on
22  the AS400 that would be relevant to the Trust
23  litigation?
24      A    Not that I'm aware of.
25      Q    Does Foodonics have any data maps that describe

1   the sources of electronic information that Foodonics
2   had?
3       A    No.  Foodonics was not a highly-sophisticated
4   technical operation.  It was, you know, a fine company,
5   but not all of our clients have anything like that.
6       Q    Did Foodonics have any policies or procedures
7   related to the retention of electronic information?
8       A    I'm not aware of any destruction policies that
9   they.
10      Q    When you say you're not aware of any, are you
11  speaking on behalf of Foodonics or just your own
12  personal knowledge?
13      A    Based on the interviews that I undertook with
14  Mr. Rosemond and Mr. Klempf.
15      Q    So your information that you provided regarding
16  policies and procedures of Foodonics is based on your
17  interviews with Eddie Rosemond and Mr. Klempf; is that
18  right?
19      A    Correct.
20      Q    Is there anybody else other than those two
21  individuals that would have knowledge regarding the
22  policies and procedures of Foodonics and their
23  information?
24      A    Not that I'm aware of.
25      Q    Foodonics is still an entity as we sit here

1 today; is that right?
2 　　A　　That's my understanding.
3 　　Q　　And who is responsible for the IT function of
4 Foodonics?
5 　　A　　I would have no different testimony about that
6 other than what Mr. Klempf testified to yesterday.
7 　　Q　　Which was what?
8 　　A　　He mentioned a woman that has some IT
9 responsibilities.  I've never met her.
10 　　Q　　So as the designated representative of
11 Foodonics who is responsible for IT function of
12 Foodonics as we sit here today?
13 　　A　　That woman that he identified.
14 　　Q　　You don't know her name?
15 　　A　　I don't recall her name.
16 　　MR. WELLS:  Mr. Dix, as noted, pursuant to
17 questions by you and Mr. Post yesterday about both
18 Foodonics and Jacques's personal knowledge,
19 Mr. Klempf is here today.  He can answer that
20 question if you want to put him under oath again.
21 　　MR. DIX:  I don't think that's necessary at
22 this time.
23 　　MR. WELLS:  Either do I.  Thank you.
24 　　MR. DIX:  But I reserve the right to ask
25 questions if we later get to a point that

1 Mr. Hancock doesn't know something related to
2 Foodonics.
3 　　Q　　Mr. Hancock, when you referred to Mr. Rosemond
4 and your interview with him earlier you mentioned the
5 AS400 system.
6 　　What other ESI did Mr. Rosemond have knowledge
7 of?
8 　　A　　We talked about the DixieEgg.com e-mails for
9 which he was the administrator.
10 　　Q　　And what did Mr. Rosemond tell you about the
11 Dixie Egg e-mails?
12 　　A　　Just of their existence.
13 　　Q　　What e-mails did Mr. Rosemond tell you existed
14 with respect to DixieEgg.com?
15 　　A　　Well, he said that when Foodonics' egg
16 operations were an ongoing entity, you know, the
17 employees, some of the employees, had DixieEgg -- there
18 was a DixieEgg.com domain and that some of the employees
19 had e-mail accounts on that domain.
20 　　He further said that at some point, I think in
21 March or April of '17, they were expiring.  At that time
22 Mr. Klempf said that he wanted to maintain his
23 DixieEgg.com account, and so Mr. Klempf paid for that
24 personally.
25 　　Q　　So prior to March or April 2018 --

1 　　A　　'17.
2 　　Q　　I'm sorry.  I thought you said '18 earlier.
3 Let me understand that.
4 　　In March or April of 2017 Mr. Rosemond
5 contacted Mr. Klempf and told him that the account was
6 about to expire?
7 　　A　　I believe that's right.
8 　　Q　　And in March or April 2017 Mr. Klempf became
9 the administrative user for those e-mails?
10 　　A　　I don't believe that's right.
11 　　Q　　Who was the administrative user for the
12 DixieEgg.com e-mails in March or April 2017?
13 　　A　　I don't think it changed.  So I think that all
14 of the other accounts other than Mr. Klempf's expired or
15 were deactivated, or whatever terminology Microsoft
16 uses, but Mr. Klempf paid for his own.  I don't believe
17 he was the administrator.  I think it was just kept as
18 Eddie Rosemond.  But I don't have personal knowledge of
19 that, but I believe that's -- that's the way it was.
20 And then Mr. Klempf didn't become the administrator
21 until when we were trying to access and collect this
22 data for this litigation.
23 　　Q　　So even though Mr. Rosemond was no longer
24 employed by Foodonics he continued to be responsible for
25 the DixieEgg.com e-mail address?

1 　　A　　I think they just didn't change it, yeah.
2 　　Q　　And for the accounts that are no longer
3 available, when did the 30-day period that triggered the
4 deletions of those accounts begin?
5 　　A　　Well, again I don't have exact knowledge of
6 that, but I believe if we just assume that it was March
7 or April of '17 when they -- when the bill was coming
8 due to renew all these things, and the company was no
9 longer -- for all intents and purposes the egg
10 operations was not an ongoing entity, Mr. Klempf had
11 decided only to maintain his.  So I would say 30 days
12 from that date is when they probably expired.  That
13 would make sense to me.
14 　　Q　　Do you have any documents that reflect the date
15 on which those accounts expired?
16 　　A　　I do not.
17 　　Q　　Is it possible that those accounts expired
18 after June 2017 when the letter from Mr. Post was sent
19 to Mr. Klempf?
20 　　A　　Again, anything is possible.  I don't -- I
21 don't deal with possibilities.
22 　　MR. WELLS:  And let the record reflect an
23 objection to the form of the question.
24 　　Q　　Are there any documents that you're aware of
25 that can confirm that the timing of the deletion of the

1   DixieEgg.com e-mail accounts that are no longer
2   available?
3       **A   Not that I'm aware of.**
4       Q   So we have talked so far about an interview you
5   had with Mr. Klempf and discussions you had with
6   Mr. Rosemond.
7           Other than those two individuals, who else, if
8   anyone, did the Foodonics parties speak to regarding the
9   identification of ESI related to the Trust litigation?
10      **A   That's it.**
11      Q   Did you or anyone representing any of the
12  Foodonics parties ever speak with any former employees
13  of Foodonics regarding any ESI related to the Trust
14  litigation that they may have?
15      **A   I spoke with Eddie Rosemond.**
16      Q   Other than Mr. Rosemond, did the Foodonics
17  parties speak with anyone else regarding the
18  identification of ESI related to the Trust litigation?
19      **A   I don't believe so.**
20      Q   Did any of the Foodonics parties ever contact
21  Dick Still to talk with him about the identification of
22  ESI related to the Trust litigation?
23      **A   I'm not Dick Still, so I don't know.**
24      Q   But you're here as a representative of
25  Foodonics; is that right?

1       **A   But not of Dick Still.  I -- I don't know who**
2   **contacted Dick Still or who Dick Still contacted.**
3       Q   So let me ask the question again.
4           Did the Foodonics parties contact Mr. Still
5   regarding the identification of ESI related to the Trust
6   litigation?
7       **A   I did not contact Dick Still.**
8       Q   And as the representative of Foodonics, if
9   you're not aware of any contact with Mr. Still then we
10  will assume that no contact was made?
11      MR. WELLS:  Object to the form.
12      **A   Well, I think what you should assume is what**
13  **Mr. Klempf testified to yesterday, which is that several**
14  **former employees contacted him about being served, or**
15  **being aware of this litigation, and that he advised them**
16  **that if they had anything to turn it over.  But since I**
17  **have no personal knowledge of that, I'm not testifying**
18  **to that.**
19      Q   As the 30(b)(6) witness for Foodonics you're
20  telling me that you are adopting Mr. Klempf's testimony
21  from yesterday regarding the Dixie Egg accounts?
22      **A   I'm telling you that I can't speak to that**
23  **personally, so the only thing that I know about your**
24  **question is what he testified to yesterday.**
25      Q   But you won't adopt his testimony from

1   yesterday?
2       MR. WELLS:  Object to the form.
3       **A   Yeah, I absolutely adopt his testimony from**
4   **yesterday.**
5       MR. DIX:  Let's take a quick break, please.
6       THE VIDEOGRAPHER:  We're off the record.  The
7   time is 10:14 a.m.
8       (Short break.)
9       THE VIDEOGRAPHER:  We are back on the record.
10  The time is 10:19 a.m.
11      Q   Mr. Hancock, would you please turn to the
12  document we marked yesterday as Exhibit 12.
13      **A   Okay.  I've got it.**
14      Q   Are you familiar with this document?
15      **A   Yes.**
16      Q   You and Mr. Santana had discussions with me
17  about the form of this document; is that right?
18      **A   Correct.**
19      Q   On the second page paragraph 1 says:  All
20  parties shall preserve ESI related to this case which
21  was created or received on or after September 1, 2008.
22          Are you aware of any ESI related to this case
23  which was not preserved?
24      **A   Only based on what Mr. Klempf said yesterday**
25  **about the changing of the setting on his cell phone, and**

1   **also the settings related to the DixieEgg.com e-mails.**
2       Q   Paragraph 2 says:  All parties shall designate
3   within ten days of the entry of this order an
4   E-discovery liaison to be knowledgeable about and
5   responsible for the party's ESI.
6           Foodonics designated Michael Santana for that
7   purpose; is that right?
8       **A   And myself, I believe.**
9       Q   Between you and Mr. Santana are you familiar --
10  are you knowledgeable about or responsible for Foodonics
11  ESI.
12      **A   Yes.**
13      Q   Paragraph 3 says:  All parties shall disclose
14  within ten days of the entry of the order the locations
15  and types of potentially discoverable information in the
16  party's possession or control and how that information
17  can be or has already been collected from the systems
18  and media in which it is stored.
19          Did Foodonics comply with paragraph 3 of the
20  order?
21      **A   I don't know when our initial 26(f) conference**
22  **was.  If it was within ten days of this then I would say**
23  **that, yes, we informed you of the location of and the**
24  **existence of ESI.**
25      Q   Other than the Rule 26 disclosures was there

1  anything else that Foodonics did to comply with
2  paragraph 3 of this order?
3     A    No.
4     Q    Didn't Mr. Santana send me an e-mail and copy
5  you, which complied with paragraph 3 of this order?
6     A    I'll take your representation that he did.
7     Q    Let's take a look at the document we marked
8  yesterday as Exhibit 13.
9     A    Okay.
10    Q    Does that e-mail refresh your recollection
11 regarding Foodonics' compliance with paragraph 3 of the
12 order?
13    A    Sure.
14    Q    The first sentence in Mr. Santana's e-mail
15 says:  Pursuant to paragraph 2 I will be the E-discovery
16 liaison.  Then it says:  Dave has far more technical
17 expertise, and he will be involved as well.
18       Is it your position that you are also one of
19 the designated E-discovery liaisons?
20    A    It says what it says.  I mean, I don't know if
21 I'm designated technically as an E-discovery liaison,
22 but he says there that I will be involved as well.
23 So --
24    Q    Speaking on behalf of Foodonics, who was -- who
25 did Foodonics designate as its E-discovery liaison?

1     A    I believe here it says Michael Santana and that
2  I will be involved as well.
3     Q    Mr. Santana's e-mail says:  Pursuant to
4  paragraph 3, as related to you previously by Dave and/or
5  Grier, we believe that the following items may have
6  discoverable information.  And then there's a list of
7  different items.  Mr. Klempf's desktop while he was at
8  Foodonics, Dixie Egg, which is located at the Dixie Egg
9  office in Jacksonville, may have documents and/or
10 correspondence.
11       Was that a true statement?
12    A    Yes.
13    Q    The next item identified, actually two, two
14 personal Apple laptops in Mr. Klempf's possession may
15 have documents and/or correspondence.
16       Is that a true statement?
17    A    Yes.
18    Q    The next item -- items described are two of
19 Mr. Klempf's cell phones which are in his possession.
20       Is that a true statement?
21    A    Yes.
22    Q    Which of the two cell phones was Mr. Klempf
23 referring -- is referred to in this e-mail?
24    A    I'm sorry?
25    Q    Two of the cell phone -- there are two cell

1  phones referred to in this e-mail from Mr. Santana.
2        Which cell phones are those?
3     A    Based on the testimony yesterday I would
4  believe those would be the 7 and the 10, the iPhone 7
5  and the iPhone 10.
6     Q    Do you have any other independent knowledge
7  regarding Mr. Klempf's cell phones?
8     A    I do not.
9     Q    Is it your understanding that as of March 26,
10 2018, Mr. Klempf had an iPhone 7 and an iPhone 10 in his
11 possession?
12    A    That's what it says here.  So, yeah, I
13 believe -- I believe that's correct.
14    Q    How did Mr. Santana know which devices,
15 including cell phones, that Mr. Klempf had?
16    A    Interviews with Mr. Klempf.
17    Q    The interview we talked about earlier was in
18 November or December of 2017; is that right?
19    A    There was one then, yes.
20    Q    Was there any subsequent communication with
21 Mr. Klempf after the initial interview, but prior to the
22 e-mail on March 26, 2018, regarding Mr. Klempf's cell
23 phones?
24    A    Absolutely.  During the pendency of any case we
25 have ongoing communications with our clients.

1     Q    My question related to -- specifically to
2  Mr. Klempf's cell phones.  So same question, but
3  specifically, were there discussions regarding
4  Mr. Klempf's cell phones in between your initial
5  interview with him and the time in which Mr. Santana
6  sent me the e-mail on March 26, 2018?
7     A    I believe that there was an interview that Mr
8  Santana and I did with Jacques as we got closer to
9  having to do our disclosures.  So, yes.
10    Q    When did your interview that you just mentioned
11 take place?
12    A    I don't recall at this point.  Obviously it was
13 prior to March 26th.
14    Q    Why is it obvious it was prior to March 26th?
15    A    Because this is dated March 26th.
16    Q    How do you know that the second time you spoke
17 with Mr. Klempf about his cell phones was prior to the
18 e-mail on March 26, 2018?
19    A    Because the information that's in this e-mail
20 wouldn't be there if we hadn't had the discussion.
21    Q    So did you learn additional information after
22 your initial interview with Mr. Klempf about his cell
23 phones that was included in the disclosure that was made
24 on March 26, 2018?
25    A    Yes.

1    Q    What additional information did you learn?

2    A    **That there are two cell phones.**

3    Q    The statement in Mr. Santana's e-mail says:

4    He, Mr. Klempf, believes the data from the old was

5    transferred to the new when obtained in early 2017.

6         Was that an accurate statement?

7    A    **I believe that to be a typo. That should say**

8    **2018.**

9    Q    At any point after Mr. Santana's March 26, 2018

10   e-mail to me did anyone from Foodonics disclose that Mr

11   Santana's e-mail was incorrect?

12   A    **I don't know what Gray Robinson's attorneys**

13   **did.**

14   Q    You participated in telephone conferences that

15   we have had with Mr. Wells about E-discovery issues in

16   this case?

17   A    **Some of them.**

18   Q    And we have talked about Mr. Santana's

19   March 26, 2018 e-mail, haven't we?

20   A    **I think recently we have, yes.**

21   Q    And at no point during those discussions did

22   you or anyone on the call represent to us that Mr.

23   Santana's e-mail was incorrect?

24        MR. WELLS:  Object to the form.

25   A    **I didn't.**

1    Q    Are you aware of anyone that did?

2    A    **No, but I wasn't involved in all discussions.**

3         MR. WELLS:  Mr. Dix, I believe if you think

4    back on our various discussions, I have advised you

5    on several occasions that his old phone was

6    shattered and replaced in early 2018. I mean, I

7    specifically corrected the e-mail, but we have had

8    those conversations.

9         MR. DIX:  I'm not here to take your deposition.

10   If you would like me to, I will.

11        MR. WELLS:  Well, I think you're being

12   disingenuous, because you know what the discussions

13   were. So you know that's an incorrect date in the

14   e-mail.

15        MR. DIX:  So you will agree that the date was

16   incorrect and no one ever corrected it?

17        MR. WELLS:  No, I do not agree to that. What

18   I'm telling you, I didn't specifically say that date

19   was incorrect, but I told you when the cell phone

20   was replaced.

21        MR. DIX:  I'm going to keep continuing --

22        MR. WELLS:  That's fine.

23        MR. DIX:  -- to ask questions of Mr. Hancock,

24   who is under oath.

25   Q    Mr. Santana's e-mail goes on to say that the

1    old cell phone was replaced due to being dropped and a

2    cracked screen.

3         Is that a true statement?

4    A    **That's my understanding.**

5    Q    What is your understanding based on?

6    A    **What Mr. Klempf told us occurred with the**

7    **phone.**

8    Q    Do you have any independent knowledge that

9    Mr. Klempf dropped and cracked the screen on his old

10   cell phone?

11   A    **I was not in his bathroom with him that day**

12   **when it fell, no.**

13   Q    Did he ever tell you that he dropped his phone

14   and cracked the screen?

15   A    **During an interview with him, yes.**

16   Q    Did anyone ever advise Mr. Klempf not to

17   replace his phone after it was dropped and the screen

18   was cracked?

19   A    **No.**

20   Q    Mr. Santana's e-mail goes on to say:  The

21   following e-mail addresses may have discoverable

22   information.  And there's listed three e-mail accounts:

23   JKlempf@DixieEgg.com, KJKeggs@aol.com, and

24   JKlempf@BAMJax.com; is that right?

25   A    **Yes.**

1    Q    Were there any other e-mail addresses that may

2    have discoverable information related to the Trust

3    litigation?

4    A    **Not that I'm aware of.**

5    Q    Did any of the DixieEgg.com e-mail accounts

6    other than Mr. Klempf's have information related to the

7    Trust litigation?

8    A    **I don't have personal knowledge of the contents**

9    **of those e-mails. I know that those accounts existed,**

10   **but I also know that from what we were able to collect**

11   **of those e-mail accounts most of those folks had nothing**

12   **to do with the management of the company whatsoever.**

13   **They were folks that worked on the farms.**

14   Q    So it's your position here today that none of

15   the DixieEgg.com e-mail accounts other than Mr. Klempf's

16   had discoverable information related to the Trust

17   litigation?

18   A    **That's not my position.**

19   Q    What is your position?

20   A    **What I just stated.**

21   Q    Could you tell me again so I understand?

22        THE WITNESS:  Could you read it back for me?

23        (The answer was read back.)

24   Q    Let me clarify then. You mentioned being able

25   to collect and review some of the other Dixie Egg e-mail

1 accounts; is that right?

2     A   I did not review them. I collected them. I

3 had them collected.

4     Q   Who reviewed them?

5     A   Honestly I don't think we did review them. I

6 think we just produced them en mass.

