```
              IN THE UNITED STATES DISTRICT COURT
                 MIDDLE DISTRICT OF FLORIDA
                   JACKSONVILLE DIVISION
```

FOODONICS INTERNATIONAL,          Jacksonville, Florida
INC., etc.,
                                  Case No. 3:17-cv-1054-J-32JRK
      Plaintiff,
                                  November 5, 2019
vs.
                                  9:59 a.m.
DINA KLEMPF SROCHI, etc.,
et al.,                           Courtroom No. 10D

      Defendants.
_____


                        STATUS CONFERENCE
          BEFORE THE HONORABLE TIMOTHY J. CORRIGAN
               UNITED STATES DISTRICT JUDGE


COURT REPORTER:

            Shannon M. Bishop, RDR, CRR, CRC
            221 North Hogan Street, #150
            Jacksonville, Florida  32202
            Telephone:  (904)549-1307
            dsmabishop@yahoo.com

      (Proceedings reported by mechanical stenography;
transcript produced by computer.)

                    A P P E A R A N C E S

PLAINTIFF'S COUNSEL:

          **SAMUEL GRIER WELLS, ESQ.**
          GrayRobinson, PA
          50 North Laura Street, Suite 1100
          Jacksonville, Florida  32202

          **DANIEL KEARNEY BEAN, ESQ.**
          Abel Bean Law, PLLC
          50 North Laura Street, Suite 2500
          Jacksonville, Florida  32202

DEFENSE COUNSEL:

          **JAMES H. POST, ESQ.**
          **R. CHRISTOPHER DIX, ESQ.**
          Smith, Hulsey & Busey
          One Independent Drive, Suite 3300
          Jacksonville, Florida  32202-3315

P R O C E E D I N G S

November 5, 2019                          9:59 a.m.

                         - - -

            COURT SECURITY OFFICER:  All rise.  The United States

District Court in and for the Middle District of Florida is now

in session.  The Honorable Timothy J. Corrigan presiding.

            Please be seated.

            THE COURT:  How is everybody doing?

            MR. WELLS:  Good.  Thank you.

            MR. POST:  Good morning.

            THE COURT:  This is the case of *Foodonics*

*International, Inc., versus Dina Klempf Srochi* -- if I'm saying

it right -- *as Trustee of Laura Jean Klempf Revocable Trust*,

et al.  The case is 3:17-cv-1054.

            So on the plaintiff's side, Mr. Wells is here,

Mr. Bean.

            And, Mr. Hancock, what -- remind me whose side you're

on.

            MR. HANCOCK:  I'm with Foodonics, Your Honor.

            THE COURT:  And are you a lawyer?

            MR. HANCOCK:  No, sir.  I'm the e-discovery liaison.

            THE COURT:  Okay.  All right.  Well, I understand

you're going to listen in.  I didn't -- so companies have

e-discovery liaisons.

            MR. WELLS:  He's actually an employee of

1   GrayRobinson, Your Honor.  And he worked with us in the ESI

2   production.  And we asked him to attend just in case questions

3   came up about what occurred.

4            THE COURT:  Oh, okay.

5            MR. WELLS:  So it's not anticipating that he'd be an

6   active participant.

7            THE COURT:  Okay.  Well, that's fine, unless --

8   unless this interference we're getting continues.  I may have

9   to cut him off.

10           Where is he located?

11           MR. HANCOCK:  I'm in Tampa.

12           MR. WELLS:  In Tampa.

13           THE COURT:  All right.  And then on the defendant

14  counter-claimant's side, I've got Mr. Post, Mr. Dix.

15           And, Mr. Blackburn, I guess you're actually a party,

16  at least at the moment, right?

17           MR. BLACKBURN:  Yes, sir.  Yes, Your Honor.

18           THE COURT:  Okay.  And I see some familiar faces in

19  the audience as well, but...

20           So let me just start by talking to y'all a minute.

21  And I'm glad Mr. Klempf is here.  And I hope that -- I hope,

22  Mr. Post, you'll share this with your clients as well.

23           You know, all of us -- and the lawyers in this room,

24  who I have great respect for and who have all been practicing a

25  long time, and -- and I know that because Mr. Post and

1  Mr. Wells have been practicing longer than I have.  And I've

2  been practicing for 38 years now, so...

3        So we all have seen situations like this, where

4  families are in dispute.  And it's always a sad situation to

5  see families fighting over money.

6        And, you know -- and, of course, I have no idea who's

7  right and who's wrong or who's -- who's got the better of it.

8  And I have no way to know that at this point.  And if we end up

9  going all the way through a trial, I guess there will

10  ultimately be a jury that will decide that.

11        But what I do know is that it's not a good thing when

12  it happens, and that we ought to all be doing everything we can

13  to get it resolved reasonably and as soon as we can.

14        And, again, although I have -- and so I will be --

15  before this hearing is over, I'll be talking to the lawyers

16  about what we can do.

17        I know y'all had an early mediation that didn't

18  produce results, but that was before you've now spent two years

19  in litigation.  And so maybe -- maybe things are more clear

20  now.  And maybe the cost of litigation is more obvious to the

21  parties.

22        But, you know, I read -- you know, I tried to read as

23  much as I could.  I can't tell you I've read every single

24  document that was given to us, but -- but I tried to read as

25  much as I can.

1        And I -- I read an e-mail that Mr. Jacques Klempf

2   wrote in January of 2017 to Mr. Edelman.  And, you know, it's a

3   long e-mail.  And it kind of sets forth his thinking about the

4   matter.

5        But one thing he said struck me.  He said, "My family

6   dynamics are horrible and I am ashamed of all of us."

7        And, you know, he said that.  Not me.

8        And so I think we ought to be doing what we can do to

9   try to resolve this matter.  I don't care how much money is

10  involved.  It's not -- you know, going all the way to the mat

11  is certainly what we'll do if that's the only choice we have.

12  And I'll give y'all a fair trial if that's your choice.  But it

13  certainly -- it certainly would be better if it could get

14  resolved.

15       And I'll have to say -- again, I have nothing but the

16  highest respect for the lawyers in this room and in this case.

17  I've practiced with and had -- and have had all of them

18  practice in front of me for years and years.  But I don't

19  really feel like the lawyers are helping very much to resolve

20  this.

21       We are now two-plus years into this case, 177 docket

22  entries.  I think there's actually a few more.  That was the

23  other day.  And we're not anywhere close -- not anywhere close

24  to a trial or anything.

25       I have -- I have to say that currently this case is

1  the most contentious prolonged case I have.  I had another one

2  that was worse, but it finally settled.  And it went on for

3  years and years.  And I can't even imagine how much money was

4  spent on it.

5          But this -- this is now my number one case for being

6  contentious and for being prolonged with no obvious end in

7  sight.

8          And so -- you know, my law clerk gave me all the

9  transcripts of the hearings in front of Judge Klindt.  And I

10  said, "You know, I'm just not going to read all that."

11          I did read his orders.  And I have read the current

12  motions that are before the Court.  And, you know, in that

13  other case, the one that you've now taken the place of as my

14  most contentious, I appointed a special master.

15          And so I said, "Well -- if this is -- if this is what

16  it's going to be, then I cannot keep asking Judge Klindt to

17  devote the amount of time and effort he's been devoting to it.

18  I don't have time to do it."

19          And so the option I'm considering -- and I'll talk to

20  y'all about it -- is a special master.  It costs y'all money.

21  The one I had in the other case, I appointed John DeVault, who

22  was agreed to by both the parties.

