UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

FOODONICS INTERNATIONAL, INC.,   )
a Florida corporation,

                       )

       Plaintiff,

                       )

v.                             )      Case No. 3:17-cv-1054-J-32JRK

                       )

DINA KLEMPF SROCHI, as Trustee   )
of the LAURA JEAN KLEMPF
REVOCABLE TRUST, a Florida trust,  )

                       )

       Defendant.

_____)

DINA KLEMPF SROCHI, as Trustee   )
of the LAURA JEAN KLEMPF
REVOCABLE TRUST, a Florida trust,  )

       Counterclaim Plaintiff,      )

v.                             )

FOODONICS INTERNATIONAL, INC.,   )
a Florida corporation, and KEVIN
JACQUES KLEMPF,             )

       Counterclaim Defendants.    )

_____

**COUNTERCLAIM PLAINTIFF'S RESPONSE TO
COUNTERCLAIM DEFENDANTS' MOTION TO COMPEL**

Counterclaim plaintiff, Dina Klempf Srochi, as Trustee of the Laura Jean Klempf

Revocable Trust (the "Trust"), files this response in opposition to Counterclaim Defendants'

Motion to Compel (Doc. No. 214; "Motion to Compel").

I. **Communications among members of the Jean Klempf Privilege Group are privileged.**

   A. **The Jean Klempf Privilege Group.**

Jean Klempf established a Trust on April 1, 1992 (the "Trust").  From 2006 until she died in 2017, Jean Klempf utilized the counsel and advice of attorneys, accountants and other agents, including her family members, to provide her and her Trust with the legal and accounting advice necessary to protect her legal and financial interests.  The chart below depicts the persons Jean Klempf utilized to advise and protect those legal and financial interests since 2008 (collectively, the "Jean Klempf Privilege Group").

THE JEAN KLEMPF PRIVILEGE GROUP



*See* Declaration of Dina Klempf Srochi (the "Srochi Declaration") attached as Exhibit A and Declaration of James H. Post (the "Post Declaration") attached as Exhibit B.

Jean Klempf and her Trust needed legal and financial protection from the forays Jacques Klempf orchestrated in his 15 year campaign to squeeze Jean Klempf out as a minority shareholder of the Company and manipulate her to enter into the Redemption Sale based upon fraudulent representations and omissions.[1]  By way of example only, attached as Exhibit C is an October 10, 2008 letter from Jean Klempf's attorney (Dennis Blackburn) to Jacques Klempf's attorney (Grier Wells) rejecting Jacques Klempf's offer to buy Jean Klempf's stock and requesting information regarding the Company's financials and operations, including information on the undisclosed personal loans Jacques Klempf made to himself from the Company.  Attached as Exhibit D, is a letter from Jean Klempf's attorney (Steve Brust) to Jacques Klempf's attorney (Grier Wells), identifying Jacques Klempf's improper actions in regard to Jean Klempf's shareholder rights and stating that Court involvement may be necessary unless Jacques Klempf "fully performs all duties required of a corporate officer and director under Florida law."

As set forth below, the communications among the Jean Klempf Privilege Group members, which included Dina Klempf Srochi and Marc Klempf, were privileged because at all material times Dina and Marc acted as Jean Klempf's agents to (i) help facilitate the communications between Jean Klempf and her attorneys and advisors in regard to the ongoing legal issues and disputes she and her Trust were having with Jacques Klempf and Foodonics, including the legal issues and disputes in this case and (ii) help Jean Klempf decide when or how to act upon her lawyers' and advisors' advice.

---

[1] As Jacques Klempf admitted in his May 14, 2016 email to Dolph Baker during the Cal-Maine sale negotiations: "On December 31, 2015 I finished the buyout of my family that took nearly 15 years to complete and $20+ million dollars."

**B.**   **The communications between members of the Jean Klempf Privilege Group have, at all relevant times, been privileged.**

The general rule of waiver when a privileged communication is shared with a third party does not apply when "the third party possesses a 'common interest' with the client, or the third party is an 'agent' of the client."   The agency exception therefore operates to prevent waiver. *In re Int'l Oil Trading Co.*, 548 B.R. 825, 831 (Bkrtcy. S.D. Fla. 2016).

