# EXHIBIT E

**Date:** Tue, 4 Nov 2014 2:40:48 PM (UTC)
**Subject:** RE: Loan update
**From:** Jacques Klempf <jklempf@dixieegg.com>
**To:** Gibson, Cecil <cecil.gibson@amerisbank.com>; Jacques (kjkeggs@aol.com) <kjkeggs@aol.com>;
**CC:** Edwards, Jon <jon.edwards@amerisbank.com>; Cheney, Andy <andy.cheney@amerisbank.com>; gwells@gray-robinson.com;

Cecil / Jon / Andy,

First of all, I want to thank each of you for the time and effort spent on trying to help me finalize the purchase of my company with this final stock acquisition. Trust me, there has been over 1-year of legal battles with family and opposing counsel to get it to this point. I'm in a good cash position to finalize this stock redemption without any financing, however would like to borrow and let cash flows from the company pay down the note, which we can easily do. For the first 9-months of the year we are at 60-million in sales and 8.9 in profit and heading into the best part of selling season with market prices that are typically at their highest.

Nevertheless, borrowing would be my first option if the terms are not too onerous for the company. I've highlighted below some of the terms and conditions that I just do not feel like is a good deal for the company given the other options available to us at this time.

Please know that I appreciate and value our current relationship and want to continue to develop and maintain going forward.

All the best,

Jacques Klempf
President / CEO
Dixie Egg Company
904-783-0950
jklempf@dixieegg.com
www.dixieegg.com


**From:** Gibson, Cecil [mailto:Cecil.Gibson@amerisbank.com]
**Sent:** Friday, October 17, 2014 8:21 PM
**To:** Jacques (kjkeggs@aol.com); Jacques Klempf
**Cc:** Edwards, Jon; Cheney, Andy
**Subject:** Loan update



Jacques,

I am sending this to you in email form rather than a verbal discussion as the detail here is more complicated and I want this to be as clear for you as I can make, since there are lots of moving parts.

Jon Edwards, Andy Cheney and I had a chance to discuss your loan and the changes that you have requested to the approval. When we originally got the loan approved a couple weeks ago, the approval was you as borrower, Foodonics as guarantor, and all the outstanding shares of stock as collateral and an assignment of life insurance on you as collateral. We were willing to do this loan because with all the stock as collateral, in a default, we would have the ability to manage and control the sale of the company and the satisfaction of the creditors. We believe that given the probable value of the company as a going concern, and based on the discussion we had with you surrounding "the Dream Team" and the potential suitors for Foodonics, that the collateral, even though non-marketable as stock, was of sufficient value to offset taking privately held stock for security on our loan.

Subsequent to that, and after reading the loan agreement from BB&T, we realized that Foodonics could not be a guarantor, as there is a restriction in the loan agreement against your company becoming a guarantor on other debt. We waived Foodonics

as a guarantor on the loan based on that, without discussion.

When Jon and I met with you after the commitment letter was issued, we discussed the life insurance requirement and you asked for that to be removed on the premise that the value of the company and the stock all being held by Ameris was sufficient collateral so as not to need life insurance because of the ease for the bank to sell the company if you were to die. After that discussion, we also agreed to drop the life insurance, believing that we were still well collateralized.

Now BB&T has drawn another roadblock for this loan and has stated that they do not want Ameris to hold an assignment in the controlling interest of Foodonics, even though it is not restricted in the loan agreement from what we can read. That has prompted you to request that Ameris Bank only hold the newly acquired shares of stock which would only give us about 43% of the outstanding shares, and effectively no controlling interest in the company.

We believe that without being able to assign controlling interest in Foodonics, that the remaining 43% in truly non-marketable, in that there is little to no one who would pay for the stock and not control the business it was purchasing into, therefore the value as collateral is significantly diminished.   This latest request completely changes the loan from what was originally approved and we are not in a position to make this loan on an unsecured basis. We understand that this is BB&T's position and they hold the cards on you, in that even with there being no restriction in the loan agreement in regards to you assigning the stock as collateral in a personal loan transaction, if they object, you have to comply since they can elect not to renew your line of credit if they are not comfortable.  We also understand that you don't want to subject your business to this type of risk.

