# EXHIBIT C

1

```
                IN THE UNITED STATES DISTRICT COURT
                     MIDDLE DISTRICT OF FLORIDA
                       JACKSONVILLE DIVISION

                     CASE NO.:  3:17-cv-1054-J-32JRK

   FOODONICS INTERNATIONAL, INC.,
   a Florida corporation,

            Plaintiff,

       vs.

   DINA KLEMPF SROCHI, as Trustee of the
   LAURA JEAN KLEMPF REVOCABLE TRUST, a
   Georgia trust,

            Defendant.
   _____

   DINA KLEMPF SROCHI, as Trustee of the
   LAURA JEAN KLEMPF REVOCABLE TRUST, a
   Florida trust, and DENNIS L. BLACKBURN,
   as Assistant Trustee of the JEAN KLEMPF
   TRUST,

            Counter Plaintiffs,

       vs.

   FOODONICS INTERNATIONAL, INC., a
   Florida corporation, and KEVIN
   JACQUES KLEMPF,

            Counterclaim Defendants.
   _____
```

     Video Deposition of **KEVIN JACQUES KLEMPF**, at 345 E.
Forsyth Street, Jacksonville, Duval County, Florida, on
Monday, January 20, 2020, at 9:00 a.m., before Terry T.
Hurley, Registered Professional Reporter, and Notary
Public in and for the State of Florida at Large.

                     - - -

            Hedquist & Associates Reporters, Inc.

2

### A P P E A R A N C E S

JAMES NOLAN, ESQUIRE
Gray Robinson, P.A.
50 N. Laura Street, Suite 1100
Jacksonville, Florida  32202

ANDREW STEIF, ESQUIRE
DANNY BEAN, ESQUIRE
Abel Bean Law P.A.
50 North Laura Street, Suite 2500
Jacksonville, Florida  32202

     Attorneys for Plaintiff/Counter Defendant

JAMES H. POST, ESQUIRE
R. CHRISTOPHER DIX, ESQUIRE
MICHAEL DEMONT, ESQUIRE
Smith Hulsey & Busey
One Independent Drive, Suite 3300
Jacksonville, Florida  32202

     Attorneys for Defendant/Counterclaim Plaintiff

ALSO PRESENT:   Dennis Blackburn, Esquire

                     - - -

Hedquist & Associates Reporters, Inc.

3

### I N D E X

Witness:   KEVIN JACQUES KLEMPF

                                        Page

DIRECT EXAMINATION
   By Mr. Post--------------------006

Hedquist & Associates Reporters, Inc.

4

### E X H I B I T S

| No. | Page |
|---|---|
| No. 01 | 006 |
| No. 02 | 007 |
| No. 03 | 008 |
| No. 04 | 016 |
| No. 05 | 017 |
| No. 06 | 018 |
| No. 07 | 018 |
| No. 08 | 018 |
| No. 09 | 019 |
| No. 10 | 019 |
| No. 11 | 021 |
| No. 12 | 022 |
| No. 13 | 025 |
| No. 14 | 026 |
| No. 15 | 028 |
| No. 16 | 028 |
| No. 17 | 039 |
| No. 18 | 030 |
| No. 19 | 030 |
| No. 20 | 036 |
| No. 21 | 036 |
| No. 22 | 037 |
| No. 23 | 042 |
| No. 24 | 045 |
| No. 25 | 046 |
| No. 26 | 052 |
| No. 27 | 059 |
| No. 28 | 073 |
| No. 29 | 090 |
| No. 30 | 109 |
| No. 31 | 111 |
| No. 32 | 140 |
| No. 33 | 154 |
| No. 34 | 161 |
| No. 35 | 170 |
| No. 36 | 175 |
| No. 37 | 178 |

Hedquist & Associates Reporters, Inc.

EXHIBITS (CONT.)

