# EXHIBIT D

IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

CASE NO.: 3:17-cv-1054-J-32JRK

FOODONICS INTERNATIONAL, INC.,
a Florida corporation,

    Plaintiff,

vs.

DINA KLEMPF SROCHI, as Trustee of the
LAURA JEAN KLEMPF REVOCABLE TRUST, a
Georgia trust,

    Defendant.
_____

DINA KLEMPF SROCHI, as Trustee of the
LAURA JEAN KLEMPF REVOCABLE TRUST, a
Florida trust, and DENNIS L. BLACKBURN,
as Assistant Trustee of the JEAN KLEMPF
TRUST,

    Counter Plaintiffs,

vs.

FOODONICS INTERNATIONAL, INC., a
Florida corporation, and KEVIN
JACQUES KLEMPF,

    Counterclaim Defendants.
_____

Deposition of **KEVIN JACQUES KLEMPF**, at 345 E. Forsyth Street, Jacksonville, Duval County, Florida, on Tuesday, March 10, 2020, at 9:00 a.m., before Terry T. Hurley, Registered Professional Reporter, and Notary Public in and for the State of Florida at Large.

- - -

Hedquist & Associates Reporters, Inc.

---

A P P E A R A N C E S

DANIEL BEAN, ESQUIRE
ANDREW STEIF, ESQUIRE
Abel Bean Law P.A.
50 North Laura Street, Suite 2500
Jacksonville, Florida 32202

    Attorneys for Plaintiff/Counter Defendant

JAMES H. POST, ESQUIRE
MICHAEL DEMONT, ESQUIRE
CHRISTOPHER DIX, ESQUIRE
Smith Hulsey & Busey
One Independent Drive, Suite 3300
Jacksonville, Florida 32202

    Attorneys for Defendant/Counterclaim Plaintiff

ALSO PRESENT: Dennis Blackburn, Esquire

- - -

Hedquist & Associates Reporters, Inc.

---

I N D E X

Witness: KEVIN JACQUES KLEMPF

Page

DIRECT EXAMINATION
  By Mr. Post--------------------257
CROSS EXAMINATION
  By Mr. Steif-------------------448
REDIRECT EXAMINATION
  By Mr. Post--------------------470
RECROSS EXAMINATION
  By Mr. Steif-------------------476
FURTHER REDIRECT EXAMINATION
  By Mr. Post--------------------479

E X H I B I T S

No. 059------------------------257
No. 060------------------------257
No. 061------------------------259
No. 062------------------------264
No. 063------------------------268
No. 064------------------------279
No. 065------------------------284
No. 066------------------------290
No. 067------------------------294
No. 068------------------------300
No. 069------------------------300
No. 070------------------------305
No. 071------------------------309
No. 072------------------------312
No. 073------------------------319
No. 074------------------------322
No. 075------------------------325
No. 076------------------------332
No. 077------------------------336
No. 078------------------------339
No. 079------------------------341

Hedquist & Associates Reporters, Inc.

---

No. 080------------------------344
No. 081------------------------347
No. 082------------------------350
No. 083------------------------359
No. 084------------------------359
No. 085------------------------361
No. 086------------------------362
No. 087------------------------366
No. 088------------------------372
No. 089------------------------376
No. 090------------------------377
No. 091------------------------379
No. 092------------------------380
No. 093------------------------383
No. 094------------------------384
No. 095------------------------387
No. 096------------------------390
No. 097------------------------393
No. 098------------------------396
No. 099------------------------397
No. 100------------------------400
No. 101------------------------401
No. 102------------------------408
No. 103------------------------410
No. 104------------------------415
No. 105------------------------422
No. 106------------------------427
No. 107------------------------429
No. 108------------------------431
No. 109------------------------433

Hedquist & Associates Reporters, Inc.

## Page 445

1   believe he called me, and then I talked to him, and,
2   like I said, you know, apologized for, you know, the
3   subpoena, or whatever he's going to get whenever he gets
4   it, and that -- being dragged into this.
5   Q   Did you discuss anything else with him in that
6   call?
7   A   Not really.
8   Q   Well, I don't understand not really. That's
9   kind of vague. I mean, what else did you discuss in
10  that call, if anything, relating to this lawsuit?
11  A   I apologized for having him dragged into it. I
12  said, but I've got to defend myself. And he made some
13  comment that, you know, there was never -- this is the
14  best of my recollection, and again he just said we never
15  had any intent to purchase Dixie, or that was never our
16  intent. And I said, well, they're going to ask you all
17  the questions, and just tell them honest answers.
18  Q   So for him to say that what you just said he
19  said you must have brought up -- you must have
20  discussed --
21  A   He knows what it's about.
22  Q   -- the subject of the lawsuit.
23  A   Yeah. Well, yeah, he -- I don't know exactly
24  why he brought -- why he said that. I think he may have
25  the subpoena, or he may have information related to this