7     Q   How can you possibly know that those e-mail

8 accounts don't have any information related to the Trust

9 litigation if no one ever reviewed them?

10     A   I can't. That's why I said I'm not making that

11 statement.

12     Q   Why weren't the other DixieEgg.com e-mail

13 accounts disclosed on March 26, 2018?

14     MR. WELLS: Object to the form.

15     A   I believe that we advised you of a DixieEgg.com

16 domain and that there were e-mail accounts there that

17 would be collected as sources of ESI.

18     Q   When did the disclosure that you just referred

19 to occur?

20     A   I believe we -- throughout the case at some

21 point we -- we mentioned it. I don't know if we did at

22 the 26(f) initial conference. But it stands to reason

23 that if Jacques Klempf has a DixieEgg.com e-mail address

24 that there is a DixieEgg.com domain, and that's what we

25 collected -- what we could collect from that domain.

1     Q   At what point, on what date did Foodonics

2 determine the information that could be collected from

3 the DixieEgg.com domain?

4     A   We had severe difficulties accessing that

5 domain, and because a lot of time had passed, because

6 the company had been sold, or the assets of the

7 egg-producing assets of the company had been sold, it's

8 not really an ongoing entity, things needed to be done

9 with Microsoft in order to gain access to those.

10     I think we finally were able to gain access to

11 them, I don't know, three or four months ago.

12     Q   When did all of actions you just described

13 first take place or start?

14     A   If we finally gained access three or four

15 months ago, I would say it started six months ago.

16     Q   Did any efforts to identify DixieEgg.com

17 e-mails, other than Mr. Klempf's e-mails, take place

18 prior to March 26, 2018?

19     THE WITNESS: Can you repeat the question?

20     (Question was read back.)

21     A   No, I don't believe so.

22     Q   Would you turn to the document we marked

23 yesterday as Exhibit 14, please.

24     A   Okay.

25     Q   This document is plaintiff's initial Rule 26(a)

1 disclosure; is that right?

2     A   Yes.

3     Q   Were you involved in the preparation of the

4 information that's included in the Rule 26(a)

5 disclosures?

6     A   I don't believe I was.

7     Q   Who on behalf of Foodonics was involved in the

8 preparation of the Rule 26(a) disclosures?

9     A   Gray Robinson.

10     Q   Was Mr. Klempf involved in the preparation of

11 the Rule 26(a) disclosures?

12     A   I don't know the answer to that question.

13     Q   As the designated representative of Foodonics

14 are you aware of anyone from Foodonics that was involved

15 in the preparation of the Rule 26(a) disclosures?

16     A   I would imagine that Mr. Klempf was for sure.

17     Q   Do you have any information that confirms

18 Mr. Klempf's involvement in the preparation of the

19 Rule 26(a) disclosures?

20     A   Just logic. No, I don't have any documents.

21     Q   The Rule 26(a) disclosures for Foodonics were

22 served on the Trust on the 16th of February, 2018. At

23 that time -- let me rephrase.

24     As of February 16, 2018, what efforts had

25 Foodonics made to identify the sources of ESI related to

1 the Trust litigation?

2     A   As I previously stated, interviews with -- I

3 don't know when Eddie Rosemond's interview occurred, but

4 I would think probably around this timeframe, and

5 certainly interviews with Mr. Klempf.

6     Q   Had any ESI been collected from Mr. Klempf or

7 any of the Foodonics parties as of the 16th day of

8 February, 2018?

9     A   No.

10     Q   Had any ESI been preserved for any of the

11 Foodonics parties as of 16th day of February 2018?

12     A   Yes.

13     Q   Which ESI had been preserved as of that date?

14     A   Everything. Everything that existed that's

15 relevant to this matter.

16     Q   February 16, 2018 was after Mr. Klempf replaced

17 his cell phone; is that right?

18     A   Yes.

19     Q   And the information that was on his iPhone 7

20 hasn't been preserved; is that right?

21     A   It was copied over to the 10.

22     Q   Other than Mr. Klempf's testimony yesterday,

23 what information do you have to confirm the successful

24 transfer of data from Mr. Klempf's iPhone 7 to his

25 iPhone 10?

1    **A**    None.

2    **Q**    Would you please turn to the document we marked

3  yesterday as Exhibit 15.

4    **A**    **(Witness complied.)**

5    **Q**    Exhibit 15 is the supplemental Rule 26

6  disclosures that were filed on behalf of both Foodonics

7  and Mr. Klempf.

8    **A**    **Okay.**

9    **Q**    Are you familiar with that document?

10    **A**    **I've seen it.**

11    **Q**    Were you involved in the preparation of this

12  document?

13    **A**    **I don't believe I was.**

14    **Q**    Who on behalf of the Foodonics parties was

15  involved in the preparation of this document?

16    **A**    **Gray Robinson and I'm sure Mr. Klempf.**

17    **Q**    How are you sure Mr. Klempf was involved in the

18  preparation of this document?

19    **A**    **Because some of the information on here, it**

20  **seems that it would come from his knowledge.**

21    **Q**    Which of the information seems like it would

22  come from Mr. Klempf's knowledge?

23    **A**    **The witnesses.**

24    **Q**    Between the time of the initial Rule 26

25  disclosures in February of 2018 and the supplemental

1  disclosures made on March 29, 2018, what additional

2  steps did the Foodonics parties take to identify ESI

3  related to the Trust litigation?

4    **A**    **I don't believe we took any more steps.  There**

5  **was a finite amount of data sources, and we knew what**

6  **those were.**

7    **Q**    You knew what the finite sources of data were

8  as of March 29, 2018?

9    **A**    **I believe so.**

10    **Q**    How was it that we're still investigating

11  Mr. Klempf's iTunes accounts and other sources of data

12  if you knew all of the sources on March 29, 2018?

13    MR. WELLS:  Object to the form.

14    **A**    **Well, the fact that we're investigating**

15  **something doesn't mean there's something there.  So is**

16  **there data on his iTunes account?  Yes.  Is it pertinent**

17  **to this litigation?  No.**

18    MR. DIX:  Would you read that response again?

19    (Answer was read back.)

20    **Q**    Mr. Hancock, are you aware of the information

21  that was collected from Mr. Klempf's iTunes account?

22    **A**    **There has been no information collected from**

23  **his iTunes account that I'm aware of.**

24    MR. DIX:  I'm sorry.  Can you read his answer

25  two questions ago.

1    (Answer was read back.)

2    **Q**    Let's move on.  I would like to talk about the

3  second area of inquiry for today's deposition, which is

4  preservation.

5    Would you take a look back at the document that

6  we marked as Exhibit 20.  Please look at the second area

7  of inquiry and tell me when you're completed.

8    **A**    **Okay.**

9    **Q**    What steps did the Foodonics parties take to

10  preserve potentially relevant sources of documents and

11  ESI related to the Trust litigation?

12    **A**    **Mr. Klempf was made aware of his duty to**

13  **preserve documents pursuant to that.  He didn't delete**

14  **anything knowingly or purposefully.  He -- when he was**

15  **contacted by former employees about this litigation he**

16  **instructed them that if they had any information to**

17  **preserve it and turn it over.**

18    **Q**    Yesterday during Mr. Klempf's deposition we

19  referred to the preservation notice that was attached to

20  the June 23rd, 2017 letter, and included in that letter

21  were instructions regarding taking affirmative steps.

22    Can you tell me, what affirmative steps did the

23  Foodonics parties take to preserve ESI related to the

24  Trust litigation?

25    **A**    **We informed Jacques of his duty to preserve and**

1  **told him not to destroy anything.  We took possession of**

2  **the AS400 and kept it in a locked office.  I would say**

3  **that's it.**

4    **Q**    Did the Foodonics parties, other than the

5  June 23rd, 2017 letter, did the Foodonics parties ever

6  receive any instructions regarding the preservation of

7  ESI related to the Trust litigation?

8    **A**    **Instructions from whom?**

9    **Q**    From anyone.

10    **A**    **Oral instructions to not delete anything that**

11  **they had.  There was a duty to preserve because of the**

12  **litigation.**

13    **Q**    What oral instructions did the Foodonics

14  parties receive?

15    **A**    **Calls, discussions about the litigation, and**

16  **that there was now a duty to preserve ESI and documents.**

17    **Q**    Who made those calls?

18    **A**    **Gray Robinson.**

19    **Q**    And when did those calls take place?

20    **A**    **Shortly after receiving that preservation**

21  **notice, I would imagine.  I didn't make the initial -- I**

22  **wasn't involved in those calls.**

23    **Q**    Are there any documents that reflect the oral

24  representation regarding preservation that you just

25  testified about?

1	A	Not that I'm aware.

2	Q	Who would have personal knowledge regarding the

3	oral communication you just testified about?

4	A	I would imagine Gray Robinson attorneys and

5	Jacques.

6	Q	So as the designated representative of

7	Foodonics you don't have knowledge of who told Foodonics

8	to preserve ESI; is that right?

9	A	I know that it --

10	MR. WELLS:  Object to the form.  You can

11	answer.

12	A	I know that it was communicated to Mr. Klempf.

13	I don't know who exactly communicated it to him or

14	exactly when it was communicated to him, but it would

15	have been shortly after it was received.

16	Q	How do you know that the communication was

17	shortly after it was received?

18	A	Because that's our obligation representing the

19	client.

20	Q	So because you have an obligation it must be

21	so?

22	MR. WELLS:  Object to the form.

23	A	Am I supposed to answer that question?

24	Q	Yes.

25	A	Yes.

1	Q	Do you have any documents that reflect

2	compliance with the obligation?

3	A	No.

4	Q	So I just asked you about whether Foodonics

5	received notice or instructions to preserve.  Now I want

6	to know, did Foodonics -- any of the Foodonics parties

7	ever instruct anyone else to preserve ESI related to the

8	Trust litigation?

9	MR. WELLS:  Object to form.  Redundant.

10	MR. DIX:  Redundant of what?

11	MR. WELLS:  He can answer the question.

12	MR. DIX:  I don't understand your objection.

13	MR. WELLS:  He can answer.

14	A	I believe Mr. Klempf testified yesterday that

15	he was contacted by several former employees or people

16	related to this and he instructed them that if they had

17	anything to preserve it and to turn it over.

18	Q	Are you aware of any documents that reflect the

19	instructions that Mr. Klempf testified about yesterday?

20	A	I am not.

21	Q	After the oral notice that you testified about

22	a minute ago from Gray Robinson and Mr. Klempf, were

23	there any steps taken after that to follow up with

24	Mr. Klempf regarding his preservation of ESI related to

25	the Trust litigation?

1	A	I guess I don't understand your question.

2	Q	There was an initial communication between Gray

3	Robinson and Mr. Klempf concerning preservation of ESI.

4	Is that your testimony?

5	A	Yes.

6	Q	After that initial instruction were there any

7	followups that took place regarding that same topic?

8	A	Not that I'm aware.

9	Q	Is there any ESI of the Foodonics parties that

10	could potentially be automatically deleted due to the

11	passage of time?

12	A	I believe Mr. Klempf testified yesterday that

13	there was a setting on his phone that his wife changed

14	in an effort to make the phone perform better, that the

15	setting was changed from forever to 30 days.  Other than

16	that I'm not aware of any ongoing destruction policy

17	that was in effect, or setting.

18	Q	What about the DixieEgg.com e-mail accounts;

19	didn't those automatically get destroyed 30 days after

20	the termination of those accounts?

21	A	Once the accounts expired, because the

22	recording feature I guess was not selected then they

23	were irretrievably at that point.

24	Q	Did any of the Foodonics parties take any steps

25	to prevent the automatic deletion of ESI in this case?

1	A	For any known policies they would have been

2	suspended, but there were none known at the time.

3	Q	Did any Foodonics parties take any steps to

4	prevent the deletion of the Dixie Egg e-mail accounts

5	which are now terminated?

6	A	It's my understanding that the Dixie Egg

7	accounts were terminated around March or April of '17.

8	Q	So my question is --

9	A	Which predates the litigation, does it not?

10	MR. DIX:  Could you read my question again.

11	(The question was read back.)

12	Q	Isn't your answer to that question no?

13	MR. WELLS:  His answer stands for itself.

14	MR. DIX:  His answer was a question.

15	MR. WELLS:  I think he answered the question.

16	MR. DIX:  Can you read his answer.

17	(The answer was read back.)

18	Q	What can you tell me about the sources and

19	volume of ESI that were preserved by Foodonics in this

20	case?

21	A	Mr. Klempf had two Apple laptops, had a PC, had

22	three e-mail accounts, had two cell phones, only one

23	that had data on it, and the Dixie Egg accounts had

24	expired in March or April of '17.

25	Q	So for each one -- and the AS400 as well?

| | | |
|---|---|---|
| 1 | A | Right. |
| 2 | Q | What can you tell me about the volume of ESI |

3  total number of files and amount of data that was
4  collected from each one of those devices?
5    **A    I can tell you that there was a forensic image**
6  **done of the two laptops and the PC.**
7    Q    One of those devices for which a forensic image
8  was apparently made was the device on which Mr. Klempf
9  used iTunes; is that correct?
10    **A    Yeah, I believe so.**
11    Q    So if Mr. Klempf made iTunes backups of his
12  phone and those backups existed at the time of the
13  forensic collection, then there might be backups of
14  Mr. Klempf's phone on the forensic image of that device;
15  is that right?
16    **A    I don't know the answer to that question.**
17    Q    Have you or anyone -- any of the Foodonics
18  parties investigated whether there are any backups of
19  Mr. Klempf's phone on any device other than his mobile
20  devices?
21    **A    Well, again, so there was a forensic imaging of**
22  **those three machines, let's call them, and then once we**
23  **got that data we applied the relevant date filter and**
24  **the keywords that we agreed to.  So if it hit on those**
25  **terms then it would have been returned for us and would**

1  **have been produced.**
2    Q    So if there was an iTunes backup of
3  Mr. Klempf's iPhone 7 phone that was made in 2015, would
4  you have identified that backup using the process you
5  just described?
6    **A    Again I'm not familiar with iTunes backups.  My**
7  **general understanding, that those backups exist on**
8  **iTunes in the Cloud, not on a device.  But again I don't**
9  **-- I don't know the answer to -- to the iTunes backup**
10  **question.**
11    Q    Have you or any of the Foodonics parties looked
12  on Mr. Klempf's devices to determine whether there are
13  iTunes backups of any of his phones?
14    **A    Not specifically.**
15    Q    Considering what we now know about the settings
16  on Mr. Klempf's phone and replacement of his phone,
17  don't you think that looking for iTunes backups would be
18  another way to locate text messages from Mr. Klempf's
19  phone?
20    **A    Could be.**
21    Q    Are the Foodonics parties going to investigate
22  the iTunes backups of Mr. Klempf's phone?
23    **A    As Mr. Klempf stated yesterday, he's contacted**
24  **iTunes, they have sent him a login and information to**
25  **download.  We have done a very cursory review of it and**

1  **saw nothing so far that would -- that would relate to**
2  **this.  There's a ton of photos.  There is not a call**
3  **log, as you had asked about yesterday.  There are no**
4  **messages, and I didn't see a folder for texts either.**
5  **There was an iCloud folder, but neither Mr. Klempf nor I**
6  **have been able to download that.  It keeps timing out.**
7    Q    The information --
8    MR. WELLS:  Let me say this, if I may, Mr. Dix.
9  If there's anything we can do to access information
10  that we've been unable to do thus far we will gladly
11  do it.  We have no problem with doing that.
12    MR. DIX:  Let me clarify.  The information
13  Mr. Hancock just described is information that was
14  collected from Apple.
15    MR. WELLS:  Very recently.
16    MR. DIX:  That's a separate source than an
17  iTunes backup, if there was one, that would have
18  been made at various points in time on Mr. Klempf's
19  computer.  That backup, if it exists, would have
20  text messages and possibly other information.  It
21  would be a -- potentially a snapshot of his phone at
22  a particular point in time.  And unlike the iCloud
23  that overwrites each time that there is a new backup
24  made, iTunes makes a separate file and saves it on
25  the device.  So there could potentially be any

1  number of phone backups on Mr. Klempf's computer.
2    And what I'm getting at is we think you ought
3  to go look to see if those backups exist, and if
4  they do we would like to know what dates the backups
5  were made on.  If it's something prior to March of
6  this year then that deserves to be investigated,
7  because you haven't produced us any text messages
8  earlier than March of this year, even though if the
9  documents -- if the text messages do exist those
10  would be relevant.
11    MR. WELLS:  As Mr. Post and I established very
12  early on in this case, we are not IT knowledgeable,
13  and about 80 percent of what you just said I don't
14  understand.
15    Okay.  But as I said, as a preamble to your
16  statement, if there's another avenue that we can
17  explore that we haven't recognized we will gladly do
18  it.  We have no problem in seeing if there's
19  something else in the iTunes backup world.  We will
20  gladly do it.
21    MR. DIX:  For the record, our concern has been
22  all along that these efforts aren't being made, and
23  to the extent they are being made, they are being
24  made by people who don't have knowledge about how to
25  do the object -- how to accomplish the objective,

1  which is why we have asked for appointment of a
2  neutral forensic examiner, someone that would be
3  familiar with how to do these things, and accomplish
4  them in a way that would be neutral, that wouldn't
5  be either side doing it.  There would be privacy
6  protection, but would get us to the ultimate result.
7      MR. WELLS:  I won't comment on your suggestion
8  about the appointment of a neutral forensic
9  examiner.  I don't -- I certainly don't agree with
10  your comment that there are people who are not
11  qualified that are involved in the process.
12      But we will do -- we have no problem in
13  pursuing whatever may be available.
14      MR. DIX:  For the record, what we would like
15  for you to do now, regardless of who you use to do
16  it, is investigate whether there are iTunes backups
17  of Mr. Klempf's mobile devices on any of his
18  computers, and if those backups exist we would like
19  to know, A, that they exist, and, B, the dates on
20  which those backups are made.  And then from that
21  point it may not make sense to look at all of them,
22  but once you know what you have then you can
23  determine what you're going to do with it.
24      MR. WELLS:  For the record, and I've stated
25  prior to that, we will do whatever we can to see

1  where information may be that we have not yet
2  discovered.
3      MR. DIX:  So does that mean you will look for
4  the iTunes backups of Mr. Klempf's phone?
5      MR. WELLS:  Yes.
6      MR. DIX:  When can we expect that we'll know
7  whether those iTunes backups exist?
8      MR. WELLS:  I can't answer that.  I don't -- as
9  I think you understand, I don't know what's involved
10  in doing that.  Okay.  I don't know who might be
11  able to do it, how long it's going to take them, but
12  we will move quickly.
13      Q    Was there any ESI that the Foodonics parties
14  identified but later determined was inaccessible for
15  some reason?
16      A    Just the AS400.
17      Q    What about password protected or encrypted
18  files?
19      A    There's -- there are some documents that are --
20  that we don't know passwords for despite investigation.
21  We -- too much time has passed.  We talked to the people
22  that sent the e-mail.  They don't remember the
23  passwords.
24      Q    I received an e-mail from you yesterday after
25  Mr. Klempf's testimony.  I have not looked at the