23          He did a really good job, but he was clicking along

24  at whatever John DeVault charges.  And so it couldn't have been

25  cheap.  He would have telephone hearings and he would issue

1  orders and he would -- you know, he was having to talk to them
2  about every week, so...
3        But if that's -- if that's the direction we need to
4  go, that's what we'll do.  Because we've got to get -- we've
5  got to get moving here.
6        And I will say that I have -- I'm sure it's
7  coincidental.  But since I issued my order -- and I'm sure
8  you-all will tell me this was all in the hopper before I issued
9  my order.
10       But there does seem to be a little better
11  cooperation.  I thought the way that the BAM stuff was handled
12  and getting rid of those lis pendens and getting rid of those
13  parties and having Mr. Bean join the Foodonics team and all
14  that was well done and fine.
15       And, you know, that -- to me, that is the very
16  beginning of what I saw as taking this and making it this.
17  And -- and that's what we need to be doing more of, because
18  eventually we've got to get to here.  We either have to join
19  issue and try it or we have to settle it.
20       And so -- so I thought that was good.  And, you know,
21  y'all were able to agree on the special master folks.  And I
22  thought that was good.
23       So maybe -- you know, maybe -- maybe we're starting
24  to see a little turn for the better.  And, you know, I'm not --
25  I mean, I, of course, have been right where y'all are.

1        You know, I've represented families before that were

2   in dispute.  And sometimes you get a little sideways in the way

3   these things go.

4        There can be a lot of dynamics going on with the

5   family.  There can be -- people really feel strongly about

6   things, and the lawyers start to advocate strongly, and the

7   next thing you know you're in a ditch.

8        And so if we are in a ditch, maybe we started to dig

9   our way out of the ditch.  And if we are in one, we're going

10  to -- we're going to stop all that and get back on track,

11  starting today.

12       And so what I want to do is, first, have you tell me

13  who are your clients -- I mean, who are your -- who are the

14  people that are interested in the case.

15       Part of that is because I want to -- as we always do

16  in federal court, I want to make sure that everything is lined

17  up jurisdictionally and so forth, but also I just want to know

18  who we're actually dealing with here.

19       So, Mr. Wells, if you could -- if you could come up

20  for a second, and just tell me who is it -- is Foodonics still

21  a company?  Does it have any business?

22       Are you just -- is Mr. Jacques Klempf the only person

23  that is interested on your side of the table?  Or are there

24  other people?

25       Can you just give me a little sense?

1          MR. WELLS:  Yes, sir.

2          Foodonics is still a corporation, but it has no

3   operational functions.  It's basically a holding company for

4   the BAM entities.  Foodonics itself is not really doing

5   anything.

6          Mr. Klempf is the sole stockholder of Foodonics.

7          THE COURT:  Okay.

8          MR. WELLS:  Foodonics initiated the action against

9   Ms. Srochi, as trustee, related to a tax-refund issue.  And

10  then that brought the counterclaim from -- in which Mr. Klempf

11  was named personally in the counterclaim.

12         THE COURT:  Right.  And that confused me a little,

13  because I guess his given name is Kevin, because I -- right?

14  It was Kevin Jacques Klempf?

15         MR. WELLS:  Kevin Jacques Klempf.

16         THE COURT:  So I was reading about this Kevin Klempf

17  and I couldn't figure out who it was.  And then I realized it

18  was him.

19         MR. WELLS:  The Court may have noticed that in the

20  pleadings we referred to Mr. Klempf as Jacques and Ms. Srochi

21  as Dina.

22         THE COURT:  Right.  So other than Mr. Jacques Klempf

23  himself and Foodonics as a corporation -- those are your

24  clients?

25         MR. WELLS:  That's correct.

```
 1              THE COURT:  Okay.

 2              MR. WELLS:  And those are the parties in interest for

 3     the plaintiff and counter defendants.

 4              THE COURT:  Thank you.

 5              MR. WELLS:  Yes, sir.

 6              THE COURT:  All right.  Mr. Post, the questions I

 7     have for you are a little more complicated.  So I want to make

 8     sure I understand.

 9              Who is Dina Klempf Srochi, if I'm saying -- how do

10     you say the last name?

11              MR. POST:  You have it right, Your Honor.

12              THE COURT:  Srochi?  Okay.

13              She's the trustee of the Laura Jean Klempf Revocable

14     Trust.  And I read that Laura Jean Klempf, who was the

15     mother -- right?

16              MR. POST:  Yes.

17              THE COURT:  She was the mother.

18              The father passed away in '02.

19              Laura Jean Klempf passed away in 2017; is that right?

20              MR. POST:  Correct, Your Honor.  Yes, Your Honor.

21              THE COURT:  Okay.  So she's the trustee.  And is

22     she -- she's the daughter of Laura Jean Klempf; is that right?

23              MR. POST:  That's correct, and Jacques Klempf's

24     sister.

25              THE COURT:  Okay.  Jacques Klempf's sister.  Right.
```

1   Okay.

2          And so -- and, again, this was the first opportunity

3   I had to kind of dig into the case and really look at it.

4          So under what -- what is the Laura Jean Klempf

5   Revocable Trust?

6          Let me ask you a couple of questions, and then you

7   can answer them all.

8          So, for example, in the counterclaim, you alleged

9   that Dina Klempf Srochi was a Georgia citizen.  And I guess you

10  said it was a Georgia trust.

11         There are -- let me get the pleadings so I can be

12  clear about this.

13         So I'm looking at the -- at the amended answer,

14  affirmative defenses to the complaint and amended counterclaim.

15  So that's your document back at them, right?

16         MR. POST:  Yes, sir.

17         THE COURT:  All right.  It says, "Dina Klempf Srochi,

18  as Trustee of the Laura Jean Klempf Revocable Trust, a Florida

19  trust."

20         That's what it says in the caption.

21         MR. POST:  Yes, sir.

22         THE COURT:  And then Mr. Blackburn, as Assistant

23  Trustee of the Jean Klempf Trust, suing back to Foodonics and

24  Mr. Jacques Klempf.  The BAM people are all out of it.

25         So the only remaining counterclaim defendants are

1  Foodonics and Jacques Klempf; is that right?

2  MR. POST: That's correct, Your Honor, except that if

3  a judgment is entered against Foodonics it would be jointly and

4  severally against the BAM entities.

5  THE COURT: Okay. So then I looked at the

6  counterclaim itself. And there are places in which -- or there

7  was a place -- and I'm having a hard time finding it right

8  now -- in which the trust is also called a Georgia trust.

9  So is it a Florida trust or a Georgia trust?

10  MR. POST: It's a Florida trust, Your Honor.

11  THE COURT: All right. Is -- is it a traditional

12  trust? In other words, is Ms. Dina Klempf Srochi a trustee

13  with the customary powers of -- she can buy, she can sell?

14  Does she have traditional trustee powers?

15  MR. POST: Yes, sir.

16  THE COURT: And the reason I'm asking is, under the

17  case law, in terms of diversity -- and I assume y'all looked at

18  this when you filed the counterclaim.

19  But you -- if the trustee has -- the words of the --

20  the cases is, like, the customary -- like, Judge Dalton wrote

21  an opinion, "If the trustee possesses certain customary powers

22  to hold, manage, and dispose of assets for the benefit of

23  others" -- quoting a Supreme Court case called *Navarro* -- "then

24  the citizenship of the trustee is controlling for purposes of

25  diversity jurisdiction. Hence, plaintiff must identify whether

1   the trusts referenced in the complaint are traditional trusts

2   and, if so, must identify the trustees and allege their

3   citizenship individually."

4          So I guess my question for you is, is Ms. Dina Klempf

5   Srochi -- is she the sole trustee of that trust?

6          MR. POST:  She is.  And Dennis Blackburn is the

7   special assistant trustee.

8          THE COURT:  Okay.  And she's a Georgia citizen?

9          MR. POST:  She just moved to Charleston, South

10  Carolina.

11         THE COURT:  Okay.  So she's a South Carolina citizen?

12         MR. POST:  Yes, Your Honor.

13         THE COURT:  All right.  And under the trust

14  instruments, the trust that was created, is she what you would

15  call a customary trustee?

16         Does she have all the powers and so forth?

17         MR. POST:  Your Honor, may I ask -- may I confer with

18  Mr. Blackburn, who's the trust expert?

19         THE COURT:  Sure.  Sure.  Or he can come up and tell

20  me.

21     (Counsel confers with Mr. Blackburn.)

22         THE COURT:  Hey, Mr. Hancock, I'm being asked to have

23  you mute your phone, please, because we can -- I don't know if

24  we're listening to you breathing or what we're doing, but...