Section 90.502(1)(c), Florida Statutes, provides that a communication is confidential if it is not intended to be disclosed to third parties other than "[t]hose to whom disclosure is in furtherance of the rendition of legal services to the client" or "[t]hose reasonably necessary for the transmission of the communication." Fla. Stat. § 90.502(1)(c). Consistent with these principles, courts have recognized that communications with agents used in furtherance of legal objectives are exempt from disclosure. As stated in the Restatement (Third) of the Law Governing Lawyers:

> The privilege normally applies to communications involving persons who on their own behalf seek legal assistance from a lawyer. However, **a client need not personally seek legal assistance, but may appoint a third person to do so as the client's agent**. . . . If the third person is an agent for the purpose of the privilege, communications through or in the presence of that person are privileged . . . .

> Restatement (Third) of the Law Governing Lawyers § 70 cmt. e (2000) (emphasis added) (citations omitted).

A client does not need to directly participate in a conversation between her agent and her counsel to invoke a claim of privilege. *See Talent Ocean Int'l, LLC v. F.D.I.C.*, No. 3:12-CV-144-J-32MCR, 2012 WL 6027774, at *3 (M.D. Fla. Dec. 4, 2012) (concluding communications exclusively between client's real estate agent and attorney were privileged because "'statements made by or to a representative or agent of either the client or the attorney

are protected as if they were made by the client or the attorney.'" (quoting Charles W. Erhard, Florida Evidence 502.2 (2011 ed.))); *see also Gerheiser v. Stephens*, 712 So. 2d 1252, 1254 (Fla. 4th DCA 1998) (explaining that, consistent with case law indicating that the attorney-client privilege "extends to the necessary intermediaries and agents through whom such communications are made[,]" a mother's communication with an attorney to obtain legal representation for son was protected because she was acting as the son's agent).

Individuals fitting this description include close family members in circumstances consistent with confidentiality. *See Coulter v. State Farm Mut. Auto. Ins. Co.*, No. 4:12CV577-WS/CAS, 2013 WL 12102888, at *3 (N.D. Fla. June 20, 2013) (concluding the attorney-client privilege applied to communications between the client's daughter and boyfriend, on the one hand, and the attorney, on the other hand, where the client did not have regular access to email or a fax machine and was frequently busy with her rehabilitation); *see also Iscaro v. Flavor Delite, Inc.,* No. 14-80644-CIV-DIMITROULEAS/Snow, 2015 WL 12780954, at *1 (S.D. Fla. June 26, 2015) (disclosure to sister-in-law did not waive privilege where client relied on her business savy); *Witte v. Witte*, 126 So. 3d 1076, 1077–79 (Fla. 4th DCA 2012) (remanding to determine whether communications were privileged that included client's daughter and son-in-law where client suffered from medical ailments and, although she had a mind of her own, she often required assistance).

Also fitting within the agency group are individuals such as secretaries, law clerks, paralegals and translators. *Int'l Oil Trading Co.*, 548 B.R. at 834; *see also Tyne*, 212 F.R.D. at 598-99 ("The attorney-client privilege extends to agents and representatives of the attorney when disclosure is in furtherance of the rendition of legal services, or when disclosure is reasonably necessary for the transmission of the communication."); *Farmaceutisk Laboratorium Ferring v. Reid Rowell, Inc. A/S*, 864 F.Supp. 1273, 1274 (N.D. Ga. 1994)

(confirming special master's finding that communications with third party acting as an agent were protected by the attorney-client privilege).[2]

The agency exception also applies to accountants hired to facilitate the effective consultation between an attorney and client. *See U.S. v. Kovel*, 296 F.2d 918, 922 (2d Cir. 1961) ("the presence of an accountant, whether hired by the lawyer or by the client, while the client is relating a complicated tax story to the lawyer, ought not destroy the privilege . . . the presence of the accountant is necessary, or at least highly useful, for the effective consultation between the client and the lawyer which the privilege is designed to permit."); *see also Int'l Oil Trading Co.*, 548 B.R. at 833 ("Clients may engage the services of non-attorney professionals in furtherance of their litigation aims. The so-called 'agency exception' to wavier of the attorney-client privilege protects from discovery the necessary communications with such parties.").

Lastly, courts have considered the nonuse or inability to use technology as a circumstance creating a reasonable necessity for an agent to facilitate communications. *See AG Beaumont 1, LLC v. Wells Fargo Bank, N.A.*, 160 So. 3d 510, 512–13 (Fla. 2d DCA 2015) (explaining that where communications were sent to an investment advisor of an LLC member, and the member did not use email, the advisor was an agent of the member and sharing the communications did "not automatically foreclose the claim of privilege"); *see also Coulter*, 2013 WL 12102888, at *3 (denying motion to compel where family members facilitated privileged communications where the client did not have regular access to email or fax).