All that being said, and in order for us to try to arrive at a position that will work for both of us,  I am going to propose a scenario to you that I think would put sufficient collateral in place that we could go back to our loan committee and request a modification of their approval.  Here is what I would propose:

    1.   We would take as collateral the acquired shares of Foodonics Stock that you do not already own, provided that our position is not further diluted by any further issuance of stock by the company during the life of the loan.
    2.   We would shorten the amortization so that the loan would pay out over 5.5 years (66 months), which would create principal payments of ~$53,000 per month, plus accrued interest, rather than the approved term of 10 years.
    3.   We would increase the interest rate by 0.25% to compensate for the additional risk of a partially secured loan.
    4.   We would re-evaluate the property value of the property owned by Buckhead Equities and currently leased by Ovinte on Buckhead Branch Drive.  If the property has sufficient value, we would consider a mortgage spreader agreement or similar document prepared to spread the mortgage on the Foodonics Property on Edgewood Court over your stock acquisition loan as collateral.  The estimated value based on the 2010 appraisal was $1,000,000.
    5.   We would require you to increase the deposit accounts held with Ameris Bank from the agreed amount of $500,000 to $1,000,000, in either personal or corporate accounts, and we would require those deposits to be held as collateral on your loan until such time as the balance is paid down to the value of the remaining collateral.
    6.   We would agree to begin to release those deposits every 6 months as the loan pays down below the $2,000,000 balance threshold, which would be in approximately 37 months into the loan

Jacques-  We are trying to be as creative as we possibly can to meet your needs.  We have to put together a loan that we believe is within our bank's credit standards.  This loan would start out as approximately $1,500,000 of the loan unsecured, which is a significant compromise by us from where we started this transactions as fully secured, with Life Insurance, and the operating company as a guarantor.   Please note that we are not putting the life insurance back in the requirements

All of us at Ameris hope we can work this out.  The scenario that I have laid out is what all three of us believe we have a reasonable chance of getting the Loan Committee to approve.  Jon has scheduled the Executive Loan Committee to meet Wednesday morning.  If you would like for us to pursue this loan for you under the revised conditions set forth in this email, then I will need to know from you by Monday evening, so I can get a revised package prepared for the presentation.  I hope that you can see that all of us at Ameris are going the extra mile to figure a way to get this done for you.

I am sorry that you are going through all of this.  If BB&T were not talking the stance they are, we would be ready to go.  We actually have had your loan documents ready to go since the last week of September, in case you needed to close quickly. Please understand, that if this structure is agreeable to you, then I am going to have to get new evaluations on Buckhead and Edgewood, and will have to engage an attorney for some if not all of the loan documents to accomplish this.  This is going to take some additional time.   Please also be aware there would be additional closing costs on this and we would not be able to close the loan in Georgia due to the real estate collateral.

FOODONICS_ESI-10114217

close the loan in Georgia due to the real estate collateral.

If you can somehow get BB&T to change their stance and allow the original transaction to take place, you are going to save lots of time and money. We are still agreeable to the commitment letter that you signed, if you can get your primary lender to agree.

One final note, Ameris Bank is big enough and financially capable to handle all of your banking needs. If the BB&T restrictions that they are placing on you are not acceptable to you, we would definitely consider becoming your primary bank and would be interested in refinancing the BB&T debt for you. As both Jon and I expressed, and I believe Andy would agree, we would certainly be interested in becoming your primary bank now or in the future.

Thanks Jacques. Please read this over and let me know how you want me to proceed. Have a good weekend

**Cecil F. Gibson III**
**Ameris Bank** | Market President
11100 San Jose Blvd | Jacksonville, Florida 32223
(O) 904-262-1421 ext 31421 | (C) 904-635-3989 | (F) 904-262-5413
cecil.gibson@amerisbank.com

visit us online at http://commercialbanking.amerisbank.com/banker/CecilGibson

This e-mail and any files transmitted with it are confidential and are intended solely for the use of the individual or entity to which they are addressed. It is not an offer or acceptance, and it is not intended to be all or part of an agreement. If you are not the intended recipient or the person responsible for delivering the e-mail to the intended recipient, be advised that you have received this e-mail in error and that any review, use, dissemination, forwarding, printing, or copying of this e-mail is strictly prohibited. If you have received this e-mail in error, please notify the sender immediately by return e-mail and delete this e-mail from your system. The sender does not accept liability for any damage caused by any virus transmitted by this e-mail or any errors or omissions in the contents of this message which arise as a result of e-mail transmission.

FOODONICS_ESI-10114218