No. 38------------------------178
No. 39------------------------191
No. 40------------------------199
No. 41------------------------199
No. 42------------------------204
No. 43------------------------205
No. 44------------------------205
No. 45------------------------207
No. 46------------------------209
No. 47------------------------209
No. 48------------------------216
No. 49------------------------220
No. 50------------------------221
No. 51------------------------224
No. 52------------------------228
No. 53------------------------232
No. 54------------------------232
No. 55------------------------233
No. 56------------------------239
No. 57------------------------241
No. 58------------------------244

- - -

---

THE VIDEOGRAPHER: We are now on the video record at 8:54 a.m. for the videotaped deposition of Mr. Kevin Klempf.

Would all counsel please state your appearance for the record.

MR. POST: Good morning. Jim Post on behalf of the Jean Klempf Trust, together with Chris Dix and Mike Demont, and Dennis Blackburn, co-counsel, is in the room as well.

MR. STEIF: Andrew Steif with Abel Bean on behalf of Jacques Klempf, along with Dan Bean, and Jim Nolan from Gray Robinson.

KEVIN JACQUES KLEMPF, having been produced and first duly sworn as a witness, testified as follows:

MR. POST: For the record, we also have Dina Klempf Srochi listening in only on this deposition. Dina, will you please put your phone on moot, if you haven't already.

DIRECT EXAMINATION

BY MR. POST:

Q Mr. Klempf, state your name for the record.
A **I'm Kevin Jacques Klempf.**
(Exhibit No. 1 was marked for identification.)
Q Mr. Klempf, I'm showing you a document which has been marked as Exhibit 1 to this deposition. It's a copy of a declaration you signed on August 30, 2019, filed in this case September 5, 2019; correct?
A **I'm just going through the document. It looks correct.**
Q In paragraph 17 on the last page you acknowledge each of these declarations under the penalty of perjury; correct?
A **Yes.**
Q Looking at paragraph 15, please.
A **Okay.**
Q You state that the home located at 815 Ponte Vedra Boulevard is now titled in the name of the Kevin Jacques Klempf Living Trust; correct?
A **That's correct.**
(Exhibit No. 2 was marked for identification.)
Q I'm showing you a document marked as Exhibit 2 to this deposition titled Special Warranty Deed, dated January -- July 10, 2019.

This deed shows that Foodonics transferred title to your Trust on July 10, 2019; correct?
A **Correct.**
Q The sales price for this transaction listed in the St. Johns County property appraiser website lists $5,104,000. Was that the sales price?
A **I don't see that in this document, so I don't know how to answer the question.**
Q Do you recall what the sales price was?
A **There was debt on the Foodonics books that was -- you know, to me, and so it transferred over. I had my accountants, you know, look at the transaction.**
(Exhibit No. 3 was marked for identification.)
Q I'm showing you what's been -- a document marked in this deposition as Exhibit 3. I'll represent to you that this is off the St. Johns County website, and on the second page it shows -- under sale information it refers to the transfer of Foodonics to your Trust, the top line; correct?
A **Correct.**
Q And it shows a sales price of $5,104,100; correct?
A **Correct.**
Q Do you know how that sales price was determined?
A **Not exactly, no.**
Q What was the value of that property at the time of its transfer?
A **I don't -- I don't know.**
Q It was at least $5.1 million; correct?

9

1  A   According to the county, yes.
2  Q   What other assets are owned by the Trust prior
3  to the transfer of this property?
4  A   What other assets are owned by the Trust?
5  Q   Yes.
6  A   I mean, personal property. You know, just my
7  personal property.
8  Q   Any real property?
9  A   Yes.
10 Q   Besides -- besides this home, is there any real
11 property in the Trust?
12 A   Yes.
13 Q   What is that?
14 A   You know, I'm just -- we have -- there's a
15 place in New York that's in my Trust.
16 Q   And you say personal property as well?
17 A   Yeah, personal property like, you know, other
18 assets.
19 Q   Are you the only beneficiary of your Trust?
20 A   No.
21 Q   Are you the primary beneficiary of your Trust?
22 A   Well, I am the beneficiary of my Trust, but
23 then upon my death my family would be the -- you know,
24 the beneficiaries.
25 Q   You're the beneficiary and the trustee;

Hedquist & Associates Reporters, Inc.