## Page 446

1   case, but he knows he's being deposed.
2   Q   Did he get that kind of information from you in
3   the phone call?
4   A   No.
5   Q   Or otherwise?
6   A   No. He already knew about it.
7   Q   Well, I guess if this -- this phone call took
8   place after your lawyers had talked to him; right?
9   A   I don't believe my lawyers have talked to him.
10  Q   Did you discuss this case with Dolph Baker?
11  A   No.
12  Q   No phone calls?
13  A   No, I mean, other than in the very beginning.
14  You know, I apologized to him too for getting dragged
15  into this and the evasiveness of this action. But
16  nothing -- nothing else.
17      That was probably two years ago.
18  Q   Let's see. This case was filed by you all in
19  September 2017, I think. So you've -- or sometime in
20  the fall of 2017.
21  A   Yeah. I don't recall either.
22  Q   So you -- would this phone call have taken
23  place sometime around that time?
24  A   I can't say for sure.
25  Q   And that's the only call you've had with

## Page 447

1   Mr. Baker?
2   A   Oh, no, no, no. We've -- I've talked to him a
3   time or two regarding just different things. I mean,
4   we're friends. He asks about my family, I ask about his
5   family. You know, he knows I'm a grandfather. He asks
6   about my kids. Yeah.
7       I mean, he -- you know, for a while we were
8   working on this fertilizer project, so we continued to
9   have some conversations, but it was just about the
10  fertilizer project.
11  Q   But in none of those conversations did you
12  discuss this case?
13  A   No.
14      MR. POST: I tender the witness.
15      MR. BEAN: So we can proceed now. We've been
16  working with Gray Robinson's discovery person. Your
17  discovery request obviously runs to the present in
18  some situations, so there will be additional
19  documents produced. Whether you want to continue
20  the deposition until you get those documents, or we
21  can proceed. However you want to go.
22      MR. STEIF: Right. Meaning if we leave it open
23  to be continued we would do our cross at the end of
24  your subsequent examination.
25      MR. BEAN: Just like there's a privilege log

## Page 448

1   issue as to a couple issue. Those are waiting to
2   see how the special master resolves those issues.
3       MR. POST: Can we go off the record?
4       MR. BEAN: Sure.
5       THE VIDEOGRAPHER: Off the record at 4:13.
6       (Short break.)
7       THE VIDEOGRAPHER: Back on the record at 4:23.
8           CROSS EXAMINATION
9   BY MR. STEIF:
10  Q   All right. Mr. Klempf, I'm going to ask you
11  some -- some questions for purposes of cross-
12  examination.
13      You recall that you were asked about the home
14  at 815 Ponte Vedra Boulevard on the first day of your
15  deposition?
16  A   I do.
17  Q   Is that your current homestead property?
18  A   It is.
19  Q   Do you recall being shown your declaration,
20  your affidavit in which you've talked about that
21  property?
22  A   Yes.
23  Q   Was everything you testified to in that
24  document truthful and accurate?
25  A   Yes.

1 Q Was the 815 Ponte Vedra property titled from
2 Foodonics to your trust?
3 A Yes.
4 Q Did Foodonics owe certain debt to you that
5 supported that transfer?
6 A Yes.
7 Q In approximately what amount?
8 A It was close to what Foodonics paid for the
9 property.
10 Q What generally was the basis for that debt
11 being owed?
12 A Renovations that I paid for for Cowford
13 Chophouse and other items.
14 Q Was the trust aware of the purchase of the
15 Cowford Chophouse property?
16 A It was definitely on the Foodonics books.
17 Q Was the -- and to your point, was the debt in
18 the financial statements of Foodonics?
19 A The debt? Well, when we purchased the
20 Cowford -- the building, the Bostwick building, it was
21 on the books for what we paid for it.
22 Q And what accountant, if any, reviewed and
23 approved that transaction?
24 A Billy Morrow with BDO.
25 Q Would you defer to Mr. Morrow regarding which

1 financial documents support that transaction?
2 A Yeah, he would be the best one.
3 Q Do you recall that we also talked about the 530
4 Ponte Vedra property?
5 A Correct.
6 Q Is that your most recent prior homestead?
7 A It is.
8 Q And is that property owned by you individually?
9 A It is.
10 Q Did you purchase it as an individual?
11 A I did.
12 Q Has it ever been owned by Foodonics?
13 A No.
14 Q And are you now the sole owner of that
15 property?
16 A I am.
17 Q Did you take a loan from the company for the
18 down payment on that property?
19 A I did.
20 Q Was that loan repaid to the company with
21 interest?
22 A It was.
23 Q Approximately when did that occur?
24 A I believe it was in 2015 December.
25 Q Okay. And what documents would show that?