1  information that you sent me.  Can you tell me what you
2  sent me yesterday?
3      A    I sent you 33 additional documents that we were
4  able to unlock based on my investigation of what the
5  possible passwords could be.
6      Q    What were those documents?  Can you describe
7  them?
8      A    They were -- a lot of them were financials for
9  wine concepts.
10      Q    Were they documents that were relevant to this
11  litigation?
12      A    I don't believe so.
13      Q    Why were they produced if they weren't relevant
14  to the litigation?
15      A    Because you insisted on really broad search
16  terms, terms like asset and purchase and stock, and when
17  we tried to refine them further you resisted that.
18      For example, when we said let's at least make
19  that include Foodonics or Klempf, and you said, no, that
20  we would be eliminating too many hits.  So consequently
21  we have a lot of what I would call false hits in this
22  case that we have wound up producing to you that have
23  nothing whatsoever to do with this litigation.
24      Q    Did you ever test the proposed additional
25  search term of adding Foodonics to the search terms and

1  determine which documents would be eliminated by running
2  that more restrictive search?
3      A    So what you're proposing -- what you're asking
4  is did we further limit it with that term and then look
5  at all of the documents that were eliminated?
6      Q    Did you look at --
7      A    No, we did not do that.
8      Q    Did you look at any of the documents?
9      A    No, we did not do that.  We talked -- we talked
10  to you about refining the terms further and you
11  resisted.
12      Q    Are you aware that the Foodonics parties didn't
13  refer to Foodonics as Foodonics in their communications?
14      A    We proposed Foodonics, Dixie Egg, and Klempf, I
15  believe, as terms.  I don't know other things that they
16  were referred to as.
17      Q    So if Dina Klempf sent an e-mail to Jacques
18  Klempf she talked about the company, and she sent it to
19  his, Mr. Klempf's, DixieEgg.com e-mail account but
20  didn't say the word Foodonics that e-mail wouldn't have
21  been produced; is that correct?
22      A    No, it would have been given to you by your
23  client.
24      Q    So if -- that's right.  We tested the
25  additional search term of Foodonics and found that there

1  were documents that would be eliminated as a result of
2  adding a term that people didn't use when they referred
3  to the company.
4      So did you -- isn't it possible that if Jacques
5  Klempf communicated with Dolph Baker and referred to his
6  company, but didn't say the word Foodonics, that e-mail
7  wouldn't be produced to us?
8      MR. WELLS:  Object to the form.
9      A   Well, it depends.  There were so many different
10  searches done on this.  So I think one of the searches
11  was any communication between Dolph and Jacques.  So I
12  think it would have been picked up in that particular
13  search.
14      Q   Is it your position that every single
15  communication between Mr. Baker and Mr. Klempf was
16  produced to us regardless of the search terms?
17      A   Well, I'm not saying that I have memorized the
18  search terms.  I just -- as I recall the agreed upon
19  search terms, there were multiple stabs at trying to
20  locate responsive documents, and one of them had to do
21  with communications between Dolph and Jacques.
22      Q   We will come back to that when we get to the
23  search area of inquiry.
24      A   Happy to.
25      Q   Is there any ESI that existed when the

1  litigation -- well, let me rephrase.
2      Is there any ESI that existed at the time of
3  the June 23rd, 2017 letter that's related to the Trust
4  litigation, but which no longer exists today?
5      A   I think other than the cell phone, the text
6  messages that have the 30-day setting.
7      Q   Other than the text messages?
8      A   I don't believe so, because I believe the Dixie
9  Egg account had already expired.
10      Q   Let's move on to collection of ESI.  Take a
11  minute and look at the third area of inquiry and tell me
12  when you're done.
13      A   Okay.
14      Q   What did the Foodonics parties do to collect
15  ESI related to the Trust litigation?
16      A   We engaged a vendor to do those services.  The
17  same vendor that you have engaged.
18      Q   When you say the same vendor, you're not using
19  the same exact people, it's just the same company?
20      A   Correct.  It's a large company.
21      Q   So the people that collected data from
22  Mr. Klempf are not also collecting data from the Trust?
23      A   Correct.
24      Q   Or any of our side?
25      A   Correct.

1      Q   When did you engage the company to collect ESI
2  from Mr. Klempf?
3      A   So the company is KLDiscovery.  I refer to them
4  a lot of times as KLD.  We -- we have what's called a
5  man services agreement with them, so they're constantly
6  engaged on most of our matters.  So I don't recall
7  specifically when we got them involved with this
8  engagement, but we did engage them to collect the data
9  of the ESI in this case.
10      Q   Would the invoices from KLDiscovery reflect the
11  dates you engaged them to collect data from the
12  Foodonics parties?
13      A   Yes.
14      Q   Yesterday Mr. Klempf agreed to produce the
15  KLDiscovery invoices that relate to this case subject to
16  redaction for attorney/client privilege; is that right?
17      A   That's my understanding, but if you're
18  referring specifically to when -- I mean, they were
19  engaged before they collected the data, but if you're
20  referring specifically to when the data was collected in
21  Jacksonville by KLDiscovery, that was in late May, and I
22  believe in early April is when the iCloud collection
23  occurred.
24      Q   Why did the iCloud collection occur before the
25  collection of the rest of the information?

1      A   I don't know.  Something has to go first.  I
2  don't know that there's a particular reason that sticks
3  out in my mind.
4      Might have been scheduling because it was a
5  physical on-site collection that had to occur up here in
6  Jacksonville.
7      Q   Who directed KLDiscovery to collect information
8  from Mr. Klempf's iCloud in April 2018?
9      A   I did.
10      Q   Who directed KLDiscovery to come to
11  Jacksonville to collect additional information from
12  Mr. Klempf in May 2018?
13      A   I did.
14      Q   Was it a single individual that came and
15  collected the information --
16      A   Yes.
17      Q   -- from Mr. Klempf in May 2018?
18      A   Yes.  That's correct.
19      Q   Was it the same individual that collected
20  information from Mr. Klempf's iCloud in April 2018?
21      A   No.
22      Q   What was the name of the person that collected
23  the iCloud data in April?
24      A   Kirk Crabb.  C-r-a-b-b.
25      Q   What experience does Mr. Crabb have in

1  collecting data from the iCloud?
2      A    Couldn't tell you.  He's part of their
3  forensics team.  I believe he's in Virginia.
4      Q    Have you ever used Mr. Crabb to collect data in
5  connection with any other case or client?
6      A    I may have.  He just wasn't identified as the
7  person that did the collection, because nobody ever
8  asked before the name of the person.
9      Q    Who did the collection in Jacksonville in May
10  2018?
11     A    Richard Abraham.
12     Q    And what is Mr. Abraham's experience in
13  collecting ESI from computers and devices?
14     A    I know that he's worked for KLDiscovery since
15  they were Credence Corp., and he has collected,
16  processed, and produced and otherwise dealt with ESI for
17  many years.
18     Q    What instructions did you give to Mr. Crabb
19  when you directed him to collect information from
20  Mr. Klempf's iCloud in April 2018?
21     A    I asked him to do an iCloud collection.
22     Q    Why did you collect ESI from the iCloud rather
23  than Mr. Klempf's physical devices?
24     A    We routinely do that in a lot of our cases.
25  It's -- it's a recognized forensically sound manner of

1  collecting data from iPhones.  Android phones there is
2  no such iCloud.  Maybe there is now.  Historically
3  androids would have to be collected on-site, or you
4  would have to be in the same place as the phone.
5      Q    Isn't it possible that there was data on
6  Mr. Klempf's phone that wasn't backed up in the iCloud?
7      A    No.
8      Q    How do you know that?
9      A    Because before they did the iCloud collection
10  they instructed Mr. Klempf to do an iCloud backup.
11     Q    Was anyone from KLDiscovery involved in the
12  backup that you're referring to?
13     A    I don't know.
14     Q    Were you involved in the backup that you're
15  referring to?
16     A    I was not.
17     Q    So you relied on Mr. Klempf himself to perform
18  the backup which was the source of the collection of
19  information from his iPhone?
20     A    I don't know that.  Could have been
21  KLDiscovery.
22     Q    Isn't it possible that Mr. Klempf, when he made
23  his backup, that the settings on his phone didn't
24  transmit the entire contents of his phone to the iCloud?
25     MR. WELLS:  Object to the form.

1      A    I mean, again anything is possible, but I
2  believe that KLD would have informed him how to do a
3  full backup.
4      Q    Do you have any knowledge of whether Mr. Klempf
5  was informed of how to do a full backup?
6      A    I do not.
7      Q    And I think you testified earlier that at no
8  time, even sitting here today, has anyone from
9  KLDiscovery ever collected any data from Mr. Klempf's
10  iPhone itself?
11     A    Correct.
12     Q    Mr. Klempf testified yesterday that he's now
13  given his iPhone 7 to an individual that lives here in
14  town; is that right?
15     A    Yes, he testified to that.
16     Q    Is that your understanding of the present
17  location of the iPhone 7 that Mr. Klempf had?
18     A    My understanding is based on his testimony.
19     Q    Before Mr. Klempf gave his phone to the
20  individual that now has it, the iPhone 7, did he check
21  with you or anyone from Gray Robinson regarding the
22  delivery of that phone?
23     A    He didn't check with me.
24     Q    Did he check with anyone from Gray Robinson?
25     A    I can't say.

1      Q    If Mr. Klempf had checked with you would you
2  have advised him to do anything with the phone prior to
3  delivering it to that individual?
4      A    I don't know.  I mean, it's a what if.  It's a
5  hypothetical.
6      MR. DIX:  I want to introduce a new document
7      here.  It's 21.
8      (Exhibit No. 21 was marked for identification.)
9      Q    The document I'm handing you is defendant's
10  request for production to Plaintiff Foodonics
11  International, Inc.
12     Have you ever seen that document?
13     A    Yeah, I believe I have.
14     Q    What is the date that that document was served?
15     A    Appears to be January 12, 2018.
16     Q    And on what date or dates did Foodonics produce
17  documents in response to the request for production?
18     A    You'll have to refresh my recollection.  I
19  don't have those dates.  There's a lot of things that
20  have occurred in this case, so I don't have those dates
21  committed to memory.
22     Q    Was there any production that took place six
23  months after the request for production was served?
24     A    Again, I don't have those dates committed to
25  memory.

1    Q    As the designated representative of Foodonics
2 you don't recall when Foodonics produced ESI to the
3 Trust?
4    **A    The exact dates, no.**
5    Q    Is there any information you can look at to
6 refresh your recollection?
7    **A    I believe in Exhibit 20 it refers to some dates**
8 **in the back here under the production section.**
9    Q    So the dates that you're looking at --
10    **A    If these are accurate then it looks like our**
11 **first production was on August 30th.**
12    MR. DIX:  Let's mark Exhibit 22.
13    (Exhibit No. 22 was marked for identification.)
14    Q    The document we just marked as Exhibit 22 is
15 the objections to defendant's request for production to
16 Plaintiff Foodonics.
17    **A    Okay.**
18    Q    Have you ever seen that document before?
19    **A    I believe I have.**
20    Q    What is the date that that document was served?
21    **A    Looks like February 12, 2018.**
22    Q    As of February 12, 2018 had any of the
23 Foodonics parties collected any ESI related to the Trust
24 litigation?
25    **A    No.**

1    Q    Turn to the document we marked yesterday as
2 Exhibit 16.
3    **A    Okay.**
4    Q    Paragraph 2 of that document, which is an
5 e-mail from Mr. Wells to Mr. Post on October 15, 2018,
6 the e-mail says:  The cell phone data collection was
7 performed by Kirk Crabb of KLDiscovery's collection team
8 via the iCloud on April 8, 128 at 5:01 a.m.
9 Should that date be 2018?
10    **A    Yes.**
11    MR. WELLS:  I apologize for not correcting that
12 earlier.
13    Q    The date that the -- the time that the cell
14 phone data was collected was 5:01 a.m.
15    Why was it collected so early?
16    **A    You'll have to ask Kirk Crabb.  Maybe he's an**
17 **early riser.**
18    Q    At the time the data was collected from
19 Mr. Klempf's iCloud what settings, if any, were required
20 to be changed to permit that collection to occur?
21    **A    I'm not aware of any, one way or the other.**
22    Q    What is your understanding of the data that Mr.
23 Crabb collected from the iCloud on April 8, 2018?
24    **A    My understanding of the data?**
25    Q    What data was Mr. Crabb able to collect?

1    **A    Whatever was in the Cloud.**
2    Q    Was the data in the Cloud an entire copy of
3 Mr. Klempf's mobile phone?
4    **A    Again it's my understanding that they had him**
5 **do a full backup prior to the collection from the Cloud.**
6 **So that's my understanding, yes.**
7    Q    Other than your understanding, do you have any
8 other information to confirm that the iCloud contained
9 an entire copy of Mr. Klempf's phone?
10    **A    Other than my understanding.  Do you want my**
11 **understanding?**
12    Q    Other than the understanding you just told me
13 about the instructions that you gave to --
14    **A    No.**
15    Q    In the first paragraph of this e-mail from
16 Mr. Wells it says:  At the time of the our conference
17 call this past Wednesday it was our understanding that
18 all text messages had been provided.
19    Then the next sentence begins:  In the face of
20 a possibility that messages from another cell phone had
21 not been collected we advised we would look into the
22 issue and get back to you.
23    What created the possibility that messages from
24 another cell phone had not been collected?
25    **A    I believe this was in response to your pointing**

1 **out a letter that was previously marked, or an e-mail, I**
2 **guess, from Mr. Santana where he referred to two cell**
3 **phones, one being damaged.**
4    Q    Mr. Wells advises that he would look into the
5 issue and get back with us.
6    What did Mr. Wells learn when he looked into
7 the issue?
8    **A    Well, do you want to know what I learned?**
9    Q    That would be -- what did the Foodonics parties
10 know about that question?
11    MR. WELLS:  Object to the form.
12    **A    We learned from Mr. Klempf that the phone had**
13 **been damaged, had been dropped.  He told us the -- what**
14 **had happened to the phone, how it fell from the bathroom**
15 **counter onto a tile floor, it got smashed, and that he**
16 **replaced it with the 10, but that he made sure to**
17 **instruct the folks at the Apple store to copy everything**
18 **over to the 10.**
19    Q    So prior to October 15, 2018 did you have any
20 knowledge that Mr. Klempf's iPhone 7 had been cracked or
21 broken?
22    **A    You know, I did.  And I've looked back at this**
23 **in preparation for this deposition.  Again, my notes**
24 **always refer to one cell phone.  I never had two cell**
25 **phones in my notes.  But clearly I was involved in the**

1  conversation with Mr. Santana and Mr. Klempf that he put
2  in his earlier communication. I just didn't have that
3  notated in my notes.
4      Q    So who was right, you or Mr. Santana, about the
5  number of phones that Mr. Klempf had?
6      A    He was.
7      Q    The e-mail from Mr. Wells, paragraph 1, the
8  last two sentences says: I also discussed the cell
9  phone issue with Jacques. He was under the impression
10 that all data from his old damaged phone had been
11 transferred to the new phone.
12          Was that a true statement?
13     A    Yes, and it was. The confusion there came from
14 our not understanding why the text messages only went
15 back to March of '18. And then Jacques subsequently
16 learned that the setting had been changed from forever
17 to 30 days.
18     Q    Once the data was collected from Mr. Klempf's
19 iCloud, or any other mobile device, what did KLDiscovery
20 do with that data?
21     A    Well, I'm assuming it goes into some sort of a
22 forensic container when they collect it. They brought
23 it to -- well, they -- it stayed in their system, and
24 they provided that -- that data to me, that iCloud data.
25     Q    How many text messages were collected from

1  Mr. Klempf's cell phone?
2      A    All of them.
3      Q    What number of text messages were collected
4  from Mr. Klempf's phone?
5      A    I don't recall at this point.
6      Q    How do you know it was all of them?
7      A    Because that's what they were told to do, was
8  to collect all of them.
9          THE VIDEOGRAPHER: We have ten minutes
10 remaining.
11         MR. DIX: Okay.
12     Q    The text messages from Mr. Klempf's phone were
13 ultimately produced on September 14, 2018; is that
14 right?
15     A    If you say so. That sounds about right.
16     Q    As the designated representative of Foodonics
17 do you have any information regarding production of text
18 messages other than on September 14, 2018?
19     A    No, if that's the date that occurred. I just
20 haven't committed it to memory. I'm not saying you're
21 wrong. There are a lot of things that have occurred in
22 this case.
23     Q    Wasn't the production of text messages on
24 September 14, 2018 one of the areas of inquiry that were
25 designated in the notice of deposition?

1      A    Yes, and I'm testifying to that.
2      Q    In your review of the areas of inquiry did you
3  determine that any of the dates were incorrect?
4      A    No.
5      Q    Assuming that the text messages were produced
6  on September 14, 2018, what happened between April of
7  2018 and September of 2018 when the text messages were
8  finally produced?
9          MR. WELLS: Object to the form.
10     Q    Let me say it a different way.
11         Why did it take so long to produce text
12 messages that were collected in April?
13     A    Because there were lots of things going on in
14 the case. It wasn't -- that's not the only
15 thing that we were focussed on. We also needed to
16 review them.
17     Q    Was the review of the text messages from
18 Mr. Klempf's phone a substantial undertaking?
19     A    Sure.
20     Q    Weren't the only text messages produced by
21 Mr. Klempf from March and April of 2018?
22     A    Yeah, apparently that's correct.
23     Q    And weren't there only 90 messages?
24     A    Yes.
25     Q    And you consider it a substantial undertaking

1  reviewing 90 messages during a date that's not relevant
2  to the case?
3      A    Well, it doesn't matter if it's relevant or
4  not. The review takes as long as it takes.
5      Q    What was substantial about the review of the
6  text messages?
7      A    Well, I mean, I guess substantial is -- is --
8  it depends on -- you know, your definition of
9  substantial is different than mine. You know, it -- it
10 didn't happen overnight.
11     Q    It took longer than one day to review the text
12 messages from Mr. Klempf's phone?
13     A    Absolutely.
14     Q    And who reviewed those text messages?
15     A    Gray Robinson.
16     Q    Who at Gray Robinson reviewed those text
17 messages?
18     A    I believe I reviewed some of them, and an
19 attorney by the name of Ashley Edwards.
20     Q    At the time that you reviewed these text
21 messages from Mr. Klempf's phone did it occur to you
22 that none of the text messages were within the relevant
23 time period in this case?
24     A    No, it didn't. It slipped my mind. I mean, it
25 slipped my attention. I knew that nothing was

1  responsive really, but -- or relevant, but in this case
2  we've unfortunately produced lots of things that were --
3  that are not responsive.
4      Q    The relevant date range in this case is
5  September 1, 2008 through January 19, 2018; is that
6  right?
7      A    That's the date range that's been set forth,
8  yeah.  I wouldn't consider that to be the relevant date
9  range, but, yes, that's the date range.
10     Q    All of the text messages that were produced
11 from Mr. Klempf's phone were outside of that date range;
12 is that right?
13     A    That's correct, but those were the only ones
14 that were on the phone.
15         MR. DIX:  Let's go ahead and stop there.  I
16     think we're getting close to running out of time.
17         THE VIDEOGRAPHER:  We're off the record.  The
18     time is 11:38 a.m.
19         (Lunch break.)
20         THE VIDEOGRAPHER:  We are back on the record.
21     The time is 12:53 p.m.
22     Q    Mr. Hancock, I want to ask you now about the
23 fourth area of inquiry in our notice of deposition,
24 which is processing.
25     A    Okay.