25         MR. HANCOCK:  Yes, sir.

1    THE COURT:  All right.

2    MR. POST:  Yes, Your Honor.

3    Mr. Blackburn informs me it is what you would

4    describe as a customary trust.

5    THE COURT:  And is there a -- and the reason I'm

6    asking is, in looking at it, in terms of the jurisdiction of

7    the Court, if the counterclaim, as I understand it -- if the

8    counterclaim is compulsory, then it doesn't really matter what

9    the citizenship of the -- of the counterclaim parties are

10   that -- because you've added Mr. Blackburn in.  You've got

11   Ms. Srochi.

12   But if it was permissive, then we have to have

13   diversity jurisdiction in the counterclaim as well.  And so --

14   and that would also apply, I guess, to the original complaint.

15   So I need to be satisfied in some way -- I know

16   you're telling me it's true.  And I don't have any reason to

17   doubt you.

18   I need to be satisfied that Dina Klempf Srochi is not

19   a Florida citizen, and that she -- and that the case is brought

20   against her as trustee and on her behalf as trustee in a trust

21   that has the customary powers of a trustee to hold, manage, and

22   dispose of assets for the benefit of others.

23   That's what the case law says.

24   MR. POST:  Yes, sir.

25   THE COURT:  And from what you're telling me, you

1 think that that's true?

2         MR. POST: Yes, sir.

3         THE COURT: Okay. Now, Mr. Blackburn is a little bit

4 of a problem, maybe. First of all, I've never really heard of

5 an assistant trustee being a party. Why -- why is that?

6         MR. POST: Mr. Blackburn is a lawyer.

7         THE COURT: I know that.

8         MR. POST: And he -- he provides guidance to the

9 trust, and experience, that a layman like Dina Klempf Srochi

10 does not have.

11         THE COURT: Perfectly understandable. But he could

12 represent the trust and -- and confer with you and provide that

13 guidance.

14         I guess I'm having -- I've never really heard of an

15 assistant trustee being a party. And, secondly, he's a Florida

16 citizen.

17         MR. POST: Yes, Your Honor.

18         THE COURT: And I'm a little bit worried -- unless

19 you can convince me that this is a compulsory counterclaim and

20 I don't have to worry about that, I'm a little bit worried that

21 he's in the case and that means there may not be diversity.

22 I'm a little bit worried about that.

23         Now, I'm not making that finding or anything, but I'm

24 probably going to have you take a look at it. Okay?

25         MR. POST: Yes, Your Honor.

1          THE COURT:  Because the last thing we want to do --

2     the last thing we want to do is spend another -- we've already

3     spent two years.

4          The last thing we want to do is spend another year or

5     so in federal court and find out we weren't supposed to be here

6     in the first place.

7          MR. POST:  Yes, Your Honor.

8          THE COURT:  So -- and I think -- if you tell me

9     that -- if you tell me that Ms. Srochi is a Georgia citizen or

10    a South Carolina citizen, and that she's a real trustee, that's

11    probably going to be good enough for diversity in that

12    situation.

13         But Mr. Blackburn is a problem, I think.  But I'm not

14    making a finding about that.  I don't really think you need him

15    in the case.

16         But I'm probably going to -- before we go much

17    further, I'm probably going to have you brief that and make

18    sure that we got our ducks in a row.  Okay?

19         MR. POST:  I perfectly understand.  I would point out

20    one thing, Your Honor.

21         THE COURT:  Yeah.

22         MR. POST:  There is -- the diversity was the federal

23    basis for which the -- Foodonics sued the trust.  The

24    counterclaim, of course, is a response to that.  And the

25    counterclaim does have one federal action in it.

1          THE COURT:  I saw that.  And I don't know -- that may

2   help you.  I don't know.  Maybe if there's a federal claim,

3   maybe the others are supplemental or appendant to that.  That

4   would be fine, too.

5          I'm not looking to kick the case.  I just want to

6   make sure that -- you know, one thing the Eleventh Circuit is

7   always looking for is subject matter jurisdiction.

8          MR. POST:  Yes.

9          THE COURT:  And I don't want to be -- I don't want to

10  spend a bunch of time and have y'all spend all that money and

11  then find out we weren't supposed to be here.

12         So I am not suggesting there's no jurisdiction.  I'm

13  not expecting there's not jurisdiction.  But I do think we need

14  to brief that and be ready to -- to have me be able to feel

15  comfortable that that's the situation.  Okay?

16         MR. POST:  Very well, Your Honor.

17         THE COURT:  Okay.  So aside from that -- and so the

18  issues are, is Mr. Blackburn a proper party?  Does that

19  destroy -- first of all, I think the first issue -- and I'm

20  not -- y'all have to research this.

21         This is just us working in the last -- you know,

22  yesterday afternoon, overnight when I was looking at this.  And

23  I said, "I better take a look at this."

24         So if I understand it correctly, the first question

25  is:  Was this a compulsory or permissive counterclaim?

1     My guess, it was permissive -- my guess is it's

2  permissive, but I don't know that for sure.

3     Because I think if it's a compulsory counterclaim --

4  I'm not sure that the diversity issue is important.  As long as

5  there's diversity in the first -- does the fact that you have a

6  federal claim in your counterclaim -- does that solve all

7  problems?

8     Does -- is Mr. Blackburn -- is his addition to -- is

9  that destroying diversity?  And is that important to the case?

10    And so -- and then on the *Navarro* -- what I call the

11  *Navarro* issue -- and that Supreme Court case is

12  N-a-v-a-r-r-o -- that's the thing that says Ms. Dina Klempf has

13  to be a real trustee.

14    I'll give you Judge Dalton's case.  There's a number

15  of them.  Judge Honeywell has one.  It was called -- and it's

16  just a little treatment of it, but it will at least get you

17  into the cases -- *Westgate Resort versus Sussman*,

18  S-u-s-s-m-a-n, 2017 Westlaw 352415, I think that's right.

19    So -- that's a 2017 case.  So I just need -- you

20  know, I just need to get a little help from you-all to make

21  sure that -- I mean, they haven't raised a jurisdictional

22  argument.  But as you know, that doesn't matter.

23    MR. POST:  Right.

24    THE COURT:  I've got to know that I've got subject

25  matter jurisdiction.  So I'm probably going to let you brief it

1   and we're probably going to let them respond.

2          And then if we got it, then that's fine -- that's

3   fine.  If we need to jettison Mr. Blackburn in order to make it

4   right, then that's what we'll do.  Because I just don't think

5   you need him.

6          If you want him in there, and you can keep him in

7   there, I'm not going to tell you you can't.  But he could

8   certainly be a lawyer for the trust and advise it and advise

9   with you just as well without being a party, I would think.

10          Now, apart from that, tell me who your clients are.

11   You've got -- so the sister of Mr. Jacques Klempf.  And she's a

12   trustee of her mom's trust.  The mom has now passed away.

13          Who are -- who are the beneficiaries of that trust?

14          MR. POST:  The two beneficiaries to the trust are

15   Dina Klempf Srochi and her brother, Marc Klempf.

16          THE COURT:  And he's a citizen of what state?

17          MR. WELLS:  Georgia.

18          MR. POST:  Georgia.

19          THE COURT:  Okay.  Well, then you may be okay anyway.

20   Because the two options are, you look at the citizenship of the

21   trustee or you look at the citizenship of the beneficiaries.

22   And if all of those are diverse, then you may be all right

23   anyway.  So that is another thing.

24          So those are the only two beneficiaries.  So all

25   these grandkids -- and I saw some names and all that on a list.

1    None of them are actual real parties in interest; is that true?

2              MR. POST:  They're not real parties in interest.  Let

3    me confer one moment.

4              THE COURT:  Sure.

5         (Counsel confer.)

6         (Judge confers with law clerk.)

7              THE COURT:  I'm being advised, too, that I should

8    mention to you that there appears to be case law that if, for

9    example, Mr. Blackburn is a non-diverse party and he's added in

10   a counterclaim that's permissive, that that potentially can

11   destroy the diversity that existed even as to the complaint

12   against you -- you know, the complaint brought by them against

13   you.