---

[2] The work-product protection is broader in application than the attorney-client privilege. "Thus, a disclosure made in preparation for trial does not waive the work product privilege unless it is 'inconsistent with the maintenance of secrecy from the disclosing party's adversary . . . that is, that it substantially increases the possibility of an opposing party obtaining the information.'" *Visual Scene, Inc. v. Pilkington Bros.*, 508 So. 2d 437, 442 (Fla. 3d DCA 1987) (quoting *U.S. v. Am. Tel. & Tel. Co.*, 642 F.2d 1285, 1299 (D.C. Cir. 1980)).

In this case, as set forth in the Srochi Declaration, Jean Klempf relied on Dina Klempf Srochi and Marc Klempf as her agents to consult effectively with, obtain and act upon advice from counsel and other advisors. This was because:

(i)      Dina Klempf Srochi and Marc Klempf were trusted and loyal family members whose interests in the administration of the Trust were aligned with Jean Klempf's interest;

(ii)     Jean Klempf did not have an email account and was unable to communicate electronically; and

(iii)    Jean Klempf was elderly and had health issues which, at times, severely impaired her ability to effectively communicate with and act upon the advice of her attorneys and accountants.[3]

To ensure the effective facilitation of privileged communications and to allow the Trust to act on its legal rights, Dina Klempf Srochi and Marc Klempf were required to routinely consult with other members of the Jean Klempf Privilege Group.  Importantly, each member of the Jean Klempf Privilege Group believed that their communications would be treated as confidential—and each member reasonably treated the communications as if they were.

For the same reasons, the attorney-client communications among the Jean Klempf Privilege Group involving Dan Edelman are also privileged.  Dan Edelman was the agent for each of the Sellers in the redemption sale negotiations with Jacques Klempf (the Sellers

---

[3] See Srochi Declaration at paras. 1 – 6.

included Jean Klempf, her Trust, Dina Klempf Srochi and Marc Klempf).  Dan Edelman also provided accounting services for each of the Sellers on complicated tax issues.[4]

In its Motion to Compel, the Foodonics Parties do not address the fact that Dina Klempf Srochi and Marc Klempf were acting as agents for Jean Klempf and her Trust.  Instead, the Foodonics Parties argue that the general rule of waiver is applicable in this case because of the non-applicability of the common interest exception.  Although the Trust used the term "common interest" in its privilege log in regard to several items, it was intended as a reference to the fact that Dina Klempf Srochi and Marc Klempf were included among the privileged persons within the Jean Klempf Privilege Group.

Based on the principle of law that communications with agents used in furtherance of legal objectives are exempt from disclosure, and the undisputed fact that Dina Klempf Srochi and Marc Klempf were members of the Jean Klempf Privilege Group who Jean Klempf relied upon them to act as agents and intermediaries for her benefit, the Motion to Compel the production of privileged documents shared with Dina Klempf Srochi and Marc Klempf should be denied.

---

[4] The Foodonics Parties also argue that no accountant-client privilege existed among Dina Klempf Srochi or Marc Klempf, as Trust beneficiaries, in their communications with Dan Edelman.  *See* Motion to Compel, p. 12.  This argument ignores the fact that Dan Edelman also represented Dina Klempf Srochi and Marc Klempf as Sellers in the redemption sale negotiations.

Moreover, the Foodonics Parties cite to Florida Statute §90.5055 in support of their argument that the "client" is limited to the trustee, the language of the statute supports a broader definition of "client" that includes *any* person consulting an accountant for the purpose of obtaining accounting services:

> A "client" is any person, public officer, corporation, association, or other organization or entity, either public or private, who consults an accountant with the purpose of obtaining accounting services.

> Florida Statute §90.5055(1)(b).

The only circumstance described in Florida Statute §90.5055 where accountant-client privilege does not apply is when communications involving matters of common interest between two or more clients are offered as evidence in civil litigation between the clients.  That exception does not apply, however, because Jacques Klempf was never a client of Dan Edelman.

8

**II.      The emails Dina Klempf Srochi sent to herself as instructed by counsel are privileged.**

Dina Klempf Srochi's emails to herself that are identified in the Trust's privilege log were part of a protocol counsel requested that was intended to collect potential information, work product and client input to formulate and provide legal advice.