10

1  correct?
2  A   Correct.
3  Q   So in your affidavit, your declaration,
4  paragraph 15 states the transfer was anticipated to
5  occur before the Trust asserted its claims.
6      Do you see that?
7  A   Yes.
8  Q   Would you explain that?
9  A   What part?
10 Q   That the transfer was anticipated to occur
11 before the Trust asserted its claims.
12 A   I mean, the Trust knew about the property that
13 was on Foodonics' books. I don't understand your
14 question.
15 Q   What about the transfer; when was that first
16 determined to happen?
17 A   The transfer to my Trust?
18 Q   Yes.
19 A   It occurred in 2019.
20 Q   Right. But when did you decide it was going --
21 when did you first determine that was going to happen?
22 A   I don't know when I first decided that was
23 going to happen.
24 Q   So when your -- your declaration says this
25 transfer was anticipated to occur before the Trust

Hedquist & Associates Reporters, Inc.

11

1  asserted its claims is based on what?
2  A   I didn't write this document. You know, I had
3  the advice of my legal counsel. You would have to ask
4  them.
5  Q   So that's your lawyers' language?
6  A   Yes, it is.
7  Q   And sitting here today you can't remember when
8  you first had the idea of moving that property from
9  Foodonics to you personally?
10 A   I didn't know exactly when I was going to move
11 it to me personally, no.
12 Q   What about generally; what year?
13 A   Not generally either.
14 Q   Did you have that intent in 2018?
15 A   I couldn't tell you. I can't give you the
16 answer that you're asking for. I mean, I don't know.
17 Q   Okay.
18 A   It was an asset of Foodonics, and I didn't know
19 when it was going to happen.
20 Q   When did you first decide that it might happen?
21     MR. STEIF: Objection. Asked and answered.
22 A   You've asked the question three different
23 times, and I can't give you a different answer, or the
24 one you want, I guess.
25 Q   It's your declaration.

Hedquist & Associates Reporters, Inc.

12

1      MR. DEMONT: Dina texted me and said she can't
2  hear, and she asked if I can call her on my phone.
3  Does anybody object?
4      MR. STEIF: Sounds okay.
5  Q   Paragraph 15 also states that the Jean Klempf
6  Trust was aware that the -- this property was an asset
7  of Foodonics prior to the execution of -- of the
8  redemption agreement.
9      Do you see that?
10 A   Yeah, I see that.
11 Q   Is that -- what is that? Can you please
12 explain that?
13     MR. STEIF: Object to form.
14 A   I mean, what's to explain?
15 Q   What -- what -- what knowledge did the Trust
16 have, and -- and -- and who did it get it from?
17 A   It's my understanding the Trust had all the
18 financials of Foodonics. We have certified audited
19 statements. All of the assets of Foodonics are on those
20 statements, and -- and -- and you had access to all of
21 that, or the Trust had access to all of that.
22 Q   So you think the Trust had access to that
23 information prior to December 31st, 2018?
24 A   Absolutely.
25 Q   The certified financial statements for 2015 had

Hedquist & Associates Reporters, Inc.

**Page 13**

1 not yet been audited -- created -- or issued as of that
2 date; correct?
3 **A That's correct, but they also had interim**
4 **statements, they had access to anything that was asked.**
5 Q Do you remember specifically giving --
6 **A No.**
7 Q -- Jean Klempf or her representatives --
8 MR. STEIF: Let him finish his question.
9 Q -- those financial documents?
10 **A No, I do not remember.**
11 Q Paragraph 15 also states the property was
12 titled in the Trust's name, and repayment of debt that
13 Foodonics owed you -- owed me personally.
14 Can you explain that?
15 **A Yeah. I mean, I financed some property that we**
16 **transferred into Foodonics' books. It was about this**
17 **amount, and so Foodonics owns that property. It was**
18 **debt. I had owned it previously.**
19 THE WITNESS: Little face time.
20 MR. POST: Sorry about that.
21 THE WITNESS: Haven't seen her in a while.
22 Q What debt did the company owe you?
23 **A I owned some -- some commercial property that I**
24 **transferred into Foodonics, into one of the band**
25 **companies, and that debt was recorded, owed to me, so**

Hedquist & Associates Reporters, Inc.