1 A John Stevens, the 2015 return -- my return and
2 the corporate return.
3 Q Do you recall that on the first day of your
4 deposition we talked about the Foodonics board of
5 directors?
6 A Correct.
7 Q Did Foodonics actually have a board of
8 directors at all times?
9 A Yes.
10 Q Was this all the way through the CalMaine sale?
11 A Yes.
12 Q And afterwards?
13 A Afterwards, yes.
14 Q Were you on that board?
15 A I was on that board.
16 Q Did the Foodonics board hold appropriate
17 meetings?
18 A And minutes, yes.
19 Q Although it was just you, if something needed
20 board approval, was that done appropriately?
21 A Yes.
22 Q Do you recall that you were asked on -- also on
23 the first day about the control that you had over
24 company events?
25 A Yes.

1 Q Did you also bear the risk for Foodonics
2 company decisions?
3 A 100 percent.
4 Q And how about the potential liability?
5 A 100 percent.
6 Q Did you ever do anything to put pressure on
7 your siblings or your mother to enter into the 2006
8 shareholders agreement?
9 A No.
10 MR. POST: Objection to form.
11 Q Okay. Did you ever do anything to put pressure
12 on your siblings to enter into the 2006 shareholders
13 agreement?
14 MR. POST: Objection to form.
15 A No.
16 Q Did you ever do anything to put pressure on
17 your mother to enter into the 2006 shareholders
18 agreement?
19 MR. POST: Objection.
20 A No.
21 Q Did you do anything to put pressure on your
22 siblings to sign or agree to the 2015 redemption?
23 MR. POST: Objection.
24 A No.
25 Q Did you do anything to put pressure on the

1 Can I just show you that briefly?
2  A  **Uh-huh.**
3  Q  Do you actually have any idea what she thought
4 at that time?
5     MR. POST: Objection.
6  A  **I don't. I mean, there's a lot of different**
7 **things written on this. That's the first time I ever**
8 **saw it was today, so I don't know.**
9  Q  Was that document, if accurate, created well
10 after the sale to CalMaine?
11    MR. POST: Objection.
12 A  **Oh, yes. It was soon after she got my letter,**
13 **I guess.**
14 Q  If you wanted to know about what was included
15 in the agreement would you look at the agreement and the
16 contemporaneous documents relating to it?
17    MR. POST: Objection.
18 A  **You're talking about the 2015?**
19 Q  Right.
20 A  **Yes.**
21 Q  Okay. You were shown an Opal Foods IPO
22 preparation overview.
23    Do you recall that?
24 A  **Yeah, I recall it.**
25 Q  Is Foodonics or you personally mentioned

1 anywhere in that document?
2  A  **I do not see that. This looks like just a**
3 **boilerplate document for any company that might go IPO.**
4     MR. STEIF: Okay. We're going to take
5 30 seconds, and we'll -- I think we're going to wrap
6 it up.
7     THE VIDEOGRAPHER: Going off record at 4:45.
8     (Short break.)
9     MR. STEIF: We're finished.
10    THE VIDEOGRAPHER: We are back on the record at
11 4:55.
12         REDIRECT EXAMINATION
13 BY MR. POST:
14 Q  So, Mr. Klempf, you answered so quickly and so
15 earnestly to all the questions Mr. Steif asked you. Had
16 you seen or heard those questions before today?
17 A  **We reviewed my deposition.**
18 Q  And you rehearsed these answers and questions?
19    MR. STEIF: Object to form.
20 A  **I don't know that I rehearsed them, but I knew**
21 **the questions they had about the deposition, yeah.**
22 Q  And you were prepared to give those answers
23 today?
24 A  **Yeah.**
25 Q  Did you ever show the Dream Team analysis to

1 anyone at SMK?
2  A  **Not to my knowledge.**
3  Q  Did you show it to anyone at Grier Robinson?
4  A  **Maybe. I'm not positive. I may have shared it**
5 **with Grier, or someone.**
6  Q  You don't recall one way or the other?
7  A  **I do not recall one way or the other. I mean,**
8 **they certainly weren't going to be anyone to back the**
9 **Dream Team.**
10 Q  They must have -- did they help you when you
11 did the nondisclosure agreement with people like Opal
12 Foods?
13    MR. STEIF: Objection. Outside the scope of
14 cross. Go ahead.
15 A  **No.**
16 Q  You mentioned that you had documents that
17 evidence the debt that supported the value of your
18 purchase of the 815 Ponte Vedra Boulevard; correct?
19 A  **There was a note receivable on the Foodonics**
20 **books to me.**
21 Q  On the books. Not a -- there wasn't a written
22 note?
23 A  **I don't believe it was a written note, no.**
24 Q  And what was the basis --
25 A  **There was a written note. I'm sorry.**