1      Q    Will you take a look at that area and let me
2  know when you're done?
3      A    Okay.
4      Q    Who was responsible for processing the ESI that
5  was collected by the Foodonics parties?
6      A    KLDiscovery.
7      Q    What instructions did you give KLDiscovery
8  regarding processing of information?
9      A    Well, we routinely do duplicate documents
10 before they're ingested into a review platform.  We also
11 applied a date filter, which is the relevant date range
12 in this case, and the search terms that the parties
13 agreed to.
14     Q    Did you give those instructions at the time of
15 processing of the data?
16     A    Before they processed them, yes.
17     Q    So when the data was processed the only data
18 that was processed was data that was within a certain
19 timeframe and responsive to certain search terms?
20     A    No, all the data was processed, but it was
21 filtered.
22     Q    So let me understand.  You provided the data to
23 KLDiscovery?
24     A    Right.
25     Q    The data was processed, and then subsequent to

1  processing it was culled based on date ranges and search
2  terms?
3      A    I guess I need to ask what you mean by
4  processing then.
5      Q    Well, the information that was collected from
6  the Foodonics parties was collected in a native format;
7  is that right?
8      A    Right.
9      Q    The format that it gets reviewed by Gray
10 Robinson is not the native format; is that right?
11     A    It is.
12     Q    So when the data is loaded into the Nebula
13 discovery tool that KL -- that Gray Robinson uses what
14 format is it in?
15     A    It's in its native format.
16     Q    Is there any processing of the data that occurs
17 prior to loading the data into KLDiscovery's Nebula
18 tool?
19     A    Using that -- that definition of processing,
20 no.  It's not processed.  It's filtered, but it's not
21 processed.
22     Q    So prior to sending the data to KLDiscovery did
23 anyone, including you, at Gray Robinson alter or edit
24 the data in any way?
25     A    No.

1      Q    When KLDiscovery loaded the ESI collected from
2  the Foodonics parties into the Nebula review tool, when
3  was that done?
4      A    It was done at different times, because it was
5  received at different -- on different dates.
6      Q    Would the records of KLDiscovery, the invoices
7  and billing records, reflect the dates on which data was
8  loaded into the Nebula review tool?
9      A    Yes.
10     Q    Would your time records for Gray Robinson also
11 reflect instructions given to KLDiscovery regarding
12 processing of data?
13     A    No.
14     Q    Why not?
15     A    I don't bill for many of my tasks, so I
16 wouldn't have bill for that.
17     Q    So in connection with the Trust litigation do
18 you keep detailed time records?
19     A    No.
20     Q    Does any of your time related to the Trust
21 litigation get billed to Mr. Klempf?
22     A    Yes.  Very little.  I bill typically for
23 attendance at hearings, attendance at 26(f) conferences,
24 and preparation for those.  But telephone conferences
25 and all the other -- the millions of other things that

1  we do in the course of a case, I do not bill for.

2      Q    So even if you're not billing for it, do you
3  keep a record of the telephone calls that you have with
4  clients?

5      A    No.

6      Q    Does Mr. Santana, keeping his records does he
7  make a record of the time he spends as the E-discovery
8  liaison in the Trust litigation?

9      A    I would assume so, yes.

10      Q    Do you have any personal knowledge of
11  Mr. Santana's time records?

12      A    I haven't seen his billing, but, I mean, he's a
13  billing -- he's an attorney with the firm.  He bills.

14      Q    Assuming he keeps track of time, records it and
15  bills it, that time would be reflected on the invoices
16  that were provided by Gray Robinson to Mr. Klempf; is
17  that right?

18      A    That's my -- yeah.  Yes.

19      Q    Were there any error reports generated by
20  KLDiscovery prior to or during the loading of the ESI
21  into the Nebula review tool?

22      A    So we were certainly alerted to the existence
23  of password protected or encrypted documents.  Other
24  than that I'm not aware of error reports that -- that
25  they brought to my attention.

1      Q    When you instructed KLDiscovery to load ESI
2  from the Foodonics parties into the Nebula review tool
3  did they provide you with any error reports?

4      A    No.

5      Q    Have you ever asked KLDiscovery whether there
6  were error reports generated in connection with loading
7  data into the Nebula review tool?

8      A    Well, so the way that we work with KLDiscovery
9  is when they encounter any errors or issues that are
10  significant they try to resolve them internally.  If
11  they can't then they let me know.

12          They let me know about the password protected
13  documents, but -- and that's one of -- an example of
14  something that would be on an error report.  It's
15  actually called an exception report.

16      Q    Okay.

17      A    But in any event, other than the password
18  protected documents I'm not aware of any -- anything on
19  those reports.

20      Q    So there are reports that exist?

21      A    Yeah.  If -- if reports exist I'm not aware of
22  anything other than the password protected documents.

23      Q    You don't know whether there are any reports
24  related to the ESI collected from the Foodonics parties?

25      A    I do not.

1      Q    When did you first become aware there were
2  documents that were password protected that had been
3  collected from the Foodonics parties?

4      A    I think it was prior to our first production.

5      Q    When would that be?

6      A    I think our first production was -- what did we
7  say -- August 30th, I think.  So prior to that.

8      Q    When was the first time that you notified
9  anyone representing the Trust that there were encrypted
10  or password protected files?

11      A    I think that issue came up at one of the
12  hearings, or prior to one of the hearings where you --
13  you had actually identified documents that we produced
14  in our -- that were password protected, and asked us to
15  try to resolve those matters.

16      Q    And did those matters get resolved?

17      A    Some of them.

18      Q    Were some of those matters that got resolved
19  the documents that you produced to us yesterday?

20      A    Yes.  And there were others before that.  So we
21  -- we did find out some of the passwords before we
22  produced, and we attempted -- you know, we unlocked the
23  documents.  But we didn't know any of the other
24  passwords, so we produced them knowing that they were,
25  you know, password protected, but we just didn't -- we

1  didn't know the passwords at that point.

2      Q    At the time of production did you disclose that
3  there were files that were protected by passwords or
4  encrypted?

5      A    I don't believe we did.

6      Q    But you had knowledge that there were files
7  that were password protected or encrypted?

8      A    Yeah, I knew that there were -- there were
9  some, and were hopeful that we could rectify that down
10  the line by asking people for the passwords.

11      Q    In advance of the initial production made by
12  Foodonics, do you recall that we had a conference call
13  with myself, you, and Mr. Wells?

14      A    I'm sure we had many, yeah.

15      Q    Do you recall a conference call in which we
16  reviewed the ESI order that was entered in this case,
17  and the production formats that are required in that
18  order?

19      A    Again I'm sure.  We had several like that, yes.

20      Q    Do you recall that during that telephone
21  conference I asked you about password protected files,
22  and you said there were none?

23      A    Yeah.  So I'm not sure of the timing of when I
24  was aware of these password protected documents.  It
25  could very well be that I became aware of them once you

1  notified us of them, and then I attempted to unlock some
2  with any known passwords, and have been doing so up
3  through last night when I produced an additional 33.
4      Q    So when you told me that there were no files
5  that were password protected was that a correct
6  statement?
7      A    There were none that I knew of at the time.
8      Q    And you became aware of the password protected
9  files after we brought them to your attention; is that
10  right?
11     A    I subsequently became aware of them.  I don't
12  recall if it was you bringing it to my attention or KLD,
13  but I was aware that we had produced documents that
14  needed a password, but, I mean, we didn't have the
15  passwords for.
16     Q    Prior to us bringing it to your attention you
17  never made any efforts to notify us regarding password
18  protected or encrypted files; is that correct?
19     A    Correct.
20     Q    Let's move on and talk about search and review.
21  Would you take a minute and review that area of inquiry,
22  please.
23     A    Okay.
24     Q    I want to have you look at a document I believe
25  we mark as Exhibit 21.  It's the Trust request for

1  production of Foodonics.  Would you find that, please.
2      A    Okay.
3      Q    What efforts did the Foodonics parties take to
4  search for documents and ESI responsive to the
5  defendant's request for production?
6      A    We interviewed possible custodians and folks
7  who knew about the sources of ESI, and we collected from
8  those sources.
9      Q    And the custodians you interviewed were
10  Mr. Klempf and --
11     A    Eddie Rosemond.
12     Q    -- Eddie Rosemond.
13          And then you collected information from the
14  sources we discussed earlier; is that correct?
15     A    Correct.
16     Q    And once you had all that information collected
17  you loaded it into the Nebula review tool?
18     A    We loaded some of it in there after it was
19  filtered.
20     Q    What information was not loaded into the Nebula
21  review tool that you collected?
22     A    The data that did not hit on the agreed upon
23  search terms, or fell outside the date range.
24     Q    How did you search the data using the search
25  terms prior to it being loaded into Nebula?

1      A    It's done in the processing tool.
2      Q    What tool?
3      A    Whatever KLDiscovery uses on their front end.
4  I mean, it's referred to colloquially as the DRT, or
5  Data Reduction Tool.  I don't know the name of their
6  actual application, but that's where they do their
7  filtering.
8      Q    And you're sure that KLDiscovery used some
9  other tool to search and cull down data prior to loading
10  it into the Nebula tool?
11     A    Yes.
12     Q    Once the data was loaded into the Nebula review
13  tool -- well, when did the data get loaded into the
14  Nebula review tool?
15     A    Again, multiple times as we received it.  I
16  don't have specific dates.
17     Q    After the data was loaded into the Nebula
18  review tool how did you search the data for documents
19  that were responsive to the request for production from
20  the Trust?
21     A    Well, because the data that was put in there
22  was responsive to the search terms agreed upon by the
23  parties, what we essentially did was a privilege review
24  to determine what documents were going to be withheld
25  for privilege, and then we produced everything else.

1      Q    Can you walk me through the timing of the steps
2  that you just described?
3      A    Meaning what?  I'm sorry.
4      Q    So you referred to searching and reviewing the
5  data and collecting -- or conducting a privilege review
6  and then producing the documents.
7      A    Right.
8      Q    So when did each of those things happen?
9      A    Well, for each document -- well, I guess we
10  didn't do it for each document population.  We waited
11  until all of the documents were in Nebula, and then we
12  did an overall privilege review first to determine what
13  was going to be withheld for privilege, and then once we
14  determined that then we produced everything else that
15  wasn't going to be withheld for privilege.
16     Q    When did all the data get loaded into Nebula?
17     A    I don't have the date.  I'm sorry.  I mean, we
18  know that the iCloud was collected in early April.  We
19  know that the two laptops and PC were collected in late
20  May.  There were three e-mail accounts collected.
21          So probably over a month, maybe less
22  than a month to deal with all that.  So I would say
23  June-ish would be when the data was in, but that's
24  conjecture.
25     Q    Once the data was all loaded into the Nebula

1 review tool did you get some kind of report from
2 KLDiscovery regarding how many documents there were?
3     A    If I ask for processing reports they will
4 basically give me a report that says, okay, we collected
5 -- I'm just using round numbers here -- 30,000
6 documents, and 5000 de-duped out, so you're left with
7 25,000, and after we applied the date filter and search
8 terms, you know, you're left with 15,000.  So then the
9 15,000 gets uploaded into Nebula.
10     Q    Did you look at any of those kind of reports
11 prior to conducting the privilege review that you
12 mentioned earlier?
13     A    I glanced at them, yeah.
14     Q    Did you make any efforts to reduce the amount
15 of data in Nebula prior to conducting your privilege
16 review?
17     A    No.
18     Q    What steps did you take when the privilege
19 review was conducted using Nebula?
20     A    We identified privileged parties, folks that we
21 felt we had a privileged relationship with, and based on
22 communications with them, you know, you typically do
23 a privilege review, and then we applied that to the
24 documents programmatically, and then we also tried to do
25 an eyes-on as well.  Eyes-on review.

1     Q    I want to ask you about each of those three
2 things.  You mentioned that you identified privileged
3 parties.
4          What were the parties that you identified as
5 privileged?
6     A    Well, so Gray Robinson attorneys, you know,
7 attorney -- legal representation, and then, you know,
8 the entities that we represented, as well as their
9 employees and agents and such.
10     Q    You just said the entities that we represented.
11     A    We being Gray Robinson.  I'm sorry.
12     Q    And the entities refer to the Foodonics parties
13 and related members, or are you referring to other non
14 Foodonics clients?
15     A    There are other non Foodonics clients, but they
16 are related to Mr. Klempf and his various undertakings.
17     Q    Other than the Gray Robinson firm, are there
18 other law firms that you identified as having privileged
19 communications with Mr. Klempf?
20     A    You know, I don't know the answer to that.  You
21 know, it's the attorneys really that -- at Gray Robinson
22 that made that determination, but I think that there
23 were some attorneys identified as having represented
24 Mr. Klempf previously.
25     Q    So with respect to Foodonics, who you're

1 appearing on behalf of today, what law firms other than
2 Gray Robinson have represented any of the Foodonics
3 parties?
4     A    Off the top of my head I don't -- I don't -- I
5 don't know.
6     Q    Did Holland & Knight ever represent any of the
7 Foodonics parties?
8     A    I've certainly seen documents from Holland &
9 Knight.  I don't know what their -- what their
10 relationship is.
11     Q    Earlier in this case didn't we identify several
12 documents that appeared to be privileged to you and
13 Mr. Wells?
14     A    Three, I think.
15     Q    Wasn't one of those documents an e-mail between
16 Mr. Klempf and someone at Holland & Knight?
17     A    I believe that's right.
18     Q    And the determination by the Foodonics parties
19 was that document was privileged; right?
20     A    I believe we attempted to claw that back, or
21 did claw that back, yes.
22     Q    And that document was clawed back as privileged
23 for what reason?
24     A    Well, I guess because there was a privilege
25 relationship there.

1     Q    Prior to our notification to Mr. Wells of the
2 e-mail that we just discussed, had Holland & Knight been
3 identified as a party that had communicated with
4 Mr. Klempf in a privileged manner related to this case?
5     A    I don't know if they were or weren't, but
6 clearly that slipped through the -- if they were then
7 that slipped through, and that's the reason for a claw
8 back agreement.
9     Q    So as we sit here today have any -- after we
10 notified Foodonics parties regarding potentially
11 privileged communications, what steps were taken by the
12 Foodonics parties or their law firm after that
13 notification to determine whether there were additional
14 privileged documents that existed in the production that
15 was made?
16     A    I think that we have had a back and forth for
17 quite a while now on privilege logs and documents that
18 have been designated as privileged, and so we have
19 worked toward cleaning up our privilege logs as far as
20 what truly is privileged and what isn't.
21          But as far as what we did to determine what
22 else might have slipped through in our production, we
23 have not done that.
24     Q    Let me make sure I understand that.  So with
25 respect to the documents that haven't been produced

1 there's an ongoing effort to determine whether some of
2 those documents are privileged or not; is that right?
3    A    The ones that were identified on the privilege
4 log, yes.
5    Q    That effort is with respect to Foodonics and
6 Gray Robinson?
7    A    Looking at both.
8    Q    When is that effort expected to be complete?
9    A    I would say within a week.
10    Q    What happens after that effort is completed?
11    A    If we determine that something shouldn't have
12 been designated privileged we'll remove it from the
13 privilege log and produce it, and if we think it belongs
14 on the privilege log it will stay.
15    Q    Do you anticipate that both Gray Robinson and
16 Foodonics will produce revised privilege logs?
17    A    Yes, as a result of that.
18    Q    In addition to the revised logs the documents
19 that are removed from previous logs will also be
20 produced?
21    A    Yes.
22    Q    Will that production occur within a week?
23    A    I believe so, yeah.  I think we can do that
24 within a week.
25    Q    All right.  Earlier you mentioned three things.

1 I asked you about the first one, and then there were two
2 others that related to the review of the documents in
3 Nebula.
4         The second thing you mentioned was you applied
5 something programmatically.  What did you mean by that?
6    A    Right.  So the first step of any privilege
7 review is to -- you know, essentially what we do in ESI
8 is try to attack the low hanging fruit first.  So we
9 would search for any documents that were between, let's
10 say for example, Mr. Wells and Mr. Klempf, and those
11 would be, you know, on their face attorney/client
12 privileged documents.  So we would try to search for
13 those and then apply a privilege tag to those
14 programmatically.
15    Q    When you're taking that action is there an
16 effort to identify documents that, although they may
17 have been sent between Mr. Klempf and Mr. Wells, are
18 also sent to third parties?
19    A    So we certainly try to do an exclusive search
20 too.  So my example of an exclusivity type search would
21 be correspondence between Mr. Wells and Mr. Klempf, not
22 including anyone else.
23    Q    So that step was performed prior to the
24 production of documents by the Foodonics parties?
25    A    Yes.

1    Q    Okay.  Then after the -- who performed the
2 programmatic steps that you just described?  Was that
3 you?
4    A    I did in conjunction with KLDiscovery.
5    Q    Were any attorneys involved in that process?
6    A    Well, certainly consultatively to talk about
7 who would have, you know, the privilege relationships.
8    Q    Do you have any records that reflect a list of
9 the privileged relationships that you found in the
10 collection of ESI from the Foodonics parties?
11    A    No.
12    Q    The third step you mentioned in the process was
13 to have -- conduct a privilege review, an actual review
14 of those documents; is that right?
15    A    Right.  So we -- on some populations I believe
16 we had summer clerks look at the documents to do an
17 initial privilege review.
18    Q    When -- I presume it was over the summer;
19 right?
20    A    That would be my guess.
21    Q    How many?  How many summer clerks did you have
22 working on it?
23    A    I think there were three.
24    Q    Were they located in Jacksonville or somewhere
25 else?