14             So we just need to take a hard look at that.  Okay?

15             MR. POST:  Thank you, Your Honor.

16             THE COURT:  All right.  And what was your answer on

17   who else is a real party in interest?

18             MR. POST:  Yes.  The grandchildren were specific

19   beneficiaries who have already been paid, so they're no longer

20   involved.

21             THE COURT:  Okay.  So the only people that -- so it's

22   Mr. Jacques Klempf on one side and Foodonics, his sister and

23   his other brother on the other side, and those are all the

24   people?

25             MR. POST:  Correct, Your Honor.

1  THE COURT:  And he's Florida, and they're either
2  Georgia or South Carolina?
3  MR. POST:  Correct.
4  THE COURT:  Okay.  You're probably going to be okay
5  if we resolve the -- what I'll call the Blackburn problem.
6  Okay?
7  MR. POST:  Right.
8  THE COURT:  All right.  But I want you to think about
9  it.  I want Mr. Dix to think about it.  I want -- you know, I
10  want to make sure.  Because I do not -- I do not want to be
11  without jurisdiction.  Okay?
12  MR. POST:  Yes, Your Honor.
13  THE COURT:  All right.  That's all I need right now,
14  Mr. Post.  Thank you, sir.
15  MR. POST:  Thank you.
16  THE COURT:  Okay.  Now, I'm going to give y'all a
17  chance to talk.  I'm not going to hog the show.  But I wanted
18  to get the pleadings -- you know, I read the pleadings, of
19  course.
20  And I wanted to get -- trying to make sure we -- that
21  I knew who was who and what was what.  And I think I have a
22  little better handle on that now.
23  So, Mr. Wells, I do have one other issue for you.
24  And we're not -- obviously we're not going to try the case
25  today.

1    But one thing that kind of struck me in your response

2  to the counterclaim, and -- was this, that -- that the -- the

3  counterclaim essentially alleges that -- that Mr. Jacques

4  Klempf essentially bought out, if I'm understanding it, his

5  mother's interest, or the interest of the trust, at

6  $3-and-something a share, and then he sold the company for

7  $10-and-something -- a share a short time later.  And it's the

8  delta between those two that is at the heart of the dispute.

9    And -- and what I -- but the way that they're doing

10  the math is -- they're saying if -- I think the -- I think the

11  mother -- or the trust got about nine million or so in the --

12  from Mr. Jacques Klempf, or from Foodonics, whoever -- I may

13  not have all the parties right.  But the numbers, I think, are

14  what I read -- and that if -- if they -- if the company had

15  been sold while they still had the 50 percent -- or close to 50

16  percent interest in it for the $10 a share, they would have

17  gotten, like, 32 million.

18    And so this is a case about $23 million; is that --

19  that's -- is that a relatively roughly fair statement of their

20  case?

21    MR. WELLS:  Relatively roughly.  Yes, sir.

22    THE COURT:  Okay.  All right.

23    Now, you, in your response, say, "Y'all just don't

24  understand the transaction.  It wasn't that Mr. Jacques

25  Klempf" -- or Foodonics, or whoever, was getting the money --

1  "they didn't clear all that money.  There were debts and bills

2  to be paid and things that had to happen."

3  And so the -- the differential is -- even if what

4  you're saying is true, the differential there is not

5  $23 million, it's something else?

6  Have you identified what the something else is?

7  MR. WELLS:  It has been identified in discovery, Your

8  Honor, yes, sir.

9  THE COURT:  And what is it, roughly?

10  MR. WELLS:  Roughly relatively?  The purchase price

11  by Cal-Maine -- which was determined by Cal-Maine, not by

12  Foodonics.

13  THE COURT:  Right.

14  MR. WELLS:  -- was roughly 69 to 70 million.  There

15  was a debt of approximately 35 million, so that the net to

16  Foodonics was roughly 35 million.  And then Ms. Klempf, or the

17  trust, in the previous stock acquisition in 2015, received nine

18  or ten.

19  And so those were the relatively rough numbers.

20  THE COURT:  So what -- I know you must have done the

21  math.  So even -- let's assume -- and this is a complete

22  assumption.  I just want to understand what the case is about,

23  in terms of money.

24  So if -- if they had -- if they had stayed in the

25  company and the company had been sold the same way it was and

1    they got their share, what would that number have been in the
2    way you look at it?
3              MR. WELLS:  We really have not done the math on that
4    at this point, Your Honor.  But if you extrapolate --
5              THE COURT:  Yeah.
6              MR. WELLS:  -- at the time Mr. Klempf acquired
7    Ms. Klempf's stock in 2015, she held roughly 47 percent.  He
8    held roughly 53.
9              If you took the stock acquisition -- and keep in mind
10   that we acquired her stock.  And the sale in 2016 was an asset
11   sale, not a stock sale.  So there are differences there.
12             But I think you would have the same result, very
13   close to it.  Had her stock not been acquired in 2015, the sale
14   taking place in 2016, and you netted out all of the liabilities
15   of the company, and then you apply certain factors to her value
16   of her 47 percent, such as marketability, minority share, that
17   kind of thing, we think the numbers would have come out
18   reasonably -- roughly relatively close to the way they came
19   out.
20             THE COURT:  So, in other words, your view of the case
21   is that they got $9 million or so, and even if they -- even if
22   the thing -- even if it had played out the way they say it
23   should have, they still would have got $9 million or so?
24             MR. WELLS:  That's one aspect of our position, yes,
25   sir.

1          THE COURT:  Okay.  Okay.  Thank you.

2          And I -- you know, I don't need to hear from you.  I

3    understand what you're saying.  So I'm not -- I just wanted to

4    understand -- and I -- and I wanted the -- at least one party

5    to hear, and hopefully the other party to hear, what's being

6    said.

7          All right.  So here's what -- here's what we need to

8    do today.  I looked at these discovery motions.  And -- and

9    I -- you know, I was hoping maybe I could come in and just

10   knock them out.  But that's not happening.  And so -- I mean,

11   it would require way more knowledge and -- than I have right

12   now.

13         And so, Mr. Wells, I'm going to ask you to stand up

14   again, if you will.  Well, actually, you -- sorry.

15         I think the -- let me look -- make sure I've got

16   the...

17         All right.  So the pending motions -- as I said, I

18   was delighted to see the BAM stuff get resolved and the

19   lis pendens, because that was -- when I had originally set the

20   case, I thought we were going to get into all that today.  So

21   that's going to shorten things up quite a bit.

22         But the actual current motions pending in front of

23   the Court right now are an unopposed motion to extend the case

24   deadlines, which has been, I think, updated.  And so obviously

25   when we leave here today, we'll leave with a schedule.

1    And then there are three discovery motions.  And one

2  of them is a motion for sanctions based on sluggish discovery.

3  One is an amended motion to compel Foodonics to produce

4  documents.  And an amended motion to compel GrayRobinson to

5  produce non-privileged documents.

6    I said three.  There's actually four.  And then

7  there's the third-party motion to compel against Cal-Maine

8  Foods.

9    All right.  Mr. Post or Mr. Dix, whoever's in charge

10  of this part of it, I -- I want to know whether any progress

11  has been made on any of this or whether these motions are still

12  live motions, whether -- what the status of it is.

13    MR. POST:  Your Honor, the motion for sanctions based

14  on sluggishness is still pending.  It has not -- it's been

15  fully briefed and it's ready for -- for the Court to look at

16  it.

17    THE COURT:  It hadn't been briefed?

18    MR. POST:  Well, it's been fully briefed.

19    THE COURT:  Oh, okay.

20    MR. POST:  Yeah.  The motion to compel Cal-Maine to

21  produce documents is fully briefed and is -- is waiting for a

22  Court ruling.

23    THE COURT:  Okay.

24    MR. POST:  And it's critical, in my opinion, to the

25  case.

1    The two other motions to compel the production of

2 what were, we believe, non-privileged documents off the

3 privilege log has -- there has been some progress.