The Foodonics Parties argue that these documents are discoverable because: (i) they do not specifically identify an attorney as a recipient; (ii) the Trust's privilege log does not state whether the documents contain fact or opinion work product; and (iii) the emails were not sent at a time when litigation was reasonably likely to occur.  These arguments fail because: (i) an attorney does not need to be a recipient of the email for it to fall within the ambit of the attorney-client privilege; (ii) whether these emails contain fact or opinion work-product is of no legal consequence in the context of the pending motion to compel; and (iii) the emails were sent at a time when (a) Jacques Klempf was engaged in his "legal battles" to get his mother's stock or (b) after the Redemption Sale when litigation was reasonably likely to, and ultimately did, occur.

The attorney-client and work-product privilege extends to information gathered for the rendering of legal advice. *U.S. ex rel. Baklid-Kunz v. Halifax Hosp. Med. Ctr.*, No. 6:09-cv-1002-Orl-31TBS, 2012 WL 5415108, at *3 (M.D. Fla. Nov. 6, 2012) ("In some cases, the privilege may also be extended to protect 'information gathered by corporate employees for transmission to corporate counsel for the rendering of legal advice.'").  Courts have acknowledged that a client's handwritten notes are protected by the attorney-client privilege, if they were made to obtain legal advice. *See Lemonik v. E. Airlines Inc.*, 632 So. 2d 239, 239 (Fla. 3d DCA 1994) (quashing order compelling the client to produce various notes and a diagram he prepared to consult with an attorney); *see also Merlin v. Boca Raton Community*

*Hosp., Inc.*, 479 So. 2d 236, 239 (Fla. 4th DCA 1985) ("We conclude the notes were protected by the attorney-client privilege, as they were prepared for and transmitted to the attorney either in contemplation of or during the litigation and kept confidential throughout."). The use of email – instead of hand written notes – to reflect the same information for the same purpose requires the same result—the documents are privileged.

In this case, Dina Klempf Srochi sent emails to herself, as instructed by counsel, was part of a protocol to obtain legal advice required for Jean Klempf and her Trust.  These emails included, for example, subjects for further discussion with the attorneys, identification of prior communications or documents that could support the Trust's claims or defenses in this litigation, and a list of topics to discuss with attorneys.

The Foodonics Parties do not articulate why a description of whether the documents contain fact or opinion work-product is relevant nor do they contend that this distinction would render any of these documents otherwise discoverable. Instead, they argue that the emails Dina Klempf Srochi sent to herself cover a period of time "when litigation was not reasonably likely to occur."  Motion to Compel, at 11.  This argument ignores, however, Jacques Klempf's self-described ongoing "legal battles" with his mother in the years prior to the redemption of his mother's shares of Foodonics stock on December 31, 2015.  As Jacques Klempf stated in an email to Ameris Bank on November 14, 2014, to obtain a loan to fund the redemption of his mother's stock:

> Trust me, there has been over 1-year of legal battles with family and opposing counsel to get it to this point.

*See* Exhibit E attached.

The Court should not compel the disclosure of privileged information collected by Dina Klempf Srochi for the purpose of advancing claims and defenses and obtaining legal advice from counsel for Jean Klempf and her Trust.

### III.    <u>The Trust's privilege log provides sufficient information</u>.

The Foodonics Parties argue that the Court should compel the Trust to amend its privilege log because it is missing information related to the title or description of each document, the subject-matter of each document and an explanation of the purposes for which the documents were prepared or communicated. The relief requested should be denied because (i) the format of the Trust's privilege log was the same format as the privilege logs produced by the Foodonics Parties; (ii) Rule 26 does not require the Trust to provide all of the information demanded by the Foodonics Parties; and (iii) producing an amended privilege log containing the additional information demanded by the Foodonics Parties  would be unduly burdensome, expensive and of little, if any, benefit in assisting the Foodonics Parties or the Court in assessing the privileges asserted or, more importantly, obtaining a speedy or inexpensive determination of this action.

(i)    During this litigation, the Trust had many concerns about the privilege logs produced by the Foodonics Parties.  At no time, however, did the Trust ever challenge the categories of information in the privilege logs produced by the Foodonics Parties.  Until last month, there was at least a tacit agreement and understanding between counsel that the categories of information contained in the privilege logs was sufficient to evaluate privilege claims.  The Foodonics Parties are estopped from now complaining that the format of the Trust's privilege log is deficient when the privilege logs previously produced by the Foodonics Parties and GrayRobinson contain the identical categories of information.