**Page 14**

1 **that's what I'm talking about.**
2 Q What property was that?
3 **A There were a couple different pieces of**
4 **property. The one on -- in Riverside, and the one on**
5 **Bay Street.**
6 Q And when were those transfers made?
7 **A I couldn't tell you exactly when they were**
8 **made. It was sometime between 2015 and 2019. It**
9 **wouldn't have been -- it would have been 2016 to 2019,**
10 **sometime in that range. I don't know exactly when.**
11 Q Do you know what those properties are worth?
12 **A I know what we paid -- or what I paid for them.**
13 Q What was that?
14 **A I don't have those numbers in front of me, so I**
15 **couldn't give you exact numbers, but it was enough to**
16 **warrant this transfer.**
17 Q In excess of $5 million?
18 **A I -- I -- probably. I don't have the numbers**
19 **in front of me to give you exact numbers.**
20 Q So your -- you now claim this property as your
21 homestead property; correct?
22 **A Correct.**
23 Q Your prior homestead property is located at 530
24 Ponte Vedra Boulevard; correct?
25 **A Correct.**

Hedquist & Associates Reporters, Inc.

**Page 15**

1 Q And that is presently listed for sale for
2 $4.5 million; correct?
3 **A That's correct.**
4 Q Is there any mortgage on that -- on the 530
5 Ponte Vedra property at this time?
6 MR. STEIF: Object to form.
7 **A Yes, there is a mortgage.**
8 Q How much is that?
9 **A I don't have the exact number, but it's close**
10 **to 2 million.**
11 Q Who is that owed to?
12 MR. STEIF: Object to form. Go ahead.
13 **A It's owed to Ameris Bank.**
14 Q So, Mr. Klempf, your father Edward Klempf and
15 your mother Jean Klempf were married 49 years until your
16 father died in 2002; correct?
17 **A That's correct. I thought they were married**
18 **50, but -- or a little more than 50.**
19 Q And they had three children: You -- you, Dina,
20 and Marc; correct?
21 **A Yeah. Not quite in that order.**
22 Q Marc's the oldest?
23 **A Correct.**
24 Q And you're the middle?
25 **A I am.**

Hedquist & Associates Reporters, Inc.

**Page 16**

1 Q I'm going to show you a few copies of these
2 photos for the record so we can match names with faces.
3 (Exhibit No. 4 was marked for identification.)
4 Q This is a picture of your father and members of
5 his management team in one of egg producing facilities
6 he established for the company; correct?
7 **A I recognize my father, but I don't think I**
8 **recognize the other individuals.**
9 Q Your father is in the middle; correct?
10 **A Yes, he is.**
11 Q And this is the facility in Blackshear,
12 Georgia; correct?
13 **A You know, I was just trying to determine that.**
14 **I don't know that it is. It could be. You know, we had**
15 **a processing facility in Jacksonville as well for a**
16 **period of time, and it's -- it's hard to say. This**
17 **could be Jacksonville, or it could have been Blackshear.**
18 Q And this picture was taken in 1968, or
19 thereafter; correct?
20 **A I have no idea when this picture was taken. I**
21 **was a child.**
22 Q Well, the Blackshear facility started in 1968;
23 correct?
24 **A I couldn't give you the exact year, but it was**
25 **in the early 70's that I think we really started getting**

Hedquist & Associates Reporters, Inc.