1  Q  There was a written note?
2  A  **Yeah. I believe there was, yes. That would**
3 **have been money spent to renovate Cowford and other**
4 **projects we had been working on.**
5  Q  A note signed by who; by you?
6  A  **Yes.**
7  Q  To who?
8  A  **I'm not sure I understand your question.**
9  Q  Who did you have the note to?
10 A  **We transferred the property into Foodonics'**
11 **name, so a note was created for Foodonics to pay me that**
12 **amount of money at some point in time.**
13 Q  So you created the note on the same day that it
14 was paid?
15 A  **No, no. The note was created a year or two**
16 **prior.**
17 Q  By who?
18 A  **Driver McAfee created the note.**
19 Q  And did you use your personal funds?
20 A  **Yes.**
21 Q  And so the note was to you?
22 A  **Yes.**
23 Q  And who was it from; Foodonics?
24 A  **Yes.**
25 Q  Foodonics didn't have the money to fund that?

1 A I don't know. I don't believe so.
2 Q Why would they have -- why would they have --
3 why would Foodonics have to borrow money from you when
4 it received all the money from the CalMaine sale?
5 A Well, I mean, I -- I have a note receivable to
6 Foodonics as well.
7 Q What note is that?
8 A You would have to get with Billy Morrow with
9 BDO, but I owe Foodonics money as well.
10 Q How much?
11 A I don't know the exact amount.
12 MR. POST: Are these notes going to be in our
13 second production?
14 MR. BEAN: I haven't seen it.
15 MR. POST: I hope they are. I would ask that
16 they be produced, if they exist.
17 MR. STEIF: Understood. Got it.
18 Q So let's look again at these exhibits. 80 is
19 the settlement and redemption agreement, 82 is the
20 agreement concerning gift and estate taxes, and 81 is
21 the SMK valuation.
22 A Uh-huh.
23 Q The settlement and redemption agreement says
24 that you're going to pay your mother -- let's see.
25 Let's look at the second page of the document, end of

1 the first recital. You're going to pay your mother the
2 adequate and full consideration for her shares in the
3 company based on an appraisal fairly conducted according
4 to usual and customary valuation practices. Right?
5 A Right.
6 Q And that appraisal was the one that was
7 produced by SMK on December 16, 2015; correct?
8 MR. STEIF: Object to form.
9 A Correct.
10 Q And if you look at the SMK appraisal, in the
11 first sentence says: Enclosed is the appraisal report
12 expressing our opinion of the fair market value of the
13 shares of the Class A voting common stock and Class B
14 nonvoting common stock of Foodonics International as of
15 September 30, 2015, held by the Laura Jean Klempf
16 Revocable Trust; correct?
17 A Correct.
18 Q So SMK is saying that they're doing a fair
19 market valuation; right?
20 MR. STEIF: Object to form.
21 A I mean, that's what SMK is saying.
22 Q And that's what the cover letter says on the --
23 of the attached report: Determination of the appraised
24 fair market value. Correct?
25 A Correct.

1 Q And the page -- the next page after the cover
2 page, Limiting Conditions and Assumptions --
3 A Which page?
4 Q It's one little i on the bottom right-hand
5 side.
6 A Okay.
7 Q Limiting Conditions and Assumptions.
8 Paragraph 2. The standard value used in this valuation
9 is fair market value. Right?
10 A That's what it says.
11 Q And if we look at the agreement concerning gift
12 and estate taxes, 82, under Paragraph D.
13 A Okay.
14 Q It says: SMK has prepared a valuation report
15 setting forth the fair market value of the redeemed
16 shares dated December 28, 2015. Right?
17 A Correct.
18 Q So how can you say that the 2015 redemption
19 agreement was based on a 2006 formula when there are all
20 these documents showing that your mother is being
21 provided fair market value of her shares?
22 MR. STEIF: Object to form.
23 A I'm saying the 2006 shareholder agreement was
24 the basis of a formula.
25 Dan Edelman had the value of the shares in

1 October, and I believe he and Jim Nolan asked for SMK to
2 provide a valuation that could back into his number.
3 Q Well, regardless of how he started the process,
4 this is how it ended up; right?
5 MR. STEIF: Object to form.
6 Q The fair market value of your mother's shares
7 was being provided to her pursuant to this agreement.
8 A Okay.
9 Q Don't you agree?
10 A That's what I -- that's what I understand.
11 Q That's what these documents say; right?
12 MR. STEIF: Object to form.
13 A Right.
14 MR. POST: No further questions.
15 RECROSS EXAMINATION
16 BY MR. STEIF:
17 Q Okay. Can you take a look at that settlement
18 and redemption agreement just briefly.
19 A Sure.
20 Q Recital A. You recall being asked about that?
21 A Right.
22 Q Is there -- were there any SMK appraisals prior
23 to 2015?
24 A Yes.
25 Q What appraisal year is being referenced in