1    A    I think they were in Orlando, but they could
2 have been in multiple offices.
3    Q    What instructions were those summer clerks
4 provided that guided their review of the ESI collected
5 from the Foodonics parties?
6    A    Well, I didn't give them the instructions, but
7 presumably it would have been:  Please look for any
8 documents that you think might be privileged, and if so
9 mark them as such and we'll follow behind you.  If
10 you're not sure, put "needs further review", or
11 something like that.
12    Q    You don't know who instructed the summer
13 associates on the review that they conducted; right?
14    A    I don't know.
15    Q    And you don't know any of the instructions that
16 were provided to the summer associates?
17    A    Not personally.
18    Q    Was there any licensed attorney involved in the
19 privilege review that was conducted in this case?
20    A    Yes.
21    Q    Which attorneys?
22    A    Ashley Edwards, I believe Mr. Wells has looked
23 at some documents, I believe Mr. Nolan has looked at
24 some, and there could be others.
25    Q    Did the three attorneys that you just mentioned

1 review the privileged log that was initially produced by
2 the Foodonics parties to the Trust?
3     **A   Yes, and we continue to try to revise it and**
4 **clean it up to the extent that it needs cleaning up.**
5     Q   The privilege log I'm referring to was produced
6 to us shortly before the status conference with the
7 court.
8     Do you recall that?
9     **A   I -- I don't recall the date. I'm sorry.**
10     Q   Do you recall that there was a status
11 conference where I represented to the court that there
12 were certain items on the privilege log which did not
13 appear to be privileged?
14     **A   Yes.**
15     Q   For example, there were communications between
16 Mr. Klempf and his sister Dina Klempf; is that right?
17     **A   If you say so.**
18     Q   Did Mr. Wells, Nolan, or Miss Edwards review
19 the privilege log prior to production to the Trust?
20     MR. WELLS: Object to the form. Go ahead and
21 answer.
22     **A   I think generally, but, as you know, it was**
23 **pretty extensive, so...**
24     Q   The -- the document that I noted when I
25 reviewed it, the first privilege log, the first item, or

1 the third item on the list was an e-mail involving
2 Mr. Blackburn, who was here yesterday.
3     Do you have any idea how much time was expended
4 reviewing the privilege log prior to production?
5     **A   I don't.**
6     Q   Do you know who prepared the privilege log that
7 was produced to the Trust initially?
8     **A   Primarily KLDiscovery, because it comes from**
9 **our database, and the various fielded information comes**
10 **from Nebula, and then we finalize it.**
11     Q   Did you request that KLDiscovery provide to you
12 a document that could be converted into a privilege log?
13     **A   Yes.**
14     Q   What instructions did you give to KLDiscovery
15 when you asked for that information?
16     **A   Just the fields of information to have on the**
17 **log. So it would be the -- you know, a doc I.D., a**
18 **date, to, from, cc, bcc I think, I don't recall exactly,**
19 **the privilege being asserted, and then a description**
20 **field.**
21     Q   What would the description field have in it?
22     **A   That's what we didn't get from KLDiscovery.**
23 **That's something that we had to flag.**
24     Q   So an e-mail that -- well, let me back up.
25     The privilege log that was generated was

1 generated after the attorneys or the summer associates
2 at Gray Robinson had performed their privilege review;
3 is that right?
4     **A   Yes.**
5     Q   Is the document you have in front of you 21?
6     **A   21.**
7     Q   That's the request for production?
8     MR. DIX: What's 22?
9     THE WITNESS: Objections.
10     Q   Would you turn to that, please.
11     **A   22?**
12     Q   The document marked as Exhibit 22.
13     **A   Yes.**
14     Q   Would you please turn to Page 4 of the document
15 we marked as Exhibit 22.
16     **A   Okay.**
17     Q   At the top of that page does it say general
18 objections?
19     **A   Yes.**
20     Q   Do you see there are objections listed on
21 pages 4, 5, 6, and part of 7?
22     **A   Yes.**
23     Q   When the documents that were produced by the
24 Foodonics parties to the Trust were produced were any
25 documents withheld based on the general objections that

1 are identified, pages 4, 5, 6, and part of 7 of the
2 document we just looked at?
3     **A   The only documents that were withheld were**
4 **documents that fell outside the date range, did not hit**
5 **on the agreed upon search terms, were personal to**
6 **Mr. Klempf. And we also did a filter for the junk**
7 **search terms that -- the same search that you guys did**
8 **for documents that were likely junk mail. Everything**
9 **else was produced.**
10     Q   As the representative of Foodonics are you
11 aware of any document or ESI that's responsive to the
12 Trust's request for production that was not produced
13 based on the criteria that you just mentioned?
14     **A   Other than the cleanup of the -- of the**
15 **privilege logs that we're still doing, no.**
16     Q   So, for example, if there was a document that
17 Mr. Klempf considered to be relevant to the case, but
18 did not fall within one of the search terms, are you
19 aware of any documents that fit that description?
20     **A   I am not.**
21     Q   You mentioned date range. What date range was
22 used, or were you referring to?
23     **A   I think 9/1/08 through 1/19/18.**
24     Q   Okay. And the search terms that you referred
25 to earlier, which search terms are those?

1    A    The search terms that the parties agreed to.

2    Q    And what documents reflect those search terms?

3    A    Well, I think there was documents attached to

4  correspondence back and forth between us, as being you

5  and myself and Mr. Santana.

6    Q    Did the searches that were performed by

7  KLDiscovery and loading the data into the Nebula review

8  tool, were those searches performed after the search

9  terms had been agreed to by the parties?

10    A    Yes.

11    Q    You mentioned personal documents.  What are

12  those?

13    A    So we did a search for just a few terms that

14  would yield documents that were absolutely personal to

15  Mr. Klempf and had nothing do with this.  One of those

16  terms was prenup or prenuptial agreement.  Another term

17  was his ex-wife's name and his current wife's name.

18    Q    And when you ran those search terms were those

19  the personal documents that Mr. Wells has referred to in

20  the past?

21    A    They are.

22    Q    And did Mr. Wells review each of the documents

23  that were identified as a result of that search?

24    A    I did actually, and I notated any that I

25  thought were a gray area and needed further review, and

1  Mr. Wells -- I believe it was Mr. Wells, could have been

2  Mr. Nolan -- reviewed those.

3    Q    How did you determine whether a document that

4  you were reviewing would have been related, or needed to

5  be further reviewed?

6    A    If it was his prenuptial agreement I didn't

7  think that that had anything to do with this case, so to

8  me that's a personal document.

9    Q    What other criteria did you apply?

10    A    Things that had nothing to do with -- with this

11  case or Foodonics.

12    Q    Did you review the prenuptial agreement?

13    A    I mean, I saw that it was there.  I didn't -- I

14  didn't review it.

15    Q    Do you know if it had any representations

16  regarding the value of Foodonics?

17    A    I don't.

18    Q    Isn't it possible that something in that

19  prenuptial agreement would relate to the value of

20  Foodonics or its shares?

21    MR. WELLS:  Object to the form.

22    A    Again, anything is possible.

23    Q    Did you exclude from information that was

24  produced to the Trust each and every communication

25  between Mr. Klempf and his ex-wife or current wife?

1    A    No.

2    Q    Which documents did you not exclude, which ESI?

3    A    I think -- I think if the document pertained to

4  the company then I would have either just said it's not

5  personal or would have asked for further -- further

6  review of that.

7    Q    For the documents that you determined did not

8  need further review, did those documents get identified

9  on any of the privilege logs that have been provided to

10  us to date?

11    A    No, because they're not privileged.  I mean,

12  some of them might have been privileged, but, no,

13  they're not -- they're not part of the privilege.

14  They're documents that are personal and not responsive.

15    Q    So they were documents that were responsive to

16  the search terms that we agreed upon, but upon further

17  review were determined to be not relevant?

18    A    Right.  It might have said sale or contract

19  somewhere in there, so they hit.

20    Q    So after you reviewed those personal documents,

21  then some combination of Mr. Wells and Nolan reviewed

22  the remaining documents, and then the documents that

23  survived that second pass review were produced to the

24  Trust?

25    A    Correct.

1    Q    Have you ever looked at or searched any of the

2  documents that were not loaded into Nebula because they

3  were not responsive to one of the search terms?

4    A    No.

5    Q    Other than yourself, is there anyone that's

6  looked at the documents I just mentioned?

7    A    No.

8    MR. WELLS:  Object to the form.

9    A    I don't believe so.  If they don't match the

10  search terms that the parties agreed to then there's no

11  need to look at them.

12    Q    Would you turn to page 7 of Exhibit 22.

13    A    Okay.

14    Q    Down at the bottom is the first request for

15  production, number 1.  The request is:  All documents

16  and ESI that you and/or Jacques Klempf, on the one hand,

17  and Dolph Baker and/or Cal-Maine, on the other hand,

18  included, but not limited to -- and then there's a

19  series of examples of communications.

20    Do you see that?

21    A    I do.

22    Q    Then the response from Foodonics was:  Subject

23  to the foregoing general objections, specifically

24  general objection number 5, Foodonics will produce

25  documents and ESI in its possession, if any, for the

1  specified topics delivered to or received from Dolph
2  Baker from December 1, 2014 through January 19, 2018,
3  related to the settlement and the redemption agreement,
4  if any, and the Cal-Maine sale.
5  This response was served on the Trust on
6  February 12, 2018. Did the ultimate production of
7  documents and ESI by Foodonics reflect the objections
8  asserted by Foodonics?
9  **A   You mean the response?**
10  Q   Yes, and objections in the response.
11  **A   I believe our production is more broad than**
12  **that. I think that we didn't limit it to only**
13  **correspondence about the settlement and redemption**
14  **agreement or the Cal-Maine sale.**
15  Q   Or the date range?
16  **A   Well, the date range goes back to 2008.**
17  Q   Right. Then the response says December 1,
18  2014.
19  **A   Oh, right. So it's more broad than that.**
20  Q   Is it safe to say that notwithstanding the
21  responses that Foodonics provided in February of 2018
22  the production was based on the search terms that were
23  agreed to by the parties subsequent to the service of
24  this document?
25  **A   Yes.**

1  Q   And are you aware of any documents or ESI that
2  were withheld by Foodonics based on any of the responses
3  or objections made in February 2018?
4  **A   Well, I mean, I haven't looked at them all, but**
5  **generally speaking, as you know, when we did our first**
6  **production, in an effort to save time and expense we**
7  **produced 47- or 48,000 documents to you which were not**
8  **all reviewed. So in so doing we produced everything**
9  **that was responsive to the search terms that the parties**
10  **agreed upon, and didn't limit it to this timeframe or**
11  **those particular subjects.**
12  Q   The response of the Foodonics parties, the bulk
13  of the documents and ESI produced were produced on
14  August 30, 2018; is that right?
15  **A   That was our first production. It was the**
16  **largest, but the Dixie Egg production was pretty**
17  **sizable.**
18  Q   Did the production that Foodonics made on
19  August 30, 2018 include all of the documents and ESI
20  responsive to request for production number 1?
21  **A   Well, notwithstanding the other documents that**
22  **were produced later. I mean, we produced three more**
23  **times after that.**
24  Q   What were the documents that were produced
25  after the initial August 30th production?

1  **A   I think one was the -- the documents that we**
2  **deemed to be not personal, one was the approximately --**
3  **well, I don't know how many, but were the documents that**
4  **were initially removed from the Foodonics privilege log,**
5  **and then the Dixie Egg production, DixieEgg.com.**
6  Q   Did you say text messages as well?
7  **A   Oh, sorry. And the text messages were also**
8  **produced. And then last night I produced an additional**
9  **33 documents that we were able to decrypt.**
10  Q   You mentioned earlier that a review was
11  conducted for relevance of the personal documents.
12  **A   Okay.**
13  Q   Was there any relevance review conducted with
14  respect to any of the other documents or ESI that were
15  produced by the Foodonics parties?
16  **A   Well, certainly we have looked at some of the**
17  **documents, an exhaustive review we have not done, no.**
18  **But that was in an effort to save the massive expense**
19  **that would be involved in doing so.**
20  Q   What documents were reviewed for relevance
21  prior to production to the Trust?
22  **A   They were reviewed. I don't know if they were**
23  **reviewed for relevance. But, you know, we've got a**
24  **database and so we routinely access it and we come**
25  **across documents. It wasn't done in an effort to review**

1  in preparation for production.
2  Q   So the data that was loaded into the Nebula
3  review tool was the data that was responsive to the
4  Trust search terms; is that right?
5  **A   Well, the search terms agreed upon by the**
6  **parties, yes.**
7  Q   Right. Subsequent to loading the data into
8  Nebula did any attorney or anyone remove documents from
9  Nebula or determine that they weren't relevant prior to
10  production to the Trust?
11  **A   No, we have not removed anything from Nebula.**
12  Q   So whatever was loaded into Nebula was produced
13  to the Trust?
14  **A   Other than the privileged documents.**
15  Q   So there was no team of Gray Robinson attorneys
16  that went into Nebula after the date it was loaded but
17  prior to production to determine that some of the
18  documents weren't relevant, notwithstanding the fact
19  that they were responsive to search terms; right?
20  **A   Well, so people can define relevance in**
21  **different ways. If it hits on the search terms that the**
22  **parties agreed upon then I guess by definition they're**
23  **responsive, if the search terms were crafted properly.**
24  **I don't think they were in this case. I think that the**
25  **search terms were far too broad, but that's a discussion**

1   for another day.

2    Q    Are you aware of any communications between

3   Mr. Klempf and Mr. Baker or Cal-Maine that haven't been

4   produced to the Trust?

5    A    No.

6    Q    Are you aware of any documents or ESI that

7   relate to the value of Foodonics or its assets or stock

8   that haven't been produced to the Trust?

9    A    No.

10    Q    Are you aware of any documents or ESI relating

11  to any proposals, offers, or discussions that any of the

12  Foodonics parties had with any person or entity

13  regarding any possible purchase or sale of Foodonics

14  assets or Foodonics stock?

15    A    No.

16    Q    Has special counsel been retained to review any

17  documents in connection with this case?

18    A    For Foodonics, no.

19    Q    Has special counsel been retained to review any

20  documents for any other person, party or not, related to

21  this case?

22    A    I thought I was here to testify for what

23  happened to Foodonics.

24    MR. WELLS:  It's okay.  We retained special

25  counsel to review Gray Robinson documents.

1    Q    Are those Gray Robinson documents within the

2  possession or control of Foodonics?

3    MR. WELLS:  No.

4    MR. DIX:  What's the status of that review?

5    MR. WELLS:  I think it's about complete based

6   on what we learned last week.  I gave Jim a call

7   last week and told him I thought it would be ready

8   this week, and as far as I know it ought to be

9   ready.

10    Q    Does Mr. Klempf have access to the Nebula

11  review tool?

12    A    No.

13    Q    Let's move on and talk about the next category,

14  the next area of inquiry, which is analysis on page 3 of

15  the amended notice of deposition.

16    A    Okay.

17    Q    Other than what we have already talked about in

18  connection with searching, what analysis was performed

19  by the Foodonics parties of the documents and ESI

20  related to the Trust litigation?

21    A    Nothing more than what we have discussed so

22  far.

23    Q    Was any predictive coding ever applied or used

24  with respect to any documents produced to the Trust?

25    A    No.

1    Q    Let's move on and talk about the next area of

2  inquiry, paragraph 7 of the areas of inquiry.  Would you

3  take a look at that and tell me when you're done.

4    A    I'm good.

5    Q    Paragraphs A, B, C and D, paragraph 7, refer to

6  various productions by the Foodonics parties to the

7  Trust in this case; is that right?

8    A    Yes.

9    MR. DIX:  Let's put another exhibit in.

10    (Exhibit No. 23 was marked for identification.)

11    Q    The document I'm showing you we just labeled as

12  Exhibit 23.

13    Have you seen this document?

14    A    Yes.

15    Q    What is it?

16    A    It's an e-mail from Grier Wells to you and

17  Mr. Post, I guess providing our first production.

18    Q    So the ESI produced by the Trust -- to the

19  Trust on August 30, 2018, was produced pursuant to this

20  e-mail from Mr. Wells; is that right?

21    A    In conjunction with, yeah.

22    Q    Prior to August 30, 2018, had any other ESI

23  been produced to the Trust?

24    A    Documents had, but not ESI.

25    Q    The second sentence of the e-mail says:  For

1   encrypted or password protected documents you may use

2  the password KLdisco2018!

3    The reference to encrypted or password

4  protected documents was to the entire collection; right?

5  Not to --

6    A    The link to production.

7    Q    Were there any documents in the production that

8  had that same password?

9    A    No.

10    Q    Mr. Wells in his final paragraph says:  As to

11  the designation of documents as confidential, we

12  previously designated certain documents as confidential

13  pursuant to the initial order.  To the extent the

14  documents produced through the link below contain any of

15  the previously designated confidential discovery

16  materials or highly confidential discovery materials,

17  they should retain such designation; otherwise, we're

18  not asserting confidentiality.

19    Are you aware of any documents that were

20  produced on October 30, 2018 that had a confidential

21  discovery or highly confidential discovery material

22  designation?

23    A    I think the financials of the company, any

24  propriety or business strategy type information.  You

25  know, the typical information that would be

1  confidential.

2  Q  Was any of that information produced on
3  August 30, 2018?

4  A  Yes.

5  Q  How would we identify the information that you
6  believe has the designation?

7  A  As it says here, if there was similar
8  information to the previously designated confidential
9  discovery materials, or highly confidential discovery
10  materials, they would have the same designation.

11  Q  Was any notation made on any of the documents
12  or in any of the metadata that would reflect
13  confidentiality designation?

14  A  No.

15  MR. DIX:  Let's mark the next one.

16  (Exhibit No. 24 was marked for identification.)

17  Q  The document I just marked as Exhibit 24 is an
18  e-mail from Mr. Wells to me and Mr. Post, with a copy to
19  you.

20  Have you seen that e-mail before?

21  A  I have.

22  Q  This e-mail was transmitted on October 1, 2018;
23  is that right?

24  A  Yes.

25  Q  And it purports to contain a supplemental

1  review, or documents from your review of the potentially
2  personal documents.

3  A  Mr. Wells misspoke.  That is supplemental
4  production.

5  Q  So which documents were produced on October 1,
6  2018?

7  A  If this is our second production, then -- and
8  it is Volume 2, so these were the documents that were
9  deemed -- that hit on the personal terms, but were
10  deemed to be not personal.  I believe there were 228 of
11  them.