4    After we filed those motions, we did receive another

5 chunk of documents from both Foodonics and from GrayRobinson.

6 But we still haven't received all of them.

7    And we primarily -- specifically, there are a number

8 of documents on the privilege log where communications between

9 Foodonics and GrayRobinson and the appraiser in this firm -- we

10 call them SMK.

11    And we took the appraiser's deposition and we found

12 out that there shouldn't have been a privilege asserted.  And

13 we've asked that those documents be produced as well.

14    There was a -- there was a -- a telephone conference

15 call just last Friday -- or maybe it was yesterday.  Anyway,

16 that they -- they said that they might be willing to -- to

17 budge on that one, too, but we haven't heard back from them on

18 that one.

19    THE COURT:  Okay.

20    MR. POST:  So there's been progress on the motions to

21 compel documents off these privilege logs.

22    THE COURT:  And describe for me, if you will, where

23 in the discovery process the parties currently are.  How far

24 have you gotten?

25    MR. POST:  Your Honor, that's a pretty sad story.

1  We -- we've gotten what purports to be all of the documents now

2  from Foodonics and GrayRobinson.  We've got 80,000 of them in a

3  document dump.

4          We have not received -- we've only received half the

5  documents we need from Cal-Maine.  They refuse to produce any

6  documents prior to the date of April 2017, as was the subject

7  of the motion to compel.  And -- and it's those documents that

8  we need to take the deposition of Jacques Klempf.

9          The only deposition -- other than the two discovery

10  depositions that Judge Klindt allowed us to take of Jacques

11  Klempf and GrayRobinson, we've only taken the deposition of the

12  SMK, the appraisal firm.

13          And after the rest of the documents are produced,

14  as -- as we discussed with opposing counsel, then we'll have to

15  have a second part of that deposition.

16          And then -- those are the only depositions that have

17  been taken.  But we're ready, Your Honor, to take the rest of

18  them that we've identified.  And the rest of -- we identified

19  at least 12 more depositions, depending on how Mr. Klempf's

20  deposition goes.

21          Because if his deposition goes a certain way, we'll

22  need more depositions.  If it goes another way, we'll need less

23  depositions.

24          And then we'll be ready for trial, Your Honor.

25          THE COURT:  Is this a case where there will be any

1  expert testimony or not?

2          MR. POST:  Yes, Your Honor.

3          THE COURT:  What kind of expert testimony?

4          MR. POST:  We are -- well, we plan on presenting an

5  expert testimony with respect to the -- the fact that the SMK

6  deposition that was produced and given by Foodonics to

7  Ms. Klempf at the closing, saying the company was only worth

8  $35 million, was flawed, for various reasons.

9          THE COURT:  So what kind of an expert?  Is that an

10 accountant?  Is it a -- what kind of expert?

11          MR. POST:  It's another business evaluator.  It's

12 called an appraisal review.  And --

13          THE COURT:  Is that like what Don Wiggins does?  Is

14 it something like that, or...

15          MR. POST:  Yes, Your Honor.

16          THE COURT:  I'm not suggesting you're going to use

17 him, but he's the one I remember from my days.

18          MR. POST:  I think actually --

19          THE COURT:  I think he's still around, isn't he?

20          MR. POST:  Oh, yeah.  He's still around.  I actually

21 think the other side has already engaged him.

22          THE COURT:  Oh, okay.  So there he is.  Okay.

23          MR. POST:  And then -- in fact, that same appraiser

24 or a different appraiser will also have -- will be giving

25 expert testimony about damages.

1         THE COURT:  Well -- and I'll talk to Mr. Wells in a

2   minute to see what they want to do, but...

3         All right.  And tell me about -- you know, I don't --

4   I don't really like having to resort to the special master, but

5   I -- but I kind of -- I just -- I just know we're not going to

6   be able to give you timely rulings.

7         And, you know, I think it's a shame that it kind of

8   played out this way.  But sometimes you just need some help to

9   get back on here, to get on track.

10         So you both agreed to Mike Tanner, who, of course, I

11   know well.  I do not know Judge -- is it Artigliere?  Is that

12   right?

13         MR. POST:  Artigliere.

14         THE COURT:  All right.  And where is he located?

15         MR. POST:  He was a circuit court judge in the middle

16   of the state.

17         THE COURT:  Yeah.  I read about him.  He seemed

18   pretty impressive.  Yeah.

19         MR. POST:  Right now he lives in the same town that

20   Clemson University is, South Carolina.

21         THE COURT:  Oh, really?  Okay.

22         Well, one of the things that -- and I don't know

23   whether you have a preference or not.  One of the things that I

24   want to look at is who can jump on it.

25         I don't -- you know, I don't want to -- I don't want

1   to appoint somebody and have them say, "Well, I'll get to it in

2   four months," or something.

3          I mean, my conception is -- I don't know if it's

4   unrealistic.  But my conception is that I'd appoint a special

5   master, he would become familiar with the matter, and he would

6   do whatever -- in whatever format he chose, he would get these

7   matters resolved, and that as of, you know -- and we've got the

8   holidays involved.

9          But let's -- so let's say as of January 10th

10  everything -- everything has been resolved and we're moving on

11  and we're going to get some discovery done and we're going to

12  get this thing moving.

13         That's my conception.  Whether it's realistic or not,

14  we'll see, but the -- and also I think a special master could

15  help you with -- you know, you say you want to take 12

16  depositions.  I think the rules only allow you to take 10

17  without permission.

18         Those are the kind of things a special master could

19  figure out, do you really need them; do you not, that kind of

20  thing.

21         And if there's no objection, of course, that's fine,

22  but...

23         So I guess the question is:  Do you have a sense of

24  which one of these individuals, both of whom look very well

25  qualified -- and I'm -- and anything y'all can agree on in this

1   case, I'm all for it.

2       Do you have a sense of -- or a preference as to which

3   one of these might be able to do the job?

4       MR. POST:  Our preference, Your Honor, would be

5   Judge Artigliere.  With respect to Mr. Tanner, we do know him

6   and respect him, and we would consent to him.  But we

7   understand he's presently seeking election to the Florida Bar

8   presidency --

9       THE COURT:  I saw that.

10      MR. POST:  -- which doesn't end until March of 2020.

11  And so we have a concern that time constraints and other

12  priorities might interfere with the proper resolution of this

13  matter.

14      THE COURT:  And did someone contact Judge Artigliere?

15  Or did you just write him down on a piece of paper and hope

16  that he was available or what?

17      MR. POST:  Mr. Dix contacted him.  He said he was

18  available.

19      THE COURT:  Okay.

20      MR. POST:  And he said that he would be -- most -- a

21  lot of this stuff would be done by phone.

22      THE COURT:  Yeah.  And that's -- I think that's the

23  way Mr. DeVault did it when he did his.  Because I think the

24  lawyers were out of town and all that, so...

25      Okay.  All right.  Thank you.  Let me talk to

1   Mr. Wells a minute.

2          All right.  Mr. Wells, what's your view of discovery?

3   What's your view of the special master?  What's your view of

4   what -- from your side -- I've heard what Mr. Post wants to do.

5          What do y'all want to do?

6          MR. WELLS:  Let me address initially, Your Honor, the

7   comments Mr. Post made about discovery.  We think we have

8   produced everything from Foodonics and from GrayRobinson.

9          We've not been advised of anything that hasn't been

10  produced, with the exception perhaps of what Mr. Post

11  references, the SMK, slash, Jess Wright documentation.

12         We asserted a work product privilege as to that.  We

13  believe the work product privilege is valid, but we are

14  probably going to waive that and produce the documents that

15  have been identified by Mr. Post.

16         And I did advise Mr. Post of that this past Friday.

17         I think there will be an issue as to redeposing

18  Mr. Wright.  SMK has its own attorney, and that issue has

19  arisen.

20         But I think that's, again, something that could be

21  decided if the Court appoints a special master.

22         THE COURT:  And I apologize for my not understanding

23  the case.  But what is SMK?