(ii)     Rule 26 "does not attempt to define for each case what information must be provided when a party asserts a claim of privilege or work product protection." Advisory Committee's Note to 1993 amendment to Fed. R. Civ. P. 26. Recognizing the growing volume of potentially privileged data and communications, the Advisory Committee explained "[d]etails concerning time, persons, general subject matter, etc., may be appropriate if only a few items are withheld, but may be unduly burdensome when voluminous documents are claimed to be privileged or protected, particularly if the items can be described by categories." *Id.*; s*ee also MCC Mgmt. of Naples, Inc. v. Arnold & Porter LLP*, 2010 WL 2431849, at *2 (M.D. Fla. June 16, 2010) ("The sheer number of documents likely produced during this period render a document-by-document log unduly burdensome and unnecessary.   Accordingly, defendants' category-based log is sufficient.").

Here, because the Trust's privilege log contained 1,911 specific items, the Trust's Rule 26 obligations could have been met by producing a categorical privilege log, which would have contained less information than what the Trust's privilege log provided.   Nevertheless, as described in section (i) above, the Trust produced a line-by-line privilege log because that was the same information format the Foodonics Parties and GrayRobinson provided in their privilege logs.

Moreover, the procedural history in this case demonstrates that the information provided in both sides' privilege logs was sufficient.   The Foodonics Parties and the Trust were both able to evaluate the Foodonics Parties' and GrayRobinson's privilege claims without additional information.   As stated by the Foodonics Parties in their Motion to Compel:

> [The Foodonics Parties'] privilege log entries clearly listed third parties as recipients, making it possible for the Trust to assess privilege (or the lack thereof) *without the need for a description of the document*.
>
> >    Motion to Compel, pg. 9, fn. 4 (emphasis added).

Based on the same evaluation standard, it is possible for the Foodonics Parties' to assess (or lack thereof) from the Trust's privilege log without the need for a description of each document.

(iii)    Lastly, it would be unduly burdensome and expensive at this late stage in the case for the Trust to provide additional information regarding each item on the Trust's privilege log.  Despite months of disputes over the Foodonics Parties' privilege log, the Foodonics Parties waited until approximately 3 months before the discovery cut-off—and during which more than 14 depositions are now scheduled—to raise any issue related to the Trust's privilege log.  Granting the requested relief would create unnecessary and time-consuming work, with little, if any, benefit to the parties or the Court at this critical stage of this litigation.

**IV.    The persons appearing in the Trust's privilege log which the Foodonics Parties "do not recognize."**

The Foodonics Parties assert that they do not recognize names of certain individuals on the Trust's privilege log.  The undersigned counsel reviewed the subject documents and individuals in question and states as follows:

A.    The following individuals are attorneys representing the Trust or members of their staff:

1.    Teri Adams:  assistant to Smith Hulsey & Busey attorney Mike Demont;
2.    Ruth Dobek: assistant to attorney Dennis L. Blackburn, Esq.;
3.    Joseph A. Frein, Esq.: attorney for the Trust;

      4.      Lynn Hunt: assistant to Joseph A. Frein, Esq.;

      5.      Charles Johnson, Esq.: attorney at Blalock Walters;

      6.      Lauren Antonino, Esq.: attorney at the Antonino Firm LLC; and

      7.      Michelle Howell: assistant at Smith, Gambrell & Russell, LLP.

B.      Kevin Sack is Dina Klempf's husband.

C.      The following individuals are persons providing banking, private wealth management or financial advisor services to Jean Klempf or her Trust.  As a result of further review, the undersigned counsel has determined these documents should be removed from the privilege log and not produced because (i) they are not responsive to the Foodonics Parties' request for production, (ii) are not relevant to the parties' claims or defenses and (iii) in any event, some contain or reveal private financial information relating to Jean Klempf or her Trust:

SunTrust Bank

1.   Karen Mayfield: Senior Vice President at SunTrust Bank (three emails between September 3, 2015 and February 27, 2017); and

2.   Kimberly Patoka: employee at SunTrust Bank (one email on March 29, 2017). (This document was produced with redactions as Trust 02-000970).

Dixon Hughes

3.   William Laird: Certified Financial Planner/Chartered Financial Analyst (three emails between February 27 and March 4, 2016).