12  MR. DIX:  Let's mark another document.

13  (Exhibit No. 25 was marked for identification.)

14  Q  The document we just marked as Exhibit 25 is an
15  e-mail from you to me and Mr. Wells on September 13,
16  2018; is that right?

17  A  Yes.

18  Q  And the second paragraph of your e-mail you
19  say:  As to Jacques Klempf's texts, after having spoken
20  with our vendor -- which is your vendor too -- we
21  believe we will be able to get you by close of business
22  tomorrow the text messages from Jacques Klempf's cell
23  phone.

24  Do you see that?

25  A  I do.

1  Q  And were those text messages produced by the
2  close of business the following day?

3  A  I don't recall.

4  Q  Do you see my e-mail to you below your e-mail
5  to me on that same page?

6  A  Yes.

7  Q  Paragraph 3 says:  Will you be timely producing
8  Jacques Klempf's text messages today?

9  That e-mail was sent on September 7, 2018; is
10  that right?

11  A  Yes.

12  Q  Pursuant to court order wasn't the production
13  of text messages due on September 7, 2018?

14  A  I know there was a court order, and I know that
15  we -- yeah, I think that's probably right.  Yeah.

16  Q  So the text messages were produced a week after
17  they were due under the court order; is that right?

18  A  Yeah.  I believe we had some issues with --
19  with producing them.

20  Q  What was the -- what were the issues with
21  producing them that caused the delay?

22  A  I don't recall whether we just hadn't reviewed
23  them yet or if there was a technical issue with
24  KLDiscovery, but, as you very well know, with ESI issues
25  happen from time to time.

1  Q  So are you telling me that something happened
2  between September 7, 2018 and September 13, 2018 that
3  caused a delay in the production of these texts?

4  A  That would be my supposition.

5  Q  But you don't recall what that --

6  A  I do not.

7  Q  -- purpose was?

8  MR. DIX:  Let's mark another document, please.

9  (Exhibit No. 26 was marked for identification.)

10  Q  We just marked a document as Exhibit 26.  It's
11  an e-mail to me on September 14, 2018.  Purports to be
12  from files at SendThisFile.com, but it's really an
13  e-mail from you; isn't that right?

14  A  With a link.

15  Q  So down below it says:  Sender
16  David.Hancock@grayrobinson.com.

17  That's you; right?

18  A  Right.

19  Q  And the message says:  We are hereby producing
20  text messages from Jacques Klempf's cell phone.

21  A  Correct.

22  Q  At the time of this e-mail on September 14,
23  2018 were you aware that none of the messages produced
24  were within the relevant date range?

25  A  I was not.

1    Q    Down below the body of the message there's a
2  link to click to retrieve files, and then there's a
3  reference to iMessage and then a phone number, and then
4  iMessage, KJKeggs@AOL.com.
5       Do you see that?
6    A    I do.
7    Q    And the extension, it looks like there's two
8  files with a 7Z extension?
9    A    Yes.
10    Q    That's a 7 ZIP file?
11    A    Correct.  It's a compressed data file.
12    Q    What are those two files?
13    A    That's the -- those are the two files as part
14  of the iCloud collection where those files existed.  So
15  that's just the name of what they were called in the
16  e-mail.
17    Q    Why were there two files produced for Jacques
18  Klempf's text messages?
19    A    Because some are -- and this gets into iCloud
20  collections or cell phone collections.  There are chats
21  and then there are MMS files and SMS files.  I think
22  they all three are technically considered text messages.
23  So I believe one was MMS messages and one was chats.
24    Q    Why the distinction with the phone number and
25  the e-mail address?  What's the significance of that?

1    A    That's not -- I don't do the file naming.
2  That's just the way that it comes up.
3    Q    The phone number that's listed there,
4  (904)885-1926, is that Mr. Klempf's mobile phone number?
5    A    I would assume so.
6    Q    You don't know whether that's his mobile phone
7  number?
8    A    I would assume that it is, yes.
9    Q    Do you know for sure?
10    A    No.
11    Q    Is it possible that these messages were
12  collected from some phone other than Mr. Klempf's?
13    A    No.
14    Q    How is it not possible if you don't know what
15  the phone number is?
16       MR. WELLS:  Objection to form.
17    A    It was his iCloud collection.  Have I memorized
18  his cell phone?  I have not.  But if you ask me what my
19  son's cell phone is I wouldn't be able to tell you.
20  It's programmed in my phone.
21    Q    You're the designated representative of
22  Foodonics today?
23    A    Yes.
24    Q    And as the designated representative don't you
25  know Mr. Klempf's cell phone?

1       MR. WELLS:  Object to form.
2    A    I believe I've answered that.
3    Q    You've answered that you don't know; is that
4  right?
5    A    That was my answer.
6    Q    Do you know whether anyone other than
7  Mr. Klempf has access to his iCloud backup?
8    A    I do not know that.
9    Q    Isn't it possible that someone other than
10  Mr. Klempf could have stored or backed up information
11  into his iCloud?
12       MR. WELLS:  Object to the form.
13    A    I don't know the answer to that.
14    Q    If someone using a different phone other than
15  Mr. Klempf's iPhone 10 that had the credentials for
16  Mr. Klempf's Apple account, used those credentials on a
17  different phone, that information might be backed up in
18  the iCloud; isn't that right?
19    A    Again we're in hypothetical land here.  I guess
20  technically that would be possible.
21    Q    When did you become aware that the text
22  messages that were produced on September 14, 2018 were
23  outside the date range, the relevant date range?
24    A    When you informed me.
25    Q    What steps did you take, if any, after I

1  informed you that the text messages were outside the
2  date range?
3    A    Repeat that.
4       MR. WELLS:  Object to form.
5    Q    Did you undertake any additional steps to
6  identify any additional text messages after I informed
7  you that the text messages produced were outside of the
8  date range?
9    A    No, because I knew they were all collected.
10  Everything that was there was collected.
11    Q    So if it wasn't produced on September 14, 2018,
12  the data doesn't exist?
13    A    Correct.
14    Q    At a certain point in this case we had a
15  conference call where we discussed the fact that the ESI
16  produced by the Trust contained information other than
17  information collected from the Foodonics parties; is
18  that right?
19    A    Can you repeat?  I don't -- I don't understand
20  the question.
21    Q    I'll rephrase.  Did the Foodonics parties ever
22  produce ESI that was collected from someone other than
23  the Foodonics parties?
24    A    If we did, I'm not aware of it.
25    Q    Didn't some of the data that Foodonics produced

1   come from Mr. Monsky and his company?
2       A    Okay. I see what you're saying.
3            Yes, there was a production that we made that
4   inadvertently included the productions from two
5   nonparties, but those were productions that had been
6   made to both parties, so you already had those
7   documents.
8       Q    How did it come to be that the Trust was
9   producing documents -- sorry.
10           How did it come to be that the Foodonics
11  parties were producing documents to the Trust that the
12  Trust had produced to the Foodonics parties?
13      A    That was an error by KLDiscovery. They didn't
14  -- they include -- because those documents reside in our
15  database, so rather than only producing all the
16  Foodonics documents, they produced Foodonics documents
17  and Monsky documents. And I forget the third one, SMK,
18  or something. I don't remember what the third one was.
19           But it was mistake on their part by not
20  filtering out the other collections and only producing
21  the Foodonics documents.
22      Q    So was it you that instructed KLDiscovery to
23  make the production?
24      A    Yes.
25      Q    And did your instructions to KLDiscovery limit

1   the production to just ESI collected from the Foodonics
2   parties?
3       A    That's my recollection.
4       Q    Prior to us notifying you that the production
5   contained ESI from other custodians did you have any
6   knowledge that that had happened?
7       A    I did not.
8       Q    Did you take any steps after you became aware
9   of that production to ensure that no additional ESI from
10  other custodians had been produced?
11      A    Yes. I spoke with KLDiscovery, and we had a
12  harsh conversation about what had occurred.
13      Q    Did they admit that they made a mistake?
14      A    They admitted that it shouldn't have happened,
15  yeah. People aren't really fond of admitting mistakes.
16      Q    Was there anything other than the incidents we
17  just talked about where something happened that
18  shouldn't have happened with respect to the production
19  of ESI?
20           MR. WELLS: Object to the form.
21      A    Not that I can think of.
22      Q    When we initially received the production from
23  the Foodonics parties did the production include all of
24  the relevant metadata?
25      A    I don't recall. I mean, if it -- if it didn't,

1   it was quickly rectified with an overlay. But I'm
2   familiar with our ESI discovery protocol, and that was
3   certainly the instructions that KLDiscovery was given.
4       Q    So you never intentionally withheld metadata
5   related to a production?
6       A    Absolutely not.
7       Q    Let's move on to the next area of inquiry, area
8   8. Take a look at that and tell me when you're ready.
9       A    Okay.
10      Q    This area of inquiry relates to the actions
11  taken on behalf of Foodonics parties related to the
12  discovery status conference orders entered on the
13  following date.
14           The first item there is actually the ESI order
15  we talked about earlier; is that right?
16      A    That's what it says.
17      Q    The second item listed in paragraph B is
18  June 6, 2018 order?
19           MR. DIX: I'm going to mark that order as
20  Exhibit 27.
21           (Exhibit No. 27 was marked for identification.)
22      Q    Take a look at that order and let me know when
23  you're done.
24      A    Okay.
25      Q    Paragraph 2 of that order on page 2 states

1   that: By June 20, 2018, Foodonics International, Inc.,
2   Foodonics, shall produce to Miss Srochi and the Trust
3   transaction closing documents discussed during the
4   hearing, including the nondisclosure agreement, along
5   with any electronically stored information, ESI, that
6   can easily be retrieved by that date, and to which there
7   is no objection by Foodonics.
8            Did Foodonics comply with paragraph 2 of that
9   order?
10      A    I wasn't involved with the production of
11  documents, but as to the ESI we complied when it was
12  reasonably retrieved.
13      Q    So you were designated to testify about the
14  actions taken by Foodonics in connection with each of
15  the orders in this case; is that right?
16      A    Yeah. I know that there were documents
17  produced. I just didn't send them out myself.
18      Q    Do you know whether Foodonics complied with
19  paragraph 2 of the order entered on June 6th?
20      A    I believe we did to the extent possible, yes.
21      Q    What electronically stored information that can
22  reasonably be retrieved by that date and to which there
23  was no objection was produced by Foodonics by June 20,
24  2018?
25      A    No ESI.

1    Q    The first ESI produced in this case wasn't
2  produced until August 30, 2018; correct?
3    A    Correct.
4    Q    More than two months after the deadline in this
5  order; is that right?
6    A    Yes.
7    Q    Why was there a two-month delay?
8    A    Well, you know, there's things that need to
9  occur, especially when you're dealing with the volume of
10  data that we were dealing with.  As we have already
11  discussed, several things need to occur, the filtering,
12  the privilege -- privilege review, and all that, and all
13  that takes time.
14    Q    Weren't the documents that the Trust received
15  from the Foodonics parties on October 30th just a
16  production of everything responsive to the search
17  terms --
18    A    No.
19    Q    -- except for privilege?
20    A    Yes, ultimately.
21    Q    So if no review of the documents took place
22  prior to production, why did it take so long?
23    A    Well, I don't know that that decision was made
24  as of June 20th to produce everything.  I think that we
25  certainly wanted to review all these documents, but once

1  we talked to special counsel to talk about the cost
2  involved we determined that it was going to be something
3  like $90,000 to review them.  So ultimately we wound up
4  producing all non-privileged documents that hit on the
5  search terms, but that wasn't our position or our tactic
6  or strategy from day one.
7    Q    So the fact that a large volume of documents
8  were produced on August 30th wasn't because the search
9  terms were too broad, it was because there was no
10  subsequent review of those documents and ESI; right?
11    MR. WELLS:  Object to form.
12    A    I disagree with that.
13    Q    Why?
14    A    I -- the search terms were far too broad in
15  this case.
16    Q    But if no subsequent review took place then why
17  does it matter?
18    A    I guess it doesn't matter if you're not paying
19  the bill.
20    Q    But it was the Foodonics parties not paying the
21  bill to not review the documents; isn't that right?
22    A    Well, there's hosting costs, there's processing
23  costs, there's costs associated with this.
24    We have a database that we're -- we look at
25  routinely.  Every -- when there's larger amounts of data

1  everything takes longer and costs more.
2    Q    Had you decided that what you did -- to do what
3  you did in August and produce everything, you could have
4  produced all of the ESI earlier; isn't that right?
5    A    I think somewhat earlier perhaps, but still we
6  would have had to do a privilege review and filtering
7  and all of that, processing.  Loading.  It's not
8  clicking a button.
9    MR. DIX:  Let's mark another document.
10    (Exhibit No. 28 was marked for identification.)
11    Q    The document we just marked as Exhibit 28 is an
12  order that was entered by the court on August 22, 2018;
13  is that right?
14    A    Yes.
15    Q    Have you seen this order before?
16    A    Yes, I believe I have.
17    Q    And paragraph 1 of the order states:  Foodonics
18  International, Inc. shall produce to the trustees all
19  electronically stored documents for which search terms
20  are being contemplated from both Foodonics and Gray
21  Robinson no later than August 30, 2018.
22    Did Foodonics comply with that portion of the
23  order?
24    A    I believe so.
25    Q    Weren't there documents that were withheld

1  referred to as personal documents earlier in this
2  deposition?
3    A    Yes.
4    Q    And those documents weren't produced by
5  August 30th, were they?
6    A    They were still being reviewed.
7    Q    So the Foodonics parties didn't comply with the
8  first sentence in the first paragraph of this order;
9  right?
10    A    We complied in large part.
11    Q    The second sentence in paragraph 1 of the order
12  states:  Text messages from Kevin Jacques Klempf shall
13  be produced no later than September 7, 2018.
14    Did Foodonics comply with the second sentence
15  of paragraph 1 of this order?
16    A    We missed that deadline by a few days.
17    Q    The text messages were produced on
18  September 14, 2018; is that right?
19    A    Yes.
20    MR. DIX:  Mark another document.
21    (Exhibit No. 29 was marked for identification.)
22    Q    The document we just marked as Document 29 is
23  an order entered by the court on October 4, 2018, after
24  a status conference on October 2, 2018; is that right?
25    A    Yes.

1    Q    Paragraph 1 of that order states that:
2  Foodonics International shall produce to the trustees an
3  amended privilege log and any additional unprivileged
4  documents no later than October 12, 2018.  Is that
5  right?
6    A    **That's what it says, yes.**
7    Q    Did Foodonics comply with that portion of the
8  court's order?
9    A    **Again we missed the deadline by a few days, I**
10  **think because of travel schedules.**
11    Q    Aren't there still documents today that you
12  told me about earlier that are going to be produced at
13  some point in the future that are required to be
14  produced in order to comply with paragraph 1?
15    A    **There are additional documents that will**
16  **probably be removed from the privilege logs, yes.**
17    Q    So Foodonics has not yet complied with this
18  portion of the order?
19    A    **We have complied in large part.**
20    Q    The last sentence in paragraph 1 of the order
21  says:  A notice of compliance must be filed with the
22  court by this date as well.
23          Did Foodonics file a notice with the court on
24  October 12, 2018, or earlier?
25    A    **I don't know that.**

1    Q    As the designated representative of Foodonics
2  you don't know whether Foodonics complied with this
3  portion of the court's order?
4    A    **I believe we filed a notice of compliance when**
5  **we produced the additional documents.**
6    Q    Wasn't that notice filed after the court's
7  October 12, 2018 deadline?
8    A    **I believe that's right.**
9    Q    Paragraph 2 of the order states that:  The Gray
10  Robinson, PA documents shall be provided to the trustees
11  no later than October 17, 2018.
12          Were the Gray Robinson documents provided to
13  the trustee no later than October 17, 2018?
14    MR. WELLS:  Object to form.  He's here as a
15  Foodonics representative, not a Gray Robinson
16  representative.
17    Q    You can answer.
18    A    **I believe we were late on that deadline.**
19    Q    When the documents -- when the Gray Robinson,
20  PA documents were produced, was it Gray Robinson
21  producing those documents in response to a subpoena, or
22  the Foodonics parties producing the documents in
23  response to a request for production?
24    A    **I don't know.**
25    Q    You don't know whether Foodonics parties

1  produced the Gray Robinson documents?
2    A    **Well, I mean, if we're here to talk about Gray**
3  **Robinson, which I didn't think we were, Gray Robinson**
4  **responded to the document request served on Gray**
5  **Robinson.**
6    Q    I know.  My question is, did the Foodonics
7  parties produce those documents, or did Gray Robinson
8  produce them?
9    A    **Gray Robinson.**
10    Q    The Foodonics parties didn't produce any
11  documents from Gray Robinson?
12    A    **I guess I don't understand your question.  Are**
13  **you asking did they produce any documents that consisted**
14  **of correspondence with Gray Robinson?  I don't know.**
15    MR. WELLS:  Mr. Dix, I think you're aware that
16  the Gray Robinson documents in this order refers to
17  the documents subpoenaed by the Klempf Trust -- the
18  Trust, and Foodonics would not have been involved in
19  that, and we're not here on behalf of the 30(b)(6)
20  notice to testify about Gray Robinson production.
21    MR. DIX:  I'm simply trying to determine
22  whether any of the documents that were produced from
23  Gray Robinson were produced by the Foodonics
24  parties.
25    MR. WELLS:  Can you tell me under what stretch

1  of any imagination Foodonics, as a party, would be
2  producing its law firm documents?
3          I object to this entire line of questioning
4  related to Gray Robinson document production.
5    Q    Mr. Hancock, are you aware of whether
6  paragraph 2 of the court's order has been complied with?
7    MR. WELLS:  Same objection.
8    Q    You can still answer.
9    A    **I don't believe we met that date.**
10    Q    Have all the Gray Robinson documents been
11  produced as we sit here today?
12    A    **No.**
13    Q    When do you expect that those documents will be
14  produced?
15    MR. WELLS:  Again same objection to the line of
16  questioning as to Gray Robinson documents.
17    MR. DIX:  Noted.
18    MR. WELLS:  He can answer.
19    A    **I think we spoke earlier about it possibly**
20  **being within the next week.**
21    Q    Take a look back at the document that was
22  labeled as Exhibit 1 yesterday.
23    A    **Okay.**
24    Q    Do you see in paragraph 3 on the second page it
25  states:  No later than October 31, 2018, Foodonics must

1  provide the trustees with a list of password protected
2  documents from the recent production, as well as the
3  corresponding passwords.
4      Did Foodonics comply with paragraph 3 of this
5  court's order?
6      A    Not by October 31st.
7      Q    When did Foodonics comply with paragraph 3 in
8  this court's order?
9      A    I provided 33 additional ones yesterday.
10     Q    Are there any additional documents beyond what
11 was produced yesterday that need to be produced in order
12 to comply with paragraph 3 of this court's order?
13     A    No, because we don't have the corresponding
14 passwords.
15     Q    So it was yesterday that Foodonics finally
16 complied with paragraph 3 of the court order; is that
17 right?
18     MR. WELLS:  Object to form.
19     A    No.  We had previously provided some documents
20 that were password protected, but based on our -- our
21 last meet and confer you kindly suggested some options,
22 some things we could look for.  After that I did a bunch
23 of research and found 33 more that we unlocked.
24     Q    Were any password protected documents produced
25 on or before October 31, 2018?