24         MR. WELLS:  They are a business evaluator.

25         THE COURT:  Okay.

1          MR. WELLS:  And subsequent to the agreement to

2     purchase Ms. Klempf's stock, they came in after the fact to

3     basically confirm the value that had been agreed upon.

4          Other than those documents, we think everything has

5     been produced, with the exception of one former employee of

6     Foodonics that was recently subpoenaed.  And we are producing

7     those documents either today or tomorrow.

8          THE COURT:  If you were going to characterize -- and

9     I understand this is a matter of dispute and I'm not going to

10    resolve it today.

11         But if you were going to characterize the discovery,

12    are you -- why has it been so difficult?  Are they asking you

13    for things you don't have?  Or are you not -- are you having

14    trouble getting the things?

15         Are you -- what's been the problem?

16         MR. WELLS:  It's been a variety of issues, if I may,

17    Your Honor.

18         First of all -- and even though we -- we ultimately

19    agreed to it, we had real concerns about the date range 2008 to

20    2018, as well as the -- the glossary of search terms.  It's

21    been very broad.

22         And as I noted in the response to the motions,

23    Foodonics, even though it was highly successful economically,

24    was a small company, did not have any dedicated IT people.  And

25    all this came about after they had shut down.

1    And so getting things together, if you will, a

2  combination of laptops, desktops, cell phones of Mr. Klempf,

3  and some of his employees, has been -- it's just been a

4  difficult process.  And I think we've addressed that in the

5  response to the motions.

6    THE COURT:  Well, that's -- I mean, I hear you.  I

7  mean, we're -- you understand we're two years out, right?

8    MR. WELLS:  Yes, sir.

9    THE COURT:  Yeah.  So...

10    All right.

11    MR. WELLS:  But if I may, Your Honor?

12    THE COURT:  Yeah.

13    MR. WELLS:  May of 2018 was when we first really got

14  started with looking at discovery.  And our first production

15  was in August of last year.

16    THE COURT:  Yeah.  Okay.

17    MR. WELLS:  You asked for my comments on a special

18  master.

19    THE COURT:  Yeah.

20    MR. WELLS:  We would prefer Mr. Tanner, primarily

21  because he's local.  I recognize that issues can be addressed

22  by telephone.  I'm personally familiar with Judge Artigliere.

23  I think he lives out of state most of the time.

24    THE COURT:  He does.  He lives in Clemson, I think.

25  That's what I was told.

1    MR. WELLS:  Mr. Tanner is running for Bar president.

2  But I called him.  I think Mr. Post had included him on the

3  list of people who would be acceptable.

4    I called Mr. Tanner and assured -- or he assured me

5  that even though he's running, that he felt he would have the

6  time to devote to it.

7    THE COURT:  All right.  Well, I'm inclined to think

8  that a local person will be better, too.  But, you know, a

9  special master is an appointment of the Court.  And I have no

10  problem picking up the phone and calling him and saying --

11    MR. WELLS:  Do it.

12    THE COURT:  -- "Mike, you know, can you do this, and

13  can you do it on a timely basis?"

14    And if he tells me he can, then I'll probably --

15  that's probably what I'll do.  And so -- because I --

16  Judge Artigliere looks great to me.  I do worry a little bit

17  about being out of town.

18    I mean, one -- this is actually one of the few cases

19  I have right now where I've got Jacksonville lawyers on both

20  sides.  I mean, so many of our cases now have lawyers from all

21  over the place, and so I think we ought to take advantage of

22  that.

23    For example, if he wants to get people in a room and

24  talk to them or whatever, then that -- that can easily be done.

25  He's also, under the Rule 53 -- because I pulled the order we

1  did in the other case.

2          He's got to give an affidavit that he doesn't have

3  any interest and so forth.  So there's a few boxes that have to

4  be checked under Rule 53 when I appoint him.  But that's what

5  I'm inclined to do, so...

6          Okay.  All right.  Thanks.

7          MR. WELLS:  Thank you, Your Honor.

8          THE COURT:  Okay.  So let me ask you both to assume

9  that we get discovery back on track and that -- let's say no

10 later than middle of January or so, you know -- and if we

11 didn't have the holidays, I'd be -- I'd be more -- even more

12 direct than that.

13         But I -- you know, I hate to try to be unrealistic

14 about what's going to occur over the holidays.  And so if we

15 could get things back on track by, say, the middle of January,

16 if Mr. Tanner needed some time to look at the file and get --

17 and then schedule a hearing, or whatever he's going to do to

18 get it resolved, and then also help you with discovery going

19 forward.

20         So now let's say by the middle of January all of that

21 has happened.

22         I'm interested in setting up a schedule.  And I want

23 a schedule that we're going to set and that we're going to

24 keep.

25         And -- and so the components of that schedule would

1  be, of course, the fact discovery.  And I -- I think I have a

2  suggestion that you-all made here.  And let me see if that

3  suggestion is still in play or not.

4          You filed -- because you asked me -- you know, you

5  asked to extend the case deadlines a while back.  I think we

6  extended a few of them to get you past those deadlines.  And

7  now you asked me again in the middle of September.  And I think

8  that might have been when we set it for hearing, but...

9          Let's see.  So I'm looking here -- you have a -- if

10 this is right, I think this is what you -- "accordingly, the

11 parties request the Court grant relief and further amend the

12 schedule."

13         And I recognize this was filed a month-and-a-half

14 ago, but...

15         You've got -- I think it might be a little ambitious.

16 You've got disclosure of expert reports on Thanksgiving Day, it

17 looks like.

18         You've got rebuttals in January.  You've got a

19 discovery deadline in March.  You know, I -- I mean, unless

20 y'all tell me this is still a good schedule -- if it is, I'll

21 set it right now and we'll go.  But I'm wondering if it's

22 unrealistic, given where we are.

23         Mr. Wells, what do you think?

24         Because I want to be -- I want to set one and I want

25 to mean it, and I want the parties to know I mean it.  So the

1  parties will either know we're going to settle or we're going

2  to go to trial when Judge Corrigan said we were going to go to

3  trial.  And so I want to be realistic about a schedule here.

4        MR. WELLS:  I think the schedule that we have set out

5  in the joint motion is essentially roughly realistic.  I think,

6  though -- Mr. Post and I have had a conversation about changing

7  the expert witness disclosure date to a later date.

8        And I apologize, Jim, I can't remember the date we

9  talked about.

10        MR. POST:  January 3rd.

11        MR. WELLS:  January 3rd.

12        THE COURT:  For the initial expert disclosures?

13        MR. WELLS:  Yes, sir.

14        THE COURT:  All right.

15        All right.  And then that would mean there were -- if

16  there's rebuttal disclosures, it would be 2/15, or something

17  like that, like 45 days or something?

18        MR. WELLS:  Yes, sir.

19        THE COURT:  Is that good?

20        All right.  And then I'm looking at a final discovery

21  deadline, which also assumes any depositions of experts have

22  been taken.  I think 3/16 is a little tight.

23        I mean, I don't -- I mean, I know Mr. Tanner is going

24  to get you situated.  But I think -- you know, to be realistic.

25  I think maybe -- and you're going to have to work out -- I

1    mean, Mr. Post is talking about taking 12 depositions.  And I

2    don't know where all these people are and everything, so, you

3    know...

4          So if we've got the experts disclosed by the middle

5    of February, is two -- and that doesn't mean you can't be doing

6    other things in the meantime.

7          But is two -- is two months -- so, in other words, if

8    we close down all discovery by the middle of April, is that --

9    is that doable?

10          Right now you've got it the middle of March.  I'm

11    giving you an extra month based on your disclosures.

12          Is that doable?  Do we need to do 5/1?  Because I

13    want to mean it, so...

14          MR. WELLS:  Your Honor, I may have to yield to

15    Mr. Post on that question.  I don't think that, on behalf of

16    Foodonics --

17          THE COURT:  You're not going to have a lot to do.

18          MR. WELLS:  We're not going to have that many

19    depositions that we'll be taking.  I think Mr. Post will be

20    taking most of them.

21          THE COURT:  Yeah.

22          MR. WELLS:  And I do -- I do recognize that -- number

23    one, we anticipate them taking our out-of-state.