Baird (Private Wealth Management)

4.   Jack Cohen: Managing Director (13 emails between August 8, 2017 and April 13, 2018);

5.   Tonya Carros: Senior Client Specialist (eight emails between August 30, 2017 and February 6, 2018); and

6.   Michele Jackson: Private Wealth Management Assistant Vice President (one email on December 21, 2017).

**V.     The draconian sanction of waiver of all claims of privilege should not be granted against the Trust in this case.**

The Foodonics Parties argue that the Trust's delay in the production of a privilege log requires this Court to impose the draconian sanction of waiver of all the Trust's privilege claims.  The undersigned counsel acknowledges the Trust's privilege log could have been served before December 23, 2019.  As set forth below, however, the delay in producing the Trust's privilege log resulted from a combination of factors—none of which are attributable to bad faith or intentional misconduct by the undersigned counsel and, in any event, have not prejudiced the Foodonics Parties.

**A.     Under the totality of circumstances, the delay of production of the Trust's privilege log in this case does not warrant the draconian sanction of privilege waiver.**

Rule 26(b)(5)(A), Federal Rules of Civil Procedure, describes the requirements for a party to assert a privilege regarding documents withheld from production that would otherwise be discoverable.  The rule lacks a specific time requirement.  As noted by the Foodonics Parties, the Eleventh Circuit "has never determined what constitutes a timely production of a privilege log in response to a request for production of documents."  *Universal City Dev. Partners, Ltd. v. Ride & Show Eng'g, Inc.*, 230 F.R.D. 688, 695 (M.D. Fla. 2005).  Although some courts consider 30 days to be presumptively timely, no court has adopted a per se rule that producing a privilege log after 30 days results in a waiver of privilege.  *See id.* (adopting a case-by-case multifactor analysis from the Ninth Circuit, which rejected a per se 30-day rule).

The Foodonics Parties argue—without citing any authority—that the timing of the Trust's production of its privilege log "should clearly be presumptively untimely."  Presumptive untimeliness, however, is inconsistent with other cases in Florida where the passage of time well in excess of 30 days did not result in waiver and disclosure of privileged

communications.  In *Tyne v. Time Warner Entertainment Co.*, the court denied a motion to compel production of documents listed on a privilege log even though the log was produced after eight months, just three days before a deposition and two weeks before the close of discovery. 212 F.R.D. 596, 597 (M.D. Fla. 2002).  In another case, the court emphasized the importance of the attorney-client privilege and denied a motion seeking to compel the production of privileged documents despite the party waiting almost a year to produce a privilege log, which also contained other deficiencies.

> Thus, '[w]hile a persuasive argument can be made that 'enough is enough' and [Plaintiffs] should be required to turn over all the documents listed on the privilege logs, the Court is reluctant to pursue such a draconian course, in spite of its superficial appeal.'
>
> *Anderson v. Branch Banking & Trust Co.*, No. 13-CV-62381, 2015 WL 2339470, at *3 (S.D. Fla. May 14, 2015) (quoting *CSX Transp. Inc. v. Admiral Ins. Co.*, No. 93-132-CIV-J-10, 1995 WL 855421, at *5 (M.D. Fla. July 20, 1995)).

In this case, the Trust's delay in producing its privilege log resulted from a number of factors described in the attached declaration of the undersigned.  Post Declaration, at 3-7. Below is a chronology that describes the efforts undertaken by the undersigned to prepare and produce the Trust's privilege log, as well as other material events that transpired during that same time:

a. On April 29, 2018, pursuant to the Order Governing ESI Issues (Doc. No. 27), the discovery liaisons for the Trust (Chris Dix, Esq.) and the Foodonics Parties (Michael Santana, Esq.) agreed to an ESI process for (i) determining search terms and (ii) the subsequent review of all data for privilege and relevance prior to production to avoid document dumping (the "Agreed Discovery Process").  See Exhibit F attached.

b. In August and September 2018, the Trust utilized a document review team from KLDiscovery to conduct a first-pass review of documents for relevance and to identify documents as "potentially privileged" when the documents involved characteristics typically found in privileged communications (e.g., documents containing the names of attorneys and law firms retained by Jean Klempf or the Trust).

c.  After KLDiscovery completed the first-pass review of the Trust's documents, SHB attorneys conducted a second-pass review of the documents to make further determinations regarding relevance and privilege, culminating in the Trust's timely production of documents to the Foodonics Parties on September 30, 2018.