1      A    Yes.
2      MR. DIX:  Let's go off the record.
3      THE VIDEOGRAPHER:  We are off the record.  The
4  time is 2:25 p.m.
5      (Short break.)
6      THE VIDEOGRAPHER:  We are back on the record.
7  The time is 2:37 p.m.
8      MR. DIX:  I have no further questions at this
9  time, but before Mr. Wells has his chance to ask
10 questions I want to note for the record that this
11 deposition is not concluded.  There are still
12 documents that have not been produced to us that
13 need to be produced to us, and so we're going to
14 continue this deposition until a date that counsel
15 will agree upon, preferably in December, after which
16 that -- that date will be a time after which the
17 documents that we're entitled to receive have been
18 produced.
19     The records we have talked about thus far are
20 the phone billing records for Mr. Klempf's phone
21 provider, the information from Apple, the KLD
22 billing records, any Gray Robinson billing records
23 which would reflect information we have discussed,
24 and any information regarding iTunes backups that
25 might be available on any of Mr. Klempf's computers.

1      MR. WELLS:  In response, on behalf of the
2  plaintiff and the counterclaim defendants we would
3  object to a continuation of the deposition.  We can
4  assert the bases for those at an appropriate time.
5      We have no difficulty in producing records that
6  are not privileged, even though those records were
7  not the subject of the notice.  We certainly would
8  object to producing Gray Robinson invoices and
9  billing records to Mr. Klempf.
10     But depending on whether a continuation of this
11 deposition occurs or not we will withhold any
12 cross-examination of Mr. Hancock as the Foodonics
13 representative, and if the deposition is ultimately
14 transcribed we will read.
15     MR. DIX:  We're adjourned for today.
16     THE VIDEOGRAPHER:  This conclude today's
17 deposition.  The time is 2:39 p.m.
18     (The deposition adjourned at 2:39 p.m.)
19
20                    - - -
21
22
23
24
25

1  **CERTIFICATE OF OATH**
2
3  STATE OF FLORIDA)
                    )
4  COUNTY OF DUVAL )
5
6      I, the undersigned authority, certify that
7  DAVID HANCOCK, personally appeared before me and was
8  duly sworn.
9
10     WITNESS my hand and official seal this 20th day
11 of December 2018.
12
13
14  _____
        Terry T. Hurley, RPR
15
16
17
18
19
20
21
22
23
24
25

1 **REPORTER'S DEPOSITION CERTIFICATE**

2

3 STATE OF FLORIDA)
 )
4 COUNTY OF DUVAL )

5

6     I, Terry T. Hurley, Registered Professional Reporter, certify that I was authorized to and did stenographically report the deposition of DAVID HANCOCK;
7 that a review of the transcript was requested; and that the transcript is a true and complete record of my
8 stenographic notes.

9     I further certify that I am not a relative, employee, attorney, or counsel of any of the parties,
10 nor am I a relative or employee of any of the parties' attorney or counsel connected with the action, nor am I
11 financially interested in the action.

12     DATED this 20th day of December 2018.

13

14

15         _____

16         Terry T. Hurley, RPR

17
18
19
20
21
22
23
24
25

        Hedquist & Associates Reporters, Inc.

---

1         **ERRATA SHEET**

2     **DO NOT WRITE ON TRANSCRIPT - ENTER CHANGES HERE**

3 In re: Foodonics v Srochi, et al.
     Date of deposition: November 29, 2018
4

5 PAGE NO.   LINE NO.     CHANGE       REASON

6     _____

7     _____

8     _____

9     _____

10     _____

11     _____

12     _____

13     _____

14     _____

15     _____

16     _____

17     _____

18     _____

19     _____

20     _____

21

22 Under penalties of perjury, I declare that I have read
     my deposition and that it is true and correct, subject
23 to any changes in form or substance entered here.

24 _____     _____
     DATE         DAVID HANCOCK
25 (th)

        Hedquist & Associates Reporters, Inc.

# TAB 73

**From:** James H. Post [mailto:jpost@smithhulsey.com]
**Sent:** Friday, November 30, 2018 5:15 PM
**To:** Grier Wells
**Cc:** David A. Hancock, CEDS; Chris Dix
**Subject:** RE: Foodonics v. Klempf Trust - Meet and Confer

Grier,

As we informed you yesterday, the 30(b)(6) deposition of the designated representative for Foodonics, David Hancock, has been continued so that your clients can complete the production of the following ESI and other information as required by Court Order, the Federal Rules of Civil Procedure or as stipulated to by you and your clients during the deposition:

A.    The documents and ESI as described in the Trust's request for production served on you on November 9, 2018:

1.    Documents or ESI sufficient to identify the make, model and carrier of each of Your mobile devices and the condition and location of each such device during the relevant time period. Jacques and I both testified re him having an iPhone 7 that was dropped and damaged such that, in 01/18 he got an iPhone 10 and had all the data from the 7 copied to the iPhone 10. He then had the iPhone 7 repaired, wiped clean, and then eventually gave it to an aspiring pro golfer. We can provide the receipt from The Apple Store.

2.    Documents or ESI sufficient to identify the location of any backups of data for each of Your mobile devices (iCloud, iTunes, VerizonCloud/ATT Locker, laptop or desktop computer backups, etc.) during the relevant time period. We have identified 5 iTunes back-ups. They are dated 3/28/17 @ 1:35 PM, 3/28/17 @ 2:25 PM, 4/25/15 @ 2:25 PM, 6/26/16 @ 5:45 PM, and 3/1/15 @ 10:30 AM. I have requested reporting for those back-ups. We also identified about 2,400 iChats for which I have also requested reporting.

3.    All documents or items of ESI (including receipts, invoices, messages or bills) relating or referring to any iPhone or other mobile device owned by You which was damaged, lost, replaced or otherwise disposed during the relevant time period. Receipt from The Apple Store in January 2018.

4.    The phone records or other documents or ESI sufficient to identify the dates and total number of all phone calls exchanged between You and Dolph Baker on each of

Your mobile devices during the relevant time period. Jacques has requested phone records back to 2010 (I assume he can't get any from further back). He was told he would get them in approx. 30 days.

5.        The phone records or other documents or ESI sufficient to identify the dates and total number of all text messages exchanged between You and Dolph Baker on each of Your mobile devices during the relevant time period. See response to No. 4 above.

These are the same ESI and documents you represented to the Court that would be voluntarily produced by your clients at or before his November 28, 2018 deposition. Of course, none of these records were produced before or at the deposition.

B.        Invoices, billing records and statements describing any services rendered by KLDiscovery to the GrayRobinson firm or its clients in the referenced case, including services to identify, preserve, collect, process, search, review, analyze or produce ESI (and the dates on which those services were provided). I provided you with all KLDiscovery invoices on Friday.

C.        The results of the search and examination by a KLDiscovery forensic examiner (or other qualified expert) of the forensic images of Jacques Klempf's desktop computer and two laptop computers created by KLDiscovery in April or May of 2018 to determine whether any backups of Mr. Klempf's phone data were created or stored by iTunes. See response to No. 2 above.

D.        Documents or ESI from Microsoft which reflect the date(s) on which DixieEgg.com email accounts (including the email account of Richard Still) were terminated and, if different, the date(s) on which the data for each of those accounts was deleted or could no longer be retrieved. I don't know if this is available. I think Jacques needs to pursue this with Microsoft since he now knows whom to contact. While he's communicating with them, he needs to find out why his cellphone has text messages older than 30 days when he just very recently changed his retention setting from 30 days back to Forever.

E.        The data associated with Jacques Klempf's Apple ID account that Jacques Klempf requested and obtained from Apple after visiting the following website: https://privacy.apple.com/. The Apple data (1) should be collected by a KLDiscovery forensic examiner (or other qualified expert) and (2) need not include the following categories of ESI: (i) App Store, iTunes Store, iBooks Store and Apple Music activity, (ii) Marketing subscriptions, downloads and other activity, (iii) Game Center activity, (iv) iCloud Bookmarks and Reading List, (v) Maps data

or (vi) iCloud Photos. We will work on this. FYI, whenever I try to access this data, Jacques is sent a text with a code necessary to access it (it's called 2 factor authentication). As such, I will coordinate with Jacques to give him a heads up about the code coming (since it is very time sensitive).

F.      The production of a revised privilege log on behalf of Foodonics and Jacques Klempf and the corresponding production of all unprivileged documents. This requires further analysis from you and/or Jim.

We are sending you a notice of continued deposition today. As usual, we will reasonably attempt to accommodate the schedules of counsel, parties and the witness. The completion of this deposition, however, is dependent upon the completion of the production from your clients – all of which needs to be completed as soon as practicable, but no later than January 11, 2019.

Please let me know if you have any questions regarding the foregoing.

Jim
James H. Post
<image001.png>
One Independent Drive | Suite 3300 | Jacksonville, Florida 32202
904-359-7700 | Direct 904-359-7783
jpost@smithhulsey.com | www.smithhulsey.com

<image003.png>

*This message is from a law firm and may contain information that is confidential or legally privileged. If you are not the intended recipient, please immediately advise the sender by reply email that this message has been inadvertently transmitted to you and delete this email from your system. Thank you for your cooperation.*

**TAB 74**

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

FOODONICS INTERNATIONAL, INC., )
a Florida corporation,
                              )
        Plaintiff,
                              )
v.                                      Case No. 3:17-cv-1054-J-32JRK
                              )
DINA KLEMPF SROCHI, as Trustee
of the LAURA JEAN KLEMPF      )
REVOCABLE TRUST, a Georgia trust,
                              )
        Defendant.
                              )
_____ )

DINA KLEMPF SROCHI, as Trustee )
of the LAURA JEAN KLEMPF
REVOCABLE TRUST, a Florida trust, )
and DENNIS L. BLACKBURN, as
Assistant Trustee of the JEAN KLEMPF )
TRUST,
                              )
        Counterclaim Plaintiffs,
                              )
v.
                              )
FOODONICS INTERNATIONAL, INC.,
a Florida corporation, and KEVIN )
JACQUES KLEMPF,
                              )
        Counterclaim Defendants.
_____ )

## NOTICE OF CONTINUATION OF RULE 30(b)(6)
## DEPOSITION OF FOODONICS INTERNATIONAL, INC.
## <u>REGARDING THE PRODUCTION OF ESI AND DOCUMENTS</u>

Please take notice that counterclaim plaintiffs, Dina Klempf Srochi, as Trustee

of the Laura Jean Klempf Revocable Trust, and Dennis Blackburn, as Assistant Trustee

of the Jean Klempf Trust, will take the continued videotaped deposition of Foodonics International, Inc. ("Foodonics") on January 4, 2019, beginning at 9:30 a.m., at the offices of Hedquist & Associates, 345 East Forsyth Street, Jacksonville, Florida 32202, before an officer authorized by law to administer oaths and take depositions. This deposition will be videotaped by Advantage Video Productions, Inc., 9951 Atlantic Boulevard, Suite 101, Jacksonville, Florida 32225.

On November 9, 2018, the Trust filed a Motion to Shorten Time for the Production of Documents (Doc. 78) seeking production of information prior to the depositions of Jacques Klempf and Foodonics on November 28-29, 2019. The motion was opposed by Jacques Klempf as "unnecessary" because he represented through counsel that such ESI and documentation would be voluntarily produced before or at the depositions (Doc. 79). None of the requested ESI or documents, however, was produced prior to the depositions.

This deposition is being continued because Foodonics has not yet completed the production of the documents, ESI and other information described in Exhibit A as required by Court Order, the Federal Rules of Civil Procedure or as stipulated by counsel for Jacques Klempf and Foodonics during the depositions of those parties on November 28-29, 2018.

Pursuant to Rule 30(b)(6), Federal Rules of Civil Procedure, Foodonics is required to designate one or more officers, directors, managing agents, or other persons

who consent to do so, to testify on its behalf concerning the areas of inquiry set forth

in Exhibit A to the Amended Notice of Deposition served on November 14, 2018.


SMITH HULSEY & BUSEY


By:  /s/ James H. Post
        James H. Post
        Michael E. Demont
        R. Christopher Dix

        Florida Bar Number 175460
        Florida Bar Number 364088
        Florida Bar Number 036988
        One Independent Drive, Suite 3300
        Jacksonville, Florida  32202
        (904) 359-7700
        (904) 359-7708 (facsimile)
        jpost@smithhulsey.com
        mdemont@smithhulsey.com
        cdix@smithhulsey.com

        Attorneys for Dina Klempf Srochi, as
          Trustee, and Dennis L. Blackburn,
          as Assistant Trustee, of the Laura Jean
          Klempf Revocable Trust

Certificate of Service

I certify that on November 30, 2018, a copy of this document has been furnished

by email to:

S. Grier Wells, Esq.
GrayRobinson, P.A.
50 North Laura Street, Suite 1100
Jacksonville, Florida 32202
grier.wells@gray-robinson.com
barbara.rude@gray-robinson.com



/s/ James H. Post
Attorney

c:      Hedquist & Associates
        (904) 354-4111
        hedquist@bellsouth.net

        Advantage Video
        (904) 724-9006
        scheduling@advantagevideo.com

1020033.2

**From:** James H. Post
**Sent:** Friday, November 30, 2018 5:15 PM
**To:** grier.wells@gray-robinson.com
**Cc:** david.hancock@gray-robinson.com; Chris Dix <cdix@smithhulsey.com>
**Subject:** RE: Foodonics v. Klempf Trust - Meet and Confer

Grier,

As we informed you yesterday, the 30(b)(6) deposition of the designated representative for Foodonics, David Hancock, has been continued so that your clients can complete the production of the following ESI and other information as required by Court Order, the Federal Rules of Civil Procedure or as stipulated to by you and your clients during the deposition:

A.     The documents and ESI as described in the Trust's request for production served on you on November 9, 2018:

1.     Documents or ESI sufficient to identify the make, model and carrier of each of Your mobile devices and the condition and location of each such device during the relevant time period.

2.     Documents or ESI sufficient to identify the location of any backups of data for each of Your mobile devices (iCloud, iTunes, VerizonCloud/ATT Locker, laptop or desktop computer backups, etc.) during the relevant time period.

3.     All documents or items of ESI (including receipts, invoices, messages or bills) relating or referring to any iPhone or other mobile device owned by You which was damaged, lost, replaced or otherwise disposed during the relevant time period.

4.     The phone records or other documents or ESI sufficient to identify the dates and total number of all phone calls exchanged between You and Dolph Baker on each of Your mobile devices during the relevant time period.

5.     The phone records or other documents or ESI sufficient to identify the dates and total number of all text messages exchanged between You and Dolph Baker on each of Your mobile devices during the relevant time period.

These are the same ESI and documents you represented to the Court that would be voluntarily produced by your clients at or before his November 28, 2018 deposition. Of course, none of these records were produced before or at the deposition.

B.     Invoices, billing records and statements describing any services rendered by KLDiscovery to the GrayRobinson firm or its clients in the referenced case, including services to identify, preserve, collect, process, search, review, analyze or produce ESI (and the dates on which those services were provided).

**EXHIBIT A**

C.   The results of the search and examination by a KLDiscovery forensic examiner (or other qualified expert) of the forensic images of Jacques Klempf's desktop computer and two laptop computers created by KLDiscovery in April or May of 2018 to determine whether any backups of Mr. Klempf's phone data were created or stored by iTunes.

D.   Documents or ESI from Microsoft which reflect the date(s) on which DixieEgg.com email accounts (including the email account of Richard Still) were terminated and, if different, the date(s) on which the data for each of those accounts was deleted or could no longer be retrieved.

E.   The data associated with Jacques Klempf's Apple ID account that Jacques Klempf requested and obtained from Apple after visiting the following website: https://privacy.apple.com/.   The Apple data (1) should be collected by a KLDiscovery forensic examiner (or other qualified expert) and (2) need not include the following categories of ESI: (i) App Store, iTunes Store, iBooks Store and Apple Music activity, (ii) Marketing subscriptions, downloads and other activity, (iii) Game Center activity, (iv) iCloud Bookmarks and Reading List, (v) Maps data or (vi) iCloud Photos.

F.   The production of a revised privilege log on behalf of Foodonics and Jacques Klempf and the corresponding production of all unprivileged documents.

We are sending you a notice of continued deposition today.  As usual, we will reasonably attempt to accommodate the schedules of counsel, parties and the witness.  The completion of this deposition, however, is dependent upon the completion of the production from your clients – all of which needs to be completed as soon as practicable, but no later than January 11, 2019.

Please let me know if you have any questions regarding the foregoing.

Jim
James H. Post

SMITH HULSEY & BUSEY

One Independent Drive | Suite 3300 | Jacksonville, Florida 32202
904-359-7700 | Direct 904-359-7783
jpost@smithhulsey.com | www.smithhulsey.com



YEARS
OF PRACTICE
EXCELLENCE

*This message is from a law firm and may contain information that is confidential or legally privileged. If you are not the intended recipient, please immediately advise the sender by reply email that this message has been inadvertently transmitted to you and delete this email from your system. Thank you for your cooperation.*

**TAB 75**

**From:** Grier Wells [mailto:Grier.Wells@gray-robinson.com]
**Sent:** Friday, December 7, 2018 3:50 PM
**To:** James H. Post <jpost@smithhulsey.com>; Chris Dix <cdix@smithhulsey.com>
**Cc:** David A. Hancock, CEDS <David.Hancock@gray-robinson.com>; James Nolan
<James.Nolan@gray-robinson.com>
**Subject:** Fwd: Foodonics v. Klempf Trust - Meet and Confer

Sent from my iPhone

**Grier Wells | Complex Commercial, Employment and Construction Litigation**
**The Florida Bar Board Certified in Civil Trial Law**
**G R A Y | R O B I N S O N**

50 North Laura Street, Suite 1100 | Jacksonville, Florida 32202
**T:** 904-598-9929 | **F:** 904-598-9109 | **D:** 904-632-8478
E-mail | Website | Bio | vCard

**Facebook | LinkedIn | Twitter**

Begin forwarded message:

Jim:

In response to your e-mail below, please note the following comments:

A.