24          THE COURT:  All right.  I'm going to say May 1st.

25    Okay?

1        All right.  But I'm -- I'm serious about this.

2   You've got -- I mean, I don't want to get a motion for

3   extension of discovery.  You need to plan it and you need to

4   get it done.  You're going to have a special master that's

5   going to help you keep on track.  So there's really no reason

6   it can't happen.

7        And so May 1st, if that's a real -- I try not to set

8   things on Sundays or Saturdays or something.

9        Yeah.  May 1st is a Friday.

10       Okay.  So...

11       All right.  Now, Mr. Wells, from your client's

12  standpoint regarding the counterclaim -- I guess the complaint

13  or the counterclaim, do you anticipate any dispositive motion

14  practice in the case or not?

15       MR. WELLS:  Yes, sir.

16       THE COURT:  You do?

17       MR. WELLS:  We do.

18       THE COURT:  Okay.  All right.

19       MR. WELLS:  We frankly would anticipate dispositive

20  motions on both the complaint and the counterclaim.

21       THE COURT:  Okay.  And, Mr. Post, I guess I don't

22  need to ask you, but I'll ask you anyway.

23       Are you anticipating motions, or not?

24       MR. POST:  Maybe partial summary judgment motions,

25  yes, Your Honor.

1    THE COURT:  Okay.  All right.  Usually what I do is I

2  give you 30 days after discovery closes.  So that would be

3  6/1 -- 6/1/20 as your dispositive motion.

4    And that also includes *Daubert* motions, by the way,

5  so if you have a problem with one of the experts.  But I

6  will -- I will -- before you put a lot of money and time in the

7  *Daubert* motions, you know, make sure you've really got

8  something.

9    Because if it's just -- if it's just

10  cross-examination material, I'm not going to grant a *Daubert*

11  motion and exclude the experts.

12    So, you know, if you've really got something, you can

13  file one.  But just make sure you're not just previewing what

14  your cross-examination is going to be.  So...

15    All right.  So then that puts us 6/1.  We've got

16  motions.  The response would be due 30 days later.  So now

17  that's 6/30.

18    So now they're in my lap July 1st.  I'll stop working

19  on all of my other 500 cases and jump right on it on July the

20  2nd.

21    I'm just kidding.

22    Let's see.

23    (Judge confers with law clerk.)

24    THE COURT:  All right.  And this is just the facts of

25  life.  If I'm presented with a complex set of motions on July

the 1st -- I mean, they're ripe on July the 1st -- matter of
fact, I'm going to build in a reply, because everybody always
asks for one, and then I won't have to worry about it.

The reply will be due, any motions will be due.  And
that reply will be limited to 15 pages.  And that reply would
be due on July the 22nd.

All right.  If I'm presented with a bunch of motions
that I've got to dig into and -- then that's going to take me
some time.

I'm going to go ahead and set it -- set you-all for
pretrial in December of '20 and trial in January of 2021.

And I know that seems like a long time, but it's
really not.  And we just need time to resolve the motions.

Now, if y'all told me you don't need me to -- if
you're not going to file a motion and you just want to go to
trial, then we'll try it sooner.  But if you really want me to
look at motions, we may have to have an argument.  I just --
you just never know, so...

So I -- I think that's realistic.

And I'm trying to do everything I can to say this is
it, this is what we're going to do.  And I'm not going to
change it unless somebody really, you know, comes up with
something.

I regret that we, in effect, have kind of lost two
years, I feel like.  I mean, maybe we didn't lose two years,

1  but we've lost a year-and-a-half.

2          I really regret that.  But, realistically speaking, a

3  case of this type and magnitude to be -- given that we're not

4  very far along, you know, to try it in essentially 14 months

5  from now is probably realistic.

6          Anybody want to be heard on that schedule?  Because

7  it will be a schedule that you'll be sleeping with under your

8  pillow from now on.

9          Mr. Wells, you want to be heard?

10         MR. WELLS:  No, sir.

11         THE COURT:  Mr. Post, you want to be heard?

12         MR. POST:  No, sir.  Thank you.

13         THE COURT:  Okay.  And I never say never.  But as

14  close to saying never as I can, this isn't changing.  And I'm

15  going to go ahead and schedule some time in January and put it

16  on our calendar in 2021.  And assuming we're all still here,

17  that's what we'll do.

18         How long, Mr. Post -- I guess since you have the

19  counterclaim -- it seems to me that the complaint is less --

20  will be less lengthy, in terms of its presentation, but -- so

21  let's say -- can you give me an estimate of how long you think

22  trial would last?

23         MR. POST:  Excluding the time it takes to pick a

24  jury?

25         THE COURT:  Yeah.

1          MR. POST:  No more than two weeks.

2          THE COURT:  That's what I think.  Okay.

3          Mr. Wells, you want to -- you don't want to say

4    longer than two weeks, do you?

5          MR. WELLS:  No, sir.

6          THE COURT:  Okay.  Yeah.  I kind of have a rule that

7    two weeks of anything is plenty, so...

8          Now, with respect to jury selection, I'm not going to

9    ask you for an answer now.  But it has become customary here,

10   in order for us -- for the district judges to be able to budget

11   our time and to do the other things we need to be doing, it's

12   been -- become somewhat customary that the magistrate judges

13   will pick the jury.

14         And so they'll pick a jury on -- you know, on a

15   Monday, and then I'll start the trial with you on a Tuesday, or

16   you'll pick the jury on a Friday and we'll start on a Monday,

17   something like that.

18         It does require the consent of both parties.  In this

19   case it would be Judge Klindt.  He picks -- he picks civil

20   juries.  He picks criminal juries.  They pick more juries than

21   we do now.  But it does require consent.

22         At some point I'll be asking you whether you will

23   consent or not.  So you need to confer with your clients.

24         Just to be clear, the magistrate judge would pick the

25   jury, but then I would try the case.

1          MR. POST:  Your Honor, we would consent to that now.

2          THE COURT:  Okay.  Well, I don't want to put any --

3  you know, I don't want to put anybody at a disadvantage.  And

4  I'm not looking for that now.

5          But, Mr. Wells, you'll discuss that with your client.

6  And -- and at some point we'll -- we'll make a decision, unless

7  you know now what your position is.

8          But if you need to discuss it with your client, I'm

9  perfectly fine with that.

10          MR. WELLS:  I would like to discuss it, if I may.

11          THE COURT:  Sure.  Absolutely.

12          MR. WELLS:  Thank you.

13          THE COURT:  At some point we'll be asking both of you

14  again.

15          Okay.  So that's going to be our case schedule.

16  And -- and that's it.  So I want to talk to y'all about

17  settlement and what we need to do to position the case to make

18  every reasonable good-faith effort to settle the case.

19          I don't remember -- Mr. Wells, who was the mediator

20  that tried early on?  I don't -- I saw there was a mediation,

21  but I don't remember who it was.

22          MR. WELLS:  Terry Schmidt was our mediator, Your

23  Honor.  We actually mediated it twice, I think maybe once

24  before litigation was commenced, and then we had a stay while

25  we explored settlement.

1    THE COURT:  Yeah.  Okay.

2    And are you, from your client's perspective -- we're

3  going to have to try again, of course.  I guess I'm interested

4  in two things from your client's perspective.

5    Do you want to stay with Mr. Schmidt?  Do you want to

6  try something different?  And when would be a good time to

7  reengage?

8    Those are my two questions.

9    MR. WELLS:  Mr. Schmidt is a very capable mediator.

10  But having mediated it twice, I think fresh blood might be

11  good.

12    THE COURT:  Okay.

13    MR. WELLS:  With all due candor, I've not considered

14  an alternative mediator at this point.

15    THE COURT:  Okay.

16    MR. WELLS:  But I think in order for mediation to be

17  meaningful, then I think some -- at least depositions of

18  critical parties and witnesses will have to be done.

19    THE COURT:  Okay.  Mr. Post, what's your thinking

20  about mediation and who and when and so forth?