d.  On October 2, 2018, the Court held its fourth Discovery Status Conference in this case.  The topics discussed at that status conference included the lack of documents and privilege log produced by GrayRobinson and the obvious deficiencies in the initial privilege log produced by Foodonics.

e.  From October 12 – 24, 2018, an SHB legal assistant assigned to this case began using a software program called Priv Log Builder (offered by KLDiscovery) to start creating a privilege log for the Trust. The initial efforts to generate a privilege log resulted in a preliminary log containing 7,081 items.  At this preliminary stage, the log had not been subjected to any review by any attorney at SHB.

f.  In October 2018, SHB moved its offices from 225 Water Street to 1 Independent Drive, resulting in considerable disruption to SHB's operations and personnel.

g.  On October 25, 2018, the Court held its fifth Discovery Status Conference.  The topics discussed at that status conference included ongoing deficiencies in the discovery responses and privilege logs produced by GrayRobinson and Foodonics.

h.  November 2, 2018, the SHB attorneys and staff working on this case met to discuss several pending discovery matters, including the preliminary log generated by the Priv Log Builder tool.

i.  On November 5, 2018, the Court held its sixth and final Discovery Status Conference. The topics discussed at that status conference included ongoing deficiencies in the privilege logs produced by GrayRobinson and Foodonics.

j.  November 6, 2018, the SHB attorneys and staff working on this case met again to discuss several pending discovery matters, including the preparation of the Trust's privilege log.  At that time, the SHB legal assistant was directed to undertake the review of the 7,081 privileged documents to determine responsiveness.

k.  On November 28 and 29, 2018, the Trust deposed Jacques Klempf and David Hancock regarding the sluggish discovery and other discovery deficiencies of Foodonics, Jacques Klempf and GrayRobinson in connection with this case.

l.  On January 28, 2019, the Trust took the continued deposition of David Hancock regarding additional sluggish discovery and other discovery deficiencies of Foodonics, Jacques Klempf and GrayRobinson in connection with this case.

m.  In March 2019, the SHB legal assistant responsible for using KLDiscovery's Priv Log Builder to create the Trust's privilege log left the employ of SHB without completing her review of the 7,081 documents on the preliminary privilege log.

n. On April 11, 2019, the Court entered an order directing the parties in this case to file all motions for sanctions by May 20, 2019.  Between April 11 and May 20, 2019, SHB's resources were focused (i) on preparing the Trust's Motion for Sanctions and the Trust's Motions to Compel Foodonics and GrayRobinson to produce documents from their respective privilege logs and (ii) other time-intensive and substantial matters in this case, such as the time-sensitive review in batches of the 300,000+ documents dumped by the Foodonics Parties over the course of discovery in this case, contrary to the Agreed Discovery Process.

o. On May 20, 2019, the Trust filed its motions for sanctions and to compel production of documents from privilege logs of Foodonics and GrayRobinson.

p. On May 21, 2019, an SHB associate took over for the SHB legal assistant and began working with KLDiscovery on revising the privilege log and adding the "privilege type" as a category shown on the log.  With assistance from KLDiscovery, SHB identified and removed a large volume of non-privileged documents that had been inadvertently marked as privileged.  Eliminating non-privileged documents reduced the number of privileged documents from 7,081 down to 3,362.

   Although this process of eliminating non-responsive documents and irrelevant documents from the privilege log was expressly agreed by the parties' ediscovery liaisons, the Trust was the only party that followed the Agreed Discovery Process -- Foodonics and GrayRobinson chose to serve privilege logs which contained thousands of documents irrelevant to this case leading to the substantial burden and delays described in greater detail in the Trust's motion for sanctions due to sluggish discovery.

q. On May 22, 2019, after additional review for responsiveness, the draft privilege log was reduced from 3,362 to 2,107 items.

r. On June 17, 2019, after additional review for responsiveness, the draft privilege log was reduced from 2,107 items to 1,911 items.

s. Between June 17, 2019 and December 7, 2019, the undersigned counsel reviewed the 1,911 items in batches over time as a second level review.  During that same time, the undersigned was also focused on other time-intensive and substantial matters in this case, including (i) the preparation and filing of the Trust's Amended Answer and Amended Counterclaim, (ii) the pursuit of additional documents from Cal-Maine Foods and Dolph Baker, BB&T, and other third parties, (iii) the continued review of the 300,000+ documents produced by the Foodonics Parties in this case, (iv) the Court's appointment of a Special Master in this case, (v) the deposition of Jess Wright and issues surrounding his communications with GrayRobinson and others and (vi) preparation and filing of a memorandum regarding the Court's jurisdiction in this case.

t. On December 7, 2019, the SHB associate working on the privilege log met with the undersigned to discuss final revisions to the privilege log.

u. On December 19, 2019, the SHB associate working on the privilege log had a medical procedure and was out of the office for several days.

v. On December 23, 2019, Special Master Tanner conducted a hearing regarding the Trust's motions to compel and for sanctions.

w. After the hearing on December 23, 2019, the Trust produced its privilege log to GrayRobinson along with third party productions that GrayRobinson had previously requested.