1.    Jacques and Dave Hancock both testified about the
iPhone 7 being dropped and damaged such that, in 01/18 Jacqujes
got an iPhone 10 and had all the data from the 7 copied to the
iPhone 10. He then had the iPhone 7 repaired, wiped clean, and
then eventually gave it to an aspiring pro golfer. We can provide
the receipt from The Apple Store.

2.    We have identified 5 iTunes back-ups. They are dated
3/28/17 @ 1:35 PM, 3/28/17 @ 2:25 PM, 4/25/15 @ 2:25
PM, 6/26/16 @ 5:45 PM, and 3/1/15 @ 10:30 AM. I have
requested reporting for those back-ups. We also identified
about 2,400 iChats for which we have also requested
reporting.

3.    Receipt from The Apple Store in January 2018.

4.    Jacques requested phone records and was advised they
can be available from 2010 in approximately 30 days.

5.    See response to No. 4 above.

B.    All KLDiscovery invoices have been provided.

C.      See response to No. 2 above.

D.      We don't know if this is available but are inquiring of Microsoft.

E.      We will address this further.

F.      Jim Nolan and I are finalizing this effort as noted last Friday.

**TAB 76**

**From:** James H. Post
**Sent:** Friday, December 7, 2018 3:28 PM
**To:** grier.wells@gray-robinson.com
**Cc:** Chris Dix <cdix@smithhulsey.com>
**Subject:** Jean Klempf Trust - Triage Report of iChats

Grier,

In regard to your email below:

1. We have not yet received any information or "different emails" from you regarding the "secured iTunes back ups" you have apparently found. Please provide that information to us at this time.

2. The discovery of Jacques Klempf's 2,300 iChat files raises several questions which we will address at the 30(b)(6) deposition to be continued on January 4, 2019.

   In the meantime, any iChat files which are responsive to our discovery requests served on your clients should be reviewed by your firm and produced to us as soon as possible but, in any event, no later than December 14, 2018.

   Alternatively, we will accept the production of all 2,300 iChat files at this time without your review.

   In either event, the iChat production will need to be in the format and manner proscribed by the ESI Protocol Order entered in this case.

Thank you,
Jim

James H. Post

SMITH HULSEY & BUSEY

One Independent Drive | Suite 3300 | Jacksonville, Florida 32202
904-359-7700 | Direct 904-359-7783
jpost@smithhulsey.com | www.smithhulsey.com



YEARS
OF PRACTICE
EXCELLENCE

*This message is from a law firm and may contain information that is confidential or legally privileged. If you are not the intended recipient, please immediately advise the sender by reply email that this message has been inadvertently transmitted to you and delete this email from your system. Thank you for your cooperation.*

**From:** Grier Wells [mailto:Grier.Wells@gray-robinson.com]
**Sent:** Thursday, December 6, 2018 3:21 PM
**To:** James H. Post <jpost@smithhulsey.com>; Chris Dix <cdix@smithhulsey.com>
**Cc:** David A. Hancock, CEDS <David.Hancock@gray-robinson.com>; James Nolan
<James.Nolan@gray-robinson.com>
**Subject:** FW: Jean Klempf Trust - Triage Report of iChats

Jim and Chris:

After the 30(b)(6) depositions last week, as we advised we would do, we asked KLDiscovery to
re-examine the forensic images that were done of Mr. Klempf's 2 Apple laptops and 1 PC. We
were ostensibly looking for iTunes back-ups. In addition to finding several iTunes back-ups (as
delineated in a different email), we were reminded that there are approximately 2300 iChat
files. We were advised by Jacques that he didn't use iChat for anything related to this
litigation. So, while we preserved them, we didn't do anything with them. However, in
reviewing the attached Data Triage Report, we saw some entries to Still, Reese, Monsky and at
least one to Dolph Baker. The overwhelming majority are to family members.

Based on information and belief, we still believe these communications to have no bearing on
this matter. However, we are inviting you to identify for us the ones you think might be
Responsive. We only see iChats dated in 2017 and 2018. Of course none of the iChats dated
after 1/19/18 would be Responsive.

Please advise.


**Grier Wells | Complex Commercial, Employment and Construction Litigation**
**The Florida Bar Board Certified in Civil Trial Law**
**G R A Y | R O B I N S O N**

50 North Laura Street, Suite 1100 | Jacksonville, Florida 32202
**T:** 904-598-9929 | **F:** 904-598-9109 | **D:** 904-632-8478
E-mail | Website | Bio | vCard

**Facebook | LinkedIn | Twitter**

This e-mail is intended only for the individual(s) or entity(s) named within the message. This e-mail might contain legally
privileged and confidential information. If you properly received this e-mail as a client or retained expert, please hold it in
confidence to protect the attorney-client or work product privileges. Should the intended recipient forward or disclose this
message to another person or party, that action could constitute a waiver of the attorney-client privilege. If the reader of this
message is not the intended recipient, or the agent responsible to deliver it to the intended recipient, you are hereby notified that
any review, dissemination, distribution or copying of this communication is prohibited by the sender and to do so might constitute
a violation of the Electronic Communications Privacy Act, 18 U.S.C. section 2510-2521. If this communication was received in
error we apologize for the intrusion. Please notify us by reply e-mail and delete the original message without reading same.
Nothing in this e-mail message shall, in and of itself, create an attorney-client relationship with the sender.

**TAB 77**

**From:** James H. Post
**Sent:** Friday, December 7, 2018 3:28 PM
**To:** grier.wells@gray-robinson.com
**Cc:** Chris Dix <cdix@smithhulsey.com>
**Subject:** Jean Klempf Trust - Triage Report of iChats

Grier,

In regard to your email below:

1. We have not yet received any information or "different emails" from you regarding the "secured iTunes back ups" you have apparently found. Please provide that information to us at this time.

2. The discovery of Jacques Klempf's 2,300 iChat files raises several questions which we will address at the 30(b)(6) deposition to be continued on January 4, 2019.

   In the meantime, any iChat files which are responsive to our discovery requests served on your clients should be reviewed by your firm and produced to us as soon as possible but, in any event, no later than December 14, 2018.

   Alternatively, we will accept the production of all 2,300 iChat files at this time without your review.

   In either event, the iChat production will need to be in the format and manner proscribed by the ESI Protocol Order entered in this case.

Thank you,
Jim

James H. Post

SMITH HULSEY & BUSEY

One Independent Drive | Suite 3300 | Jacksonville, Florida 32202
904-359-7700 | Direct 904-359-7783
jpost@smithhulsey.com | www.smithhulsey.com



YEARS
OF PRACTICE
EXCELLENCE

*This message is from a law firm and may contain information that is confidential or legally privileged. If you are not the intended recipient, please immediately advise the sender by reply email that this message has been inadvertently transmitted to you and delete this email from your system. Thank you for your cooperation.*

**From:** Grier Wells [mailto:Grier.Wells@gray-robinson.com]
**Sent:** Thursday, December 6, 2018 3:21 PM
**To:** James H. Post <jpost@smithhulsey.com>; Chris Dix <cdix@smithhulsey.com>
**Cc:** David A. Hancock, CEDS <David.Hancock@gray-robinson.com>; James Nolan
<James.Nolan@gray-robinson.com>
**Subject:** FW: Jean Klempf Trust - Triage Report of iChats

Jim and Chris:

After the 30(b)(6) depositions last week, as we advised we would do, we asked KLDiscovery to
re-examine the forensic images that were done of Mr. Klempf's 2 Apple laptops and 1 PC. We
were ostensibly looking for iTunes back-ups. In addition to finding several iTunes back-ups (as
delineated in a different email), we were reminded that there are approximately 2300 iChat
files. We were advised by Jacques that he didn't use iChat for anything related to this
litigation. So, while we preserved them, we didn't do anything with them. However, in
reviewing the attached Data Triage Report, we saw some entries to Still, Reese, Monsky and at
least one to Dolph Baker. The overwhelming majority are to family members.

Based on information and belief, we still believe these communications to have no bearing on
this matter. However, we are inviting you to identify for us the ones you think might be
Responsive. We only see iChats dated in 2017 and 2018. Of course none of the iChats dated
after 1/19/18 would be Responsive.

Please advise.


**Grier Wells | Complex Commercial, Employment and Construction Litigation**
**The Florida Bar Board Certified in Civil Trial Law**
**G R A Y | R O B I N S O N**

50 North Laura Street, Suite 1100 | Jacksonville, Florida 32202
**T:** 904-598-9929 | **F:** 904-598-9109 | **D:** 904-632-8478
E-mail | Website | Bio | vCard


**Facebook | LinkedIn | Twitter**

This e-mail is intended only for the individual(s) or entity(s) named within the message. This e-mail might contain legally
privileged and confidential information. If you properly received this e-mail as a client or retained expert, please hold it in
confidence to protect the attorney-client or work product privileges. Should the intended recipient forward or disclose this
message to another person or party, that action could constitute a waiver of the attorney-client privilege. If the reader of this
message is not the intended recipient, or the agent responsible to deliver it to the intended recipient, you are hereby notified that
any review, dissemination, distribution or copying of this communication is prohibited by the sender and to do so might constitute
a violation of the Electronic Communications Privacy Act, 18 U.S.C. section 2510-2521. If this communication was received in
error we apologize for the intrusion. Please notify us by reply e-mail and delete the original message without reading same.
Nothing in this e-mail message shall, in and of itself, create an attorney-client relationship with the sender.

# TAB 78

**From:** James H. Post [mailto:jpost@smithhulsey.com]
**Sent:** Tuesday, December 18, 2018 2:50 PM
**To:** Grier Wells
**Cc:** David A. Hancock, CEDS; Chris Dix
**Subject:** RE: Foodonics v. Klempf Trust - Meet and Confer

This message originated outside of GrayRobinson.

Grier,

Your email below exacerbates the questions and concerns we have regarding the deficiencies and sluggishness surrounding your client's discovery production in this case, including the following:

1. We have not received any documents or ESI in response to the Trust's Request for Production to Jacques Klempf served on November 9, 2018. The deadline for that production was Monday, December 20, 2018.

   **Do you intend to serve a response and produce the requested documents and ESI? If so, when?**

2. We have not been provided with any of the 2,400 iChat messages referenced in your email below. **Do you intend to produce the responsive iChat messages? If so, when?**

3. In regard to your belated "discovery" of your client's 5 iTunes backups, you are required to immediately produce all text messages responsive to the Trust's discovery requests that KLDiscovery can be retrieve from those 5 iTunes backups, including all text messages exchanged between Jacques Klempf and Dolph Baker during the relevant time period (September 1, 2008 – January 19, 2018).

   **Will you be producing Jacques Klempf's text messages and the other responsive information from the iTunes backups, as requested? If so, when?**

4. **Do you intend to produce a revised privilege log together with a corresponding production of all non-privileged documents? If so, when?**

5. **Do you intend to produce any documents or ESI from Microsoft which reflect the date(s) on which DixieEgg.com email accounts (including the email account of Richard Still) where terminated and, if different, the date(s) on which the data for each of those accounts was deleted or could no longer be retrieved? If so, when?**

Please note that, although your email below states that Jacques Klempf "needs to pursue this with Microsoft," the production of documents and ESI in this case is your firm's professional responsibility and -- your firm and, if necessary, KLDiscovery or some other IT professional -- need to obtain the information from Microsoft -- not Jacques Klempf who admitted in his deposition that (i) he has no expertise in this area, and (ii) his prior inept attempts to obtain this information from Microsoft ended in failure.

6.    **Do you intend to produce the data associated with Jacques Klempf's Apple ID account that Jacques Klempf requested and obtained from Apple after visiting https://privacy.apple.com/?" If so, when?**

Again, the collection and production of this information is your firm's professional responsibility -- you cannot simply assert that this information cannot be obtained because Jacques Klempf -- who has no technical expertise -- allegedly made unsuccessful efforts to collect this information from Apple.

7.    Your email below states that Jacques Klempf has requested phone records going back to the year 2010 and anticipates receipt of those phone records in approximately 30 days.

**Do you intend to produce Jacques Klempf's phone records dating back to 2010? If so, when?**

Please respond to these questions on or before Friday, December 21, 2018.

Thank you,
Jim

James H. Post

<image001.png>
One Independent Drive | Suite 3300 | Jacksonville, Florida 32202
904-359-7700 | Direct 904-359-7783
jpost@smithhulsey.com | www.smithhulsey.com

<image002.png>

*This message is from a law firm and may contain information that is confidential or legally privileged. If you are not the intended recipient, please immediately advise the sender by reply email that this message has been inadvertently transmitted to you and delete this email from your system. Thank you for your cooperation.*

**TAB 79**

On Dec 26, 2018, at 4:20 PM, Grier Wells <Grier.Wells@gray-robinson.com> wrote:

In response to your e-m ail below, please note the following:

1.      We will file a response no later than January 8, perhaps sooner.   As I indicated last week, I will be out on a domestically mandated trip to D.C. through the 3rd but I may be able to coordinate a response while away.

2.      We were informed by our client that there would be nothing Responsive in them.  For that reason, we didn't Produce anything from them previously.  However, in the spirit of full disclosure, we sent you the Triage Report for them and asked what, if anything, you wanted from the list (which shows very few instances of items NOT from friends or family).  Rather than tell us what you want, you've "offered" to take them all (which would no doubt be followed by a complaint to the Court that we did a data dump or Produced Non-Responsive documents.  We don't believe there is anything there that is Responsive but we offered the entire Report so that you could ask for the ones you thought might be Responsive.  Our offer stands.

3.      Be advised that one of the 5 iTunes back-ups m is corrupt and unable to be read.  Another one is from Mr. Klempf's Stepdaughter's (Eden) phone.  As for the remaining 3, we are in the process of reviewing the text messages in order to find any that are Responsive.  We can Produce those text messages before the New Year.

4.      We are in the end stages of finalizing the revisions to the GrayRobinson and Foodonics Privilege Logs.  We can Produce the documents being removed from them (as Supplemental Productions) and send updated/revised Privilege Logs before the New Year.

5.      We do not presently have the referenced information but will continue our efforts to determine the information.

6.      We have reviewed the Apple information we have been able to access and have found nothing additional responsive.  However, we are continuing our efforts to access whatever additional data may be available.

7.      See response to number 1 above.

**Grier Wells | Complex Commercial, Employment and Construction Litigation**
**The Florida Bar Board Certified in Civil Trial Law**
**G R A Y | R O B I N S O N**

50 North Laura Street, Suite 1100 | Jacksonville, Florida 32202
**T: 904-598-9929 | F: 904-598-9109 | D: 904-632-8478**
E-mail | Website | Bio | vCard

**Facebook | LinkedIn | Twitter**

# TAB 80

**From:** James H. Post
**Sent:** Thursday, January 3, 2019 2:08 PM
**To:** grier.wells@gray-robinson.com
**Subject:** FW: Foodonics v. Klempf Trust - Meet and Confer

Grier,

      You requested that we reschedule the continued deposition of the Foodonics Rule 30(b)(6) representative on discovery problems which was scheduled for January 4, 2019.

      In my email of December 26, 2018, I proposed alternative dates for the rescheduling of that deposition, but have not received a response from you. Accordingly, attached is an amended notice of the continuation of that deposition which we have now scheduled for Thursday, January 24, 2019.

      If the date does not work for you or the deponent, please let me know as soon as possible. We will be willing to discuss an alternative date provided that it is reasonably soon.

      The deficient and sluggish discovery responses from your client and your firm in this case must come to an end.

Jim

James H. Post

SMITH HULSEY & BUSEY

One Independent Drive | Suite 3300 | Jacksonville, Florida 32202
904-359-7700 | Direct 904-359-7783
jpost@smithhulsey.com | www.smithhulsey.com



YEARS
OF PRACTICE
EXCELLENCE

*This message is from a law firm and may contain information that is confidential or legally privileged. If you are not the intended recipient, please immediately advise the sender by reply email that this message has been inadvertently transmitted to you and delete this email from your system. Thank you for your cooperation.*

**From:** James H. Post
**Sent:** Wednesday, December 26, 2018 5:12 PM
**To:** Grier Wells <Grier.Wells@gray-robinson.com>
**Cc:** David A. Hancock, CEDS <David.Hancock@gray-robinson.com>; Chris Dix <cdix@smithhulsey.com>
**Subject:** Re: Foodonics v. Klempf Trust - Meet and Confer


Grier,

I am willing to reschedule the January 4 continued deposition as a courtesy to you, but we need a firm reschedule date. I recommend January 16, 17 or 18.

Please confirm. Jim

Sent from my iPhone

On Dec 26, 2018, at 4:20 PM, Grier Wells <Grier.Wells@gray-robinson.com> wrote:

In response to your e-m ail below, please note the following:

1.　　We will file a response no later than January 8, perhaps sooner.  As I indicated last week, I will be out on a domestically mandated trip to D.C. through the 3rd but I may be able to coordinate a response while away.

2.　　We were informed by our client that there would be nothing Responsive in them.  For that reason, we didn't Produce anything from them previously.  However, in the spirit of full disclosure, we sent you the Triage Report for them and asked what, if anything, you wanted from the list (which shows very few instances of items NOT from friends or family).  Rather than tell us what you want, you've "offered" to take them all (which would no doubt be followed by a complaint to the Court that we did a data dump or Produced Non-Responsive documents.  We don't believe there is anything there that is Responsive but we offered the entire Report so that you could ask for the ones you thought might be Responsive.  Our offer stands.

3.　　Be advised that one of the 5 iTunes back-ups m is corrupt and unable to be read.  Another one is from Mr. Klempf's Stepdaughter's (Eden) phone.  As for the remaining 3, we are in the process of reviewing the text messages in order to find any that are Responsive.  We can Produce those text messages before the New Year.

4.　　We are in the end stages of finalizing the revisions to the GrayRobinson and Foodonics Privilege Logs.  We can Produce the documents being removed from them (as Supplemental Productions) and send updated/revised Privilege Logs before the New Year.

5.　　We do not presently have the referenced information but will continue our efforts to determine the information.

6.　　We have reviewed the Apple information we have been able to access and have found nothing additional responsive.  However, we are continuing our efforts to access whatever additional data may be available.

7.　　See response to number 1 above.

**Grier Wells | Complex Commercial, Employment and Construction Litigation**
**The Florida Bar Board Certified in Civil Trial Law**
**G R A Y | R O B I N S O N**
50 North Laura Street, Suite 1100 | Jacksonville, Florida 32202
**T: 904-598-9929 | F: 904-598-9109 | D: 904-632-8478**
E-mail | Website | Bio | vCard
**Facebook | LinkedIn | Twitter**