21    MR. POST:  Your Honor, we think -- we like Terry

22  Schmidt, but we -- I agree that perhaps fresh blood would be

23  appropriate.

24    We would -- we would be amenable to, if possible,

25  someone like -- maybe Judge Schlesinger or someone like that,

1  or one of the other magistrates that are on this case would be

2  welcome as well.

3          As far as the timing is concerned, I -- I can see the

4  logic that Mr. Wells might be -- have, in saying that we need

5  to take some depositions first.  But we were -- we're willing

6  to do it either way.

7          THE COURT:  Okay.  Well, with respect to Judge

8  Schlesinger, he will from time to time agree to do one.  I try

9  to not ask him very often.

10          He has -- he spent nine years settling my firefighter

11  discrimination case against the City, and just did a tremendous

12  job.

13          And he's really -- you know, he does a great job.

14  But he's senior status.  And I don't -- I try not to -- because

15  if I ask him, he'll say yes.  But I try not to ask him very

16  often, because I don't want to take advantage of his good

17  graces.

18          I'll consider that.  But more likely I would suggest

19  a magistrate judge for you.  If it wasn't Judge Klindt --

20  sometimes we don't -- you know, you've had so much experience

21  with Judge Klindt on the discovery and so forth, it might be

22  better to have somebody else do it.

23          Not that he wouldn't do a great job, but maybe --

24  maybe because he knows about the case, that would be something

25  to consider.

1    So what I'm going to do -- but I don't want to really

2 make that decision myself.  I want y'all to think about it, I

3 want you to talk to each other, and I want you to suggest to me

4 in a filing who you would like me to appoint and -- and a time

5 frame for that appointment.

6    And so -- and I may or may not agree with you on

7 either one of those things, but at least you'll have told me

8 what you think, and I'll -- I'll give it some thought.

9    I have -- I have become aware recently that -- that

10 Mike Abel is now doing mediations.  And he just settled a

11 case -- a really difficult case that I had.

12    And I thought he did a nice job.  And so he's

13 somebody I also have in mind as a possibility.  I don't know if

14 either one of you know Mr. Abel.  I assume you do.  So that's

15 somebody else I would consider in -- throwing into the mix.

16    MR. BEAN:  Your Honor?

17    THE COURT:  Yeah.

18    MR. BEAN:  I know Mr. Abel very well.

19    THE COURT:  Oh, that's right.  Sorry.  Yeah.  Sorry

20 about that, Dan.  Yeah.  All right.

21    MR. BEAN:  Your Honor, we -- there's some discussion

22 about having an ACTEC mediator.  We've -- I've used them

23 before.

24    THE COURT:  I don't know what that is.  What is that?

25    MR. BEAN:  It's the academy of trust and estates

1    lawyers.

2            THE COURT:  Oh, okay.

3            MR. BEAN:  It's a certification that you get.

4            THE COURT:  Yeah.

5            MR. BEAN:  There was one we used with -- Mr. DeVault

6    and I were opposite sides.  He's out of Orlando and very

7    effective and understands trust and estates issues.

8            THE COURT:  Okay.  Well, you know, I'm open to

9    anything -- I want the person -- I want you to pick the person

10   that's going to have the best chance of settling the case.

11   That's who I want you to pick.

12           So whoever that is -- so, yeah, I forgot, Mr. Bean,

13   you're -- that wouldn't really do, would it, since he's your

14   partner.

15           MR. WELLS:  We have no objection to Mr. Abel.

16           THE COURT:  I understand.  Yeah.

17           Well, he just did a really nice job in a -- you know,

18   in a really difficult civil rights case, so that's why he's on

19   my mind, so...

20           All right.  I'm going -- I'm going to give you two

21   dates here, a date to let me know about dispute resolution, in

22   terms of persons and -- and a timing range.  Even if you can't

23   agree exactly, just give me a range.

24           And then, secondly, I want to give dates for the

25   briefing on the jurisdictional issues that I raised.

1    So, Mr. Post, if I gave you-all a couple of weeks to

2   file a jurisdictional brief that was able to assure me that I

3   had jurisdiction in the matter, is that enough time?

4    MR. POST:  Yes, Your Honor.

5    THE COURT:  Okay.  So -- I'm looking at the wrong...

6    Okay.  So November 19th, if y'all will file a

7   jurisdictional brief addressing the issues that I raised with

8   you today.

9    And if you -- if you need to know more what they are

10   or get -- you know, you can get a transcript from Ms. Bishop.

11    And then, Mr. Wells and Mr. Bean -- we've got

12   Thanksgiving going on.  So how about -- if you have any

13   response to the jurisdictional brief...

14    Since it's Thanksgiving, I'm going to -- I'll give

15   you until December the 10th to file any jurisdictional

16   response.  Okay?

17    MR. WELLS:  Thank you, Your Honor.

18    THE COURT:  And then with respect to the alternative

19   dispute resolution, mediator, I'll give y'all until the 19th,

20   also, to file a joint notice with me as to how you would like

21   me to include that.

22    And I'll wait -- I'll wait on issuing the scheduling

23   order until I get your mediation choice and timing.  And then

24   we'll include that in the scheduling order.

25    But the parties should assume at this moment that

1    they're under the scheduling order that I've announced on the

2    record here today.

3          Is that all right?  Or should we wait and issue it?

4    Or what do you want to do?

5          I guess maybe we'll go ahead and issue the

6    scheduling -- I'd like y'all to have it -- have it in your hand

7    and know what it is.  And then we can just follow up and issue

8    a second order on the -- on the mediator.

9          All right.  What else do y'all need to talk about

10   today?  We've covered a lot.

11          But what else -- Mr. Wells, is there anything else on

12   your mind at the moment?

13          MR. WELLS:  Not on behalf of plaintiff and counter

14   defendants, Your Honor.

15          THE COURT:  All right.  And, Mr. Post, anything, sir?

16          MR. POST:  Nothing further, Your Honor.  Thank you

17   very much.

18          THE COURT:  Okay.  Sure.  And I hope -- I hope both

19   of you -- I know Mr. Klempf is in the back there.  And, you

20   know, I don't know -- I don't know.

21          I mean, I don't know anything about anything.  I

22   really don't.  All I -- I just know that families fighting each

23   other is just not a good thing.  And if there's any way to

24   figure out a way to resolve it, that's what should happen.

25          And -- and, you know, sometimes that's going to --

1   y'all both knew my senior partner, Harris Dittmar, who I -- who

2   I came up under.

3        And he had a saying -- when clients would sit in the

4   room and tell us it was a matter of principle, it's a matter of

5   principle, and he'd look at them and he'd say, "Sometimes you

6   have to rise above your principles."

7        And sometimes you do have to rise above your

8   principles.  You have to do things you don't want to do, maybe

9   for the -- for the better.

10       Again, I don't know anything about the family

11  dynamics.  And I don't pretend to want to get in the middle of

12  it.  But, you know, it's just not a good thing for brothers and

13  sisters to be fighting each other in federal court over money.

14       And if there's any way to make that not happen in a

15  way that everybody can live with, that's what we ought to be

16  about.

17       So enough said.  I appreciate everybody's

18  participation.  I am confident that whatever problems we've had

19  in the past, and whatever delays we've had in the past, are in

20  the past, and that with Mr. Tanner's help, who I'm going to

21  call and appoint, and with the schedule we've got -- I sure

22  hope it settles.  But if it doesn't, we will stay on track and

23  we will go to trial in January of 2021.

24       All right.  Good to see everybody.

25       MR. WELLS:  Thank you, Your Honor.

1          COURT SECURITY OFFICER:  All rise.

2      (The proceedings concluded at 11:13 a.m.)

3                          - - -

## **CERTIFICATE**

UNITED STATES DISTRICT COURT    )
                                )
MIDDLE DISTRICT OF FLORIDA      )


        I hereby certify that the foregoing transcript is a true

and correct computer-aided transcription of my stenotype notes

taken at the time and place indicated herein.


        DATED this 20th day of November, 2019.




                    s/Shannon M. Bishop
                    Shannon M. Bishop, RDR, CRR, CRC