At no time prior to the Trust's production of its privilege log on December 23, 2019, did counsel for the Foodonics Parties ever make a request for a privilege log from the Trust.

The undersigned counsel acknowledges that (i) he was required to comply with Rule 26 and should have produced a privilege log without prompting from opposing counsel and (ii) with the benefit of hindsight, could have taken different actions in order to produce a privilege log earlier in this case. As set forth above, however, the delay in producing the Trust's privilege log in this case resulted from a combination of the particular circumstances of this litigation, which included the intensity of work over an extended period of time related to the Trust's efforts to (i) obtain minimally sufficient document productions from Foodonics, Jacques Klempf and third parties during 2018 and 2019 and (ii) the review and organization of the 300,000+ document dump by the Foodonics Parties.

## B.   Waiver of privilege is a drastic sanction which would be excessive in this case.

Waiver of privilege is a drastic sanction that should not be used absent extreme circumstances, as demonstrated by its inclusion in the Florida Rules of Appellate Procedure as a basis for seeking certiorari review in Florida's District Courts of Appeal. *See* Florida Rule of Appellate Procedure 9.100(h); *see also Lacaretta Rest. v. Zepeda*, 115 So. 3d 1091, 1093 (Fla. 1st DCA 2013) (explaining requiring the disclosure of privileged documents is a departure from the essential requirements of law and supports certiorari review). The

Foodonics Parties have not alleged any extreme circumstances that justify such drastic relief. In contrast, the Court previously did not require the Foodonics Parties to waive their privilege claims even though the Foodonics Parties missed Court-ordered deadlines to produce their privilege logs.

### C.       The Foodonics Parties are not prejudiced by any delay in the Trust's production of its privilege log.

The Foodonics Parties argue that the Trust's failure to produce a privilege log sooner than December 23, 2019 now impairs their ability to depose the Trust's representatives in this case. It should be noted, however, that Foodonics Parties waited for more than 27 months after commencing this case to schedule their first deposition in this case. Also, during the telephonic hearing with the Special Master on February 3, 2020, the Trust agreed to produce a witness within its privilege group for a second deposition to testify about the additional documents, if any, the Court directs the Trust to disclose relating to that witness. Any prejudice to the Foodonics Parties is cured by the Trust's February 3 proposal.

### D.       The Trust should not be punished for a process for which it had no control or input.

Lastly, and in any event, it was the undersigned counsel, not the Trust, that made the decisions regarding how to allocate the resources of SHB to meet the priorities demanded by this case, including the preparation and production of the Trust's privilege log. It is respectfully submitted that the Trust should not be punished by the draconian sanction of waiver resulting from a process over which it had no control or input.

### <u>Conclusion</u>

For the foregoing reasons, the Trust respectfully requests the Court to enter an Order denying the Counterclaim Defendants' Motion to Compel.

SMITH HULSEY & BUSEY


By:    /s/ *James H. Post*
           James H. Post
           Michael E. Demont
           R. Christopher Dix

Florida Bar Number 175460
Florida Bar Number 364088
Florida Bar Number 036988
One Independent Drive, Suite 3300
Jacksonville, Florida  32202
(904) 359-7700
(904) 359-7708 (facsimile)
jpost@smithhulsey.com
mdemont@smithhulsey.com
cdix@smithhulsey.com

Attorneys for Dina Klempf Srochi, as
       Trustee of the Laura Jean Klempf
       Revocable Trust

Certificate of Service

I certify that on this 12th day of February, 2020, I electronically filed the foregoing with the Clerk of Court through the Court's CM/ECF electronic notification system, which will send a Notice of Electronic Filing to all CM/ECF participants in this case. I further certify that I mailed the forgoing document and the notice of electronic filing by first-class mail to the following non-CM/ECF participants: none.


/s/ James H. Post
Attorney

1060789